Nos. 22, 50281, 22-50283, 22-50312

IN THE UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA, )
 )
  Plaintiff-Appellee, )
 )
  v. )
 )
TRAVIS SCHLOTTERBECK and )
JAMES VLHA, )
 )
  Defendant-Appellant. )
 )

———————

**APPELLANTS' JOINT EXCERPTS OF RECORD
VOLUME 1 OF 3**

———————

Appeal from the United States District Court
for the Central District of California

No. 19-cr-00343-GW
Hon. George H. Wu, United States District Judge

Jerome J Haig (131903)
Law Office of Jerome J Haig
21143 Hawthorne Boulevard Suite 454
Torrance, CA 90503
Telephone: 424-488-0686
Facsimile: 424-271-5990

Attorney for Defendant-Appellant
**JAMES VLHA**

Edward M. Robinson (126244)
Rachael A. Robinson (313991)
Law Office of Edward M. Robinson
21515 Hawthorne Boulevard, Suite 730
Torrance, CA 90502
Telephone: (310) 316-9333
Facsimile: (310) 316-6442

Attorneys for Defendant-Appellant
**TRAVIS SCHLOTTERBECK**

# United States District Court
# Central District of California

| UNITED STATES OF AMERICA vs. | Docket No. | CR 19-343-GW | JS 3 |
|---|---|---|---|

**Defendant**    1. TRAVIS SCHLOTTERBECK

akas: _____

**Social Security No.** 7   4   2   3

(Last 4 digits)

## JUDGMENT AND PROBATION/COMMITMENT ORDER

In the presence of the attorney for the government, the defendant appeared in person on this date.

| | MONTH | DAY | YEAR |
|---|---|---|---|
| | 11 | 17 | 2022 |

**COUNSEL**    **Edward M. Robinson; Rachael A. Robinson, Retained**

(Name of Counsel)

**PLEA**    ☑ **GUILTY,** and the court being satisfied that there is a factual basis for the plea.    ☐ **NOLO CONTENDERE**    ☐ **NOT GUILTY**

**FINDING**    There being a finding/verdict of **GUILTY,** defendant has been convicted as charged of the offense(s) of:

**18 U.S.C. § 371: CONSPIRACY; and 18 U.S.C. § 922(d)(1): SALE OF A FIREARM TO A FELON as charged in Counts 1 and 3 of the Indictment.**

**JUDGMENT AND PROB/ COMM ORDER**    The Court asked whether there was any reason why judgment should not be pronounced. Because no sufficient cause to the contrary was shown, or appeared to the Court, the Court adjudged the defendant guilty as charged and convicted and ordered that: Pursuant to the Sentencing Reform Act of 1984, it is the judgment of the Court that the defendant is hereby committed to the custody of the Bureau of Prisons to be imprisoned for a term of: **THREE (3) MONTHS.**

It is ordered that the defendant shall pay to the United States a special assessment of $200, which is due immediately.

It is ordered that the defendant shall pay to the United States a total fine of $50,000, consisting of the following: Counts 1 and 3, a fine of $50,000. The total fine shall bear interest as provided by law. Fine will not be paid until appeal is resolved.

The defendant shall comply with Second Amended General Order No. 20-04.

This recommendation includes language regarding an order of forfeiture in anticipation that, by the time of sentencing, the Government will have sought such an order. At this time, the Probation Officer is not aware that an order of forfeiture has been issued. In the event that no order has been issued by the time of sentencing, the forfeiture language will not be applicable.

Pursuant to the Sentencing Reform Act of 1984, it is the judgment of the Court that the defendant, Travis Schlotterbeck, is hereby committed on Counts 1 and 3 of the Indictment to the custody of the Bureau of Prisons for a term of three (3) months. This consists of three (3) months on each of Counts 1 and 3 of the Indictment, to be served concurrently.

The Court recommends that the Bureau of Prisons evaluate the defendant's eligibility for the 500-hour drug treatment program (RDAP), conduct a mental health evaluation of the defendant, and provide all necessary treatment.

Upon release from imprisonment, the defendant shall be placed on supervised release for a term of three years under the following terms and conditions:

1.    The defendant shall comply with the rules and regulations of the United States Probation Office and Second Amended General Order 20-04.

2.    During the period of community supervision, the defendant shall pay the special assessment and fine in accordance with this judgment's orders pertaining to such payment.

ER002

USA vs.   **2. TRAVIS SCHLOTTERBECK**             Docket No.:   **CR 19-343-GW**

3.        The defendant shall cooperate in the collection of a DNA sample from the defendant.

4.        The defendant shall participate in mental health treatment, which may include evaluation and counseling, until discharged from the program by the treatment provider, with the approval of the Probation Officer.

5.        As directed by the Probation Officer, the defendant shall pay all or part of the costs of the Court-ordered treatment to the aftercare contractors during the period of community supervision. The defendant shall provide payment and proof of payment as directed by the Probation Officer. If the defendant has no ability to pay, no payment shall be required.

6.        The defendant shall submit his person, property, house, residence, vehicle, papers, computers (as defined in 18 U.S.C. § 1030(e)(1)), cell phones, other electronic communications or data storage devices or media, email accounts, social media accounts, cloud storage accounts, or other areas under the defendant's control, to a search conducted by a United States Probation Officer or law enforcement officer. Failure to submit to a search may be grounds for revocation. The defendant shall warn any other occupants that the premises may be subject to searches pursuant to this condition. Any search pursuant to this condition will be conducted at a reasonable time and in a reasonable manner upon reasonable suspicion that the defendant has violated a condition of his supervision and that the areas to be searched contain evidence of this violation.

The Court authorizes the Probation Officer to disclose the Presentence Report, and any previous mental health evaluations or reports, to the treatment provider. The treatment provider may provide information (excluding the Presentence report), to State or local social service agencies (such as the State of California, Department of Social Service), for the purpose of the client's rehabilitation.

Self-surrender is stayed pending resolution of appeal.

The Government's request to dismiss the remaining counts of the underlying Indictment is granted.

The Court advises defendant of his rights to an appeal. Bond is exonerated upon reporting to the U.S. Probation Office. Bond not required on appeal.

In addition to the special conditions of supervision imposed above, it is hereby ordered that the Standard Conditions of Probation and Supervised Release within this judgment be imposed. The Court may change the conditions of supervision, reduce or extend the period of supervision, and at any time during the supervision period or within the maximum period permitted by law, may issue a warrant and revoke supervision for a violation occurring during the supervision period.

| | |
|---|---|
| November 17, 2022 | *George H. Wu* |
| Date | HON. GEORGE H. WU, U. S. District Judge |

It is ordered that the Clerk deliver a copy of this Judgment and Probation/Commitment Order to the U.S. Marshal or other qualified officer.

Clerk, U.S. District Court

| | | |
|---|---|---|
| November 17, 2022 | By | /s/ Javier Gonzalez |
| Filed Date | | Deputy Clerk |

USA vs. **2. TRAVIS SCHLOTTERBECK**  Docket No.: **CR 19-343-GW**

The defendant must comply with the standard conditions that have been adopted by this court (set forth below).

## STANDARD CONDITIONS OF PROBATION AND SUPERVISED RELEASE

While the defendant is on probation or supervised release pursuant to this judgment:

1. The defendant must not commit another federal, state, or local crime;
2. The defendant must report to the probation office in the federal judicial district of residence within 72 hours of imposition of a sentence of probation or release from imprisonment, unless otherwise directed by the probation officer;
3. The defendant must report to the probation office as instructed by the court or probation officer;
4. The defendant must not knowingly leave the judicial district without first receiving the permission of the court or probation officer;
5. The defendant must answer truthfully the inquiries of the probation officer, unless legitimately asserting his or her Fifth Amendment right against self-incrimination as to new criminal conduct;
6. The defendant must reside at a location approved by the probation officer and must notify the probation officer at least 10 days before any anticipated change or within 72 hours of an unanticipated change in residence or persons living in defendant's residence;
7. The defendant must permit the probation officer to contact him or her at any time at home or elsewhere and must permit confiscation of any contraband prohibited by law or the terms of supervision and observed in plain view by the probation officer;
8. The defendant must work at a lawful occupation unless excused by the probation officer for schooling, training, or other acceptable reasons and must notify the probation officer at least ten days before any change in employment or within 72 hours of an unanticipated change;

9. The defendant must not knowingly associate with any persons engaged in criminal activity and must not knowingly associate with any person convicted of a felony unless granted permission to do so by the probation officer. This condition will not apply to intimate family members, unless the court has completed an individualized review and has determined that the restriction is necessary for protection of the community or rehabilitation;
10. The defendant must refrain from excessive use of alcohol and must not purchase, possess, use, distribute, or administer any narcotic or other controlled substance, or any paraphernalia related to such substances, except as prescribed by a physician;
11. The defendant must notify the probation officer within 72 hours of being arrested or questioned by a law enforcement officer;
12. For felony cases, the defendant must not possess a firearm, ammunition, destructive device, or any other dangerous weapon;
13. The defendant must not act or enter into any agreement with a law enforcement agency to act as an informant or source without the permission of the court;
14. The defendant must follow the instructions of the probation officer to implement the orders of the court, afford adequate deterrence from criminal conduct, protect the public from further crimes of the defendant; and provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

ER004

USA vs.  **2. TRAVIS SCHLOTTERBECK**                     Docket No.:  **CR 19-343-GW**

☐     The defendant must also comply with the following special conditions (set forth below).

### STATUTORY PROVISIONS PERTAINING TO PAYMENT AND COLLECTION OF FINANCIAL SANCTIONS

The defendant must pay interest on a fine or restitution of more than $2,500, unless the court waives interest or unless the fine or restitution is paid in full before the fifteenth (15th) day after the date of the judgment under 18 U.S.C. § 3612(f)(1). Payments may be subject to penalties for default and delinquency under 18 U.S.C. § 3612(g). Interest and penalties pertaining to restitution, however, are not applicable for offenses completed before April 24, 1996.

If all or any portion of a fine or restitution ordered remains unpaid after the termination of supervision, the defendant must pay the balance as directed by the United States Attorney's Office. 18 U.S.C. § 3613.

The defendant must notify the United States Attorney within thirty (30) days of any change in the defendant's mailing address or residence address until all fines, restitution, costs, and special assessments are paid in full. 18 U.S.C. § 3612(b)(l)(F).

The defendant must notify the Court (through the Probation Office) and the United States Attorney of any material change in the defendant's economic circumstances that might affect the defendant's ability to pay a fine or restitution, as required by 18 U.S.C. § 3664(k). The Court may also accept such notification from the government or the victim, and may, on its own motion or that of a party or the victim, adjust the manner of payment of a fine or restitution under 18 U.S.C. § 3664(k). See also 18 U.S.C. § 3572(d)(3) and for probation 18 U.S.C. § 3563(a)(7).

Payments will be applied in the following order:

1. Special assessments under 18 U.S.C. § 3013;
2. Restitution, in this sequence (under 18 U.S.C. § 3664(i), all non-federal victims must be paid before the United States is paid):
       Non-federal victims (individual and corporate),
       Providers of compensation to non-federal victims,
       The United States as victim;
3. Fine;
4. Community restitution, under 18 U.S.C. § 3663(c); and
5. Other penalties and costs.

