Nos. 22, 50281, 22-50283, 22-50312

IN THE UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff-Appellee, | ) |
| | ) |
| v. | ) |
| | ) |
| TRAVIS SCHLOTTERBECK and JAMES VLHA, | ) |
| | ) |
| Defendant-Appellant. | ) |
| | ) |

———————————

**APPELLANTS' JOINT EXCERPTS OF RECORD**
**VOLUME 2 OF 3**

———————————

Appeal from the United States District Court
for the Central District of California

No. 19-cr-00343-GW
Hon. George H. Wu, United States District Judge

Jerome J Haig (131903)
Law Office of Jerome J Haig
21143 Hawthorne Boulevard Suite 454
Torrance, CA 90503
Telephone: 424-488-0686
Facsimile: 424-271-5990

Attorney for Defendant-Appellant
**JAMES VLHA**

Edward M. Robinson (126244)
Rachael A. Robinson (313991)
Law Office of Edward M. Robinson
21515 Hawthorne Boulevard, Suite 730
Torrance, CA 90502
Telephone: (310) 316-9333
Facsimile: (310) 316-6442

Attorneys for Defendant-Appellant
**TRAVIS SCHLOTTERBECK**

1          UNITED STATES DISTRICT COURT

2     CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

3              HONORABLE GEORGE WU

4       UNITED STATES DISTRICT JUDGE PRESIDING

5                  - - -


6
United States of America,        )
7                    PLAINTIFF,   )
                                  )
8  VS.                            )  NO. CR 19-343 GW
                                  )
9  Travis Schlotterbeck, James Vlha, )
   et al.,                        )
10                   DEFENDANTS,  )
   _____)

11

12

13

14       REPORTER'S TRANSCRIPT OF PROCEEDINGS

15            LOS ANGELES, CALIFORNIA

16          THURSDAY, NOVEMBER 17, 2022

17

18

19     _____

20          KATIE E. THIBODEAUX, CSR 9858
            U.S. Official Court Reporter
21                  Suite 4311
              350 West 1st Street
22          Los Angeles, CA  90012

23

24

25

ER070

```
 1   APPEARANCES OF COUNSEL:

 2

 3   FOR PLAINTIFF, THE UNITED STATES OF AMERICA:

 4   Brian R. Faerstein

 5   AUSA - Office of US Attorney

 6   Public Corruption and Civil Rights Section

 7   312 North Spring Street, Suite 1500

 8   Los Angeles, CA 90012

 9

10   FOR DEFENDANT SCHLOTTERBECK:

11   Rachael A. Robinson

12   Edward M. Robinson, A Professional Law Corporation

13   21515 Hawthorne Boulevard, Suite 730

14   Torrance, CA 90503

15

16   FOR DEFENDANT VLHA:

17   Jerome J. Haig

18   Law Office of Jerome J. Haig

19   21143 Hawthorne Boulevard, Suite 454

20   Torrance, CA 90503

21

22

23

24

25
```

```
 1        LOS ANGELES, CALIFORNIA; THURSDAY, NOVEMBER 17, 2022

 2                        8:06 A.M.

 3                        - - - - -

 4

 5

 6        THE COURT:  All right.  Let me call the matter of

 7   United States versus Schlotterbeck and Vlha.

 8              Let me have appearances starting with

 9   government counsel first.

10        MR. FAERSTEIN:  Good morning, your Honor.  AUSA

11   Brian Faerstein on behalf of the United States.

12        THE COURT:  All right.  For the defense.

13        MR. ROBINSON:  Your Honor, good morning.  Edward

14   and Rachael Robinson on behalf of Mr. Schlotterbeck.

15              Your Honor, Mr. Schlotterbeck is present in

16   court with a lot of his family members, and he is out of

17   custody.  May we take our masks off to address you?

18        THE COURT:  If you want.  That is fine.  And for

19   the other defendant.

20        MR. HAIG:  Good morning, your Honor.  Jerome Haig

21   with Mr. Vlha who is present before the Court on bond

22   and, as Mr. Robinson said regarding his client, there are

23   several members in the audience, friends and family.

24        THE COURT:  All right.  We are here for

25   sentencing.  I will do them individually because there is
```

ER072

```
 1   no sense in doing them together.  Who do you want me to
 2   start with first?
 3        MR. ROBINSON:  Whichever you choose, Your Honor.
 4   We are ready.
 5        THE COURT:  Well, all right.  Let do Vlha first.
 6             What I will do is I will summarize the
 7   situation, and then I will allow both counsel and
 8   defendant to speak.
 9             I just had a question on his -- in the
10   presentence report, initially, it stated that he had
11   plead to Counts 1 and 3.  That is incorrect.  I am
12   looking at paragraph 1.  That is incorrect.  He only
13   plead to Count 1; is that correct?
14        MR. HAIG:  That's right, Your Honor.  He was not
15   charged in Count 3.
16        THE COURT:  All right.  Let me ask the counsel,
17   both counsel, other than what you have presented to me,
18   is there anything that is contained in the presentence
19   report that either side thinks is incorrect or should be
20   changed or modified?
21             I understand the government has an argument
22   about whether or not he is a minor participant, but,
23   aside from that, is there anything else the government is
24   objecting to in the presentence report?
25        MR. FAERSTEIN:  No.  Other than what is in our
```

```
 1   papers, Your Honor.

 2          THE COURT:  Okay.  Great.

 3              And for the defense as well?

 4          MR. HAIG:  That's correct.

 5          THE COURT:  Mr. Robinson, you have to hold your

 6   horses.

 7              Let me ask Mr. Vlha.  You have had an

 8   opportunity to look at the materials from the probation

 9   office; is that correct?

10          DEFENDANT VLHA:  Yes, Your Honor.

11          THE COURT:  Is there anything contained in those

12   materials that you think is incorrect or should be

13   changed or modified in any way?

14          DEFENDANT VLHA:  No, Your Honor.

15          THE COURT:  Okay.  Thanks.  Let me also ask

16   another question before I go further.

17              The defendants are going to be appealing the

18   Court's order; is that correct.

19          MR. HAIG:  So pursuant to the conditional plea, we

20   will be appealing the Court's ruling on the pretrial

21   motions that were reflected in the plea agreement.

22          THE COURT:  Okay.  And so that is the government's

23   understanding as well?

24          MR. FAERSTEIN:  It is.  I just want to correct one

25   thing.  Mr. Haig just said, he said the pretrial motions.
```

KATIE THIBODEAUX, CSR, RPR, CRR
UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
1   There is one motion for which they have reserved the
2   right to appeal, the one with respect to the Supreme
3   Court's decision in the Bruen case, and that is it.
4        THE COURT:  And I also presume that in this
5   particular situation no matter what I sentence them to,
6   if I sentence them to any custody time, they are not
7   going to surrender until after the appeal; is that
8   correct?
9        MR. HAIG:  That would be our request.
10       THE COURT:  That would be what I would do.  Let me
11  just indicate to the government, do you have an
12  objection?  Let's face it, that is what I am going to do.
13       MR. FAERSTEIN:  Thank you, Your Honor.  I will
14  take that under advisement.
15       THE COURT:  It is a fait accompli.  All right.
16  Because it is an interesting issue.  And, you know, there
17  is no sense -- it might change the overall sentence if
18  that portion gets reversed.
19            All right.  Okay.  So let me just start again
20  with the defendant No. 2.  Defendant plead to Count 1 of
21  the three count indictment, Count 1 charged him with a
22  violation of 18, U.S.C., Section 371 and 922(a)(1)(A)
23  which is conspiracy to manufacture and deal in firearms
24  without a license.
25            The presentence report indicates a base
```

```
 1   offense level of 12 under section 2X1.1C1 and 2K2.1.

 2   Then there was a two-level increase because the

 3   conspiracy involved more than three but less than seven

 4   firearms, and that is under section 2K2.1(b)(1)(A).  And

 5   then there was a negative two levels for minor

 6   participation under section 3B1.2(b).  And then there was

 7   a negative two levels for acceptance of responsibility

 8   under section 3B1.1 for a total offense level of 10.

 9            In terms of defendant's criminal history, he

10   has one misdemeanor DUI.  He received three years

11   probation plus a fine.  That equals one point.  And then

12   the probation office added two additional points because

13   the present crime was committed while he was on

14   probation.  So, therefore, he has three points which

15   places him in category 2.

16            In terms of the defendant's background, he is

17   approximately 29 years old.  His parents are alive and

18   retired.  He has two siblings.  Defendant lived in a

19   strict household but otherwise normal.  He graduated from

20   high school in 2012.  He joined the Marine Corps in April

21   of that year I think.  No.  He would be too young for

22   that.  He joined the Marines at some point in time

23   thereafter.  He was honorably discharged in 2021.

24            He has also worked as a contract landscaper

25   and as a painter.  Defendant is married.  Has two
```

ER076

1    children, ages 4 and 2.  Defendant purports to be in good

2    health.  Has no history of drug abuse.

3              The presentence report -- sorry -- the

4    presentence -- the probation office recommendation is at

5    an offense level of 10, criminal history category of 2

6    equals a guidelines range of between 8 and 14 months.

7    The probation office recommends a fine of $25,000

8    forfeiture insofar as any of the firearms that still

9    would remain and six months in prison which is obviously

10   below the guidelines range.

11             The government's brief objects to the negative

12   two levels for minor participant arguing that the

13   explanation provided by the probation office is contrary

14   to the factual portion of his plea.  Although, I think

15   the government would concede that of the defendant's, the

16   three defendants that were involved, Mr. Vlha played the

17   least significant role.

18             The government's brief argues that at an

19   offense level of 12, criminal history category 2, it

20   equals a guidelines range of between 12 and 18 months.

21   The government recommends 15 months.  The government

22   argues that the defendant was involved in manufacturing

23   ghost guns and, unless, you know, if there hadn't been

24   the investigation and the arrest that he wouldn't have

25   been involved in the creation and sale of more of these

```
 1   types of weapons and that that the government goes
 2   through the history -- well, not necessarily history but
 3   the prior incidents of the use of these particular types
 4   of AK15 weapons in various rather horrendous crimes.
 5   Although, there is no argument that the defendant himself
 6   was involved in anything of that sort, but these types of
 7   weapons are used in those types of situations.
 8            The defense brief argues that the defendant
 9   has a relatively free criminal background, has been free
10   of any criminal activities background, that if the minor
11   role is left the defendant would fall within zone B which
12   would be within the possibility of a probationary
13   sentence in this matter.  The defense has also included
14   letters from the defendant's former Marine squad leader,
15   a retired LA county sheriff and the owner of this
16   Juggernaut Tactical where the defendant worked.
17            Let me ask counsel, have I summarized the
18   situation correctly?
19        MR. FAERSTEIN:  Your Honor, with respect to the
20   minor role issue, I would just mention, I think Your
21   Honor mentioned that the government would concede the
22   defendant was less involved.  With respect to the
23   standard, it is substantially less culpable and, you
24   know, the government --
25            THE COURT:  I understand that.
```

```
 1          MR. FAERSTEIN:  Yes, Your Honor.

 2          THE COURT:  I didn't say that you had conceded the

 3     point that you were making.  I just said that you would

 4     have to admit that of the three he was probably the least

 5     culpable of the three, but that doesn't necessarily mean

 6     that he automatically gets the minor participant.

 7          MR. FAERSTEIN:  That's correct, Your Honor.

 8          THE COURT:  Okay.

 9          MR. FAERSTEIN:  Otherwise, yes, you have

10     summarized it correctly.

11          THE COURT:  All right.  Thank you.

12             Let me ask the defense counsel, have I

13     summarized the situation correctly?

14          MR. HAIG:  The only diffrence, Your Honor, is that

15     in the government's response to Mr. Vlha's sentencing

16     memorandum, there wasn't -- and, actually, in their

17     actual sentencing position papers, they didn't mention

18     the wide range of crimes that have occurred.  That was in

19     Mr. Schlotterbeck's.

20          THE COURT:  All right.  Well, let me put it this

21     way, it is an argument that they could have made.  And I

22     presume that you would have addressed it in the same way

23     that Mr. Robinson did.

24          MR. HAIG:  I profess shock at what they said.

25          THE COURT:  Well, let's put it this way.  I don't
```

```
 1    see how you can profess shock in the sense that AK15s
 2    seem to be the weapons of choice for mass murderers.
 3    Let's face it.
 4          MR. HAIG:  Let's face a lot of other facts too,
 5    Your Honor, that --
 6          THE COURT:  Again, I didn't indicate that he was
 7    creating these weapons with the intention to provide them
 8    to people who otherwise would use them in that fashion
 9    because I presume that there is also a lot of other
10    people who apparently have these weapons who don't go
11    around murdering people.
12          MR. HAIG:  Very well.  I just want to clarify that
13    that sentencing argument, for whatever reason, was not
14    made by the government against Mr. Vlha.
15          THE COURT:  All right.
16          MR. FAERSTEIN:  Your Honor, may I just correct one
17    thing for the record, the government did incorporate the
18    arguments it made with respect to Mr. Schlotterbeck and
19    all the things that would be applicable to Mr. Vlha in
20    the government's sentencing memo with respect to Mr. Vlha
21    in a footnote.
22          THE COURT:  All right.
23          MR. HAIG:  Your Honor, there is enough to read in
24    this case so I profess ignorance at not reading that
25    footnote.
```

```
1            THE COURT:  Let me put it this way, I am sure you
2    read the papers for the codefendant as well.
3            MR. HAIG:  Oh.  Yeah.  Yes, sir.  Yes, Your Honor.
4            THE COURT:  You are not that lazy.  All right.
5            You know, let me just -- I am sort of a little
6    bit torn on this one.  I am torn also on
7    Mr. Schlotterbeck as well.  In the sense that obviously
8    this is a serious crime, et cetera, but, you know, the
9    defendant really does not have a major criminal history
10   in this particular situation.
11           And, you know, frankly, something in the back
12   of my mind, you know, I think the problem is that I think
13   in the current discourse in the country, there is, I
14   think, a lot of I guess misinformation that is out there
15   in regards to guns and, you know, the legality of
16   different types and things of that sort.
17           And, you know, I think that some persons, not
18   necessarily this defendant but maybe this defendant, are
19   blind to the legal requirements not necessarily of the
20   license aspect because, frankly, that is an aspect but of
21   the nature of the types of weapons and the legality of
22   the types of weapons that were involved because my
23   understanding is that, here, it was -- the primary
24   activity was this what you call the activity to render
25   it -- what otherwise would be -- I can't remember what
```

KATIE THIBODEAUX, CSR, RPR, CRR
UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1    the piece of it it is.

 2           MR. HAIG:  The lower receiver.

 3           THE COURT:  The lower receiver.

 4           MR. HAIG:  Making it a 80 percent or a hundred

 5    percenter.

 6           THE COURT:  That type of stuff.  It is an issue,

 7    and, obviously, that is part of the issue that is going

 8    to be taken on appeal.  But it is an issue that I think

 9    that is -- well, what can I say.  It has been extremely

10    problematic.

11           So, but, I think the primary argument here is

12    the issue in regards to whether or not he can be deemed

13    to be a minor participant.  Is the probation office

14    totally incorrect in that regard, or is it something that

15    is arguable because if it is arguable, then I will

16    consider it, but, if it is a situation where it is just

17    simply wrong, then, obviously, I can't.

18           So that is the issue primarily because, if it

19    is, then the defendant might get a probationary sentence,

20    but, if not, then I can't give him a probationary

21    sentence.  So let me hear that argument on that point.

22           MR. FAERSTEIN:  Yes, Your Honor.  So it is a very

23    fact specific inquiry as the guidelines instruct.

24           The government would not say it is not a

25    debatable point.  However, the government in this case
```

```
1   has set forth and marshaled a significant amount of
2   evidence from the recordings of the meetings and the
3   calls and the text messages reflecting that the defendant
4   was integrally involved in this conspiracy.
5            He was communicating with the customers about
6   all aspects of it, the pricing, the supply, the supply of
7   parts, how long it takes to make them, prior firearms
8   that they have made, how payment gets done.
9            I mean, he he had knowledge as to all aspects
10  because he was involved.
11       THE COURT:  But to what extent did he formulate
12  those policies of the particular activity?  In other
13  words, he might have known them, but the question is did
14  he help formulate them.
15       MR. FAERSTEIN:  Well, Your Honor, in terms of
16  formula, there is a three person conspiracy.  It is a
17  three person partnership.  It is not a case where we
18  have --
19       THE COURT:  Well, you can have a two person
20  partnership too.
21       MR. FAERSTEIN:  That's correct.  You can.  But,
22  here, we have three, and the defendant was present and
23  involved in the discussions and communications with the
24  customers.
25            In fact, he told them in one case, yeah, we
```

ER083

```
 1    all talk, basically, you can put in an order with any of
 2    us.  And he discussed prior builds that they had done
 3    and, you know, using we, not they, we.  And that is also
 4    reflected in our papers.
 5              There is a significant amount of other
 6    customers and builds that is reflected in the evidence.
 7    It is not just the ATF customers with the six orders of
 8    firearms.  And I don't think I made this clear in the
 9    government's papers, but in terms of our mid point
10    recommendation, it is because we think that the
11    guidelines themselves undercount the number of guns.
12              Of course, in this factual basis, we specify
13    six, and that is what we agreed to in the guidelines, but
14    in terms of, you know, the amount of guns, we are well
15    over seven.
16         THE COURT:  Well, let me put it this way,
17    obviously, I agree that had the conspiracy not been found
18    out, there would have been more of an opportunity to
19    produce more of these guns, et cetera, et cetera, et
20    cetera.  I agree with you on that.
21         MR. FAERSTEIN:  And, then, there is also the
22    history of it, Your Honor.  As reflected in the
23    statements they made about prior sales, they have done
24    text messages.  They have had other customers and built
25    and sold other AR15-type firearms.  So it is not just had
```

```
 1   the conspiracy continued, it is what happened previously

 2   and during the course of the conspiracy.

 3           So it is broader than just these six sales,

 4   and the defendant was aware of all of that and was

 5   involved.  And, in one case, as we specified in the

 6   papers, one of the ATF customers texted the defendant.

 7   He sent him a photo of what they had done previously,

 8   said this is what we have done in the past, here is an

 9   example.

10           And then, with respect to Your Honor's

11   statements, regarding this being sort of an uncertain

12   area --

13       THE COURT:  I didn't say it was necessarily an

14   uncertain area.  I was just simply saying that there is a

15   lot of discussion by people who really don't understand

16   the area, and I think that has muddied the waters a lot.

17       THE COURT:  That may be true with other people but

18   not these defendants, Your Honor.

19           We cite evidence showing that they understood

20   they needed to have trust with their customers and, in

21   fact, said to the ATF undercover officer, if someone ever

22   asks you, you did this yourself, we didn't do it.

23           So that shows their knowledge that the guns

24   that they were making were not legal, and it was not

25   legal to sell them.  There is no loophole here with
```

```
1   respect to setting up a business to manufacture and sell

2   AR -- ghost gun AR15 type firearms.  They had full

3   knowledge of that.

4         THE COURT:  All right.  Let me hear a response

5   from the defense counsel.

6         MR. HAIG:  Sure.  Your Honor, I also want to

7   discuss some disparity issues if the Court wants to

8   entertain that.  If not --

9         THE COURT:  I mean, you know, the only one that

10  really would be the primary one is the other defendant;

11  isn't that correct?

12        MR. HAIG:  You mean Mr. Schlotterbeck?

13        THE COURT:  Not Mr. Schlotterbeck.

14        MR. HAIG:  You mean Mr. Roh?

15        THE COURT:  Yes.

16        MR. HAIG:  Sure.  I mean, I discussed it pretty

17  extensively.

18        THE COURT:  That is the only one.  The other ones

19  I don't think -- I am not necessarily persuaded because,

20  again, they are not -- I mean, I don't know the extent to

21  which one can say it is a comparable situation.

22        MR. HAIG:  Well, I don't think there is anything

23  comparable on the upside, on the upside meaning with a

24  defendant in this district where there are any facts --

25  there are none where any facts are similar to Mr. Vlha
```

1    where we have got this small amount of firearms, and I

2    will quite firmly protest what the government is saying

3    about there being --

4         THE COURT:  Well, but let me just ask.  So you are

5    saying that the government can't cite to a situation

6    where -- but, here, it is the manufacturing and sale and

7    without a license.  And those situations, aren't they the

8    exact same thing?

9         MR. HAIG:  Well, so, this is a complex factual and

10   legal interplay, and that is why there needs to be a

11   higher sense of willfulness because we are dealing with a

12   statutory scheme that is --

13        THE COURT:  Well, no.  Let me put it this way,

14   there may be some aspects that I agree with you in terms

15   of the more complexity insofar as the nature of some of

16   the aspects of the manufacturer, but there is no --

17   really, it is not a complex issue in regards to sale of

18   firearms without a license.  That one is obvious.

19        MR. HAIG:  I think -- well, for the count of

20   conviction, yes.  But I think when the government makes

21   the statement that there are a lot of other guns there,

22   that these defendants or Mr. Vlha is engaged in a

23   conspiracy in manufacturing and selling without a

24   license, that is not true.

25             And I will tell you why it is not true, Your

1    Honor.  All we have to do is look at the Roh case and

2    look at some of the facts in our case.  Let's look at the

3    Roh case, for example.  Judge Selna granted a motion to

4    dismiss any of the transactions where Mr. Roh actually

5    did not physically do everything soup to nuts.  And by

6    soup to nuts, I am talking about actually drill the holes

7    in the lower receiver and then assemble the weapon.

8            So when Judge Selna ruled on that Rule 29

9    motion, he said to the extent that Mr. Roh -- and I cited

10   the quote in my moving papers of his tentative ruling --

11   to the extent that Mr. Roh fully assembled the firearms

12   and committed all the acts of assembling the firearms, he

13   is guilty of selling firearms without a license.  We are

14   talking about hundreds of guns.

15           However, Mr. Roh like a lot of other gun

16   enthusiasts in Orange County, LA County, everywhere in

17   California have these drilling parties where I go and buy

18   a piece of metal which is called a lower receiver if you

19   want to call it that, that is unfinished, and it is only

20   a piece of metal.  I can buy it at any place, along with,

21   Your Honor, there is all these photographs in the

22   government's --

23           THE COURT:  I know.  I saw the photographs.

24           MR. HAIG:  Right.  So everything in those

25   photographs can legally be purchased with the exception

```
 1   of a drilled lower receiver.  And when I say it can be

 2   purchased, without ID, without a background check,

 3   without any of those things.  And I can buy all of those

 4   items on the Internet.  I can drill the holes in myself.

 5   I can construct a unserialized firearm, an AR15, and it

 6   is a legal firearm.  I do not have to register it.  I do

 7   not have to get a serial number.  I can do those things,

 8   but I don't have to.

 9            So why is this important?  Well, it is

10   important because in at least the first two or three

11   transactions in this case, the undercover informant or

12   officer, whomever it might have been, actually took an

13   unfinished lower and went to Cherokee and had it drilled.

14   And who drilled it?  It was Mr. Dekoning, the third

15   defendant in this case who was dismissed.

16            So when he says there is all these other guns

17   out there, first of all, he is engaging in wild

18   supposition of that is what was going on because this was

19   not a business that was advertized on the Internet.  They

20   were not trying to make money, and it is clear that

21   Mr. Vlha made no money around this other than his salary

22   in vaping -- in vape pens and gun parts.  That is what he

23   was there doing.

24            THE COURT:  All right.

25            Let me hear from the government.  I understand
```

```
 1   your argument.

 2        MR. FAERSTEIN:  Yes, Your Honor.  And I thought

 3   there was a plea hearing in this case where the defendant

 4   plead guilty.  Maybe I am mistaken.

 5        THE COURT:  Well, I will say this.  He is trying

 6   to backtrack a little bit.  But I think that is more of

 7   his attorney than him.

 8        MR. FAERSTEIN:  Okay.  Well, Your Honor, with

 9   respect to the suppositions.  I just want to address some

10   of these points.  I am going to just quote from the

11   defendant's mouth that we cited in our papers various

12   things he said to the ATF customers reflecting their

13   building and selling other firearms prior to the sales

14   they did to the ATF customers.

15        We are all, quote, we are always building one.

16   Quote, what we usually do for the build is.  Quote, this

17   is for the returning customers on the build.  Quote, we

18   built three.

19        There is not -- it is not supposition.  There

20   is evidence.  And Mr. Vlha in his papers did not address

21   any of the evidence that the government set forth with

22   respect to the broader, the broader context of this

23   business.

24        Second, with respect to the Roh case, here,

25   there may have been some photos in our exhibit that had
```

```
 1    some of the lower receivers that maybe had not been cut.
 2    There was also lots of photos of completed AR15 firearms,
 3    and, actually, most of them were complete AR15 firearms.
 4    And it was showing the nature of their manufacture from
 5    soup to nuts.
 6              And that is what this case is about,
 7    manufacturing and selling the completed AR15 firearms.
 8    The ATF customers didn't buy lower receivers that had
 9    been milled.  They bought completed AR15 firearms, and
10    that is why this is a different case than Roh.
11              With respect to their arguments about the
12    diversion that was extended to Roh, that just has no
13    bearing on this particular case.  That was a separate
14    case.  There were separate legal issues there.  The case
15    did involve allegations of the sale of lower receivers,
16    not just completed firearms, but that doesn't mean that
17    now, after that case, no one should be held accountable
18    for manufacturing and selling AR15 firearms without a
19    license.  And that is essentially what they are asking
20    the Court to find.
21              The government cited some other cases in the
22    response to Mr. Vlha's sentencing memo where the
23    government has prosecuted and convicted and obtained
24    sentences for people that were dealing in firearms
25    without a license.  We are not saying that those are
```

```
 1   comps in terms of similarly situated defendants.  We are

 2   just saying that demonstrating that this is still a crime

 3   that is prosecuted and that courts sentence defendants to

 4   significant sentences because of the seriousness of the

 5   offense.

 6        THE COURT:  Let me ask a couple of questions as

 7   well.

 8            If I impose any -- well, first of all, did he

 9   ever do any time at all?

10        MR. HAIG:  One day.

11        THE COURT:  One day.  So in this situation I can

12   impose supervised release.

13            All right.  And if I impose additional custody

14   time, can I do it in terms of some home detention, or

15   does it have to be physical custody?

16        MR. HAIG:  Your Honor, under zone B, I mean the

17   guidelines are --

18        THE COURT:  Well, zone B, I can put him in a

19   probationary sentence.  If I don't put him on probation,

20   can I put a sentence with home detention as the custody

21   time?

22        MR. HAIG:  You can.  And because the guidelines

23   and the guideline levels, zone A, B, C and D are only

24   advisory.

25        THE COURT:  Well, I understand that.
```

KATIE THIBODEAUX, CSR, RPR, CRR
UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1          MR. HAIG:  So I guess the point I am making, Your

 2   Honor, there is no prescription in the statute against a

 3   probationary grant, and, if there is none in the statute,

 4   then the court is free to do that regardless of what zone

 5   defendant falls under.

 6          THE COURT:  All right.  Let me hear from the

 7   government.

 8          MR. FAERSTEIN:  Well, Your Honor, first of all,

 9   our guidelines calculation is zone C, not zone B.

10          THE COURT:  Yes.  I understand that.

11          MR. FAERSTEIN:  Your Honor knows that.

12              I believe under zone C, there is not a home

13   detention sort of residual.  However, Mr. Haig is correct

14   the guidelines are advisory.

15          THE COURT:  Okay.

16          MR. FAERSTEIN:  But, you know.

17          THE COURT:  Also, I mentioned earlier the

18   forfeiture aspect.  There is nothing at this point in

19   time that is forfeiting at this point, or is there

20   something?

21          MR. FAERSTEIN:  There is no forfeiture, Your

22   Honor, here.

23          THE COURT:  Also, in terms of the fine amount, the

24   probation office was requesting 25,000, that amount.  Is

25   the government asking for more or less?
```

```
 1          MR. FAERSTEIN:  Your Honor, in terms of the fine,
 2    we agree with probation that the defendant seems to have
 3    significant assets and net positive monthly cash flow.
 4    We really defer to the Court in terms of the fine amount.
 5    We think the fine is supposed to be punitive as well.
 6    That is in the guidelines.  That is the purpose of it,
 7    one of the purposes of it.  So it is part of the overall
 8    sentencing deterent.
 9          THE COURT:  Okay.  Yes.
10          MR. HAIG:  Can I just -- I will go with the fine
11    first, Your Honor.
12          THE COURT:  Sure.
13          MR. HAIG:  I am retained in this case, but my fee
14    was -- and this is my fault, not anybody else's, but my
15    fee was less than I would make if I was CJA counsel in
16    this case.  And that is not because the fact that I
17    underpriced it, it is because Mr. Vlha --
18          THE COURT:  You are just a nice guy.
19          MR. HAIG:  Mr. Vlha was in the military.  I was in
20    the military.  And I gave him what we call a military
21    discount.
22          THE COURT:  So, therefore, if he is ordered to pay
23    a fine, then he can at least think to himself at least I
24    saved some of it from the expense of my attorney who
25    provided me with wonderful representation during the
```

ER094

```
1    course of this entire litigation.
2          MR. HAIG:  Your Honor, his father paid my entire
3    fee.  His monthly positive cash flow is less than a
4    hundred dollars.  His only asset is his home which is
5    under mortgage just like most other people's homes.  He
6    had to quit his job the day he plead guilty, he quit his
7    job that exact same day at Juggernaut.  The president of
8    Juggernaut is here today.  He wrote a letter to the Court
9    as the Court knows.
10         THE COURT:  Yes.
11         MR. HAIG:  I don't see that -- I think the Court
12   should waive the fine in this case.  I don't see why a
13   fine is --
14         THE COURT:  Let me put it this way in terms of the
15   punitive that the Court would impose, I presume he would
16   prefer the punitive monetary as opposed to the punitive
17   in custody.
18         MR. HAIG:  Well, sure.  But I am doing what I can
19   to try to preserve my client's rights as best as
20   possible.  Listen, I adopt some of the things that the
21   probation officer said, and others I do have a bit of a
22   quarrel with.
23         If I could just speak to the Roh case quickly.
24   I don't want to beat a dead horse here.
25         THE COURT:  You are beating a dead horse here.
```

```
1         MR. HAIG:  Well, his conduct was offensive, and
2    the reason the government didn't let that conviction
3    stand is because there would have been an appeal and they
4    did not want an adverse ruling on appeal.  The reason why
5    we didn't get similar love from the government in this
6    case that Mr. Roh got, even though the facts in this case
7    are one one hundredth or one one thousandth of what
8    Mr. Roh did, a bustling gun business that was advertised
9    and that was his sole means of support and good support
10   at that was --
11        THE COURT:  Let me just stop you.  This particular
12   AUSA did not make the determination.  It was made by the
13   higher-ups in his office, and they are weighing various
14   things.  And just because of the fact that they evaluate
15   one case in a particular way doesn't necessarily mean
16   that all the cases of that type have to be discounted
17   because of the determination that was made in that case.
18        MR. HAIG:  Sure, Your Honor, but what was I told?
19   I was told that the reason why Mr. Vlha and
20   Mr. Schlotterbeck are being prosecuted in this case is
21   because they found out a different way to charge the
22   case.  New language.  So different English words to
23   charge conduct that is vastly less serious.
24        THE COURT:  One could look at the Supreme Court
25   decisions and say they find in vastly different ways of
```

```
1    slicing and dicing too.
2         MR. HAIG:  We have conduct that happened at the
3    same time and essentially the same locale --
4         THE COURT:  Let me stop you.  I understand your
5    argument.  The basic -- my basic determination in this
6    case ultimately will be based on my evaluation of the
7    defendant himself.  I am not going to necessarily say
8    that there is something that, you know, I am going to cut
9    him a break because of something that happened in another
10   court.
11        It is really, you know, whether or not the
12   extent to which obviously he has already conceded that he
13   has done something wrong.  He plead.  And he made certain
14   admissions so I understand those.  So the real question
15   is what is the appropriate sentence in this situation
16   after all that.
17        MR. HAIG:  One last issue on Roh, then, Your
18   Honor, if I may.
19        THE COURT:  Yes.
20        MR. HAIG:  The offense conduct, even though the
21   conspiracy went until the middle of May, middle of 2017,
22   the last overt act that my client actually committed was
23   in 2016 which was before his DUI arrest in 2017.  That is
24   why I say that he should have a criminal history category
25   of 1 and not 2.  And I understand the government's
```

```
 1   argument to the contrary because the conspiracy was

 2   ongoing, but there was no conduct that my client engaged

 3   in.

 4           Secondarily, when that last overt act occurred

 5   in 2017, that is when the ATF agents paid a visit to

 6   Mr. Schlotterbeck, talked to him about what happened.

 7   And here is what is important about that.  My client was

 8   not there.  He wasn't there that day.  He was either on

 9   vacation or just not working that day.  Mr. Schlotterbeck

10   allowed them to search the business, and they took all

11   the items they wanted to take.  He talked to them about

12   the transactions that were the subject of this

13   proceeding, and then the ATF said don't do this anymore,

14   stop it.  And they did.

15           And here is why that is important, Your Honor.

16   Mr. Roh was told that several times and basically thumbed

17   his nose at the government and continued to commit

18   egregious conduct even when he knew that the ATF and the

19   federal government had specifically told him that it was

20   wrong.  That never happened in this case.

21       THE COURT:  I understand.  Let me just ask this

22   other question.  Did the defendants produce their

23   customer sales list?

24       MR. HAIG:  They didn't have a customer sales list,

25   Your Honor.
```

```
 1          THE COURT:  They had a record of how many guns
 2   they had sold, and I presume they know to whom.
 3          MR. HAIG:  I don't even know if that exists.
 4   Maybe Mr. Robinson and Ms. Robinson can talk to you about
 5   that.
 6          MR. FAERSTEIN:  Your Honor, I don't believe we
 7   ever found a customer list.  This was extremely, you
 8   know, covertly undertaken, and it was based on trust and
 9   a cash business.
10          THE COURT:  All right.  All right.
11               Anything else from counsel?
12          MR. HAIG:  One other thing, Your Honor.  When my
13   client was arrested, unlike Mr. Kwan in this case who was
14   arrested with a whole category of legal firearms,
15   firearms parts including I believe an automatic weapon
16   conversion part, my client, when he was arrested at his
17   home, was arrested with a number of firearms, all legal,
18   all registered to him and all surrendered to a licensed
19   gun dealer within days of his arrest pursuant to the
20   Court's order.
21               He has been a model citizen under pretrial
22   supervision.  He even abided by the Court's orders when
23   he was on his weekend training in the Marine Corps by
24   telling his commanding officer that he was not -- well,
25   he told him that he could not possess a firearm during
```

1   any of the training which is kind of difficult if you are

2   an infantryman in the Marine Corps.  So he was doing

3   other duties during the training so he didn't have to run

4   afoul of that either.

5        THE COURT:  All right.

6        MR. HAIG:  He is a good man, Your Honor, and I do

7   not think that any time in custody is warranted.

8        THE COURT:  Any additional time.

9        MR. FAERSTEIN:  May I respond to one thing, just

10  add one final note, Your Honor.

11       THE COURT:  Yes.

12       MR. FAERSTEIN:  With respect to the criminal

13  history category, we address in in our papers, but the

14  conspiracy did continue until 2017.  The defendant did

15  not withdraw.  They put no evidence out.  The law is very

16  clear on that.

17           And he admitted to that in his factual basis,

18  again, that the conspiracy lasted through June, 2017.

19  The factual basis is the factual basis.

20       THE COURT:  I understand that.

21       MR. FAERSTEIN:  Finally, Your Honor, just with

22  respect to -- and I don't know if this came through in

23  the government's papers, but we have real concerns with

24  respect to Mr. Vlha in terms of during the sentencing

25  proceedings and the papers, him really disavowing the

```
 1    conduct that he engaged in, the factual basis he affirmed
 2    in court and minimizing his role and the seriousness of
 3    this conduct.
 4            And that is something we think Your Honor
 5    should account for under 3553(a) in terms of the
 6    seriousness of the offense and the specific deterrence.
 7            THE COURT:  I understand your argument.
 8            MR. FAERSTEIN:  Yes, Your Honor.
 9            THE COURT:  Let me hear from the defendant.
10            Sir, is there anything you wish to say to the
11    Court before the Court sentences you?
12            THE DEFENDANT:  Good morning, your Honor.  Thank
13    you for taking this time this morning with us.
14            Leaving the Marine Corps was not something I
15    wanted to do, but I had to.  I hoped that the actions of
16    this case -- sorry -- do not reflect on my character.
17            Thank you.
18            THE COURT:  Okay.  All right.
19            I have considered the materials that have been
20    presented to me by the government, by the probation
21    office and also by the defense.  I have considered the
22    factors under 3553, subpart (a), and I will sentence as
23    follows:
24            I will find that the probation office's
25    calculation of the guidelines range in this case is
```

```
 1    correct.  I understand the government's argument that,
 2    you know, that perhaps the government -- the probation
 3    office was being extremely generous insofar as its
 4    acceptance of the defendant's role in this case and,
 5    therefore, there is an argument that could be made that
 6    the minor participant negative two levels should not have
 7    been applied.  But I think it is arguable one way or the
 8    other.  And it is not a situation where I think it is
 9    totally wrong, and so I will accept that
10    characterization.
11          And, you know, to be blunt on this, some of
12    the things that sway me in this matter in terms of the
13    sentencing is the defendant's real lack of criminal
14    activity prior to this and his service in the military,
15    et cetera, which maybe I am old fashioned, but stuff of
16    that sort does impress me.  So I will sentence as
17    follows:
18          I will give the -- well, actually, let me do
19    it this way.  Rather than putting him on probationary
20    sentence, what I will do is I will give him a time served
21    sentence except that I will impose a supervised release
22    for a period of I think it is two years -- no -- three
23    year period of supervised release under the following
24    terms and conditions:
25          First of all, I will order him to pay the
```

```
 1   special assessment of a hundred dollars that will be due

 2   forthwith.  I will order him to pay the fine of $25,000

 3   during the period of supervised release.

 4              As part of the terms of supervised release, I

 5   will order as follows, that he comply with all the rules

 6   and regulations of the probation office and also Second

 7   Amended General Order 20-04, that he cooperate in the

 8   collection of a DNA sample from himself.

 9              The defendant doesn't have any history of

10   prior substance abuse, and so, therefore, I will not

11   order testing in that regard.

12              What I will do is I will not place him on home

13   arrest situation, et cetera.  Let me just ask the defense

14   counsel, how many hours does he work a week at this point

15   in time?

16        (Defendant and counsel confer.)

17        MR. HAIG:  About 50 hours a week this past week at

18   least.  So a full time job and sometimes a little bit

19   more than 40 hours a week.  So it was 50 hours last week,

20   and that is fairly consistent, Your Honor.

21        THE COURT:  Okay.  I will order him to do an

22   additional 20 hours a month in community service for six

23   months, and he and the probation office can talk about

24   the format of that type of community service.

25              Also -- obviously, the defendant, since he is
```

```
1    a felon now, he can't possess a firearm.
2            The defendant is also ordered that if he is
3    requested by any probation office or other law
4    enforcement officer to a search of either his property,
5    his person, his residence, vehicles, and any -- well,
6    actually, I will include his cell phone on that as well,
7    he shall submit to such a search and that failure to
8    submit to such a search can be grounds for request to
9    revoke the terms of his supervised release.
10           And, however, any such search has to be done
11   at a reasonable time and in a reasonable manner and based
12   upon reasonable suspicion that the defendant has violated
13   either the terms of his supervised release or has
14   violated the -- any other law, federal, state or local in
15   nature.
16           Let me ask the government, is there anything
17   else in terms of the terms of supervised release?
18       MR. FAERSTEIN:  I don't think so, Your Honor.
19       THE COURT:  Okay.  All right.  Let me ask, is he
20   named in Count 2?
21       MR. FAERSTEIN:  Yes, Your Honor.
22       THE COURT:  Does the government move to dismiss
23   Count 2?
24       MR. FAERSTEIN:  We will move to dismiss Count 2,
25   Your Honor.
```

```
 1          THE COURT:  Okay.  You don't have to move.  You
 2   just have to dismiss.
 3          MR. FAERSTEIN:  I thought it was with leave of
 4   Court.
 5          THE COURT:  All right.  I will dismiss Count 2 at
 6   this point in time.
 7               Let me ask the defendant, do you have any
 8   questions about your sentence?
 9          THE DEFENDANT:  No, Your Honor.
10          THE COURT:  I am cutting you a break at this point
11   in time.  No offense, but I don't want to see you again.
12   Well, at least not in this context.  All right.
13               Let me ask the defense counsel, you were about
14   to add something?
15          MR. HAIG:  Just is the Court going to order the
16   stay pending.
17          THE COURT:  I will stay this -- well, actually, I
18   don't know why I would stay because it would be -- the
19   only thing I guess would be staying is the community
20   service time.  I will give him a choice on this.
21   Because, otherwise, he is not doing any additional
22   custody time.
23          MR. HAIG:  Well, the fine is a punitive part of
24   that as well.
25          THE COURT:  No.  But I indicated the fine would
```

```
 1   only have to be paid during the period of supervised
 2   release which is three years so I presume the -- put it
 3   this way, I will order that he not necessarily have to
 4   pay the fine during the period of time that the case is
 5   on appeal.
 6           MR. HAIG:  All right.
 7           THE COURT:  And he can elect if he wants in terms
 8   of his -- the community service, if he doesn't want to
 9   start it right away, he can also postpone that until the
10   appeal is resolved.  He can do that if he so desires, but
11   those -- if his appeal is unsuccessful, he is going to
12   have to complete all of that within the scope of the
13   remaining period of time of three years.
14           MR. HAIG:  That is fine.
15           THE COURT:  So that will be what I will order.
16   All right.
17           Okay.  Mr. in terms of Mr. Schlotterbeck?
18           MR. FAERSTEIN:  Your Honor, if I may, I just want
19   to make sure the record is crystal clear on the waivers.
20   With respect to the waiver of appeal of the conviction.
21           THE COURT:  Let me indicate to the defendant, in
22   this particular matter you agreed to waive some but not
23   all of your appeal rights in this matter, and, obviously,
24   in the course of the plea agreement, you were reserving
25   specifically one specific aspect for an appeal.
```

```
 1              However, insofar as anything else in the plea

 2   agreement insofar as appeals are concerned that you have

 3   waived, those waivers are still applicable.  So it is not

 4   going to be a basis for you to raise them on appeal

 5   because, in fact, you have waived them.

 6              And I presume that defense counsel, you will

 7   be representing him for any purposes of any appeal so I

 8   be don't need to advise him of his remaining appeal

 9   rights; right?

10        MR. HAIG:  I will be representing him, and I will

11   be seeking appointment of counsel on the appeal, Your

12   Honor.

13        THE COURT:  From me?

14        MR. HAIG:  From the Court of Appeal.

15        THE COURT:  Okay.  Good.

16        MR. FAERSTEIN:  And the only reason I said that,

17   Your Honor, is I think in the discussion we had with

18   respect to the sentencing factors, there was some

19   discussion about the lower receiver issue being somewhat

20   ambiguous which the government has a different view on

21   but --

22        THE COURT:  When I said ambiguous, I meant

23   ambiguous amongst members of the public.  Because the way

24   in which those things are discussed is somewhat

25   irresponsible.
```

KATIE THIBODEAUX, CSR, RPR, CRR
UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    MR. FAERSTEIN: Understood, Your Honor. But there
2    was a motion to dismiss that was partly premised on that.
3    That the defendant, both Vlha and Schlotterbeck, had
4    waived their right to appeal that motion to dismiss.
5         THE COURT: Yes.
6         MR. FAERSTEIN: The only one that is pending that
7    they have preserved is the Bruen case, the Supreme Court
8    case.
9         THE COURT: Let me ask defense counsel, that is
10   your understanding as well; right?
11        MR. HAIG: My understanding is what is set forth
12   in the plea agreement so whatever characterization the
13   government has is their understanding of what is in the
14   plea agreement as well so I am not going to adopt his
15   specific language, but I don't quarrel it either.
16        THE COURT: Okay. All right. Wishy-washy
17   position.
18             The bond I will exonerate -- well, let me just
19   ask what about the bond? My clerk is asking.
20        MR. HAIG: Well, now that the case is over and the
21   Court has imposed judgment, I would ask that the bond be
22   exonerated, and I would ask that the Court not ask for an
23   appeal bond.
24        THE COURT: Actually, I would agree. I don't need
25   the bond because I have placed him on supervised release.

```
 1    So he has to obey all the terms and conditions of that
 2    so, for that reason, I will exonerate the bond at this
 3    point in time.  I will exonerate it upon his reporting to
 4    the probation office.
 5         MR. HAIG:  Is the court not going to require bond
 6    pending appeal either?
 7         THE COURT:  I won't require bond pending appeal.
 8    He has made all his appearances.  All right.
 9             So let me get to Mr. Schlotterbeck.
10             Same situation, same questions I would ask the
11    counsel.  Aside from what you have already indicated to
12    me in your moving papers, is there anything that is
13    contained in any of these papers that either said thinks
14    is incorrect or should be changed or modified in any way?
15         MR. FAERSTEIN:  No, Your Honor.
16         MR. ROBINSON:  No, Your Honor.
17         THE COURT:  And let me ask Mr. Schlotterbeck.  Did
18    you have an opportunity to look at the materials from the
19    probation office?
20         DEFENDANT SCHLOTTERBECK:  Yes, Your Honor.
21         THE COURT:  You discussed them with your counsel?
22         DEFENDANT SCHLOTTERBECK:  Yes, Your Honor.
23         THE COURT:  Is there anything contained therein
24    that you think should be changed or modified in any way?
25         DEFENDANT SCHLOTTERBECK:  No, Your Honor.
```

```
1              THE COURT:  Let me summarize the situation.

2              The defendant plead to Counts 1 and 3 of a

3    three count indictment.  Count 1 charged him with a

4    violation of 18, U.S.C., Section 371 and 922(a)(1)(A)

5    which is conspiracy to sell firearms without a license

6    and Count 3 charged a violation of 18, U.S.C., Section

7    922(d)(1) which is sale of a firearm to a felon.

8              The presentence report indicates an offense

9    level -- and the probation office combined or grouped

10   both counts together for the purposes of the calculation.

11   And under section -- that was under section 3D1.2(d), the

12   base offense level was set at 20 under section

13   2K2.1(a)(4)(B), and then there was a two level increase

14   because of the amount of firearms that were involved.

15   That is under section 2K2.1(b)(1)(A) for a total offense

16   level of 22.  Then, there was a negative two levels for

17   acceptance of responsibility but not three because I

18   guess the argument was that the case had almost gone to

19   trial and it was plead at the last minute.

20             In terms of the defendant's criminal history,

21   he has none.  Therefore, he falls within category 1.  He

22   is approximately 37 years old.  His parents are deceased.

23   He has one sister and two half sisters.  Defendant grew

24   up in a low income household.  His father used drugs and,

25   his parents were divorced when he was 7 or 8.  His mother
```

```
 1   died when he was 10, and he was raised primarily by his

 2   grandmother and aunt.  Defendant's father died when the

 3   defendant was in high school.

 4           Defendant graduated high school and shortly

 5   thereafter joined the Marines.  He served in the Marine

 6   Corps from July of '04 through June of 2021.  He was

 7   honorably discharged.  He received various commendations

 8   and awards from the Marine Corps and did a tour of duty

 9   in Afghanistan between 2009, 2010.  From 2007 to the

10   present, the defendant has owned a signage company.  The

11   defendant married Janelle Trimble in 2005.  They were

12   divorced in 2014.

13           They had two children now ages 16 and 14.

14   After the divorce, defendant began drinking heavily.  And

15   during the period of time he was drinking heavily, he was

16   also participating in the criminal activity that is the

17   subject of this action.

18           The defendant married his current wife in

19   2017.  They have two children ages 3 and 4 months, and he

20   has -- well, since the marriage, has not had his alcohol

21   problem.

22           Defendant got a Bachelors degree in 2020 and

23   earned a Black Belt in Jujitsu.  Defendant reports to be

24   in general good health except for some PSD associated

25   ailments including a right knee pain syndrome, headaches,
```

```
 1   tinnitus, and the defendant obviously has prior history

 2   of alcohol abuse but no illegal drug use.

 3          The probation office recommendation is at a

 4   criminal history category of 20 -- sorry -- criminal

 5   level of 20 and a criminal history category of 1 equals a

 6   guidelines range of between 33 and 41 months.  The

 7   probation office recommends 24 months and a fine plus,

 8   sorry, a fine of a hundred thousand dollars and

 9   forfeiture.

10          The government recommends a 37-month sentence

11   with a fine of $200,000, and, again, notes similar

12   arguments that were raised as to prior defendant

13   including sale of ghost guns.  The defendant's brief,

14   again, notes no prior criminal history, service as a

15   Marine, actions since he was indicted in this case

16   including getting a BA degree, his commitment to the

17   family.  He also argues the sentencing disposition as to

18   the codefendant and also argues about the discrepancies,

19   potential discrepancies as to other defendants in other

20   criminal cases which the defense argues are somewhat

21   similar to this one and also notes the present debate

22   over receivers of the types that were involved in this

23   case.

24          Defense asked for time served, has included a

25   letter from defendant, defendant's wife, his sister,
```

KATIE THIBODEAUX, CSR, RPR, CRR
UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

 1 | friends who were with him in the Marine Corps, other
 2 | friends and his pastor.  And the defense has also filed a
 3 | reply brief.
 4 |          Let me ask, have I summarized the situation
 5 | correctly?
 6 |      MR. FAERSTEIN:  With respect to the government's
 7 | recommendation on the fine, Your Honor, we do recommend a
 8 | fine.  I believe Your Honor said $200,000.  We don't
 9 | specify an amount.  We defer to the Court on the amount
10 | of the fine.  I think we do recommend the $200 mandatory
11 | special assessment.
12 |      THE COURT:  That is obvious.  Okay.  Let me ask
13 | Mr. Robinson, did I summarize the situation correctly?
14 |      MR. ROBINSON:  Yes, you have, Your Honor.
15 |      THE COURT:  Let me ask the defendant, have I
16 | summarized the situation correctly?
17 |      DEFENDANT SCHLOTTERBECK:  Yes, Your Honor.
18 |      THE COURT:  Let me hear arguments from the
19 | government counsel first.
20 |      MR. FAERSTEIN:  Yes, Your Honor.
21 |          And I think some of what I say will be
22 | reminiscent of arguments I made with respect to Mr. Vlha.
23 | I think setting the stage, you know, context matters in
24 | this case, and Mr. Schlotterbeck filed a reply to the
25 | government's sentencing memo taking issue with the

```
 1    government's citation of, you know, the recent epidemic.
 2          THE COURT:  Well, let me stop.  Again, you know
 3    what my thoughts are insofar as those types of arguments
 4    are concerned.  The problem I have with Mr. Schlotterbeck
 5    is the Count 3 which is different than Count 1.  And, you
 6    know, the sale of a firearm to a known felon or
 7    supposedly somebody he thought was a felon is much more
 8    troublesome.  But, to offset that, he has a really good
 9    career in the Marines which as I have indicated, call me
10    soft hearted in that regard, I think persons who do serve
11    in the military especially when they do tour of duties in
12    active war zones is to my mind a -- strongly outweighs a
13    lot of the other stuff.
14          But the problem I have in his case is he has
15    this second -- in other words, I probably would give him
16    something of a time served as to Count 1, but I am not
17    inclined to do it as to the Count 3.  So that is the
18    situation.
19          MR. FAERSTEIN:  Your Honor, if I could just
20    address those points Your Honor has made.  First, with
21    respect to the Marines, the government does not
22    diminish --
23          THE COURT:  Good.  I don't think you could.
24          MR. FAERSTEIN:  And I wouldn't, Your Honor.
25          What I will say is that that is important in
```

```
1    terms of the conduct in which he was engaged in this

2    case -- manufacturing and selling these AR15 type

3    firearms that he knows are extremely dangerous because of

4    his position in the military.  And he has taken a duty to

5    protect the people of the United States, and these guns

6    are putting the people of the United States in direct

7    danger.  And that is obviously illustrated by what we

8    have seen.

9         THE COURT:  Let's hope we get a statement of that

10   sort from the Supreme Court.

11        MR. FAERSTEIN:  I'm sorry?

12        THE COURT:  Let's hope we can get a statement of

13   that sort from the Supreme Court which seems to be

14   somewhat enamored with firearms at least some of them.

15        MR. ROBINSON:  If I can just interject?

16        THE COURT:  No.  Let me have the government

17   finish.

18        MR. FAERSTEIN:  Thank you, Your Honor.  So that is

19   our view.  We view that as sort of an aggravating factor.

20   I know Your Honor may disagree, but it is something that

21   goes to the history and characteristics of the defendant

22   and his knowledge of the conduct he was engaged in and

23   the seriousness of it.

24            With respect to the sale to the felon, I think

25   Your Honor is correct.  That is extremely troubling in
```

1    this case.  As we have illustrated in our sentencing

2    papers, they were selling to basically strangers, to

3    relative strangers.  They didn't know the CI, and they

4    built and sold him the gun.  And then he introduces

5    another undercover and then another undercover.

6         THE COURT:  I understand, but, frankly, again, the

7    problem I have is there is a certain portion of members

8    of the country who feel that guns are like trading cards

9    and things of that sort.  They get excited about it, et

10   cetera, et cetera.  It is like a game.  They don't

11   appreciate the dangerousness of it even though they

12   perhaps should.  But what can one say.

13        MR. FAERSTEIN:  Well, Your Honor, they knew -- he

14   has plead guilty to engaging in willful conduct.

15        THE COURT:  I understand that.  And I understand

16   these things are dangerous.  Honestly, these types of

17   weapons are extremely dangerous.

18        MR. FAERSTEIN:  They are especially dangerous when

19   you sell them to someone who you know is --

20        THE COURT:  Well, that is the problem I have with

21   Count 3.

22        MR. FAERSTEIN:  So that is what happened here.  He

23   has admitted to that.  The evidence that the government

24   has put in its papers proves that.  It shows that he knew

25   this person was not supposed to have it, and he was just

1    another customer.

2            And there is no background checks.  These are

3    untraceable firearms.  That is all part and parcel of the

4    conduct in which he was engaged and extended to selling

5    to a prohibited person which we agree is another

6    aggravating factor, and that is why the guidelines with

7    respect to Mr. Schlotterbeck are significantly higher.

8         THE COURT:  All right.

9         MR. FAERSTEIN:  That adds another eight levels I

10   believe under the guidelines.

11        THE COURT:  All right.  Let me hear from the

12   defense.  What is the defense response?

13        MR. ROBINSON:  Well, Your Honor -- and I'm sorry

14   that I stood up and attempted to interject.

15        THE COURT:  That is all right.  It was fun.

16        MR. ROBINSON:  It is fun.  But it is not funny.

17            When you were talking about what the Supreme

18   Court may or may not do, how about Congress.  These --

19   everything that Mr. Schlotterbeck dealt with had it --

20   every part is unregulated.  Had he constructed these for

21   himself, there would have been no crime.  Had he given

22   them to me in a private party transfer, there would have

23   been no crime.

24        THE COURT:  I understand that.  You are talking

25   about Count 1, and I have indicated that if it was just

```
 1   Count 1, I would give him time served.
 2        MR. ROBINSON:  And I appreciate that.  I do want
 3   to just add this because I think it may be relevant to
 4   the issue we preserved on appeal.
 5             Judge, now Justice Barrett in a case in the
 6   Seventh Circuit when she was on the Circuit Court of
 7   Appeal -- and we cited this in our brief that is going to
 8   go up to the Ninth Circuit -- in a dissent, she found
 9   that at the time of the ratification of the second
10   amendment, there was no law against selling to a felon.
11        THE COURT:  Did she have a degree in history?
12        MR. ROBINSON:  Does it matter I guess.
13        THE COURT:  It really should because, again, I
14   guess when everybody was going to law school including
15   her when she went to law school nobody thought that
16   history was the primary area that you should have been
17   studying for purposes of becoming a lawyer especially if
18   you want to do any sort of appellate lawyering.
19        MR. ROBINSON:  Well Justice Thomas agreed with
20   her.
21        THE COURT:  Well, what can one say.
22        MR. ROBINSON:  And so this is the context, and
23   Mr. Faerstein brings up a good point, context matters.
24   It does matter.
25        THE COURT:  But, again, I don't understand how you
```

```
 1   can segue from this insofar as Count 3 is concerned
 2   because, again, I understand that the area insofar as
 3   Count 1 is concerned and as I have indicated but had he
 4   only been charged in Count 1, he would be getting a time
 5   served.
 6        MR. ROBINSON:  And the way I segue is this, and
 7   forgive me if it sounds tortured, but I do think that it
 8   is logical.  We all agree that Mr. Schlotterbeck's
 9   service in the military is extraordinary.
10        THE COURT:  Well, I don't say necessarily
11   extraordinary because there are a lot of Marines, they
12   are Marines so they do a high level of service, but that
13   is not to say that he is the most outstanding ever in the
14   Marine Corps but, obviously, he has a very impressive
15   Marine Corps resume.
16        MR. FAERSTEIN:  We are talking about him
17   individually and I think that his service to this country
18   with two tours of duty in combat, all the commendations,
19   everything about him, his lack of criminal history --
20        THE COURT:  Let me stop you again.  I don't see
21   how you are going to segue from Count 3.  Again, I have
22   already indicated if it was just Count 1 if he has the
23   history that he has I would give him time served.
24        MR. ROBINSON:  If you look at the evidence that
25   supports Count 3, this attempted sale to a prohibited
```

1   person, there was a -- I will use the word community if

2   you will -- community of the military experience between

3   Mr. Schlotterbeck and the purchaser.

4           The fact of the matter is we are not

5   contesting the offense conduct, but I do want to suggest

6   very strongly that Mr. Schlotterbeck made that one sale.

7   And there is quid pro quo in this plea agreement, but,

8   prior to the agreement that we entered into to preserve

9   the second amendment issue, let's never forget that the

10  government abandoned the first object of the conspiracy

11  count.  And that is the repetitive sale for profit.

12          So while there were some sales, it wasn't

13  enough to persuade the government to go to a jury on that

14  first object of the 922 count.  It just wasn't.  And so

15  what we are dealing with here is a sliver of time, and we

16  are not contesting the offense conduct.  But the question

17  that you have to decide is is it necessary to put

18  Mr. Schlotterbeck into custody.

19          If you look at his post offense rehabilitation

20  which the Supreme Court in an earlier time under Pepper

21  said it is critical because you are to sentence the

22  person standing in front of you.  This conduct is five to

23  six years old.  Mr. Schlotterbeck overcame a childhood

24  that can be best described as troubling.

25          THE COURT:  Well, no.  His childhood is, actually,

KATIE THIBODEAUX, CSR, RPR, CRR
UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   in terms of the people I get in front of me, his
 2   childhood was not bad at all.
 3        MR. FAERSTEIN:  He lost both of his parents.  He
 4   lost his mother when he was 10.
 5        THE COURT:  You are talking -- I am talking about
 6   abuse.  I would say at least 25 percent of the defendants
 7   in front of me have been physically abused by either
 8   strangers or their own relatives, et cetera.
 9        I mean, put it this way, he didn't have
10   obviously the best childhood, but, in terms of the people
11   I get in front of me, for some reason I don't get many of
12   these executives and that sort who have wonderful
13   childhoods.  I mean most of the people I get in front of
14   me have horrendous childhoods.
15        MR. ROBINSON:  I understand that, and that is why
16   personal history and characteristics --
17        THE COURT:  I have considered that fact.  Let me
18   put it this way, you have convinced me not to give him
19   the sentence that the government wants.
20        MR. ROBINSON:  Okay.  What does the Court wish to
21   hear from me?
22        THE COURT:  I don't know what else you can say to
23   me.  There is this major problem that I have because an
24   offense of this sort, to my mind, deserves serious
25   custody time, but I am willing to reduce it to a large
```

```
 1   extent because of his prior service.  And I agree with
 2   you on prior service, the fact that during this period of
 3   time since the arrest he has been exemplary in that
 4   regard.  He got a BA degree and other things.
 5          Let's put it this way, I don't think he needs
 6   much more by way of rehabilitation because I don't think
 7   that is necessary at this point in time.  I think he has
 8   rehabilitated himself to the extent he needed because he
 9   didn't have a serious prior criminal history.  But the
10   back of my mind, the problem is if I don't give him
11   custody time, insofar as the sale of an AR15 to somebody
12   who is known to him to be a felon or presumed by him to
13   be a felon is something that is so serious that I have to
14   give some custody time.
15       MR. FAERSTEIN:  And so I assume, Your Honor, based
16   upon your comments here, that you don't need to
17   incarcerate him to protect the public from future crime.
18       THE COURT:  Not in the sense that unless I do,
19   other people are going to be engaged in this type of
20   conduct and making the argument like your cocounsel here
21   saying, well, look at this judge didn't put him in jail,
22   why should my client go to jail.
23       MR. FAERSTEIN:  Let me address that if I may
24   because there are two sentencing factors under 3553 that
25   we are required to address to you and you are required to
```

```
 1   consider.  The first one being deterrence, and, in our
 2   papers, we talk about general versus individual
 3   deterrence.  And there is that ethical conflict that the
 4   district court in Iowa highlights because if
 5   Mr. Schlotterbeck does every single thing within his
 6   power to rehabilitate himself but he gets punished to
 7   make an example, what sort of message is sent to the
 8   public who is to be generally deterred?
 9        THE COURT:  You just defined the notion of
10   deterrence.
11        MR. ROBINSON:  But there is individual and general
12   deterrence.  There are the two forms of deterrence.
13        THE COURT:  What you would say to them is that the
14   judge could have given him a guideline sentence of
15   between 33 and 41 months, and if I sentenced him between
16   33 and 41 months, I could just simply say that I
17   considered the guidelines factors and this is what I am
18   giving him.
19        MR. ROBINSON:  And that would assume that the
20   guidelines are entitled to a greater degree of deference.
21        THE COURT:  I said if I were to sentence him to --
22   so if I go below the guidelines range, obviously, the
23   probation office argues that I should go below the
24   guidelines range, and I am agreeing with the probation
25   office.  I think I should.  But they are going to 24
```

```
 1   months.  And so, therefore, I would say I am giving him
 2   24 months for the reasons that are stated in the
 3   probation office.  I don't think I am going to get
 4   reversed on that one either.
 5        MR. ROBINSON:  Well, Your Honor, we are not
 6   suggesting -- I think we have waived our right to appeal
 7   on the sentencing, but I expect we will be back here at
 8   least on Count 3.  I really firmly do, and you look at
 9   what is happening in the circuit courts of appeal and the
10   district courts, these selling to prohibited people cases
11   are going for the defense in a way that is going to I
12   think --
13        THE COURT:  When you say that, I don't know what
14   you mean by that.
15        MR. ROBINSON:  Okay.  Two district courts --
16        THE COURT:  I don't think that the government is
17   losing all these cases.
18        MR. ROBINSON:  Well --
19        THE COURT:  Maybe it is the government in other
20   jurisdictions.
21        MR. ROBINSON:  Well, maybe it is not
22   Mr. Faerstein, but, Your Honor, it is happening.
23        THE COURT:  I don't think he is worried about it.
24        MR. ROBINSON:  Well -- I don't know what we all
25   worry about.
```

```
 1              Having said these things, you are also, under

 2   3553, to consider what is an unwarranted sentencing

 3   disparity not between codefendants.  It is on a national

 4   level.  And we have constrained our analysis to this

 5   circuit.  When you look at what and Mr. -- I believe

 6   Mr. Haig brought this up in his papers, and I think the

 7   government did as well.

 8              Sean Alexander went to trial in this district

 9   in front of Judge Klausner.  He went to trial.  He did

10   not plead guilty.  Two counts conspiracy and dealing

11   without an FFL.  He is offense level 20.  That is what

12   Mr. Schlotterbeck is if we are going to use the

13   guidelines as a starting point.

14              Mr. Alexander sold 30 firearms to an informant

15   in five months and the government was asking for 41

16   months, and Judge Klausner gave 24 months.  That is

17   without an acceptance of responsibility.

18         THE COURT:  I already indicated I would go below

19   24 months.  That is a given.

20         MR. ROBINSON:  But the question is to what degree

21   because it is that degree that creates the unwarranted

22   disparity that we are to avoid.  So I am going to ask the

23   court to please consider this:  There is no need because

24   you are to impose a sentence that is not greater than

25   necessary to promote the sentencing factors based upon
```

```
 1   Mr. Schlotterbeck's personal history and characteristics.
 2        THE COURT:  My intention is not to give him a year
 3   and a day.  It is going to be less than a year and a day.
 4   Are you happy now?
 5        MR. ROBINSON:  I am getting happier.  Can we make
 6   that into a situation where he can work and provide for
 7   his four young children and maybe do halfway house or
 8   home arrest because, if he goes in to custody for a
 9   period of time, he will lose his business.
10        THE COURT:  I don't think he will lose his
11   business.  He was in the Marine Corps during the portions
12   of time that he was running his business.
13        MR. ROBINSON:  Well, Judge, may I have a moment?
14        (Defendant and counsel confer.)
15        MR. ROBINSON:  He was in reserve at that time so
16   he was able to work.  If he is locked down, he can't
17   work.
18             And a punishment of either home incarceration
19   or halfway house where he can work during the day and
20   provide for his family for a short period of time, if
21   that is what the Court is looking to do, then I would say
22   thank you.  But I think --
23        THE COURT:  It is going to be custody time.  There
24   is going to be some amount of custody time.
25        MR. ROBINSON:  Can we make it a short enough
```

```
 1    period of time that he doesn't lose every single thing

 2    that he has?

 3         THE COURT:  He can address that, and let me know

 4    what he is talking about.

 5         MR. ROBINSON:  And, finally, Your Honor, with

 6    respect to the fine, we have addressed the fine.  And

 7    because -- we have addressed that in our papers.  We have

 8    tied it to the guideline range.  And if a variance is

 9    tied to a guideline range which in these proceedings we

10    have discussed -- I use the word, the pronoun we to talk

11    about all the defendants in this case, if zone B, zone C,

12    zone D, if all that matters, not that it is mandatory but

13    that it matters, if you look at Mr. Schlotterbeck's

14    guideline range, assuming that he is even at a level 15,

15    and I am hoping that it will be lower than that because

16    you have indicated you are going to go below.

17         THE COURT:  I have indicated -- well, I haven't

18    indicated yet, but I am going to indicate that I find

19    that the guidelines range calculation by the probation

20    office is correct.

21         MR. ROBINSON:  But you are varying from it.

22         THE COURT:  I am varying from it, but the initial

23    range is correctly calculated.

24         MR. ROBINSON:  And we are not contesting that.

25         THE COURT:  Okay.
```

```
1         MR. ROBINSON:  But with respect to figuring out
2    what the fine range is, under the guidelines --
3         THE COURT:  Well, let me just indicate this:  I
4    would use the recommendation, I would follow the
5    recommendation of the probation office insofar as the
6    fine amount.
7         MR. ROBINSON:  That is way too high, Your Honor.
8    A hundred thousand dollars in a case like this for a man
9    who is raising his family.  It is unnecessarily --
10        THE COURT:  Did you take a cut in your charges
11   like your co-counsel did?
12        MR. ROBINSON:  Pardon me?
13        THE COURT:  Did you take a cut in your charges
14   like your --
15        MR. ROBINSON:  I did because --
16        THE COURT:  Let me hear from the government.  We
17   are at the very end here.  What is your position vis a
18   vis the fine amount?
19        MR. FAERSTEIN:  Similarly, the last defendant,
20   Your Honor, the defendant has significant assets, I think
21   735,000 and a positive monthly net cash flow.  We think a
22   fine is part of the overall sentence and the deterrent
23   here.
24        THE COURT:  Well, most of that amount, though, is
25   the amount of money he has in paper because it is
```

```
 1    primarily his residence.
 2         MR. FAERSTEIN:  Well, Your Honor, you can take out
 3    money, you can take out additional equity on a home or
 4    business.
 5         THE COURT:  All right.
 6         MR. ROBINSON:  Who is going to loan money to a man
 7    who is in custody?  That is absurd.  How can he get a
 8    loan on his equity if he is in custody?  That is
 9    impossible.
10         THE COURT:  It is not impossible.
11         MR. ROBINSON:  Well, you will see me on a bank
12    fraud case soon enough I imagine because can you
13    imagine --
14         THE COURT:  Well, let me stop you.  I understand
15    the position of both sides on this.  I don't need further
16    argument.
17              Let me hear from the defendant.  Sir, what do
18    you wish to say to the Court before the Court sentences
19    you?
20         DEFENDANT SCHLOTTERBECK:  Good morning, Your
21    Honor.  I don't have a whole lot to say because I wrote a
22    letter to you.
23         THE COURT:  Let me also indicate I read the
24    letter.  The letter was actually very good.
25         THE DEFENDANT:  Thank you, Your Honor.  I do want
```

```
 1   to stand up here, and, A, I want to apologize for just
 2   being here in general.  I want to apologize to you.
 3        THE COURT:  You don't have to apologize to me.
 4        THE DEFENDANT:  I want to apologize to the
 5   government, and I want to apologize to my friends and
 6   family back here that I have dragged them through this.
 7        THE COURT:  Let me ask you this question:  What is
 8   the lengthiest period of time you feel you could stay in
 9   custody without losing your business?
10        THE DEFENDANT:  Well, I will tell you this, Your
11   Honor.  I deployed to Afghanistan 2009 to 2010, and I
12   came back to no business and started it all over again.
13   And that was for seven months.  I have been there.  I
14   have restarted it, but I lost all my clients.  Had to
15   redo it from the ground up again.  So, you know, if that
16   is what I have to do, then that is what I will do.
17        But you know I just want to continue with
18   thanking you for your time and your consideration here
19   today, and, again, I'm sorry that I have put you all
20   through this.
21        THE COURT:  You don't have to apologize to me.  I
22   get paid.  I am here every day anyway.  It doesn't make
23   any difference.
24        All right.  I have considered the materials
25   that have been presented to me by both the defendant, the
```

KATIE THIBODEAUX, CSR, RPR, CRR
UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

ER130

```
 1   government and the probation office.  I have considered

 2   the factors under 18, U.S.C., 3553, subpart (a), and I

 3   will sentence as follows:

 4           First of all, I find the correct calculation

 5   is the one that was prepared by the probation office.

 6   Criminal history category of -- sorry, offense level of

 7   20, criminal history category of 1 equals a guidelines

 8   range of between 33 and 41 months.  I will vary

 9   substantially below that for the reasons I have indicated

10   but, primarily, to emphasize again, I really appreciate

11   his service in this particular matter.  He has no prior

12   criminal history.

13           The primary problem here is the Count No. 3

14   which is the sale of the firearm to the felon.  But for

15   that, I would have given him a time served.  I do feel,

16   however, there has to be some custody time.  So I will

17   sentence him to what I feel is probably the de minimus

18   that I can do in good conscience in this particular

19   situation which is three months.  I will give him three

20   months in custody followed by a period of supervised

21   release for three years under the following terms and

22   conditions:

23           Let me ask the government, there is no

24   forfeiture aspect here, is there?

25       MR. FAERSTEIN:  That's correct, Your Honor.
```

```
 1          THE COURT:  I will order that he obey all rules
 2   and regulations of the probation office and also Amended
 3   General Order 20-4.  Also, he is to pay $200 which is the
 4   special assessment that will be paid forthwith.
 5          I will also require him to pay before the end
 6   of supervised release, a fine of $50,000.
 7          I will also order that he will cooperate in
 8   the collection of a DNA sample from himself is.
 9          I will not order testing because he doesn't
10   have any prior history of drug abuse.  I will order that
11   he participate in a mental health treatment program if
12   the probation office recommends it, but I don't
13   necessarily think that that would be required.  But I
14   will leave that up to the probation office.
15          Also, I will order the defendant to submit his
16   person, property, residence, papers, computers and other
17   electronic equipment to a search if requested by any
18   probation officer or other law enforcement officer and
19   that the failure to submit to such a search can be
20   grounds for revocation.
21          However, any such search has to be done at a
22   reasonable time in a reasonable manner and based upon a
23   reasonable suspicion that the defendant has violated
24   either the terms of his supervised release or has
25   otherwise committed a violation of the law.
```

```
 1              Let me ask counsel, anything else in terms of
 2     the supervised release?
 3          MR. FAERSTEIN:  Did Your Honor mention you can't
 4     possess firearms?
 5          THE COURT:  Oh.  Yeah.  Well, he was advised of
 6     that when I took his plea.  Because he is a felon, he
 7     can't possess a firearm.
 8          MR. FAERSTEIN:  Yes, Your Honor.  Nothing else.
 9          THE COURT:  Does the government move to dismiss
10     Count 2?
11          MR. FAERSTEIN:  We do, Your Honor.
12          THE COURT:  Okay.  I will dismiss that count.  Let
13     me ask the defense counsel -- well, let me ask defendant,
14     do you understand you agreed to waive some but not all of
15     your appeal rights in this particular matter in your plea
16     agreement?
17          THE DEFENDANT:  Yes, Your Honor.
18          THE COURT:  And do you have any questions about
19     what could be appealed in this case?
20          THE DEFENDANT:  I do not, Your Honor.
21          THE COURT:  And let me ask defense counsel, you
22     will represent him I presume if he is going to appeal
23     anything?
24          MR. ROBINSON:  Yes, we hope to, Your Honor.
25          THE COURT:  All right.  And let me ask is there
```

```
 1   anything else -- sorry.  I will exonerate the bond
 2   upon -- upon his reporting to the probation office, and,
 3   as I have indicated, I will stay his reporting for the
 4   sentence until such time as the appeal is completed.
 5   And, also, as I indicated, the payment of the fine will
 6   be stayed until such time as the appeal is completed.
 7           All right.  Is there anything else I need to
 8   do in this matter?
 9       MR. FAERSTEIN:  No, Your Honor.  Just again with
10   respect to the waivers of the challenges to the
11   conviction and sentence, that is set forth in the plea
12   agreement.
13       THE COURT:  Yes.
14       MR. FAERSTEIN:  And there is one issue they
15   preserved with respect to the motion to dismiss on the
16   second amendment ground from Bruen and that is the only
17   pretrial motion.
18       THE COURT:  Yes.  But that is stated in the plea
19   agreement.
20       MR. FAERSTEIN:  Yes, Your Honor.
21       THE COURT:  Okay.  Thank you very much, gentlemen.
22   Good luck.  And thank you everybody.
23       (Proceedings concluded.)
24
25
```

```
 1                        CERTIFICATE

 2

 3

 4    I hereby certify that pursuant to Section 753, Title 28,

 5    United States Code, the foregoing is a true and correct

 6    transcript of the stenographically reported proceedings held

 7    in the above-entitled matter and that the transcript page

 8    format is in conformance with the regulations of the

 9    Judicial Conference of the United States.

10    Date:  December 21, 2022

11

12     /s/ Katie Thibodeaux, CSR No. 9858, RPR, CRR

13

14

15

16

17

18

19

20

21

22

23

24

25
```

**DEFENDANT SCHLOTTERBECK: [5]**
40/19 40/21 40/24 44/16
60/19
**DEFENDANT VLHA: [2]**   5/9
5/13
**MR. FAERSTEIN: [57]**
**MR. HAIG: [50]**
**MR. ROBINSON: [37]**
**THE COURT: [158]**
**THE DEFENDANT: [7]**   32/11
36/8 60/24 61/3 61/9 64/16
64/19

## $

**$200 [2]**   44/10 63/3
**$200 mandatory [1]**   44/10
**$200 which [1]**   63/3
**$200,000 [2]**   43/11 44/8
**$25,000 [2]**   8/7 34/2
**$50,000 [1]**   63/6

## '

**'04 [1]**   42/6

## /

**/s [1]**   66/12

## 0

**04 [1]**   34/7

## 1

**10 [4]**   7/8 8/5 42/1 52/4
**12 [3]**   7/1 8/19 8/20
**14 [2]**   8/6 42/13
**15 [2]**   8/21 58/14
**1500 [1]**   2/7
**16 [1]**   42/13
**17 [2]**   1/16 3/1
**18 [5]**   6/22 8/20 41/4 41/6
62/2
**19-343 [1]**   1/8
**1st [1]**   1/21

## 2

**20 [6]**   34/22 41/12 43/4 43/5
56/11 62/7
**20-04 [1]**   34/7
**20-4 [1]**   63/3
**2005 [1]**   42/11
**2007 [1]**   42/9
**2009 [2]**   42/9 61/11
**2010 [2]**   42/9 61/11
**2012 [1]**   7/20
**2014 [1]**   42/12
**2016 [1]**   28/23
**2017 [6]**   28/21 28/23 29/5
31/14 31/18 42/19
**2020 [1]**   42/22
**2021 [2]**   7/23 42/6
**2022 [3]**   1/16 3/1 66/10
**21 [1]**   66/10
**21143 [1]**   2/19
**21515 [1]**   2/13
**22 [1]**   41/16
**24 [5]**   43/7 54/25 55/2 56/16
56/19
**25 percent [1]**   52/6
**25,000 [1]**   24/24
**28 [1]**   66/4
**29 [2]**   7/17 19/8
**2K2.1 [4]**   7/1 7/4 41/13
41/15
**2X1.1C1 [1]**   7/1

## 3

**30 [1]**   56/14
**312 [1]**   2/7

**33 [4]**   43/6 54/15 54/16 62/8
**35 [3]**   31/7 61/4 61/22
**350 [1]**   1/21
**3553 [5]**   32/5 32/22 53/24
56/2 62/2
**37 [1]**   41/22
**37-month [1]**   43/10
**371 [2]**   6/22 41/4
**3B1.1 [1]**   7/8
**3B1.2 [1]**   7/6
**3D1.2 [1]**   41/11

## 4

**40 [1]**   34/19
**41 [5]**   43/6 54/15 54/16
56/15 62/8
**4311 [1]**   1/21
**454 [1]**   2/19

## 5

**50 [2]**   34/17 34/19

## 7

**730 [1]**   2/13
**735,000 [1]**   59/21
**753 [1]**   66/4

## 8

**80 percent [1]**   13/4
**8:06 [1]**   3/2

## 9

**90012 [2]**   1/22 2/8
**90503 [2]**   2/14 2/20
**922 [4]**   6/22 41/4 41/7 51/14
**9858 [2]**   1/20 66/12

## A

**A.M [1]**   3/2
**abandoned [1]**   51/10
**abided [1]**   30/22
**able [1]**   57/16
**about [32]**   4/22 14/5 15/23
18/3 19/6 19/14 22/6 22/11
29/6 29/7 29/11 30/4 34/17
34/23 36/8 36/13 38/19 39/19
43/18 47/9 48/17 48/18 48/25
50/16 50/19 52/5 54/2 55/23
55/25 58/4 58/11 64/18
**above [1]**   66/7
**above-entitled [1]**   66/7
**absurd [1]**   60/7
**abuse [5]**   8/2 34/10 43/2
52/6 63/10
**abused [1]**   52/7
**accept [1]**   33/9
**acceptance [4]**   7/7 33/4
41/17 56/17
**accompli [1]**   6/15
**account [1]**   32/5
**accountable [1]**   22/17
**act [2]**   28/22 29/4
**action [1]**   42/17
**actions [2]**   32/15 43/15
**active [1]**   45/12
**activities [1]**   9/10
**activity [5]**   12/24 12/24
14/12 33/14 42/16
**acts [1]**   19/12
**actual [1]**   10/17
**actually [12]**   10/16 19/4
19/6 20/12 22/3 28/22 33/18
35/6 36/17 39/24 51/25 60/24
**add [3]**   31/10 36/14 49/3
**added [1]**   7/12
**additional [6]**   7/12 23/13
31/8 34/22 36/21 60/3
**address [8]**   3/17 21/9 21/20

**31/13 45/20 53/23 53/25 58/3**
**58/7**
**adds [1]**   48/9
**admissions [1]**   28/14
**admit [1]**   10/4
**admitted [2]**   31/17 47/23
**adopt [2]**   26/20 39/14
**adverse [1]**   27/4
**advertised [1]**   27/8
**advertized [1]**   20/19
**advise [1]**   38/8
**advised [1]**   64/5
**advisement [1]**   6/14
**advisory [2]**   23/24 24/14
**affirmed [1]**   32/1
**Afghanistan [2]**   42/9 61/11
**afoul [1]**   31/4
**after [4]**   6/7 22/17 28/16
42/14
**again [19]**   6/19 11/6 17/20
31/18 36/11 43/11 43/14 45/2
47/6 49/13 49/25 50/2 50/20
50/21 61/12 61/15 61/19
62/10 65/9
**against [3]**   11/14 24/2 49/10
**agents [1]**   29/5
**ages [3]**   8/1 42/13 42/19
**aggravating [2]**   46/19 48/6
**agree [8]**   15/17 15/20 18/14
25/2 39/24 48/5 50/8 53/1
**agreed [4]**   15/13 37/22 49/19
64/14
**agreeing [1]**   54/24
**agreement [10]**   5/21 37/24
38/2 39/12 39/14 51/7 51/8
64/16 65/12 65/19
**ailments [1]**   42/25
**AK15 [1]**   9/4
**AK15s [1]**   11/1
**al [1]**   1/9
**alcohol [2]**   42/20 43/2
**Alexander [2]**   56/8 56/14
**alive [1]**   7/17
**all [75]**
**allegations [1]**   22/15
**allow [1]**   4/7
**allowed [2]**   31/18 46/18
**almost [1]**   41/18
**along [1]**   19/20
**already [4]**   28/12 40/11
50/22 56/18
**also [30]**   5/15 6/4 7/24 9/13
11/9 12/6 15/3 15/21 17/6
22/2 24/17 24/23 32/21 34/6
34/25 35/2 37/9 42/16 43/17
43/18 43/21 44/2 56/1 60/23
63/2 63/3 63/5 63/7 63/15
65/5
**Although [2]**   8/14 9/5
**always [1]**   21/15
**am [30]**   4/11 6/12 12/1 12/5
12/6 17/19 19/6 21/4 21/10
24/1 25/13 26/18 28/7 28/8
33/15 36/10 39/14 45/16 52/5
52/25 54/17 54/24 55/1 55/3
56/22 57/5 58/15 58/18 58/22
61/22
**ambiguous [3]**   38/20 38/22
38/23
**Amended [2]**   34/7 63/2
**amendment [3]**   49/10 51/9
65/16
**America [2]**   1/6 2/3
**amongst [1]**   38/23
**amount [15]**   14/1 15/5 15/14
18/1 24/23 24/24 25/4 41/14
44/9 44/9 57/24 59/6 59/18
59/24 59/25

## A

**analysis [1]** 56/4
**ANGELES [4]** 1/15 1/22 2/8 3/1
**another [7]** 5/16 28/9 47/5 47/5 48/1 48/5 48/9
**any [34]**
**anybody [1]** 25/14
**anymore [1]** 29/13
**anything [15]** 4/18 4/23 5/11 9/6 17/22 30/11 32/10 35/16 38/1 40/12 40/23 64/1 64/23 65/1 65/7
**anyway [1]** 61/22
**apologize [6]** 61/1 61/2 61/3 61/4 61/5 61/21
**apparently [1]** 11/10
**appeal [28]** 6/2 6/7 13/8 27/3 27/4 37/5 37/10 37/11 37/20 37/23 37/25 38/4 38/7 38/8 38/11 38/14 39/4 39/23 40/6 40/7 49/4 49/7 55/6 55/9 64/15 64/22 65/4 65/6
**appealed [1]** 64/19
**appealing [2]** 5/17 5/20
**appeals [1]** 38/2
**appearances [3]** 2/1 3/8 40/8
**appellate [1]** 49/18
**applicable [2]** 11/19 38/3
**applied [1]** 33/7
**appointment [1]** 38/11
**appreciate [3]** 47/11 49/2 62/10
**appropriate [1]** 28/15
**approximately [2]** 7/17 41/22
**April [1]** 7/20
**AR [1]** 17/2
**AR15 [10]** 15/25 17/2 20/5 22/2 22/3 22/7 22/9 22/18 46/2 53/11
**AR15-type [1]** 15/25
**are [77]**
**area [5]** 16/12 16/14 16/16 49/16 50/2
**aren't [1]** 18/7
**arguable [3]** 13/15 13/15 33/7
**argues [7]** 8/18 8/22 9/8 43/17 43/18 43/20 54/23
**arguing [1]** 8/12
**argument [15]** 4/21 9/5 10/21 11/13 13/11 13/21 21/1 28/5 29/1 32/7 33/1 33/5 41/18 53/20 60/16
**arguments [6]** 11/18 22/11 43/12 44/18 44/22 45/3
**around [2]** 11/11 20/21
**arrest [6]** 8/24 28/23 30/19 34/13 53/3 57/8
**arrested [4]** 30/13 30/14 30/16 30/17
**as [54]**
**aside [2]** 4/23 40/11
**ask [31]** 4/16 5/7 5/15 9/17 10/12 18/4 23/6 29/21 34/13 35/16 35/19 36/7 36/13 39/9 39/19 39/21 39/22 39/22 40/10 40/17 44/4 44/12 44/15 56/22 61/7 62/23 64/1 64/13 64/13 64/21 64/25
**asked [1]** 43/24
**asking [4]** 22/19 24/25 39/19 56/15
**asks [1]** 16/22
**aspect [5]** 12/20 12/20 24/18 37/25 62/24
**aspects [4]** 14/6 14/9 18/14 18/16

**assemble [1]** 19/7
**assembled [1]** 19/12
**assembling [1]** 19/12
**assessment [3]** 34/1 44/11 63/4
**asset [1]** 26/4
**assets [2]** 25/3 59/20
**associated [1]** 42/24
**assume [2]** 53/15 54/19
**assuming [1]** 58/14
**ATF [9]** 15/7 16/6 16/21 21/12 21/14 22/8 29/5 29/13 29/18
**attempted [2]** 44/18 50/25
**attorney [3]** 2/5 21/7 25/24
**audience [1]** 3/23
**aunt [1]** 42/2
**AUSA [3]** 2/5 3/10 27/12
**automatic [1]** 30/15
**automatically [1]** 10/6
**avoid [1]** 56/22
**awards [1]** 42/8
**aware [1]** 16/4
**away [1]** 37/9

## B

**BA [2]** 43/16 53/4
**Bachelors [1]** 42/22
**back [5]** 12/11 53/10 55/7 61/6 61/12
**background [5]** 7/16 9/9 9/10 20/2 48/2
**backtrack [1]** 21/6
**bad [1]** 52/2
**bank [1]** 60/11
**Barrett [1]** 49/5
**base [2]** 6/25 41/12
**based [6]** 28/6 30/8 35/11 53/15 56/25 63/22
**basic [2]** 28/5 28/5
**basically [3]** 15/1 29/16 47/2
**basis [6]** 15/12 31/17 31/19 31/19 32/1 38/4
**be [65]**
**bearing [1]** 22/13
**beat [1]** 26/24
**beating [1]** 26/25
**because [55]**
**becoming [1]** 49/17
**been [22]** 8/23 8/25 9/9 13/9 15/17 15/18 20/12 21/25 22/1 22/9 27/3 30/21 32/19 33/7 48/21 48/23 49/16 50/4 52/7 53/3 61/13 61/25
**before [6]** 3/21 5/16 28/23 32/11 60/18 63/5
**began [1]** 42/14
**behalf [2]** 3/11 3/14
**being [7]** 16/11 18/3 27/20 33/3 38/19 54/1 61/2
**believe [6]** 24/12 30/6 30/15 44/8 48/10 56/5
**below [6]** 8/10 54/22 54/23 56/18 58/16 62/9
**Belt [1]** 42/23
**best [3]** 26/19 51/24 52/10
**between [9]** 8/6 8/20 42/9 43/6 51/2 54/15 54/15 56/3 62/8
**bit [4]** 12/6 21/6 26/21 34/18
**Black [1]** 42/23
**blind [1]** 12/19
**blunt [1]** 33/11
**bond [10]** 3/21 39/18 39/19 39/21 39/23 39/25 40/2 40/5 40/7 65/1
**both [7]** 4/7 4/17 39/3 41/10

**BA [2]** 43/16 53/4
**Boulevard [2]** 2/13 2/19
**break [2]** 28/9 36/10
**Brian [2]** 2/4 3/11
**brief [6]** 8/11 8/18 9/8 43/13 44/3 49/7
**brings [1]** 49/23
**broader [3]** 16/3 21/22 21/22
**brought [1]** 56/6
**Bruen [3]** 6/3 39/7 65/16
**build [2]** 21/16 21/17
**building [2]** 21/13 21/15
**builds [1]** 15/2 15/6
**built [3]** 15/24 21/18 47/4
**business [12]** 17/1 20/19 21/23 27/8 29/10 30/9 57/9 57/11 57/12 60/4 61/9 61/12
**bustling [1]** 27/8
**buy [4]** 19/17 19/20 20/3 22/8

## C

**CA [4]** 1/22 2/8 2/14 2/20
**calculated [1]** 58/23
**calculation [5]** 24/9 32/25 41/10 58/19 62/4
**CALIFORNIA [4]** 1/2 1/15 3/1 19/17
**call [5]** 3/6 12/24 19/19 25/20 45/9
**called [1]** 19/18
**calls [1]** 14/3
**came [2]** 31/22 61/12
**can [46]**
**can't [8]** 12/25 13/17 13/20 18/5 35/1 57/16 64/3 64/7
**cards [1]** 47/8
**career [1]** 45/9
**case [51]**
**cases [5]** 22/21 27/16 43/20 55/10 55/17
**cash [4]** 25/3 26/3 30/9 59/21
**category [11]** 7/15 8/5 8/19 28/24 30/14 31/13 41/21 43/4 43/5 62/6 62/7
**cell [1]** 35/6
**CENTRAL [1]** 1/2
**certain [2]** 28/13 47/7
**CERTIFICATE [1]** 66/1
**certify [1]** 66/4
**cetera [9]** 12/8 15/19 15/19 15/20 33/15 34/13 47/10 47/10 52/8
**challenges [1]** 65/10
**change [1]** 6/17
**changed [4]** 4/20 5/13 40/14 40/24
**character [1]** 32/16
**characteristics [3]** 46/21 52/16 57/1
**characterization [2]** 33/10 39/12
**charge [2]** 27/21 27/23
**charged [5]** 4/15 6/21 41/3 41/6 50/4
**charges [2]** 59/10 59/13
**check [1]** 20/2
**checks [1]** 48/2
**Cherokee [1]** 20/13
**childhood [4]** 51/23 51/25 52/2 52/10
**childhoods [2]** 52/13 52/14
**children [4]** 8/1 42/13 42/19 57/7
**choice [2]** 11/2 36/20
**choose [1]** 4/3
**CI [1]** 47/3

## C

**circuit [5]** 49/6 49/6 49/8 55/9 56/5
**citation [1]** 45/1
**cite [2]** 16/19 18/5
**cited [4]** 19/9 21/11 22/21 49/7
**citizen [1]** 30/21
**Civil [1]** 2/6
**CJA [1]** 25/15
**clarify [1]** 11/12
**clear [4]** 15/8 20/20 31/16 37/19
**clerk [1]** 39/19
**client [7]** 3/22 28/22 29/2 29/7 30/13 30/16 53/22
**client's [1]** 26/19
**clients [1]** 61/14
**co [1]** 59/11
**co-counsel [1]** 59/11
**cocounsel [1]** 53/20
**Code [1]** 66/5
**codefendant [2]** 12/2 43/18
**codefendants [1]** 56/3
**collection [2]** 34/8 63/8
**combat [1]** 50/18
**combined [1]** 41/9
**commanding [1]** 30/24
**commendations [2]** 42/7 50/18
**comments [1]** 53/16
**commit [1]** 29/17
**commitment [1]** 43/16
**committed [4]** 7/13 19/12 28/22 63/25
**communicating [1]** 14/5
**communications [1]** 14/23
**community [6]** 34/22 34/24 36/19 37/8 51/1 51/2
**company [1]** 42/10
**comparable [2]** 17/21 17/23
**complete [2]** 22/3 37/12
**completed [6]** 22/2 22/7 22/9 22/16 65/4 65/6
**complex [2]** 18/9 18/17
**complexity [1]** 18/15
**comply [1]** 34/5
**comps [1]** 23/1
**computers [1]** 63/16
**concede [2]** 8/15 9/21
**conceded [2]** 10/2 28/12
**concerned [4]** 38/2 45/4 50/1 50/3
**concerns [1]** 31/23
**concluded [1]** 65/23
**conditional [1]** 5/19
**conditions [3]** 33/24 40/1 62/22
**conduct [16]** 27/1 27/23 28/2 28/20 29/2 29/18 32/1 32/3 46/1 46/22 47/14 48/4 51/5 51/16 51/22 53/20
**confer [2]** 34/16 57/14
**Conference [1]** 66/9
**conflict [1]** 54/3
**conformance [1]** 66/8
**Congress [1]** 48/18
**conscience [1]** 62/18
**consider [4]** 13/16 54/1 56/2 56/23
**consideration [1]** 61/18
**considered [6]** 32/19 32/21 52/17 54/17 61/24 62/1
**consistent [1]** 34/20
**conspiracy [15]** 6/23 7/3 14/4 14/16 15/17 16/1 16/2 18/23 28/21 29/1 31/14 31/18 41/5 51/10 56/10
**constrained [1]** 56/4
**construct [1]** 20/5
**construct [1]** 20/21
**contained [4]** 4/18 5/11 40/13 40/23
**contesting [3]** 51/5 51/16 58/24
**context [5]** 21/22 36/12 44/23 49/22 49/23
**continue [2]** 31/14 61/17
**continued [2]** 16/1 29/17
**contract [1]** 7/24
**contrary [2]** 8/13 29/1
**conversion [1]** 30/16
**convicted [1]** 22/23
**conviction [4]** 18/20 27/2 37/20 65/11
**convinced [1]** 52/18
**cooperate [2]** 34/7 63/7
**Corporation [1]** 2/12
**Corps [10]** 7/20 30/23 31/2 32/14 42/6 42/8 44/1 50/14 50/15 57/11
**correct [17]** 4/13 5/4 5/9 5/18 5/24 6/8 10/7 11/16 14/21 17/11 24/13 33/1 46/25 58/20 62/4 62/25 66/5
**correctly [7]** 9/18 10/10 10/13 44/5 44/13 44/16 58/23
**Corruption [1]** 2/6
**could [11]** 10/21 26/23 27/24 30/25 33/5 45/19 45/23 54/14 54/16 61/8 64/19
**counsel [24]** 2/1 3/9 4/7 4/16 4/17 9/17 10/12 17/5 25/15 30/11 34/14 34/16 36/13 38/6 38/11 39/9 40/11 40/21 44/19 57/14 59/11 64/1 64/13 64/21
**count [32]** 4/13 4/15 6/20 6/21 6/21 18/19 35/20 35/23 35/24 36/5 41/3 41/3 41/6 45/5 45/5 45/16 45/17 47/21 48/25 49/1 50/1 50/3 50/4 50/21 50/22 50/25 51/11 51/14 55/8 62/13 64/10 64/12
**country [3]** 12/13 47/8 50/17
**counts [4]** 4/11 41/2 41/10 56/10
**county [3]** 9/15 19/16 19/16
**couple [1]** 23/6
**course [4]** 15/12 16/2 26/1 37/24
**court [36]**
**Court's [5]** 5/18 5/20 6/3 30/20 30/22
**courts [4]** 23/3 55/9 55/10 55/15
**covertly [1]** 30/8
**CR [1]** 1/8
**creates [1]** 56/21
**creating [1]** 11/7
**creation [1]** 8/25
**crime [6]** 7/13 12/8 23/2 48/21 48/23 53/17
**crimes [2]** 9/4 10/18
**criminal [21]** 7/9 8/5 8/19 9/9 9/10 12/9 28/24 31/12 33/13 41/20 42/16 43/4 43/4 43/5 43/14 43/20 50/19 53/9 62/6 62/7 62/12
**critical [1]** 51/21
**CRR [1]** 66/12
**crystal [1]** 37/1
**CSR [2]** 1/20 66/12
**culpable [2]** 9/23 10/5
**current [2]** 12/13 42/18
**custody [20]** 3/17 6/6 23/13 23/15 23/20 26/17 31/7 36/22 51/18 52/25 53/11 53/14 57/8

**customer [4]** 29/23 29/24 30/7 48/1
**customers [11]** 14/5 14/24 15/6 15/7 15/24 16/6 16/20 21/12 21/14 21/17 22/8
**cut [4]** 22/1 28/8 59/10 59/13
**cutting [1]** 36/10

## D

**danger [1]** 46/7
**dangerous [4]** 46/3 47/16 47/17 47/18
**dangerousness [1]** 47/11
**Date [1]** 66/10
**day [10]** 23/10 23/11 26/6 26/7 29/8 29/9 57/3 57/3 57/19 61/22
**days [1]** 30/19
**de [1]** 62/17
**dead [2]** 26/24 26/25
**deal [1]** 6/23
**dealer [1]** 30/19
**dealing [4]** 18/11 22/24 51/15 56/10
**dealt [1]** 48/19
**debatable [1]** 13/25
**debate [1]** 43/21
**deceased [1]** 41/22
**December [1]** 66/10
**decide [1]** 51/17
**decision [1]** 6/3
**decisions [1]** 27/25
**deemed [1]** 13/12
**defendant [63]**
**defendant's [11]** 7/9 7/16 8/15 9/14 21/11 33/4 33/13 41/20 42/2 43/13 43/25
**defendants [11]** 1/10 5/17 8/16 16/18 18/22 23/1 23/3 29/22 43/19 52/6 58/11
**defense [19]** 3/12 5/3 9/8 9/13 10/12 17/5 32/21 34/13 36/13 38/6 39/9 43/20 43/24 44/2 48/12 48/12 55/11 64/13 64/21
**defer [2]** 25/4 44/9
**deference [1]** 54/20
**defined [1]** 54/9
**degree [7]** 42/22 43/16 49/11 53/4 54/20 56/20 56/21
**Dekoning [1]** 20/14
**demonstrating [1]** 23/2
**deployed [1]** 61/11
**described [1]** 51/24
**deserves [1]** 52/24
**desires [1]** 37/10
**detention [3]** 23/14 23/20 24/13
**deterent [1]** 25/8
**determination [3]** 27/12 27/17 28/5
**deterred [1]** 54/8
**deterrence [6]** 32/6 54/1 54/3 54/10 54/12 54/12
**deterrent [1]** 59/22
**dicing [1]** 28/1
**did [28]** 10/23 11/17 14/11 14/13 16/22 19/5 21/14 21/20 22/15 23/8 27/4 27/8 27/12 29/14 29/22 31/14 31/14 40/17 42/8 44/13 49/11 56/7 56/9 59/10 59/11 59/13 59/15 64/3
**didn't [14]** 10/2 10/17 11/6 16/13 16/22 22/8 27/2 27/5 29/24 31/3 47/3 52/9 53/9

**D**

didn't.... [1]  53/21
died [2]  42/1 42/2
difference [1]  61/23
different [7]  12/16 22/10
  27/21 27/22 27/25 38/20 45/5
difficult [1]  31/1
diffrence [1]  10/14
diminish [1]  45/22
direct [1]  46/6
disagree [1]  46/20
disavowing [1]  31/25
discharged [2]  7/23 42/7
discount [1]  25/21
discounted [1]  27/16
discourse [1]  12/13
discrepancies [2]  43/18
  43/19
discuss [1]  17/7
discussed [5]  15/2 17/16
  38/24 40/21 58/10
discussion [3]  16/15 38/17
  38/19
discussions [1]  14/23
dismiss [10]  19/4 35/22
  35/24 36/2 36/5 39/2 39/4
  64/9 64/12 65/15
dismissed [1]  20/15
disparity [3]  17/7 56/3
  56/22
disposition [1]  43/17
dissent [1]  49/8
district [8]  1/1 1/2 1/4
  17/24 54/4 55/10 55/15 56/8
diversion [1]  22/12
DIVISION [1]  1/2
divorce [1]  42/14
divorced [2]  41/25 42/12
DNA [2]  34/8 63/8
do [54]
does [11]  12/9 23/15 33/16
  34/14 35/22 45/21 49/12
  49/24 52/20 54/5 64/9
doesn't [8]  10/5 22/16 27/15
  34/9 37/8 58/1 61/22 63/9
doing [5]  4/1 20/23 26/18
  31/2 36/21
dollars [4]  26/4 34/1 43/8
  59/8
don't [46]
done [8]  14/8 15/2 15/23
  16/7 16/8 28/13 35/10 63/21
down [1]  57/16
dragged [1]  61/6
drill [2]  19/6 20/4
drilled [3]  20/1 20/13 20/14
drilling [1]  19/17
drinking [2]  42/14 42/15
drug [3]  8/2 43/2 63/10
drugs [1]  41/24
due [1]  34/1
DUI [2]  7/10 28/23
during [12]  16/2 25/25 30/25
  31/3 31/24 34/3 37/1 37/4
  42/15 53/2 57/11 57/19
duties [2]  31/3 45/11
duty [3]  42/8 46/4 50/18

**E**

earlier [2]  24/17 51/20
earned [1]  42/23
Edward [2]  2/12 3/13
egregious [1]  29/18
eight [1]  48/9
either [12]  4/19 29/8 31/4
  35/4 35/13 39/15 40/6 40/13
  52/7 55/4 57/18 63/24
elect [1]  37/7

electronic [1]  63/12
Eleven [3]  7/18 11/21 64/12
  65/7
else's [1]  25/14
emphasize [1]  62/10
enamored [1]  46/14
end [2]  59/17 63/5
enforcement [2]  35/4 63/18
engaged [7]  18/22 29/2 32/1
  46/1 46/22 48/4 53/19
engaging [2]  20/17 47/14
English [1]  27/22
enough [4]  11/23 51/13 57/25
  60/12
entered [1]  51/8
entertain [1]  17/8
enthusiasts [1]  19/16
entire [2]  26/1 26/2
entitled [2]  54/20 66/7
epidemic [1]  45/1
equals [5]  7/11 8/6 8/20
  43/5 62/7
equipment [1]  63/17
equity [2]  60/3 60/8
especially [3]  45/11 47/18
  49/17
essentially [2]  22/19 28/3
et [10]  1/9 12/8 15/19 15/19
  15/19 33/15 34/13 47/9 47/10
  52/8
ethical [1]  54/3
evaluate [1]  27/14
evaluation [1]  28/6
even [7]  27/6 28/20 29/18
  30/3 30/22 47/11 58/14
ever [4]  16/21 23/9 30/7
  50/13
every [4]  48/20 54/5 58/1
  61/22
everybody [2]  49/14 65/22
everything [4]  19/5 19/24
  48/19 50/19
everywhere [1]  19/16
evidence [8]  14/2 15/6 16/19
  21/20 21/21 31/15 47/23
  50/24
exact [2]  18/8 26/7
example [3]  16/9 19/3 54/7
except [2]  33/21 42/24
exception [1]  19/25
excited [1]  47/9
executives [1]  52/12
exemplary [1]  53/3
exhibit [1]  21/25
exists [1]  30/3
exonerate [4]  39/18 40/2
  40/3 65/1
exonerated [1]  39/22
expect [1]  55/7
expense [1]  25/24
experience [1]  51/2
explanation [1]  8/13
extended [2]  22/12 48/4
extensively [1]  17/17
extent [7]  14/11 17/20 19/9
  19/11 28/12 53/1 53/8
extraordinary [2]  50/9 50/11
extremely [6]  13/9 30/7 33/3
  46/3 46/25 47/17

**F**

face [3]  6/12 11/3 11/4
fact [9]  13/23 14/25 16/21
  25/16 27/14 38/5 51/4 52/17
  53/2
factor [2]  46/19 48/6
factors [6]  32/22 38/18
  53/24 54/17 56/25 62/2

facts [5]  11/4 17/24 17/25
factual [7]  8/14 15/12 18/9
  31/17 31/19 31/19 32/1
Faerstein [4]  2/4 3/11 49/23
  55/22
failure [2]  35/7 63/19
fairly [1]  34/20
fait [1]  6/15
fall [1]  9/11
falls [2]  24/5 41/21
family [6]  3/16 3/23 43/17
  57/20 59/9 61/6
fashion [1]  11/8
fashioned [1]  33/15
father [3]  26/2 41/24 42/2
fault [1]  25/14
federal [2]  29/19 35/14
fee [3]  25/13 25/15 26/3
feel [4]  47/8 61/8 62/15
  62/17
felon [10]  35/1 41/7 45/6
  45/7 46/24 49/10 53/12 53/13
  62/14 64/6
FFL [1]  56/11
figuring [1]  59/1
filed [2]  44/2 44/24
final [1]  31/10
finally [2]  31/21 58/5
find [5]  22/20 27/25 32/24
  58/18 62/4
fine [30]  3/18 7/11 8/7
  24/23 25/1 25/4 25/5 25/10
  25/23 26/12 26/13 34/2 36/23
  36/25 37/4 37/14 43/7 43/8
  43/11 44/7 44/8 44/10 58/6
  58/6 59/2 59/6 59/18 59/22
  63/6 65/5
finish [1]  46/17
firearm [8]  20/5 20/6 30/25
  35/1 41/7 45/6 62/14 64/7
firearms [30]  6/23 7/4 8/8
  14/7 15/8 15/25 17/2 18/1
  18/18 19/11 19/12 19/13
  21/13 22/2 22/3 22/7 22/9
  22/16 22/18 22/24 30/14
  30/15 30/17 41/5 41/14 46/3
  46/14 48/3 56/14 64/4
firmly [2]  18/2 55/8
first [15]  3/9 4/2 4/5 20/10
  20/17 23/8 24/8 25/11 33/25
  44/19 45/20 51/10 51/14 54/1
  62/4
five [2]  51/22 56/15
flow [3]  25/3 26/3 59/21
follow [1]  59/4
followed [1]  62/20
following [2]  33/23 62/21
follows [4]  32/23 33/17 34/5
  62/3
footnote [2]  11/21 11/25
foregoing [1]  66/5
forfeiting [1]  24/19
forfeiture [5]  8/8 24/18
  24/21 43/9 62/24
forget [1]  51/9
forgive [1]  50/7
format [2]  34/24 66/8
former [1]  9/14
forms [1]  54/12
formula [1]  14/16
formulate [2]  14/11 14/14
forth [4]  14/1 21/21 39/11
  65/11
forthwith [2]  34/2 63/4
found [4]  15/17 27/21 30/7
  49/8
four [1]  57/7
frankly [3]  12/11 12/20 47/6

**F**
fraud [1]   60/12
free [3]   9/9 9/9 24/4
friends [4]   3/23 44/1 44/2
61/5
front [6]   51/22 52/1 52/7
52/11 52/13 56/9
full [2]   17/2 34/18
fully [1]   19/11
fun [2]   48/15 48/16
funny [1]   48/16
further [2]   5/16 60/15
future [1]   53/17

**G**
game [1]   47/10
gave [2]   25/20 56/16
general [6]   34/7 42/24 54/2
54/11 61/2 63/3
generally [1]   54/8
generous [1]   33/3
gentlemen [1]   65/21
GEORGE [1]   1/3
get [14]   13/19 20/7 27/5
40/9 46/9 46/12 47/9 52/1
52/11 52/12 53/13 55/3 60/7
61/22
gets [4]   6/18 10/6 14/8 54/6
getting [3]   43/16 50/4 57/5
ghost [3]   8/23 17/2 43/13
give [12]   13/20 33/18 33/20
36/20 45/15 49/1 50/23 52/18
53/10 53/14 57/2 62/19
given [4]   48/21 54/14 56/19
62/15
giving [2]   54/18 55/1
go [11]   5/16 11/10 19/17
25/10 49/8 51/13 53/22 54/22
54/23 56/18 58/16
goes [3]   9/1 46/21 57/8
going [30]   5/17 6/7 6/12
13/7 20/18 21/10 28/7 28/8
36/15 37/11 38/4 39/14 40/5
49/7 49/14 50/21 53/19 54/25
55/3 55/11 55/11 56/12 56/22
57/3 57/23 57/24 58/16 58/18
60/6 64/22
gone [1]   41/18
good [16]   3/10 3/13 3/20 8/1
27/9 31/6 32/12 38/15 42/24
45/8 45/23 49/23 60/20 60/24
62/18 65/22
got [4]   18/1 27/6 42/22 53/4
government [50]
government's [13]   5/22 8/11
8/18 10/15 11/20 15/9 19/22
28/25 31/23 33/1 44/6 44/25
45/1
graduated [2]   7/19 42/4
grandmother [1]   42/2
grant [1]   24/3
granted [1]   19/3
Great [1]   5/2
greater [2]   54/20 56/24
grew [1]   41/23
ground [2]   61/15 65/16
grounds [2]   35/8 63/20
grouped [1]   41/9
guess [6]   12/14 24/1 36/19
41/18 49/12 49/14
guideline [5]   23/23 54/14
58/8 58/9 58/14
guidelines [23]   8/6 8/10
8/20 13/23 15/11 15/13 23/17
23/22 24/9 24/14 25/6 32/25
43/6 48/6 48/10 54/17 54/20
54/22 54/24 56/13 58/19 59/2
62/7

**guilty [5]**   19/13 21/4 26/6
gun [6]   17/2 19/15 20/22
27/8 30/19 47/4
guns [13]   8/23 12/15 15/11
15/14 15/19 16/23 18/21
19/14 20/16 30/1 43/13 46/5
47/8
guy [1]   25/18
GW [1]   1/8

**H**
had [30]   4/9 4/10 5/7 10/2
14/9 15/2 15/17 15/24 15/25
16/7 17/2 20/13 21/25 22/1
22/8 26/6 29/19 30/1 30/2
32/15 38/17 39/3 41/18 42/13
42/20 48/19 48/20 48/21 50/3
61/14
hadn't [1]   8/23
Haig [6]   2/17 2/18 3/20 5/25
24/13 56/6
half [1]   41/23
halfway [2]   57/7 57/19
happened [6]   16/1 28/2 28/9
29/6 29/20 47/22
happening [2]   55/9 55/22
happier [1]   57/5
happy [1]   57/4
has [54]
have [117]
haven't [1]   58/17
Having [1]   56/1
Hawthorne [2]   2/13 2/19
he [170]
headaches [1]   42/25
health [3]   8/2 42/24 63/11
hear [10]   13/21 17/4 20/25
24/6 32/9 44/18 48/11 52/21
59/16 60/17
hearing [1]   21/3
hearted [1]   45/10
heavily [2]   42/14 42/15
held [2]   22/17 66/6
help [1]   14/14
her [2]   49/15 49/20
here [28]   3/24 12/23 13/11
14/22 16/8 16/25 18/6 21/24
24/22 26/8 26/24 26/25 29/7
29/15 47/22 51/15 53/16
53/20 55/7 59/17 59/23 61/1
61/2 61/6 61/18 61/22 62/13
62/24
hereby [1]   66/4
high [5]   7/20 42/3 42/4
50/12 59/7
higher [3]   18/11 27/13 48/7
higher-ups [1]   27/13
highlights [1]   54/4
him [50]
himself [8]   9/5 25/23 28/7
34/8 48/21 53/8 54/6 63/8
his [76]
history [28]   7/9 8/2 8/5
8/19 9/2 9/2 12/9 15/22
28/24 31/13 34/9 41/20 43/1
43/4 43/5 43/14 46/21 49/11
49/16 50/19 50/23 52/16 53/9
57/1 62/6 62/7 62/12 63/10
hold [1]   5/5
holes [2]   19/6 20/4
home [9]   23/14 23/20 24/12
26/4 30/17 34/12 57/8 57/18
60/3
homes [1]   26/5
Honestly [1]   47/16
Honor [94]
Honor's [1]   16/10
HONORABLE [1]   1/3

**honorably [2]**   7/23 42/7
hope [2]   37/19 55/24
hoped [1]   32/15
hoping [1]   58/15
horrendous [2]   9/4 52/14
horse [2]   26/24 26/25
horses [1]   5/6
hours [5]   34/14 34/17 34/19
34/19 34/22
house [2]   57/7 57/19
household [2]   7/19 41/24
how [9]   11/1 14/7 14/8 30/1
34/14 48/18 49/25 50/21 60/7
however [7]   13/25 19/15
24/13 35/10 38/1 62/16 63/21
hundred [5]   13/4 26/4 34/1
43/8 59/8
hundreds [1]   19/14
hundredth [1]   27/7

**I**
I'm [3]   46/11 48/13 61/19
ID [1]   20/2
ignorance [1]   11/24
illegal [1]   43/2
illustrated [2]   46/7 47/1
imagine [2]   60/12 60/13
important [5]   20/9 20/10
29/7 29/15 45/25
impose [6]   23/8 23/12 23/13
26/15 33/21 56/24
imposed [1]   39/21
impossible [2]   60/9 60/10
impress [1]   33/16
impressive [1]   50/14
incarcerate [1]   53/17
incarceration [1]   57/18
incidents [1]   9/3
inclined [1]   45/17
include [1]   35/6
included [2]   9/13 43/24
including [5]   30/15 42/25
43/13 43/16 49/14
income [2]   41/24
incorporate [1]   11/17
incorrect [6]   4/11 4/12 4/19
5/12 13/14 40/14
increase [2]   7/2 41/13
indicate [6]   6/11 11/6 37/21
58/18 59/3 60/23
indicated [13]   36/25 40/11
45/9 48/25 50/3 50/22 56/18
58/16 58/17 58/18 62/9 65/3
65/5
indicates [2]   6/25 41/8
indicted [1]   43/15
indictment [2]   6/21 41/3
individual [2]   54/2 54/11
individually [2]   3/25 50/17
infantryman [1]   31/2
informant [2]   20/11 56/14
initial [1]   58/22
initially [1]   4/10
inquiry [1]   13/23
insofar [10]   8/8 18/15 33/3
38/1 38/2 45/3 50/1 50/2
53/11 59/5
instruct [1]   13/23
integrally [1]   14/4
intention [2]   11/7 57/2
interesting [1]   6/16
interject [2]   46/15 48/14
Internet [2]   20/4 20/19
interplay [1]   18/10
introduces [1]   47/4
investigation [1]   8/24
involve [1]   22/15
involved [13]   7/3 8/16 8/22
8/25 9/6 9/22 12/22 14/4

**I**

involved... [5]  14/10 14/23
16/5 41/14 43/22
**Iowa [1]**  54/4
**irresponsible [1]**  38/25
**is [350]**
**isn't [1]**  17/11
**issue [14]**  6/16 9/20 13/6
13/7 13/8 13/12 13/18 18/17
28/17 38/19 44/25 49/4 51/9
65/14
**issues [2]**  17/7 22/14
**it [146]**
**items [2]**  20/4 29/11
**its [2]**  33/3 47/24

**J**

**jail [2]**  53/21 53/22
**James [1]**  1/9
**Janelle [1]**  42/11
**Jerome [2]**  2/17 2/18 3/20
**job [3]**  26/6 26/7 34/18
**joined [3]**  7/20 7/22 42/5
**judge [9]**  1/4 19/3 19/8 49/5
53/21 54/14 56/9 56/16 57/13
**judgment [1]**  39/21
**Judicial [1]**  66/9
**Juggernaut [3]**  9/16 26/7
26/8
**Jujitsu [1]**  42/23
**July [1]**  42/6
**June [2]**  31/18 42/6
**jurisdictions [1]**  55/20
**jury [1]**  51/13
**just [49]**
**Justice [2]**  49/5 49/19

**K**

**KATIE [2]**  1/20 66/12
**kind [1]**  31/1
**Klausner [2]**  56/9 56/16
**knee [1]**  42/25
**knew [3]**  29/18 47/13 47/24
**know [37]**
**knowledge [4]**  14/9 16/23
17/3 46/22
**known [3]**  14/13 45/6 53/12
**knows [3]**  24/11 26/9 46/3
**Kwan [1]**  30/13

**L**

**LA [2]**  9/15 19/16
**lack [2]**  33/13 50/19
**landscaper [1]**  7/24
**language [2]**  27/22 39/15
**large [1]**  52/25
**last [6]**  28/17 28/22 29/4
34/19 41/19 59/19
**lasted [1]**  31/18
**law [10]**  2/12 2/18 31/15
35/3 35/14 49/10 49/14 49/15
63/18 63/25
**lawyer [1]**  49/17
**lawyering [1]**  49/18
**lazy [1]**  12/4
**leader [1]**  9/14
**least [10]**  8/17 10/4 20/10
25/23 25/23 34/18 36/12
46/14 52/6 55/8
**leave [2]**  36/3 63/14
**Leaving [1]**  32/14
**left [1]**  9/11
**legal [8]**  12/19 16/24 16/25
18/10 20/6 22/14 30/14 30/17
**legality [2]**  12/15 12/21
**legally [1]**  19/25
**lengthiest [1]**  61/8
**less [8]**  7/3 9/22 9/23 24/25

25/15 26/3 27/23 57/3
**lesson [1]**  27/1
**let's [9]**  6/12 10/25 11/3
11/4 19/2 46/9 46/12 51/9
53/5
**letter [1]**  26/8 43/25 60/22
60/24 60/24
**letters [1]**  9/14
**level [15]**  7/1 7/2 7/8 8/5
8/19 41/9 41/12 41/13 41/16
43/5 50/12 56/4 56/11 58/14
62/6
**levels [7]**  7/5 7/7 8/12
23/23 33/6 41/16 48/9
**license [9]**  6/24 12/20 18/7
18/18 18/24 19/13 22/19
22/25 41/5
**licensed [1]**  30/18
**like [8]**  19/15 26/5 47/8
47/10 53/20 59/8 59/11 59/14
**list [3]**  29/23 29/24 30/7
**Listen [1]**  26/20
**litigation [1]**  26/1
**little [3]**  12/5 21/6 34/18
**lived [1]**  7/18
**loan [2]**  60/6 60/8
**local [1]**  35/14
**locale [1]**  28/3
**locked [1]**  57/16
**logical [1]**  50/8
**long [1]**  14/7
**look [12]**  5/8 19/1 19/2 19/2
27/24 40/18 50/24 51/19
53/21 55/8 56/5 58/13
**looking [2]**  4/12 57/21
**loophole [1]**  16/25
**LOS [4]**  1/15 1/22 2/8 3/1
**lose [3]**  57/9 57/10 58/1
**losing [2]**  55/17 61/9
**lost [3]**  52/3 52/4 61/14
**lot [11]**  3/16 11/4 11/9
12/14 16/15 16/16 18/21
19/15 45/13 50/11 60/21
**lots [1]**  22/2
**love [1]**  27/5
**low [1]**  41/24
**lower [11]**  13/2 13/3 19/7
19/18 20/1 20/13 22/1 22/8
22/15 38/19 58/15
**luck [1]**  65/22

**M**

**made [15]**  10/21 11/14 11/18
14/8 15/8 15/23 20/21 27/12
27/17 28/13 33/5 40/8 44/22
45/20 51/6
**major [2]**  12/9 52/23
**make [9]**  14/7 20/20 25/15
27/12 37/19 54/7 57/5 57/25
61/22
**makes [1]**  18/20
**making [5]**  10/3 13/4 16/24
24/1 53/20
**man [3]**  31/6 59/8 60/6
**mandatory [2]**  44/10 58/12
**manner [2]**  35/11 63/22
**manufacture [3]**  6/23 17/1
22/4
**manufacturer [1]**  18/16
**manufacturing [6]**  8/22 18/6
18/23 22/7 22/18 46/2
**many [3]**  30/1 34/14 52/11
**Marine [7]**  7/20 9/14 30/23
31/2 32/14 42/5 42/8 43/15
44/1 50/14 50/15 57/11
**Marines [6]**  7/22 42/5 45/9
45/21 50/11 50/12
**marriage [1]**  42/20
**married [3]**  7/25 42/11 42/18

**marshaled [1]**  14/1
**Mary [1]**  66/4
**mass [1]**  11/2
**materials [5]**  5/8 5/12 32/19
40/18 61/24
**matter [13]**  3/6 6/5 9/13
33/12 37/22 37/23 49/12
49/24 51/4 62/11 64/15 65/8
66/7
**matters [4]**  44/23 49/23
58/12 58/13
**may [15]**  3/17 11/16 16/17
18/14 21/25 28/18 28/21 31/9
37/18 46/20 48/18 48/18 49/3
53/23 57/13
**maybe [8]**  12/18 21/4 22/1
30/4 33/15 55/19 55/21 57/7
**me [83]**
**mean [13]**  10/5 14/9 17/9
17/12 17/14 17/16 17/20
22/16 23/16 27/15 52/9 52/13
55/14
**meaning [1]**  17/23
**means [1]**  27/9
**meant [1]**  38/22
**meetings [1]**  14/2
**members [4]**  3/16 3/23 38/23
47/7
**memo [3]**  11/20 22/22 44/25
**memorandum [1]**  10/16
**mental [1]**  63/11
**mention [3]**  9/20 10/17 64/3
**mentioned [2]**  9/21 24/17
**message [1]**  54/7
**messages [2]**  14/3 15/24
**metal [2]**  19/18 19/20
**mid [1]**  15/9
**middle [2]**  28/21 28/21
**might [4]**  6/17 13/19 14/13
20/12
**military [8]**  25/19 25/20
25/20 33/14 45/11 46/4 50/9
51/2
**milled [1]**  22/9
**mind [4]**  12/12 45/12 52/24
53/10
**minimizing [1]**  32/2
**minimus [1]**  62/17
**minor [8]**  4/22 7/5 8/12 9/10
9/20 10/6 11/3 13/13 33/6
**minute [1]**  41/19
**misdemeanor [1]**  7/10
**misinformation [1]**  12/14
**mistaken [1]**  21/4
**model [1]**  30/21
**modified [4]**  4/20 5/13 40/14
40/24
**moment [1]**  57/13
**monetary [1]**  26/16
**money [5]**  20/20 20/21 59/25
60/3 60/6
**month [2]**  34/22 43/10
**monthly [3]**  25/3 26/3 59/21
**months [20]**  8/6 8/9 8/20
8/21 34/23 42/19 43/6 43/7
54/15 54/16 55/1 55/2 56/15
56/16 56/16 56/19 61/13 62/8
62/19 62/20
**more [10]**  7/3 8/25 15/18
15/19 18/15 21/6 24/25 34/19
45/7 53/6
**morning [6]**  3/10 3/13 3/20
32/12 32/13 60/20
**mortgage [1]**  26/5
**most [5]**  22/3 26/5 50/13
52/13 59/24
**mother [2]**  41/25 52/4
**motion [7]**  6/1 19/3 19/9
39/2 39/4 65/15 65/17

ER141

**M**

motions [2]   5/21 5/25
mouth [1]   21/11
move [4]   35/22 35/24 36/1
64/9
moving [2]   19/10 40/12
Mr [6]   5/5 22/22 25/17 30/4
37/17 56/5
Mr. [60]
Mr. Alexander [1]   56/14
Mr. Dekoning [1]   20/14
Mr. Faerstein [2]   49/23
55/22
Mr. Haig [3]   5/25 24/13 56/6
37/17
Mr. in [1]   37/17
Mr. Kwan [1]   30/13
Mr. Robinson [3]   3/22 10/23
44/13
Mr. Roh [8]   17/14 19/4 19/9
19/11 19/15 27/6 27/8 29/16
Mr. Schlotterbeck [21]   3/14
3/15 11/18 12/7 17/12 17/13
27/20 29/6 29/9 40/9 40/17
44/24 45/4 48/7 48/19 51/3
51/6 51/18 51/23 54/5 56/12
Mr. Schlotterbeck's [4]
10/19 50/8 57/1 58/13
Mr. Vlha [14]   3/21 5/7 8/16
11/14 11/19 11/20 17/25
18/22 20/21 21/20 25/19
27/19 31/24 44/22
Mr. Vlha's [1]   10/15
Ms [1]   30/4
much [3]   45/7 53/6 65/21
muddied [1]   16/16
murderers [1]   11/2
murdering [1]   11/11
my [27]   12/12 12/22 19/10
25/13 25/14 25/14 25/24 26/2
26/19 28/5 28/6 28/22 29/2
29/7 30/12 30/16 32/16 39/11
39/19 45/3 45/12 52/24 53/10
53/22 57/2 61/5 61/14
myself [1]   20/4

**N**

named [1]   35/20
national [1]   56/3
nature [4]   12/21 18/15 22/4
35/15
necessarily [11]   9/2 10/5
12/18 12/19 16/13 17/19
27/15 28/7 37/3 50/10 63/13
necessary [3]   51/17 53/7
56/25
need [6]   38/8 39/24 53/16
56/23 60/15 65/7
needed [2]   16/20 53/8
needs [2]   18/10 53/5
negative [5]   7/5 7/7 8/11
33/6 41/16
net [2]   25/3 59/21
never [2]   29/20 51/9
New [1]   27/22
nice [1]   25/18
Ninth [1]   49/8
no [40]
No. [2]   6/20 62/13
No. 2 [1]   6/20
No. 3 [1]   62/13
nobody [1]   49/15
none [3]   17/25 24/3 41/21
normal [1]   7/19
North [1]   2/7
nose [1]   29/17
not [94]
note [1]   31/10
notes [3]   43/11 43/14 43/21

**O**

nothing [2]   24/18 64/8
NOVEMBER [2]   1/16 3/1
now [6]   22/17 35/1 39/20
42/13 49/5 57/4
number [3]   15/11 20/7 30/17
nuts [3]   19/5 19/6 22/5

**O**

obey [2]   40/1 63/1
object [2]   51/10 51/14
objecting [1]   4/24
objection [1]   6/12
objects [1]   8/11
obtained [1]   22/23
obvious [2]   18/18 44/12
obviously [13]   8/9 12/7 13/7
13/17 15/17 28/12 34/25
37/23 43/1 46/7 50/14 52/10
54/22
occurred [2]   10/18 29/4
off [1]   3/17
offense [17]   7/1 7/8 8/5
8/19 23/5 28/20 32/6 36/11
41/8 41/12 41/15 51/5 51/16
51/19 52/24 56/11 62/6
offensive [1]   27/1
office [31]   2/5 2/18 5/9
7/12 8/4 8/7 8/13 13/13
24/24 27/13 32/21 33/3 34/6
34/23 35/3 40/4 40/19 41/9
43/3 43/7 54/23 54/25 55/3
52/20 59/5 62/1 62/5 63/2
63/12 63/14 65/2
office's [1]   32/24
officer [7]   16/21 20/12
26/21 30/24 35/4 63/18 63/18
Official [1]   1/20
offset [1]   45/8
Oh [2]   12/3 64/5
Okay [21]   5/2 5/15 5/22 6/19
10/8 21/8 24/15 25/9 32/18
34/21 35/19 36/1 37/17 38/15
39/16 44/12 52/20 55/15
58/25 64/12 65/21
old [4]   7/17 33/15 41/22
51/23
one [42]
ones [1]   17/18
ongoing [1]   29/2
only [13]   4/12 10/14 17/9
17/18 19/19 23/23 26/4 36/19
37/1 38/16 39/6 50/4 65/16
opportunity [3]   5/8 15/18
40/18
opposed [1]   26/16
Orange [1]   19/16
order [18]   5/18 15/1 30/20
33/25 34/2 34/5 34/7 34/11
34/21 36/15 37/3 37/15 63/1
63/3 63/7 63/9 63/10 63/15
ordered [2]   25/22 35/2
orders [2]   15/7 30/22
other [35]
others [1]   26/21
otherwise [6]   7/19 10/9 11/8
12/25 36/21 63/25
our [17]   3/17 4/25 6/9 15/4
15/9 19/2 21/11 21/25 24/9
31/13 46/19 47/1 49/7 54/1
55/6 56/4 57/9
out [9]   3/16 12/14 15/18
20/17 27/21 31/15 59/1 60/2
60/3
outstanding [1]   50/13
outweighs [1]   45/12
over [4]   15/15 39/20 43/22
61/12
overall [3]   6/17 25/7 59/22

**P**

overcame [1]   51/23
owe [1]   42/13
own [1]   52/8
owned [1]   42/10
owner [1]   9/15

**P**

page [1]   66/7
paid [5]   26/2 29/5 37/1
61/22 63/4
pain [1]   42/25
painter [1]   7/25
paper [1]   59/25
papers [20]   5/1 10/17 12/2
15/4 15/9 16/6 19/10 21/11
21/20 31/13 31/23 31/25
40/12 40/13 47/2 47/24 54/2
56/6 58/7 63/16
paragraph [1]   4/12
parcel [1]   48/3
Pardon [1]   59/12
parents [4]   7/17 41/22 41/25
52/3
part [8]   13/7 25/7 30/16
34/4 36/23 48/3 48/20 59/22
participant [5]   4/22 8/12
10/6 13/13 33/6
participate [1]   63/11
participating [1]   42/16
participation [1]   7/6
particular [11]   6/5 9/3
12/10 14/12 22/13 27/11
27/15 37/22 62/11 62/18
64/15
parties [1]   19/17
partly [1]   39/2
partnership [2]   14/17 14/20
parts [3]   14/7 20/22 30/15
party [1]   48/22
past [2]   16/8 34/17
pastor [1]   44/2
pay [6]   25/22 33/25 34/2
37/4 63/3 63/5
payment [2]   14/8 65/5
pending [4]   36/16 39/6 40/6
40/7
pens [1]   20/22
people [13]   11/8 11/10 11/11
16/15 16/17 22/24 46/5 46/6
52/1 52/10 52/13 53/19 55/10
people's [1]   26/5
Pepper [1]   51/20
percent [2]   13/4 52/6
percenter [1]   13/5
perhaps [2]   33/2 47/12
period [13]   33/22 33/23 34/3
37/1 37/4 37/13 42/15 53/2
57/9 57/20 58/1 61/8 62/20
person [9]   14/16 14/17 14/19
35/5 47/25 48/5 51/1 51/22
63/16
personal [2]   52/16 57/1
persons [2]   12/17 45/10
persuade [1]   51/13
persuaded [1]   17/19
phone [1]   35/6
photo [1]   16/7
photographs [3]   19/21 19/23
19/25
photos [2]   21/25 22/2
physical [1]   23/15
physically [2]   19/5 52/7
piece [3]   13/1 19/18 19/20
place [2]   19/20 34/12
placed [1]   39/25
places [1]   7/15
PLAINTIFF [2]   1/7 2/3
played [1]   8/16
plea [13]   5/19 5/21 8/14

ER142

**P**

plea... [10]   21/3 37/24 38/1 39/12 39/14 51/7 64/6 64/15 65/11 65/18
plead [10]   4/11 4/13 6/20 21/4 26/6 28/13 41/2 41/19 47/14 56/10
please [1]   56/23
plus [2]   7/11 43/7
point [16]   7/11 7/22 10/3 13/21 13/25 15/9 24/1 24/18 24/19 34/14 36/6 36/10 40/3 49/23 53/7 56/13
points [4]   7/12 7/14 21/10 45/20
policies [1]   14/12
portion [3]   6/18 8/14 47/7
portions [1]   57/11
position [5]   10/17 39/17 46/4 59/17 60/15
positive [3]   25/3 26/3 59/21
possess [4]   30/25 35/1 64/4 64/7
possibility [1]   9/12
possible [1]   26/20
post [1]   51/19
postpone [1]   37/9
potential [1]   43/19
power [1]   54/6
prefer [1]   26/16
premised [1]   39/2
prepared [1]   62/5
prescription [1]   24/2
present [6]   3/15 3/21 7/13 14/22 42/10 43/21
presented [3]   4/17 32/20 61/25
presentence [7]   4/10 4/18 4/24 6/25 8/3 8/4 41/8
preserve [2]   26/19 51/8
preserved [3]   39/7 49/4 65/15
president [1]   26/7
PRESIDING [1]   1/4
presume [8]   6/4 10/22 11/9 26/15 30/2 37/2 38/6 64/22
presumed [1]   53/12
pretrial [4]   5/20 5/25 30/21 65/17
pretty [1]   17/16
previously [2]   16/1 16/7
pricing [1]   14/6
primarily [4]   13/18 42/1 60/1 62/10
primary [5]   12/23 13/11 17/10 49/16 62/13
prior [16]   9/3 14/7 15/2 15/23 21/13 33/14 34/10 43/1 43/12 43/14 51/8 53/1 53/2 53/9 62/11 63/10
prison [1]   8/9
private [1]   48/22
pro [1]   51/7
probably [3]   10/4 45/15 62/17
probation [35]
probationary [6]   9/12 13/19 13/20 23/19 24/3 33/19
problem [9]   12/12 42/21 45/4 45/14 47/7 47/20 52/23 53/10 62/13
problematic [1]   13/10
proceeding [1]   29/13
proceedings [5]   1/14 31/25 58/9 65/23 66/6
produce [2]   15/19 29/22
profess [3]   10/24 11/1 11/24
Professional [1]   2/12

profit [1]   51/11
program [1]   54/2
prohibited [3]   48/5 50/25 55/10
promote [1]   56/25
pronoun [1]   58/10
property [2]   35/4 63/16
prosecuted [3]   22/23 23/3 27/20
protect [2]   46/5 53/17
protest [1]   18/2
proves [1]   47/24
provide [3]   11/7 57/6 57/20
provided [2]   8/13 25/25
PSD [1]   42/24
public [4]   2/6 38/23 53/17 54/8
punished [1]   54/6
punishment [1]   57/18
punitive [5]   25/5 26/15 26/16 26/16 36/23
purchased [2]   19/25 20/2
purchaser [1]   51/3
purports [1]   8/1
purpose [1]   25/6
purposes [4]   25/7 38/7 41/10 49/17
pursuant [3]   5/19 30/19 66/4
put [19]   10/20 10/25 12/1 15/1 15/16 18/13 23/18 23/19 23/20 26/14 31/15 37/2 47/24 51/7 52/9 52/18 53/5 53/21 61/19
putting [2]   33/19 46/6

**Q**

quarrel [2]   26/22 39/15
question [8]   4/9 5/16 14/13 28/14 29/22 51/16 56/20 61/7
questions [4]   23/6 36/8 40/10 64/18
quickly [1]   26/23
quid [1]   51/7
quit [2]   26/6 26/6
quite [1]   18/2
quo [1]   51/7
quote [6]   19/10 21/10 21/15 21/16 21/16 21/17

**R**

Rachael [2]   2/11 3/14
raise [1]   38/4
raised [2]   42/1 43/12
raising [1]   59/9
range [15]   8/6 8/10 8/20 10/18 32/25 43/6 54/22 54/24 58/8 58/9 58/14 58/19 58/23 59/2 62/8
rather [2]   9/4 33/19
ratification [1]   49/9
read [3]   11/23 12/2 60/23
reading [1]   11/24
ready [1]   4/4
real [3]   28/14 31/23 33/13
really [11]   12/9 16/15 17/10 18/17 25/4 28/11 31/25 45/8 49/13 55/8 62/10
reason [7]   11/13 27/2 27/4 27/19 38/16 40/2 52/11
reasonable [6]   35/11 35/11 35/12 63/22 63/22 63/23
reasons [2]   55/2 62/9
received [2]   7/10 42/7
receiver [6]   13/2 13/3 19/7 19/18 20/1 38/19
receivers [4]   22/1 22/8 22/15 43/22
recent [1]   45/1

recommend [2]   44/7 44/10
recommendation [4]   15/10 43/3 44/7 59/4 59/5
recommends [5]   8/7 8/21 43/7 43/10 63/12
record [3]   11/17 30/1 37/19
recordings [1]   14/2
redo [1]   61/15
reduce [1]   52/25
reflect [1]   32/16
reflected [4]   5/21 15/4 15/6 15/22
reflecting [2]   14/3 21/12
regard [4]   13/14 34/11 45/10 53/4
regarding [2]   3/22 16/11
regardless [1]   24/4
regards [3]   12/15 13/12 18/17
register [1]   20/6
registered [1]   30/18
regulations [3]   34/6 63/2 66/8
rehabilitate [1]   54/6
rehabilitated [1]   53/8
rehabilitation [2]   51/19 53/6
relative [1]   47/3
relatively [1]   9/9
relatives [1]   52/8
release [14]   21/12 33/21 33/23 34/3 34/4 35/9 35/13 35/17 37/2 39/25 62/21 63/6 63/24 64/2
relevant [1]   49/3
remain [1]   8/9
remaining [2]   37/13 38/8
remember [1]   12/25
reminiscent [1]   44/22
render [1]   12/24
repetitive [1]   51/11
reply [2]   44/3 44/24
report [6]   4/10 4/19 4/24 6/25 8/3 41/8
reported [1]   66/6
Reporter [1]   1/20
REPORTER'S [1]   1/14
reporting [3]   40/3 65/2 65/3
reports [1]   42/23
represent [1]   64/22
representation [1]   25/25
representing [2]   38/7 38/10
request [2]   6/9 35/8
requested [2]   35/3 63/17
requesting [1]   24/24
require [3]   40/5 40/7 63/5
required [3]   53/25 53/25 63/13
requirements [1]   12/19
reserve [1]   57/15
reserved [1]   6/1
reserving [1]   37/24
residence [3]   35/5 60/1 63/16
residual [1]   24/13
resolved [1]   37/10
respect [25]   6/2 9/19 9/22 11/18 11/20 16/10 17/1 21/9 21/22 21/24 22/11 31/12 31/22 31/24 37/20 38/18 44/6 44/22 45/21 46/24 48/7 58/6 59/1 65/10 65/15
respond [1]   31/9
response [4]   10/15 17/4 22/22 48/12
responsibility [3]   7/7 41/17 56/17
restarted [1]   61/14
resume [1]   50/15

**R**

retained [1]   25/13
retired [2]   7/18 9/15
returning [1]   21/17
reversed [2]   6/18 55/4
revocation [1]   63/20
revoke [1]   35/9
right [43]
rights [5]   2/6 26/19 37/23
38/9 64/15
Robinson [9]   2/11 2/12 3/14
3/22 5/5 10/23 30/4 30/4
44/13
Roh [15]   17/14 19/1 19/3
19/4 19/9 19/11 19/15 21/24
22/10 22/12 26/23 27/6 27/8
28/17 29/16
role [5]   8/17 9/11 9/20 32/2
33/4
RPR [1]   66/12
Rule [1]   19/8
ruled [1]   19/8
rules [2]   34/5 63/1
ruling [3]   5/20 19/10 27/4
run [1]   31/3
running [1]   57/12

**S**

said [18]   3/22 5/25 5/25
10/3 10/24 16/8 16/21 19/9
21/12 26/21 29/13 38/16
38/22 40/13 44/8 51/21 54/21
56/1
salary [1]   20/21
sale [13]   8/25 18/6 18/17
22/15 41/7 43/13 45/6 46/24
50/25 51/6 51/11 53/11 62/14
sales [6]   15/23 16/3 21/13
29/23 29/24 51/12
same [7]   10/22 18/8 26/7
28/3 28/3 40/10 40/10
sample [2]   34/8 63/8
saved [1]   25/24
saw [1]   19/23
say [26]   10/2 13/9 13/24
16/13 17/21 20/1 21/5 27/25
28/7 28/24 32/10 44/21 45/25
47/12 49/21 50/10 50/13 52/6
52/22 54/13 54/16 55/1 55/13
57/21 60/18 60/21
saying [6]   16/14 18/2 18/5
22/25 23/2 53/21
says [1]   20/16
scheme [1]   18/12
Schlotterbeck [26]   1/9 2/10
3/7 3/14 3/15 11/18 12/7
17/12 17/13 27/20 29/6 29/9
37/17 39/3 40/9 40/17 44/24
45/4 48/7 48/19 51/3 51/6
51/18 51/23 54/5 56/12
Schlotterbeck's [4]   10/19
50/8 57/1 58/13
school [5]   7/20 42/3 42/4
49/14 49/15
scope [1]   37/12
Sean [1]   56/8
search [8]   29/10 35/4 35/7
35/8 35/10 63/17 63/19 63/21
second [6]   21/24 34/6 45/15
49/9 51/9 65/16
Secondarily [1]   29/4
section [13]   2/6 6/22 7/1
7/4 7/6 7/8 41/4 41/6 41/11
41/11 41/12 41/15 64/4
see [6]   11/1 26/11 26/12
36/11 50/20 60/11
seeking [1]   38/11
seem [1]   11/2

seems [2]   25/2 46/13
segue [3]   50/1 50/6 50/21
sell [4]   16/25 17/1 41/5
47/19
selling [10]   18/23 19/13
21/13 22/7 22/18 46/2 47/2
48/4 49/10 55/10
Selna [2]   19/3 19/8
sense [6]   4/1 6/17 11/1 12/7
18/11 53/18
sent [2]   16/7 54/7
sentence [26]   6/5 6/6 6/17
9/13 13/19 13/21 23/3 23/19
23/20 28/15 32/22 33/16
33/20 33/21 36/8 43/10 51/21
52/19 54/14 54/21 56/24
59/22 62/3 62/17 65/4 65/11
sentenced [1]   54/15
sentences [4]   22/24 23/4
32/11 60/18
sentencing [17]   3/25 10/15
10/17 11/13 11/20 22/22 25/8
31/24 33/13 38/18 43/17
44/25 47/1 53/24 55/7 56/2
56/25
separate [2]   22/13 22/14
serial [1]   20/7
serious [5]   12/8 27/23 52/24
53/9 53/13
seriousness [4]   23/4 32/2
32/6 46/23
serve [1]   45/10
served [8]   33/20 42/5 43/24
45/16 49/1 50/5 50/23 62/15
service [12]   33/14 34/22
34/24 36/20 37/8 43/14 50/9
50/12 50/17 53/1 53/2 62/11
set [5]   14/1 21/21 39/11
41/12 65/11
setting [2]   17/1 44/23
seven [3]   7/3 15/15 61/13
Seventh [1]   49/6
several [2]   3/23 29/16
shall [1]   35/7
she [4]   49/6 49/8 49/11
49/15
sheriff [1]   9/15
shock [2]   10/24 11/1
short [2]   57/20 57/25
shortly [1]   42/4
should [15]   4/19 5/12 22/17
26/12 28/24 32/5 33/6 40/14
40/24 47/12 49/13 49/16
53/22 54/23 54/25
showing [2]   16/19 22/4
shows [2]   16/23 47/24
siblings [1]   7/18
side [1]   4/19
sides [1]   60/15
signage [1]   42/10
significant [6]   8/17 14/1
15/5 23/4 25/3 59/20
significantly [1]   48/7
similar [4]   17/25 27/5 43/11
43/21
similarly [2]   23/1 59/19
simply [3]   13/17 16/14 54/16
since [4]   34/2 42/20 43/15
53/3
single [2]   54/5 58/1
sir [3]   12/3 32/10 60/17
sister [2]   41/23 43/25
sisters [1]   41/23
situated [1]   23/1
situation [20]   4/7 6/5 9/18
10/13 12/10 13/16 17/21 18/5
23/11 28/15 33/8 34/13 40/10
41/1 44/4 44/13 44/16 45/18

57/6 62/19
six [6]   8/9 15/7 15/13 16/3
34/22 52/23 51/23
slicing [1]   28/1
sliver [1]   51/15
small [1]   18/1
so [58]
soft [1]   45/10
sold [4]   15/25 30/2 47/4
56/14
sole [1]   27/9
some [25]   7/22 12/17 17/7
18/14 18/15 19/2 21/9 21/25
22/1 22/21 23/14 25/24 26/20
33/11 37/22 38/18 42/24
44/21 46/14 51/12 52/11
53/14 57/24 62/16 64/14
somebody [2]   45/7 53/11
someone [2]   16/21 47/19
something [12]   12/11 13/14
24/20 28/8 28/9 28/13 32/4
32/14 36/14 45/16 46/20
53/13
sometimes [1]   34/18
somewhat [4]   38/19 38/24
43/20 46/14
soon [1]   60/12
sorry [9]   8/3 32/16 43/4
43/8 46/1 48/13 61/19 62/6
65/1
sort [14]   9/6 12/5 12/16
16/11 24/13 33/16 46/10
46/13 46/19 47/9 49/18 52/12
52/24 54/7
sounds [1]   50/7
soup [3]   19/5 19/6 22/5
speak [2]   4/8 26/23
special [3]   34/1 44/11 63/4
specific [4]   13/23 32/6
37/25 39/15
specifically [2]   29/19 37/25
specified [1]   16/5
specify [2]   15/12 44/9
Spring [1]   2/7
squad [1]   9/14
stage [1]   44/23
stand [2]   27/3 61/1
standard [1]   9/23
standing [1]   51/22
start [3]   4/2 6/19 37/9
started [1]   61/12
starting [2]   3/8 56/13
state [1]   35/14
stated [3]   4/10 55/2 65/18
statement [3]   18/21 46/9
46/12
statements [2]   15/23 16/11
STATES [10]   1/1 1/4 1/6 2/3
3/7 3/11 46/5 46/6 66/5 66/9
statute [2]   24/2 24/3
statutory [1]   18/12
stay [5]   36/16 36/17 36/18
61/8 65/3
stayed [1]   65/6
staying [1]   36/19
stenographically [1]   66/6
still [3]   8/8 23/2 38/3
stood [1]   48/14
stop [6]   27/11 28/4 29/14
45/2 50/20 60/14
strangers [3]   47/2 47/3 52/8
Street [2]   1/21 2/7
strict [1]   7/19
strongly [2]   45/12 51/6
studying [1]   49/17
stuff [3]   13/6 33/15 45/13
subject [2]   29/12 42/17
submit [4]   35/7 35/8 63/15

**S**

submit... [1]   63/19
subpart [2]   32/22 62/2
substance [1]   34/10
substantially [2]   9/23 62/9
such [7]   35/7 35/8 35/10
 63/19 63/21 65/4 65/6
suggest [1]   51/5
suggesting [1]   55/6
Suite [4]   1/21 2/7 2/13 2/19
summarize [3]   4/6 41/1 44/13
summarized [5]   9/17 10/10
 10/13 44/4 44/16
supervised [14]   23/12 33/21
 33/23 34/3 34/4 35/9 35/13
 35/17 37/1 39/25 62/20 63/6
 63/24 64/2
supervision [1]   30/22
supply [2]   14/6 14/6
support [2]   27/9 27/9
supports [1]   50/25
supposed [2]   25/5 47/25
supposedly [1]   45/7
supposition [2]   20/18 21/19
suppositions [1]   21/9
Supreme [7]   6/2 27/24 39/7
 46/10 46/13 48/17 51/20
sure [7]   12/1 17/6 17/16
 25/12 26/18 27/18 37/19
surrender [1]   6/7
surrendered [1]   30/18
suspicion [2]   35/12 63/23
sway [1]   33/12
syndrome [1]   42/25

**T**

Tactical [1]   9/16
take [7]   3/17 6/14 29/11
 59/10 59/13 60/2 60/3
taken [2]   13/8 46/4
takes [1]   14/7
taking [2]   32/13 44/25
talk [5]   15/1 30/4 34/23
 54/2 58/10
talked [2]   29/6 29/11
talking [8]   19/6 19/14 48/17
 48/24 50/16 52/5 52/5 58/4
tell [2]   18/25 61/10
telling [1]   30/24
tentative [1]   19/10
terms [31]   7/9 7/16 14/15
 15/9 15/14 18/14 23/1 23/14
 24/23 25/1 25/4 26/14 31/24
 32/5 33/12 33/24 34/4 35/9
 35/13 35/17 35/17 37/7 37/17
 40/1 41/20 46/1 52/1 52/10
 62/21 63/24 64/1
testing [2]   34/11 63/9
text [2]   14/3 15/24
texted [1]   16/6
than [16]   4/17 4/25 7/3 7/3
 16/3 20/21 21/7 22/10 25/15
 26/3 33/19 34/19 45/5 56/24
 57/3 58/15
thank [9]   6/13 10/11 32/12
 32/17 46/18 57/22 60/25
 65/21 65/22
thanking [1]   61/18
Thanks [1]   5/15
that [388]
That's [5]   4/14 5/4 10/7
 14/21 62/25
their [10]   10/16 16/20 16/23
 21/12 22/4 22/11 29/22 39/4
 39/13 52/8
them [22]   3/25 4/1 6/5 6/6
 11/7 11/8 14/7 14/13 14/14
 14/25 16/25 22/3 29/10 29/11

themselves [1]   15/11
then [22]   4/7 7/2 7/5 7/6
 7/11 13/15 13/17 13/19 13/20
 15/21 16/10 19/7 24/4 25/23
 28/17 29/13 41/13 41/16 47/4
 47/5 57/21 61/16
there [86]
thereafter [2]   7/23 42/5
therefore [6]   7/14 25/22
 33/5 34/10 41/21 55/1
therein [1]   40/23
these [26]   8/25 9/3 9/6 11/7
 11/10 15/19 16/3 16/18 18/22
 19/17 19/21 20/16 21/10
 40/13 46/2 46/5 47/16 47/16
 48/2 48/18 48/20 52/12 55/10
 55/17 56/1 58/9
they [52]
THIBODEAUX [2]   1/20 66/12
thing [8]   5/25 11/17 18/8
 30/12 31/9 36/19 54/5 58/1
things [13]   11/19 12/16 20/3
 20/7 21/12 26/20 27/14 33/12
 38/24 47/9 47/16 53/4 56/1
think [53]
thinks [2]   4/19 40/13
third [1]   20/14
Thomas [1]   49/19
those [15]   5/11 9/7 14/12
 18/7 19/24 20/3 20/3 20/7
 22/25 28/14 37/11 38/3 38/24
 45/3 45/20
though [4]   27/6 28/20 47/11
 59/24
thought [4]   21/2 36/3 45/7
 49/15
thoughts [1]   45/3
thousand [2]   43/8 59/8
thousandth [1]   27/7
three [20]   6/21 7/3 7/10
 7/14 8/16 10/4 10/5 14/16
 14/17 14/22 20/10 21/18
 33/22 37/2 37/13 41/3 41/17
 62/19 62/19 62/21
through [6]   9/2 31/18 31/22
 42/6 61/6 61/20
thumbed [1]   29/16
THURSDAY [2]   1/16 3/1
tied [2]   58/8 58/9
time [49]
times [1]   29/16
tinnitus [1]   43/1
Title [1]   66/4
today [2]   26/8 61/19
together [2]   4/1 41/10
told [6]   14/25 27/18 27/19
 29/16 29/19 30/25
too [5]   7/21 11/4 14/20 28/1
 59/7
took [3]   20/12 29/10 64/6
torn [2]   12/6 12/6
Torrance [2]   2/14 2/20
tortured [1]   50/7
total [2]   7/8 41/15
totally [2]   13/14 33/9
tour [2]   42/8 45/11
tours [1]   50/18
trading [1]   47/8
training [3]   30/23 31/1 31/3
transactions [3]   19/4 20/11
 29/12
transcript [3]   1/14 66/6
 66/7
transfer [1]   48/22
Travis [1]   1/9
treatment [1]   63/11

trial [3]   41/19 56/8 56/9
tricky [1]   8/25
troublesome [1]   45/8
troubling [2]   46/25 51/24
true [4]   16/17 18/24 18/25
 66/5
trust [2]   16/20 30/8
try [1]   26/19
trying [2]   20/20 21/5
two [21]   7/2 7/5 7/7 7/12
 7/18 7/25 8/12 14/19 20/10
 33/6 33/22 41/13 41/16 41/23
 42/13 42/19 50/18 53/24
 54/12 55/15 56/10
two-level [1]   7/2
type [7]   13/6 15/25 17/2
 27/16 34/24 46/2 53/19
types [10]   9/1 9/3 9/6 9/7
 12/16 12/21 12/22 43/22 45/3
 47/16

**U**

U.S [1]   1/20
U.S.C [4]   6/22 41/4 41/6
 62/2
ultimately [1]   28/6
uncertain [2]   16/11 16/14
under [24]   6/14 7/1 7/4 7/6
 7/8 23/16 24/5 24/12 26/5
 30/21 32/5 32/22 33/23 41/11
 41/11 41/12 41/15 48/10
 51/20 53/24 56/1 59/2 62/2
 62/21
undercount [1]   15/11
undercover [4]   16/21 20/11
 47/5 47/5
underpriced [1]   25/17
understand [22]   4/21 9/25
 16/15 20/25 23/25 24/10 28/4
 28/14 28/25 29/21 31/20 32/7
 33/1 47/6 47/15 47/15 48/24
 49/25 50/2 52/15 60/14 64/14
understanding [5]   5/23 12/23
 39/10 39/11 39/13
understood [2]   16/19 39/1
undertaken [1]   30/8
unfinished [2]   19/19 20/13
UNITED [10]   1/1 1/4 1/6 2/3
 3/7 3/11 46/5 46/6 66/5 66/9
unless [2]   8/23 53/18
unlike [1]   30/13
unnecessarily [1]   59/9
unregulated [1]   48/20
unserialized [1]   20/5
unsuccessful [1]   37/11
until [6]   6/7 28/21 31/14
 37/9 65/4 65/6
untraceable [1]   48/3
unwarranted [2]   56/2 56/21
up [9]   17/1 41/24 48/14 49/8
 49/23 56/6 61/1 61/15 63/14
upon [7]   35/12 40/3 53/16
 56/25 63/22 65/2 65/2
ups [1]   27/13
upside [2]   17/23 17/23
us [3]   2/5 15/2 32/13
use [7]   9/3 11/8 43/2 51/1
 56/12 58/10 59/4
used [2]   9/7 41/24
using [1]   15/3
usually [1]   21/16

**V**

vacation [1]   29/9
vape [1]   20/22
vaping [1]   20/22
variance [1]   58/8
various [4]   9/4 21/11 27/13

ER145

## V

various... [1]   42/7
vary [1]   62/8
varying [2]   58/21 58/22
vastly [2]   27/23 27/25
vehicles [1]   35/5
versus [2]   3/7 54/2
very [8]   11/12 13/22 31/15
50/14 51/6 59/17 60/24 65/21
view [3]   38/20 46/19 46/19
violated [3]   35/12 35/14
63/23
violation [4]   6/22 41/4 41/6
63/25
vis [2]   59/17 59/18
visit [1]   29/5
Vlha [20]   1/9 2/16 3/7 3/21
4/5 5/7 8/16 11/14 11/19
11/20 17/25 18/22 20/21
21/20 25/17 25/19 27/19
31/24 39/3 44/22
Vlha's [2]   10/15 22/22

## W

waive [3]   26/12 37/22 64/14
waived [4]   38/3 38/5 39/4
55/6
waiver [1]   37/20
waivers [3]   37/19 38/3 65/10
want [21]   3/18 4/1 5/24
11/12 17/6 19/19 21/9 26/24
27/4 36/11 37/8 37/18 49/2
49/18 51/5 60/25 61/1 61/2
61/4 61/5 61/17
wanted [2]   29/11 32/15
wants [3]   17/7 37/7 52/19
war [1]   45/12
warranted [1]   31/7
was [113]
washy [1]   39/16
wasn't [4]   10/16 29/8 51/12
51/14
waters [1]   16/16
way [23]   5/13 10/21 10/22
10/25 12/1 15/16 18/13 26/14
27/15 27/21 33/7 33/19 37/3
38/23 40/14 40/24 50/6 52/9
52/18 53/5 53/6 55/11 59/7
ways [1]   27/25
we [79]
weapon [2]   19/7 30/15
weapons [9]   9/1 9/4 9/7 11/2
11/7 11/10 12/21 12/22 47/17
week [5]   34/14 34/17 34/17
34/19 34/19
weekend [1]   30/23
weighing [1]   27/13
well [67]
went [5]   20/13 28/21 49/15
56/8 56/9
were [23]   5/21 8/16 10/3
12/22 16/24 16/24 20/20 22/3
22/14 22/24 29/12 36/13
37/24 41/14 41/25 42/11
43/12 43/22 44/1 47/2 48/17
51/12 54/21
West [1]   1/21
WESTERN [1]   1/2
what [69]
whatever [2]   11/13 39/12
when [24]   18/20 19/8 20/1
20/16 29/4 29/5 29/18 30/12
30/16 30/22 38/22 41/25 42/1
42/2 45/11 47/18 48/17 49/6
49/14 49/15 52/4 55/13 56/5
64/6
where [14]   9/16 13/16 14/17
17/24 17/25 18/1 18/6 19/4

whether [3]   4/22 13/12 28/11
which [29]   6/1 6/23 7/14 8/9
9/11 17/21 19/18 26/4 28/12
28/23 31/1 33/15 37/2 38/20
38/24 41/5 41/7 43/20 45/5
45/9 46/1 46/13 48/4 48/5
51/20 58/9 62/14 62/19 63/3
Whichever [1]   4/3
while [2]   7/13 51/12
who [20]   3/21 4/1 11/8 11/10
11/10 16/15 20/14 20/15
25/24 30/13 44/1 45/10 47/8
47/19 52/12 53/12 54/8 59/9
60/6 60/7
whole [2]   30/14 60/21
whom [1]   30/2
whomever [1]   20/12
why [13]   18/10 18/25 20/9
22/10 26/12 27/4 27/19 28/24
29/15 36/18 48/6 52/15 53/22
wide [1]   10/18
wife [2]   42/18 43/25
wild [1]   20/17
will [71]
willful [1]   47/14
willfulness [1]   18/11
willing [1]   52/25
wish [3]   32/10 52/20 60/18
Wishy [1]   39/16
Wishy-washy [1]   39/16
withdraw [1]   31/15
within [6]   9/11 9/12 30/19
37/12 41/21 54/5
without [14]   6/24 18/7 18/18
18/23 19/13 20/2 20/2 20/3
22/18 22/25 41/5 56/11 56/17
61/9
won't [1]   40/7
wonderful [2]   25/25 52/12
word [2]   51/1 58/10
words [3]   14/13 27/22 45/15
work [5]   34/14 57/6 57/16
57/17 57/19
worked [2]   7/24 9/16
working [1]   29/9
worried [1]   55/23
worry [1]   55/25
would [46]
wouldn't [2]   8/24 45/24
wrong [4]   13/17 28/13 29/20
33/9
wrote [2]   26/8 60/21
WU [1]   1/3

## Y

yeah [3]   12/3 14/25 64/5
year [4]   7/21 33/23 57/2
57/3
years [8]   7/10 7/17 33/22
37/2 37/13 41/22 51/23 62/21
yes [28]   5/10 10/1 10/9 12/3
12/3 13/22 17/15 18/20 21/2
24/10 25/9 26/10 28/19 31/11
32/8 35/21 39/5 40/20 40/22
44/14 44/17 44/20 64/8 64/17
64/24 65/13 65/18 65/20
yet [1]   58/18
you [149]
young [2]   7/21 57/7
your [116]
yourself [1]   16/22

## Z

zone [11]   9/11 23/16 23/18
23/23 24/4 24/9 24/9 24/12
58/11 58/11 58/12

zones [1]   45/12

ER146

1



1      UNITED STATES DISTRICT COURT

2    CENTRAL DISTRICT OF CALIFORNIA - CENTRAL DIVISION

3      HONORABLE GEORGE H. WU, U.S. DISTRICT JUDGE

4

5  UNITED STATES OF AMERICA,

6              Plaintiff,

7      vs.                    Case No. CR 19-343-GW

8  TRAVIS SCHLOTTERBECK,
   JAMES BRADLEY VLHA,
9              Defendants.
   _____/

10

11

12

13          REPORTER'S TRANSCRIPT OF
            CHANGE OF PLEA HEARING
            Thursday, July 14, 2022
14              2:00 p.m.
            LOS ANGELES, CALIFORNIA

15

16

17

18

19

20

21

22  _____

23       TERRI A. HOURIGAN, CSR NO. 3838, CCRR
         FEDERAL OFFICIAL COURT REPORTER
         350 WEST FIRST STREET, ROOM 4311
24       LOS ANGELES, CALIFORNIA  90012
            (213) 894-2849

25

UNITED STATES DISTRICT COURT

2

1                    APPEARANCES OF COUNSEL:

2

3    **FOR THE PLAINTIFF:**

4        UNITED STATES ATTORNEY'S OFFICE
         United States Attorney
5        BY:  BRIAN R. FAERSTEIN
             DANIEL BOYLE
6        Assistant United States Attorneys
         United States Courthouse
7        312 North Spring Street
         Los Angeles, California  90012

8

9

10   **FOR THE DEFENDANT:  TRAVIS SCHLOTTERBECK**

         EDWARD M. ROBINSON, A PROFESSIONAL LAW CORPORATION
11       BY:  EDWARD M. ROBINSON
             RACHAEL A. ROBINSON
12       Attorneys at Law
         21515 Hawthorne Boulevard, Suite 730
13       Torrance, California  90503

14

15   **FOR THE DEFENDANT:  JAMES BRADLEY VLHA**

16       LAW OFFICE OF JEROME J. HAIG
         BY: JEROME J. HAIG
17       Attorney at Law
         21143 Hawthorne Boulevard, Suite 454
18       Torrance, California  90503

19

20

21

22

23

24

25

**UNITED STATES DISTRICT COURT**

ER148

3

1          **LOS ANGELES, CALIFORNIA; THURSDAY, JULY 14, 2022**

2                              **8:30 a.m.**

3                              --oOo--

4

5          THE COURTROOM DEPUTY:  Please come to order.  This

6   United States District Court is again in session.

7          THE COURT:  All right.  Let me call the matter of

8   *United States versus Schlotterbeck and Vlha.*

9              I see everybody is on the videoconferencing, so I

10  don't think I need to announce appearances.

11             I do have in front of me -- I guess, the parties

12  have reached written plea agreements; is that correct?

13         MR. FAERSTEIN:  Yes, Your Honor.

14         THE COURT:  All right.  Is it -- just so I don't

15  have to sit here and read it in front of you -- is it a

16  situation where it's a plea agreement, but the parties reserve

17  an appellate issue?

18         MR. FAERSTEIN:  That's correct, Your Honor.

19             Defense will be reserving the right to appeal or

20  challenge, one, determination, the most recent motion to

21  dismiss with respect to the Supreme Court's decision in the

22  *Bruen* case.

23         THE COURT:  Okay.  I want to make sure all of my

24  little comments I have made in there are going to be in front

25  of the Appellate Court -- it's just a joke.  I'm sure it will

**UNITED STATES DISTRICT COURT**

ER149

1  be.  We will see what they say.  I have no problem with that,

2  if that's what makes the world go around.

3          Let me also indicate, Mr. Haig, do you want me to

4  tell you the answer is -- you asked me what my inclination was,

5  and I guess it was Docket No. 126?

6          MR. HAIG:  Yes, we're all on pins and needles.

7          THE COURT:  I would be more inclined to the

8  government's version than the defendants' version.

9          The main reason is this:  I mean, the government

10 takes most of the language from the Ninth Circuit model rules,

11 so therefore, why -- my feeling is I get reversed all of the

12 time, but if I get reversed on something that the Ninth Circuit

13 said I could use, I could turn to them, and say, well, it's

14 your fault, not mine, and so it's, like, bad parenting, so that

15 is the reason I would be more inclined to the government's

16 position.

17         Also, I think that certain things, for example,

18 the government does throw in -- even though I understand the

19 defense makes this argument, but I mean, the government uses

20 the language from *Bryant*.

21         Even though I understand the defense's position

22 as well, there are complexities that are involved in this case,

23 but underlying the *Bryant* case was this exact statutory

24 provision in this very similar situation, but in that case it

25 was dealership, but instead, the issue was willfulness.

5

1          I would use the government's insofar as that is

2     concerned.

3          Again, the government's version also uses the

4     other statutory definitions, like, for example, definition of

5     principle objective of obtaining livelihood and profit and

6     those kind of things.

7          So for those reasons, I would go along with that.

8     Not to say I would have used the government's proposed

9     instructions 100 percent, but I was more inclined to the

10    government's position than the defense version for those

11    reasons.

12         MR. HAIG:  Thank you.

13         THE COURT:  All right.  What I presume I will do at

14    this point in time is I will take the pleas -- I will take the

15    pleas together; is that all right?

16         I don't have to do them individually, do I?

17         MR. ROBINSON:  No objection on behalf of

18    Mr. Schlotterbeck, Your Honor.

19         MR. HAIG:  Same with Mr. Vlha, Your Honor.

20         Also, I think both defendants did file requests

21    for videoconference for the change of plea hearing that

22    requires a Court's finding of good cause.

23         I would ask the Court to adopt the findings of

24    good cause from those documents.

25         THE COURT:  I presume there is no objection; if

**UNITED STATES DISTRICT COURT**

6

1    there is no objection, I will adopt the findings of good cause

2    that permits us to do this by way by videoconferencing rather

3    than in court in person appearance.

4           MR. FAERSTEIN:  Your Honor, if I may, I hate to be

5    the wet blanket here, but in terms of the plea agreements, the

6    defendants are pleading to different -- they are both pleading

7    to Count 1, but defendant Schlotterbeck is also pleading to

8    Count 3, so there are different penalties in play and also

9    different elements with respect to Count 3.

10          THE COURT:  Let me stop you.

11              I will ask that during the process the government

12   to explain all that on the record, so that you won't have to

13   worry about that.

14              When I say "take them together," I do take the

15   pleas simultaneously, but the full explanations of a lot of

16   this stuff will come from the government.

17              Is that what your worry is?

18          MR. FAERSTEIN:  Yes, Your Honor.  My only concern is

19   making sure we have a clear record and knowingly, intelligent,

20   as Your Honor knows.

21          THE COURT:  Trust me, it will be laborious in its

22   scope.  That's the reason why I'm having you say a lot of it so

23   I don't have to say a lot of it.

24              Let me indicate to the defendants, let me ask

25   Mr. Schlotterbeck and Mr. Vlha, both of you can see and hear

**UNITED STATES DISTRICT COURT**

1    me, right?

2            DEFENDANT SCHLOTTERBECK:  Yes, Your Honor.

3            DEFENDANT VLHA:  Yes.

4            THE COURT:  We are here for taking of your pleas,

5    and the way we're going to go about doing this is I will be

6    placing both of you under oath, I will be asking you certain

7    questions.  If you give me intentionally false answers to any

8    of those questions, that can result in further criminal

9    prosecution, either in the form of a perjury charge or some

10   other count.

11           Do you understand that, Mr. Schlotterbeck?

12           DEFENDANT SCHLOTTERBECK:  Yes, Your Honor.

13           THE COURT:  Do you understand, Mr. Vlha?

14           DEFENDANT VLHA:  Yes, Your Honor.

15           THE COURT:  Now, if at any point in time during the

16   process, if I speak too fast or you don't understand what I'm

17   saying or you want to talk with your attorney for whatever

18   reason, feel free to tell me to stop and you guys can talk to

19   your counsel outside of the hearing and observations of other

20   persons participating in this videoconferencing and have those

21   questions answered or the issues resolved.

22           Do both of you understand that?

23           DEFENDANT SCHLOTTERBECK:  Yes, Your Honor.

24           DEFENDANT VLHA:  Yes.

25           THE COURT:  Okay.  Let me ask the defense, can

**UNITED STATES DISTRICT COURT**

8

1  either of you think of any reason why we should not go forward

2  with a plea agreement at this point in time?

3          MR. ROBINSON:  On behalf of Mr. Schlotterbeck, no,

4  Your Honor.

5          MR. HAIG:  No, Your Honor, on behalf of Mr. Vlha.

6          THE COURT:  I was asking that of your clients,

7  rather than of you.

8            Mr. Schlotterbeck?

9          DEFENDANT SCHLOTTERBECK:  No, Your Honor.

10         THE COURT:  Mr. Vlha?

11         DEFENDANT VLHA:  No, Your Honor.

12         THE COURT:  Okay.  Let me have the clerk swear in

13 the defendants.

14         THE COURTROOM DEPUTY:  Mr. Schlotterbeck, please

15 raise your right hand.

16              (Oath was administered.)

17         DEFENDANT SCHLOTTERBECK:  I do.

18         THE COURTROOM DEPUTY:  Thank you.  Mr. Vlha, please

19 raise your right hand.

20              (Oath was administered.)

21         DEFENDANT VLHA:  I do.

22         THE COURT:  All right.  Let me ask

23 Mr. Schlotterbeck, what is your true and correct name?

24         DEFENDANT SCHLOTTERBECK:  Travis Michael

25 Schlotterbeck.

**UNITED STATES DISTRICT COURT**

9

```
1              THE COURT:  How old are you?
2              DEFENDANT SCHLOTTERBECK:  37 years old.
3              THE COURT:  How many years of schooling have you
4   completed?
5              DEFENDANT SCHLOTTERBECK:  Four-year batchelor's
6   degree, Your Honor.
7              THE COURT:  All right.  Have you ever been treated
8   for any form of mental illness, addiction to narcotics, or
9   alcoholism?
10             DEFENDANT SCHLOTTERBECK:  PTSD, Your Honor.
11             THE COURT:  What was that?
12             DEFENDANT SCHLOTTERBECK:  PTSD, Your Honor.
13             THE COURT:  How long ago was that?
14             DEFENDANT SCHLOTTERBECK:  Probably six or
15  seven years ago.
16             THE COURT:  Do you think you have any, like, mental
17  condition or disability that would prevent you from
18  understanding these proceedings?
19             DEFENDANT SCHLOTTERBECK:  No, Your Honor.
20             THE COURT:  Are you presently under the influence of
21  any medicine, drug, or alcoholic beverage?
22             DEFENDANT SCHLOTTERBECK:  No, Your Honor.
23             THE COURT:  And can you think of any reason why we
24  should not go forward today with a change of plea?
25             DEFENDANT SCHLOTTERBECK:  No, Your Honor.
```

**UNITED STATES DISTRICT COURT**

1          THE COURT:  Let me ask defendant Vlha, how old are

2   you?

3          DEFENDANT VLHA:  29, Your Honor.

4          THE COURT:  What exactly is your true and correct

5   name?

6          DEFENDANT VLHA:  James Bradley Vlha.

7          THE COURT:  And have you ever been treated for any

8   form of mental illness, addiction to narcotics, or alcoholism?

9          DEFENDANT VLHA:  No.

10          THE COURT:  Are you presently under the influence of

11   any medicine, drug, or alcoholic beverage?

12          DEFENDANT VLHA:  No, Your Honor.

13          THE COURT:  Do you feel you suffer from any mental

14   condition on disability that would prevent you from

15   understanding these proceedings?

16          DEFENDANT VLHA:  No, Your Honor.

17          THE COURT:  Can you think of any reason why we

18   should not go forward with a change of plea?

19          DEFENDANT VLHA:  No, Your Honor.

20          THE COURT:  All right.  Let me ask Mr. Robinson, you

21   have discussed the change of plea with your client today?

22          MR. ROBINSON:  I have.

23          THE COURT:  And do you believe that he is in full

24   possession of his faculties and in competent to proceed?

25          MR. ROBINSON:  I do.

**UNITED STATES DISTRICT COURT**

1      THE COURT:  Can you think of any reason why the

2  Court should not accept your client's plea of guilty today?

3      MR. ROBINSON:  I do not.

4      THE COURT:  All right.  Based on the statements of

5  the defendant and his counsel and upon my observations, I find

6  that the defendant Schlotterbeck is in full possession of his

7  faculties and is competent to proceed.

8      Let me ask Mr. Haig, you have talked with your

9  client today about these proceedings; is that correct?

10      MR. HAIG:  I have, Your Honor.

11      THE COURT:  Do you have any reason to believe he

12  should not go forward with a change of plea?

13      MR. HAIG:  No, I do not.

14      THE COURT:  Do you believe he is in full possession

15  of his faculties and is competent to proceed?

16      MR. HAIG:  Yes, Your Honor.

17      THE COURT:  All right.  Based on the statements of

18  the defendant and his counsel and upon my observations, I find

19  that the defendant Vlha is in full possession of his faculties

20  and is competent to proceed.

21      Let me have the AUSA state for the record the

22  counts that each defendant is pleading to and the elements of

23  each count.

24      MR. FAERSTEIN:  Yes, Your Honor.

25      Defendant Schlotterbeck is pleading guilty to

1    Counts 1 and 3 of the indictment.

2              Count 1 charges Title 18, United States Code,

3    Section 371 and 922(a)(1)(A), that is conspiracy to engage in

4    the business of manufacturing firearms without a license; and

5    Count 3 charges a violation of Title 18, United States Code,

6    Section 922(d)(1), and that charge is the sale of a firearm to

7    a felon.

8              With respect to the elements on Count 1, if Your

9    Honor can indulge me for a moment?

10             The elements of conspiracy to engage in the

11   business of manufacturing and dealing firearms without a

12   license are as follows:

13             First, beginning on a date unknown, but no later

14   than on or about May 21st, 2015, and continuing to a date

15   unknown but no earlier than on or about June 21st, 2017, there

16   was an agreement between two or more persons to commit at least

17   one crime as charged in the indictment.

18             Second, defendant became a member of the

19   conspiracy knowing of at least one of its objects and intending

20   to help accomplish it.

21             Third, one of the members of the conspiracy

22   performed at least one overt act for the purpose of carrying

23   out the conspiracy.

24             With respect to Count 3, which is the sale of the

25   firearm to a felon, the elements are as follows:

1            First, defendant knowingly sold an AR-15 type

2    rifle bearing no serial number to a confidential informant who

3    unbeknownst to the defendant was working for Bureau of Alcohol

4    Tobacco, Firearms and Explosives.

5            Second, defendant knew or had reasonable cause to

6    believe that the confidential informant was under indictment

7    for or had been convicted in any court of a crime punishable by

8    imprisonment for a term exceeding one year.

9            Defendant Vlha is pleading guilty to Count 1 of

10   the indictment, which I just summarized, which is a charge of

11   Title 18, United States Code, Sections 371 and 922(a)(1)(A),

12   which is conspiracy to engage in the business of manufacturing

13   and dealing in firearms.

14           I could read those elements again, just for the

15   record.

16           With respect to that count of conspiracy the

17   elements are as follows:

18           First, beginning on a date unknown, but no later

19   than on or about May 21st, 2015, and continuing to a date

20   unknown but no earlier than on or about June 21st, 2017, there

21   was an agreement between two or more persons to commit at least

22   one crime as charged in the indictment.

23           Second, defendant became a member of the

24   conspiracy knowing of at least one of its objects and intending

25   to help accomplish it.

**UNITED STATES DISTRICT COURT**

14

1           And third, one of the members of the conspiracy

2   performed at least one overt act for the purpose of carrying

3   out the conspiracy.

4           THE COURT:  All right.  Let me ask defendant

5   Schlotterbeck, do you understand the two charges that you are

6   pleading to and the elements of those charges?

7           DEFENDANT SCHLOTTERBECK:  Yes, Your Honor.

8           THE COURT:  You have discussed those with your

9   counsel?

10          DEFENDANT SCHLOTTERBECK:  Yes, Your Honor.

11          THE COURT:  Okay.  Let me ask defendant Vlha -- I

12  keep putting an "r" at the end of your name, I apologize.

13          Have you discussed the elements of the charge you

14  are pleading to with your counsel?

15          DEFENDANT VLHA:  Yes, Your Honor.

16          THE COURT:  Do you feel you have an understanding of

17  the nature of that charge and its elements?

18          DEFENDANT VLHA:  Yes, Your Honor.

19          THE COURT:  Gentlemen, let me talk to you about the

20  Constitutional rights you are going to be waiving or giving up

21  if you go forward today with a change of plea.

22          First of all, you have the right to plead not

23  guilty to any offense charged against you and to persist in

24  that plea.

25          You have the right to a speedy and public trial.

**UNITED STATES DISTRICT COURT**

ER160

1    You have the right to a trial by jury.  At the trial, you would

2    be presumed to be innocent and the government would have to

3    prove your guilt beyond a reasonable doubt.

4              If both you and the government give up the right

5    to be tried by a jury, you have the right to be tried by the

6    Court.

7              Also, you have the right to the assistance of

8    counsel to represent you even if you do not enter into a plea

9    agreement.

10             If you cannot afford counsel, the Court would

11   appoint counsel for you free of charge to represent you at the

12   trial and at all other stages of these proceedings.

13             Also, you have the right to confront and

14   cross-examine the witnesses against you.

15             That is, you have the right to have those

16   witnesses be brought into court, be sworn in, and be questioned

17   by your attorney in your presence.

18             You also have the right to use the subpoena power

19   of the Court to compel persons to come into this courtroom and

20   have them testify on your behalf.

21             You also have the right to testify on your own

22   behalf if you want to do so.

23             You also have the privilege against

24   self-incrimination; that is, you have the right to remain

25   silent and not incriminate yourself in any way.

**UNITED STATES DISTRICT COURT**

1    For example, if you decide to go to trial, if you

2    decide not to testify, that fact could not be used against you.

3    However, if you go toward today with a change of plea, you are

4    going to be waiving your right to remain silent and you are

5    going to be incriminating yourself.

6    Also, you have the right to appeal your

7    conviction and your sentence if you go forward to a trial and

8    if you are convicted.

9    Let me ask Mr. Schlotterbeck, have you discussed

10   all of these constitutional rights with your counsel?

11   DEFENDANT SCHLOTTERBECK:  Yes, Your Honor.

12   THE COURT:  At this point in time, do you have any

13   questions about any of those rights?

14   DEFENDANT SCHLOTTERBECK:  No, Your Honor.

15   THE COURT:  Do you feel you understand each and

16   every one of them?

17   DEFENDANT SCHLOTTERBECK:  Yes, Your Honor.

18   THE COURT:  Now, do you understand if you go forward

19   today with a change of plea, you are going to be waiving all of

20   those constitutional rights I have just described except for

21   your right to counsel?

22   DEFENDANT SCHLOTTERBECK:  Yes, Your Honor.

23   THE COURT:  Let me ask, at this point, do you wish

24   to give up each and every one of those constitutional rights I

25   have just described and go forward today with a change of plea?

**UNITED STATES DISTRICT COURT**

```
 1              DEFENDANT SCHLOTTERBECK:  Yes, Your Honor.

 2              THE COURT:  Let me ask similar questions of the

 3    other defendant.

 4                   Sir, have you discussed all of those

 5    constitutional rights with your counsel?

 6              DEFENDANT VLHA:  Yes, Your Honor.

 7              THE COURT:  At this point in time, do you have any

 8    questions about any of them?

 9              DEFENDANT VLHA:  No, Your Honor.

10              THE COURT:  Do you feel you understand each and

11    every one of them?

12              DEFENDANT VLHA:  Yes, Your Honor.

13              THE COURT:  Now, do you understand that if you go

14    forward today with a change of plea, you are going to be

15    waiving all of those constitutional rights except for your

16    right to counsel?

17              DEFENDANT VLHA:  Yes, Your Honor.

18              THE COURT:  Let me ask, at this point in time, do

19    you wish to give up each and every one of those constitutional

20    rights and go forward today with a change of plea?

21              DEFENDANT VLHA:  Yes, Your Honor.

22              THE COURT:  Let me ask Mr. Haig, do you join in the

23    waivers?

24              MR. HAIG:  I do, Your Honor.

25              THE COURT:  And do you also stipulate that each of
```

1    these waivers is knowingly, intelligently, and voluntarily

2    made?

3              MR. HAIG:  Yes, Your Honor.

4              THE COURT:  Let me ask Mr. Robinson as to your

5    client, do you join and concur in the waivers?

6              MR. ROBINSON:  I do.

7              THE COURT:  Are you satisfied that each of these

8    waivers is knowingly, intelligent, and voluntarily made?

9              MR. ROBINSON:  I am.

10             THE COURT:  All right.  Let me have the AUSA state

11   for the defendant's understanding the sentence that each of

12   them faces if they go forward with a change of plea?

13             MR. FAERSTEIN:  Yes, Your Honor.

14                  I will try to be a little more efficient this

15   time.

16                  Both defendants are charged -- are pleading

17   guilty to Count 1, which is the conspiracy count, and the

18   maximum penalty for violation of Title 18, United States Code,

19   Section 371 is as follows:

20                  Five years imprisonment, a three-year period of

21   supervised release, a fine of $250,000 or twice the gross gain

22   or gross loss resulting from the offense, whichever is

23   greatest, and a mandatory special assessment of $100.

24                  Mr. Schlotterbeck is also pleading guilty to

25   Count 3, which carries the following statutory maximum

1   penalties.

2            First -- and that is sale to a felon.

3            First, ten years' imprisonment.

4            Second, the three-year period of supervised

5   release.

6            Third, a fine of $250,000 or twice the gross gain

7   or gross loss resulting from the offense, whichever is

8   greatest, and a mandatory special assessment of $100.

9            So with respect to Mr. Schlotterbeck only, the

10  maximum penalties -- combined penalties are as follows:

11           15 years' imprisonment; a three-year period of

12  supervised release; a fine of $500,000 or twice the gross gain

13  or gross loss resulting from the offense, whichever is

14  greatest, and a mandatory special assessment of $200.

15           THE COURT:  All right.  Let me ask

16  Mr. Schlotterbeck, do you understand the sentence you are

17  facing if you go forward today with a change of plea?

18           DEFENDANT SCHLOTTERBECK:  Yes, Your Honor.

19           THE COURT:  And Mr. Vlha, do you also understand the

20  sentence you are facing?

21           DEFENDANT VLHA:  Yes, Your Honor.

22           THE COURT:  Let me indicate to both defendants, if I

23  sentence either one of you to any term of imprisonment, I can

24  also impose on you what is called supervised release.  What

25  that means at the time of sentencing, I will be telling you,

**UNITED STATES DISTRICT COURT**

```
 1   you are going to go to prison for a certain number of months,
 2   and when you get out of prison for a certain period of time,
 3   you have to obey certain terms and conditions.
 4            If you were to violate any of those terms and
 5   conditions, I can send you back to prison for those violations.
 6            Do you understand that, Mr. Schlotterbeck?
 7            DEFENDANT SCHLOTTERBECK:  Yes, Your Honor.
 8            THE COURT:  Do you understand that, Mr. Vlha?
 9            DEFENDANT VLHA:  Yes, Your Honor.
10            THE COURT:  All right.  Also, do you understand if
11   either of you are presently on a sentence of probation, parole,
12   or supervised release in any other criminal case, by pleading
13   guilty in this matter, it could cause you to become in
14   violation of the earlier set parole, probation, or supervised
15   release such that you could be sent back to prison in the
16   earlier case because you pled guilty in this case.
17            Mr. Schlotterbeck?
18            DEFENDANT SCHLOTTERBECK:  Yes, Your Honor.
19            THE COURT:  And Mr. Vlha, do you understand that?
20            DEFENDANT VLHA:  Yes, Your Honor.
21            THE COURT:  Okay.  Do you also understand that if
22   you are not a citizen of the United States, by pleading guilty
23   in this matter, that could cause you to be deported or removed
24   from the United States or could result in the denial of
25   naturalization or citizenship, a denial of residency status,
```

21

1    and/or a denial of amnesty in the future.

2            Do you understand that, Mr. Schlotterbeck?

3            DEFENDANT SCHLOTTERBECK:  Yes, Your Honor.

4            THE COURT:  Do you understand that, Mr. Vlha?

5            DEFENDANT VLHA:  Yes, Your Honor.

6            THE COURT:  Do you further understand that because

7    you are pleading to a felony offense, that once your plea is

8    accepted, that can cause you to be deprived of valuable civil

9    rights you either now have or could get in the future, such as

10   the right to vote, the right to hold public office, the right

11   to serve on a jury and/or the right to possess a firearm of any

12   kind.

13           Do you understand that, Mr. Schlotterbeck?

14           DEFENDANT SCHLOTTERBECK:  Yes, Your Honor.

15           THE COURT:  Do you understand that, Mr. Vlha?

16           DEFENDANT VLHA:  Yes, Your Honor.

17           THE COURT:  Okay.  Let me ask the AUSA, is there an

18   issue as to either restitution or forfeiture?

19           MR. FAERSTEIN:  No, Your Honor.

20           THE COURT:  Let me ask the defendants, do each of

21   you understand that you are going to be sentenced under the

22   Sentencing Reform Act of 1984, and under that statute, the

23   United States Sentencing Commission has issued certain

24   guidelines that the Courts must take into account and consider

25   but are not obligated to follow for purposes of selecting an

**UNITED STATES DISTRICT COURT**

```
 1  appropriate sentence.
 2              Do you understand that, Mr. Schlotterbeck?
 3          DEFENDANT SCHLOTTERBECK:  Yes, Your Honor.
 4          THE COURT:  Do you understand that, Mr. Vlha?
 5          DEFENDANT VLHA:  Yes, Your Honor.
 6          THE COURT:  Now, have each of you discussed the
 7  guidelines and how they can be applied in your case with your
 8  counsel?
 9              Mr. Schlotterbeck?
10          DEFENDANT SCHLOTTERBECK:  Yes, Your Honor.
11          THE COURT:  And do you feel at this point in time
12  that you have a general understanding of those guidelines and
13  how they can be applied in your case?
14          DEFENDANT SCHLOTTERBECK:  Yes, Your Honor.
15          THE COURT:  Do you also understand that at this
16  point in time we don't know what guidelines range would be
17  because we don't have all of the information we would need to
18  do that calculation; for example, we don't know your criminal
19  history background and all of those types of similar facts.
20              Do you understand that?
21          DEFENDANT SCHLOTTERBECK:  Yes, Your Honor.
22          THE COURT:  Okay.  Similar questions to Mr. Vlha.
23  You have talked about the guidelines with your counsel?
24          DEFENDANT VLHA:  Yes, Your Honor.
25          THE COURT:  And at this point in time, do you feel
```

23

1  you have a general understanding of those guidelines and how

2  they can be applied in your case?

3          DEFENDANT VLHA:  Yes, Your Honor.

4          THE COURT:  Do you understand at this point in time

5  we don't know what guidelines range would be, because we don't

6  have all of the information we would need to do the

7  calculation.

8              Do you understand that?

9          DEFENDANT VLHA:  Yes, Your Honor.

10          THE COURT:  And let me ask each of the defendants,

11  do each of you have a copy of your respective plea agreements

12  in front of you?

13          DEFENDANT SCHLOTTERBECK:  Yes, Your Honor.

14          DEFENDANT VLHA:  Yes, Your Honor.

15          THE COURT:  Let me ask Mr. Schlotterbeck first,

16  turning to your plea agreement, obviously, do you recognize

17  this document?

18          DEFENDANT SCHLOTTERBECK:  Yes, Your Honor.

19          THE COURT:  Is that your signature on pages 19 and

20  20 of the document?

21          DEFENDANT SCHLOTTERBECK:  Yes, Your Honor.

22          THE COURT:  Now, prior to your signing the document,

23  did you read it?

24          DEFENDANT SCHLOTTERBECK:  Yes, Your Honor.

25          THE COURT:  After you read it, did you discuss it

24

1   with your counsel?

2           DEFENDANT SCHLOTTERBECK:  Yes, Your Honor.

3           THE COURT:  Did he answer any and all questions that

4   you would have in regards to the plea agreement?

5           DEFENDANT SCHLOTTERBECK:  Yes, Your Honor.

6           THE COURT:  At the time you signed the plea

7   agreement, do you feel that you fully understood all of the

8   terms and provisions of the plea agreement?

9           DEFENDANT SCHLOTTERBECK:  Yes, Your Honor.

10          THE COURT:  Is this written plea agreement the

11  entire understanding that you have with the government?

12          DEFENDANT SCHLOTTERBECK:  Yes, Your Honor.

13          THE COURT:  Has anyone made any promises,

14  representations, or guarantees of any kind to you in an effort

15  to get you to plead guilty in this case other than what is

16  contained in this written plea agreement?

17          DEFENDANT SCHLOTTERBECK:  No, Your Honor.

18          THE COURT:  Do you understand the Court is not a

19  party to the plea agreement?

20          DEFENDANT SCHLOTTERBECK:  Yes, Your Honor.

21          THE COURT:  Has anyone in any way attempted to

22  threaten either you or anyone near or dear to you to force you

23  to plea guilty in this case?

24          DEFENDANT SCHLOTTERBECK:  No, Your Honor.

25          THE COURT:  And you are pleading freely and

**UNITED STATES DISTRICT COURT**

```
 1   voluntarily?

 2              DEFENDANT SCHLOTTERBECK:  Yes, Your Honor.

 3              THE COURT:  Do you understand that the plea

 4   agreement contains within it a limited waiver of your right to

 5   appeal in this matter.

 6                  In other words, you will have waived some, but

 7   not all of your rights to appeal in this case?

 8                  Do you understand that?

 9              DEFENDANT SCHLOTTERBECK:  Yes, Your Honor.

10              THE COURT:  And I did not -- I don't think mentioned

11   there was one major appeal that you are not waiving that is

12   referenced in the plea agreement.

13                  Do you understand that?

14              DEFENDANT SCHLOTTERBECK:  Yes, Your Honor.

15              THE COURT:  Okay.  And let me similarly ask the

16   defendant Vlha, turning to your plea agreement, do you

17   recognize this document?

18              DEFENDANT VLHA:  Yes, Your Honor.

19              THE COURT:  And is it that your signature on

20   pages 17 and 18 of the plea agreement?

21              DEFENDANT VLHA:  Yes, Your Honor.

22              THE COURT:  And let me ask, prior to your signing

23   the plea agreement, did you read it?

24              DEFENDANT VLHA:  Yes, Your Honor.

25              THE COURT:  After you read it, did you discuss it
```

**UNITED STATES DISTRICT COURT**

26

```
 1   with your counsel?
 2           DEFENDANT VLHA:  Yes, Your Honor.
 3           THE COURT:  Did he answer any and all questions that
 4   you had in regards to the plea agreement?
 5           DEFENDANT VLHA:  Yes, Your Honor.
 6           THE COURT:  At the time you signed this plea
 7   agreement, did you feel you fully understood all of the terms
 8   and provisions of the plea agreement?
 9           DEFENDANT VLHA:  Yes, Your Honor.
10           THE COURT:  At this point in time do you have any
11   questions about the plea agreement?
12           DEFENDANT VLHA:  No, Your Honor.
13           THE COURT:  Do you understand that the Court is not
14   a party to the plea agreement and is not bound by its terms?
15           DEFENDANT VLHA:  Yes, Your Honor.
16           THE COURT:  And is this written plea agreement the
17   entire understanding you have with the government?
18           DEFENDANT VLHA:  Yes, Your Honor.
19           THE COURT:  Other than what is contained in the
20   written plea agreement, and other than what has been stated
21   here in open court, has anyone made any promises,
22   representations, or guarantees of any kind to you in an effort
23   to get you to plead guilty in this case?
24           DEFENDANT VLHA:  No, Your Honor.
25           THE COURT:  Has anyone in any way attempted to
```

**UNITED STATES DISTRICT COURT**

27

```
 1   threaten either you or anyone near or dear to you to force you
 2   to plead guilty in this case?
 3            DEFENDANT VLHA:  No, Your Honor.
 4            THE COURT:  Do you also understand that the plea
 5   agreement contains within it a limited waiver of your rights to
 6   appeal in this matter?
 7            DEFENDANT VLHA:  Yes, Your Honor.
 8            THE COURT:  Did you discuss that limited waiver of
 9   your appeal rights with your counsel?
10            DEFENDANT VLHA:  Yes, Your Honor.
11            THE COURT:  Is it still your intention to waive
12   those appeal rights as described in the plea agreement?
13            DEFENDANT VLHA:  Yes, Your Honor.
14            THE COURT:  All right.  Let me ask the defense
15   counsel, starting with Mr. Robinson, your client's plea
16   agreement indicates you signed off on it on pages 19 and 21; is
17   that correct?
18            MR. ROBINSON:  That's correct, Your Honor.
19            THE COURT:  And prior to your signing the plea
20   agreement, did you observe your client reading it?
21            MR. ROBINSON:  Yes.
22            THE COURT:  After he read it, did you answer any and
23   all questions that he had in regards to the plea agreement?
24            MR. ROBINSON:  I did.
25            THE COURT:  Did he sign the plea agreement in front
```

**UNITED STATES DISTRICT COURT**

28

1  of you?

2         MR. ROBINSON:  Yes, he did.

3         THE COURT:  At the time he signed the plea

4  agreement, did you feel that he fully understood all of the

5  terms and provisions of the plea agreement?

6         MR. ROBINSON:  Yes.

7         THE COURT:  And is this written plea agreement the

8  entire understanding your client has with the government?

9         MR. ROBINSON:  It is.

10        THE COURT:  To the best of your knowledge, has

11 anyone made any promises, representations, or guarantees of any

12 kind either to you or to your client other than what is

13 expressly contained in this written plea agreement, and other

14 than what we have discussed here in open court?

15        MR. ROBINSON:  No, Your Honor.

16        THE COURT:  Have you reviewed the facts of his case

17 and all of the discovery provided to you by the government in

18 this case?

19        MR. ROBINSON:  Yes.

20        THE COURT:  Have you gone over those facts and that

21 discovery with your client?

22        MR. ROBINSON:  Yes, I have.

23        THE COURT:  Have you pursued with your client all of

24 the potential defenses that he might have to the charges in

25 this case?

**UNITED STATES DISTRICT COURT**

```
1              MR. ROBINSON:  Yes.
2              THE COURT:  And have you advised your client
3    concerning the legality or admissibility of any statements,
4    confessions, or other evidence that the government has against
5    him?
6              MR. ROBINSON:  We have discussed that, yes.
7              THE COURT:  To the best of your knowledge, is your
8    client pleading guilty because of any illegally obtained
9    evidence in the possession of the government?
10             MR. ROBINSON:  No, Your Honor.
11             THE COURT:  Did you and your client agree that it is
12   in his best interest to enter into this plea?
13             MR. ROBINSON:  Yes, we did.
14             THE COURT:  Do you believe that your client is
15   entering into the plea freely and voluntarily?
16             MR. ROBINSON:  I do.
17             THE COURT:  Can you think of any reason why the
18   Court should not accept your client's plea of guilty?
19             MR. ROBINSON:  I do not.
20             THE COURT:  Do you join in the waiver of the jury
21   trial and concur in the plea?
22             MR. ROBINSON:  Yes, I do.
23             THE COURT:  Let me ask Mr. Haig, similarly, did your
24   client sign the plea agreement in your presence?
25             MR. HAIG:  Yes, Your Honor.
```

**UNITED STATES DISTRICT COURT**

30

```
 1              THE COURT:  And that was after you observed him
 2   reading the plea agreement?
 3              MR. HAIG:  That's correct, yes.
 4              THE COURT:  That was also after you answered any and
 5   all questions that he had in regards to the plea agreement?
 6              MR. HAIG:  Yes.
 7              THE COURT:  So at the time he signed the plea
 8   agreement, did you feel he fully understood all of the terms
 9   and provisions of the plea agreement?
10              MR. HAIG:  I do, Your Honor.
11              THE COURT:  Is this written plea agreement the
12   entire understanding your client has with the government?
13              MR. HAIG:  Yes.
14              THE COURT:  To the best of your knowledge, has
15   anyone made any promises, representations or guarantees of any
16   kind to either you or to your client to get him to plead guilty
17   in this case other than what is contained in written plea
18   agreement, and other than what we discussed here in open court?
19              MR. HAIG:  No.
20              THE COURT:  Have you reviewed the facts of this case
21   and all of the discovery provided to you by the government in
22   this case?
23              MR. HAIG:  Yes.
24              THE COURT:  Have you gone over those facts and
25   discovery with your client?
```

**UNITED STATES DISTRICT COURT**

31

```
1            MR. HAIG:  Yes, Your Honor.
2            THE COURT:  Have you pursued with your client all of
3    the potential defenses he might have to the charges in this
4    case?
5            MR. HAIG:  Yes.
6            THE COURT:  Have you advised your client concerning
7    the legality or admissibility of any statements, confessions or
8    other evidence that the government has against him?
9            MR. HAIG:  Yes.
10           THE COURT:  To the best of your knowledge, is your
11   client pleading guilty because of any illegally obtained
12   evidence in the possession of the government?
13           MR. HAIG:  No.
14           THE COURT:  Did you and your client agree it is in
15   his best interest to enter into the plea?
16           MR. HAIG:  Yes.
17           THE COURT:  Do you believe your client is entering
18   into this plea freely and voluntarily?
19           MR. HAIG:  I do, Your Honor.
20           THE COURT:  Can you think of any reason why the
21   Court should not accept your client's plea of guilty?
22           MR. HAIG:  No.
23           THE COURT:  Do you join in the waiver of the jury
24   trial and concur in the plea?
25           MR. HAIG:  I do, Your Honor.
```

**UNITED STATES DISTRICT COURT**

32

```
1            THE COURT:  Let me ask the AUSA, other than what is
2   expressly contained in the respective plea agreements of the
3   defendants, and other than what we have discussed here in open
4   court, has the government made any promises, representations or
5   guarantees of any kind either to the defendant or defense
6   counsel in this case in an effort to get them to plead guilty
7   in this case?
8            MR. FAERSTEIN:  No, Your Honor.
9            THE COURT:  And does the government waive its right
10  to a jury trial?
11           MR. FAERSTEIN:  Yes, Your Honor.
12           THE COURT:  All right.  Let me ask
13  Mr. Schlotterbeck, sir, are you satisfied with the
14  representation that your attorney has provided to you?
15           DEFENDANT SCHLOTTERBECK:  Yes, Your Honor.
16           THE COURT:  Have you told your lawyer everything you
17  know about your case, especially about any statements,
18  confessions, or other evidence that the government may have
19  against you?
20           DEFENDANT SCHLOTTERBECK:  Yes, Your Honor.
21           THE COURT:  Do you believe that he has fully advised
22  you concerning all of the matters that we have discussed here
23  this afternoon?
24           DEFENDANT SCHLOTTERBECK:  Yes, Your Honor.
25           THE COURT:  Do you believe that you fully understood
```

**UNITED STATES DISTRICT COURT**

33

```
 1   everything we have talked about here this afternoon?
 2              DEFENDANT SCHLOTTERBECK:  Yes, Your Honor.
 3              THE COURT:  At this point in time, do you have any
 4   questions?
 5              DEFENDANT SCHLOTTERBECK:  No, Your Honor.
 6              THE COURT:  Can you think of any reason why the
 7   Court should not accept your plea of guilty?
 8              DEFENDANT SCHLOTTERBECK:  No, Your Honor.
 9              THE COURT:  Do you understand that once you plead
10   guilty in this case, the only thing that is going to be left in
11   this matter is sentencing, although, it's my understanding that
12   there will also be a plea -- sorry, not a plea -- will also be
13   an appeal in this matter as well.
14                   Do you understand that?
15              DEFENDANT SCHLOTTERBECK:  Yes Your Honor.
16              THE COURT:  Now, at this point, again, can you think
17   of any reason why this Court should not accept your plea of
18   guilty?
19              DEFENDANT SCHLOTTERBECK:  No, Your Honor.
20              THE COURT:  Let me ask Mr. Vlha similar questions.
21                   Do you believe that you fully understood
22   everything that we have discussed here this morning?
23              DEFENDANT VLHA:  Yes, Your Honor.
24              THE COURT:  And have you told your lawyer everything
25   you know about your case, especially about any statements,
```

**UNITED STATES DISTRICT COURT**

ER179

34

```
 1    confessions, or other evidence that the government has against
 2    you?
 3              DEFENDANT VLHA:  Yes, Your Honor.
 4              THE COURT:  Are you fully satisfied with the
 5    representation that your attorney has provided to you?
 6              DEFENDANT VLHA:  Yes, Your Honor.
 7              THE COURT:  Do you wish to change any of your prior
 8    answers to any of the Court's questions?
 9              DEFENDANT VLHA:  No, Your Honor.
10              THE COURT:  At this point in time, do you have any
11    questions?
12              DEFENDANT VLHA:  No, Your Honor.
13              THE COURT:  So you feel you fully understood
14    everything we have talked about here today?
15              DEFENDANT VLHA:  Yes, Your Honor.
16              THE COURT:  All right.  Let me ask each defendant to
17    listen carefully -- well, let me ask this question, rather than
18    reading the factual basis that is contained in the plea
19    agreement, do both sides agree that the Court can simply
20    inquire of the respective defendants whether or not the
21    assertions in the factual bases with respect to
22    Mr. Schlotterbeck, Paragraph 13, the plea agreement whether or
23    not all of those facts are true and correct, and as to
24    Mr. Vlha, it would be Paragraph Number 10, or do you want me to
25    have the AUSA read all of the pages?
```

**UNITED STATES DISTRICT COURT**

35

1           MR. ROBINSON:  With respect to Mr. Schlotterbeck,

2  Your Honor, we do not wish to have them read.

3              I will represent, and Mr. Schlotterbeck will

4  affirm, that we have read this factual basis in detail --

5           THE COURT:  Let me stop you.  I will ask him the

6  questions --

7           MR. ROBINSON:  I know.

8           THE COURT:  It will look like the reading, so I will

9  ask him the questions, so you don't have to worry about that.

10           MR. ROBINSON:  Okay.

11           THE COURT:  You and your client waive the reading;

12  is that correct?

13           MR. ROBINSON:  Yes, he does.  Thank you, Your Honor.

14           THE COURT:  Let me ask Mr. Haig.

15           MR. HAIG:  Yes, we waive the reading of the factual

16  basis into the record.

17           THE COURT:  Let me ask the government.

18           MR. FAERSTEIN:  Yes, Your Honor.  Assuming Your

19  Honor is going to inquire, the government is fine with that.

20           THE COURT:  Let me ask Mr. Schlotterbeck, do you

21  understand that normally I would ask the AUSA to state for the

22  record those facts that the government feels it could prove if

23  your case went to trial, and normally what happens is that if

24  there is a written plea agreement, the AUSA reads the portions

25  of the plea agreement, which has a recitation of those facts.

**UNITED STATES DISTRICT COURT**

36

1    In your plea agreement, those facts are listed in

2  Paragraph 13, which covers pages 7, 8 -- well, 7 through

3  page 11.

4    Do you understand that?

5    DEFENDANT SCHLOTTERBECK:  Yes, Your Honor.

6    THE COURT:  Okay.  And let me ask you, have you read

7  with care Paragraph 13 on pages 7 through 11 of your plea

8  agreement?

9    DEFENDANT SCHLOTTERBECK:  Yes, Your Honor.

10    THE COURT:  Have you discussed those facts that are

11  contained in that paragraph with your counsel?

12    DEFENDANT SCHLOTTERBECK:  Yes, Your Honor.

13    THE COURT:  Now, is everything that is stated in

14  Paragraph 13 of your plea agreement, true and correct?

15    DEFENDANT SCHLOTTERBECK:  Yes, Your Honor.

16    THE COURT:  And is everything that is said about

17  you, about your conduct, and about your intent in that

18  paragraph, true and correct?

19    DEFENDANT SCHLOTTERBECK:  Yes, Your Honor.

20    THE COURT:  Are you pleading guilty to Counts 1 and

21  3 of the indictment because you did the things that are charged

22  in the indictment as more further described in Paragraph 13 of

23  the plea agreement?

24    DEFENDANT SCHLOTTERBECK:  Yes, Your Honor.

25    THE COURT:  Are you pleading guilty to Counts 1 and

37

```
 1   3 of the indictment because in fact you are guilty of those
 2   crimes that are charged?
 3           DEFENDANT SCHLOTTERBECK:  Yes, Your Honor.
 4           THE COURT:  All right.  Let me ask defendant Vlha,
 5   in your plea agreement, the factual basis is delineated in
 6   Paragraph 10, which is located on pages 6 through the top of
 7   page 10 of the plea agreement.
 8               Now, did you read with care all of the contents
 9   of Paragraph 10 in your plea agreement?
10           DEFENDANT VLHA:  Yes, Your Honor.
11           THE COURT:  After you did that, did you discuss that
12   in detail with your attorney?
13           DEFENDANT VLHA:  Yes, Your Honor.
14           THE COURT:  And is everything that is stated in
15   Paragraph 10 of the plea agreement, correct?
16           DEFENDANT VLHA:  Yes, Your Honor.
17           THE COURT:  Is everything that is said in that
18   paragraph about your conduct and about your intent and about
19   your actions, true and correct?
20           DEFENDANT VLHA:  Yes, Your Honor.
21           THE COURT:  Are you pleading guilty to Count 1 of
22   the indictment because you did the things that are charged in
23   Count 1 of the indictment as more further described in your
24   plea agreement?
25               DEFENDANT VLHA:  Yes, Your Honor.
```

**UNITED STATES DISTRICT COURT**

38

```
 1              THE COURT:  Are you pleading guilty to Count 1
 2   because in fact you are guilty of the crime charged?
 3              DEFENDANT VLHA:  Yes, Your Honor.
 4              THE COURT:  All right.  Let me ask, is the
 5   government satisfied with the factual basis?
 6              MR. FAERSTEIN:  Yes, Your Honor.
 7              THE COURT:  And do both sides agree that the Court
 8   has complied with the requirements of Rule 11?
 9              MR. FAERSTEIN:  Yes, Your Honor.
10              MR. HAIG:  Yes, Your Honor.
11              MR. ROBINSON:  Yes, Your Honor.
12              THE COURT:  Okay.  All right.  Let me ask
13   Mr. Schlotterbeck, in the matter of the *United States versus
14   Schlotterbeck*, which is Case No. CR 19-343, how do you plead to
15   Count 1 of the indictment which charges you with a violation of
16   18, U.S.C., Sections 371 and 922(a)(1)(A) which is conspiracy
17   to engage in the business of manufacturing and dealing in
18   firearms without a license?
19              DEFENDANT SCHLOTTERBECK:  Guilty, Your Honor.
20              THE COURT:  How do you plead to Count 3 of the
21   indictment which charges you with a violation of 18, U.S.C.,
22   Section 922(d)(1) which is sale of a firearm to a felon?
23              DEFENDANT SCHLOTTERBECK:  Guilty, Your Honor.
24              THE COURT:  All right.  Let me ask Mr. Vlha, how do
25   you plead to Count 1 of the indictment which charges you with a
```

1  violation of 18, U.S.C., Sections 371 and 922(a)(1)(A) which is

2  conspiracy to engage in the business of manufacturing and

3  dealing in firearms without a license?

4          DEFENDANT VLHA:  Guilty, Your Honor.

5          THE COURT:  All right.  Actually, let me ask one

6  question, I hate to bring this up at the very end of this

7  process, I just noticed an issue I just wanted to confirm, the

8  plea agreement references both the business of manufacturing

9  and dealing in firearms.

10          But at one point, I thought that the parties had

11  indicated that dealing was not an aspect of the case.  I just

12  want to make sure that we don't have a snafu here.

13          MR. FAERSTEIN:  Yes, Your Honor.  The government was

14  not going to be presenting the alternate theory of dealing at

15  trial, but with respect to the count to which they are pleading

16  guilty here, which is conspiracy, the agreement to engage in

17  the conduct, the indictment, nonetheless, is still premised on

18  both theories and they are pleading to the count in the

19  indictment.

20          Our presentation at trial was going to be

21  different or more narrow, but that is not where we are right

22  now, Your Honor.

23          THE COURT:  All right.  Let me ask defense counsel,

24  that is the defendant's understanding as well; is that correct?

25          MR. ROBINSON:  On behalf Mr. Schlotterbeck, it is,

**UNITED STATES DISTRICT COURT**

1    and I believe the factual basis also is tailored to the

2    manufacturing object, so we don't see any --

3                THE COURT:  All right.  That is fine.

4                Mr. Haig, you feel the same way?

5                MR. HAIG:  I feel the same way.  I adopt what

6    Mr. Robinson just said, Your Honor.

7                THE COURT:  I will make the following findings:  In

8    the case of *United States versus Schlotterbeck and Vlha*, the

9    Court having questioned each of the defendants and their

10   respective counsel on their offers of a plea of guilty,

11   Mr. Schlotterbeck as to Counts 1 and 3, and Mr. Vlha as to

12   Count 1 only, all of those counts being felonies; each

13   defendant and his respective counsel having advised Court that

14   they have conferred concerning the offered pleas of guilty and

15   all aspects of the charges against the defendants and any

16   defenses that he might have; and the Court having observed each

17   defendants' intelligence, demeanor, and attitude while

18   answering the Court's questions; and the Court having also

19   observed each of the defendants did not appear to be under the

20   influence of any medicine, drug, or other substance or factor

21   that might affect his judgment or actions in any manner, the

22   Court finds that each of the defendants is fully competent and

23   capable of entering into an informed plea, that each of the

24   defendants is aware of the nature of the charge or charges that

25   they are pleading to and the consequences of their pleas.

**UNITED STATES DISTRICT COURT**

41

1           The Court further finds that each of the pleas of

2   guilty is knowingly, intelligently, and voluntarily made with a

3   full understanding of the nature of the charge, the

4   consequences of the plea and the defendants' respective

5   constitutional rights.

6           The Court further finds that each of the pleas of

7   guilty is supported by an independent factual basis containing

8   each of the central elements of the offense pled to; the Court,

9   therefore, accepts the plea, orders that the pleas be entered,

10  and that the plea agreements be incorporated in the process.

11          Now, let me indicate to the defendants, well let

12  me ask this question of the attorneys first, normally what

13  happens next is the preparation of a presentence report.

14          Let me ask, do the parties envision that I would

15  hold a sentencing or do the parties envision that I would just

16  simply have the pleas entered, and thereafter, allow the

17  appeals if the parties want to appeal?

18          How do you envision this?

19          MR. FAERSTEIN:  Speaking for the government, Your

20  Honor, I think the traditional way that we would have the

21  presentence investigation period, sentencing, and then after

22  sentencing, they can file their notices of appeal.

23          THE COURT:  All right.  Is that the understanding

24  for the defense counsel as well?

25          MR. ROBINSON:  For Mr. Schlotterbeck, yes, Your

42

1  Honor.

2          MR. HAIG:  Yes, Your Honor.  I don't think it would

3  be ripe, because there may be sentencing issues depending on

4  what the Court says.

5          THE COURT:  Do you think I will make a mistake at

6  the sentencing time as well, is that what you are saying?

7          MR. HAIG:  No.  I didn't say that at all.  I said

8  there may be.

9          THE COURT:  All right.  Let me indicate to the

10  defendants, what is going to happen next in each of your

11  situations, each of you will be interviewed by persons from the

12  Probation Office, they will prepare a written presentence

13  report.  Each of you will be getting copies of that report as

14  well as your counsel.

15          If either of you have any objections to the

16  contents of the presentence report, you are free to file

17  objections in writing with the Court prior to the sentencing

18  hearing.

19          Also, at the sentencing hearing, both you and

20  your counsel will be allowed to speak on your behalf, so I

21  would urge you to consult with your counsel throughout the

22  process so that he can answer any and all questions that you

23  might have.

24          Let me ask counsel, when do you want me to

25  schedule a sentencing?

**UNITED STATES DISTRICT COURT**

43

```
 1             MR. HAIG:  Your Honor, I was asking Thursday,
 2   November 10th.
 3             THE COURT:  Let me ask, is that all right with
 4   Mr. Robinson and the government counsel?
 5             MR. ROBINSON:  Rachael?
 6             MS. ROBINSON:  Isn't that when Brian is getting
 7   married?
 8             MR. HAIG:  Okay.  I don't want to --
 9             THE COURT:  Wait, who is Brian?
10             MR. FAERSTEIN:  Not me.  I'm already married, Your
11   Honor.
12             THE COURT:  Yeah, we know it wouldn't be you.  There
13   couldn't be two people in this world whose name is Brian that
14   are getting married.
15             MR. HAIG:  We can pick a different date.
16             MR. ROBINSON:  That is a good day.  Brian is getting
17   married on the 5th of November.
18             MR. FAERSTEIN:  I do expect to have a trial that
19   week -- the week before when sentencing papers would be due.
20   To the extent the 17th is available, that would be preferred,
21   but if that is not, the government will make do.
22             MR. HAIG:  17th works for us, Your Honor.
23             THE COURT:  17th for Mr. Robinson?
24             MR. ROBINSON:  Unless everybody is getting married
25   that day, that is a great day, Your Honor, November 17.
```

**UNITED STATES DISTRICT COURT**

44

```
1              THE COURT:  Well, if they were getting married,
2   wouldn't that be a greater day?
3                  So the 17th of November, and I want sentencing
4   positions in writing no later than November 10th, all right?
5              MR. ROBINSON:  What is a good time for sentencing,
6   Your Honor?
7              THE COURT:  Why don't we put it at 8 o'clock.
8              MR. ROBINSON:  Thank you.
9              THE COURT:  The defendants are currently out on
10  bond, right?
11             MR. HAIG:  Yes, Your Honor.
12             THE COURT:  I will leave them out on bond under all
13  same terms and conditions, except order they appear in person
14  or by video on November 17th.
15                 All right.  Anything else I need to do in this
16  matter?
17             MR. HAIG:  Just to vacate the trial date, Your
18  Honor?
19             THE COURT:  Yes.
20                 Thank you, everybody.  Have a very, very nice
21  day.
22                 (The proceedings concluded at 3:02 p.m.)
23                              * * *
24
25
```

45

1                    **CERTIFICATE OF OFFICIAL REPORTER**

2

3    COUNTY OF LOS ANGELES   )
                            )
4    STATE OF CALIFORNIA     )

5

6            I, TERRI A. HOURIGAN, Federal Official Realtime

7    Court Reporter, in and for the United States District Court for

8    the Central District of California, do hereby certify that

9    pursuant to Section 753, Title 28, United States Code that the

10   foregoing is a true and correct transcript of the

11   stenographically reported proceedings held in the

12   above-entitled matter and that the transcript page format is in

13   conformance with the regulations of the judicial conference of

14   the United States.

15

16   Date: 12th day of December, 2022.

17

18

19                         /s/ TERRI A. HOURIGAN
                    _____
20                  TERRI A. HOURIGAN, CSR NO. 3838, RPR, CRR
                             Federal Court Reporter
21

22

23

24

25

**UNITED STATES DISTRICT COURT**

STEPHANIE S. CHRISTENSEN
Acting United States Attorney
SCOTT M. GARRINGER
Assistant United States Attorney
Chief, Criminal Division
BRIAN R. FAERSTEIN (Cal. Bar No. 274850)
Assistant United States Attorney
Environmental and Community Safety Crimes Section
DAN G. BOYLE (Cal. Bar No. 332518)
Assistant United States Attorney
Asset Forfeiture Section
    1300/1400 United States Courthouse
    312 North Spring Street
    Los Angeles, California 90012
    Telephone: (213) 894-3819/2426
    Facsimile: (213) 894-0141/0142
    E-mail:    Brian.Faerstein@usdoj.gov
                Daniel.Boyle2@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. CR 19-00343-GW-1 |
| Plaintiff, | PLEA AGREEMENT FOR DEFENDANT TRAVIS SCHLOTTERBECK |
| v. | |
| TRAVIS SCHLOTTERBECK, | |
| Defendant. | |

    1.    This constitutes the conditional plea agreement between Travis Schlotterbeck ("defendant") and the United States Attorney's Office for the Central District of California (the "USAO") in the above-captioned case pursuant to Federal Rule of Criminal Procedure 11(a)(2). This agreement is limited to the USAO and cannot bind any other federal, state, local, or foreign prosecuting, enforcement, administrative, or regulatory authorities.

//

//

<pre>
 1                    DEFENDANT'S OBLIGATIONS

 2        2.   Defendant agrees to:

 3             a.   At the earliest opportunity requested by the USAO and

 4   provided by the Court, appear and plead guilty to counts one and

 5   three of the indictment in <u>United States v. Travis Schlotterbeck et</u>

 6   <u>al.</u>, CR No. 19-00343-GW, which charge defendant with conspiracy to

 7   commit an offense against the United States, namely, engaging in the

 8   business of manufacturing and dealing firearms without a license, in

 9   violation of 18 U.S.C. §§ 371 and 922(a)(1)(A), and sale of a firearm

10   to a felon, in violation of 18 U.S.C. § 922(d)(1).

11             b.   Not contest facts agreed to in this agreement.

12             c.   Abide by all agreements regarding sentencing contained

13   in this agreement.

14             d.   Appear for all court appearances, surrender as ordered

15   for service of sentence, obey all conditions of any bond, and obey

16   any other ongoing court order in this matter.

17             e.   Not commit any crime; however, offenses that would be

18   excluded for sentencing purposes under United States Sentencing

19   Guidelines ("U.S.S.G." or "Sentencing Guidelines") § 4A1.2(c) are not

20   within the scope of this agreement.

21             f.   Be truthful at all times with the United States

22   Probation and Pretrial Services Office and the Court.

23             g.   Pay the applicable special assessments at or before

24   the time of sentencing unless defendant has demonstrated a lack of

25   ability to pay such assessments.

26        3.   Defendant and the USAO agree that defendant's entry of

27   guilty pleas pursuant to paragraph 2(a) above will be conditional, in

28   that defendant reserves the right, on appeal from the judgment, to
</pre>

2

1  seek review of the adverse determination of "Defendants' Joint Motion
2  to Dismiss the Indictment Per Fed. R. Crim. P. 12(b)(3)(A)," filed on
3  July 1, 2022 (ECF Dkt. No. 136), which raised a challenge to the
4  indictment pursuant to New York State Rifle & Pistol Association,
5  Inc. v. Bruen, --S.Ct.--, 2022 WL 2251305, at *1 (2022).  If
6  defendant prevails on appeal, defendant will be allowed to withdraw
7  defendant's guilty pleas.  In addition to the waivers set forth in
8  paragraphs 18-20 herein, defendant expressly waives any and all right
9  to appeal or otherwise seek review of any adverse determinations of
10 other pretrial motions or other pretrial challenges raised prior to
11 entry of this plea agreement, including, but not limited to,
12 "Defendants' Joint Motion to Dismiss Indictment Per Fed. R. Crim. P.
13 12(b)(3)(a)," filed on June 2, 2022 (ECF Dkt. No. 113), which raised
14 a challenge to the indictment on alleged constitutional vagueness
15 grounds.

THE USAO'S OBLIGATIONS

17     4.   The USAO agrees to:
18          a.   Not contest facts agreed to in this agreement.
19          b.   Abide by all agreements regarding sentencing contained
20 in this agreement.
21          c.   At the time of sentencing, move to dismiss the
22 remaining count of the indictment as against defendant.  Defendant
23 agrees, however, that at the time of sentencing the Court may
24 consider any dismissed charges in determining the applicable
25 Sentencing Guidelines range, the propriety and extent of any
26 departure from that range, and the sentence to be imposed.
27          d.   At the time of sentencing, provided that defendant
28 demonstrates an acceptance of responsibility for the offenses up to

3

and including the time of sentencing, recommend a two-level reduction in the applicable Sentencing Guidelines offense level, pursuant to U.S.S.G. § 3E1.1.  The government will not move for an additional one-level reduction pursuant to U.S.S.G. § 3E1.1(b) and believes any such additional reduction is inappropriate in light of, among other things, the government's substantial preparations for trial in this case.

<u>NATURE OF THE OFFENSES</u>

5.    Defendant understands that for defendant to be guilty of the crime charged in count one, that is, conspiracy to commit an offense against the United States, namely, engaging in the business of manufacturing and dealing firearms without a license, in violation of 18 U.S.C. §§ 371 and 922(a)(1)(A), the following must be true:

a.    First, beginning on a date unknown, but no later than on or about May 21, 2015, and continuing to a date unknown, but no earlier than on or about June 21, 2017, there was an agreement between two or more persons to commit at least one crime as charged in the indictment;

b.    Second, defendant became a member of the conspiracy knowing of at least one of its objects and intending to help accomplish it; and

c.    Third, one of the members of the conspiracy performed at least one overt act for the purpose of carrying out the conspiracy.

6.    Defendant understands that for defendant to be guilty of the crime charged in count three, that is, sale of a firearm to a felon, in violation of 18 U.S.C. § 922(d)(1), the following must be true:

4

1          a.    First, defendant knowingly sold an AR-15-type rifle,

2    bearing no serial number, to a confidential informant who,

3    unbeknownst to defendant, was working for the Bureau of Alcohol,

4    Tobacco, Firearms and Explosives; and

5          b.    Second, defendant knew or had reasonable cause to

6    believe that the confidential informant was under indictment for or

7    had been convicted in any court of a crime punishable by imprisonment

8    for a term exceeding one year.

9                                PENALTIES

10        7.    Defendant understands that the statutory maximum sentence

11   that the Court can impose for a violation of Title 18, United States

12   Code, Section 371, is: five years imprisonment; a three-year period

13   of supervised release; a fine of $250,000 or twice the gross gain or

14   gross loss resulting from the offense, whichever is greatest; and a

15   mandatory special assessment of $100.

16        8.    Defendant understands that the statutory maximum sentence

17   that the Court can impose for a violation of Title 18, United States

18   Code, Section 922(d)(1), is: ten years imprisonment; a three-year

19   period of supervised release; a fine of $250,000 or twice the gross

20   gain or gross loss resulting from the offense, whichever is greatest;

21   and a mandatory special assessment of $100.

22        9.    Defendant understands, therefore, that the total maximum

23   sentence for all offenses to which defendant is pleading guilty is:

24   15 years imprisonment; a three-year period of supervised release; a

25   fine of $500,000 or twice the gross gain or gross loss resulting from

26   the offenses, whichever is greatest; and a mandatory special

27   assessment of $200.

28

ER196

10.    Defendant understands that supervised release is a period of time following imprisonment during which defendant will be subject to various restrictions and requirements.  Defendant understands that if defendant violates one or more of the conditions of any supervised release imposed, defendant may be returned to prison for all or part of the term of supervised release authorized by statute for the offense that resulted in the term of supervised release, which could result in defendant serving a total term of imprisonment greater than the statutory maximum stated above.

11.    Defendant understands that, by pleading guilty, defendant may be giving up valuable government benefits and valuable civic rights, such as the right to vote, the right to possess a firearm, the right to hold office, and the right to serve on a jury. Defendant understands that he is pleading guilty to a felony and that it is a federal crime for a convicted felon to possess a firearm or ammunition.  Defendant understands that the convictions in this case may also subject defendant to various other collateral consequences, including but not limited to revocation of probation, parole, or supervised release in another case and suspension or revocation of a professional license.  Defendant understands that unanticipated collateral consequences will not serve as grounds to withdraw defendant's guilty pleas.

12.    Defendant and his counsel have discussed the fact that, and defendant understands that, if defendant is not a United States citizen, the convictions in this case makes it practically inevitable and a virtual certainty that defendant will be removed or deported from the United States.  Defendant may also be denied United States citizenship and admission to the United States in the future.

6

ER197

1  Defendant understands that while there may be arguments that

2  defendant can raise in immigration proceedings to avoid or delay

3  removal, removal is presumptively mandatory and a virtual certainty

4  in this case.  Defendant further understands that removal and

5  immigration consequences are the subject of a separate proceeding and

6  that no one, including his attorney or the Court, can predict to an

7  absolute certainty the effect of his convictions on his immigration

8  status.  Defendant nevertheless affirms that he wants to plead guilty

9  regardless of any immigration consequences that his pleas may entail,

10 even if the consequence is automatic removal from the United States.

11                          FACTUAL BASIS

12     13.  Defendant admits that defendant is, in fact, guilty of the

13 offenses to which defendant is agreeing to plead guilty.  Defendant

14 and the USAO agree to the statement of facts provided below and agree

15 that this statement of facts is sufficient to support pleas of guilty

16 to the charges described in this agreement and to establish the

17 Sentencing Guidelines factors set forth in paragraph 15 below but is

18 not meant to be a complete recitation of all facts relevant to the

19 underlying criminal conduct or all facts known to either party that

20 relate to that conduct.

21     Beginning on a date unknown, but no later than on or about May

22 21, 2015, and continuing to a date unknown, but no earlier than on or

23 about June 21, 2017, defendant conspired and agreed with co-defendant

24 James Bradley Vlha, co-conspirator Ping-Yi "Jesse" Kwan, and other

25 co-conspirators known and unknown to commit an offense against the

26 United States, namely, engaging in the business of manufacturing and

27 dealing in firearms without a license, in violation of Title 18,

28 United States Code, Section 922(a)(1)(A).  Defendant became a member

7

ER198

1    of the conspiracy knowing of its objects and intending to help

2    accomplish it.

3        Specifically, defendant and his co-conspirators agreed to

4    manufacture and sell firearms, as that term is defined under Title

5    18, United States Code, Section 921(a)(3)(A), to firearms customers.

6    At all relevant times, neither defendant nor his co-conspirators had

7    applied for or been issued a firearms license from any federal, state,

8    or local governmental entity to engage in business as firearms or

9    ammunition importers, manufacturers, or dealers within the State of

10   California.  Defendant and his co-conspirators conducted a large part

11   of their illegal business activities at Live Fire Coatings and Sign

12   Imaging, two adjacent businesses operated by defendant in Bellflower,

13   California, within Los Angeles County in the Central District of

14   California.

15       Defendant and his co-conspirators agreed to manufacture and sell

16   firearms that included semiautomatic firearms capable of accepting

17   large capacity magazines, specifically, AR-15-type rifles and

18   pistols.  Defendant and his co-conspirators took custom orders for

19   AR-15-type firearms, obtained the firearm parts, arranged for certain

20   parts (specifically, unfinished lower receivers) to be drilled for

21   use through specialized machinery, and assembled and finished

22   (including through the use of a protective ceramic coating known as

23   Cerakote) the AR-15-type firearms for sale.  These firearms did not

24   contain the markings of a manufacturer or serial numbers.

25       In furtherance of the conspiracy, defendant and his co-

26   conspirators knowingly and willfully communicated with and took

27   orders from customers to manufacture, assemble, and sell completed

28   firearms and, in some cases, ammunition.  Defendant and his co-

ER199

1  conspirators obtained firearm parts, including unfinished lower

2  receivers, from various sources.  Defendant and his co-conspirators

3  would arrange to mill out (i.e., drill through use of specialized

4  machinery) or have milled out cavities in the lower receivers

5  necessary to allow the lower receivers to be attached to an upper

6  receiver and barrel, among other firearms parts, in order to

7  construct completed AR-15-type firearms.  Defendant and his co-

8  conspirators thereafter would assemble, finish, and sell the

9  completed firearms to firearms customers at Live Fire Coatings and

10 Sign Imaging.

11      Defendant and his co-conspirators performed numerous overt acts

12 for the purpose of knowingly and willfully carrying out the

13 conspiracy, including communicating with customers in person and

14 through phone calls and text messages, ordering the parts for the AR-

15 15-type firearms, arranging to mill out lower receivers, and

16 completing other processes for manufacturing for sale and selling the

17 following firearms to customers on the following dates:

18      a.   From on or about July 7, 2015, through on or about

19 September 23, 2015, defendant and his co-conspirators, each aiding

20 and abetting the other, coordinated, manufactured and sold an AR-15-

21 type rifle, bearing no serial number, to an individual who defendant

22 believed to be a firearms customer but who was, in fact, a

23 confidential informant (the "CI") working at the direction of the

24 United States Bureau of Alcohol, Tobacco, Firearms and Explosives

25 ("ATF"), for $2,000.

26      b.   From on or about October 5, 2015, through on or about

27 October 27, 2015, defendant and his co-conspirators, each aiding and

28 abetting the other, coordinated, manufactured and sold an AR-15-type

9

rifle, bearing no serial number, to an individual defendant believed to be a firearms customer but who was, in fact, an undercover ATF agent ("UC-1"), for $1,500.

        c.   From on or about December 21, 2015, through on or about February 11, 2016, defendant and his co-conspirators, each aiding and abetting the other, coordinated, manufactured and sold an AR-15-type pistol, bearing no serial number, along with two 30-round ammunition magazines and three 10-round ammunition magazines, to UC-1 for $1,600.

        d.   From on or about February 11, 2016, through on or about March 16, 2016, defendant and his co-conspirators, each aiding and abetting the other, coordinated, manufactured and sold, and willfully caused the manufacture for sale of, an AR-15-type pistol, bearing no serial number, along with two 10-round ammunition magazines, to an individual defendant believed to be a firearms customer but who was, in fact, a second undercover ATF agent ("UC-2"), for $1,530.

        e.   From on or about March 16, 2016, through on or about May 6, 2016, defendant and his co-conspirators, each aiding and abetting the other, coordinated, manufactured and sold an AR-15-type pistol, bearing no serial number, along with a 31-round ammunition magazine, to UC-1 for $1,770.

        f.   From on or about June 13, 2016, through on or about June 15, 2016, defendant and his co-conspirators, each aiding and abetting the other, coordinated, manufactured and sold an AR-15-type rifle, bearing no serial number, along with a 30-round ammunition magazine, to UC-2 for $1,600.

ER201

1    In addition, in connection with the above-described sale of the
2  AR-15-type rifle, bearing no serial number, to the CI on or about
3  September 23, 2015, defendant knowingly sold, and willfully caused
4  the sale of, the firearm to the CI knowing or having reasonable cause
5  to believe that the CI had been convicted in any court of a crime
6  punishable by imprisonment for a term exceeding one year and thus was
7  not permitted to possess firearms.

8                          SENTENCING FACTORS

9    14.  Defendant understands that in determining defendant's
10  sentence the Court is required to calculate the applicable Sentencing
11  Guidelines range and to consider that range, possible departures
12  under the Sentencing Guidelines, and the other sentencing factors set
13  forth in 18 U.S.C. § 3553(a).  Defendant understands that the
14  Sentencing Guidelines are advisory only, that defendant cannot have
15  any expectation of receiving a sentence within the calculated
16  Sentencing Guidelines range, and that after considering the
17  Sentencing Guidelines and the other § 3553(a) factors, the Court will
18  be free to exercise its discretion to impose any sentence it finds
19  appropriate up to the maximum set by statute for the crimes of
20  conviction.

21    15.  Defendant and the USAO agree to the following applicable
22  sentencing guideline factors:

23    Base Offense Level:          20        U.S.S.G. § 2K2.1(a)(4)(B)
24    Specific Offense            +2        U.S.S.G. § 2K2.1(b)(1)(A)
      Characteristics:
25

26  Defendant and the USAO reserve the right to argue that additional
27  specific offense characteristics, adjustments, and departures under
28  the Sentencing Guidelines are appropriate.  The base offense level

                                  11

ER202

1    set forth above is based on information currently known to the

2    government regarding defendant's criminal history.  Defendant

3    understands and agrees that defendant's base offense level could be

4    increased if defendant is an armed career criminal under U.S.S.G.

5    §§ 4B1.4 and 18 U.S.C. § 924(e), or if defendant has additional prior

6    convictions for either a crime of violence or a controlled substance

7    offense under U.S.S.G. § 2K2.1.  If defendant's base offense level is

8    so altered, defendant and the USAO will not be bound by the base

9    offense level agreed to above.

10        16.  Defendant understands that there is no agreement as to

11   defendant's criminal history or criminal history category.

12        17.  Defendant and the USAO reserve the right to argue for a

13   sentence outside the sentencing range established by the Sentencing

14   Guidelines based on the factors set forth in 18 U.S.C. § 3553(a)(1),

15   (a)(2), (a)(3), (a)(6), and (a)(7).

16                    WAIVER OF CONSTITUTIONAL RIGHTS

17        18.  Defendant understands that by pleading guilty, defendant

18   gives up the following rights:

19             a.   The right to persist in a plea of not guilty.

20             b.   The right to a speedy and public trial by jury.

21             c.   The right to be represented by counsel -- and if

22   necessary have the Court appoint counsel -- at trial.  Defendant

23   understands, however, that, defendant retains the right to be

24   represented by counsel -- and if necessary have the Court appoint

25   counsel -- at every other stage of the proceeding.

26             d.   The right to be presumed innocent and to have the

27   burden of proof placed on the government to prove defendant guilty

28   beyond a reasonable doubt.

                              12

1          e.    The right to confront and cross-examine witnesses
2     against defendant.

3          f.    The right to testify and to present evidence in
4     opposition to the charges, including the right to compel the
5     attendance of witnesses to testify.

6          g.    The right not to be compelled to testify, and, if
7     defendant chose not to testify or present evidence, to have that
8     choice not be used against defendant.

9          h.    Any and all rights to pursue any affirmative defenses,
10    Fourth Amendment or Fifth Amendment claims, and other pretrial
11    motions that have been filed or could be filed.

12         i.    Understanding that the government has in its
13    possession digital devices and/or digital media seized from
14    defendant, defendant waives any right to the return of digital data
15    contained on those digital devices and/or digital media and agrees
16    that if any of these digital devices and/or digital media are
17    returned to defendant, the government may delete all digital data
18    from those digital devices and/or digital media before they are
19    returned to defendant.

20                    WAIVER OF APPEAL OF CONVICTION

21         19.   Defendant understands that, with the exception of an appeal
22    based on a claim that defendant's guilty pleas were involuntary, or
23    an appeal on the grounds specifically reserved in paragraph 3 above,
24    by pleading guilty defendant is waiving and giving up any right to
25    appeal defendant's convictions on the offenses to which defendant is
26    pleading guilty.  Defendant understands that this waiver includes,
27    but is not limited to, arguments that the statutes to which defendant
28    is pleading guilty are unconstitutional, and any and all claims that

                                    13

the statement of facts provided herein is insufficient to support

defendant's pleas of guilty.

WAIVER OF APPEAL OF SENTENCE AND COLLATERAL ATTACK

20.  Defendant gives up the right to appeal all of the

following: (a) the procedures and calculations used to determine and

impose any portion of the sentence; (b) the term of imprisonment

imposed by the Court, including, to the extent permitted by law, the

constitutionality or legality of defendant's sentence, provided it is

within the statutory maximum; (c) the fine imposed by the Court,

provided it is within the statutory maximum; (d) the term of

probation or supervised release imposed by the Court, provided it is

within the statutory maximum; and (e) any of the following conditions

of probation or supervised release imposed by the Court: the

conditions set forth in Second Amended General Order 20-04 of this

Court; the drug testing conditions mandated by 18 U.S.C.

§§ 3563(a)(5) and 3583(d); and the alcohol and drug use conditions

authorized by 18 U.S.C. § 3563(b)(7).

21.  Defendant also gives up any right to bring a post-

conviction collateral attack on the convictions or sentence, except a

post-conviction collateral attack based on a claim of ineffective

assistance of counsel, a claim of newly discovered evidence, or an

explicitly retroactive change in the applicable Sentencing

Guidelines, sentencing statutes, or statutes of conviction.

Defendant understands that this waiver includes, but is not limited

to, arguments that the statutes to which defendant is pleading guilty

are unconstitutional, and any and all claims that the statement of

facts provided herein is insufficient to support defendant's pleas of

guilty.

14

22.  This agreement does not affect in any way the right of the USAO to appeal the sentence imposed by the Court.

RESULT OF WITHDRAWAL OF GUILTY PLEA

23.  Defendant agrees that if, after entering guilty pleas pursuant to this agreement, defendant seeks to withdraw and succeeds in withdrawing defendant's guilty pleas on any basis other than a claim and finding that entry into this plea agreement was involuntary, then (a) the USAO will be relieved of all of its obligations under this agreement; and (b) should the USAO choose to pursue any charge that was either dismissed or not filed as a result of this agreement, then (i) any applicable statute of limitations will be tolled between the date of defendant's signing of this agreement and the filing commencing any such action; and (ii) defendant waives and gives up all defenses based on the statute of limitations, any claim of pre-indictment delay, or any speedy trial claim with respect to any such action, except to the extent that such defenses existed as of the date of defendant's signing this agreement.

RESULT OF VACATUR, REVERSAL OR SET-ASIDE

24.  Defendant agrees that if any count of conviction is vacated, reversed, or set aside, the USAO may: (a) ask the Court to resentence defendant on any remaining count of conviction, with both the USAO and defendant being released from any stipulations regarding sentencing contained in this agreement, (b) ask the Court to void the entire plea agreement and vacate defendant's guilty plea on any remaining count of conviction, with both the USAO and defendant being released from all their obligations under this agreement, or (c) leave defendant's remaining convictions, sentence, and plea

15

1   agreement intact.  Defendant agrees that the choice among these three
2   options rests in the exclusive discretion of the USAO.

EFFECTIVE DATE OF AGREEMENT

4        25.  This agreement is effective upon signature and execution of
5   all required certifications by defendant, defendant's counsel, and an
6   Assistant United States Attorney.

BREACH OF AGREEMENT

8        26.  Defendant agrees that if defendant, at any time after the
9   signature of this agreement and execution of all required
10  certifications by defendant, defendant's counsel, and an Assistant
11  United States Attorney, knowingly violates or fails to perform any of
12  defendant's obligations under this agreement ("a breach"), the USAO
13  may declare this agreement breached.  All of defendant's obligations
14  are material, a single breach of this agreement is sufficient for the
15  USAO to declare a breach, and defendant shall not be deemed to have
16  cured a breach without the express agreement of the USAO in writing.
17  If the USAO declares this agreement breached, and the Court finds
18  such a breach to have occurred, then: (a) if defendant has previously
19  entered guilty pleas pursuant to this agreement, defendant will not
20  be able to withdraw the guilty pleas, and (b) the USAO will be
21  relieved of all its obligations under this agreement.

22       27.  Following the Court's finding of a knowing breach of this
23  agreement by defendant, should the USAO choose to pursue any charge
24  that was either dismissed or not filed as a result of this agreement,
25  then:

26            a.  Defendant agrees that any applicable statute of
27  limitations is tolled between the date of defendant's signing of this
28  agreement and the filing commencing any such action.

16

        b.    Defendant waives and gives up all defenses based on
the statute of limitations, any claim of pre-indictment delay, or any
speedy trial claim with respect to any such action, except to the
extent that such defenses existed as of the date of defendant's
signing this agreement.

        c.    Defendant agrees that: (i) any statements made by
defendant, under oath, at the guilty plea hearing (if such a hearing
occurred prior to the breach); (ii) the agreed to factual basis
statement in this agreement; and (iii) any evidence derived from such
statements, shall be admissible against defendant in any such action
against defendant, and defendant waives and gives up any claim under
the United States Constitution, any statute, Rule 410 of the Federal
Rules of Evidence, Rule 11(f) of the Federal Rules of Criminal
Procedure, or any other federal rule, that the statements or any
evidence derived from the statements should be suppressed or are
inadmissible.

           COURT AND UNITED STATES PROBATION AND PRETRIAL SERVICES

                                OFFICE NOT PARTIES

    28.   Defendant understands that the Court and the United States
Probation and Pretrial Services Office are not parties to this
agreement and need not accept any of the USAO's sentencing
recommendations or the parties' agreements to facts or sentencing
factors.

    29.   Defendant understands that both defendant and the USAO are
free to: (a) supplement the facts by supplying relevant information
to the United States Probation and Pretrial Services Office and the
Court, (b) correct any and all factual misstatements relating to the
Court's Sentencing Guidelines calculations and determination of

                                     17

sentence, and (c) argue on appeal and collateral review that the
Court's Sentencing Guidelines calculations and the sentence it
chooses to impose are not error, although each party agrees to
maintain its view that the calculations in paragraph 15 are
consistent with the facts of this case.  While this paragraph permits
both the USAO and defendant to submit full and complete factual
information to the United States Probation and Pretrial Services
Office and the Court, even if that factual information may be viewed
as inconsistent with the facts agreed to in this agreement, this
paragraph does not affect defendant's and the USAO's obligations not
to contest the facts agreed to in this agreement.

30.  Defendant understands that even if the Court ignores any
sentencing recommendation, finds facts or reaches conclusions
different from those agreed to, and/or imposes any sentence up to the
maximum established by statute, defendant cannot, for that reason,
withdraw defendant's guilty pleas, and defendant will remain bound to
fulfill all defendant's obligations under this agreement.  Defendant
understands that no one -- not the prosecutor, defendant's attorney,
or the Court -- can make a binding prediction or promise regarding
the sentence defendant will receive, except that it will be within
the statutory maximum.

<u>NO ADDITIONAL AGREEMENTS</u>

31.  Defendant understands that, except as set forth herein,
there are no promises, understandings, or agreements between the USAO
and defendant or defendant's attorney, and that no additional
promise, understanding, or agreement may be entered into unless in a
writing signed by all parties or on the record in court.

18

ER209

PLEA AGREEMENT PART OF THE GUILTY PLEA HEARING

    32.  The parties agree that this agreement will be considered part of the record of defendant's guilty plea hearing as if the entire agreement had been read into the record of the proceeding.

AGREED AND ACCEPTED

UNITED STATES ATTORNEY'S OFFICE
FOR THE CENTRAL DISTRICT OF
CALIFORNIA

STEPHANIE S. CHRISTENSEN
Acting United States Attorney

_____    7/14/2022

BRIAN R. FAERSTEIN             Date
DAN G. BOYLE
Assistant United States Attorneys

_____    7/14/22

TRAVIS SCHLOTTERBECK        Date
Defendant                     7/14/22

_____

EDWARD ROBINSON             Date
Attorney for Defendant Travis
Schlotterbeck

//
//
//
//
//
//
//
//
//
//
//

19

ER210

1                           CERTIFICATION OF DEFENDANT

2      I have read this agreement in its entirety.  I have had enough

3  time to review and consider this agreement, and I have carefully and

4  thoroughly discussed every part of it with my attorney.  I understand

5  the terms of this agreement, and I voluntarily agree to those terms.

6  I have discussed the evidence with my attorney, and my attorney has

7  advised me of my rights, of possible pretrial motions that might be

8  filed, of possible defenses that might be asserted either prior to or

9  at trial, of the sentencing factors set forth in 18 U.S.C. § 3553(a),

10  of relevant Sentencing Guidelines provisions, and of the consequences

11  of entering into this agreement.  No promises, inducements, or

12  representations of any kind have been made to me other than those

13  contained in this agreement.  No one has threatened or forced me in

14  any way to enter into this agreement.  I am satisfied with the

15  representation of my attorney in this matter, and I am pleading

16  guilty because I am guilty of the charges and wish to take advantage

17  of the promises set forth in this agreement, and not for any other

18  reason.

19                    7|14|22

20  TRAVIS SCHLOTTERBECK           Date
      Defendant

21

22  //

23  //

24  //

25  //

26  //

27  //

28  //

ER211

1    CERTIFICATION OF DEFENDANT'S ATTORNEY

2        I am Travis Schlotterbeck's attorney.  I have carefully and

3    thoroughly discussed every part of this agreement with my client.

4    Further, I have fully advised my client of his rights, of possible

5    pretrial motions that might be filed, of possible defenses that might

6    be asserted either prior to or at trial, of the sentencing factors

7    set forth in 18 U.S.C. § 3553(a), of relevant Sentencing Guidelines

8    provisions, and of the consequences of entering into this agreement.

9    To my knowledge: no promises, inducements, or representations of any

10   kind have been made to my client other than those contained in this

11   agreement; no one has threatened or forced my client in any way to

12   enter into this agreement; my client's decision to enter into this

13   agreement is an informed and voluntary one; and the factual basis set

14   forth in this agreement is sufficient to support my client's entry of

15   guilty pleas pursuant to this agreement.

16

17   EDWARD ROBINSON                              Date
     Attorney for Defendant Travis
18   Schlotterbeck

19

20

21

22

23

24

25

26

27

28

21

ER212

STEPHANIE S. CHRISTENSEN
Acting United States Attorney
SCOTT M. GARRINGER
Assistant United States Attorney
Chief, Criminal Division
BRIAN R. FAERSTEIN (Cal. Bar No. 274850)
Assistant United States Attorney
Environmental and Community Safety Crimes Section
DAN G. BOYLE (Cal. Bar No. 332518)
Assistant United States Attorney
Asset Forfeiture Section
    1300/1400 United States Courthouse
    312 North Spring Street
    Los Angeles, California 90012
    Telephone: (213) 894-3819/2426
    Facsimile: (213) 894-0141/0142
    E-mail:   Brian.Faerstein@usdoj.gov
              Daniel.Boyle2@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. CR 19-00343-GW-2 |
| Plaintiff, | PLEA AGREEMENT FOR DEFENDANT JAMES BRADLEY VLHA |
| v. | |
| JAMES BRADLEY VLHA, | |
| Defendant. | |

    1.    This constitutes the conditional plea agreement between James Bradley Vlha ("defendant") and the United States Attorney's Office for the Central District of California (the "USAO") in the above-captioned case pursuant to Federal Rule of Criminal Procedure 11(a)(2).  This agreement is limited to the USAO and cannot bind any other federal, state, local, or foreign prosecuting, enforcement, administrative, or regulatory authorities.

//

//

1          DEFENDANT'S OBLIGATIONS

2      2.   Defendant agrees to:

3          a.   At the earliest opportunity requested by the USAO and

4   provided by the Court, appear and plead guilty to count one of the

5   indictment in United States v. Travis Schlotterbeck et al., CR No.

6   19-00343-GW, which charges defendant with conspiracy to commit an

7   offense against the United States, namely, engaging in the business

8   of manufacturing and dealing firearms without a license, in violation

9   of 18 U.S.C. §§ 371 and 922(a)(1)(A).

10         b.   Not contest facts agreed to in this agreement.

11         c.   Abide by all agreements regarding sentencing contained

12  in this agreement.

13         d.   Appear for all court appearances, surrender as ordered

14  for service of sentence, obey all conditions of any bond, and obey

15  any other ongoing court order in this matter.

16         e.   Not commit any crime; however, offenses that would be

17  excluded for sentencing purposes under United States Sentencing

18  Guidelines ("U.S.S.G." or "Sentencing Guidelines") § 4A1.2(c) are not

19  within the scope of this agreement.

20         f.   Be truthful at all times with the United States

21  Probation and Pretrial Services Office and the Court.

22         g.   Pay the applicable special assessment at or before the

23  time of sentencing unless defendant has demonstrated a lack of

24  ability to pay such assessment.

25      3.   Defendant and the USAO agree that defendant's entry of a

26  guilty plea pursuant to paragraph 2(a) above will be conditional, in

27  that defendant reserves the right, on appeal from the judgment, to

28  seek review of the adverse determination of "Defendants' Joint Motion

2

to Dismiss the Indictment Per Fed. R. Crim. P. 12(b)(3)(A)," filed on July 1, 2022 (ECF Dkt. No. 136), which raised a challenge to the indictment pursuant to New York State Rifle & Pistol Association, Inc. v. Bruen, --S.Ct.--, 2022 WL 2251305, at *1 (2022). If defendant prevails on appeal, defendant will be allowed to withdraw defendant's guilty plea. In addition to the waivers set forth in paragraphs 15-17 herein, defendant expressly waives any and all right to appeal or otherwise seek review of any adverse determinations of other pretrial motions or other pretrial challenges raised prior to entry of this plea agreement, including, but not limited to, "Defendants' Joint Motion to Dismiss Indictment Per Fed. R. Crim. P. 12(b)(3)(a)," filed on June 2, 2022 (ECF Dkt. No. 113), which raised a challenge to the indictment on alleged constitutional vagueness grounds.

THE USAO'S OBLIGATIONS

4.    The USAO agrees to:

a.    Not contest facts agreed to in this agreement.

b.    Abide by all agreements regarding sentencing contained in this agreement.

c.    At the time of sentencing, move to dismiss the remaining count of the indictment as against defendant. Defendant agrees, however, that at the time of sentencing the Court may consider any dismissed charges in determining the applicable Sentencing Guidelines range, the propriety and extent of any departure from that range, and the sentence to be imposed.

d.    At the time of sentencing, provided that defendant demonstrates an acceptance of responsibility for the offense up to and including the time of sentencing, recommend a two-level reduction

3

in the applicable Sentencing Guidelines offense level, pursuant to
U.S.S.G. § 3E1.1.  The government will not move for an additional
one-level reduction pursuant to U.S.S.G. § 3E1.1(b) and believes any
such additional reduction is inappropriate in light of, among other
things, the government's substantial preparations for trial in this
case.

<u>NATURE OF THE OFFENSES</u>

5.  Defendant understands that for defendant to be guilty of
the crime charged in count one, that is, conspiracy to commit an
offense against the United States, namely, engaging in the business
of manufacturing and dealing firearms without a license, in violation
of 18 U.S.C. §§ 371 and 922(a)(1)(A), the following must be true:

a.  First, beginning on a date unknown, but no later than
on or about May 21, 2015, and continuing to a date unknown, but no
earlier than on or about June 21, 2017, there was an agreement
between two or more persons to commit at least one crime as charged
in the indictment;

b.  Second, defendant became a member of the conspiracy
knowing of at least one of its objects and intending to help
accomplish it; and

c.  Third, one of the members of the conspiracy performed
at least one overt act for the purpose of carrying out the
conspiracy.

<u>PENALTIES</u>

6.  Defendant understands that the statutory maximum sentence
that the Court can impose for a violation of Title 18, United States
Code, Section 371, is: five years imprisonment; a three-year period
of supervised release; a fine of $250,000 or twice the gross gain or

4

1  gross loss resulting from the offense, whichever is greatest; and a
2  mandatory special assessment of $100.
3      7.    Defendant understands that supervised release is a period
4  of time following imprisonment during which defendant will be subject
5  to various restrictions and requirements.  Defendant understands that
6  if defendant violates one or more of the conditions of any supervised
7  release imposed, defendant may be returned to prison for all or part
8  of the term of supervised release authorized by statute for the
9  offense that resulted in the term of supervised release, which could
10 result in defendant serving a total term of imprisonment greater than
11 the statutory maximum stated above.
12     8.    Defendant understands that, by pleading guilty, defendant
13 may be giving up valuable government benefits and valuable civic
14 rights, such as the right to vote, the right to possess a firearm,
15 the right to hold office, and the right to serve on a jury.
16 Defendant understands that he is pleading guilty to a felony and that
17 it is a federal crime for a convicted felon to possess a firearm or
18 ammunition.  Defendant understands that the conviction in this case
19 may also subject defendant to various other collateral consequences,
20 including but not limited to revocation of probation, parole, or
21 supervised release in another case and suspension or revocation of a
22 professional license.  Defendant understands that unanticipated
23 collateral consequences will not serve as grounds to withdraw
24 defendant's guilty plea.
25     9.    Defendant and his counsel have discussed the fact that, and
26 defendant understands that, if defendant is not a United States
27 citizen, the conviction in this case makes it practically inevitable
28 and a virtual certainty that defendant will be removed or deported

ER217

1  from the United States. Defendant may also be denied United States
2  citizenship and admission to the United States in the future.
3  Defendant understands that while there may be arguments that
4  defendant can raise in immigration proceedings to avoid or delay
5  removal, removal is presumptively mandatory and a virtual certainty
6  in this case. Defendant further understands that removal and
7  immigration consequences are the subject of a separate proceeding and
8  that no one, including his attorney or the Court, can predict to an
9  absolute certainty the effect of his conviction on his immigration
10 status. Defendant nevertheless affirms that he wants to plead guilty
11 regardless of any immigration consequences that his plea may entail,
12 even if the consequence is automatic removal from the United States.

13                              FACTUAL BASIS

14     10. Defendant admits that defendant is, in fact, guilty of the
15 offense to which defendant is agreeing to plead guilty. Defendant
16 and the USAO agree to the statement of facts provided below and agree
17 that this statement of facts is sufficient to support a plea of
18 guilty to the charge described in this agreement and to establish the
19 Sentencing Guidelines factors set forth in paragraph 12 below but is
20 not meant to be a complete recitation of all facts relevant to the
21 underlying criminal conduct or all facts known to either party that
22 relate to that conduct.

23     Beginning on a date unknown, but no later than on or about May
24 21, 2015, and continuing to a date unknown, but no earlier than on or
25 about June 21, 2017, defendant conspired and agreed with co-defendant
26 Travis Schlotterbeck, co-conspirator Ping-Yi "Jesse" Kwan, and other
27 co-conspirators known and unknown to commit an offense against the
28 United States, namely, engaging in the business of manufacturing and

                                  6

1  dealing in firearms without a license, in violation of Title 18,

2  United States Code, Section 922(a)(1)(A).  Defendant became a member

3  of the conspiracy knowing of its objects and intending to help

4  accomplish it.

5       Specifically, defendant and his co-conspirators agreed to

6  manufacture and sell firearms, as that term is defined under Title

7  18, United States Code, Section 921(a)(3)(A), to firearms customers.

8  At all relevant times, neither defendant nor his co-conspirators had

9  applied for or been issued a firearms license from any federal, state,

10 or local governmental entity to engage in business as firearms or

11 ammunition importers, manufacturers, or dealers within the State of

12 California.  Defendant and his co-conspirators conducted a large part

13 of their illegal business activities at Live Fire Coatings and Sign

14 Imaging, two adjacent businesses operated by defendant in Bellflower,

15 California, within Los Angeles County in the Central District of

16 California.

17      Defendant and his co-conspirators agreed to manufacture and sell

18 firearms that included semiautomatic firearms capable of accepting

19 large capacity magazines, specifically, AR-15-type rifles and

20 pistols.  Defendant and his co-conspirators took custom orders for

21 AR-15-type firearms, obtained the firearm parts, arranged for certain

22 parts (specifically, unfinished lower receivers) to be drilled for

23 use through specialized machinery, and assembled and finished

24 (including through the use of a protective ceramic coating known as

25 Cerakote) the AR-15-type firearms for sale.  These firearms did not

26 contain the markings of a manufacturer or serial numbers.

27      In furtherance of the conspiracy, defendant and his co-

28 conspirators knowingly and willfully communicated with and took

7

ER219

orders from customers to manufacture, assemble, and sell completed firearms and, in some cases, ammunition. Defendant and his co-conspirators obtained firearm parts, including unfinished lower receivers, from various sources. Defendant and his co-conspirators would arrange to mill out (i.e., drill through use of specialized machinery) or have milled out cavities in the lower receivers necessary to allow the lower receivers to be attached to an upper receiver and barrel, among other firearms parts, in order to construct completed AR-15-type firearms. Defendant and his co-conspirators thereafter would assemble, finish, and sell the completed firearms to firearms customers at Live Fire Coatings and Sign Imaging.

Defendant and his co-conspirators performed numerous overt acts for the purpose of knowingly and willfully carrying out the conspiracy, including communicating with customers in person and through phone calls and text messages, ordering the parts for the AR-15-type firearms, arranging to mill out lower receivers, and completing other processes for manufacturing for sale and selling the following firearms to customers on the following dates:

a.    From on or about July 7, 2015, through on or about September 23, 2015, defendant and his co-conspirators, each aiding and abetting the other, coordinated, manufactured and sold an AR-15-type rifle, bearing no serial number, to an individual who defendant believed to be a firearms customer but who was, in fact, a confidential informant (the "CI") working at the direction of the United States Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"), for $2,000.

ER220

b. From on or about October 5, 2015, through on or about October 27, 2015, defendant and his co-conspirators, each aiding and abetting the other, coordinated, manufactured and sold an AR-15-type rifle, bearing no serial number, to an individual defendant believed to be a firearms customer but who was, in fact, an undercover ATF agent ("UC-1"), for $1,500.

c. From on or about December 21, 2015, through on or about February 11, 2016, defendant and his co-conspirators, each aiding and abetting the other, coordinated, manufactured and sold an AR-15-type pistol, bearing no serial number, along with two 30-round ammunition magazines and three 10-round ammunition magazines, to UC-1 for $1,600.

d. From on or about February 11, 2016, through on or about March 16, 2016, defendant and his co-conspirators, each aiding and abetting the other, coordinated, manufactured and sold, and willfully caused the manufacture for sale of, an AR-15-type pistol, bearing no serial number, along with two 10-round ammunition magazines, to an individual defendant believed to be a firearms customer but who was, in fact, a second undercover ATF agent ("UC-2"), for $1,530.

e. From on or about March 16, 2016, through on or about May 6, 2016, defendant and his co-conspirators, each aiding and abetting the other, coordinated, manufactured and sold an AR-15-type pistol, bearing no serial number, along with a 31-round ammunition magazine, to UC-1 for $1,770.

f. From on or about June 13, 2016, through on or about June 15, 2016, defendant and his co-conspirators, each aiding and abetting the other, coordinated, manufactured and sold an AR-15-type

9

rifle, bearing no serial number, along with a 30-round ammunition
magazine, to UC-2 for $1,600.

SENTENCING FACTORS

11. Defendant understands that in determining defendant's
sentence the Court is required to calculate the applicable Sentencing
Guidelines range and to consider that range, possible departures
under the Sentencing Guidelines, and the other sentencing factors set
forth in 18 U.S.C. § 3553(a). Defendant understands that the
Sentencing Guidelines are advisory only, that defendant cannot have
any expectation of receiving a sentence within the calculated
Sentencing Guidelines range, and that after considering the
Sentencing Guidelines and the other § 3553(a) factors, the Court will
be free to exercise its discretion to impose any sentence it finds
appropriate up to the maximum set by statute for the crime of
conviction.

12. Defendant and the USAO agree to the following applicable
sentencing guideline factors:

| | | |
|---|---|---|
| Base Offense Level: | 12 | U.S.S.G. § 2K2.1(a)(7) |
| Specific Offense Characteristics: | +2 | U.S.S.G. § 2K2.1(b)(1)(A) |

Defendant and the USAO reserve the right to argue that additional
specific offense characteristics, adjustments, and departures under
the Sentencing Guidelines are appropriate. The base offense level
set forth above is based on information currently known to the
government regarding defendant's criminal history. Defendant
understands and agrees that defendant's base offense level could be
increased if defendant is an armed career criminal under U.S.S.G.
§§ 4B1.4 and 18 U.S.C. § 924(e), or if defendant has additional prior

10

1   convictions for either a crime of violence or a controlled substance

2   offense under U.S.S.G. § 2K2.1.  If defendant's base offense level is

3   so altered, defendant and the USAO will not be bound by the base

4   offense level agreed to above.

5        13.  Defendant understands that there is no agreement as to

6   defendant's criminal history or criminal history category.

7        14.  Defendant and the USAO reserve the right to argue for a

8   sentence outside the sentencing range established by the Sentencing

9   Guidelines based on the factors set forth in 18 U.S.C. § 3553(a)(1),

10  (a)(2), (a)(3), (a)(6), and (a)(7).

11                   <u>WAIVER OF CONSTITUTIONAL RIGHTS</u>

12       15.  Defendant understands that by pleading guilty, defendant

13  gives up the following rights:

14            a.   The right to persist in a plea of not guilty.

15            b.   The right to a speedy and public trial by jury.

16            c.   The right to be represented by counsel -- and if

17  necessary have the Court appoint counsel -- at trial.  Defendant

18  understands, however, that, defendant retains the right to be

19  represented by counsel -- and if necessary have the Court appoint

20  counsel -- at every other stage of the proceeding.

21            d.   The right to be presumed innocent and to have the

22  burden of proof placed on the government to prove defendant guilty

23  beyond a reasonable doubt.

24            e.   The right to confront and cross-examine witnesses

25  against defendant.

26            f.   The right to testify and to present evidence in

27  opposition to the charges, including the right to compel the

28  attendance of witnesses to testify.

                                 11

g.    The right not to be compelled to testify, and, if defendant chose not to testify or present evidence, to have that choice not be used against defendant.

h.    Any and all rights to pursue any affirmative defenses, Fourth Amendment or Fifth Amendment claims, and other pretrial motions that have been filed or could be filed.

<u>WAIVER OF APPEAL OF CONVICTION</u>

16.   Defendant understands that, with the exception of an appeal based on a claim that defendant's guilty plea was involuntary, or an appeal on the grounds specifically reserved in paragraph 3 above, by pleading guilty defendant is waiving and giving up any right to appeal defendant's conviction on the offense to which defendant is pleading guilty.  Defendant understands that this waiver includes, but is not limited to, arguments that the statutes to which defendant is pleading guilty are unconstitutional, and any and all claims that the statement of facts provided herein is insufficient to support defendant's plea of guilty.

<u>WAIVER OF APPEAL OF SENTENCE AND COLLATERAL ATTACK</u>

17.   Defendant gives up the right to appeal all of the following: (a) the procedures and calculations used to determine and impose any portion of the sentence; (b) the term of imprisonment imposed by the Court, including, to the extent permitted by law, the constitutionality or legality of defendant's sentence, provided it is within the statutory maximum; (c) the fine imposed by the Court, provided it is within the statutory maximum; (d) the term of probation or supervised release imposed by the Court, provided it is within the statutory maximum; and (e) any of the following conditions of probation or supervised release imposed by the Court: the

12

ER224

1  conditions set forth in Second Amended General Order 20-04 of this
2  Court; the drug testing conditions mandated by 18 U.S.C.
3  §§ 3563(a)(5) and 3583(d); and the alcohol and drug use conditions
4  authorized by 18 U.S.C. § 3563(b)(7).

5      18.  Defendant also gives up any right to bring a post-
6  conviction collateral attack on the conviction or sentence, except a
7  post-conviction collateral attack based on a claim of ineffective
8  assistance of counsel, a claim of newly discovered evidence, or an
9  explicitly retroactive change in the applicable Sentencing
10  Guidelines, sentencing statutes, or statutes of conviction.
11  Defendant understands that this waiver includes, but is not limited
12  to, arguments that the statutes to which defendant is pleading guilty
13  are unconstitutional, and any and all claims that the statement of
14  facts provided herein is insufficient to support defendant's plea of
15  guilty.

16      19.  This agreement does not affect in any way the right of the
17  USAO to appeal the sentence imposed by the Court.

18                    RESULT OF WITHDRAWAL OF GUILTY PLEA

19      20.  Defendant agrees that if, after entering a guilty plea
20  pursuant to this agreement, defendant seeks to withdraw and succeeds
21  in withdrawing defendant's guilty plea on any basis other than a
22  claim and finding that entry into this plea agreement was
23  involuntary, then (a) the USAO will be relieved of all of its
24  obligations under this agreement; and (b) should the USAO choose to
25  pursue any charge that was either dismissed or not filed as a result
26  of this agreement, then (i) any applicable statute of limitations
27  will be tolled between the date of defendant's signing of this
28  agreement and the filing commencing any such action; and

ER225

1  (ii) defendant waives and gives up all defenses based on the statute

2  of limitations, any claim of pre-indictment delay, or any speedy

3  trial claim with respect to any such action, except to the extent

4  that such defenses existed as of the date of defendant's signing this

5  agreement.

6  RESULT OF VACATUR, REVERSAL OR SET-ASIDE

7  21. Defendant agrees that if the count of conviction is

8  vacated, reversed, or set aside, both the USAO and defendant will be

9  released from all their obligations under this agreement.

10  EFFECTIVE DATE OF AGREEMENT

11  22. This agreement is effective upon signature and execution of

12  all required certifications by defendant, defendant's counsel, and an

13  Assistant United States Attorney.

14  BREACH OF AGREEMENT

15  23. Defendant agrees that if defendant, at any time after the

16  signature of this agreement and execution of all required

17  certifications by defendant, defendant's counsel, and an Assistant

18  United States Attorney, knowingly violates or fails to perform any of

19  defendant's obligations under this agreement ("a breach"), the USAO

20  may declare this agreement breached. All of defendant's obligations

21  are material, a single breach of this agreement is sufficient for the

22  USAO to declare a breach, and defendant shall not be deemed to have

23  cured a breach without the express agreement of the USAO in writing.

24  If the USAO declares this agreement breached, and the Court finds

25  such a breach to have occurred, then: (a) if defendant has previously

26  entered a guilty plea pursuant to this agreement, defendant will not

27  be able to withdraw the guilty plea, and (b) the USAO will be

28  relieved of all its obligations under this agreement.

ER226

24.   Following the Court's finding of a knowing breach of this agreement by defendant, should the USAO choose to pursue any charge that was either dismissed or not filed as a result of this agreement, then:

a.   Defendant agrees that any applicable statute of limitations is tolled between the date of defendant's signing of this agreement and the filing commencing any such action.

b.   Defendant waives and gives up all defenses based on the statute of limitations, any claim of pre-indictment delay, or any speedy trial claim with respect to any such action, except to the extent that such defenses existed as of the date of defendant's signing this agreement.

c.   Defendant agrees that: (i) any statements made by defendant, under oath, at the guilty plea hearing (if such a hearing occurred prior to the breach); (ii) the agreed to factual basis statement in this agreement; and (iii) any evidence derived from such statements, shall be admissible against defendant in any such action against defendant, and defendant waives and gives up any claim under the United States Constitution, any statute, Rule 410 of the Federal Rules of Evidence, Rule 11(f) of the Federal Rules of Criminal Procedure, or any other federal rule, that the statements or any evidence derived from the statements should be suppressed or are inadmissible.

### COURT AND UNITED STATES PROBATION AND PRETRIAL SERVICES OFFICE NOT PARTIES

25.   Defendant understands that the Court and the United States Probation and Pretrial Services Office are not parties to this agreement and need not accept any of the USAO's sentencing

15

ER227

1   recommendations or the parties' agreements to facts or sentencing

2   factors.

3        26.   Defendant understands that both defendant and the USAO are

4   free to: (a) supplement the facts by supplying relevant information

5   to the United States Probation and Pretrial Services Office and the

6   Court, (b) correct any and all factual misstatements relating to the

7   Court's Sentencing Guidelines calculations and determination of

8   sentence, and (c) argue on appeal and collateral review that the

9   Court's Sentencing Guidelines calculations and the sentence it

10  chooses to impose are not error, although each party agrees to

11  maintain its view that the calculations in paragraph 12 are

12  consistent with the facts of this case.  While this paragraph permits

13  both the USAO and defendant to submit full and complete factual

14  information to the United States Probation and Pretrial Services

15  Office and the Court, even if that factual information may be viewed

16  as inconsistent with the facts agreed to in this agreement, this

17  paragraph does not affect defendant's and the USAO's obligations not

18  to contest the facts agreed to in this agreement.

19       27.   Defendant understands that even if the Court ignores any

20  sentencing recommendation, finds facts or reaches conclusions

21  different from those agreed to, and/or imposes any sentence up to the

22  maximum established by statute, defendant cannot, for that reason,

23  withdraw defendant's guilty plea, and defendant will remain bound to

24  fulfill all defendant's obligations under this agreement.  Defendant

25  understands that no one -- not the prosecutor, defendant's attorney,

26  or the Court -- can make a binding prediction or promise regarding

27  the sentence defendant will receive, except that it will be within

28  the statutory maximum.

16

ER228

<u>NO ADDITIONAL AGREEMENTS</u>

28.   Defendant understands that, except as set forth herein, there are no promises, understandings, or agreements between the USAO and defendant or defendant's attorney, and that no additional promise, understanding, or agreement may be entered into unless in a writing signed by all parties or on the record in court.

<u>PLEA AGREEMENT PART OF THE GUILTY PLEA HEARING</u>

29.   The parties agree that this agreement will be considered part of the record of defendant's guilty plea hearing as if the entire agreement had been read into the record of the proceeding.

AGREED AND ACCEPTED

UNITED STATES ATTORNEY'S OFFICE
FOR THE CENTRAL DISTRICT OF
CALIFORNIA

STEPHANIE S. CHRISTENSEN
Acting United States Attorney

_____       7/14/2022
BRIAN R. FAERSTEIN                       Date
DAN G. BOYLE
Assistant United States Attorneys

_____       17-14-2022
JAMES BRADLEY VLHA                       Date
Defendant

_____       7/14/22
JEROME J. HAIG                           Date
Attorney for Defendant James
Bradley Vlha

//

//

//

//

//

17

ER229

1   <u>CERTIFICATION OF DEFENDANT</u>

2        I have read this agreement in its entirety.  I have had enough

3   time to review and consider this agreement, and I have carefully and

4   thoroughly discussed every part of it with my attorney.  I understand

5   the terms of this agreement, and I voluntarily agree to those terms.

6   I have discussed the evidence with my attorney, and my attorney has

7   advised me of my rights, of possible pretrial motions that might be

8   filed, of possible defenses that might be asserted either prior to or

9   at trial, of the sentencing factors set forth in 18 U.S.C. § 3553(a),

10  of relevant Sentencing Guidelines provisions, and of the consequences

11  of entering into this agreement.  No promises, inducements, or

12  representations of any kind have been made to me other than those

13  contained in this agreement.  No one has threatened or forced me in

14  any way to enter into this agreement.  I am satisfied with the

15  representation of my attorney in this matter, and I am pleading

16  guilty because I am guilty of the charge and wish to take advantage

17  of the promises set forth in this agreement, and not for any other

18  reason.

19  _____          7-14-2022

20  JAMES BRADLEY VLHA                       Date
    Defendant

21

22  //

23  //

24  //

25  //

26  //

27  //

28  //

                              18

ER230

```
1                    CERTIFICATION OF DEFENDANT'S ATTORNEY

2        I am James Bradley Vlha's attorney.  I have carefully and

3   thoroughly discussed every part of this agreement with my client.

4   Further, I have fully advised my client of his rights, of possible

5   pretrial motions that might be filed, of possible defenses that might

6   be asserted either prior to or at trial, of the sentencing factors

7   set forth in 18 U.S.C. § 3553(a), of relevant Sentencing Guidelines

8   provisions, and of the consequences of entering into this agreement.

9   To my knowledge: no promises, inducements, or representations of any

10  kind have been made to my client other than those contained in this

11  agreement; no one has threatened or forced my client in any way to

12  enter into this agreement; my client's decision to enter into this

13  agreement is an informed and voluntary one; and the factual basis set

14  forth in this agreement is sufficient to support my client's entry of

15  a guilty plea pursuant to this agreement.

16                                                 7/14/22

17  JEROME J. HAIG                                 Date
    Attorney for Defendant James
18  Bradley Vlha

19

20

21

22

23

24

25

26

27

28

                                19
```



```
 1                  UNITED STATES DISTRICT COURT

 2          CENTRAL DISTRICT OF CALIFORNIA - CENTRAL DIVISION

 3             HONORABLE GEORGE H. WU, U.S. DISTRICT JUDGE

 4

 5   UNITED STATES OF AMERICA,

 6                         Plaintiff,

 7             vs.                          Case No. CR 19-343-GW

 8   TRAVIS SCHLOTTERBECK,
     JAMES BRADLEY VLHA,
 9                         Defendants.
     _____/

10

11

12
                         REPORTER'S TRANSCRIPT OF
13                        PRETRIAL CONFERENCE
                          Tuesday, June 28, 2022
14                           10:00 a.m.
                         LOS ANGELES, CALIFORNIA
15

16

17

18

19

20

21
     _____
22
                 TERRI A. HOURIGAN, CSR NO. 3838, CCRR
23               FEDERAL OFFICIAL COURT REPORTER
                 350 WEST FIRST STREET, ROOM 4311
24               LOS ANGELES, CALIFORNIA  90012
                        (213) 894-2849
25
```

```
1                    APPEARANCES OF COUNSEL:

2

3    FOR THE PLAINTIFF:

4        UNITED STATES ATTORNEY'S OFFICE
         United States Attorney
5        BY:      BRIAN R. FAERSTEIN
             DANIEL BOYLE
6         Assistant United States Attorneys
         United States Courthouse
7        312 North Spring Street
         Los Angeles, California  90012
8

9

     FOR THE DEFENDANT:  TRAVIS SCHLOTTERBECK
10
         EDWARD M. ROBINSON, A PROFESSIONAL LAW CORPORATION
11       BY:  EDWARD M. ROBINSON
             RACHAEL ROBINSON
12       Attorneys at Law
         21515 Hawthorne Boulevard, Suite 730
13       Torrance, California  90503

14

15   FOR THE DEFENDANT:  JAMES BRADLEY VLHA

16       LAW OFFICE OF JEROME J. HAIG
         BY: JEROME J. HAIG
17       Attorney at Law
         21143 Hawthorne Boulevard, Suite 454
18       Torrance, California  90503

19

20

21

22

23

24

25
```

UNITED STATES DISTRICT COURT

ER233

1           **LOS ANGELES, CALIFORNIA; TUESDAY, JUNE 28, 2022**

2                        **8:30 a.m.**

3                        **--oOo--**

4

5           THE COURTROOM DEPUTY:  Please come to order.  This

6    United States District Court is now in session.  The Honorable

7    George H. Wu, Judge presiding.

8           THE COURT:  Let me call the matter of *United States*

9    *versus Schlotterbeck, et al.*

10          Let me have appearances, starting with government

11   counsel first.

12          MR. FAERSTEIN:  Good morning, Your Honor.  AUSA

13   Brian Faerstein and Dan Boyle on behalf of the United States.

14          THE COURT:  All right.  And for the defense on

15   video, we have?

16          MR. ROBINSON:  On behalf of Mr. Schlotterbeck, we

17   have Edward Robinson and Rachael Robinson.

18          Mr. Schlotterbeck is appearing, we're all

19   appearing virtually.

20          THE COURT:  All right.  In court, we have?

21          MR. HAIG:  Good morning, Your Honor.  Jerome Haig

22   appearing for Mr. Vlha, since I was already in the courthouse,

23   and Mr. Vlha who is present on WEBEX.

24          THE COURT:  This is a continuation of pretrial stuff

25   and there has also already previously been a waiver of in-court

**UNITED STATES DISTRICT COURT**

ER234

```
 1    in-person appearance from the defendants.
 2                We have just a few things still on the burner --
 3    still on this burner at this point in time.
 4                First of all, the Court has received the
 5    defendants ex parte application to continue the trial.
 6                I have looked at it and also the government's
 7    response.
 8                My initial reaction would be no, I don't
 9    understand what the point is for the continuance.  I mean, if
10    you guys want to do further investigation on the history of
11    something or what exactly do you want to do during this interim
12    period of time?
13                I don't think that the recent Supreme Court
14    decision does anything or affects this case at all, so what
15    exactly do you want?
16                MR. ROBINSON:  With respect to Mr. Schlotterbeck, if
17    I sound halting, I have these earpieces and I'm in the hallway
18    over at 312, so that is the reason I sound a little bit odd
19    here.
20                With respect to Count 3, Mr. Schlotterbeck is
21    charged with selling to a felon.
22                And when you look at the Bruen case, and you look
23    at Judge Comey Barrett's dissent in the Seventh Circuit case,
24    which is now -- which the majority has been abrogated and she
25    goes directly to the history and the text analysis doing away
```

```
 1   with any type of other interested means-end scrutiny --

 2           THE COURT:  Well, let me stop you.  All of that

 3   stuff is there.  You could spend, like, six hours in a law

 4   library and accomplish all that you need to do.  So I don't

 5   understand why you need to extend.  The trial is not supposed

 6   to start until July the 22nd, about a month away.

 7           MR. ROBINSON:  I anticipate the following, and

 8   Ms. Robinson and Mr. Haig and I have been speaking with some of

 9   the defender offices across the country, in light of *Bruen*

10   there is going to be challenge for a felon in possession sales

11   to a felon and other Title 18 charges.

12               Those challenges are going to get to the Supreme

13   Court very quickly.  And I don't --

14           THE COURT:  Let me put it this way, who knows what

15   the Supreme Court -- maybe the Supreme Court will want persons

16   to be able to have handguns on the street corner.  That may be

17   their next ruling, and that wouldn't surprise me, but I'm not

18   going to wait to see if that in fact is what they are going to

19   do.

20               One could imagine the current Supreme Court is

21   making all sort of strange decisions, but, you know, if they do

22   it -- obviously, if your clients get convicted, I mean, I guess

23   this case could be the case that you would want to raise that

24   issue to the Supreme Court, and that is fine.

25               I just had a case that came back from the Supreme
```

```
 1   Court, so it would be a another one I can put on my diary that
 2   this case of mine went to the Supreme Court.  It's always fun
 3   to have these trading cards, like baseball cards.
 4            I don't think -- frankly, I don't see it as
 5   affecting this case, because again, it would be so inconsistent
 6   that it does not seem to give rise to a serious reason for
 7   delaying the case, especially if it's a matter of law.
 8            And again, I understand you want to look into the
 9   area, but you could look into the area and you can make the
10   arguments and preserve the arguments, which is all you are
11   entitled to do.
12            You are not entitled to wait and see if some
13   Appellate Court or even the Supreme Court would buy the
14   argument, because the law is at this point what the law is.
15            MR. ROBINSON:  We're not saying that we're entitled
16   to that, Your Honor.  We just thought it might be prudent.
17            But I appreciate the Court's position, and with
18   your permission, if we could have a briefing schedule, and we
19   could at least brief the issue with respect to Count 3.
20            I think Counts 1 and 2 are a little bit
21   different.  I know that Mr. Haig has some comments with regards
22   to Count 1 and 2.
23            THE COURT:  Let me ask Mr. Haig, what are your
24   comments with respect to Counts 1 and 2?
25            MR. HAIG:  My comments as to Count 1 and 2, I think
```

```
 1    the government has a rather strict view of the Bruen case, and
 2    the Bruen case expanded -- blew a hole in Heller.  Heller just
 3    dealt with the possession of handgun for self-defense in one's
 4    own residence.
 5              This case deals with handgun regulations.  It
 6    strips away the two-step approach that has been approved in
 7    every Circuit in this country, and says that if a firearm
 8    regulation is --
 9              THE COURT:  Let me stop.  We're not talking about a
10    firearm regulation, we're talking about the statute itself.
11              MR. HAIG:  Well, the statute itself, which is part
12    of the Gun Control Act of 1968, I believe, is a firearm
13    regulation.
14              THE COURT:  Of course, but I didn't think -- the
15    Supreme Court didn't say you cannot have any regulation.
16              MR. HAIG:  No.  But what it did say, and I just want
17    to read a very short quote, if I can, Your Honor, from Justice
18    Thomas in the majority opinion.
19              He said:  When confronting present-day firearm
20    regulations, the historical inquiry that Courts must conduct
21    will involve reasoning by analogy, like all analogical
22    reasoning determining whether a historical regulation is a
23    proper analog for a distinctly modern firearm regulation,
24    requires a determination of whether the two regulations are
25    relatively similar.
```

```
 1            He gave an example as well, Your Honor.

 2            He says:  For instance, if a gun law is

 3   addressing a societal problem that also existed in the 18th

 4   Century, it is evidence that the modern law is unconstitutional

 5   if there was no similar regulation then.

 6            So, therefore, Your Honor, that is a very broad

 7   ruling, and it is current law today that one can build one's

 8   own weapon without going through a federal firearm's license

 9   dealer.

10            THE COURT:  Nobody disagrees with that.

11            MR. HAIG:  Right.  So I'm assuming, and I don't know

12   because I haven't done the historical research, that that was

13   also true in 1791.

14            If it was true in 1791 that one could build one's

15   own firearm without getting a proper permit from the

16   government, then aiding and abetting a person doing that, it

17   would be --

18            THE COURT:  Well, the problem is that that statement

19   is so devoid of any connection with anything, because again,

20   the society that existed at that point in time is very

21   different than the society that exists now.

22            I understand what the Supreme Court is trying to

23   say, but the problem is, is that again, the society is so

24   different then, so -- and frankly, until *Heller*, nobody thought

25   that the Second Amendment was what the Supreme Court now thinks
```

```
 1    the Second Amendment is.
 2              Previously, no Court went even half as far as
 3    what Heller did.  So therefore, to say that, well, you have to
 4    consider what was thought of back then, part of what was
 5    thought of back then was they didn't consider the Second
 6    Amendment to be what the Supreme Court now thinks it is.
 7              So what are we supposed to draw from that?  The
 8    fact that it assumed certain things that you didn't need to do
 9    because, in fact, that was the accepted dogma back then, I
10    understand times have changed.
11              But conversely, however, I think we're getting
12    far afield of what this case is really about.  This case is
13    really about this question as to whether or not the defendants
14    did that which is charged in the indictment.
15              Although, I have a question to the government
16    about when the government amended its indictment, because I
17    didn't see the amendment.
18              MR. HAIG:  If I can follow up on that, Your Honor.
19    I do not disagree with a word the Court is saying from my own
20    personal view and from a historical view of jurisprudence on
21    the Second Amendment.
22              However, what the Court said is essentially what
23    Justice Stephen Breyer said in his dissent on Bruen.  And that
24    analysis has been rejected by --
25              THE COURT:  I'm not saying that, because again, the
```

1   discussion that is the foundation of the most recent Supreme

2   Court case is whether or not the state can refuse to license

3   persons to carry hand weapons for their self defense outside of

4   their home.  That was the issue.  I didn't see them saying we

5   have changed the law, there is no restrictions on firearms.

6              Had they said that, I would agree with you that

7   this case should go down the toilet, but that's not what they

8   said.

9              What they said was in considering what the issue

10  was whether or not a license -- not that licenses couldn't be

11  required -- they didn't say that.

12             MR. HAIG:  They didn't, but the thing is --

13             THE COURT:  Now, I do understand that somebody

14  somewhere will now, and I accept that.  And it will probably --

15  you may be right -- it may be go up to the Supreme Court, but

16  I'm not going to waste my time at this point waiting for the

17  two years that it will take before bringing this case to trial.

18             MR. HAIG:  Well, I'm not asking for a -- we're not

19  asking for a delay, Your Honor, for Supreme Court action on

20  similar types of cases, what we're asking for is a delay so

21  that two things can happen.

22             One, so the Department of Justice can determine

23  whether charging cases such as this is appropriate in light of

24  *Bruen* and two, Your Honor --

25             THE COURT:  Let me ask you, has the Department of

1    Justice given any indication -- let me ask the AUSA, has your

2    department indicated that they want you to slow down on these

3    types of cases or anything of that sort?

4         MR. FAERSTEIN:  Your Honor, well I am sort of loathe

5    to speak about internal iterations, but I would say no, that

6    has not happened.  I want to respond to something that Mr. Haig

7    just argued.

8         MR. HAIG:  I'm not done.

9         THE COURT:  He's says he's not finished talking.  I

10   will allow you to finish your sentence and we will go back to

11   him.

12        MR. FAERSTEIN:  Yes, Your Honor.  The historical

13   analysis that Mr. Haig was referring to, we don't even get

14   there in this case because the first step is to look at the

15   plain text, and this was briefed in our opposition, the plain

16   text of the Second Amendment.

17        If the conduct at issue is not covered by that

18   plain text, you don't even look to the historical precedent.

19        In *Bruen*, they were dealing with carrying a

20   firearm in public for self-defense.

21        The Supreme Court said that is clearly covered by

22   the right to keep and bear arms, just as it was in *Heller*,

23   having a gun at your home.

24        But what we're dealing with here is far afield

25   from that reading of the Second Amendment.  It's not within the

1    plain text of the Second Amendment.

2         THE COURT:  Well, let me put it this way, one could

3    argue the current Supreme Court believes -- what was at the

4    time originally used for undefined constitutional rights, the

5    penumbra, was that the suggestion?

6         They basically said the Second Amendment has its

7    penumbra, and that it goes really far afield.  That is fine and

8    dandy, but I agree with you, it's not really relevant to the

9    facts of this particular case.

10        MR. HAIG:  Well, the reason we think it is, Your

11   Honor, is because we think that the current statute that the

12   defendants are charged with, the conspiracy and the actual

13   substantive offense, and Count 1 is a conspiracy to commit the

14   substantive offense in Count 2, is unconstitutional under the

15   Second and Fourteenth Amendment as applied to the defendants in

16   this case because the underlying conduct, if I can just --

17        THE COURT:  Let me stop you.  I'm not saying you

18   can't make the argument.  I'm just saying, okay, make the

19   argument at some point in time, and I will rule on it, but we

20   still have a trial on the 22nd on July.

21        MR. HAIG:  Mr. Robinson talked about a briefing

22   schedule.

23        I think our *ex partes*, while written as quickly

24   and as proficiently as we could on both sides, we don't have

25   time to delve into the historical analysis.

```
1              I know that the government doesn't think it's
2    necessary we do.
3              We do think it is necessary because if you are
4    aiding and abetting a legal act in Counts 1 and 2 or aiding and
5    abetting -- or actually committing a sale to somebody who may
6    no longer be prohibited from possessing a weapon because he did
7    not have a dangerous felony conviction, which historically was
8    the requirement to disenfranchise someone under their Second
9    Amendment rights, then --
10             THE COURT:  When you say historically to
11   disenfranchise somebody from his Second Amendment rights, what
12   are you referring to?
13             MR. HAIG:  I'm referring to the dissent by Justice
14   Comey Barrett in --
15             THE COURT:  She wasn't on the Supreme Court then.
16             MR. HAIG:  No, she wasn't, Your Honor.  Her dissent
17   was flagged as being an appropriate reaction to --
18             THE COURT:  In other words, she believed that -- in
19   other words, what would you do, you would be doing some sort of
20   -- what do you call the analysis?
21             MR. HAIG:  Historical analysis, Your Honor.
22             THE COURT:  No, what do you call it when you are
23   trying to figure out if state convictions are less similar to
24   federal convictions?
25             MR. ROBINSON:  May I jump on this issue, because it
```

**UNITED STATES DISTRICT COURT**

 1    only applies to Mr. Schlotterbeck.

 2              There is no question that Judge Barrett's dissent

 3    has been adopted, at least, in the reasoning in *Bruen*, and I

 4    took the time last night to listen to the *Bruen* oral argument

 5    and for what it's worth, I will put this in the brief, Justice

 6    Cavanaugh was quoting from the Seventh Circuit dissent which is

 7    now being treated as the law as the majority opinion was

 8    abrogated at least on Westlaw by the *Bruen* case.  But it

 9    doesn't matter --

10              THE COURT:  But what I don't understand, again, I

11    understand you guys want to make an argument.  You are free to

12    make the argument, it's just that the trial is going forward.

13              MR. ROBINSON:  With respect to Count 3, that is

14    fine, because what you are saying, Your Honor, I couldn't agree

15    with you more.

16              THE COURT:  Well, you could actually, because you

17    could stop now, but I will allow you to finish your sentence.

18              MR. ROBINSON:  Thank you.  It's crazy, but you will

19    see -- I hope we will be able to show you that the craziness

20    now is law of the land, and what happened in 1791 governs the

21    way in which we regulate handguns in 2022.

22              THE COURT:  But let's put it this way, there really

23    wasn't a regulation of that sort back then.  That is the

24    problem.

25              In other words, you are talking about a situation

```
 1   where the structures weren't there, because of the fact that --
 2   in other words, if one were to accept your argument, then we
 3   would have to deconstruct the American society to a time when
 4   the federal government was much, much smaller and things of
 5   that sort.
 6           Of course, then we also have to adjust the
 7   federal tax stuff as well, so that means states like California
 8   would get to keep most of their money rather than sending most
 9   of their money to Mississippi and Alabama.
10           Things would be entirely different, I understand
11   that, but that is one of the problems is that this stuff -- I
12   understand you want to make the arguments, and I'm perfectly
13   happy to have you make those arguments, I'm perfectly willing
14   to entertain those arguments, I'm sure the AUSAs are chomping
15   at the bit in responding to those arguments, but that is
16   something that will be addressed.
17           But again, we're talking about a trial that is
18   going to start on July the 22nd.
19           MR. ROBINSON:  And, Your Honor, if I may, has that
20   date been blessed by --
21           THE COURT:  It hadn't been blessed, because the time
22   frame is the end of this week to ask for it, so I will be
23   asking for it, and I will let you know as soon as possible.
24           Obviously, if we don't get it, if we don't get
25   the 22nd, I'm sure we're going to get the next week, because
```

16

1  the other problem is -- I'm starting -- at the beginning of

2  August -- I'm starting another three-week criminal trial, so I

3  have to get yours out of the way, so to speak, not that it's

4  not as important.

5          MR. HAIG:  Following up on Mr. Robinson, we would

6  like to brief this issue, I know the Court can't prevent us

7  from doing that.

8          THE COURT:  I could try to prevent you, but why

9  would I?

10          MR. HAIG:  I guess you could, right, but will the

11  Court set some sort of briefing schedule?

12          THE COURT:  You can talk about it.  Whatever you

13  guys agree upon regarding a briefing schedule would be fine

14  with me.

15          Again, you know, if you want to argue it at some

16  point in time in the midst of the trial, that is fine, as long

17  as it's not in front of the jury, I don't care, it's not a

18  problem.

19          MR. HAIG:  Okay.

20          THE COURT:  So you guys agree on the schedule for

21  that.

22          Then the next issue is you didn't agree on a

23  joint statement that should be read to the jury.

24          Frankly, in my -- how many years have I been a

25  Judge -- many, more than 20, I have never had that situation

```
 1   where the parties did not agree.
 2              I'm not going to force you, you guys are all
 3   adults, and if you want to read the redacted indictment, that
 4   is fine with me.
 5              The only thing is, I will require the AUSA to
 6   read it.  I'm not going to read it.
 7              You, the AUSA, will read the redacted indictment,
 8   and you are going to have to do it two times.
 9              The first time is when the jury eventually comes
10   in so the jury understands what this case is about, and once
11   the jury is selected then -- well, the second time may be -- I
12   don't know if you guys stipulate not to read it again, that is
13   fine.
14              But certainly at the very, very start of the
15   trial, the AUSA is going to be required to read it.
16              Is that understood by everybody?
17              MR. ROBINSON:  Yes, Your Honor.
18              MR. FAERSTEIN:  Yes, Your Honor.
19              MR. ROBINSON:  Your Honor, if I could just say, it's
20   not out of a sense of petulance that we are not agreeing, it is
21   because the term "manufacturing" is a legal issue we need to
22   preserve.  The government has been very understanding about
23   that.
24              And this is going to be 90 percent of what will
25   happen in this trial, it will center around legal issues and
```

```
 1   not factual issues.
 2             THE COURT:  I agree, that's the reason why I have
 3   some questions about your expert, but I will get to that in a
 4   moment.
 5             All right, so that's fine.  The AUSA will read
 6   the redacted indictment.
 7             And I obviously will inform the jury that an
 8   indictment is not evidence or anything of that sort, it's just
 9   a statement as to what this case is about, so I will say that.
10   If I don't say that, remind me to say that, and I will say that
11   at the start of the trial as well.
12             MR. HAIG:  There was one issue on the redacted
13   indictment that we objected to, I think the last sentence of
14   Paragraph 5.
15             THE COURT:  Okay.  I don't have if from front of me.
16             MR. HAIG:  Perhaps the government can read it
17   because I would have to shovel through the paperwork here.
18             MR. FAERSTEIN:  I can read it, Your Honor.  In the
19   stipulation regarding the redacted trial indictment, we made
20   clear that the parties are still reserving their rights with
21   respect to challenges to evidentiary issues and legal issues
22   and jury instruction issues.
23             I think what Mr. Haig is referring to is they
24   view certain language in the indictment as surplusage, we
25   don't.  But they are not waiving that argument by agreeing to
```

```
 1   the redacted indictment.
 2              MR. HAIG:  I found it, Your Honor.
 3              THE COURT:  Actually, I can get it on my computer.
 4                  Well, I'm more visual than you guys are, I want
 5   to see it in all its full glory.
 6              MR. HAIG:  It's on page 2, Your Honor.
 7              THE COURT:  I will get there in a second.  So this
 8   is docket -- what is the docket number on this one?
 9              MR. FAERSTEIN:  131-1 is the proposed clean version.
10              THE COURT:  Okay.  So you are talking about the
11   indictment as redacted and what page?
12              MR. HAIG:  Page 2, Your Honor, Paragraph 5 and just
13   the last sentence.
14              THE COURT:  Well, let me just ask, you are reading
15   the indictment, that is what is stated in the indictment, you
16   know I understand -- what really is the objection to this?
17              MR. HAIG:  The objection is, again, it's saying that
18   there is something inherently wrong with this firearm.
19              THE COURT:  No.  It's not saying anything is wrong
20   with it.  It's saying certain firearms, if they have serial
21   numbers and things of that sort, they are traceable, whereas
22   other firearms that do not have serial numbers are not
23   traceable, it's common sense.
24              MR. HAIG:  It is common sense, Your Honor, but it's
25   not relevant to any of the charges as I noted last week during
```

```
 1  our hearings, and it's not an element that needs to be proven
 2  or disproven.
 3          THE COURT:  Well, let me ask the government, what is
 4  the government's response?
 5          MR. FAERSTEIN:  Well, Your Honor, the fact that the
 6  firearms they sold don't have serial numbers is reflected by
 7  the fact that they were manufacturing these firearms without a
 8  license illegally.
 9          This was one of the ways that they were skirting
10  the restrictions for the requirements of the federal firearms
11  licensing system by selling to customers and not serializing
12  them and that had real ramifications in terms of these firearms
13  were just not traceable.
14          It's in the indictment, Your Honor.
15          THE COURT:  You are arguing something different.
16  Your argument now is different than what the sentence says.
17          MR. FAERSTEIN:  Well, I'm sorry, Your Honor.  This
18  is a fact that is, as we have alleged and as Your Honor has
19  found with respect to the government's Motion to Limine No. 1,
20  the fact that these firearms are not serialized is part and
21  parcel of the conduct of this case.
22          THE COURT:  Well, let me stop you.  I will agree
23  with the defense on this.  I will eliminate that sentence.  You
24  can always put it in later on and you can raise it, you are
25  going to be able to raise it.
```

1          But at this point in time, we're telling the jury

2    generally what this case is about.

3          What you are saying is different than what this

4    sentence says, and again, there is no sense at this point in

5    time in making it more complex than it otherwise would be.

6          I will agree with the defense just insofar as

7    this sentence is concerned.

8          All right.  Now, we have done that.

9          Okay.  Let me ask this question:  The government

10   obviously is agreeing to take out the words "dealing" and "in

11   dealing in firearms."

12         Did the government actually amend the indictment

13   to remove those references?

14         MR. FAERSTEIN:  Your Honor, we did not, but we are

15   narrowing a theory that was alleged, and the parties have

16   stipulated that this is not an amendment in the indictment,

17   it's simply a narrowing in the stipulation we filed yesterday.

18         There are alternate theories under 922(a)(1)(A),

19   and we are not presenting one of those theories to the jury,

20   and that is, you know, why we are simplifying or streamlining

21   the indictment simply for trial.

22         THE COURT:  Well, when you say you were

23   simplifying --

24         MR. FAERSTEIN:  Simplifying may be the wrong word,

25   Your Honor, but we are going to be presenting one of the

 1   alternate theories to the jury that is not an amendment of the

 2   indictment --

 3            THE COURT:  This is the problem I have.  You want to

 4   focus on the business of manufacturing.

 5            The business of manufacturing goes over a bit

 6   with the notion of dealing.  And if you drop dealing, it makes

 7   it more confusing rather than less confusing, in my mind.  This

 8   is one of the problems I have.

 9            So I understand what you want to do, I just don't

10   know if it's advisable for you to do that, but I'm not going to

11   change the government's case.

12            I mean, if the government wants to drop dealing,

13   okay, I will accept that, but don't come back and complain to

14   me about other consequences of your having done that.  That is

15   all I'm saying.

16            MR. FAERSTEIN:  Yes, I understand.  Can I just

17   hopefully add a point of clarification on this?

18            THE COURT:  Yes.

19            MR. FAERSTEIN:  Under the statutory definition of

20   engaging in the business, the statute and this is 921(a) --

21            THE COURT:  I know, it's subpart 21, I have read it.

22            MR. FAERSTEIN:  Right.  For the definition of

23   engaging in the business as a dealer, it speaks to the

24   repetitive purchase and resale of the firearms.

25            So that is different than the manufacturing of

```
 1   new firearms for sale.  It's the purchase of existing firearms
 2   in the resale.  There is also a gunsmithing definition.
 3              But the dealing definition is actually narrower
 4   than it sounds just on its face.
 5              With respect to the engaging in the business as a
 6   manufacturer, that still also requires the sale or distribution
 7   of the firearms.
 8              THE COURT:  But let me ask you this:  A person can
 9   be a dealer if the person engages in the business of repairing
10   firearms or making or fitting special barrel stocks or trigger
11   mechanisms to firearms.  That doesn't involve sell and resell,
12   it just involves that.
13              MR. FAERSTEIN:  Sorry, Your Honor.  That involves
14   that service for someone else's preexisting firearm, whereas
15   here, our theory, and we believe the facts are -- this is sort
16   of the essential facts here, is that they were creating new
17   firearms for sale to multiple customers for the purpose of
18   livelihood and profit.
19              So the sale component is still integral and
20   something we have to prove as part of the engaging in the
21   business of manufacturing without a license.
22              THE COURT:  All right.  I presume defense doesn't
23   have any comment on that?
24              MR. HAIG:  No, Your Honor.
25              MR. ROBINSON:  No.
```

1    THE COURT:  Well, it is what it is then.

2         Now, insofar as the expert stuff, as I see it,

3    the defense only has a couple of objections to the government's

4    expert Chimileski.

5         And the objection is if he is testifying as to

6    regulatory matters relating to certain FFL types and the

7    manufacturing of firearms for sale, et cetera, and those things

8    are noted on page 6 of docket number filing, that is Docket

9    No. 132.

10        Let me ask defense counsel, those are your only

11   objections as to what you expect -- well, what the government

12   is expecting Chimileski to testify about?

13        MR. ROBINSON:  Yes.

14        MR. HAIG:  Base upon the government's proffer, yes.

15        MR. ROBINSON:  Yes.

16        THE COURT:  So let me ask the government, what is

17   your response to their objection?

18        MR. FAERSTEIN:  Well, Your Honor, I mean, we don't

19   think that manufacturing is vague.

20        My understanding of their objection is that it's

21   meant to preserve their argument that manufacturing is vague.

22        Our expert is not going to be discussing the

23   legal definition of manufacturing.  He will be discussing his

24   day-to-day responsibilities in the field as a regulator and how

25   he approaches entities that have manufacturing licenses or that

**UNITED STATES DISTRICT COURT**

```
 1    are applying for manufacturing licenses.
 2              So this is part and parcel of his analysis and
 3    his expertise, it's not something he's going to be speaking to
 4    in terms as a legal definition of manufacturing.
 5              MR. ROBINSON:  Your Honor, that is why we really
 6    narrowed our position with respect to the government's proffer.
 7    We understand where Mr. Faerstein and Mr. Boyle are going with
 8    this testimony.  We just need to make sure there will be no
 9    testimony that will provide a definition of manufacturing to
10    which our clients could never have been put on notice.  We will
11    leave it at that.
12              THE COURT:  All right.
13              MR. ROBINSON:  That's why we narrowly tailored our
14    position on that proffer.
15              THE COURT:  That's fine.
16              Then as to the government's objections to the
17    defendant's expert, these are my thoughts at this point in
18    time.
19              I looked at the items that the defense is
20    proffering that there are six subject areas that Mr. Lieberman
21    is going to be testifying about.
22              The problem I have is much of what he is going to
23    be opining on is his view of the law, Items 1 through 4.  I
24    mean, that is basically what he's going to be talking about.
25              Again, the Court will define the law for the
```

 1   jury.  It's not up to an expert to come in and say what he or

 2   she thinks the law is because that pretty much is irrelevant,

 3   unless, of course, he or she is nine members of the Supreme

 4   Court, that, I think, I would have to accept.

 5            But barring that, I don't think I have to accept

 6   that.  I have to define what the law is.

 7            Also, some of what he seems that he's going to be

 8   talking about may not be particularly relevant, although, he

 9   might be coming in -- to the extent he comes into counter

10   something that is said by the government's expert, that I can

11   understand.

12            So, in other words, if the government's expert

13   was talking about, for example, Item No. 4 about how the ATF

14   interpretations of the law have affected citizens -- how

15   citizens can legally make a firearm, if the government's expert

16   talks about that, then I would allow the defense expert to

17   opine on the same thing, assuming he has a basis, you know,

18   like a *Daubert* basis for those opinions.

19            But it seems to me that one of the problems I

20   have with Mr. Lieberman is that some of the stuff he wants to

21   talk about may not be -- to counter something the government

22   says, but maybe something that is not particularly relevant to

23   the current case.

24            So this is what I would want from -- well,

25   actually, before I get to that.

```
 1              Also again, some of what he is opining, I can't
 2  tell from these little categorizations, the six categories he
 3  proffers, what's the basis for his opinions at all.
 4              So as a result of this, I would require that the
 5  defense set out in more detail what Mr. Lieberman is going to
 6  be saying with the understanding that he probably would be
 7  allowed to counter Mr. Chimileski's opinions, assuming he has a
 8  basis for doing so.
 9              But, for example, Items 1 through 3, you know,
10  again, he wants to offer these definitions -- legal
11  definitions.  They don't come from him.
12              MR. HAIG:  Well, Your Honor, the reason why we think
13  it is appropriate is because this is a case in which the ATF
14  routinely advises members of the public as to what the meaning
15  of manufacturing is, what the meaning of dealing is, giving
16  examples of things that can and cannot be done by a private
17  person or entity unless they have got a federal firearms
18  license, a manufacturing license, or a gunsmithing license, for
19  example.  And the ATF routinely visits people and tells them
20  about certain things, like, hey, you can't do this.
21              THE COURT:  Had they done that here?
22              MR. HAIG:  They did.
23              THE COURT:  In other words, they came to the
24  defendants and talked to them about it?
25              Well, that is going to come in then.
```

```
1              MR. HAIG:  It sure will.

2              THE COURT:  Why does he need to testify?

3              MR. HAIG:  He needs to testify because he is in the

4    Southern California area, he is an FFL, he does have much

5    communication with the ATF, he trains law enforcement officers

6    on --

7              THE COURT:  That's all fine and dandy, but unless he

8    was also involved in this case, why would he be coming to

9    testify?

10             MR. HAIG:  He's not a percipient witness, Your

11   Honor.

12             THE COURT:  So I don't understand what his expertise

13   is.

14             MR. HAIG:  We're dealing with the issue of

15   willfulness.

16             THE COURT:  I understand that, but he can't

17   determine willfulness.

18             MR. HAIG:  He can't determine willfulness.  He can

19   determine what the prevailing view of the community is of what

20   can and cannot be done with a home-built weapon, how it can be

21   made, how it can be procured, and the technical steps that are

22   needed to turn a weapon.

23             THE COURT:  Let me hear from the government, what is

24   the government's response?

25             MR. FAERSTEIN:  Yes, Your Honor.
```

1    Well, I think, first of all the government shares

2  in the Court's concern about Mr. Lieberman's qualifications to

3  testify --

4           THE COURT:  That's not the question.

5           The first question is did the ATF officers speak

6  to the defendants?

7           MR. FAERSTEIN:  When they executed search warrants

8  in June 2017 at the last day of the conspiracy -- so they

9  didn't speak to them prior to the execution of search warrants.

10          THE COURT:  In other words, the defendants could not

11  have relied upon the ATF for whatever they did in this case?

12          Let me ask Mr. Haig, are your clients going to be

13  testifying that prior to the execution of the search warrants

14  and things like that in this case, that they talked with the

15  ATF about their activities?

16          MR. HAIG:  To be precise, Your Honor, the ATF spoke

17  to Mr. Schlotterbeck and not to Mr. Vlha, and it was at

18  Mr. Schlotterbeck's place of business, and that is actually the

19  subject of another motion in limine that I think Mr. Robinson

20  is more properly going to be dealing with regarding the

21  statements that were elicited at that time.

22          But to answer the direct question, there was

23  no --

24          THE COURT:  Had they identified themselves as ATF

25  officers at that point?

```
 1              MR. HAIG:  At the end, after all of the transactions
 2    were finished, they basically told Mr. Schlotterbeck, don't do
 3    this.
 4              He said, okay.
 5              Now, there is a lot more that happened, of
 6    course.  Mr. Vlha wasn't there that day and they weren't
 7    arrested until a couple of years later when the indictment was
 8    returned and unsealed.
 9              During that interim time, there was no criminal
10    activity by either of the defendants.
11              THE COURT:  Well, there wasn't any indicted criminal
12    activity.
13              MR. HAIG:  There wasn't any activity.  Period.
14              THE COURT:  Well, it is left up to argument, that's
15    what the jury is going to decide.
16              MR. HAIG:  I'm talking about the ATF agents paid a
17    visit to Schlotterbeck.
18              THE COURT:  You are saying after that, they didn't
19    engage in whatever conduct they had previously engaged in, so
20    therefore, there was no new criminal conduct?
21              MR. HAIG:  Yes.
22              THE COURT:  Okay.
23              MR. ROBINSON:  If I may address the notice.  Was
24    Mr. Schlotterbeck notified prior to any of the alleged conduct
25    that what he was doing was illegal by an ATF agent.  No, he
```

```
 1   wasn't.
 2             In our supplement on the Rule 106 motion, we
 3   excerpt texts -- excuse, me parts of conversations between
 4   Mr. Schlotterbeck and the ATF agent where Mr. Schlotterbeck
 5   says --
 6             THE COURT:  Well, let me stop.  I'm going to get to
 7   that in a second.
 8             Here, at this point in time, we're talking about
 9   the expert testimony, and so we will get to that stuff a little
10   bit later.
11             MR. ROBINSON:  The expert testimony will corroborate
12   the good faith belief that Mr. Schlotterbeck had that at the
13   time he was doing what he was doing because he had not been
14   placed on proper notice --
15             THE COURT:  Let me ask this question, I guess, maybe
16   this does go toward what the defense wants insofar as the
17   defendant's portion of what they had been saying, the recorded
18   portion.
19             I do understand and it seems to me that I do get
20   a sense from those portions that the defense wants to come in
21   that Mr. Schlotterbeck was trying to fit within what was -- I
22   don't know what you call it -- the 80 percent rule or something
23   to that effect.
24             So the question is that if -- maybe that's what
25   the whole purpose of Mr. Lieberman is, is to talk about the
```

```
 1   80 percent rule or something of that sort and whether or not

 2   that was a viable approach to manufacturing firearms that were

 3   not -- that would not be -- that component would not render it

 4   illegal.

 5              I can understand that.  I think that is my

 6   understanding, in part, of why the defense wants -- that was

 7   the additional portions of Mr. Schlotterbeck's conversations at

 8   the time.

 9              Let me have the AUSA address that point.

10   Although, also taking a step back from that, even if there was

11   some compliance with that, in other words, that the manufacture

12   may not have been illegal in and of itself, the dealing in --

13   sorry, not the dealing, but the business of manufacturing,

14   which includes the commerce aspect of firearms is still at

15   play, and my understanding is you would need a license for that

16   even if -- in other words, if you made a handgun or firearm

17   that you didn't need to get a license to manufacture, you would

18   still need a license for the commerce aspect of it, the

19   business aspect of it, wouldn't you?

20              MR. HAIG:  Not -- well, that will be a question for

21   the jury as to whether --

22              THE COURT:  Well, it's a question whether or not

23   they engaged in it.

24              But conceptionally, if they met the criteria of

25   the business-of aspect, then there would be a licensing
```

```
 1   requirement, wouldn't there?
 2           MR. HAIG:  If they are manufacturing and they are
 3   engaged in the business, yes, but those are both questions for
 4   the jury.
 5           THE COURT:  Well no, it's the business of
 6   manufacturing.
 7           MR. HAIG:  They have to manufacture the firearm and
 8   they also have to --
 9           THE COURT:  Well no, it's business and
10   manufacturing.  I mean that is the language of 921.
11           MR. HAIG:  That's exactly why Mr. Robinson talks
12   about it being so vague.
13           THE COURT:  Well, let's put it this way, it wasn't
14   vague.  It never has been raised as being vague heretofore.
15           MR. HAIG:  There are six weapons in this case over
16   the span of a little bit over a year, and whether that is the
17   business of manufacturing --
18           THE COURT:  Well, that is up for the jury to decide.
19           MR. HAIG:  That's what I said.
20           THE COURT:  That's clear, that is an issue, but that
21   is not vague.
22           MR. HAIG:  Well, no, no, no.  I mean, the jury can
23   determine whether they are in the business of manufacturing
24   when they make less than $2,000 in a year, right?  They can
25   make that determination.
```

```
 1          THE COURT:  But that is not a vagueness issue.  I
 2   thought you were arguing some vagueness issue.
 3          MR. HAIG:  What I was arguing is we're going back
 4   and forth what the statute says and what it means, that's why
 5   we think it's vague.
 6          THE COURT:  Let me put it this way, unless the
 7   statute were to say "business means more than $5,000 a year,"
 8   well then, by definition, anything that is less than that is in
 9   your mind, vague.  It doesn't work that way.
10              There are lots of statutes that don't have bright
11   line cutoff points, and they are still viable criminal
12   statutes.
13          MR. HAIG:  Fair enough, Your Honor.
14          MR. ROBINSON:  But that is not our point on behalf
15   of Mr. Schlotterbeck.
16              It's not, because we take the very, very discreet
17   position that regardless of the modifier he engaged in the
18   business, manufacturing is a term that stands alone under
19   statutory construction rules that are now apparently the only
20   way in which we're supposed to look at a Constitutional Second
21   Amendment question of the history.
22              It doesn't modify and provide the necessary
23   clarity to distinguish between assembling and manufacturing, so
24   if Mr. Schlotterbeck believed that he's following the law --
25          THE COURT:  That's one of the problems I have.  I
```

**UNITED STATES DISTRICT COURT**

```
 1   don't understand why assembling can't be in manufacturing.

 2             In most businesses, there would be no distinction

 3   between a product that is assembled by a company as calling

 4   that having been manufactured, even though the component parts

 5   might be gotten from other locations.

 6             As I mentioned, if cars were in that situation,

 7   cell phones parts are manufactured all over the world and/or

 8   assembled and derived from all different parts of the world,

 9   and they are assembled in the particular location and that

10   entity is called a manufacturer of that cell phone.

11             MR. ROBINSON:  Well, if you look at the trade rules

12   that we have, everything that is manufactured in China is

13   assembled in the United States in order to be built in the

14   United States and there are two -- both parties have shown,

15   there are competing common everyday understanding from the

16   dictionary as to what assembling versus manufacturing means,

17   but forget about that, if we may for this point.

18             If Mr. Schlotterbeck believes in good faith that

19   he is following the -- we will use this term for this motion --

20   80 percent rule, and therefore, he is not manufacturing, but

21   assembling, and the expert can say that was the understanding

22   of the so-called gun community, the government will have a more

23   difficult time proving, based upon Mr. Schlotterbeck's good

24   faith, he acted willfully under whatever standard of

25   willfulness the Court can apply.
```

```
1              THE COURT:  I understand your position.
2                   Let me hear from the government, why can't the
3     defendant, if it's applicable to him, argue that point that he
4     thought there was this 80 percent rule, assuming arguendo that
5     it exists, and he thought what he was doing was lawful?
6              MR. FAERSTEIN:  Well, Your Honor, I'm assuming that
7     -- I'm assuming that is something they will argue to the jury.
8              THE COURT:  Well obviously, there has to be some
9     evidence.
10                  Let me indicate to defense counsel, I'm not going
11    to force your clients to testify if they don't want to, but a
12    lot of that stuff, unless they testify, I don't know how it
13    comes in.
14             MR. ROBINSON:  Under 106, it comes in, because what
15    the government has excerpted, it looks like a confession.  It
16    doesn't include 80 percent conversations of the
17    Mr. Schlotterbeck where he demonstrates to the ATF agent, hey,
18    wait a minute, I thought I was following the law.  That is
19    exactly what *Lopez* stands for in the Ninth Circuit with respect
20    to making sure --
21             THE COURT:  Let me stop you.  That gets back to
22    whether or not which portions of the transcript I'm going to
23    allow in.  As I have indicated, it seems to me the 80 percent
24    rule could come in.
25             MR. ROBINSON:  Right.
```

1          THE COURT:  But it's going to be limited to what he

2    said therein, and unless he testifies, nothing else is going to

3    come in as to it, so it is what it is.

4              I understand the significance of all of this, but

5    again, you know, a lot of this stuff that you want to get in,

6    unless he testifies, I don't see how it's going to come in.

7          MR. ROBINSON:  But if you looked at what we have

8    excerpted in, and mind you, we get it, it is in the light most

9    favorable to us, there is a discussion between the ATF agent

10   and Mr. Schlotterbeck about how he believed he wasn't

11   manufacturer and he was assembling.  There was a discussion --

12         THE COURT:  That is your argument about how the jury

13   should interpret what he said, I understand that.

14         MR. ROBINSON:  Well, if that was the understanding

15   in the gun community, then to circle back, the expert's opinion

16   explaining that this was an understanding of the gun community

17   about the so-called 80 percent rule, and he has the

18   qualifications to tender that opinion, then it corroborates

19   what Mr. Schlotterbeck was saying and how can he be proven

20   guilty -- proven to have acted willfully beyond a reasonable

21   doubt if he has got this good faith belief backed up by some

22   expert testimony.

23         THE COURT:  I understand your position.  What is the

24   government's response?

25         MR. FAERSTEIN:  With respect to the expert,

1   Mr. Boyle will address with respect to the statements.

2           With respect to the expert, what they are

3   proposing is entirely impermissible under Rule 704(b).

4           They are asking the expert to opine on why the

5   defendant did not think what he was doing was unlawful.

6           THE COURT:  Let me stop you.  I would agree with

7   that.

8           In other words, the expert can't give testimony

9   as to what was going on in Mr. Schlotterbeck's mind.  I agree

10  with you 100 percent.

11          MR. ROBINSON:  Of course, he can't.

12          THE COURT:  As Mr. Haig is saying, he's not

13  intending to do that.  So everybody is agreeing with you on

14  that point.

15          MR. FAERSTEIN:  Right, Your Honor.

16          THE COURT:  But, as I see the construct that the

17  defense is going to be trying to do is that the defense is

18  going to try to get in the evidence of the existence of the

19  so-called 80 percent rule as an argument that members of the --

20  I guess gun manufacturing public -- also believed that this

21  80 percent rule, and they thought they believed that if you

22  complied with the 80 percent rule that what you were doing was

23  not illegal.

24          MR. FAERSTEIN:  Yes, Your Honor.

25          But this expert, it's unclear to the government

```
 1   what his specialized knowledge is.  Is he going to be coming in
 2   and testifying anecdotally as to what he --
 3            THE COURT:  That's the reason why I have asked the
 4   defense to give me more as to what Mr. Lieberman is going to
 5   say.
 6            Frankly, normally this type of stuff is put in
 7   some sort of report, and I understand the defense did put it in
 8   a report, but then the defense indicated that what was stated
 9   in the report wasn't exactly necessarily what he was actually
10   going to say.
11            But the problem is that unless I know what he's
12   going to say, I don't know whether or not what he is saying is
13   going to be admissible.  I also need to know the basis upon
14   which he is going to be saying what he is saying because I
15   understand the government is making a *Daubert* challenge.
16            But all things said and considered, the purpose
17   of the *Daubert* is not to prevent necessarily opinions that the
18   government disagrees with, because that is the whole purpose of
19   cross-examination.
20            I would have to make a determination that there
21   is no basis upon which -- in other words, he does not have a
22   foundation upon which he could opine or give an opinion of that
23   sort.
24            But, you know, he's claiming to be some sort of
25   person well-connected with the gun manufacturing portions of
```

```
1    society.
2                So, you know, I don't think the government is
3    objecting to -- I mean, obviously the government isn't
4    objecting to his status on certain things.  I don't believe the
5    government is challenging his background, as I understand it.
6           MR. FAERSTEIN:  We're challenging his specialized
7    knowledge to testify in this case how that is going to be
8    helpful to the jury.  And the report that the defense initially
9    proffered raised also significant doubts in our mind as to
10   whether he actually has any foundation and the facts of this
11   case, which is a requirement of Daubert, or whether he has the
12   legal foundation and reliability to testify on these issues
13   which is also a gatekeeping consideration under Daubert.
14          THE COURT:  Let's put it this way, we're going to
15   address the issue again.  I'm ordering the defense to give me
16   more precisely what he's going to say and more precisely the
17   basis upon which he can say what he wants to say.
18               So I will give the government another chance to
19   address it once we get a firmer foundation in that regard.
20          MR. ROBINSON:  In light of that, Your Honor, could
21   we also then defer any discussion on the 106 issues, because I
22   think that we would be speaking possibly -- hopefully a --
23          THE COURT:  When you say 106, what precise 106
24   issues are you referring to?
25          MR. ROBINSON:  I'm referring to the excerpts that we
```

1   submitted as supplement.  I think it goes directly to what

2   Mr. Faerstein and Mr. Haig are talking about with respect to

3   corroboration.

4            THE COURT:  It seems to me a portion, but not

5   necessarily everything, but a portion of what the additional

6   materials that the defense wants does to my mind, reference

7   this 80 percent thing.

8            And again, obviously, if I were to allow it to

9   come in, then it makes those portions of Mr. Schlotterbeck's

10  statements more relevant.

11           If I don't allow it in, then it wouldn't be

12  particularly helpful to anybody.

13           So I will postpone and put off until we have

14  resolved the Lieberman issue.

15           MR. BOYLE:  This is AUSA Boyle.  Might I briefly be

16  heard on that portion?

17           THE COURT:  Sure.

18           MR. BOYLE:  So, if we go to the updated filing you

19  ordered from the defendants on the statements, and I think that

20  was extremely helpful, Your Honor, because if we look at the

21  page -- the first page of their updated filing, they note that

22  the government lists three groups of excerpts.

23           We had six originally, we withdrew one because it

24  dealt with silencers and Your Honor ruled on that.

25           So of the three groups, three of these statements

```
 1   left, deal with the --
 2            THE COURT:  Let me stop you, for some reason you are
 3   fading in and out.
 4            MR. BOYLE:  My apologies, Your Honor.
 5            THE COURT:  Okay.  You said there were three groups
 6   and what?
 7            MR. BOYLE:  Yes.  The first group deals with
 8   Mr. Schlotterbeck's knowledge that he was dealing with a
 9   convicted felon.
10            THE COURT:  Those things are indicated on page 1 of
11   Docket No. 129, so your point is what?
12            MR. BOYLE:  The defendants aren't offering any
13   context or completeness statements about those, so there is
14   nothing to offer there.
15            The only statement which could potentially bring
16   in the 80 percent comment would be those -- would be the
17   Government's Exhibit C, which the defendants refer to as
18   Mr. Schlotterbeck's general knowledge of firearm licensing.
19            So there is only one statement the government has
20   offered which could potentially bring in this 80 percent
21   material.
22            I think if the Court looks at Exhibit C, the
23   Court will see that there is simply no --
24            THE COURT:  Let me stop you.  What about -- as I
25   understand it -- what about the defense's argument?  I mean,
```

**UNITED STATES DISTRICT COURT**

1   the defense is putting a lot of its eggs or their eggs on this

2   notion of manufacture, the definition of manufacture as opposed

3   to business of manufacture.

4           So, you know, if according to maybe their hope

5   that if for some reason the term "manufacturing" is held to be

6   indefinite or something of that sort, that if a defendant is

7   found not to have violated the manufacturing element for one

8   reason or another, then the business of manufacturing kind of

9   goes away if the underlying manufacturing is somehow gotten rid

10  of.

11          What is your response to that?

12          MR. BOYLE:  My response, Your Honor, is that may be

13  a viable theory if the defendants choose to testify, but what

14  we're talking about is the defendants trying to inject their

15  statements in through the rule of completeness.

16          So they can't put in a statement that they like,

17  that they think would help support the theory, they have to

18  find a statement that the government misleadingly tailored or

19  edited it, and that simply doesn't exist here.

20          The defendants have to choose whether they are

21  going to testify and put in this theory, or they have to find

22  something that would fall under the rule of completeness where

23  the government edited or altered a statement to make it

24  misleading.

25          I think if the Court looks at Exhibit C, which is

```
 1  the only portion they identify of somehow giving basis for this
 2  rule of completeness argument, there is just nothing misleading
 3  there, Your Honor.  I will read it to the Court.
 4          THE COURT:  Don't read it to me, because I will
 5  forget between now and then.
 6              I'm going to postpone the ruling on this.  I want
 7  to see how the thing plays out insofar as what Mr. Lieberman is
 8  going to be allowed to say.  Then at that point in time, I will
 9  be better versed in deciding in terms of how much
10  Mr. Schlotterbeck's statements will be able to come in or if
11  any additional stuff will come in other than what the
12  government wants.
13              I'm not disagreeing with you at this time,
14  Mr. Boyle, I'm saying there is no sense in my drawing a line in
15  the sand now because how I rule on Mr. Lieberman might affect
16  my ruling on this aspect as well.
17          MR. BOYLE:  Then I will submit for now, Your Honor.
18          THE COURT:  All right.  What else do we need to
19  discuss other than just housekeeping matters at this point?
20          MR. HAIG:  I have got one minor thing that wasn't on
21  the calendar, but it does relate to a ruling that the Court
22  made last week.
23              If the Court recalls it allowed the sale of a
24  high-capacity magazine that was part of one of the AR-15 or
25  more than one of the AR-15 sales.
```

1             There is a current case before the United States
2    Supreme Court called *Duncan versus Bonta*.  It's Docket
3    Number 21-1194, and that is a challenge to the
4    constitutionality, and I hate to go back to this, but
5    challenges the constitutionality of the high-capacity magazine
6    ban in California.
7             It's an interesting issue, and the reason it's an
8    interesting issue because Mr. Schlotterbeck made a comment
9    about the perceived illegality of that; however, in light of
10   *New York Pistol and Rifle Association versus Bruen*, the case
11   that was decided by the U.S. Supreme Court last week, where
12   they abrogated the two-step approach that the U.S. Court of
13   Appeal in Ninth Circuit used to affirm the constitutionality of
14   that statute.  Most legal scholars are saying that that --
15         THE COURT:  That raises two issues.
16            The first issue is whether or not that law will
17   go by the way side and be declared unconstitutional, which is
18   one aspect.
19            Another aspect, which is an interesting
20   tangential interesting aspect is well is at the time he made
21   the statement, it was illegal under California law.
22            Can that knowledge of illegality be used against
23   him in a situation where even if that statute was found to be
24   unconstitutional, he thought it was -- he knew he was aware of
25   that law that prohibited it at the time.

```
 1          MR. ROBINSON:  Your Honor, if we're going to address
 2   this in the felon sales to a felon motion, I guess it becomes
 3   sort of an ex post facto thought --
 4          THE COURT:  I'm saying that Mr. Haig is bringing it
 5   up.  We're not going to resolve the issue now, but it's
 6   something that perhaps we should address.
 7          MR. HAIG:  Well, I brought it up briefly when we had
 8   a conference call with the government yesterday, I think I did,
 9   but if we didn't, I apologize.
10          I just wanted to make sure that I let everybody
11   know that the -- let the Court know that will probably be
12   something that it will have to consider.
13          I agree with what you just said, it's kind of a
14   strange thing, the law maybe declared unconstitutional, but at
15   the time, it's your actual thought process that might be more
16   important.
17          So I don't know how that is going to come out.
18          THE COURT:  I don't know what the law is on that, I
19   don't know of any cases that specifically addresses it, but
20   probably some Court somewhere has.
21          Let me also ask one last thing, do you guys want
22   to try to resolve the case?
23          MR. HAIG:  Your Honor, there have been discussions
24   that got somewhere, but not too close.  Actually, we got fairly
25   close, Mr. Vlha and I.
```

**UNITED STATES DISTRICT COURT**

1          THE COURT:  He's going to abandon Mr. Schlotterbeck?

2          MR. HAIG:  No, no, it has nothing to do with that.

3   It's just that we were --

4          THE COURT:  Let me put it this way, I think all of

5   us recognize the fact this area is constantly evolving, and you

6   know, you guys could spend a lot of time and money doing this,

7   but in the end, the issue, if the government gets conviction,

8   it may go up to higher Courts and who knows what is going to

9   happen then.

10          But conversely, the government is still

11  interested in getting some pound of flesh, so maybe it's a

12  situation where the parties can discuss and see if they can

13  resolve the matter rather than getting something for certain

14  rather than living in a situation where there is a lot

15  high-level of uncertainty.

16          MR. ROBINSON:  We also discussed, and I know the

17  Court -- we're not treading on Rule 11 here, I hope.

18          THE COURT:  No.  I can't force you guys to settle.

19  I am just saying it's always a good opportunity at this point

20  in time to see if you can resolve it, especially since new

21  developments have occurred.

22          MR. ROBINSON:  We have talked in the past about

23  conditional pleas and that kind of thing, and I'm not saying

24  that the government is in a position to agree with that, but

25  given what we have here, I think it would be wise for us to at

48

```
 1   least talk about the possibility of conditional pleas or a
 2   court trial or something like that.
 3             Like I said earlier, 90 percent of this case is
 4   all about what the law is or what it will be, and it's a
 5   very -- it's a fascinating part of the law that is evolving.
 6             THE COURT:  Just a comment that I have, I have at
 7   this point in time a case which involved medical marijuana and
 8   certain aspects of medical marijuana, and it was a criminal
 9   case.
10             And I think I rendered a decision in that case --
11   well, let's put it this way, it's been on appeal now for over
12   ten years.  It's still on appeal over ten years.
13             Sometimes these interesting cases involve
14   changing conditions and there are strange aspects that occur in
15   that regard.
16             Sometimes it's better to have a bird in the hand
17   rather than chasing after birds in the open.
18             MR. HAIG:  After saying that, Your Honor, our
19   request for short continuance is looking better.
20             THE COURT:  You know, it works against asking for a
21   continuance, because now it's not my problem, it's the
22   Appellate Court's problem.
23             Let's talk about scheduling now.
24             MR. FAERSTEIN:  Your Honor, may I jump in with one
25   other substantive point that goes back to a ruling Your Honor
```

49

1    made on last Thursday?

2              THE COURT:  Yes.

3              MR. FAERSTEIN:  With respect to the silencer issue,

4    the discussions of purchasing silencers by the defendants from

5    the UC and the CI.

6                   We have looked back at the recordings and there

7    is going to be some recordings we're not going to use anymore.

8                   There are others -- there is one that we can edit

9    but there are a few, two or three recordings where the parties,

10   the defendants and the customers are speaking about the topic

11   of silencers, but very obliquely.

12                  And it is not even -- no words are used that

13   would lead a juror to understand what they are talking about.

14   It's kind of part and parcel of their conversation about the

15   sales of firearms, and if we don't bring it up -- if the

16   witness doesn't say, oh, that was -- we were talking about

17   potentially buying silencers, so it seems to us that there is

18   nothing that would --

19             THE COURT:  Well, let me do it this way, why don't

20   you propose to the defense, see what the defense's response is.

21                  If you can reach a agreement, that is fine with

22   me.  If you can't reach an agreement, you can always make a

23   request that I can consider it based upon a new edited version

24   of those portions that you want in.

25             MR. ROBINSON:  We can work something out on that.

**UNITED STATES DISTRICT COURT**

```
 1    It shouldn't be difficult.
 2             THE COURT:  So let's talk about scheduling.
 3             MR. HAIG:  Your Honor, I'm leaving today, I will be
 4    back on July 7th in the evening.
 5             So, really from July 8th, I have got the Court --
 6    the case I had today in Judge Lynch's Court, and she said hi to
 7    you as well.
 8             On July 8th, I have a trial starting in that case
 9    on July 11th, but it might get resolved.
10             THE COURT:  Uh-huh.
11             MR. HAIG:  It's a retrial, so there is no time
12    waiver from the defendant on that case.
13             That's only about a week long, but that whole
14    week of July 11th, I'm available, and I can even be here on
15    July 8th, if the Court wants us to be.
16             THE COURT:  No.  Why would I have you -- first of
17    all, we have to discuss when all of this additional briefing
18    and all of this additional submissions are going to be made.
19             I'm obviously going to have to have time to look
20    at it.  I don't always like to shoot from the seat of my pants,
21    although apparently I do it a lot.
22             MR. HAIG:  You have got two people named Robinson
23    that are on the call.
24             THE COURT:  It may be the big Robinson and the
25    minion?
```

```
 1            MR. HAIG:  I have read what she writes, and she's

 2   anything but a minion.

 3            THE COURT:  She's probably better than he is.

 4            MR. HAIG:  Oh yeah, just between us.

 5            MR. ROBINSON:  There is no question about that, Your

 6   Honor, it's fairly well known.

 7            MR. HAIG:  I will be in communication with them for

 8   sure.

 9            THE COURT:  Again, because I'm going to be gone

10   starting from the 17th through the 21st, so I'm not going to be

11   able to start -- we're still going to be starting the trial the

12   day after I get back, so I would probably want to talk with you

13   guys certainly on the 11th, and if it's necessary on the 14th.

14            I want to get some materials so I can look at the

15   stuff so we can have a better conversation.

16            So, why don't you guys give me whatever you

17   can -- well, let me ask Mr. Haig, are you giving Mr. Robinson

18   and Ms. Robinson the ability to file stuff for you?

19            MR. HAIG:  Yes.  As you can see, Your Honor, a lot

20   of our papers are -- most of them are jointly filed, and we

21   have corroborated on much of our work where it makes sense to

22   corroborate.

23            The only one we haven't is the 106.

24            THE COURT:  Sure.  Why don't we have you file

25   everything you can by noon on the 6th of July, and we will talk
```

**UNITED STATES DISTRICT COURT**

1   about the stuff on July 11th.

2           Also, you guys are going to give me -- just to

3   make sure all of the rest of the stuff is fine, like, the

4   witness list and all of the other type of stuff we have already

5   dealt with, so all of this stuff is prepared at this point.

6           MR. HAIG:  What time on 11th?

7           THE COURT:  8:30.

8           MR. HAIG:  Let me check my calendar.

9           THE COURT:  Where are you going?  Are you going to

10  Ireland?

11          MR. HAIG:  London.  I'm going to Wimbledon on

12  July 4th, Your Honor.  I am very excited about that.

13          THE COURT:  Why?  You just go like this all day.

14                  (Court indicating.)

15          MR. HAIG:  So actually, my seats are behind the --

16          THE COURT:  All right.  Anything else from the

17  government?

18          MR. BOYLE:  Your Honor, from the government, I note

19  under Rule 12(d), the Court is empowered to defer consideration

20  of a pretrial motion.

21          So specifically with request to this new

22  constitutional motion, the Court is empowered to consider that

23  motion after trial so long as it doesn't interfere with either

24  a conviction or the right to appeal.

25          I don't know that this is a matter we have to

53

```
 1    resolve pre-trial, particularly, considering it's a question of

 2    law.

 3               THE COURT:  I'm not indicating I'm intending to

 4    resolve it pre-trial.

 5               I just want to make sure that everything --

 6    because again, as I have indicated, I don't think that much of

 7    what they are saying is an issue of law.  And again, what they

 8    are arguing, in fact, is what they expect the law to be, not

 9    necessarily what the law is at this point in time.

10               So I think what I have said so far, I don't think

11    what they have said has caused me to change my views on what

12    the law is.

13               Although, I might be fearful as to what the law

14    may be in the future, as you will be, but not what the law is

15    at this point in time.

16               So I agree with you, I don't have to resolve it

17    prior to trial.  Although, I would want to have some, I guess,

18    some discussion -- let's put it this way, what I might very

19    well do is I could tell the defense what exactly do you expect

20    that the law to be or law to have changed to that would affect

21    how I would conduct this trial?

22               If you don't expect that it's going to come about

23    unless I make the actual ruling in the course of the case, then

24    why would I do anything different for purposes of the trial?

25               MR. ROBINSON:  We will present to you the reasons
```

```
1    why we believe that ruling needs to take place before the jury

2    is instructed and before the parties present their cases.

3              We will have that for you by the 6th, that won't

4    be difficult, Your Honor.

5              THE COURT:  Okay.

6              MR. ROBINSON:  We're in good shape.

7              THE COURT:  Anything else we need to discuss at this

8    point?

9              MR. FAERSTEIN:  Just to clarify, the 6th is the

10   deadline for the submission by all parties -- that would be the

11   defense's motions and the government's opposition?

12             THE COURT:  No, no.  I just want by the 6th the

13   defense and the government to have discussed the issue, because

14   I want to know precisely those legal arguments that the defense

15   wants to make and how the defense feels that that could affect,

16   for example, specific jury instructions that the Court would be

17   giving in this case, and then I just want the government's

18   short response.

19             I'm not going to resolve the issue, I just want

20   to be informed because it may dawn on me, okay, actually, I

21   think now the defendant is right, in which case, I probably

22   would continue the trial or something of that sort.

23             But I might say, well, I understand that the

24   defense has a wish list of what they want the Appellate Courts

25   to do in the future, but that is like a wish list and I want to
```

```
 1    win the lottery too.
 2              Sorry, I didn't hear Mr. Robinson?
 3              MR. ROBINSON:  We're hoping to win the lottery and
 4    get a new date for the trial.  We will work for Mr. Faerstein
 5    and Mr. Boyle.
 6              THE COURT:  We can all do a pool and see if we can
 7    get this Quick 6 or whatever it is.
 8              MR. HAIG:  Your Honor, on the 6th, you want us to
 9    flesh out more of what Mr. Lieberman is going to specifically
10    be saying?
11              THE COURT:  Yes, that is primarily what I want.
12    That is No. 1 thing, I want to know what exactly his opinions
13    are going to be specifically and the basis for those.
14              And again, but you guys need to coordinate with
15    the government, because again, I want there to be both sides
16    represented in this regard, and if you guys could do it in one
17    document for each of these things, that would be the best
18    because that would make it really quick for me to get into all
19    of this stuff.
20              MR. FAERSTEIN:  Your Honor, given the long holiday
21    weekend, it seems like we're going to have to do a lot of
22    coordination back and forth.
23              THE COURT:  All right.  By noon on the 7th.
24              MR. FAERSTEIN:  Thank you, Your Honor.
25              THE COURT:  Anything else from anyone?
```

**UNITED STATES DISTRICT COURT**

```
 1              MR. ROBINSON:  No.  Thank you very much.

 2              THE COURT:  Everybody, have a very, very nice day

 3   and have a happy 4th, and Mr. Haig, don't drink too much of

 4   that alcoholic stuff.

 5              MR. HAIG:  That ruins it for me than makes it fun,

 6   but thank you anyway.

 7              THE COURT:  Are you speaking from experience?

 8              MR. ROBINSON:  We will make up for it back here.

 9              THE COURT:  All right.  Everybody, have a nice

10   weekend.

11              MR. FAERSTEIN:  Thank you, Your Honor.

12              (The proceedings concluded at 11:20 a.m.)

13                          *  *  *

14

15

16

17

18

19

20

21

22

23

24

25
```

UNITED STATES DISTRICT COURT

57

1          **CERTIFICATE OF OFFICIAL REPORTER**

2

3     COUNTY OF LOS ANGELES    )
                               )
4     STATE OF CALIFORNIA      )

5

6              I, TERRI A. HOURIGAN, Federal Official Realtime

7     Court Reporter, in and for the United States District Court for

8     the Central District of California, do hereby certify that

9     pursuant to Section 753, Title 28, United States Code that the

10    foregoing is a true and correct transcript of the

11    stenographically reported proceedings held in the

12    above-entitled matter and that the transcript page format is in

13    conformance with the regulations of the judicial conference of

14    the United States.

15

16    Date: 8th day of July, 2022.

17

18

19                             /s/ TERRI A. HOURIGAN
                          _____
20                        TERRI A. HOURIGAN, CSR NO. 3838, RPR, CRR
                                   Federal Court Reporter
21

22

23

24

25

**UNITED STATES DISTRICT COURT**

ER288



UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA - CENTRAL DIVISION

HONORABLE GEORGE H. WU, U.S. DISTRICT JUDGE

UNITED STATES OF AMERICA,

                    Plaintiff,

        vs.                              Case No. CR 19-343-GW

TRAVIS SCHLOTTERBECK,
JAMES BRADLEY VLHA,
                    Defendants.
_____/


REPORTER'S TRANSCRIPT OF
PRETRIAL CONFERENCE
Thursday, June 23, 2022
8:30 a.m.
LOS ANGELES, CALIFORNIA


TERRI A. HOURIGAN, CSR NO. 3838, CCRR
FEDERAL OFFICIAL COURT REPORTER
350 WEST FIRST STREET, ROOM 4311
LOS ANGELES, CALIFORNIA  90012
(213) 894-2849

```
1                    APPEARANCES OF COUNSEL:

2

3    FOR THE PLAINTIFF:

4        UNITED STATES ATTORNEY'S OFFICE
         United States Attorney
5        BY:  BRIAN R. FAERSTEIN
             DANIEL BOYLE
6         Assistant United States Attorneys
         United States Courthouse
7        312 North Spring Street
         Los Angeles, California  90012
8

9
     FOR THE DEFENDANT:  TRAVIS SCHLOTTERBECK
10
         EDWARD M. ROBINSON, A PROFESSIONAL LAW CORPORATION
11       BY:  EDWARD M. ROBINSON
             BRIAN A. ROBINSON
12       Attorneys at Law
         21515 Hawthorne Boulevard, Suite 730
13       Torrance, California  90503

14

15   FOR THE DEFENDANT:  JAMES BRADLEY VLHA

16       LAW OFFICE OF JEROME J. HAIG
         BY: JEROME J. HAIG
17       Attorney at Law
         21143 Hawthorne Boulevard, Suite 454
18       Torrance, California  90503

19

20

21

22

23

24

25
```

```
 1              LOS ANGELES, CALIFORNIA; THURSDAY, JUNE 23, 2022

 2                              8:30 a.m.

 3                              --oOo--

 4              THE COURT:  All right.  Let me call the matter of

 5   United States versus Schlotterbeck and Vlha.

 6              Let me have appearances starting with government

 7   counsel first.

 8              MR. BOYLE:  This is AUSA Dan Boyle.  I believe Brian

 9   Faerstein is dialing in as we speak.

10              THE COURT:  All right.

11              THE COURTROOM DEPUTY:  I will allow him once we have

12   him, Judge.

13              THE COURT:  We also have the defendants.

14              THE COURTROOM DEPUTY:  Mr. Schlotterbeck, please

15   start your video.

16              THE COURT:  Let me ask Mr. Boyle, where is your

17   cohort actually signing on?

18              MR. BOYLE:  Mr. Faerstein is attempting to sign in

19   now.  I just messaged him, Your Honor.

20              My apologies for the delay.

21              THE COURT:  He's on.

22              All right.  For the defense, we have?

23              MR. ROBINSON:  Good afternoon, Edward Robinson and

24   Brian Robinson is with me.  He's not on the screen, and we are

25   here virtually with Mr. Schlotterbeck, who is also present.
```

4

```
1          THE COURT:  And the other defense counsel, you are

2    muted.

3          MR. HAIG:  Sorry, Jerome Haig appearing for

4    Mr. Vlha, who is also present via WEBEX at a separate location

5    from myself.

6          THE COURT:  There has already been a waiver filed?

7          MR. HAIG:  Yes, Your Honor.

8          THE COURT:  All right.  As to both defendants?

9          THE COURTROOM DEPUTY:  Yes.

10         THE COURT:  All right.  We're here for pretrial.

11   There is lots to talk about today.

12             Let me ask this question, the matter is currently

13   set for trial on July the 12th.

14             Let me ask, I don't know if I can get a July 12th

15   date, because I have to put in and I'm going to try to get it,

16   but let me ask, how long is this case expected to last?

17         MR. FAERSTEIN:  Well, Your Honor, you know, I think

18   originally the government was projecting four to five days and

19   that would include what we anticipate would be the defense

20   cross-examination of the case, I think closer to five.

21             And that was I think our intention with our prior

22   dates.  We understand Your Honor has another trial the week

23   after, I'm not certain if that is not scheduled.

24         THE COURT:  I have lots of trials, but the other

25   problem I'm attending a conference between the 18th and 21st of
```

ER292

```
 1   July.  And so I presume you don't want this case to be broken

 2   up, so if there is the possibility of it being a five-day

 3   trial, we're not going to be able to do it in the time between

 4   the 12th and the 15th, and that is assuming I can get the 12th.

 5            So if I can't get the day I asked for, if that is

 6   the case, do you want to postpone this for another point in

 7   time?

 8            MR. HAIG:  I think that is a good idea.  I don't see

 9   that we could get the trial done before the 18th, Your Honor,

10   not in my view.

11            THE COURT:  Mr. Robinson?  What is your client's

12   position?

13            MR. ROBINSON:  We would agree with Mr. Haig's

14   statement.  We are not opposed to continuing the matter.  I

15   think I put this on the record last time that my daughter is

16   getting married on September 17th, out of town, and I need the

17   week before open.

18            THE COURT:  Let's put it this way, I'm not going to

19   deprive you of that expense, you are paying for it, I presume?

20            MR. ROBINSON:  I'm paying for it as we speak, Your

21   Honor.

22            THE COURT:  I won't deprive you of that expenditure.

23   Just so I'm very clear on this, when would you have to leave,

24   you would have to leave by what date?

25            MR. ROBINSON:  Your Honor, the week before.  One
```

1    second, please let me grab my -- I think the week before the

2    wedding is September 12th, 13th, 14th, 15th, 16th, I can't do a

3    trial.

4                THE COURT:  For example, if the trial were to end by

5    September 9th, you could do the trial?

6                MR. ROBINSON:  If the trial were to end?

7                THE COURT:  September 9th, sorry, I misspoke.

8                MR. ROBINSON:  Yes, Your Honor, I would be able

9    to -- I can do that.

10                THE COURT:  Okay.

11                MR. ROBINSON:  But I do know we have discussed this

12   with the government, and they had an issue in August, as I

13   recall.

14                THE COURT:  Let me ask the government, do you guys

15   still have an issue in August?

16                MR. FAERSTEIN:  Yes, Your Honor.  We have witness

17   availability issues in August, and my co-counsel has

18   availability issues that are not movable at the end of August

19   and early September, so July was our hopes.

20                THE COURT:  Let me ask you this, you are talking

21   about Mr. Boyle's schedule?

22                MR. BOYLE:  Yes.

23                THE COURT:  Let me ask Mr. Boyle, when do you have

24   to leave or do you have another matter?

25                MR. BOYLE:  It's not so much departure as an

1  arrival, Your Honor.  My wife is due with our second child in

2  late August.

3          THE COURT:  You can't tell her to hold off on it for

4  a little bit while you finish this trial?

5          MR. BOYLE:  My wife apparently wants the child to

6  arrive sooner than later.  We would strongly like to keep the

7  current trial date, doing whatever is possible to keep that

8  date.

9          THE COURT:  Well, the only problem is it would cause

10 there to be a situation where we would have to take a four-day

11 break in between.

12          In other words, assuming that I can get the 12th

13 of July, but I don't even know if I can get the 12th of July, I

14 have to ask.

15          I tell you what, so let me just ask Mr. Boyle,

16 her due date is when?

17          MR. BOYLE:  It is currently the last week of August,

18 Your Honor.

19          THE COURT:  So if you were in trial the first week

20 of August, that wouldn't be a problem?

21          MR. BOYLE:  If the Court sets a trial date the first

22 week of August, I will make that work and the government, of

23 course, will make that work, Your Honor.

24          THE COURT:  All right.  Why don't I do this, let me

25 see what I can do about dates and then I will get back to you

1   guys.

2              What I will do is I will set this matter back on

3   calendar just for scheduling discussions on the 30th of June.

4              MR. HAIG:  Your Honor, if that is the case, this is

5   Jerome Haig, could Mr. Robinson stand in for me?  I'm going to

6   be in England on vacation from next Tuesday, well, actually I'm

7   going on a staggered vacation that starts tomorrow, and I won't

8   be back until July 7th, but I will be out of the country

9   starting on June -- next Tuesday, which will be June 28th.

10             THE COURT:  Okay.

11             MR. HAIG:  If Mr. Robinson is standing in, I am okay

12  with that.

13             THE COURT:  Why don't we have Mr. Robinson stand in

14  for you.

15             MR. HAIG:  If he's all right with that?

16             MR. ROBINSON:  I am.

17             THE COURT:  Actually, you are going to be back by?

18             MR. HAIG:  I'm back on the evening of July 7th.

19             THE COURT:  In that case, I will put it for June

20  the 30th, and it will just be discussing scheduling and so just

21  give Mr. Robinson your availability.

22             MR. HAIG: All right.

23             MR. FAERSTEIN:  Your Honor, if I may -- just I guess

24  preview one issue.  I was just checking our witness

25  availability schedule, and I don't know if this was prepared

9

| | |
|---|---|
| 1 | for the last hearing, we had -- one of our key witnesses is out |
| 2 | the first two weeks of August. |
| 3 | I think it's a pre-planned vacation, it's the |
| 4 | kind of thing that we're going to be having to navigate in |
| 5 | August, so I will, of course, confirm that, but I am expecting |
| 6 | that that is not going to work. |
| 7 | THE COURT: Well, we will talk about that on the |
| 8 | 30th. |
| 9 | You can clue me in, and, again, since I'm in part |
| 10 | continuing this because I'm going to be at a conference, |
| 11 | obviously, I'm not going to deprive Mr. Robinson of his |
| 12 | wedding, and Mr. Haig his English beer, and Mr. Boyle with yet |
| 13 | another child, I will accommodate everybody. |
| 14 | MR. HAIG: Your Honor, just so you know, and I know |
| 15 | it doesn't really matter, but I have got a family issue the |
| 16 | same week that Mr. Robinson does as well. I know that the |
| 17 | Court wasn't going to interrupt that. |
| 18 | THE COURT: Well, let's put it this way, if he can't |
| 19 | be available, I'm not going to have you standing in his place. |
| 20 | MR. HAIG: For planning purposes, not that I'm a |
| 21 | huge beer drinker, is the Court envisioning continuing the 7/12 |
| 22 | date yet? |
| 23 | THE COURT: I don't know if I can get the 7/12 date; |
| 24 | in other words, I don't know because in our district we have to |
| 25 | make arrangements with the Chief Judge and, you know, so what |

**UNITED STATES DISTRICT COURT**

```
 1   he does is every two weeks on a Friday he asks for those judges
 2   who have trials within the next following two weeks to give him
 3   a list, and then what he does is he sets dates.
 4            Like, for example, I'm going to start a trial on
 5   June the 30th, but I previously asked that I be able to start
 6   on June the 28th.  He couldn't give me the 28th, so I'm
 7   starting on June 30th.
 8            I was planning to make a request for July
 9   the 12th, but I don't know if I could get July 12th, it might
10   very well be if I ask for July 12th, I might not get July 12th,
11   I might get something else.
12            MR. HAIG:  If you get July 12th, hypothetically, you
13   are going to be gone for those four days, then we have already
14   said the 12th isn't going to work.
15            THE COURT:  Let me ask you this, I'm thinking about
16   trying to start maybe on the 22nd of July, because that is a
17   date that most people don't like, it's a Friday, not as many
18   judges would be asking for a Friday start date, so I can make a
19   request to start on the July the 22nd, because that would
20   hopefully complete the trial within the first week of August or
21   something of that sort.
22            Let me ask, Javier, what are the other cases I
23   have?
24            THE COURTROOM DEPUTY:  You have the Zendejas trial,
25   that is for the 19th of July.
```

```
 1              THE COURT:  Uh-huh.

 2              THE COURTROOM DEPUTY:  I don't know if they're going

 3    to start before 7/25.

 4              THE COURT:  If we could start -- okay, like some

 5    time on July 8th or something like that.  I have to see what

 6    Judge Gutierrez says.  I think I can do that, so if I were to

 7    see if we can get July the 22nd as a start date, I envision

 8    this case would not take more than five days, right?

 9              MR. ROBINSON:  Edward Robinson.  My only concern

10    with that is I have a healthcare fraud case in front of Judge

11    Wright that is set for the 26th of July, and to the extent

12    anything is ever etched in stone, that one is.  It's old like

13    this case.

14              This case might be -- it's an old healthcare

15    fraud case, and I have -- I don't want to tread on his

16    schedule.  I appreciate the timing of all of these things, but

17    that is something I should consider.

18              THE COURT:  He is going to be in the same position,

19    he may ask for that day, but he might not get it.

20              MR. ROBINSON:  True.

21              THE COURT:  I mean, if you start a case, you start a

22    case, and you can just blame me.  Judge Wright and I are -- he

23    started I think two weeks before I did on the federal bench, so

24    we're kind of, like, chummy, so just blame me, that will be all

25    right with him.
```

1          MR. ROBINSON:  Okay.

2          THE COURT:  I will try to shoot for the 22nd of

3    July, but we will talk about it again on the 30th and we will

4    see what the situation is at that point in time.

5          MR. HAIG:  Is the 12th, like, out?

6          THE COURT:  I'm going to see.  I will let you guys

7    know further on, on the 30th.  I'm going to be talking to Judge

8    Gutierrez to see what the lay of the land is.

9               Let's get back to the pretrial, that's what we're

10   here for.  I will try to get as much done as we can at this

11   point.

12              I have the government's statement of the case.  I

13   want a joint statement of the case.  If the parties can't agree

14   on a joint statement, I will read the indictment, I presume,

15   you would rather have me read the indictment?  You would

16   probably want to get together on a joint statement of the case,

17   so, I would want that.

18              I have the joint exhibit list, and with the

19   stipulations regarding the evidence, that is fine.  I also have

20   a joint witness list, that seems to be fine.

21              A joint verdict form, which seems to be fine.  I

22   do have joint jury instructions and disputed jury instructions

23   and supplemental disputed jury instructions, and the closer it

24   gets to the trial date, I will look at all of that stuff and

25   talk to you guys further about that, but I wanted to indicate I

```
 1    have that.
 2              I also have stipulations of fact.  The only
 3    question I had about the stipulations of fact is how is that
 4    going to be presented to the jury?  Is it going to be a
 5    situation where on Day 1, they will get a copy of that, or is
 6    it going to be the situation where somebody would read it to
 7    the jury at some point in time?
 8              How are the parties thinking that is going to be
 9    presented?
10         MR. FAERSTEIN:  This is Brian Faerstein speaking for
11    the government.
12              I think our intention is to read them to the
13    jury, either at the beginning or maybe the end of our case.  Of
14    course, we're open to the Court's preferences with respect to
15    that.
16         THE COURT:  Probably it would be better to read it
17    to them.  I haven't looked at what the facts are.  Usually
18    normally, it's a situation where you read them at the start of
19    the case, but also they are facts that the jury would get a
20    copy of them and so that is a suggestion, but again, if you
21    guys agree, I will agree with your agreement.
22         MR. FAERSTEIN:  I was going to say, I should have
23    mentioned it, it would be our intention to mark them as
24    exhibits as well.  I suppose in that way we would move to admit
25    the exhibits of each stipulation and read it.
```

 1          THE COURT:  Let me put it this way, each stipulation
 2   would not be an exhibit.  In other words, there would be a
 3   single document which would be the stipulations, that would be
 4   marked as an exhibit, I have no problem with that, but I don't
 5   see that you would be marking each stipulation as a separate
 6   exhibit, there is no need.
 7          MR. FAERSTEIN:  That's fine, Your Honor.
 8          THE COURT:  All right.  Mr. Haig, do you have
 9   something else you wanted to add?
10          MR. HAIG:  Well, just sometimes reading them at the
11   beginning of the case, the jury might not even know the context
12   yet.  So, I think we can figure out when is the best time to
13   read it.
14          THE COURT:  I'm not insisting, so if you guys all
15   agree, then whatever you agree upon, I would agree upon.
16              What I would also need is I would need the voir
17   dire questions from both sides.  I haven't gotten that yet.
18   Let me just indicate, I do the voir dire, but I give each side
19   additional time to do follow-up questions, and I usually think
20   I'm fairly thorough about this, but what I also want each side
21   to do is give me their proposed voir dire questions.
22              Normally what I do is I give both sides ten
23   additional minutes after I finish my voir dire questions, and
24   if it's a situation where the attorneys have used up their time
25   but they want to ask some additional questions, just ask me on

1    a sidebar and let me know what the additional questions are.

2          Just, I don't want to waste time by asking the

3    jurors what their favorite magazine is.  If I think you have

4    wasted time or what a lot of attorneys do is they start

5    attempting to pre-condition jurors, which you can't do, and if

6    I find you have done that, I won't give you additional time.

7          If you ask good questions and you just need

8    additional time, I will usually give you additional time, but

9    that's the way I conduct voir dire.

10          MR. HAIG:  Would that be ten minutes for each

11    defendant or ten minutes for the defense total?

12          THE COURT:  Ten minutes each side.  Each of you

13    would get five minutes.

14          MR. HAIG:  I see.

15          THE COURT:  And we're going to have 12 jurors, two

16    alternates.  The government gets six peremptories and the

17    defense gets ten.  I'm not going to provide for extra

18    peremptories.  The defense will get ten.  They will be

19    exercising jointly, so each defendant would get five.  And as

20    to the alternates, each side gets one challenge, but if the

21    parties also say the parties can attempt to stipulate; in other

22    words, after the 12 original are given, if the parties can get

23    together and agree on the alternate jurors, they would agree

24    upon that, you can also agree on the order in which those

25    alternates would be staggered.  But if you can't, each side

```
 1   would get additional peremptories for a challenge.

 2             Also, the for cause challenges would be done on

 3   sidebar, the peremptories would be done in front of a jury.

 4             MR. FAERSTEIN:  May I just jump in with respect to

 5   the alternates.  During our last hearing the government raised

 6   the possibility of having more than two alternates, and given

 7   the rising COVID numbers, I think that is still a concern, and

 8   will be, unfortunately, in later July, so I think we discussed

 9   maybe three or four would be our preference.

10             THE COURT:  I wouldn't agree to four, I might agree

11   to three, but I wouldn't agree to four.  I'm not even going to

12   agree to three.  I don't know of any jurors that we have had

13   have had problems.  I mean, obviously it depends.  The closer

14   it gets, if the numbers, for example, get really bad, then

15   obviously, I have no problem with having more alternates, but

16   it really just depends on what the situation is at that point

17   in time.

18             The closer it gets, we will talk about it and

19   frankly, on the day of trial, you know, at this point in time

20   I'm going to say two, but on the day of trial, depending upon

21   what the statistics are, I could also agree to have more.

22             MR. FAERSTEIN:  Yes, Your Honor.

23             THE COURT:  Okay.  Any questions that either side

24   have about the voir dire at this point?

25             MR. FAERSTEIN:  No.
```

UNITED STATES DISTRICT COURT

1    THE COURT:  We also have a motion to dismiss.  I

2    issued a tentative on this.  I presume the Court's motion on

3    the motion to dismiss, everyone has seen it?

4         MR. FAERSTEIN:  Yes, Your Honor.

5         THE COURT:  Does somebody want to argue something?

6         MR. ROBINSON:  I don't want to argue anything other

7    than to say that -- and I think this applies to the difficulty

8    that we're having with respect to statement of the case.

9              To boil this trial down, it's going to come down

10   to whether or not the government can prove that either

11   defendants manufactured without a license, and we have attacked

12   the term "manufacturing" both factually and as implied.

13        THE COURT:  Let me stop you, do you really think

14   manufacturing is that vague?  I don't see the vagueness aspect

15   of it.

16             I have had lots of these cases, and to tell you

17   the honest truth, you are the first people that said, oh we

18   think that manufacturing is somewhat ambiguous.  I don't see

19   where the ambiguity is.

20        MR. ROBINSON:  Well, the ambiguity is based upon the

21   way in which the case is pled, but also the term itself.

22             The way the case is pled, and you can surmise

23   this is going to be our defense, is that there was a division

24   of labor, there was the milling of the lower receiver, which

25   you have seen does not amount to a firearm under the federal

```
 1   firearm law, and then the assembling of the parts.
 2           THE COURT:  Let me stop you.  Let me ask you, there
 3   is no dispute that in the end there were completely assembled
 4   AR-15s.
 5           Does anybody dispute that?
 6           MR. ROBINSON:  No.  They are not being -- the
 7   defendants are not being prosecuted for dealing the weapon
 8   without a license.
 9           The government elected not to pursue that object
10   of the conspiracy, and so all we're talking about, and the only
11   decision that the jury has to make in this case is whether or
12   not the defendants have manufactured without a license.
13           And manufacturing, if the Court were inclined to
14   define the term that allowed for a conviction based upon
15   assembling, as opposed to changing the nature of raw material,
16   then it would direct a verdict against the defendants.
17           Congress elected not to define the term
18   "manufacturing."  The government has cited a dictionary
19   definition.  We have cited a dictionary definition, they are at
20   odds with each other.
21           THE COURT:  Let me stop you.  I reference you to the
22   Fourth Circuit decision.  What is wrong with that definition?
23           MR. ROBINSON:  What is wrong with that definition,
24   and we addressed it in our reply brief, is that the *Broughman*
25   case is a civil case and it deals with regulation, and as we
```

1    all know what we're dealing with is the criminal statute, so

2    the vagueness challenge has to be dealt with at a much higher

3    level of scrutiny.

4            The only thing that was at issue in *Broughman* is

5    whether or not, I guess, you could call him an intervenor, the

6    plaintiff, whether he had to pay the additional $50 a year to

7    get a manufacturing license and a dealing license.

8            And the Circuit Court affirmed declaratory relief

9    just from the Circuit Court, and they said, well you have to

10   comply with the regulatory purpose, not the criminalizing of

11   the regulatory purpose of the Gun Safety Act making assembling

12   a weapon is enough for manufacturing, but that is not what we

13   have here.

14           This is really like the *Santos* case, the Supreme

15   Court case that dealt with the definition of proceeds to the

16   money laundering statute.  And the Supreme Court said proceeds

17   could be based upon a common usage and understanding of the

18   term the profits or gross revenue and the Supreme Court said

19   when we have got a criminal case, proceeds are acceptable by

20   two definitions, they are going to reverse the conviction, in

21   effect, direct Congress to define the term proceeds, which is

22   exactly what they did the following year.

23           Congress came back and said, well proceeds for

24   the purpose of money laundering in a criminal case is gross

25   receipts.  There is no definition of manufacturing in the

1    criminal code.

2              So, Mr. Schlotterbeck and Mr. Vlha could have

3    believed they weren't doing anything wrong because they are not

4    placed on notice that assembling is different from

5    manufacturing, and that they were trying to abide by the law,

6    so they are not acting willfully.

7              And if the Court is inclined to instruct the jury

8    to make available for usage or assembling is a proper

9    definition of the crime, they were never on notice at the time

10   they were engaged in this conduct that their behavior could be

11   prosecuted criminally and face prison time, and that's why we

12   have raised this vagueness challenge.

13         THE COURT:  Let me hear from the government, what is

14   the government's response?

15         MR. FAERSTEIN:  Yes, Your Honor.  And we laid this

16   all out in our briefing as well.

17              First, you know, it is our view, that the Fourth

18   Circuit decision in *Broughman*, which was, you know, adopted by

19   the District of Nevada in a criminal case in the context of,

20   you know, manufacturing ammunition without a license, which is

21   the same statute essentially that the assembly of firearms can

22   make them suitable for use is an adequate definition of

23   manufacturing, and it's a common meaning, and that's what the

24   Courts look to when a term is not defined by Congress.

25              That being said in this case, not only do we have

 1   the assembly of the completed firearms, we have from soup to

 2   nuts containing the parts, including unfinished parts as

 3   alleged in the indictment, arranging to have them machined,

 4   which changes the structure of the raw material for purposes of

 5   assembly, that lower receiver to the upper barrel and other

 6   components to complete -- finished completed firearms that they

 7   then sold.

 8                There is no notice issue here.  This is, as we

 9   decided -- as we argued that the Ninth Circuit has guided us

10   for these types of challenges.

11                This is an applied challenge and it clearly

12   incorporates, not only the assembly, but this additional aspect

13   of milling lower receivers in the context of the complete

14   manufacture of a completed weapon.

15           THE COURT:  Let me ask this, does the government

16   concede that it has waived the dealing aspect?

17           MR. FAERSTEIN:  We waived it, we are not going to be

18   arguing dealing at trial as an alternate theory, yes, Your

19   Honor.  I don't know when we waived it, but we will not be

20   presenting it to the jury as an alternate theory even though it

21   was part of the indictment.

22                But I will say -- sorry, Your Honor.

23           THE COURT:  Let me ask, can I ask why out of

24   curiosity is the situation where the government doesn't want to

25   present dealing at trial?

 1          MR. FAERSTEIN:  I prefer not to say, though, you

 2   know, it has to do with -- we think the manufacturing theory is

 3   not subject to any potential vagueness challenges, and we think

 4   it's for the reason we stated in our brief, whereas the dealing

 5   theory, you know, potentially they could have made an argument.

 6   Our view is the conduct in this case essentially is

 7   manufacturing firearms -- completed weapons for sale for the

 8   purpose of profit.

 9          THE COURT:  Let me ask Mr. Robinson, again, your

10   argument about manufacturing, you know, is applied in this

11   case.  I mean, in this case, the manufacturing was, you know,

12   the end result, and the end result is a completed operable

13   AK-15.  Why isn't that manufacturing?

14          MR. ROBINSON:  Your Honor, your question I would

15   suggest is based upon a premise that the selling or the giving

16   or the handing over of the completed weapon is somehow part of

17   the manufacturing process.  It's not.

18          Mr. Faerstein and Mr. Boyle have elected not to

19   pursue the dealing object, and we have formed our defense

20   strategy both legal and factual to that representation.  We

21   appreciate that.

22          So the question then becomes is giving the

23   unfinished lower receiver to a third party to mill, which

24   parenthetically, does not convert that lower receiver to a

25   handgun with the definition of the Handgun Safety Act and then

 1   assembling parts so that you have a completed firearm, because

 2   you can build your own weapon at home if you want, and you can

 3   get these other parts off the Internet if you want.

 4            These other parts that are attached to the lower

 5   receiver are not regulated, and because of those things --

 6   because of the efforts taken by Mr. Schlotterbeck and Mr. Vlha

 7   to not mill the lower receiver, maybe it is an issue of fact, I

 8   get that, but to not mill the lower receiver is done so that

 9   they can abide by the law.  Whether it's a loophole or not,

10   doesn't change the analysis.

11            So Congress has not defined manufacturing.  They

12   just haven't.  And the tag-along that it's done for profit does

13   not cure the vagueness with respect to the term.

14            THE COURT:  I agree with you, whether or not it's

15   sold is really irrelevant, they could give it away.

16            MR. ROBINSON:  Well --

17            THE COURT:  I mean, but the thing about it is, the

18   goal was a completed AR-15, that is the goal.

19            It's not a situation where they are, like, you

20   know, putting together, like, oh let's make 50 percent of it

21   and then throw it away or something of that sort, then I could

22   understand you may have an argument of some sort about whether

23   or not that particular item was manufactured.

24            But the end result of -- I mean, it's a

25   conspiracy too.  In other words, the government has alleged a

24

1   conspiracy to end up with completed AR-15s.

2           So, you know, in that context, I don't see why

3   the term "manufacturing" is vague.

4           MR. ROBINSON:  Let me raise this issue now, because

5   I think it's going to inform -- it's going to inform the

6   defense's objections and legal theory throughout this

7   prosecution.

8           Let's assume that there is an agreement between

9   the defendants that they are not going to be involved with the

10  milling of a lower receiver, that that is going to be milled by

11  the purchaser of the lower receiver.

12          By the way, when the person purchases the lower

13  receiver, it's not a firearm, and therefore, there is no

14  license requirement, so if you --

15          THE COURT:  Let me stop you.  Actually, I agree with

16  that.  I presume the government agrees with that as well?

17          MR. FAERSTEIN:  Purchasing an unfinished lower

18  receiver does not require -- to sell an unfinished lower

19  receiver does not require a license; is that the proposition,

20  Your Honor?

21          THE COURT:  Yes.

22          MR. FAERSTEIN:  Unfinished lower receivers were not

23  subject to serialization and manufacturing licenses.

24          What I will just say in terms of where

25  Mr. Robinson is going, but what he is describing is not what is

**UNITED STATES DISTRICT COURT**

```
 1    alleged in this indictment and is not what the facts are going
 2    to bear out at trial.
 3              So, you know, in terms of this being a motion to
 4    dismiss, we're going a bit far afield of not only the
 5    allegations, but also the facts.
 6              MR. ROBINSON:  Let me address what Mr. Faerstein has
 7    just said.
 8              Whether that is the case or not, the definition
 9    of the term "manufacturing" in our position, it cannot be
10    defined by the parties through a suggestion to the Court with
11    respect to just any definition.
12              It can't be defined in a way that would have
13    given Mr. Schlotterbeck and Mr. Vlha notice at the time they
14    were doing that -- what they were doing is illegal.
15              So let me just finish this point, and then I will
16    stop talking.
17              We have evidence of an agreement between Vlha,
18    Schlotterbeck and others that they are not going to do the
19    milling, that the purchaser of the unregulated unfinished lower
20    receiver is the one who is going to do the milling.  That
21    receiver is brought back and then there is assembling of the
22    AR-15.
23              Then, that is assembly --
24              THE COURT:  That is precisely the problem.  I don't
25    understand why you don't think that the assembling -- why the
```

1    assembling can't constitute manufacturing?

2         MR. ROBINSON:  Because the common ordinary

3    dictionary definition, which is the first tentative

4    construction for manufacturing, does not include assembling,

5    so, if the --

6         THE COURT:  Let me ask, is a Ford Motor car

7    manufactured?

8         MR. ROBINSON:  It's manufactured, and then it's

9    assembled.  The parts are manufactured, they are forged and

10   milled or whatever that may be.

11        THE COURT:  But Ford is considered to be a

12   manufacturer of automobiles, isn't it?

13        MR. ROBINSON:  Well, I guess.

14        THE COURT:  If you are just saying that there is no

15   manufacture because certain components are not finalized by the

16   conspirators -- alleged conspirators, but are in fact given to

17   somebody else to do something with, and then given back in a

18   completed form, and then those parts are assembled, hey, it

19   seems to me there is a manufacturer there.

20        MR. ROBINSON:  So, look at it this way, if we can.

21            The unfinished lower receiver is not a firearm.

22   It does not become a firearm in the case of an AR-15.

23            The lower receiver, it never does because of the

24   other discussions, but that lower receiver does not become a

25   firearm subject to licensing requirements until it is milled,

1    until its raw form is changed by some form of milling.

2              Now look, we are dealing with a criminal statute

3    and there is a willfulness requirement, and while there is case

4    law that says a willfulness requirement can in most

5    circumstances cure a vague statute, it doesn't here, because if

6    Mr. Schlotterbeck and Mr. Vlha genuinely believed that they

7    were not violating the law because of the way in which their

8    agreement had a third party do the milling of the lower

9    receiver, and after that, there is mere assembly, how on earth

10   can they be placed on constitutional notice of criminal

11   prosecution and incarceration when that term is never defined?

12             If we try to define that term for them in this

13   jury trial, it's going to be a situation where they could be

14   convicted for the mere assembly of the AR-15, long after the

15   conduct for which they never had any notice that what they were

16   doing was lawful because they believed they were following the

17   law.

18             We have got competing everyday ordinary --

19             THE COURT:  I understand your position, let me hear

20   a quick response from the government.

21             What is the government's response to that

22   argument?

23             MR. FAERSTEIN:  First of all, looking back to the

24   definition of manufacturing, the Fourth Circuit District of

25   Nevada, we think assembly is a common meaning -- common and

1  ordinary meaning for purposes of putting defendants on notice.

2          Second of all, in this case we don't only have

3  the assembly of completed lower receivers that were done by

4  third parties or by the customer, in fact, the allegations are

5  that the defendants arranged to have the lower receivers milled

6  for two of the -- first two of six deals.  The customers had a

7  token role in that, and this is part of the applied challenge

8  here.

9          But on the other four, the defendants were

10  arranging to have the lower receivers that they ordered

11  unfinished.  They were arranging to have those milled for

12  purposes of assembling with the other parts that they obtained

13  to complete -- excuse me, to manufacture completed AR-15 type

14  firearms.

15          So when you are looking at assembly alone, which

16  we believe is adequate, or assembly plus having coordinating --

17  arranging to have the lowers actually milled and completed for

18  purposes of this scheme, both are there, and, you know, there

19  is no notice issue, and there is no arbitrary and

20  discriminatory enforcement issues --

21          THE COURT:  I have heard enough.  You know, when we

22  get to trial itself, then you will probably be arguing again a

23  definition for manufacture, but it does not seem to me that it

24  is sufficiently vague that I would grant at this point in time

25  a motion to dismiss the indictment as the indictment is worded

```
 1   in this case.
 2              Mr. Haig, do you want to say something?
 3              MR. HAIG:  I do, Your Honor.  I know that
 4   Mr. Robinson has obviously set forth the defense's position,
 5   but there are a couple of things I wanted to note just from the
 6   Court's tentative, and I would like to clear it up.
 7              The Court, on page 3 of the top, talks about the
 8   Skilling case, and specifically that a criminal statute must
 9   clearly define the conduct and a statute that is
10   unconstitutionally vague cannot be saved by a more precise
11   indictment nor by judicial construction that writes in specific
12   criteria that its text does not contain.
13              I would ask, are there -- would there be jury
14   instructions defining what the proscribed conduct would be?  In
15   this case, that is exactly what happened here.
16              The Court, in Footnote 6, asked the question
17   about whether it was unclear whether there was a tentative
18   order that ever adopted the ruling by Judge Selna in the Roh
19   case.
20              It wasn't here and the reason why there wasn't,
21   Your Honor, is because that defendant, Mr. Roh, at the end of a
22   bench trial where both sides presented their own evidence that
23   defendant was going to be convicted by Judge Selna of dealing
24   in completed firearms -- fully assembled, as Mr. Faerstein,
25   said soup to nuts; however, the government did not want an
```

1    adverse ruling in Court of Appeal based on an imprecise

2    indictment and a faulty record.  I think it must have been what

3    they said, and when I inquired two years ago about why we

4    weren't entitled to a diversionary disposition in this case

5    where the conduct was miles away from what Mr. Roh had done, I

6    was told that the indictment in this case was drafted in a way

7    that was more precise, that we're not going to have those types

8    of situations.

9               Now, the government has taken away dealing and

10   deal planning might have an issue, and manufacturing is the

11   easiest way for them to get a conviction in this case, but

12   again, they are doing exactly what the Court in *Skilling* said

13   that they can't do.

14              And I fear, Your Honor, you are trying to devise

15   some sort of definition for manufacturing that is going to go

16   back to the jury.

17              THE COURT:  Basically what you are saying is that

18   the Congress has to define every single word in a criminal

19   statute?  It doesn't.

20              It's often held that where Congress does not --

21   you know, the statute itself does not contain a definition, one

22   can look at the common definitions that stem from a dictionary,

23   for example, and you know, the way you guys are trying to

24   stretch manufacturing, I mean, it's because you have this

25   particular little quirk that insofar as who actually -- the

1    proper term is "milled" the lower receiver, but again, the

2    defendants aren't charged with milling the lower receiver.

3              The defendants are charged with manufacturing the

4    completed AR-15.

5              MR. HAIG:  Well, there is nothing illegal with

6    getting a milled lower receiver from a second party and putting

7    all of those components together.

8              So if the Court's and the defendant's theory or

9    the plaintiff's theory were correct here then --

10             THE COURT:  Let me stop you.  Maybe I'm going under

11   a supposition that doesn't a person have to have a license to

12   manufacture for other people an AR-15?

13             MR. HAIG:  For other people, yes, Your Honor.

14             THE COURT:  Okay.

15             MR. HAIG:  But the operative thing, and this is what

16   Judge Selna found as well, as long as the end customer is

17   involved in the charade of pushing the button quote/unquote on

18   the milling machine, then he has manufactured -- he or she has

19   manufactured a firearm.

20             THE COURT:  But in this particular case, the

21   government's indictment says that as to four, that charade was

22   not even done, so therefore, you know, it seems to me this

23   indictment under anyone's approach is sufficient in that

24   regard.

25             MR. HAIG:  Well --

    1           THE COURT:  Let me ask Mr. Faerstein, isn't that the
    2    government's position?
    3           MR. FAERSTEIN:  Yes, it is, Your Honor.  And with
    4    respect to the *Roh* case, in particular, the Court actually
    5    found that even where a customer did take part in that initial
    6    charade of pressing the button, the defendant then taking that
    7    completed lower receiver and assembling all of the other parts
    8    into an AR, it was manufactured.
    9           THE COURT:  In other words, in the *Roh* case, the
   10    problem was that there were two counts.  The first count was as
   11    to, I think, it was hundreds of lower receivers that had been
   12    processed.
   13              That was what Selna focused on, on the one hand,
   14    and the other one, insofar as the completed ARs, he had no
   15    problem with that.
   16              In the end, *Roh* pled, so, you know, that is the
   17    reason why the matter wasn't resolved.
   18           MR. HAIG:  He didn't, Your Honor.  He was going
   19    through diversion, and the case has been dismissed because he
   20    successfully completed 12 months of diversion, and now he's
   21    free to do whatever he wants.
   22           THE COURT:  Well maybe I'm not looking at it right,
   23    but the only thing that is stated in the record that I saw in
   24    that case, which is 14-167, was the fact that there was the
   25    motion to dismiss for unconstitutional vagueness and it was

```
1    taken off calendar, and it was taken off calendar because the
2    defendant elected to plea.
3              Maybe there is something else that was done after
4    that, but that's what was indicated in the record.
5              MR. HAIG:  He got diversion right away, that case
6    has been dismissed.
7              THE COURT:  Again, I don't really care about that, I
8    mean, but all I can say is that, again, you guys have cited to
9    me a tentative ruling from Judge Selna, not even a completed
10   ruling from Judge Selna, and, you know, even the tentative
11   ruling doesn't help you, because again, Judge Selna was
12   focusing on the receiver aspect where the defendant was charged
13   vis-a-vis the receivers.
14             But there was a second charge, which was as to
15   completed ARs and Judge Selna had no problem with the count as
16   to the completed ARs.
17             I understand the defense's position, you
18   understand my position, I hope, and my position at this point
19   in time is I'm going to deny the motion to dismiss.
20             All right.  So we have taken care of that one.
21             Obviously, I'm sure we are going to -- around the
22   time of trial -- we're going to be -- you guys and myself --
23   are going to be going over the jury instructions on this point
24   about manufacturing.  I understand that.
25             All right.  Now turning to the motions in limine,
```

1   the defendant has one and the government has three, as I can

2   tell you.

3              Turning to the defendant's Motion in Limine

4   No. 1, which is to exclude reference to the term "ghost gun"

5   meaning a firearm without a serial number or otherwise

6   referring to a firearm that has been unserialized or having no

7   serial number.

8              The defense argues such is pejorative and/or it

9   is prejudicial, however the defendants really don't cite to any

10  case that basically has held that.

11             And I do understand obviously Federal Rules of

12  Evidence 401 through 403, but let me just ask the defense, you

13  have no case that has said that?

14             MR. HAIG:  I looked, Your Honor, all the cases that

15  have really been cited are cases that the Court has difficulty

16  with on a pretrial or --

17             THE COURT:  Let me put it this way, I have found

18  cases where the Courts themselves -- I don't know if they used

19  them in front of the jury, but they used the term "ghost gun"

20  as if it's not uncommon.

21             MR. HAIG:  So I think the operative thing here, Your

22  Honor, is the Court has to determine whether the term "ghost

23  gun" -- I didn't mean to cut you off if the Court wasn't done.

24             THE COURT:  I'm looking at you.

25             MR. HAIG:  The term "ghost gun" or without a serial

1   number, proving any of those facts are not relevant to any of

2   the charges in the indictment against any of the defendants.

3   They are not charged with selling a ghost gun, specifically

4   producing and manufacturing your own firearm, which is what we

5   posit the end-users were fully doing in this case is not

6   against the law.

7                   You or I or anybody sitting in this court without

8   a criminal record can make our own gun and --

9           THE COURT:  Let me stop you.  Let me address this

10  question to government, that is the question I have.  In other

11  words, if you drop dealing as a basis, how do you counter the

12  defense argument that, oh, we were making these things for

13  ourselves.

14          MR. BOYLE:  Your Honor, the way we encountered that

15  is the defendant sold all six of the charged firearms.

16          THE COURT:  I understand that, but the defense is

17  saying you are not bringing this case on the basis of dealing,

18  which it leaves it open for the defendants saying, well, we did

19  this, you know, we built these for ourselves, which apparently

20  they don't need a license for.

21                  Now you are saying we will counter that by

22  showing they sold these guns.  Well, isn't that dealing?

23          MR. BOYLE:  No, Your Honor, because sale is an

24  element of the manufacturing charge, Your Honor.

25                  As the defense points out, Your Honor, simply

1    manufacturing a gun that is not intended to be sold for one's

2    personal use, that would not require a license.

3                    However, where one is manufacturing for the

4    purposes of profit, and I believe Mr. Faerstein could give us

5    the full definition, that is an element of the manufacturing

6    defense, Your Honor.

7                    THE COURT:  Let me put it this way, the government

8    makes it difficult for itself and what I consider to be

9    somewhat of a strange position.

10                   In other words, I don't understand why you

11   dropped dealing.

12                   MR. BOYLE:  I'm deferring to Mr. Faerstein on that.

13                   THE COURT:  So, in other words, you are going to

14   point the finger at him?

15                   MR. BOYLE:  He has the entire explanation, Your

16   Honor.

17                   With respect to the motion in limine, I think our

18   position is Rule 403 sets a fairly high standard.

19                   Under the commencement of that rule, the evidence

20   would have to be such that would cause a jury to essentially

21   disregard --

22                   THE COURT:  Let me put it this way, I agree with you

23   to the extent it seems to me that, you know, the reference to

24   unserialized guns or ghost guns is not so prejudicial, so, you

25   know, that the jury could not follow jury instructions.

1        Frankly, to tell you the truth, let me indicate

2   to the defendants, you know, I will make you guys remind me, I

3   will make a reference to whether or not any juror has ever

4   heard the term "ghost gun," and if it endears some sort of

5   response, what that response is will let you know that the

6   jurors have any concern about ghost guns.

7        But I don't think that just the use of the term

8   is somewhat pejorative or something like that, it gives rise to

9   especially a sense that some of these terms that the defendants

10  are objecting to are terms that are going to be referred to.

11  In other words, some of these guns -- or actually all of the

12  guns don't have serial numbers on them.

13       MR. HAIG:  That is true, Your Honor, whether they

14  have a serial number or not are not elements of the offense.

15       THE COURT:  But it is going to come in in a sense

16  that, for example, other manufacturers of guns, you know, have

17  serial numbers on them, means of identification, and that is

18  distinguishing these products from other forms in other

19  manufacturers of firearms.

20       And I would agree with you, you know, the jury

21  can be informed that obviously if somebody manufactures ARs for

22  themselves, you know, they don't need a license and they

23  wouldn't be putting a serial number on it.

24       MR. HAIG:  Right, then you have got to instruct the

25  jury on legal ownership and possession of unserialized weapons.

**UNITED STATES DISTRICT COURT**

1    As to the issue of whether the weapon is serialized or not is

2    not something that the jury needs to decide as to whether the

3    defendant is guilty or not guilty.

4              And the Court has also said ghost guns aren't a

5    pejorative term, and President Biden and Senator Padilla would

6    disagree.

7              THE COURT:  Supreme Court apparently has no problems

8    with concealed weapons.

9              MR. HAIG:  Sure.

10             THE COURT:  And the constitutional right to carry a

11   concealed weapon, you know, I don't understand what your worry

12   is about.

13             MR. HAIG:  I'm worried about the fact that people --

14   that people don't ordinarily know that a weapon, if it doesn't

15   have a serial number is legal to make, own, or possess.  But it

16   what it is, and it was at that time and it still is now.

17             So by talking about a weapon being unserialized,

18   the pejorative term "ghost gun" you are entering into this case

19   evidence that is not relevant for the government to prove any

20   of the elements of the offense.

21             It's not inextricably intertwined.  None of the

22   defendants in any of the text messages mentioned anything

23   about, oh, isn't that great you can get a gun without a serial

24   number.  You have got to follow what we're doing -- none of

25   those things ever happened as to whether or not the serial

```
1   number is not relevant.
2            THE COURT:  I have to switch reporters, and so let's
3   take a short break, not that I don't want to hear from you
4   anymore, Mr. Haig, but I don't really -- this is a good excuse
5   for a pause.  We're going to switch reporters.
6            (Proceedings concluded at 12:58 p.m.)
7                              *  *  *
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

40

**CERTIFICATE OF OFFICIAL REPORTER**

COUNTY OF LOS ANGELES    )
                         )
STATE OF CALIFORNIA      )

        I, TERRI A. HOURIGAN, Federal Official Realtime
Court Reporter, in and for the United States District Court for
the Central District of California, do hereby certify that
pursuant to Section 753, Title 28, United States Code that the
foregoing is a true and correct transcript of the
stenographically reported proceedings held in the
above-entitled matter and that the transcript page format is in
conformance with the regulations of the judicial conference of
the United States.


Date: 29th day of June, 2022.


                              /s/ TERRI A. HOURIGAN
                    _____
                     TERRI A. HOURIGAN, CSR NO. 3838, RPR, CRR
                            Federal Court Reporter

ER328

STEPHANIE S. CHRISTENSEN
Acting United States Attorney
SCOTT M. GARRINGER
Assistant United States Attorney
Chief, Criminal Division
BRIAN R. FAERSTEIN (Cal. Bar No. 274850)
Assistant United States Attorney
Environmental and Community Safety Crimes Section
DAN G. BOYLE (Cal. Bar No. 332518)
Assistant United States Attorney
Asset Forfeiture Section
     1300/1400 United States Courthouse
     312 North Spring Street
     Los Angeles, California 90012
     Telephone: (213) 894-3819/2426
     Facsimile: (213) 894-0141/0142
     E-mail:    Brian.Faerstein@usdoj.gov
               Daniel.Boyle2@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | No. CR 19-343-GW |
|---|---|
| Plaintiff, | GOVERNMENT'S OPPOSITION TO DEFENDANTS' JOINT MOTION TO DISMISS THE INDICTMENT (DKT. NO. 136) |
| v. | |
| TRAVIS SCHLOTTERBECK and JAMES BRADLEY VLHA, | Hearing Date: July 11, 2022 |
| Defendant. | Hearing Time: 1:30 p.m. Location:    Courtroom of the Hon. George H. Wu |

    Plaintiff United States of America, by and through its counsel of record, the Acting United States Attorney for the Central District of California and Assistant United States Attorneys Brian Faerstein and Dan Boyle, hereby files its opposition to defendants' second joint motion to dismiss the indictment (Dkt. No. 136).

    This opposition is based upon the attached memorandum of points

//

//

1 and authorities, the files and records in this case, and such further

2 evidence and argument as the Court may permit.

3   Dated: July 7, 2022          Respectfully submitted,

4                               STEPHANIE S. CHRISTENSEN
                                Acting United States Attorney
5
                                SCOTT M. GARRINGER
6                               Assistant United States Attorney
                                Chief, Criminal Division
7

8                                    /s/
                                _____
                                BRIAN R. FAERSTEIN
9                               DAN G. BOYLE
                                Assistant United States Attorney
10
                                Attorneys for Plaintiff
11                              UNITED STATES OF AMERICA

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

                                      2

**TABLE OF CONTENTS**

DESCRIPTION                                                                    PAGE

TABLE OF AUTHORITIES.............................................................ii

OPPOSITION MEMORANDUM OF POINTS AND AUTHORITIES.....................1

I.   INTRODUCTION................................................................1

II.  RELEVANT BACKGROUND.........................................................2

III. ARGUMENT....................................................................2

     A.   Relevant Rule 12(b) Standard...........................................2

     B.   Defendants' Motion Should be Denied as Untimely..........3

     C.   Defendants' Challenges Based on <u>Bruen</u> Are Without
          Merit....................................................................4

          1.   Defendants Fundamentally Misconstrue and Misapply
               <u>Bruen</u>.......................................................4

          2.   Counts One and Two Do Not Implicate the Second
               Amendment..........................................................9

          3.   Count Three Does Not Implicate the Second
               Amendment.........................................................14

     D.   The Court Should Not Stay the Proceedings................19

IV.  CONCLUSION.................................................................20

ER331

**TABLE OF AUTHORITIES**

DESCRIPTION                                                                PAGE

**Federal Cases**

Bosse v. Oklahoma,
    137 S.Ct. 1 (2016) (per curiam) ........................... 11, 19

Broadrick v. Oklahoma,
    413 U.S. 601 (1973) ......................................... 4

Heller v. District of Columbia,
    554 U.S. 570 (2008) ................................... *passim*

In re Zermeno Gomez,
    868 F.3d 1048 (9th Cir. 2017) (per curiam) ................... 20

Kanter v. Barr,
    919 F.3d 437 (7th Cir. 2019) ......................... 3, 17, 18

Marks v. United States,
    430 U.S. 188 (1977) .........................................11

McDonald v. City of Chicago, Ill.,
    561 U.S. 742 (2010) .................................. *passim*

Montana Shooting Sports Ass'n v. Holder, No. CV-09-147-DWM-JCL,
    2010 WL 3926029 (D. Mont. Aug. 31, 2010) ................... 13

New York State Rifle & Pistol Association, Inc. v. Bruen,
    --S.Ct.--, 2022 WL 2251305 .............................. *passim*

Saban v. U.S. Dep't of Labor,
    509 F.3d 376 (7th Cir. 2007) .............................. 19-20

Teixeira v. County of Alameda,
    873 F.3d 670 (9th Cir. 2017) (en banc) ................. 12, 13, 14

United States v. Bacon,
    884 F.3d 605 (6th Cir. 2018) ............................... 15

United States v. Boren,
    278 F.3d 911 (9th Cir. 2002) ............................... 2

United States v. Castro,
    No. 10-50160, 2011 WL 6157466 (9th Cir. 2011) ............... 13

ER332

# TABLE OF AUTHORITIES (CONTINUED)

DESCRIPTION                                                          PAGE

United States v. Chafin,
  423 F. App'x 342 (4th Cir. 2011) ............................. 15

United States v. Focia,
  869 F.3d 1269 (11th Cir. 2017) ........................... 13, 15

United States v. Nukida,
  8 F.3d 665 (9th Cir. 1993) .................................... 2

United States v. Phillips,
  827 F.3d 1171 (9th Cir. 2016) ............................ 16-17

United States v. Smith,
  329 Fed. App'x 109 (9th Cir. 2009) ......................... 16

United States v. Vongxay,
  594 F.3d 1111 (9th Cir. 2010) .............................. 16

United States v. Yousef,
  327 F.3d 56 (2d Cir. 2003) ................................... 4

**Federal Statutes**

18 U.S.C. § 371 ............................................... 9

18 U.S.C. § 922 .......................................... *passim*

**Federal Rules**

Federal Rule of Criminal Procedure 12 ...................... 2, 3, 4

ER333

1 <u>**OPPOSITION MEMORANDUM OF POINTS AND AUTHORITIES**</u>

2 **I. INTRODUCTION**

3     Defendants Travis Schlotterbeck and James Bradley Vlha have

4 moved to dismiss the indictment a second time, claiming the charges

5 against them are unconstitutional under <u>New York State Rifle & Pistol</u>

6 <u>Association, Inc. v. Bruen</u>, --S.Ct.--, 2022 WL 2251305, at *1 (2022)

7 ("<u>Bruen</u>").  (Dkt. No. 136 ("Mot").)  Defendants' challenge, which is

8 yet again untimely, purports to be based upon the Second Amendment,

9 but their premise is flawed from the start.

10     Defendants ignore the clear guidance from <u>Bruen</u> that the first

11 step of the analysis requires assessing whether the conduct at issue

12 is covered by the "plain text" of the Second Amendment.  Defendants

13 do not undertake any such analysis nor could they succeed in doing

14 so.  <u>Bruen</u> reaffirmed recent Supreme Court precedent that "individual

15 self-defense is the '<u>central component</u>' of the Second Amendment

16 right."  The charged conduct here – the unlicensed manufacture of

17 firearms for sale and the sale of a firearm to a felon – is not

18 covered by the "plain text" of the Second Amendment based on binding

19 authority from the Supreme Court and Ninth Circuit.  Defendants skip

20 over the first step of the test because they cannot get past it.

21     Because they cannot proceed past step one, no further analysis,

22 including of the "Nation's historical tradition of firearm

23 regulation," is warranted nor necessary.  Yet defendants' motion is

24 based entirely on the erroneous assumption that the burden has

25 shifted to the government to justify the charged conduct in

26 historical context.  Defendants misread and misapply <u>Bruen</u>, which

27 marked a change only at step two of the analysis that has no bearing

28 on this case.  Defendants' motion to dismiss thus should be denied.

## II.   RELEVANT BACKGROUND

In its opposition to defendants' first motion to dismiss the indictment, the government described the charges and allegations in the indictment in detail.  (See Dkt. No. 120 at 2-5.)  The government incorporates that description herein by reference.

As most relevant here, defendants are charged in a three-count indictment that is premised, at its core, on defendants' and co-conspirator Ping-Yi Kwan's manufacture for sale of completed AR-15-type firearms.  Schlotterbeck and Vlha both are charged in Count One (conspiracy) and Count Two (engaging in the business of manufacturing firearms without a license).  Schlotterbeck is charged alone in Count Three (sale of firearm to felon).  (Dkt. No. 1.)

Defendants are not charged with any offenses relating to their personal possession or use of firearms nor do the charges have any bearing on the broader law-abiding population's ability to obtain, possess, carry, or use firearms for self-defense or otherwise.

## III. ARGUMENT

### A.   Relevant Rule 12(b) Standard

Federal Rule of Criminal Procedure 12(b) permits a pretrial motion to dismiss "that the court can determine without a trial on the merits."  Fed. R. Crim. P. 12(b)(1).  However, in ruling on such a motion, "the district court is bound by the four corners of the indictment."  United States v. Boren, 278 F.3d 911, 914 (9th Cir. 2002).  The motion "cannot be used as a device for a summary trial of the evidence."  Id.  The "unavailability of Rule 12 in determination of general issues of guilt or innocence . . . helps ensure that the respective provinces of the judge and jury are respected[.]"  United States v. Nukida, 8 F.3d 665, 670 (9th Cir. 1993).

ER335

**B.  Defendants' Motion Should be Denied as Untimely**

For the reasons set forth in the government's opposition to defendants' first motion to dismiss, defendants' second motion is untimely in light of prior Court-ordered deadlines for Rule 12(b) motions in this case.  (See Dkt. No. 120 at 6-7; see also Dkt. Nos. 73, 75 (prior Court-ordered deadlines for Rule 12(b) motions); Dkt. No. 78 (defendants' acknowledgment in stipulation to continue trial that "they d[id] not anticipate filing any motions pursuant to [Rule] 12(b)").)

To the extent defendants contend that they are relying on the recently-issued Bruen opinion, defendants have been on notice for some time of the issues litigated in Bruen.  The Supreme Court granted certiorari in Bruen in April 2021, prior to this Court's final Rule 12(b) pretrial motion deadline in July 2021 here.  (Dkt. No. 75.)  The Supreme Court heard oral argument in Bruen on November 3, 2021.  Moreover, defendants place significant weight in their motion on a dissent written by then-Judge Amy Coney Barrett of the Seventh Circuit on March 15, 2019, several months before the indictment in this case.  (See Mot. at 3-4 (discussing Judge Barrett's dissent in Kanter v. Barr, 919 F.3d 437 (7th Cir. 2019)).)  And, at its heart, defendants' motion is based on the Supreme Court's opinions in Heller v. District of Columbia, 554 U.S. 570 (2008) ("Heller") and McDonald v. City of Chicago, Ill., 561 U.S. 742 (2010) ("McDonald"), both decided over a decade ago.  Contrary to defendants' claims, Bruen did not usher in any meaningful change to the Supreme Court's approach to the "plain text" of the Second Amendment (i.e., step one of the analysis) as it relates to the charges here; defendants' claims are as meritless now as they were

3

1   immediately following <u>Heller</u> and <u>McDonald</u>.  But that does not change

2   the fact that defendants have been on notice of the claims animating

3   their motion well before the Rule 12(b) motions deadline passed in

4   this case.  They failed to bring the motion before that deadline, and

5   thus they have waived their right to bring it now.[1]

6    **C.  Defendants' Challenges Based on <u>Bruen</u> Are Without Merit**

7        1.   <u>Defendants Fundamentally Misconstrue and Misapply</u>

8              <u>Bruen</u>

9   Defendants' attempt to import the Supreme Court's analysis in

10  <u>Bruen</u> to the charges and circumstances of this case is fundamentally

11  at odds with <u>Bruen</u>'s central holdings.  When undertaking a faithful

12  analysis of <u>Bruen</u> (and the other recent Supreme Court precedent on

13  which it is based), defendants' Second Amendment challenges to the

14  charges in this case, whether facial or as applied, do not get off

15  the ground.[2]

16  In <u>Bruen</u>, the Supreme Court held, "consistent with <u>Heller</u> and

17

18      [1] The decisions of defendant Schlotterbecks's prior counsel do
not insulate him from waiver.  <u>See</u>, <u>e.g</u>, <u>United States v. Yousef</u>, 327

19  F.3d 56, 124-25 (2d Cir. 2003) ("A strategic decision by counsel not
to pursue a claim, inadvertence of one's attorney, and an attorney's

20  failure to timely consult with his client are all insufficient to
establish cause" for untimely pretrial motion practice).

21

22      [2] Without distinguishing between theories in their motion,
defendants purport to challenge the charged conduct as

23  unconstitutional on both a facial and as-applied basis.  (<u>See</u> Mot. at
4, 5.)  Defendants challenges fail under either analysis, as the

24  charged statutes in all their potential applications and as applied
to the conduct alleged in the indictment here entail conduct that

25  does not implicate the "plain text" of the Second Amendment.
Nonetheless, the government maintains that only an as-applied

26  analysis is warranted even at the first step of the two-step inquiry
in <u>Bruen</u>, as "[e]mbedded in the traditional rules governing

27  constitutional adjudication is the principle that a person to whom a
statute may constitutionally be applied will not be heard to

28  challenge that statute on the ground that it may conceivably be
applied unconstitutionally to others, in other situations not before
the Court."  <u>Broadrick v. Oklahoma</u>, 413 U.S. 601, 610-11 (1973).

ER337

 1   McDonald, that the Second and Fourteenth Amendments protect an

 2   individual's right to carry a handgun for self-defense outside the

 3   home." Bruen, 2022 WL 2251305, at *5. In so holding, the Court

 4   "reiterate[d] that the standard for applying the Second Amendment is

 5   as follows: When the Second Amendment's plain text covers an

 6   individual's conduct, the Constitution presumptively protects that

 7   conduct. The government must then justify its regulation by

 8   demonstrating that it is consistent with the Nation's historical

 9   tradition of firearm regulation." Id. at *11 (emphasis added).

10        The Court recognized that the first step of analyzing the "plain

11   text" of the Second Amendment was "[i]n keeping with Heller." Id. at

12   *8. However, the Court rejected the post-Heller test that had

13   developed among the circuit and district courts at the second step of

14   the analysis, in which courts applied so-called means-end scrutiny

15   (i.e., strict or intermediate scrutiny) to laws that were found to

16   fall within the Second Amendment's "plain text." Id. at *8-9.

17   Instead, the Court held that an analysis of the "Nation's historical

18   tradition of firearm regulation," not means-end scrutiny, is the

19   appropriate standard at the second step. Id.

20        Defendants distort and misapply the Court's holdings in Bruen in

21   two fundamental ways that pervade and undermine their motion.

22        First, defendants broadly describe Bruen as a "sea change on the

23   law concerning Second Amendment claims," without recognizing any

24   distinction between laws that are covered by the "plain text" of the

25   Second Amendment and those that are not. (Mot. at 1.) Defendants

26   recite the actual "two-step, burden shifting approach" one time in

27   the Legal Standard section of their motion. (Mot. at 3.) Yet

28   everything that comes before and after presumes only the second step

                                     5

1   applies.  Defendants undertake no analysis whatsoever of the Second

2   Amendment's "plain text" as it pertains to the charges in this case,

3   erroneously concluding that the government bears the "heavy burden"

4   from the outset of establishing the charged statutes satisfy the

5   historical tradition analysis.

6        For example, defendants claim that "[u]nder the Bruen case, in

7   all analysis of a Second Amendment claim, like this one to dismiss

8   the charges in the indictment, it is presumed that '[the]

9   individual's conduct' is constitutionally protected."  (Mot. at 1

10  (quoting Bruen, 2022 WL 2251305, at *8) (emphasis added).)  But that

11  is flatly incorrect.  The actual language from Bruen, from which

12  defendants selectively quote, states, "we hold that when the Second

13  Amendment's plain text covers an individual's conduct, the

14  Constitution presumptively protects that conduct."  Bruen, 2022 WL

15  2251305, at *8.  Defendants read out step one altogether, much less

16  the "plain text" analysis that determines what conduct is

17  "presumptively protect[ed]" and subject to further analysis.

18       Defendants repeat this error numerous times in their motion,

19  impermissibly shifting the burden to the government and launching

20  into a premature (and, as explained below, inapplicable) analysis of

21  the "Nation's historical tradition of firearm regulation."  (See,

22  e.g., Mot. at 1-2 ("government cannot meet its heavy burden to

23  establish that Mr. Schlotterbeck and Mr. Vlha's conduct would be

24  subject to regulation at the time of the ratification of the Second

25  Amendment"); id. at 2 ("government cannot carry its heavy burden

26  establishing that the sale to all felons . . . is consistent with

27  regulations" at adoption of Second Amendment); id. at 3 ("In full

28  recognition of Bruen's command that the government bear the burden of

                                      6

1  proving that this regulation does not run afoul of the Second

2  Amendment. . .”); id. at 4 (“government will not be able to meet its

3  burden of proving that this regulation . . . does not run afoul of

4  the Second Amendment.”).)

5      Thus, whatever purported “sea change” there may be in the

6  Supreme Court’s discussion of the second step of the analysis –

7  abandoning means-end scrutiny for “historical tradition” inquiry –

8  that holding in Bruen has no bearing on the charges in this case,

9  which do not get past the first step as explained further herein.

10     Second, in presuming without any analysis that the charged

11 manufacturing for sale and sale to a felon conduct here implicates

12 the Second Amendment, defendants ignore the Court’s clear and

13 repeated articulation of what the “plain text” of the Second

14 Amendment covers.  Drawing upon its earlier opinions in Heller and

15 McDonald, the Court in Bruen reiterated that the “plain text” of the

16 Second Amendment – in particular, “the right of the people to keep

17 and bear Arms” – “guarantee[s] the individual right to possess and

18 carry weapons in case of confrontation.”  Id. at *9 (quoting Heller,

19 554 U.S. at 592).[3]  The Court repeatedly spoke of the covered conduct

20 as “an individual right to self-defense.”  Id.; see also, e.g., id.

21 at *12 (Second Amendment “‘surely elevates above all other interests

22 the right of law abiding, responsible citizens to use arms’ for self-

23

24     _____

25       [3] In reaching the conclusion in Heller that the Second Amendment
   codified the “right to possess and carry weapons in case of
26 confrontation,” the Court undertook an extensive textual analysis of
   the terms “keep and bear Arms” within the context of the Second
   Amendment.  Heller, 554 U.S. at 581-92.  The Court further recognized
27 that “this meaning is strongly confirmed by the historical background
   of the Second Amendment,” to which it looked in determining the scope
28 of the right (as opposed to the propriety of regulations that might
   implicate the Second Amendment).  Id. at 592.

ER340

defense" (quoting Heller, 554 U.S. at 635)); id. at *13 ("As we stated in Heller and repeated in McDonald, 'individual self-defense is the 'central component' of the Second Amendment right.'") (emphasis in original); id. at * 14 ("Heller further confirmed that the right to 'bear arms' refers to the right to 'wear, bear, or carry . . . upon the person or in the clothing or in a pocket, for the purpose . . . of being armed and ready for offense or defensive action in a case of conflict with another person.'"); id. at *15 ("self-defense is 'the central component of the [Second Amendment] right itself'") (emphasis in original).

Three of the Justices in the Bruen majority (Justices Alito and Kavanaugh and Chief Justice Roberts) authored or joined in concurrences stating their view that the Court's holding was indeed narrowly drawn. Justice Alito emphasized, "[a]ll that we decide in this case is that the Second Amendment protects the right of law-abiding people to carry a gun outside the home for self-defense." Id. at *37 (Alito, J. concurring). Justice Kavanaugh, joined by Chief Justice Roberts, wrote separately to "underscore two important points about the limits of the Court's decision," reiterating that "individual self-defense is 'the central component' of the Second Amendment," id. at *38 (Kavanaugh, J. concurring) (quoting McDonald, 561 U.S. at 767 and Heller, 554 U.S. at 599), and "[p]roperly interpreted, the Second Amendment allows a 'variety' of gun regulations."[4]   Id. at *39 (quoting Heller, 554 U.S. at 636).

---

[4] Consistent with this more limited interpretation of the Second Amendment, it is not surprising that Heller, McDonald, and Bruen all dealt with laws effectively prohibiting the people's right to possess and carry handguns for self-defense.  See Heller, 554 U.S. at 573 (D.C. "prohibition on the possession of usable handguns in the
*(footnote cont'd on next page)*

ER341

1    Thus, the majority's repeated focus on the Second Amendment's

2    "central component" of an individual right to self-defense and the

3    concurring Justices' express limitations of their views to that

4    narrow holding underscore the fallacy of defendants' argument here.

5    Without any acknowledgment of their burden at step one, defendants

6    presume the manufacturing for sale and sale to a felon charges are

7    similarly covered by the "plain text" of the Second Amendment.

8    Defendants are wrong.  With the proper framework in mind, Counts One,

9    Two and Three all pertain to conduct that is not implicated by the

10   Second Amendment, and thus no further analysis - of "historical

11   tradition" or otherwise - is necessary.

12          2.    <u>Counts One and Two Do Not Implicate the Second
                  Amendment</u>

13

14   Defendants are charged in Counts One and Two with conspiracy to

15   engage and engaging in the business of manufacturing firearms without

16   a license, in violation of 18 U.S.C. §§ 371 and 922(a)(1)(A).  By

17   statute, defendants are alleged to have "manufactur[ed] firearms as a

18   regular course of trade or business with the principal objective of

19   livelihood and profit through the sale or distribution of the

20   firearms manufactured."  18 U.S.C. § 922(a)(21)(A).  The indictment

21   alleges, <u>inter</u> <u>alia</u>, that defendants worked together in manufacturing

22   multiple AR-15-type firearms to sell to at least three different

23   customers without obtaining a license to do so.

24          Defendants summarily claim that "the indictment alleges an

25   unconstitutional criminal regulation" of defendants' conduct,

26

27   ───────────────
     home"); <u>McDonald</u>, 561 U.S. at 750 (Chicago "handgun ban"); <u>Bruen</u>,
     2022 WL 2251305, at *6 (New York "proper cause" requirement for
28   "permit to carry a handgun in public").  The Supreme Court has spoken
     when laws allegedly implicate an individual's right to self-defense.

                                    9

proceeding immediately to purported "regulations on the manufacturing of firearms" at the time the Second Amendment was ratified.  (Mot. at 4.)  Defendants do not even attempt to meet their burden at step one of showing that the conduct alleged in Counts One and Two is covered by the "plain text" of the Second Amendment.  Defendants do not attempt to do so because they cannot do so.

As previously discussed, <u>Bruen</u> reiterated the holdings from <u>Heller</u> and <u>McDonald</u> that "individual self-defense is the '<u>central component</u>' of the Second Amendment right."  <u>Bruen</u>, 2022 WL 2251305, at *13 (quoting <u>Heller</u> and <u>McDonald</u>) (emphasis in original).  <u>Bruen</u> did not extend the Supreme Court's interpretation of the bounds of the Second Amendment any further, including with respect to the manufacturing of firearms for sale alleged here.

To the contrary, in their concurrence, Justice Kavanaugh and Chief Justice Roberts reaffirmed the Supreme Court's recognition in in <u>Heller</u> and <u>McDonald</u> that "nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill . . . or laws imposing conditions and qualifications on the commercial sale of arms."  <u>Id.</u> at *39 (quoting <u>Heller</u>, 554 U.S. at 626-27, and <u>McDonald</u>, 561 U.S. at 786).  Justice Alito similarly emphasized the Court's "holding decides nothing about who may lawfully possess a firearm or the requirements that must be met to buy a gun."  <u>Id.</u> at *34.  Justice Alito's concurrence is especially noteworthy, as he wrote the majority opinion in <u>McDonald</u> in which the Court made a point to "repeat th[e] assurances" from <u>Heller</u> that the Court's rulings did not "cast doubt" on the regulation of "the commercial sale of arms," which the <u>Heller</u> Court described as "presumptively lawful regulatory

10

ER343

1  measures." <u>McDonald</u>, 561 U.S. at 786 (quoting <u>Heller</u>, 554 U.S. at
2  626-27, 627 n.26).

3      Defendants contend in passing that "[w]hile Justice Kavanaugh's
4  concurrence argues that this new interpretation does not affect
5  licensing regulations, for obvious reasons this position was not
6  adopted in the majority opinion and is thus not the law of the land."
7  (Mot. at 5 n.2.)  Defendants have it completely backwards. <u>Heller</u>
8  and <u>McDonald</u> expressly carved out "presumptively lawful regulatory
9  measures" – including the "commercial sale of arms" laws at issue
10  here.  The <u>Bruen</u> majority did nothing to disrupt that prior, binding
11  guidance.  And three of the six Justices in the majority (to say
12  nothing of the three Justices who joined in dissent) wrote separately
13  to clarify the limits of <u>Bruen</u>'s holdings.  Defendants do not
14  elaborate on the purported "obvious reasons" that support their
15  opposite and erroneous conclusion.  But even if there was some
16  uncertainty as to <u>Bruen</u>'s intended reach (and, to be clear, there is
17  not), the Supreme Court has repeatedly emphasized that, "it is this
18  Court's prerogative alone to overrule one of its precedents." <u>Bosse</u>
19  <u>v. Oklahoma</u>, 137 S.Ct. 1, 2 (2016) (per curiam) (quoting <u>United</u>
20  <u>States v. Hatter</u>, 532 U.S. 557, 567 (2001), and <u>State Oil Co. v.</u>
21  <u>Khan</u>, 522 U.S. 3, 20 (1997)).[5]

22

23      [5] Defendants' dismissiveness toward the concurring opinions in
24  <u>Bruen</u> is particularly curious given the substantial reliance they
place on a 2019 dissent by then-Judge Barrett in the Seventh Circuit.
(Mot. at 3-4.)  Moreover, in cases where "a fragmented Court decides
25  a case and no single rationale explaining the result enjoys the
assent of five Justices, 'the holding of the Court may be viewed as
26  that position taken by those Members who concurred in the judgments
on the narrowest grounds . . . .'" <u>Marks v. United States</u>, 430 U.S.
27  188, 193 (1977) (quoting <u>Gregg v. Georgia</u>, 428 U.S. 153, 169 n.15
(1976)).  In any event, the <u>Bruen</u> majority has left no ambiguity of
28  its narrow holding as to the meaning of the "plain text" of the
*(footnote cont'd on next page)*

11

ER344

Defendants' arguments are further foreclosed by controlling Ninth Circuit authority.  In <u>Teixeira v. County of Alameda</u>, the Ninth Circuit held <u>en</u> <u>banc</u> that "the Second Amendment does not confer a freestanding right to sell firearms."  873 F.3d 670, 682 (9th Cir. 2017) (en banc).  <u>Teixeira</u> involved a challenge to a zoning law that, among other things, prohibited the sale of firearms in certain areas. <u>Id.</u> at 673.  In concluding that "the Second Amendment does not independently protect the ability to engage in gun sales," <u>id.</u> at 682 n.16, the Ninth Circuit undertook a detailed analysis of the text and intended purpose of the Second Amendment when it was codified.  <u>See</u> <u>id.</u> at 683-87.

Following the guidance from <u>Heller</u>, the court "beg[a]n with [the] text of the Second Amendment," finding that "[n]othing in the specific language of the Amendment suggests that sellers fall within the scope of its protection."  <u>Id.</u> at 683.  The court similarly found that "[n]o historical authority suggests that the Second Amendment protects an individual's right to <u>sell</u> a firearm unconnected to the rights of citizens to 'keep and bear' arms."[6]  <u>Id.</u> at 686-87 (emphasis in original).  The court concluded that "the Second Amendment does not confer a freestanding right, wholly detached from any customer's ability to acquire firearms, upon a proprietor of a

_____

Second Amendment, consistent with the Court's precedents in <u>Heller</u> and <u>McDonald</u>.

[6] To be clear, the Ninth Circuit's approach in looking at the historical record was limited, at step one of its analysis, to determining whether the right to sell firearms was embodied in the Second Amendment at the time it was ratified.  The Ninth Circuit did <u>not</u> conduct a historical analysis of the statute being challenged because it did not need to further consider the law – the challenged provision "d[id] not burden conduct falling within the [Second] Amendment's scope and [wa]s necessarily allowed by the Amendment." <u>Teixeira</u>, 873 F.3d at 690 (internal quotation and citation omitted).

12

1    commercial establishment to sell firearms." <u>Id.</u> at 682.

2         The Ninth Circuit also has rejected a post-<u>Heller</u> constitutional

3    challenge to 18 U.S.C. § 922(a)(1)(A), the statute at issue in Counts

4    One and Two. <u>See</u> <u>United States v. Castro</u>, No. 10-50160, 2011 WL

5    6157466, at *1 (9th Cir. 2011) (unpublished) (Second Amendment

6    challenge to section 922(a)(1)(A) foreclosed in recognition that the

7    "Supreme Court has made it clear that the government can continue to

8    regulate commercial gun dealing").  Other courts have reached similar

9    conclusions in the aftermath of <u>Heller</u>. <u>See</u>, <u>e.g.</u>, <u>United States v.</u>

10   <u>Focia</u>, 869 F.3d 1269, 1284, 1286 (11th Cir. 2017) (rejecting

11   challenge to section 922(a)(1)(A) premised on <u>Heller</u>, finding that

12   defendant's "Second Amendment challenge to 18 U.S.C. § 922(a)(1)(A)

13   fails"); <u>cf.</u> <u>Montana Shooting Sports Ass'n v. Holder</u>, No. CV-09-147-

14   DWM-JCL, 2010 WL 3926029, at *21 (D. Mont. Aug. 31, 2010) ("The

15   federal firearms laws at issue here do just what <u>Heller</u> considered

16   appropriate—they impose conditions and qualifications on the

17   manufacture and sale of arms").

18        In sum, defendants cannot proceed past step one of the Second

19   Amendment analysis reaffirmed in <u>Bruen</u>.  The unlicensed manufacturing

20   of firearms for sale that is charged in Counts One and Two – both on

21   its face or as applied to defendants' conduct alleged in the

22   indictment – is not covered by the "plain text" of the Second

23   Amendment, and thus no analysis of the "Nation's historical tradition

24   of firearm regulation" is necessary nor warranted.[7]  <u>Bruen</u>, 2022 WL

25

26        [7] In support of their abbreviated (and inapplicable) historical
     analysis, defendants contend that "regulations on the manufacturing
27   of firearms among the states were almost non-existent and federal
     law in this area did not develop until the first-half of the 20th
28   Century.  (<u>See</u> Mot. at 4-5.)  Defendants attach two exhibits in

                                                    *(footnote cont'd on next page)*

                                 13

1  2251305 at *8.  Defendants' constitutional challenges to Counts One
2  and Two premised on <u>Bruen</u> should be denied.
3          3.    <u>Count Three Does Not Implicate the Second Amendment</u>
4          Defendant Schlotterbeck is charged in Count Three with selling a
5  firearm to a felon, in violation of 18 U.S.C. § 922(d)(1).
6  Specifically, the indictment alleges that defendant Schlotterbeck
7  knowingly sold a completed AR-15-type firearm bearing no serial
8  number to a customer (in reality, an ATF confidential informant)
9  knowing or having reasonable cause to believe that the customer had
10  been convicted of a felony.
11         The analysis set forth in section III.C.2 above applies with
12  equal force to the charge in Count Three, which similarly regulates
13  the sale of firearms, in this case prohibiting sales to a specific
14  category of people (<u>i.e.</u>, felons).  The Supreme Court and Ninth
15  Circuit have made clear that regulation of firearm sales is not
16  covered by the Second Amendment, and thus no second step nor analysis
17  of historical tradition is necessary.  (<u>See</u> <u>supra</u> § III.C.2.)
18         Moreover, courts that have considered post-<u>Heller</u> constitutional
19  challenges to 18 U.S.C. 922(d)(1) in particular, or other similar
20
    _____
21  support, both excerpted from unidentified sources and with little
    context or explanation.  (<u>See</u> <u>id.</u>, Exhs. B and C.)  Defendants appear
22  to contend implicitly that they were manufacturing firearms for their
    own use in framing this historical analysis.  But that is not what
23  they are charged with in this case.  Rather, they are alleged to have
    manufactured firearms for sale as a business enterprise, without a
24  license to do so.  The Ninth Circuit's <u>en</u> <u>banc</u> opinion in <u>Teixeira</u>,
    as one summary of historical data, provides numerous examples of
25  regulations on the sale of firearms among the colonies and states at
    the time the Second Amendment was ratified (in demonstrating that the
26  Second Amendment did not entail the right to sell firearms).  <u>See</u>
    <u>generally</u> <u>Teixeira</u>, 873 F.3d at 685-86 (providing examples of
27  "colonial governments substantially controll[ing] the firearms
    trade").  That analysis is irrelevant here, however, as defendants
28  cannot establish the conduct charged in Counts One and Two is covered
    by the Second Amendment in the first instance.
                                14

1   provisions under section 922 that criminalize sales of firearms to
2   certain persons, have consistently rejected those challenges as
3   outside the scope of the Second Amendment.  See, e.g., United States
4   v. Bacon, 884 F.3d 605, 611 (6th Cir. 2018) (affirming conviction for
5   18 U.S.C. § 922(d)(1) where court found "no historical indication
6   that the Second Amendment encompasses such sales"); United States v.
7   Focia, 869 F.3d 1269, 1286 (11th Cir. 2017) (rejecting constitutional
8   challenge to unlawful transfer of firearm to out-of-state unlicensed
9   buyer under 18 U.S.C. § 922(a)(5) where the law "does not
10  substantially burden the Second Amendment" and "only minimally
11  affects the ability to acquire a firearm"); United States v. Chafin,
12  423 F. App'x 342, 344 (4th Cir. 2011) (unpublished) (affirming
13  conviction for sale of firearm to unlawful user of drugs under 18
14  U.S.C. § 922(d)(3) where court found no authority "remotely
15  suggest[ing] that, at the time of its ratification, the Second
16  Amendment was understood to protect an individual's right to sell a
17  firearm" (emphasis in original)).

18      Putting aside that the charged unlawful sale of a firearm is
19  foreclosed from constitutional scrutiny under the Second Amendment,
20  defendants once again jump to step two, impermissibly shift the
21  burden to the government, and focus on the buyer, not the seller,
22  within the context of Count Three.  Defendants take aim at 18 U.S.C.
23  § 922(g)(1) – which is not charged in this case – and claim
24  erroneously that Bruen has invalidated the felon in possession of a
25  firearm statute.  By defendants' logic, if 18 U.S.C. § 922(g)(1) is
26  unconstitutional, then the statute criminalizing the sale of a
27  firearm to the same category of prohibited person must also be
28  unconstitutional.  Defendants' claim fails for a number of reasons.

15

ER348

First, defendants contend without any support that section 922(g)(1)'s "blanket prohibition on felons has now been rendered unconstitutional" in light of Bruen. (Mot. at 2.)  But, as previously explained, Bruen did not speak to or undermine in any way the Supreme Court's prior pronouncements in Heller and McDonald that "nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill . . .," which the Court described as "presumptively lawful regulatory measures." Heller, 554 U.S. at 626-27, 627 n.26; McDonald, 561 U.S. at 786.  The concurrences in Bruen emphasized that this prior guidance remains intact.  See Bruen, 2022 WL 2251305 at *34 (Alito, J. concurring) ("Our holding decides nothing about who may lawfully possess a firearm or the requirements that must be met to buy a gun."); id. at *39 (Kavanaugh, J. concurring) (reaffirming legality of "longstanding prohibitions on the possession of firearms by felons" pronounced in Heller and McDonald).

Second, in light of this guidance from Heller and McDonald, the Ninth Circuit has repeatedly upheld the constitutionality of 18 U.S.C. § 922(g)(1).  See, e.g., United States v. Vongxay, 594 F.3d 1111, 1115, 1118 (9th Cir. 2010) ("§ 922(g)(1) does not violate the Second Amendment as it applies to . . . a convicted felon," because "felons are categorically different from the individuals who have a fundamental right to bear arms."); United States v. Smith, 329 Fed. App'x 109, 111 n.1 (9th Cir. 2009) ("Heller did not disturb . . . [precedent] that felons have no constitutional right to possess firearms."); United States v. Phillips, 827 F.3d 1171, 1174 (9th Cir. 2016) (rejecting, as foreclosed by Vongxay, felon's Second Amendment challenge to his § 922(g)(1) conviction based on nature of predicate

16

1  felony), cert. denied, 138 S. Ct. 56 (2017).  Nothing in <u>Bruen</u> casts

2  doubt on the continuing validity of this line of controlling

3  authority in the Ninth Circuit.

4      Third, defendants solely rely on then-Judge Barrett's dissent in

5  <u>Kanter v. Barr</u>, 919 F.3d 437 (7th Cir. 2019), in which she argued

6  section 922(g)(1) was unconstitutionally overbroad in prohibiting all

7  felons, not just "dangerous" felons, from possessing firearms.[8]

8  (Mot. at 3-4.)  Defendants claim that "[b]enefitting from Justice

9  Barrett's detailed analysis [in her dissent], the government will not

10 be able to meet its burden of proof and production."  (<u>Id.</u> at 4.)

11 The government bears no burden, however, as the actual statute at

12 issue here – 18 U.S.C. § 922(d)(1) – is not covered by the "plain

13 text" of the Second Amendment.  Nor does the Supreme Court's express

14 guidance, as described above, indicate that 18 U.S.C. § 922(g)(1)

15 would even be subject to step-two historical tradition analysis, as

16 the law is a "presumptively lawful regulatory measure[]."  <u>Heller</u>,

17 554 U.S. at 627 n.26; <u>McDonald</u>, 561 U.S. at 786.

18     Defendants also misleadingly state that the "majority opinion

19 [in <u>Kanter v. Barr</u>] upholding the constitutionality of the

20 transcendent definition of felons in 922(g) has been abrogated by the

21 <u>Bruen</u> decision."  (Mot. at 4.)  In fact, <u>Bruen</u> abrogated <u>Kanter</u> only

22 to the extent that <u>Kanter</u> (among a number of other specified circuit

23 court cases) applied means-end scrutiny at the second step of the

24 Second Amendment analysis.  <u>See Bruen</u>, 2022 WL 2251305 (summary of

25

26 _____

27     [8] Notably, Justice Barrett made clear in her <u>Kanter</u> dissent that
   the "Second Amendment confers an individual right, intimately
   connected with the natural right of self-defense."  <u>Kanter</u>, 919 F.3d
28 at 464 (Barrett, J. dissenting).  Nothing in her dissent spoke of a
   broader application of the Second Amendment to firearm sales conduct.

                                17

holdings, stating "means-end scrutiny, such as strict or intermediate scrutiny, does not apply in the Second Amendment context, abrogating . . . Kanter v. Barr, 919 F.3d 437"). The majority opinion in Bruen said nothing about 18 U.S.C. § 922(g)(1), much less did it question the "constitutionality of the transcendent definition of felons in 922(g)." (Mot. at 4). The Bruen concurrences reflect just the opposite. And Justice Barrett's 2019 dissenting opinion from Kanter in the Seventh Circuit remains just that: a circuit court dissent.[9]

Finally, Count Three charges defendant Schlotterbeck with the illegal sale of a firearm in violation of 18 U.S.C. § 922(d)(1), not the unlawful possession of the firearm in his own right. The alleged illegal sale conduct has nothing to do with possession or carrying firearms for self-defense and thus does not implicate the "plain text" of the Second Amendment. Moreover, the Ninth Circuit Model Criminal Jury Instruction for 18 U.S.C. § 922(d)(1) does not even require the government to prove that the buyer of the firearm was in fact a prohibited person. See Ninth Circuit Model Criminal Jury Instruction No. 14.11. The statute criminalizes the act of the sale, not the buyer's act of possession. Thus, the fact of the buyer's actual status (and any restriction of their ability to possess firearms) is irrelevant to the charge.

Accordingly, defendants' attempt to challenge the constitutionality of 18 U.S.C. § 922(d)(1) in Count Three, on a facial or as applied basis, as "criminaliz[ing] an otherwise

---

[9] Justice Barrett wrote a separate brief concurrence in Bruen and did not speak to any aspect of her supposed views on limiting felons under 18 U.S.C. § 922(g)(1) to "dangerous" felons or the invalidation of 18 U.S.C. § 922(g)(1) more broadly, neither of which is supported in any way by Bruen.

18

1    constitutional transaction" is without merit.  (Mot. at 4.)  The

2    analysis begins and ends with the "plain text" of the Second

3    Amendment, and defendants' challenge to Count Three should be denied.

4         **D.   The Court Should Not Stay the Proceedings**

5         In their Conclusion, defendants request "in the alternative,"

6    with no argument or analysis, "that this court stay the proceedings

7    pending further development in the law."  (Mot. at 5.)  Defendants'

8    request should be denied.

9         The Supreme Court has spoken clearly as to the bounds of the

10   "plain text" of the Second Amendment, and it does not include the

11   statutes and conduct alleged in this case.  The Ninth Circuit

12   similarly has defined the limits of the Second Amendment, drawing

13   from and consistent with the Supreme Court's guidance in Heller and

14   McDonald.  Nothing in Bruen has called into question any of this

15   controlling authority as relevant to the charges here.

16        As defendants would have it, courts across the country should

17   stay all pending cases under section 922 of Title 18, or the Gun

18   Control Act more broadly, in the far-off and highly speculative

19   chance that the Supreme Court drastically reverses course on its

20   approach to the Second Amendment in the coming years.  Of course,

21   that is not what the law dictates.  The Supreme Court's and Ninth

22   Circuit's precedents described herein are clear, binding, and

23   directly applicable to defendants' motion, and provide no grounds for

24   staying these proceedings.  See Bosse v. Oklahoma, 137 S.Ct. 1, 2

25   (2016) (per curiam) ("[I]t is this Court's prerogative alone to

26   overrule one of its precedents."); Saban v. U.S. Dep't of Labor, 509

27   F.3d 376, 378 (7th Cir. 2007) ("The Supreme Court has told the lower

28   courts that they are not to anticipate the overruling of a Supreme

                                   19

ER352

Case 2:19-cr-00343-GW Document 142 Filed 07/07/22 Page 25 of 25 Page ID #:1158

Court decision, but are to consider themselves bound by it until and unless the Court overrules it, however out of step with current trends in the relevant case law the case may be."); <u>In re Zermeno Gomez</u>, 868 F.3d 1048, 1053 (9th Cir. 2017) (per curiam) ("[W]e have unequivocally stated that a published decision constitutes binding authority and must be followed unless and until it is overruled by a body competent to do so.").

**IV.  CONCLUSION**

Accordingly, the government respectfully requests that this Court deny defendants' second joint motion to dismiss the indictment.

20