### CONDITIONS OF PROBATION AND SUPERVISED RELEASE PERTAINING TO FINANCIAL SANCTIONS

As directed by the Probation Officer, the defendant must provide to the Probation Officer: (1) a signed release authorizing credit report inquiries; (2) federal and state income tax returns or a signed release authorizing their disclosure and (3) an accurate financial statement, with supporting documentation as to all assets, income and expenses of the defendant. In addition, the defendant must not apply for any loan or open any line of credit without prior approval of the Probation Officer.

The defendant must maintain one personal checking account. All of defendant's income, "monetary gains," or other pecuniary proceeds must be deposited into this account, which must be used for payment of all personal expenses. Records of all other bank accounts, including any business accounts, must be disclosed to the Probation Officer upon request.

The defendant must not transfer, sell, give away, or otherwise convey any asset with a fair market value in excess of $500 without approval of the Probation Officer until all financial obligations imposed by the Court have been satisfied in full.

These conditions are in addition to any other conditions imposed by this judgment.

## RETURN

I have executed the within Judgment and Commitment as follows:

Defendant delivered on _____ to _____

Defendant noted on appeal on _____

Defendant released on _____

Mandate issued on _____

Defendant's appeal determined on _____

Defendant delivered on _____ to _____

at _____

the institution designated by the Bureau of Prisons, with a certified copy of the within Judgment and Commitment.

United States Marshal

By _____

_____
Date                                         Deputy Marshal

## CERTIFICATE

I hereby attest and certify this date that the foregoing document is a full, true and correct copy of the original on file in my office, and in my legal custody.

Clerk, U.S. District Court

By _____

_____
Filed Date                                   Deputy Clerk

## FOR U.S. PROBATION OFFICE USE ONLY

Upon a finding of violation of probation or supervised release, I understand that the court may (1) revoke supervision, (2) extend the term of supervision, and/or (3) modify the conditions of supervision.

These conditions have been read to me. I fully understand the conditions and have been provided a copy of them.

(Signed) _____          _____
            Defendant                                 Date

_____          _____
U. S. Probation Officer/Designated Witness          Date

# United States District Court
# Central District of California

**UNITED STATES OF AMERICA vs.**

**Defendant**   2. JAMES BRADLEY VLHA

akas:

**Docket No.**   CR 19-343-GW   JS 3

**Social Security No.**   4   0   0   3
(Last 4 digits)

## JUDGMENT AND PROBATION/COMMITMENT ORDER

In the presence of the attorney for the government, the defendant appeared in person on this date.

| MONTH | DAY | YEAR |
|-------|-----|------|
| 11 | 17 | 2022 |

**COUNSEL**   Jerome J. Haig, Retained

(Name of Counsel)

**PLEA**   ☑ **GUILTY,** and the court being satisfied that there is a factual basis for the plea.   ☐ **NOLO CONTENDERE**   ☐ **NOT GUILTY**

**FINDING**   There being a finding/verdict of **GUILTY,** defendant has been convicted as charged of the offense(s) of:

**18 U.S.C. § 371: CONSPIRACY as charged in Count 1 of the Indictment.**

**JUDGMENT AND PROB/ COMM ORDER**   The Court asked whether there was any reason why judgment should not be pronounced. Because no sufficient cause to the contrary was shown, or appeared to the Court, the Court adjudged the defendant guilty as charged and convicted and ordered that: Pursuant to the Sentencing Reform Act of 1984, it is the judgment of the Court that the defendant is hereby committed to the custody of the Bureau of Prisons to be imprisoned for a term of: **TIME SERVED.**

It is ordered that the defendant shall pay to the United States a special assessment of $100, which is due immediately.

It is ordered that the defendant shall pay to the United States a total fine of $25,000, which shall bear interest as provided by law. Fine will not be paid until appeal is resolved.

The defendant shall comply with Second Amended General Order No. 20-04.

This recommendation includes language regarding an order of forfeiture in anticipation that, by the time of sentencing, the Government will have sought such an order. At this time, the Probation Officer is not aware that an order of forfeiture has been issued. In the event that no order has been issued by the time of sentencing, the forfeiture language will not be applicable.

Pursuant to the Sentencing Reform Act of 1984, it is the judgment of the Court that the defendant, James Bradley Vlha, is hereby committed on Count 1 of the Indictment to the custody of the Bureau of Prisons for a term of TIME SERVED.

Upon release from imprisonment, the defendant shall be placed on supervised release for a term of three years under the following terms and conditions:

1. The defendant shall comply with the rules and regulations of the United States Probation Office and Second Amended General Order 20-04.

2. During the period of community supervision, the defendant shall pay the special assessment and fine in accordance with this judgment's orders pertaining to such payment.

3. The defendant shall cooperate in the collection of a DNA sample from the defendant.

4. When not employed at least part-time and/or enrolled in an educational or vocational program, the defendant shall perform 20 hours of community service per month for six months as directed by the Probation Officer. Community service may be stayed pending resolution of appeal;

ER007

USA vs. **2. JAMES BRADLEY VLHA**                                    Docket No.: **CR 19-343-GW**

5.      The defendant shall submit the defendant's person, property, house, residence, vehicle, papers, or other areas under the defendant's control, to a search conducted by a United States Probation Officer or law enforcement officer. Failure to submit to a search may be grounds for revocation. The defendant shall warn any other occupants that the premises may be subject to searches pursuant to this condition. Any search pursuant to this condition will be conducted at a reasonable time and in a reasonable manner upon reasonable suspicion that the defendant has violated a condition of his supervision and that the areas to be searched contain evidence of this violation.

The drug testing condition mandated by statute is suspended based on the Court's determination that the defendant poses a low risk of future substance abuse.

The Government's request to dismiss the remaining counts of the underlying Indictment is granted.

The Court advises defendant of his rights to an appeal. Bond is exonerated upon reporting to the U.S. Probation Office. Bond not required on appeal.

In addition to the special conditions of supervision imposed above, it is hereby ordered that the Standard Conditions of Probation and Supervised Release within this judgment be imposed. The Court may change the conditions of supervision, reduce or extend the period of supervision, and at any time during the supervision period or within the maximum period permitted by law, may issue a warrant and revoke supervision for a violation occurring during the supervision period.

---

November 17, 2022
_____
Date

_George H. Wu_

HON. GEORGE H. WU, U. S. District Judge

It is ordered that the Clerk deliver a copy of this Judgment and Probation/Commitment Order to the U.S. Marshal or other qualified officer.

Clerk, U.S. District Court

November 17, 2022
_____
Filed Date

By    /s/ Javier Gonzalez
_____
Deputy Clerk

---

The defendant must comply with the standard conditions that have been adopted by this court (set forth below).

## STANDARD CONDITIONS OF PROBATION AND SUPERVISED RELEASE

While the defendant is on probation or supervised release pursuant to this judgment:

USA vs. **2. JAMES BRADLEY VLHA**          Docket No.: **CR 19-343-GW**

1. The defendant must not commit another federal, state, or local crime;
2. The defendant must report to the probation office in the federal judicial district of residence within 72 hours of imposition of a sentence of probation or release from imprisonment, unless otherwise directed by the probation officer;
3. The defendant must report to the probation office as instructed by the court or probation officer;
4. The defendant must not knowingly leave the judicial district without first receiving the permission of the court or probation officer;
5. The defendant must answer truthfully the inquiries of the probation officer, unless legitimately asserting his or her Fifth Amendment right against self-incrimination as to new criminal conduct;
6. The defendant must reside at a location approved by the probation officer and must notify the probation officer at least 10 days before any anticipated change or within 72 hours of an unanticipated change in residence or persons living in defendant's residence;
7. The defendant must permit the probation officer to contact him or her at any time at home or elsewhere and must permit confiscation of any contraband prohibited by law or the terms of supervision and observed in plain view by the probation officer;
8. The defendant must work at a lawful occupation unless excused by the probation officer for schooling, training, or other acceptable reasons and must notify the probation officer at least ten days before any change in employment or within 72 hours of an unanticipated change;
9. The defendant must not knowingly associate with any persons engaged in criminal activity and must not knowingly associate with any person convicted of a felony unless granted permission to do so by the probation officer. This condition will not apply to intimate family members, unless the court has completed an individualized review and has determined that the restriction is necessary for protection of the community or rehabilitation;
10. The defendant must refrain from excessive use of alcohol and must not purchase, possess, use, distribute, or administer any narcotic or other controlled substance, or any paraphernalia related to such substances, except as prescribed by a physician;
11. The defendant must notify the probation officer within 72 hours of being arrested or questioned by a law enforcement officer;
12. For felony cases, the defendant must not possess a firearm, ammunition, destructive device, or any other dangerous weapon;
13. The defendant must not act or enter into any agreement with a law enforcement agency to act as an informant or source without the permission of the court;
14. The defendant must follow the instructions of the probation officer to implement the orders of the court, afford adequate deterrence from criminal conduct, protect the public from further crimes of the defendant; and provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

USA vs. **2. JAMES BRADLEY VLHA**        Docket No.: **CR 19-343-GW**

[ ]        The defendant must also comply with the following special conditions (set forth below).

### STATUTORY PROVISIONS PERTAINING TO PAYMENT AND COLLECTION OF FINANCIAL SANCTIONS

The defendant must pay interest on a fine or restitution of more than $2,500, unless the court waives interest or unless the fine or restitution is paid in full before the fifteenth (15th) day after the date of the judgment under 18 U.S.C. § 3612(f)(1). Payments may be subject to penalties for default and delinquency under 18 U.S.C. § 3612(g). Interest and penalties pertaining to restitution, however, are not applicable for offenses completed before April 24, 1996.

If all or any portion of a fine or restitution ordered remains unpaid after the termination of supervision, the defendant must pay the balance as directed by the United States Attorney's Office. 18 U.S.C. § 3613.

The defendant must notify the United States Attorney within thirty (30) days of any change in the defendant's mailing address or residence address until all fines, restitution, costs, and special assessments are paid in full. 18 U.S.C. § 3612(b)(l)(F).

The defendant must notify the Court (through the Probation Office) and the United States Attorney of any material change in the defendant's economic circumstances that might affect the defendant's ability to pay a fine or restitution, as required by 18 U.S.C. § 3664(k). The Court may also accept such notification from the government or the victim, and may, on its own motion or that of a party or the victim, adjust the manner of payment of a fine or restitution under 18 U.S.C. § 3664(k). See also 18 U.S.C. § 3572(d)(3) and for probation 18 U.S.C. § 3563(a)(7).

Payments will be applied in the following order:

1. Special assessments under 18 U.S.C. § 3013;
2. Restitution, in this sequence (under 18 U.S.C. § 3664(i), all non-federal victims must be paid before the United States is paid):
        Non-federal victims (individual and corporate),
        Providers of compensation to non-federal victims,
        The United States as victim;
3. Fine;
4. Community restitution, under 18 U.S.C. § 3663(c); and
5. Other penalties and costs.

### CONDITIONS OF PROBATION AND SUPERVISED RELEASE PERTAINING TO FINANCIAL SANCTIONS

As directed by the Probation Officer, the defendant must provide to the Probation Officer: (1) a signed release authorizing credit report inquiries; (2) federal and state income tax returns or a signed release authorizing their disclosure and (3) an accurate financial statement, with supporting documentation as to all assets, income and expenses of the defendant. In addition, the defendant must not apply for any loan or open any line of credit without prior approval of the Probation Officer.

The defendant must maintain one personal checking account. All of defendant's income, "monetary gains," or other pecuniary proceeds must be deposited into this account, which must be used for payment of all personal expenses. Records of all other bank accounts, including any business accounts, must be disclosed to the Probation Officer upon request.

The defendant must not transfer, sell, give away, or otherwise convey any asset with a fair market value in excess of $500 without approval of the Probation Officer until all financial obligations imposed by the Court have been satisfied in full.

These conditions are in addition to any other conditions imposed by this judgment.

**RETURN**

I have executed the within Judgment and Commitment as follows:

Defendant delivered on _____ to _____

Defendant noted on appeal on _____

Defendant released on _____

Mandate issued on _____

Defendant's appeal determined on _____

Defendant delivered on _____ to _____

at _____

the institution designated by the Bureau of Prisons, with a certified copy of the within Judgment and Commitment.

United States Marshal

By _____

_____          Deputy Marshal
Date

**CERTIFICATE**

I hereby attest and certify this date that the foregoing document is a full, true and correct copy of the original on file in my office, and in my legal custody.

Clerk, U.S. District Court

By _____

_____          Deputy Clerk
Filed Date

**FOR U.S. PROBATION OFFICE USE ONLY**

Upon a finding of violation of probation or supervised release, I understand that the court may (1) revoke supervision, (2) extend the term of supervision, and/or (3) modify the conditions of supervision.

These conditions have been read to me. I fully understand the conditions and have been provided a copy of them.

(Signed) _____          _____
            Defendant                                    Date

_____          _____
U. S. Probation Officer/Designated Witness          Date

ER011



```
 1              UNITED STATES DISTRICT COURT

 2       CENTRAL DISTRICT OF CALIFORNIA - CENTRAL DIVISION

 3          HONORABLE GEORGE H. WU, U.S. DISTRICT JUDGE

 4

 5  UNITED STATES OF AMERICA,

 6                      Plaintiff,

 7          vs.                        Case No. CR 19-343-GW

 8  TRAVIS SCHLOTTERBECK,
    JAMES BRADLEY VLHA,
 9                      Defendants.
    _____/
10

11

12

13              REPORTER'S TRANSCRIPT OF
                  PRETRIAL CONFERENCE
                 Monday, July 11, 2022
14                   10:00 a.m.
                LOS ANGELES, CALIFORNIA
15

16

17

18

19

20

21
    _____
22
              TERRI A. HOURIGAN, CSR NO. 3838, CCRR
23            FEDERAL OFFICIAL COURT REPORTER
              350 WEST FIRST STREET, ROOM 4311
24            LOS ANGELES, CALIFORNIA  90012
                     (213) 894-2849
25
```

ER012

```
 1                     APPEARANCES OF COUNSEL:

 2

 3   FOR THE PLAINTIFF:

 4       UNITED STATES ATTORNEY'S OFFICE
         United States Attorney
 5       BY: BRIAN R. FAERSTEIN
             DANIEL BOYLE
 6        Assistant United States Attorneys
         United States Courthouse
 7       312 North Spring Street
         Los Angeles, California  90012
 8

 9
     FOR THE DEFENDANT:  TRAVIS SCHLOTTERBECK
10
         EDWARD M. ROBINSON, A PROFESSIONAL LAW CORPORATION
11       BY: EDWARD M. ROBINSON
             BRIAN ARTHUR ROBINSON
12       Attorneys at Law
         21515 Hawthorne Boulevard, Suite 730
13       Torrance, California  90503

14

15   FOR THE DEFENDANT:  JAMES BRADLEY VLHA

16       LAW OFFICE OF JEROME J. HAIG
         BY: JEROME J. HAIG
17       Attorney at Law
         21143 Hawthorne Boulevard, Suite 454
18       Torrance, California  90503

19

20

21

22

23

24

25
```

UNITED STATES DISTRICT COURT

```
 1              LOS ANGELES, CALIFORNIA; MONDAY, JULY 11, 2022

 2                            8:30 a.m.

 3                            --oOo--

 4

 5

 6              THE COURTROOM DEPUTY:  Please come to order this

 7    United States District Court is again in session.

 8              THE COURT:  All right.  Let me call the matter of

 9    United States versus Schlotterbeck.  Let me have appearances

10    starting with government counsel first.

11              MR. FAERSTEIN:  Good afternoon, AUSA Brian Faerstein

12    and Daniel Boyle on behalf of the United States.

13              THE COURT:  All right.  For the defense?

14              MR. ROBINSON:  Good afternoon, Your Honor.  Edward

15    Robinson appearing virtually with Travis Schlotterbeck.

16              THE COURT:  All right.  For the other defendant?

17              MR. HAIG:  Good afternoon, Jerome Haig appearing

18    virtually as well with Mr. Vlha who is also appearing

19    virtually.

20              THE COURT:  All right.  My understanding is they

21    previously filed a waiver of personal appearance, right?

22                 The most important questions for the day we want

23    to figure out what Mr. Haig did what he was at the British Open

24    and things of that sort, oh, Wimbledon.

25              MR. HAIG:  A week ago today I was at center court
```

4

1    and I had a grand time and thank you very much.

2              THE COURT:  Such a world traveler, so lucky.

3              MR. HAIG:  I am entitled to vacations from time to

4    time.  It's my first one since pre-COVID.  It's nice to be able

5    to do.

6              THE COURT:  Let me ask counsel, I think the two

7    major things that are still on calendar at this point in time

8    -- well, there is a third thing, but I don't think it's that

9    serious, the two things that are as to the motion to dismiss as

10   recently briefed in light of the -- is it the *Bruen* case, and

11   then the second one is the testimony of the both the government

12   and the defense experts.

13             On the motion to dismiss, let me just ask the

14   defense counsel this question:  You know, I don't think I would

15   approach the issues exactly the same way as the government did

16   in this case, but it seems to me that the argument that the

17   defense wants to make has pretty much been precluded by *Heller*.

18   Although, it's precluded perhaps by dicta in *Heller*, but dicta

19   in *Heller* is pretty good.

20             You are on mute, Mr. Robinson.

21             MR. ROBINSON:  I was speaking to Brian Robinson who

22   was giving me a clue how to answer your question, Your Honor.

23             Hold on a second.  His point is my point as well.

24             I think if we talk about Count 3, first of all.

25   With respect to Count 3 on its face, the prohibited person, a

**UNITED STATES DISTRICT COURT**

1    felon, it seems like that is going by the wayside under the --

2            THE COURT:  Well, the first thing one is supposed to

3    look at is the language of amendment itself.

4            And even if we did like the Supreme Court in

5    *Heller* and ignored more than 50 percent of the language of the

6    amendment, there is still that nub of what supposedly all of

7    the fuss is about.  But, you know, the language there doesn't

8    talk about any sort of any limitation in that regard.

9            And the language, I'm referring to in *Heller*,

10   *Heller* says, and I quote:  Although, we do not undertake an

11   exhaustive historical analysis today of the full scope of the

12   Second Amendment, nothing in our opinion should be taken to

13   cast doubt on the longstanding prohibitions on the possession

14   of firearms by felons and the mentally ill or laws forbidding

15   the carrying of firearms in sensitive places, such as schools

16   and government buildings, or laws imposing conditions and

17   qualifications on the commercial sale of arms.

18           That is the language from *Heller*.  So, it seems

19   to me that the Supreme Court already thought about the point

20   and noted that there were these longstanding prohibitions, so

21   given those longstanding prohibitions, I don't see how,

22   especially since *Bruen* did not consider these issues, but

23   considered a different issue, I don't see how we can say that

24   *Bruen* has changed the landscape as to this particular case.

25           Now, while obviously the *Bruen* case did get rid

**UNITED STATES DISTRICT COURT**

ER016

1  of the quote, two step analysis, that was being done by many

2  Courts of Appeals and District Courts, we don't even need to

3  get there insofar as the analysis here, because I think the

4  language is fairly clear.

5          Again, the Supreme Court recognized the

6  longstanding prohibitions.

7          MR. ROBINSON:  In *Heller*.

8          THE COURT:  Yes.

9          MR. ROBINSON:  So --

10         THE COURT:  Unless you want to say *Heller* was

11  decided wrong in that topic itself.

12         MR. ROBINSON:  I don't want to say anything good

13  about *Heller*, if you don't mind.  But I will say this, the

14  *Bruen* case and one of the reasons that I'm not retreading this

15  ground seeking a continuance, but one of the reasons we asked

16  for a continuance, and I'm not being a prognosticator but

17  looking at what this Supreme Court has done this term, and how

18  untethered it might be to what it said in the past and its

19  members --

20         THE COURT:  I think we must all agree that this

21  current Supreme Court is untethered by precedent, that is true.

22         MR. ROBINSON:  By what they said they would do at

23  the confirmation hearings all of that.

24         THE COURT:  But the problem is that it's difficult,

25  if not impossible, for the Court to decide that a federal

```
 1   statute is unconstitutional, especially in this particular
 2   portion of the federal statute is unconstitutional based on
 3   what was said in Heller.
 4             Even though I will admit that this Supreme Court
 5   that we now have could go off on any direction like an
 6   unexplored land mine, it's stuff that is going to happen or
 7   maybe walk around it, but I can't basically say that a
 8   particular statute is unconstitutional because of the fact that
 9   we may have a Supreme Court that decides on a whim that it is
10   unconstitutional.
11             MR. ROBINSON:  And one of the reasons why we asked
12   for the continuance is because this is a sea change, no matter
13   what anybody says, the test, looking at the text and treating
14   not all history is created equal, as I quote in going back to
15   the time of the ratification.  You have seen what we have
16   attached.
17             THE COURT:  The problem is, is that as one said that
18   Judges are not historians, and so, I don't know -- I don't
19   understand what you expect.
20             In other words, do you expect that somebody is
21   going to do an analysis of the laws that were in existence
22   between the time that the Second Amendment was passed and also
23   the Fourteenth Amendment was passed?
24             First, I don't think you are going to be -- is
25   that the analysis that you want to get done?  It's interesting.
```

```
 1          MR. ROBINSON:  Let me say this, it's what Justice
 2   Thomas said that the government has to do.
 3               And it's craziness, I get it, but Justice Thomas
 4   said the government bears the burden of establishing the
 5   historical basis for the present regulation.
 6          THE COURT:  Let me just ask you, given the fact that
 7   Heller referenced the long-standing prohibitions, are you
 8   saying that Scalia's opinion in Heller was totally unfounded?
 9               I mean, he must have had something in his mind,
10   he got other Justices to go along with him in Heller, so I
11   presume there is something there to that "there" that is being
12   referenced.
13          MR. ROBINSON:  I'm saying that whatever Justice
14   Scalia said in Heller about the longstanding notions of
15   regulation, which was dicta with respect to -- the holding in
16   Heller is now superseded and replaced by the two-part test in
17   Bruen, and you know, according to the Supreme Court the
18   government has the burden, once we have established that the
19   text would support, in this case, the purchaser's right to
20   possess a firearm, the government bears the burden of proving,
21   and I will be -- I will use a little bit of poetic license
22   here, if I may, the government bears the burden of proving at
23   the time of the ratification or thereabout, not even at the
24   time of the Fourteenth Amendment, because we are not dealing
25   with the Fourteenth Amendment in this case.
```

1    At the time of the ratification there were laws

2    that would have prohibited the so-called felon in this case

3    from possessing a firearm.

4    If he's not one of the dangerous felons as

5    understood at the time of the ratification, then to deprive

6    that purchaser of his Second Amendment right to possess a

7    firearm would be unconstitutional, and there would be no crime

8    with Mr. Schlotterbeck selling to that person a firearm.

9    And it's not up to us to do the historical

10   analysis.  We just attached the then Judge Barrett's dissent as

11   evidence of the research that she had done, but the government

12   now, according to Justice Thomas in *Bruen,* bears the burden of

13   coming forward with the relevant history around the time the

14   ratification to show that this type of regulation that we have

15   now in 922(g) would have been consistent with the understanding

16   of the folks who ratified the Constitution with that Second

17   Amendment in it.

18   That's what the law is today.

19   One of the reasons we asked for a stay of the

20   proceedings or a brief continuance is to see what is going to

21   happen, and again, not to be a prognosticator, but I am certain

22   that 922(g) is going to be attacked and -- not that it matters

23   one bit --

24   THE COURT:  I would have thought this is a case for

25   it to be attacked; this one.

```
 1                  In other words, why should we wait for somebody
 2      else, this one is here.
 3                  MR. ROBINSON:  I agree then, you should grant it,
 4      and take it up and see what happens.
 5                  I'm not being facetious when I say that because
 6      historically --
 7                  THE COURT:  Let me put it this way, I would if I
 8      thought you were right; unfortunately, I don't think you are
 9      right.
10                  MR. ROBINSON:  Okay.  The government hasn't come
11      forward with any of the required historical proof that Bruen
12      requires.
13                  THE COURT:  Well no.  What Bruen says is that when
14      the Second Amendment's plain text covers an individual's
15      conduct, the Constitution presumptively protects that conduct.
16      That's not what we have here.
17                  In other words, there is nothing in the Second
18      Amendment that says or refers to the possession and sale of a
19      firearm to a convicted felon.
20                  There is nothing -- I mean, I don't know how many
21      words there are in the Second Amendment, assuming that we don't
22      look at the introductory portion of the Second Amendment, which
23      talks about something regulated militia, we are not looking at
24      that, we're just looking at this other portion.
25                  MR. HAIG:  Your Honor, if I could say something
```

1  since it's a joint motion.

2      There was nothing in the Second Amendment that

3  actually talks about somebody having a concealed permit to

4  possess a firearm outside of their own home.  That is what

5  *Heller* talked about, possession of a firearm in your own home.

6      *Bruen* talks about possession of a firearm

7  concealed on one's person in a public place, so to the extent

8  that the Court is looking at *Heller* as kind of a bench mark on

9  what may or may not be precluded -- just like Mr. Robinson said

10  *Bruen* --

11      THE COURT:  Let me ask you then, when the Supreme

12  Court said in *Bruen* that one looks at the Second Amendment's

13  plain text, what was it referring to?

14      MR. HAIG:  So it was referring to, I think, Justice

15  Thomas said what was the relevant firearm regulation that the

16  government has now and what was it back in 1791.

17      Back in 1791, according to Justice Barrett, now

18  Justice Barrett --

19      THE COURT:  Let me stop.  Let me just ask you, was

20  Justice Barrett a historian?

21      MR. ROBINSON:  May I just jump in on that?

22      MR. HAIG:  She attempted to be.

23      THE COURT:  She's not a historian.  Again, it's nice

24  that she has her law clerks looking at this stuff.

25      MR. ROBINSON:  Let me see if I can try to answer

1    your question a little bit better.

2              With respect to the first part of the *Bruen*

3    analysis, what does a text cover?

4              As the Supreme Court said in *Bruen*, the Second

5    Amendment right is not like a voting right which is a so-called

6    collective right.

7              Going back to Heller, it's an individual right,

8    and is presumed that we, as individuals, and in this case the

9    purchaser of the weapon, the so-called prohibited person, a

10   felon, that person has a Second Amendment right to possess.

11             THE COURT:  I understand that is what you are

12   saying, but I don't understand how I would square that

13   assertion with the language from *Heller* itself.

14             I mean, *Bruen* is based on *Heller*.  And so, I

15   don't think -- and in *Heller*, it says that nothing in the

16   Supreme Court's opinion in *Heller* should be taken to cast doubt

17   on the longstanding prohibitions on the possession of firearms

18   by felons and the mentally ill.

19             I mean, how much clearer could the Supreme Court

20   have been?  Although, I do admit it's dicta, but what can one

21   say until the Supreme Court says, by the way, it's dicta and we

22   no longer agree with that; in fact, we think that longstanding

23   prohibitions should be -- are not the relevant focus at this

24   point.

25             MR. ROBINSON:  It's dicta, and we have a test that

```
 1    is new, and I think all of us would agree that all things being

 2    equal, forgetting -- and we will get to the felon part in a

 3    second -- but that purchaser of the gun, the undercover, until

 4    it is shown otherwise through historical analysis of what the

 5    laws were like at the time of the ratification of the Second

 6    Amendment, that individual has a Second Amendment right to

 7    possess a firearm.

 8              Now, the Supreme Court has said in Bruen, and

 9    this is where it's different from Heller, that it is the

10    government's obligation, given the fact the Second Amendment

11    right is an individual right as opposed to a collective right

12    to show that historically -- it' not our obligation --

13    historically, not all of the history being created equal, that

14    at the time of the ratification a blanket prohibition on all

15    felons was consistent with the text and the understanding of

16    the Second Amendment and the history surrounding it, and it's

17    just flat out not.

18              THE COURT:  All right.  Let me stop you.  I

19    understand your argument.

20              Let me hear from the government, let me ask the

21    government, why isn't the defense right about it's the

22    government's burden?

23              MR. FAERSTEIN:  Well, Your Honor, as you have

24    observed the plain text is the first step.

25              And in Heller and in McDonald they re-emphasize
```

**UNITED STATES DISTRICT COURT**

1  the language from *Heller*, which the Ninth Circuit actually has

2  found to be not just dicta, but that the felon in possession

3  statute, nothing is meant in *Heller* to cast doubt on the felon

4  in possession statute as being presumptively lawful.

5           *Bruen* did not speak to that whatsoever.  In fact,

6  three of the justices that were in the majority in *Bruen* wrote

7  separately in a concurrence because *Bruen* didn't speak to that

8  or overturn it or do anything in any way to cast doubt on it as

9  well.

10          Three of the justices said, yeah, that is

11  correct, and they reiterated that language from *Heller* which

12  was again, reaffirmed in *McDonald*.

13          So, there is nothing -- there is no sea change

14  here with respect to the first part of the analysis, the Second

15  Amendment even covered this conduct.

16          The only sea change, to use the defendant's

17  language, is at the second step, once you have determined that

18  particular statute or conduct is even covered and subject to

19  further analysis.

20          So, with respect to the felon in possession

21  statute, which again, we're not -- what we're dealing with in

22  this case is 922(d)(1), the sale to a prohibited person, which

23  the Ninth Circuit's model instructions don't even require the

24  government to prove that the person who bought it was actually

25  even prohibited.

```
 1              Putting that aside, even taking their point with
 2    respect to 922(g)(1), nothing has been said in Bruen that casts
 3    any doubt on Heller and McDonald Court's holdings or language
 4    with respect to that statute.
 5              And the Ninth Circuit, in the United States
 6    versus Vongxay, and additional cases since Heller, has
 7    specifically reiterated that 922(g)(1) is not covered by the
 8    Second Amendment -- is not -- it is lawful based on the Supreme
 9    Court's guidance.
10              THE COURT:  All right.  Well, that is my decision.
11              I'm not going to agree with the motion to
12    dismiss.
13              Although, it's an interesting issue, and it will
14    give the defense counsel lots and lots of wiggle room if your
15    clients get convicted, so it's an appealable issue, look at it
16    that way.
17              All right.  Then the other issue is insofar as
18    the expert opinions are concerned.
19              I'm primarily going to focus on the defendant's
20    expert witness, because again, at this point in time, I don't
21    understand exactly why his testimony is particularly relevant
22    in this case, because as I understand the -- well, there are
23    three counts obviously.  The first one is conspiracy to violate
24    18 U.S.C. 922(a)(1)(A), and the second count is the violation
25    of that particular statute, and then the third count is the
```

```
 1    sale of a firearm to a prohibited person, to a felon.

 2              I don't understand what exactly his expertise --

 3    how it comes into play in this particular situation.

 4              MR. ROBINSON:  May I just say one thing?  I'm sorry

 5    to cut you off like this, Your Honor.

 6              With respect to your ruling on the motion to

 7    dismiss, that applies to Counts 1 and 2 as well, correct?

 8              THE COURT:  Well, it comes into play primarily

 9    within Count No. 3, because that was what you were focusing on

10    -- seemed to be your focus was in the most recent filing.

11              MR. ROBINSON:  But we also applied it to Counts 1

12    and 2.  I want to make sure there is no allegation of waiver.

13              THE COURT:  I don't think you have waived as to

14    that, although you didn't stress it.  I suppose an argument

15    could waived that you are also making the contention as to

16    Counts 1 and 2 as well.

17              MR. ROBINSON:  As long as your ruling is as to the

18    entirety of the indictment, we are fine.  Thank you, Your

19    Honor.

20              THE COURT:  But let me take a step back.  As I

21    understood it, the first motion to dismiss the indictment was

22    not based on Bruen because Bruen hadn't been decided on that

23    point, so when I asked for supplemental briefing it was

24    primarily on Bruen.

25              The focus on Bruen was primarily, as I saw it in
```

1    the defense papers, it was focusing on Count 3.

2              As to Counts 1 and 2, the same analysis would

3    apply, so I would say yes, it would cover Counts 1 and 2 as

4    well.

5              MR. ROBINSON:  We do address it in the motion, so as

6    long as it's the Court's ruling, I think the record is

7    protected, so thank you.

8              THE COURT:  I want it to be protected, because

9    again, it's an issue potentially on all three counts.

10             All right.  So turning back to the defense

11   expert.  In other words, for example, there was some discussion

12   as to whether or not he was going to testify as to what

13   sometimes is referred to 80 percent rule?

14             MR. HAIG:  That's right, Your Honor.  When we were

15   here a couple of weeks ago at the last hearing, that is

16   essentially what we proffered the expert to testify about, and

17   that is also set forth in --

18             THE COURT:  But what I don't understand is in what

19   context, because again, I don't think, at least as I understand

20   the government's case, the government is not bringing a

21   prosecution resting on the 80 percent situation.

22             What the government is arguing is that the

23   defendants were in the business of manufacturing the completed

24   firearms.

25             In another words, the fact that the firearms are

```
 1    whatever way they are finally completed, it is kind of
 2    irrelevant, because in the end, it's a completed firearm.
 3              MR. HAIG:  Okay.  So I understand the Court's
 4    question on that.
 5              But the government is piecing their case together
 6    in a few different ways.
 7              In one of the ways, this lower receiver, the
 8    unfinished lower receiver was actually milled and cut, if you
 9    will, by a third person, or by the assistance of the alleged
10    co-conspirator and cooperator Jesse Dekoning, without the help
11    or benefit of either of the defendants.
12              THE COURT:  Well, that is not as to all of the
13    firearms.  That is only as to some of the firearms.
14              MR. HAIG:  Well, so it's as to -- well, so as to
15    some of the firearms, the actual end-user or purchaser, whether
16    that was the undercover agent or confidential informant, was
17    the person that actually was present and involved in the
18    milling and manufacturing of that lower receiver.
19              So when I say "milling or manufacturing" I mean
20    actually physically involved in the drilling of the holes by
21    either pushing a button or going over to the place where that
22    could be done, because that could not be done where the
23    defendants were actually working.
24              THE COURT:  But let me ask you, it's my
25    understanding that that particular piece, once it was completed
```

**UNITED STATES DISTRICT COURT**

1  was delivered, and thereafter incorporated into the finished

2  firearm; isn't that correct?

3          MR. HAIG:  Yes.  So in order to actually make a

4  completed firearm there has to be some sort of work on that

5  unfinished lower.

6          So when that unfinished lower was completed

7  either by Mr. Dekoning at some other time and then delivered to

8  one of the defendants or both of them, it was then assembled

9  with other parts.

10          THE COURT:  Well, it's kind of like there are tons

11  of products that are -- the parts of which are manufactured by

12  other persons and then all of these various parts are put

13  together in the same room and are assembled into one item, and

14  that one item is the complete firearm.

15          So the business of the firearm is the business of

16  manufacturing the completed firearm.

17          MR. HAIG:  Well, I think the government's position

18  is that the defendants were manufacturing.

19          Our position is that there was no manufacturing

20  going on.

21          There was snapping parts together, and there was

22  no manufacturing process by any defendant.

23          THE COURT:  Let me stop.  That is a legal argument.

24  Well, let me put it this way, that is something that is up to

25  me to make the decision on.

1        I don't understand why I would be giving that

2    issue to a jury to consider.

3            MR. ROBINSON:  Your Honor, if I may just jump in.

4            This is the problem that we have with this case

5    and we are speaking to you in something of a void.  We have

6    taken the position --

7            THE COURT:  Let me stop you.  Are you accusing me of

8    being a void?

9            MR. ROBINSON:  No.  You are in the void with us.

10           MR. HAIG:  We're in the vortex together, all of us.

11           MR. ROBINSON:  Right.  It's a current one, it's not

12   a 17th or 18th Century one, I promise.

13           But in any event, we have taken a position that

14   manufacturing is vague, and, you know, we cannot, in order to

15   preserve the argument on the --

16           THE COURT:  Let me stop you.  I understand that

17   argument you have made, you already understand I have rejected

18   that argument, and it's already preserved for the record.  I

19   don't think you have to worry about that, it's clearly

20   preserved.

21           MR. ROBINSON:  I got that.  But if we are going

22   to -- if we're going to take the position that the unmilled or

23   even the fully milled lower receiver is not a firearm --

24           THE COURT:  I agree with you.  The lower mill --

25   well, let me put it this way, for purposes of this case, it is

```
 1   not a firearm.  I would agree with you on that.

 2               But that is not the charge, as I understand the

 3   charges.

 4               MR. ROBINSON:  No.  But putting together unregulated

 5   parts to build a firearm, our position is that that is

 6   assembling, it's not -- it can't be manufacturing, according to

 7   our position, and our clients.  If the Court defines

 8   manufacturing to include assembling, we have to take the

 9   position that they would never have been put on notice at the

10   time that they did this.  That is the real problem.

11               THE COURT:  I understand that is your position, but

12   the problem is I disagree.  I think that manufacturing can be

13   assembling, because I mean Apple manufacturers the iPhone.

14   The components of an iPhone are made at different locations and

15   put together in China.

16               MR. HAIG:  They are assembled in China, Your Honor,

17   but the chips are manufactured and manufacturing and assembly

18   are two different things.

19               And if I can just back up for a second.

20               THE COURT:  Why are you saying that?  Why are you

21   saying that manufacturing cannot be assembling?

22               MR. HAIG:  Well, in this case manufacturing

23   certainly is not assembling.

24               THE COURT:  I don't understand why you say that.

25               MR. HAIG:  Because manufacturing encompasses some
```

 1   sort of actual machine work on different components, and that

 2   is nothing that happened in this case.

 3              All of these components are legally obtained by

 4   the defendants and placed --

 5              THE COURT:  I agree with you entirely 100 percent.

 6   I agree with you that all of these components may be legally

 7   obtained separately.

 8              But when you put them together such that they

 9   comprise, in the end, a usable firearm, at that point in time

10   they have been manufactured into that firearm.

11              If what you say is correct, then all of these

12   manufacturers of firearms at this point in time can simply just

13   contract out the various components of firearms, and then just

14   have all of those components delivered to their factories for

15   assembly, in which case there would be no obligation on their

16   part to obtain a license.

17              So we could have Remington not having to have a

18   license, we could have Colt not having to have a license, Smith

19   and Wesson -- I don't know if all of these companies are still

20   around, but assuming they are.

21              MR. HAIG:  Now, you are talking about dealing.

22              THE COURT:  I'm not talking about dealing at all,

23   because dealing is, again, separate from the business of

24   manufacturing.

25              And all I'm saying is one can just simply

23

```
 1   assemble from parts -- different parts and not saying that that
 2   is manufacturing, then there would never be a manufacturing
 3   unless, you know, they actually got together, and even then,
 4   what would happen if, like, 90 percent is manufactured but
 5   10 percent is assembled?
 6             In that situation has there been manufacturing?
 7             MR. HAIG:  I don't know the answer to that, but the
 8   federal government has never told us what manufacturing is.
 9   It's up to the ATF to tell us.
10             THE COURT:  No.  On the contrary, the statute
11   defines what a manufacturer is, and business of manufacturing
12   is defined by statute as well, so that's what we look at.
13             MR. HAIG:  Well, but, Your Honor, you said a second
14   ago, Your Honor, that a finished lower receiver, I believe you
15   said this, I don't want to speak for you, is not a firearm.
16             THE COURT:  No.  I agree it is not a firearm.  It's
17   a component of a firearm, much the same way if somebody, you
18   know, had a rifle, let's say, the barrel of the rifle is
19   manufactured by one company and shipped to a location and then
20   the wooden butt of the firearm is manufactured by another
21   entity and shipped to that location.  You know, again, the
22   barrel is not a firearm.  The butt is not a firearm, but when
23   you put all of them together such that you get an operable
24   firearm, at that point in time, there is the firearm.
25             MR. HAIG:  Well, I don't think that is completely
```

**UNITED STATES DISTRICT COURT**

1    accurate under the law.

2              The actual lower receiver on an AR-15 is

3    different than the lower receiver than almost every other

4    weapon.

5              THE COURT:  What difference does it make if it is or

6    it is not?

7              MR. HAIG:  It does make a difference.

8              THE COURT:  Let's put it this way, it doesn't make a

9    defense for this case.

10             Now, I would agree with you if the government had

11   charged the defendants with this manufacturing of a lower

12   portion of the receiver, if that -- and there have been cases

13   that have been filed along those lines, and I agree with you if

14   that is what the government did in this case, I would agree

15   with you 100 percent that your defense expert should be allowed

16   to testify.  I would agree with you.

17             But that's not what we have here.

18             MR. HAIG:  Well, it's not, but the government's

19   expert disagrees with you.  He said that the lower receiver

20   that is finished is actually a firearm.  And FFLs have been

21   using that as their guidepost, and so have Mr. Schlotterbeck

22   and Mr. Vlha.

23             THE COURT:  But the mere fact -- you can question

24   their expert I suppose on that subject, and you know, I will

25   have to say that I would disagree with their expert.

1      But hopefully the government wouldn't be going

2  along those lines where it's going to have their expert saying

3  something that is really irrelevant to this case.

4      MR. HAIG:  We have gotten a disclosure from them

5  where there has been a change of belief as to what is and what

6  is not an actual completed firearm.

7      The reason why a lower receiver, an AR-15 is not,

8  Your Honor, because it does not have two components that are

9  required under the law to be a completed firearm.  That is a

10  breach lock and the threaded barrel.  Most other lower

11  receivers have that.

12      However, an AR-15 that has been completed is

13  serialized by a manufacturer, such as Smith and Wesson or Colt.

14  It will have a serial number.  It can only be distributed to a

15  FFL dealer and it cannot be distributed in any other way.

16      THE COURT:  According to your theory that Colt

17  wouldn't have to put a serial on it if all they did was

18  contracted out all of the components to other entities and then

19  simply got together in one room and put them together at that

20  point in time, then they wouldn't have to have a serial number,

21  and it wouldn't have to be licensed.

22      MR. HAIG:  Well, they are a manufacturer and a

23  dealer, Your Honor, they would have to do it.

24      The government has decided not to proceed under a

25  dealing theory, that is their choice, we talked about that at

1   other motion hearings as well.

2            But the only thing Mr. Lieberman is going to

3   testify to, not about anything other than what the prevailing

4   view in the community was at the time, which is I think what

5   Mr. Chimileski, the government's expert, would say as well,

6   that a finished receiver, in their view, was the regulated

7   component.  It is still the regulated component.

8            For example, Your Honor, if this Court were to

9   allow -- I'm sorry, if this Court were to order a defendant as

10  a condition of pretrial release, like the defendants in this

11  case, to get rid of all of their firearms by either selling

12  them or putting them with a licensed dealer, do you know what

13  that license dealer would do, Your Honor?

14           He could strip out all of the components of that

15  firearm, with the exception of a lower receiver of an AR-15,

16  keep that lower receiver of the AR-15, and then give that --

17  all of those other components legally back to that defendant.

18  He would not be violating your rules.

19           THE COURT:  Let me ask you, would the prosecution in

20  that situation be under 18 U.S.C. Section 922(a)(1)(A) or would

21  it be under a different section?

22           MR. HAIG:  I don't think that it really matters in

23  my analysis.

24           THE COURT:  It does matter, because again, that's

25  what we have here.  There maybe other sections of various

```
 1   statutes and regulations which could come into play in other
 2   scenarios, but I don't see this in that scenario, because
 3   again --
 4             MR. HAIG:  If I could say one other thing?
 5                  FFL dealers, FFL licensed dealers are allowed to
 6   legally take finished components and put them together without
 7   having an FFL manufacturing license, and without being
 8   prosecuted by the federal government, so by you saying that
 9   assembly --
10             THE COURT:  Well, let me ask the government, is he
11   right on that?
12             MR. BOYLE:  Your Honor, I don't believe Mr. Haig's
13   description of the facts in this case is correct.
14             THE COURT:  No.  That is not the question I have
15   asked you.  The question I have asked you is in fact what he is
16   saying correct; in other words, that manufacturers or producers
17   of completed handguns can assemble parts without being deemed
18   in the business of manufacturing?
19             MR. BOYLE:  There may be circumstances, however,
20   Your Honor, if they are assembling -- assembling parts to form
21   a weapon that is capable of firing a projectile, that would
22   fall under the definition of a firearm under 921.
23                  That states a weapon including a starter gun
24   which will or it is designed to or may readily be converted to
25   expel a projectile or the action of an explosive.
```

1          So if someone were to say, take a firearm, and

2   take parts off and put them back, that wouldn't necessarily

3   constitute manufacturing, Your Honor.

4          We already have a firearm, they are not

5   manufacturing.

6          Taking something apart, like, to use your

7   example, Your Honor, if you were to purchase a finished

8   manufactured iPhone and take the battery out and put it back

9   in, that would not be manufacturing.

10          Now, it might in certain circumstances qualify as

11   gunsmithing, which is not charged in this case.

12          What Mr. Haig is describing, I believe, based on

13   what he said is that scenario, where somebody is simply taking

14   apart a firearm and reassembling it.

15          That is distinct from manufacturing, which is

16   taking components, which are not capable of expelling a

17   projectile, combining them, manufacturing a weapon, which falls

18   under the definition stated in 921, Your Honor.

19          THE COURT:  All right.

20          MR. BOYLE:  I would emphasize, Your Honor, I think

21   the Court previously recognized that these are hypotheticals,

22   and the facts of this case are not about lower receivers as

23   charged in this indictment.

24          The case is about weapons which fire a

25   projectile.

```
1               I think the Court was correct in discerning that
2  and the issue we're discussing is whether or not an expert can
3  testify about lower receivers, not whether this expert -- well,
4  I don't know what this expert would possibly have to discuss
5  about Mr. Haig's hypothetical.
6               MR. HAIG:  I didn't proffer that hypothetical
7  because it just came up during this argument.
8               The Court has before it the latest filing, which
9  talks about what we are going to be asking Mr. Lieberman, who
10 we believe is an expert, has testified as an expert in a past,
11 is an FFL, and has over 30 years of training in firearms about
12 what the habit and custom was in the community at the time that
13 the defendants are accused of committing the crimes that they
14 are charged with in this indictment.
15              I think it's proper for Mr. Chimileski, the
16 government expert, to talk about those exact same things.
17              I'm not going to ask and we're not going to ask
18 Mr. Lieberman whether the conduct was legal or illegal, whether
19 it was manufacturing or assembly, those are not terms that an
20 expert should be able to define for us.
21              Those are terms that either the Court should
22 define or the jury should try to define on their own.
23              THE COURT:  Well, but then what is he going to
24 testify to?
25              Now, let's put it this way, obviously, if you
```

```
 1    want to have a defense expert to rebut the testimony of the
 2    government's expert, I can understand that, and that would be
 3    sort of fine.
 4              But, if he gets into this other area, then I
 5    don't understand why I would allow him to testify in that
 6    regard.
 7              MR. HAIG:  When you say "other area," can you be
 8    more specific as to what you mean by other area?
 9              THE COURT:  Well, what he originally said in his
10    expert report, which I understand was not meant to be an expert
11    report, but it had discussions of these items in it.  I talked
12    about the problems -- extreme problems I had with the positions
13    that he was taking in that document.
14              If he goes there, I would say that no, he's not
15    going to be allowed to testify, but if he simply -- what?
16              MR. HAIG:  That's not what we're asking for, Your
17    Honor.  If you just look at page -- you asked us to give a
18    specific guidepost for what the expert will be asked, and that
19    is on page 3 and 4 of Document No. 141.
20              It was filed on July 7th for all counsel, so
21    that's what we talked about at the last hearing two weeks ago
22    and that is our proffer for what he will be saying and we're
23    not disavowing what was said in the report, we're not saying
24    any of those things are not his true beliefs, but it doesn't
25    mean those things are relevant or admissible.
```

1          THE COURT:  Let me ask the government, what is your

2     response to the defense's reference to -- was it Docket

3     No. 141?

4          MR. HAIG:  141, yes.

5          THE COURT:  Docket 141.

6          MR. BOYLE:  My response would be this is the same

7     document the Court looked at before at the previous conference

8     and then requested that the defense provide additional detail

9     about what Mr. Lieberman would be testifying about.

10          This is the same group of -- I would argue fairly

11     vague topics that the Court wanted more clarity about.  The

12     only clarity we have gotten is to this purported 80 percent

13     belief in the gun community.

14          To the extent that defendants are discussing this

15     80 percent belief, I think we have outlined in our submission

16     why that is not a -- for variety of reasons -- not proper here.

17          But these original topics, these were the same

18     topics where the Court was deeply concerned about the basis for

19     the defense's expert purported expertise, and the lack of

20     detail.

21          THE COURT:  Well, let me ask you this question, what

22     if the expert were to testify, assuming that there is a

23     foundational basis for him to testify, about the gun

24     community's belief in the 80 percent rule.

25          In other words, if it's 80 percent, then it's not

1   unlawful, you don't need a license.

2           Why wouldn't that go toward willfulness?

3           MR. BOYLE:  Because the gun community is not on

4   trial here, Your Honor.  And it would potentially violate the

5   prohibition in 704 on commenting on a mental state.

6           To have an expert testify as to what uncharged

7   third parties' mental states might be serves no purpose other

8   than to ask the jury to infer the defendant's mental state.

9   That is an improper inference for an expert to offer.

10          I think this is fairly well laid out in the

11  defendant's cited authority, which I'm pointing to -- the

12  citation now and that is the *Morales* case.

13          In *Morales* the Ninth Circuit stated that it is

14  proper to have an expert opine on predicate facts, but it's not

15  proper to interfere in the province of the jury as to the

16  defendant's mental state.

17          In this case, the defendants are not offering

18  Mr. Lieberman to testify to predicate facts, such as, for

19  example, the expertise of these defendants in firearms or

20  something similar.

21          Instead, unlike in *Morales*, here, the defendants

22  are offering an expert to testify to the mental state of third

23  parties.

24          It would be as if in *Morales*, the bookkeeper, who

25  was the defendant there, to avoid conviction offered an expert

 1   who testified that other bookkeepers don't think what she did

 2   was illegal.

 3            That is not what the Ninth Circuit approved of in

 4   *Morales*.

 5            Instead, in *Morales*, the Ninth Circuit said an

 6   expert can testify to knowledge of general facts, not knowledge

 7   of the law.

 8            THE COURT:  Well, let me ask you this question:

 9   What happens if a defendant testifies that that is what his

10   belief was, and thereafter, the defense wants to offer

11   Mr. Lieberman as saying, well, that was what was understood in

12   the gun industry at the time or gun enthusiasts at the time.

13            MR. BOYLE:  Your Honor, in that case, the defendant

14   has already provided the best evidence of its mental state.

15            The government would certainly seek to impeach

16   it, but at that point, offering testimony that other third

17   parties agree with me would simply be buttressing.  There is no

18   relevance to that testimony, Your Honor.

19            MR. HAIG:  It is not buttressing.

20            MR. ROBINSON:  I'm sorry.  Looking at the affidavit

21   that supports the search warrant in this case, and it's the

22   affidavit that supports the complaint as well, and in that the

23   case agent from ATF specifically talks about the understanding

24   in the firearm industry of the 80 percent when talking about

25   the AR-15 lower receiver.

```
 1                And so to amplify what you just said, if we put

 2    our clients on, and they testified about their understanding of

 3    the 80 percent rule, which has some relevance to their

 4    willfulness and the government then cross-examines them about

 5    how ridiculous that may be and it sounds contrived and all of

 6    the things we can imagine happening, and are not allowed to

 7    present the fact that in the community there was an -- it's a

 8    unique community -- there was an understanding about what an

 9    80 percent lower receiver was specifically for the AR-15 which

10    is why the government is going to have a hard time proving

11    willfulness, that will be our argument.

12                If we're not allowed to do that then we have been

13    deprived of a defense that we should be able to present through

14    cross-examination of the government's own witnesses.

15                This is not something that is contrived as

16    evidenced by Roh and Jimenez.

17                It's clear that anybody who is involved in this

18    activity understands what the rules are with respect to

19    unfinished 80 percenters as they are called.

20                THE COURT:  Let me ask this, what exactly is this

21    rule?  What exactly does it say?

22                MR. ROBINSON:  Well, what does it say?

23                It says that if 80 percent -- the understanding

24    is I get it, and please don't hold me to this if I'm wrong, but

25    an unfinished lower receiver for an AR-15 is 80 percent of a
```

1   firearm because it hasn't been milled out, and it hasn't been

2   -- I will use the phrase with a smile on my face --

3   manufactured to become something else.

4            The real fact of the matter is that even a fully

5   milled lower isn't a firearm, as we have discussed a number of

6   times now in which I believe everybody concedes in this case,

7   but it's relevant to what Mr. Schlotterbeck thought.

8            As I have shown the Court in the excerpts on the

9   106 issue, that is what Mr. Schlotterbeck talked to the ATF

10  agent about when he was being questioned at the time his place

11  was searched, that is, 80 percent goes straight to willfulness.

12           THE COURT:  But the problem is again, I don't

13  understand how this 80 percent rule comes into play since here

14  the business of manufacturing is as to an operable firearm.

15           MR. ROBINSON:  Our position is it has to be

16  assembling which is not manufacturing, which leads us back to

17  the starting point of all of the problems we're having in this

18  case.

19           THE COURT:  But you already know my ruling on that,

20  so that will be my ruling, and that's the problem I have.

21           I don't think you are right on that particular

22  point, I don't think that -- I don't think it's ambiguous, and

23  I think it's clear you can manufacture by assembling.

24           MR. ROBINSON:  May I ask a Court a question, just so

25  we're clear on this?

1     If we were to try to present evidence, like we

2 are here, and if we were to try to argue to a jury that the

3 government has failed to prove manufacturing and they have only

4 proven assembling, would you preclude that evidence and

5 preclude that argument?

6     THE COURT:  When you say, would I preclude it, what

7 I will indicate to the jury that one can manufacture by

8 assembling.

9     MR. ROBINSON:  But if the Court gives that -- so

10 let's say that Schlotterbeck gets up on the stand and he

11 testifies and he is cross-examined, and I seek to introduce

12 his prior statements to the ATF agent, his prior consistent

13 statements, where he says:  I was just assembling with the

14 80 percent.

15     And he firmly believes that, and we're in a gray

16 area as we can establish through cross-examination, then your

17 instruction will direct the verdict against Mr. Vlha and

18 Mr. Schlotterbeck, and that's why manufacturing needs to be

19 defined by Congress and not by any of us, otherwise, we may not

20 have to deal with 922(g) on appeal.

21     MR. HAIG:  Especially, Your Honor, let me give you

22 an absurd example as to why the Court cannot equate

23 manufacturing with assembly and take that question away from

24 the jury.

25     I could go today and purchase an unfinished lower

```
 1   receiver, an 80 percenter, I could take it to a C&C shop, and I
 2   could put 100 of them into -- one after another -- into a C&C
 3   machine, and then I don't own, I push the button on all of
 4   those, they then become 100 percenters, basically completed
 5   lowers.  I could take them back to my house, I could purchase
 6   all of these parts and assemble 100 completed AR-15 firearms
 7   and all 100 of those would be legal under federal law because I
 8   was not manufacturing them.
 9             I do not need a manufacturing FFL.
10             Now, if I assembled those 100 AR-15s and sold
11   them to you, then I have got big problems, because I don't have
12   an FFL to sell them.
13        THE COURT:  Exactly.  That is what we have here.
14   He's -- they are charged with the business of manufacturing.
15        MR. HAIG:  The business of manufacturing, but Your
16   Honor, I could manufacture -- but I'm not manufacturing those,
17   Your Honor, I am just assembling those.
18        THE COURT:  Let me put it this way, the business of
19   manufacturing includes assembling for sale.
20        MR. HAIG:  Well, I don't think they are necessarily
21   including each other, and that is what the Court is saying.
22             You can't assemble and manufacture but you can
23   assemble without manufacturing.
24        THE COURT:  In your situation there is no problem
25   with your clients getting together, taking these unfinished
```

1  lower receivers during the process by which they are finished,

2  taking them to their home, and thereafter, completing them to

3  completed fully functional AR-15s and then just keeping them

4  there in locked safety boxes.

5        At that point in time, they are not involved in

6  the business of manufacturing.

7        MR. HAIG:  But they weren't manufacturing anyway.

8  If I wanted to sell those 100 AR-15s.

9        THE COURT:  That's where you and I disagree.

10        MR. HAIG:  As a matter of law, the Court cannot say

11  that.

12        THE COURT:  Well, a couple of things:  One, I just

13  said it, and so when you say I can't say that, that is not true

14  because I have just said it.

15        MR. HAIG:  I don't mean to be presumptuous, I didn't

16  mean it that way.  What I do mean is I don't believe the Court

17  should take that definition and define it for the jury.

18        If it defines it for the jury, it doesn't matter

19  what the defendants put on.

20        THE COURT:  It's a legal point, it's not a factual

21  point.

22        In other words, what constitutes manufacturing

23  for purposes of the business manufacturing is up to the Court

24  to define.

25        Now, you may think that I have defined it

```
 1    incorrectly, in which case, if your clients get convicted, they
 2    have a really good appealable issue.
 3            MR. HAIG:  Well, I think the issue of willfulness
 4    and the issue of enhanced willfulness, because we have the ATF
 5    and the government deciding what manufacturing is, and then the
 6    Court has to go along with that decision, the Court has already
 7    said that assembling equals manufacturing, and I would ask the
 8    Court not to rule that way.
 9            I would ask the Court to listen to all of the
10    evidence in this case, and ask the jury to make their own
11    decision, which I think is also perilous.
12            THE COURT:  Well, let's put it this way, the people
13    from the ATF, according to the current Supreme Court, we
14    shouldn't be given Chevron deference anymore.
15            So therefore, I mean the people in ATF can say
16    all of the things they want to, and apparently I'm not supposed
17    to be giving them any deference.
18            MR. HAIG:  I don't mean to be strident, really, I
19    didn't, and I apologize to you for saying --
20            THE COURT:  Let me stop you.  I think you are doing
21    a wonderful job defending your client.
22            I don't think anything you have done so far is
23    problematic.  I think we have a difference in the
24    interpretation of what the law is.
25            You have taken the position, which I don't think,
```

**UNITED STATES DISTRICT COURT**

 1  you know, you may be the wave of the future, and I'm just a

 2  dinosaur and I can't recognize what the inevitable is.

 3          That is great, I don't mind being told I'm wrong

 4  by the Appellate Courts, that happens with a large frequency.

 5          MR. ROBINSON:  Can I jump in for a quick second,

 6  Your Honor?

 7          THE COURT:  Sure.

 8          MR. ROBINSON:  By the way, you asked if you are

 9  supposed to be a historian, maybe not, but now you are supposed

10  to be an expert on carbon emission.

11          Anyway, just so you know, if I take your point as

12  a ruling that as we sit here today you are inclined to tell the

13  jury that assembling is manufacturing, I almost --

14          THE COURT:  What I would tell the jury is one can

15  manufacture by assembling.

16          MR. ROBINSON:  And we would have to take the

17  position that directs a verdict with respect to our client.  It

18  overrides their evidence of a lack of willfulness, and it

19  defeats a genuine good faith belief that they were acting

20  within what may be called a loophole, but what we would call as

21  being within the law.

22          I almost think we should sit down and discuss a

23  conditional plea, and get the facts in order.

24          THE COURT:  Let's put it this way, if that's what

25  you want, let's put it this way, I'm not going to force your

```
 1   clients to plea.
 2              MR. ROBINSON:  Of course.
 3              THE COURT:  But, you know, my position, and it might
 4   very well be that this type of stuff should be sent up to the
 5   Appellate Courts and be trotted out to the Supreme Court.
 6              MR. ROBINSON:  I think that we all, to a large
 7   degree, if not entirely agree on the facts of the case.  And
 8   it's the legal definitions of manufacturing.
 9              And now we have the Second Amendment issues that
10   are creating the vortex that I referred to earlier where it is
11   -- and recognizing that you are in charge of this vortex, we're
12   all somewhat floating around in it, and it would be nice to get
13   direction --
14              THE COURT:  In other words, you are circling the
15   sink hole, and I'm the sink hole, is what you are saying?
16              MR. ROBINSON:  Well, you may be in front of us of a
17   sink hole.
18              THE COURT:  Let me hear from the government, does
19   the government have any further comments?
20              MR. BOYLE:  Very briefly, Your Honor.
21              First, I think the Court is correct by
22   identifying the importance of the sale element here.
23              The firearms laws protect the ability of someone
24   to make their own firearm.  But the second someone starts
25   selling those firearms for livelihood and profit, then we
```

```
 1   approach the definitions in 921.
 2            Second, I would respectfully disagree with
 3   Mr. Robinson that the facts are all agreed upon here.
 4            I think the government and the defense have some
 5   differences on what actually happened with respect to the
 6   manufacturing here or the manufacturing and sale, and our
 7   position is that a trial record is necessary to flush this out.
 8            But we will certainly be preparing for trial in
 9   the meantime.
10            Finally, I think we're far afield from the
11   specific question the Court was requesting briefing on, which
12   is what this expert is going to testify about, and at this
13   point, I don't know that we have substantially more clarity
14   than we started with, Your Honor.
15            THE COURT:  Well, let me put it this way, I have
16   indicated insofar as their defense expert would testify, first
17   of all, I agree with the government that the defense expert can
18   testify as to what was going on in the particular defendant's
19   minds.  That is a given.
20            And I do think, however, that if the defendants
21   were to get on the stand and testify of their belief insofar as
22   some rule, for purposes of argument, although we don't have
23   that defined yet, the 80 percent rule -- the problem, I guess I
24   have is that assuming that there is -- let's assume that
25   everybody would agree that within the gun enthusiasts community
```

 1  there was a belief of the 80 percent rule, if you feel within

 2  the 80 percent rule, you could be subject to the licensing

 3  requirement provisions.

 4          To what extent -- I mean, the part of the

 5  willfulness aspect is knowledge that your activity was

 6  unlawful.

 7          Let me ask, this is a question for the

 8  government, that is an element the government has to prove,

 9  right?

10          MR. BOYLE:  Yes.  That is a standard under *Brian*,

11  Your Honor.  A general knowledge of unlawfulness, not the

12  firearms law specifically, Your Honor.

13          THE COURT:  Can you repeat that what you just said?

14          MR. BOYLE:  I believe Mr. Faerstein briefed this, if

15  the Court wants more detail, but under *Brian* just the

16  willfulness element is a general knowledge of unlawfulness, not

17  a knowledge of which firearm statutes an individual is alleged

18  to have broken.

19          MR. FAERSTEIN:  Just to put a finer point on that,

20  Your Honor, in *Brian* the Supreme Court found you don't have to

21  know the licensing scheme, you don't have to know your conduct

22  was running afoul of the licensing statute, but you have to

23  know that your conduct was unlawful generally.

24          That was a specific holding in *Brian*, and you

25  know, as we have briefed in our jury instruction submissions

**UNITED STATES DISTRICT COURT**

```
 1    here, they don't have to know that they were in violation of
 2    922(a)(1)(A) or the specific licensing requirement, but they
 3    need to know what they were doing without a license was
 4    unlawful.
 5              THE COURT:  Again, this is somewhat of a problematic
 6    area.
 7              It seems to me that one might have the situation
 8    where, let's say for a hypothetical -- you have a particular
 9    defendant who thought that it was not unlawful to assemble for
10    purposes of using the word of that sort, assemble a firearm.
11              Well, see the problem is this:  I mean, the
12    problem is there is a difference between assembling and then
13    there is a difference between the business of manufacturing.
14              And so there is a problem there, and so I could
15    see somebody thinking that they are not violating the law
16    insofar as they are putting it together, a completed firearm,
17    but that does not necessarily mean that that person does not
18    know that there is -- even if you have put it together
19    lawfully, that you are not allowed to sell -- in other words,
20    not allowed to engage in the business of manufacturing.
21              MR. FAERSTEIN:  Right, Your Honor.  The government
22    agrees with that distinction.
23              To the extent that they are going to be arguing
24    we thought this was all lawful, because people in the community
25    were putting together these guns for themselves, we believe
```

```
 1   that is irrelevant.

 2           The facts here they were doing this for sale to

 3   multiple customers, that they were getting referrals, and I

 4   will add as well, that, you know, they were assembling these

 5   completed weapons, which is a definition of firearm under 921,

 6   but they were also -- and this is alleged in the indictment and

 7   we briefed this in our opposition to their first motion to

 8   dismiss on vagueness -- they were both assembling these

 9   completed weapons, which we believe, and under the law is

10   manufacturing, but that not only were they doing that, they

11   were also arranging for the lower receiver components to be

12   machined as part of the process of manufacturing the completed

13   firearms.

14           So in a way, it's assembly, plus, let's say, all

15   for sale, all without a license, and to that end we don't agree

16   with the defendants on the facts.  I mean, it's just

17   fundamental here, and all of this will be borne out through the

18   trial record.

19           THE COURT:  All right.  Let me ask counsel, is there

20   anything else I should be doing at this point?

21           MR. HAIG:  Are you saying about the motions before

22   the Court right now?

23           THE COURT:  I have indicated that as to the

24   defendant's expert, I would allow the expert to rebut the

25   government's expert, but I won't allow him to interject items
```

```
 1    that are irrelevant to this action.
 2              MR. ROBINSON:  Are you deeming our cross-examination
 3    of the government's expert at this time about the 80 percent
 4    lowers irrelevant, or is that something we are going to -- do
 5    you believe it's relevant or?
 6              THE COURT:  Let me ask you, the 80 percent rule goes
 7    towards the manufacturing, I suppose, but it doesn't go towards
 8    the business of manufacturing.
 9              MR. ROBINSON:  Right.  Not to be so repetitive that
10    it's overwhelming, but that is our problem with the definition
11    of manufacturing which Congress has to do.  But let's assume
12    we're going to -- obviously, we will prepare, given what you
13    give us as the definition of manufacturing, but with respect to
14    the 80 percent, it goes directly to Mr. Schlotterbeck's and
15    Mr. Vlha's willfulness.
16              THE COURT:  But the problem is that the willfulness,
17    in other words, they are not accused of just the simple act of
18    manufacturing.
19              They are accused of engaging in the business of
20    manufacturing.  And so, you know, they could have been wrong or
21    correct, you know, because even assuming that they are right
22    about manufacturing, in other words, if the 80 percent rule is
23    valid and accepted everywhere, they would still need to get a
24    license if they are going to be engaged in the business of
25    manufacturing.
```

```
1              MR. HAIG:  Well not if they are assisting the
2    end-user in building their own firearm, which I know the
3    government contests that that was not the case with some of the
4    weapons.
5              But if I went to Mr. Schlotterbeck and Mr. Vlha
6    with a milled lower, and said, hey, can you help me put this
7    together, I don't really know what I'm doing, that is not a
8    violation of the law, even if you take a fee for doing it.
9              THE COURT:  Let's put it this way, on something of
10   that sort that may be something that should go to the jury.
11             For example, if that is only one instance where
12   he did it, that would be one situation, if he is known to set
13   up a business for other people to put together these components
14   for a number of people who paid them, that is another
15   situation.
16             Either of those two situations are what we have
17   here supposedly.
18             What we have here is for the majority of these
19   guns to have been put together by the defendants, not for the
20   assistance of other people.  Like, the first two were maybe
21   something that fell toward that, but that's not here in the
22   majority of the guns.
23             MR. ROBINSON:  I just want to make sure that I'm not
24   later accused of forfeiting or waiving anything.
25             We take the position, just so that this record is
```

```
 1   clear, that manufacturing isn't defined and the vagueness in
 2   that term is not clarified by "for the business of."
 3            It's like a reverse Heller, Your Honor, the
 4   second half of the clause is surplusage, not the first.
 5            But our position is that these gentlemen were
 6   assembling.  They believed they were following the law based
 7   upon the 80 percent gun community mindset, not to overstate it,
 8   and it goes to the government's ability to prove willfulness,
 9   and that's why we asked for the heightened willfulness be
10   entered, because a general misunderstanding of -- being
11   generally knowing you violated the law is different from
12   knowing the specific regulations that are involved here, which
13   is what this case is all about.
14            And I'm not asking the Court to reconsider
15   anything that I have said here, but if we're going to prepare
16   for trial, we need to have direction from the Court on what we
17   can question the expert about and what we can't, and that
18   direction has to be against the backdrop of the assumption that
19   Mr. Schlotterbeck will testify.
20            And he's going to testify, as I have set forth in
21   those 106 pleadings, about how he believed he was following the
22   law, particularly with respect to the 80 percent unmilled lower
23   receivers.
24        THE COURT:  Well again, let me hear a response from
25   the government.  What is the government's response?
```

```
 1            MR. FAERSTEIN:  Your Honor, I'm not sure exactly
 2   what I'm responding to.
 3            I think we have obviously already litigated the
 4   vagueness challenge, and Your Honor's ruling with respect to a
 5   assembly and our explanation of the facts of trial are going to
 6   bear out --
 7            THE COURT:  Let me stop you.  What I think the
 8   defense counsel is asking that he intends to cross-examine your
 9   expert on such topics as the 80 percent rule and things of that
10   sort.
11            The question he wants to know is would I sustain
12   that objection?  I think that's what you are asking,
13   Mr. Robinson?
14            MR. ROBINSON:  Yes, it is, thank you.
15            THE COURT:  So let me ask the government, what is
16   the government's -- what would the government's response be,
17   assuming that Mr. Robinson gets up and starts crossing your
18   expert about that subject?
19            MR. FAERSTEIN:  Right.  Your Honor, with respect to
20   the 80 percent rule, and I'm not sure it's a rule, but we have
21   called it a rule here today, that is irrelevant because these
22   guys were not doing it for themselves.  They were doing it for
23   sale.
24            This idea that they were just helping people put
25   together their own completed AR-15 weapons will be borne out as
```

```
 1   not accurate at trial.
 2                Even to the extent the first two could arguably
 3   fall under that, and we would disagree with that, there is a
 4   conversation the defendants have with an undercover in this
 5   case where they basically say, you know, we're going to do the
 6   whole thing.  If anyone ever asks you who cut, meaning the
 7   machine, the lower receiver, just say you did it yourself,
 8   which, you know, I think is very strong evidence of
 9   willfulness.
10                So to the extent they want to go down some rabbit
11   hole with respect to individuals doing this for their own
12   building of their own personal firearms, we would object that
13   that is irrelevant to the facts of this case and the charges.
14           THE COURT:  All right.  And I would probably agree
15   with the government on that.
16                Again, the 80 percent rule -- I mean, if this
17   situation had been not the business of manufacturing, but just
18   simply the question of manufacturing, then I would say, yeah,
19   the 80 percent rule might come into play.
20                But that is how the guns got together to exist as
21   operable firearms is not particularly at issue, the issue is
22   whether or not they were engaged in the business of
23   manufacturing these firearms.
24           MR. ROBINSON:  Obviously, we take a different
25   position, but I'm not going to retread that ground.
```

```
 1                  Is the Court inclined to do a written ruling with
 2    respect to this?
 3                  THE COURT:  No, I'm not.
 4                  MR. ROBINSON:  Can we maybe present something to you
 5    to say yes or no so that this record could be clear?
 6                  THE COURT:  The problem is I'm not going to be here,
 7    you know, we're supposed to start trial on the 22nd of July,
 8    and I'm not going to be here between the 18th and the 21st, so
 9    I'm not going to have much time to respond.
10                  MR. ROBINSON:  A joint filing?  Maybe we can talk to
11    the government about it.
12                  I don't -- I'm not sure there is a big factual
13    difference.
14                  THE COURT:  Well, last thing, because I'm not going
15    to be here, if the parties, for some reason -- I'm not
16    insisting on it -- if the parties agree on some sort of
17    stipulation insofar as a plea, but preserving various issues
18    for purposes of appeal, I have no problem with that.
19                  Give my clerk notice, because we have a jury on
20    order.  So I want to be able to not call the jury in if it's a
21    situation where you guys resolve the case prior to the trial
22    date, okay?
23                  MR. HAIG:  So the 22nd is confirmed so we know that?
24                  THE COURT:  Yes, in other words, I have a jury
25    ordered for the 22nd of July.
```

52

```
 1            Give my clerk as much advance notice if it's a
 2   situation where they are not going to be needed.
 3            MR. HAIG:  I was going to ask, is the Court going to
 4   issue any rulings today on the status of the jury instructions
 5   and which ones the Court is going to give, especially in
 6   regards to the enhanced willfulness instruction that we're
 7   asking for?
 8            THE COURT:  No.  But I will tell you what, if I have
 9   the time is there a particular instruction -- give me the
10   docket number and the particular jury instruction, and I will
11   take a look at that one in particular.
12            MR. HAIG:  I will have my co-counsel do that, I
13   don't exactly know which document it is in.
14            MR. FAERSTEIN:  Your Honor, I can weight in.
15            So the parties or the defendants filed a disputed
16   jury instructions submission, it's Docket No. 126, and they
17   were kind enough to include the government's position on the
18   instructions that they are disputing, and that includes the
19   willfulness definition.
20            THE COURT:  Okay.  I will take a look at the Docket
21   No. 126 in particular, the willfulness instruction, and I will
22   get back to you hopefully before the end of the week on that.
23            MR. HAIG:  Okay.  I'm sorry, go ahead,
24   Mr. Faerstein.
25            MR. FAERSTEIN:  Your Honor, I would just raise two
```

```
1    issues, hopefully they are quick.
2              One, is in light of Your Honor's ruling on the
3    motion to dismiss today, the Bruen-based motion, which is
4    predicated on the Second Amendment, the government now is to
5    some degree concerned about the defendants raising the Second
6    Amendment at trial as inviting nullification.
7              We think it's entirely irrelevant to this case
8    for all of the reasons we have briefed in our opposition, and
9    that is something that would be a motion in limine typically
10   you weren't aware of this until they filed their motion, but we
11   think it would be improper for them to refer to the Second
12   Amendment as protecting any of the conduct that is charged in
13   this case.
14        MR. ROBINSON:  On behalf of Mr. Schlotterbeck, we
15   would agree, that is a legal question, so we're not going to
16   raise that issue.
17        MR. HAIG:  It's not our intent either on behalf
18   plaintiff Vlha.
19        THE COURT:  Anything else from either side then?
20        MR. BOYLE:  One housekeeping issue, Your Honor.
21   With respect to the actual firearms and some firearm parts, the
22   government intends to bring actual firearms into court.  We
23   were coordinating with the U.S. Marshals and we intend to have
24   the firearms there during the presentation of the jury.
25              I'm aware some of the Judges in the district have
```

```
 1    restrictions on firearms in the courtroom.

 2              Does the Court have any specific instructions for

 3    us with respect to those which will obviously be unloaded, made

 4    safe, and so on.

 5              THE COURT:  Yes.  As long as they are unloaded, made

 6    safe, I have no problem.

 7              MR. BOYLE:  Thank you, Your Honor.

 8              THE COURT:  Let me have you guys come back on

 9    Thursday.  Hopefully I will be able to look at Docket No. 126

10    on the willfulness issue and give you my thoughts.

11              MR. HAIG:  This Thursday, Your Honor?

12              THE COURT:  Yes.  Are you available?

13              MR. HAIG:  Yes.

14              THE COURT:  All right.  Thank you.

15              THE COURTROOM DEPUTY:  What time Judge?

16              THE COURT:  Let's put them at 9:30.

17              MR. ROBINSON:  One second, please.

18              MR. HAIG:  Your Honor, is that defendants as well or

19    do you want us all there?

20              THE COURT:  No.  It's -- I'm just going to talk to

21    you about my thoughts on the willfulness instruction at that

22    point in time.  The defendants can be here if you they want,

23    they don't have to be here if they don't want, either way is

24    fine.  Anything else?

25              MR. ROBINSON:  No.  Thank you, Your Honor.
```

**UNITED STATES DISTRICT COURT**

```
 1              THE COURT:  Everybody, have a nice day.

 2              MR. BOYLE:  Thank you, Your Honor.

 3              MR. HAIG:  Thank you, Your Honor.

 4               (The proceedings concluded at 2:53 p.m.)

 5                              *  *  *

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

**UNITED STATES DISTRICT COURT**

1        **CERTIFICATE OF OFFICIAL REPORTER**

2

3    COUNTY OF LOS ANGELES  )
                            )
4    STATE OF CALIFORNIA    )

5

6             I, TERRI A. HOURIGAN, Federal Official Realtime

7    Court Reporter, in and for the United States District Court for

8    the Central District of California, do hereby certify that

9    pursuant to Section 753, Title 28, United States Code that the

10   foregoing is a true and correct transcript of the

11   stenographically reported proceedings held in the

12   above-entitled matter and that the transcript page format is in

13   conformance with the regulations of the judicial conference of

14   the United States.

15

16   Date: 13th day of July, 2022.

17

18

19                              /s/ TERRI A. HOURIGAN
                         _____
20                       TERRI A. HOURIGAN, CSR NO. 3838, RPR, CRR
                                  Federal Court Reporter
21

22

23

24

25


**UNITED STATES DISTRICT COURT**

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CRIMINAL MINUTES - GENERAL

| Case No. | CR 19-343-GW | Date | July 11, 2022 |
|---|---|---|---|

Present: The Honorable **GEORGE H. WU, UNITED STATES DISTRICT JUDGE**

Interpreter **NONE**

| Javier Gonzalez | Terri A. Hourigan | Daniel G. Boyle; Brian R. Faerstein |
|---|---|---|
| *Deputy Clerk* | *Court Reporter/Recorder, Tape No.* | *Assistant U.S. Attorney* |

| U.S.A. v. Defendant(s): | Present | Cust. | Bond | Attorneys for Defendants: | Present | App. | Ret. |
|---|---|---|---|---|---|---|---|
| 1. Travis Schlotterbeck | ✔ | | ✔ | Edward M. Robinson, Ret.<br>Brian A. Robinson, Ret. | ✔ | | ✔ |
| 2. James Bradley Vlha | ✔ | | ✔ | Jerome J. Haig, Ret. | ✔ | | ✔ |

**Proceedings:** **PRETRIAL CONFERENCE**

Hearing is held by video teleconference. Defendants' CARES Act Orders are on file [92 and 95].

Defendants' Joint Motion to Dismiss the Indictment per Fed. R. Crim. P. 12(b)(3)(A) [136] is denied.

Court hears further argument as to Motion in Limine No. 3 to Exclude Testimony of Proposed Defense Expert Steven D. Lieberman, Esq. [82]. Motion is granted in part and denied in part.

The pretrial conference is continued to July 14, 2022 at 9:30 a.m.

|  | 1 | : | 25 |
|---|---|---|---|

Initials of Deputy Clerk   JG

cc:

ER068