Nos. 22, 50281, 22-50283, 22-50312

IN THE UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,  )
                            )
  Plaintiff-Appellee,        )
                            )
  v.                        )
                            )
TRAVIS SCHLOTTERBECK and    )
JAMES VLHA,                 )
                            )
  Defendant-Appellant.      )
  _____)

————————

**APPELLANTS' JOINT EXCERPTS OF RECORD
VOLUME 3 OF 3**

————————

Appeal from the United States District Court
for the Central District of California

No. 19-cr-00343-GW
Hon. George H. Wu, United States District Judge

Jerome J Haig (131903)
Law Office of Jerome J Haig
21143 Hawthorne Boulevard Suite 454
Torrance, CA 90503
Telephone: 424-488-0686
Facsimile: 424-271-5990

Attorney for Defendant-Appellant
**JAMES VLHA**

Edward M. Robinson (126244)
Rachael A. Robinson (313991)
Law Office of Edward M. Robinson
21515 Hawthorne Boulevard, Suite 730
Torrance, CA 90502
Telephone: (310) 316-9333
Facsimile: (310) 316-6442

Attorneys for Defendant-Appellant
**TRAVIS SCHLOTTERBECK**

# EXHIBIT A

**\*450** Here, unlike the challengers in *Binderup*, who were convicted of "non-serious" state misdemeanors and served no prison time, Kanter was convicted of a serious federal felony for conduct broadly understood to be criminal, and he did not face a minor sentence. 836 F.3d at 353 & n.6. Instead, Kanter is more akin to the challenger in *Hamilton*, whose fraud and theft convictions were "black-letter *mala in se* felonies reflecting grave misjudgment and maladjustment." 848 F.3d at 627. Kanter's crime—defrauding the federal government out of hundreds of thousands of dollars—"reflect[s] significant disrespect for the law." *Id.* at 627 n.14; *see also Medina*, 913 F.3d at 160 (rejecting as-applied challenge where plaintiff was convicted of "felony fraud—a serious crime, malum in se, that is punishable in every state"). Thus, Kanter's serious felony conviction prevents him from challenging the constitutionality of § 922(g)(1) as applied to him.[12]

We are further assured in our decision because the highly-individualized approach Kanter proposes raises serious institutional and administrative concerns. *See Torres-Rosario*, 658 F.3d at 113 ("[S]uch an approach, applied to countless variations in individual circumstances, would obviously present serious problems of administration, consistency and fair warning."); *see also Medina*, 913 F.3d at 159–60 (rejecting argument that "non-dangerous felons have a right to bear arms" because "[u]sing an amorphous 'dangerousness' standard to delineate the scope of the Second Amendment would require the government to make case-by-case predictive judgments before barring the possession of weapons"). As mentioned above, Congress previously allowed the ATF to restore a felon's gun rights under § 925(c) if the agency determined that "the applicant will not be likely to act in a manner dangerous to public safety and that the granting of the relief would not be contrary to the public interest." 18 U.S.C. § 925(c). However, Congress abandoned that approach after finding that the dangerousness inquiry was a "very difficult" and time-intensive task, H.R. Rep. No. 102-618, at 14 (1992), and that "too many of these felons whose gun ownership rights were restored went on to commit violent crimes with firearms." H.R. Rep. No. 104-183, at 15 (1995). Congress's failed attempt to delegate this investigative task to a law enforcement agency "should have a profound impact on our tailoring analysis." *Binderup*, 836 F.3d at 403 (Fuentes, J., concurring in part, dissenting in part, and dissenting from the judgment).

At bottom, the fact-specific inquiry Kanter asks this Court to undertake is "a function best performed by the Executive, which, unlike courts, is institutionally equipped for conducting a neutral, wide-ranging investigation." *Bean*, 537 U.S. at 77, 123 S.Ct. 584; *see also Pontarelli v. U.S. Dep't of the Treasury*, 285 F.3d 216, 231 (3d Cir. 2002) ("Unlike ATF, courts possess neither the re-sources to conduct the requisite investigations nor the expertise to predict accurately which felons may **\*451** carry guns without threatening the public's safety."). Moreover, "[i]n the context of firearm regulation, the legislature is far better equipped than the judiciary to make sensitive public policy judgments (within constitutional limits) concerning the dangers in carrying firearms and the manner to combat those risks." *Schrader*, 704 F.3d at 990 (citation and internal quotation marks omitted).

In sum, the government has established that the felon dispossession statutes are substantially related to the important governmental objective of keeping firearms away those convicted of serious crimes. Because Kanter was convicted of a serious federal felony for conduct broadly understood to be criminal, his challenge to the constitutionality of § 922(g)(1) is without merit.

## III. Conclusion

For the foregoing reasons, we Affirm the judgment of the district court.

Barrett, Circuit Judge, dissenting.

History is consistent with common sense: it demonstrates that legislatures have the power to prohibit dangerous people from possessing guns. But that power extends only to people who are *dangerous*. Founding-era legislatures did not strip felons of the right to bear arms simply because of their status as felons. Nor have the parties introduced any evidence that founding-era legislatures imposed virtue-based restrictions on the right; such restrictions applied to civic rights like voting and jury service,

not to individual rights like the right to possess a gun. In 1791—and for well more than a century afterward—legislatures disqualified categories of people from the right to bear arms only when they judged that doing so was necessary to protect the public safety.

18 U.S.C. § 922(g)(1) and Wisconsin Statute § 941.29(1m) would stand on solid footing if their categorical bans were tailored to serve the governments' undeniably compelling interest in protecting the public from gun violence. But their dispossession of *all* felons—both violent and nonviolent—is unconstitutional as applied to Kanter, who was convicted of mail fraud for falsely representing that his company's therapeutic shoe inserts were Medicare-approved and billing Medicare accordingly. Neither Wisconsin nor the United States has introduced data sufficient to show that disarming all nonviolent felons substantially advances its interest in keeping the public safe. Nor have they otherwise demonstrated that Kanter himself shows a proclivity for violence. Absent evidence that he either belongs to a dangerous category or bears individual markers of risk, permanently disqualifying Kanter from possessing a gun violates the Second Amendment.[1]

## I.

At the outset, it is worth clarifying a conceptual point. There are competing ways of approaching the constitutionality of gun dispossession laws. Some maintain that there are certain groups of people—for example, violent felons—who fall entirely outside the Second Amendment's scope. *See, e.g., Binderup v. Attorney Gen. U.S.*, 836 F.3d 336, 357 (3d Cir. 2016) (en banc) (Hardiman, J., concurring in part and concurring in the judgments) ("[T]he **\*452** Founders understood that not everyone possessed Second Amendment rights. These appeals require us to decide who count among 'the people' entitled to keep and bear arms."). Others maintain that all people have the right to keep and bear arms but that history and tradition support Congress's power to strip certain groups of that right. *See* Eugene Volokh, *Implementing the Right to Keep and Bear Arms for Self-Defense: An Analytical Framework and a Research Agenda*, 56 UCLA L. Rev. 1443, 1497–98 (2009) (describing these competing views). These approaches will typically yield the same result; one uses history and tradition to identify the scope of the right, and the other uses that same body of evidence to identify the scope of the legislature's power to take it away.

In my view, the latter is the better way to approach the problem. It is one thing to say that certain weapons or activities fall outside the scope of the right. *See District of Columbia v. Heller*, 554 U.S. 570, 627, 128 S.Ct. 2783, 171 L.Ed.2d 637 (2008) (explaining that "the sorts of weapons protected were those 'in common use at the time' " (citation omitted)); *Ezell v. City of Chicago*, 846 F.3d 888, 892 (7th Cir. 2017) (*Ezell II*) ("[I]f ... the challenged law regulates activity falling outside the scope of the right as originally understood, then 'the regulated activity is categorically unprotected, and the law is not subject to further Second Amendment review.' " (citation omitted)); *Ezell v. City of Chicago*, 651 F.3d 684, 702 (7th Cir. 2011) (*Ezell I*) (drawing an analogy between categories of speech, like obscenity, that fall outside the First Amendment and activities that fall outside the Second Amendment). It is another thing to say that certain *people* fall outside the Amendment's scope. Arms and activities would always be in or out. But a person could be in one day and out the next: the moment he was convicted of a violent crime or suffered the onset of mental illness, his rights would be stripped as a self-executing consequence of his new status. No state action would be required.

To be sure, under this theory such a person could possess a gun as a matter of legislative grace. But he would lack standing to assert constitutional claims that other citizens could assert. For example, imagine that a legislature disqualifies those convicted of crimes of domestic violence from possessing a gun for a period of ten years following release from prison. *See United States v. Skoien*, 614 F.3d 638, 642 (7th Cir. 2010) (en banc) (holding constitutional 18 U.S.C. § 922(g)(9), which forbids those convicted of crimes of domestic violence to possess a gun). After fifteen years pass, a domestic violence misdemeanant challenges a handgun ban identical to the one that the Court held unconstitutional in *Heller*. Despite the legislative judgment that such a person could safely possess a gun after ten years, a court would still have to determine whether the person had standing to assert a Second Amendment claim. If the justification for the initial deprivation is that the person falls outside the protection of the Second Amendment, it doesn't matter if the statutory disqualification expires. If domestic violence misdemeanants are out, they're out.[2]

That is an unusual way of thinking about rights. In other contexts that involve the loss of a right, the deprivation occurs because of state action, and state action determines the scope of the loss (subject, of course, to any applicable constitutional **\*453** constraints). Felon voting rights are a good example: a state can disenfranchise felons, but if it refrains from doing so, their voting rights remain constitutionally protected.[3] So too with the right to keep and bear arms: a state can disarm certain people (for example, those convicted of crimes of domestic violence), but if it refrains from doing so, their rights remain constitutionally protected. In other words, a person convicted of a qualifying crime does not automatically lose his right to keep and bear arms but instead becomes *eligible* to lose it.

In addition to being analytically awkward, the "scope of the right" approach is at odds with *Heller* itself. There, the Court interpreted the word "people" as referring to "all Americans." 554 U.S. at 580–81, 128 S.Ct. 2783; *see also id.* at 580, 128 S.Ct. 2783 (asserting that "the people" "refers to a class of persons who are part of a national community or who have otherwise developed sufficient connection with this country to be considered part of that community" (citation omitted)). Neither felons nor the mentally ill are categorically excluded from our national community. That does not mean that the government cannot prevent them from possessing guns. Instead, it means that the question is whether the government has the power to disable the exercise of a right that they otherwise possess, rather than whether they possess the right at all.

Thus, I treat Kanter as falling within the scope of the Second Amendment and ask whether Congress and Wisconsin can nonetheless prevent him from possessing a gun.


## II.

*Heller* did not "undertake an exhaustive historical analysis ... of the full scope of the Second Amendment," but it did offer a list of "presumptively lawful regulatory measures," including "longstanding prohibitions on the possession of firearms by felons and the mentally ill." *See Heller*, 554 U.S. at 626–27 & n.26, 128 S.Ct. 2783. Like the majority, I am "reluctant to place more weight on these passing references than the Court itself did." *See* Maj. Op. at 445 (quoting *United States v. Meza-Rodriguez*, 798 F.3d 664, 669 (7th Cir. 2015)). The constitutionality of felon dispossession was not before the Court in *Heller*, and because it explicitly deferred analysis of this issue, the scope of its assertion is unclear. For example, does "presumptively lawful" mean that such regulations are presumed lawful unless a historical study shows otherwise? Does it mean that as-applied challenges are available? Does the Court's reference to "felons" suggest that the legislature cannot disqualify misdemeanants from possessing guns? Does the **\*454** word "longstanding" mean that prohibitions of recent vintage are suspect? As we observed in *Skoien*, judicial opinions are not statutes, and we don't dissect them word-by-word as if they were. 614 F.3d at 640. Thus, I agree with the majority that *Heller*'s dictum does not settle the question before us.

It does, however, give us a place to start. *Heller*'s reference endorses the proposition that the legislature can impose some categorical bans on the possession of firearms. *See id.* ("That *some* categorical limits are proper is part of the original meaning."). Our task is to determine whether *all* felons—violent and nonviolent alike—comprise one such category.

Wisconsin and the United States advance three basic historical arguments in support of this categorical exclusion. First, they say that there is some evidence suggesting that founding-era legislatures deprived felons of the right. Second, they argue that because the states put felons to death at the time of the founding, no one would have questioned their authority to take felons' guns too. And third, they insist that founding-era legislatures permitted only virtuous citizens to have guns, and felons are not virtuous citizens.

As I explain below, none of these rationales supports the proposition that the legislature can permanently deprive felons of the right to possess arms simply because of their status as felons. The historical evidence does, however, support a different proposition: that the legislature may disarm those who have demonstrated a proclivity for violence or whose possession of guns

ER358

would otherwise threaten the public safety. This is a category simultaneously broader and narrower than "felons"—it includes dangerous people who have not been convicted of felonies but not felons lacking indicia of dangerousness.

## A.

The best historical support for a legislative power to permanently dispossess all felons would be founding-era laws explicitly imposing—or explicitly authorizing the legislature to impose—such a ban. But at least thus far, scholars have not been able to identify any such laws. The only evidence coming remotely close lies in proposals made in the New Hampshire, Massachusetts, and Pennsylvania ratifying conventions. In recommending that protection for the right to arms be added to the Constitution, each of these proposals included limiting language arguably tied to criminality. *See, e.g.*, Don B. Kates, Jr., *Handgun Prohibition and the Original Meaning of the Second Amendment*, 82 Mich. L. Rev. 204, 222, 266 (1983); Steven P. Halbrook, *The Right of the People or the Power of the State: Bearing Arms*, 26 Val. U. L. Rev. 131, 147, 185 (1991); *see also* C. Kevin Marshall, *Why Can't Martha Stewart Have a Gun?*, 32 Harv. J.L. & Pub. Pol'y 695, 712 (2009) ("For relevant authority before World War I for disabling felons from *keeping* firearms, then, one is reduced to three proposals emerging from the ratification of the Constitution.").

A majority of the New Hampshire convention recommended that a bill of rights include the following protection: "Congress shall never disarm any citizen, *unless such as are or have been in actual rebellion*." *See* 1 Jonathan Elliot, The Debates in the Several State Conventions on the Adoption of the Federal Constitution 326 (2d ed. 1891) (emphasis added). In the Massachusetts convention, Samuel Adams proposed to protect the right to arms with the following language: "And that the said Constitution be never construed to authorize Congress to ... prevent the people of the United States, *who are peaceable citizens*, from keeping their own arms." *See* 2 Bernard Schwartz, The Bill of Rights: A **\*455** Documentary History 675, 681 (1971) (emphasis added). Finally, the influential Pennsylvania Minority suggested an addition stating: "That the people have a right to bear arms for the defense of themselves and their own State or the United States, or for the purpose of killing game; and no law shall be passed for disarming the people or any of them *unless for crimes committed, or real danger of public injury from individuals* ...." 2 Schwartz, *supra*, at 662, 665 (emphasis added). On the basis of these three proposals some conclude that "[a]ll the ratifying convention proposals which most explicitly detailed the recommended right-to-arms amendment excluded criminals and the violent." *See, e.g.*, Kates, 82 Mich. L. Rev. at 266.

Several things bear emphasis here. First, none of the relevant limiting language made its way into the Second Amendment. Second, only New Hampshire's proposal—the least restrictive of the three—even carried a majority of its convention. *See* 2 Schwartz, *supra*, at 628, 675, 758. Third, proposals from other states that advocated a constitutional right to arms did not contain similar language of limitation or exclusion. *See* Kates, 82 Mich. L. Rev. at 222 (citing 1 Elliot, *supra*, at 328, 335). And finally, similar limitations or exclusions do not appear in any of the four parallel state constitutional provisions enacted before ratification of the Second Amendment. *See* Eugene Volokh, *State Constitutional Rights to Keep and Bear Arms*, 11 Tex. Rev. L. & Pol. 191, 208 (2006) (North Carolina, Pennsylvania, Vermont, Massachusetts). All that said, these proposals may "indicate some common if imprecise understanding at the Founding regarding the boundaries of a right to keep and bear arms." Marshall, 32 Harv. J.L. & Pub. Pol'y at 713. And at a minimum, the fact that they are routinely invoked in support of blanket felon disarmament makes it necessary to consider them.

I'll begin with the New Hampshire proposal, which did not embrace the disarmament of all felons, but rather of those citizens who "are or have been in *actual rebellion*." 1 Elliot, *supra*, at 326 (emphasis added). This limitation targeted a narrow group because "rebellion" was a very specific crime. *See Rebellion*, 2 New Universal Etymological English Dictionary (4th ed. 1756) (explaining that the term is "now used for a traiterous taking up arms, or a tumultuous opposing the authority of the king, etc. or supreme power in a nation"). There are obvious reasons why the government would take guns away from those bent on overthrowing it, and, as I discuss later, stripping rebels of their gun rights followed well-established practice in both England and the colonies. Thus, while this proposal reflects support for disarming rebels, it does not say anything about disarming those who have committed other crimes, much less nonviolent ones.

Samuel Adams's proposed language to the Massachusetts convention, which would have limited the right to "peaceable citizens," *see* 2 Schwartz, *supra*, at 681, sweeps more broadly—but not so broadly that it encompasses all criminals, or even all felons. At the time, "peaceable" was defined as "[f]ree from war; free from tumult"; "[q]uiet; undisturbed"; "[n]ot violent; not bloody"; "[n]ot quarrelsome; not turbulent." 1 Samuel Johnson, A Dictionary of the English Language (5th ed. 1773). Those who "breach[ed] the peace" caused "[a] violation of the public peace, as by a riot, affray, or any tumult which is contrary to law, and destructive to the public tranquility." *See Breach*, Noah Webster, An American Dictionary of the English Language (1828); *see also Atwater v. City of Lago Vista*, 532 U.S. 318, 327 & n.2, 121 S.Ct. 1536, 149 L.Ed.2d 549 (2001) (noting some "variations in the common-law usage of the term 'breach of the **\*456** peace' " but assuming that the definition "entail[ed] at least a threat of violence"); *id.* (quoting Michael Dalton, The Country Justice 9 (1727) ("The Breach of th[e] Peace seemeth to be any injurious Force or Violence moved against the Person of another, his Goods, Lands, or other Possessions, whether by threatening words, or by furious Gesture, or Force of the Body, or any other Force used *in terrorem.*")); *Pearce v. Atwood*, 13 Mass. 324, 332 (1816) ("Breaches of the peace comprise not only cases of actual violence to the person of another, but any unlawful acts, tending to produce an actual breach of the peace; whether the peace of the public, or an individual, be in fact disturbed or not."). Not all crimes are violent; nor, for that matter, is every non-peaceable person a criminal. In short, the phrase "peaceable citizens" was not a synonym for "non-felons" or even "non-criminals."

That leaves the strongest support for a blanket felon exclusion: the Pennsylvania Minority's suggested guarantee of the right to arms "unless for crimes committed, or real danger of public injury from individuals." 2 Schwartz, *supra*, at 665. This proposal can be read in two ways. The first, which would support a broad exclusion, is to interpret it as capturing two groups: (1) those who have committed any crime—felony or misdemeanor, violent or nonviolent—and (2) those who have not committed a crime but nonetheless pose a danger to public safety. The second, which would support a more targeted exclusion, is to interpret it as capturing one group: those who pose a danger to public safety, whether or not they have committed a crime. On this reading, the catchall phrase limiting the rights of individuals who pose a "real danger of public injury" would be an effort to capture non-criminals whose possession of guns would pose the *same kind of danger* as possession by those who have committed crimes. And unless the founding generation understood *all* crimes—even nonviolent misdemeanors—to be markers for that risk, the relevant "crimes committed" would be the subset of crimes suggesting a proclivity for violence. (As far as I can find, no one even today reads this provision to support the disarmament of literally all criminals, even nonviolent misdemeanants.) If "crimes committed" refers only to a subset of crimes, that subset must be defined; using "real danger of public injury" to draw the line is both internally coherent and consistent with founding-era practice.

Whatever else may be said about the particulars of each of these three proposals, they are most helpful taken together as evidence of the scope of founding-era understandings regarding categorical exclusions from the enjoyment of the right to keep and bear arms. The concern common to all three is not about felons in particular or even criminals in general; it is about threatened violence and the risk of public injury. *See Binderup*, 836 F.3d at 368 (Hardiman, J., concurring in part and concurring in the judgments). This is the same concern that animated English and early American restrictions on arms possession.

In England, officers of the Crown had the power to disarm anyone they judged to be "dangerous to the Peace of the Kingdom." Militia Act of 1662, 13 & 14 Car. 2, c. 3, § 13 (1662). Relatedly, English common law "punish[ed] people who [went] armed to terrify the King's subjects" with imprisonment and forfeiture of their "armour."[4] *Sir John Knight's Case*, 87 Eng. **\*457** Rep. 75, 76 (K.B. 1686). And—perhaps unsurprisingly because they were presumptively thought to pose a similar threat or terror—Parliament also disarmed Catholics. *See* Joyce Lee Malcolm, To Keep and Bear Arms 18–19, 122 (1994) (explaining that Protestants feared revolt, massacre, and counter-revolution from Catholics); *see also* Adam Winkler, Gunfight 115 (2011) (explaining that Parliament disarmed Catholics because the Protestant majority found them "untrustworthy"); Marshall, 32 Harv. J.L. & Pub. Pol'y at 723 ("In short, the stated principle supporting the disability was cause to fear that a person, although technically an English subject, was because of his beliefs effectively a resident enemy alien liable to violence against the king.").[5]

Similar laws and restrictions appeared in the American colonies, adapted to the fears and threats of that time and place. *See* Alexander DeConde, Gun Violence in America 22 (2001) ("Although the colonial demand for such discriminatory controls

ER360

sprang from circumstances different from those in England, as in applying them against Indians and blacks, colonists usually followed home-country practices of excluding other distrusted people from ownership."). In some places, Catholics were still disarmed, but "on the basis of allegiance, not on the basis of faith." *See* Robert H. Churchill, *Gun Regulation, the Police Power, and the Right to Keep Arms in Early America: The Legal Context of the Second Amendment*, 25 Law & Hist. Rev. 139, 157 (2007) (citing Virginia's 1756 "disarmament of all those refusing the test of allegiance")[6]; *see also* DeConde, *supra*, at 22–23 (associating Catholics with the "distrusted inhabitants" from whom the colonies seized guns "with the intent of preventing social upheavals" and "rebellion"). Those "willing to swear undivided allegiance to the sovereign" were permitted to keep their arms. *See* Churchill, 25 Law & Hist. Rev. at 157. After all, confiscation of guns from those who refused to swear an oath of allegiance was meant to "deal with the potential threat coming from armed citizens who remained loyal to" another sovereign. *See* Saul Cornell & Nathan DeDino, *A Well Regulated Right: The Early American Origins of Gun Control*, 73 Fordham L. Rev. 487, 506 (2004); *see also NRA v. Bureau of Alcohol, Tobacco, Firearms, and Explosives*, 700 F.3d 185, 200 (5th Cir. 2012) ("American legislators had determined that permitting [those who refused to swear an oath of allegiance] to keep and bear arms posed a potential danger."). **\*458** But that particular threat dissipated when a person pledged his allegiance to the United States or to a particular state.

Slaves and Native Americans, on the other hand, were thought to pose more immediate threats to public safety and stability and were disarmed as a matter of course. *See* Malcolm, *supra*, at 140–41; Winkler, *supra*, at 115–16 (noting "forcible disarmament" out of "fear that these groups would use guns to revolt" or otherwise threaten the "public safety"); DeConde, *supra*, at 21–22 (noting "anxiety that slaves would rebel"). And this practice of keeping guns out of the hands of "distrusted" groups continued after the Revolution. For example, many states even constitutionalized the disarmament of slaves and Native Americans. *See* Volokh, 11 Tex. Rev. L. & Pol. at 208–09.[7]

In sum, founding-era legislatures categorically disarmed groups whom they judged to be a threat to the public safety. But neither the convention proposals nor historical practice supports a legislative power to categorically disarm felons because of their status as felons.

## B.

A common response to the dearth of felon-disarmament laws in the eighteenth and nineteenth centuries is to say that such laws would have been unnecessary given the severity with which felons were punished. Because felons were routinely executed or stripped of all rights, the argument goes, explicit provisions depriving them of firearms would have been redundant. *See, e.g.*, Brief of Defendant-Appellee Brad D. Schimel at 9 ("[I]n eighteenth-century America, felonies were punishable by death, so no early American lawmaker would have questioned the propriety of a proposal to disarm serious offenders."); *Medina v. Whitaker*, 913 F.3d 152, 158 (D.C. Cir. 2019) ("[I]t is difficult to conclude that the public, in 1791, would have understood someone facing death and estate forfeiture to be within the scope of those entitled to possess arms."). One scholar puts it this way:

> The constitutionality of [bans on felon possession] cannot seriously be questioned ... [because f]elons simply did not fall within the benefits of the common law right to possess arms. That law punished felons with automatic forfeiture of all goods, usually accompanied by death. We may presume that persons confined in gaols awaiting trial on criminal charges were also debarred from the possession of arms.

Kates, 82 Mich. L. Rev. at 266. On this view, the criminal law provides a historical justification for felon disarmament even if laws regulating gun safety do not.

The premise of this argument—that the states permanently extinguished the rights of felons, either by death or operation of law, in the eighteenth and nineteenth centuries—is shaky. While it accurately describes the punishment of felons at English common law, the American picture is far more complex. It is true that at common law, the "idea of felony" was intertwined with the punishments of death and civil death. 4 William Blackstone, Commentaries on the Laws of England 98 (1769) ("The idea of felony is indeed so generally connected with that of capital punishment, that we find it hard to separate them ....");

*Avery v. Everett*, 110 N.Y. 317, 18 N.E. 148, 150 (1888) ("By the ancient common law ... [t]here were three principle incidents consequent upon an attainder for **\*459** treason or felony, forfeiture, corruption of blood, and an extinction of civil rights, more or less complete, which was denominated civil death."). Civil death was a state in which a person "though living, was considered dead"—a status "very similar to natural death in that all civil rights were extinguished." *See* Harry David Saunders, Note, *Civil Death—A New Look at an Ancient Doctrine*, 11 Wm. & Mary L. Rev. 988, 988–89 (1970). As originally conceived, civil death signified "a transitional status in the period between a capital sentence and its execution." Gabriel J. Chin, *The New Civil Death: Rethinking Punishment in the Era of Mass Incarceration*, 160 U. Pa. L. Rev. 1789, 1797 (2012). It "was intended to merely settle the estate of an executed or banished felon." Saunders, 11 Wm. & Mary L. Rev. at 990.

During the period leading up to the founding, the connection between felonies and capital punishment started to fray. Once a short, specified list of offenses, felonies in England grew to "no less than an hundred and sixty," which is likely what forced Blackstone to define them in terms of their most common characteristic: capital punishment. *See* 4 Blackstone, *supra*, at 18, 97–98. But as the number of designated felonies continued to grow, so did the variations on punishment, especially in the American colonies. Throughout the seventeenth and eighteenth centuries, capital punishment in the colonies was used "sparingly," and property crimes including variations on theft, burglary, and robbery "were, on the whole, not capital." Lawrence M. Friedman, Crime and Punishment in American History 42 (1993). By the time the Constitution was ratified, James Wilson observed that while the term "felony" was once "very strongly connected with capital punishment," that was no longer true. John D. Bessler, Cruel & Unusual 52–53 (2012) (quoting 2 The Works of James Wilson 348 (James DeWitt Andrews ed., 1896)); *see also* 6 Nathan Dane, Digest of American Law 715 (1823) ("[W]e have many felonies, not one punished with forfeiture of estate, and but a very few with death."). Of course, many crimes remained eligible for the death penalty, and the extent to which that was true varied by state. Death, however, no longer inevitably followed a felony conviction.

Because it was no longer defined with reference to a list of specific crimes or even a specific punishment, the definition of "felony" was difficult to pin down at the time of the founding. *See* Will Tress, *Unintended Collateral Consequences: Defining Felony in the Early American Republic*, 57 Clev. St. L. Rev. 461, 465 (2009) (emphasizing the "ambiguity in the meaning of felony" at the founding). According to James Madison, "felony" was "a term of loose signification even in the common law of England," but more so in the States where "[t]he meaning of the term ... [was] not precisely the same in any two of the States; and varie[d] in each with every revision of its criminal laws." The Federalist No. 42, at 228 (J. R. Pole ed., 2005); *see also* Dane, *supra*, at 715 ("[T]he word *felony*, in the process of many centuries, has derived so many meanings from so many parts of the common law, and so many statutes in England, and has got to be used in such a vast number of different senses, that it is now impossible to know precisely in what sense we are to understand this word.").

The shift in punishment for felonies necessitated a shift in the meaning of civil death, which had been previously connected to a capital sentence. And so civil death came to be understood "as an incident of life conviction." *See* Saunders, 11 Wm. & Mary L. Rev. at 990; *see also Troup v. Wood*, 4 Johns. Ch. 228, 248 (N.Y. Ch. 1820) (a person convicted of felony and sentenced to imprisonment in the state **\*460** prison for life is "*civiliter mortuus*"). But applying the ancient concept of civil death in this context proved difficult. Because "[i]mprisonment for life was a punishment unknown to the common law," courts quickly realized that common-law civil death did not automatically apply. *See Platner v. Sherwood*, 6 Johns. Ch. 118, 122 (N.Y. Ch. 1822) (¶ 2 argument of Butler and Henry, counsel for the plaintiff); *id.* at 128 (Opinion of the Chancellor). Thus, courts soon decided that civil death applied only when statutes explicitly attached it to life sentences, and statutes did not universally do so. *Id.* at 129 (holding that a person convicted of a felony and sentenced to life imprisonment was not "deemed and taken to be civilly dead, to all intents and purposes in the law" until an act of the legislature made it so)[8]; *see also Frazer v. Fulcher*, 17 Ohio 260, 262 (1848) ("But it is said that, by the rules of the common law, there is such a thing as a civil death as well as a natural death. We know that in England there are cases in which a man, although in full life, is said to be civilly dead, but I have not learned, until this case was brought before us, that there was but one kind of death known to our laws."); *Cannon v. Windsor*, 1 Houst. 143, 144, 6 Del. 143 (1855) ("But here there is no such general forfeiture of property, or the right to maintain an action, on a conviction for treason or felony, and the maxim or principle of *civilter mortuus* cannot therefore apply in this State, even when he is a party plaintiff."); Chin, 160 U. Pa. L. Rev. at 1796 ("In England, civil death was a common law punishment, but in the United States, it existed only if authorized by statute. It was far from universal...."). And even when it applied to life

sentences, the doctrine of civil death had to be at least partially reconceived because it had begun as a time-limited doctrine justified by the anticipation of natural death—it was "not a condition applicable potentially for decades." *See* Chin, 160 U. Pa. L. Rev. at 1797. As courts hammered out the incongruities between civil death and continued life over the next century, they settled uncomfortably on an American version of civil death that required explicit statutory authorization and deprived a felon of many, but not all, rights.[9] *See, e.g.,* **\*461** *Avery*, 18 N.E. at 154–55 (suggesting that a life convict maintained a right to defend an action brought against him and certain property rights, including the ability to transfer property by will or deed).

Of particular relevance to Kanter's case, courts also struggled to determine how—if at all—the old concept of civil death applied to felons serving sentences for a term of years. Cases decided in the early nineteenth century, like *Troup v. Wood* and *Platner v. Sherwood*, associated the *loss* of rights under a theory of civil death only with capital and life sentences. Later cases building on that reasoning held that the rights of felons serving less than life were merely *suspended* during the term of the sentence. *See, e.g., In re Estate of Nerac*, 35 Cal. 392, 396 (1868) ("If the convict be sentenced for life, he becomes *civiliter mortuus*, or dead in law.... If, however, he be sentenced for a term less than life, his civil rights are only suspended during the term."); *Ruffin v. Commonwealth*, 62 Va. 790, 796 (1871) (explaining that a convict is "*civiliter mortuus,*" but only "[f]or the time being, during his term of service in the penitentiary"); *Bowles v. Habermann*, 95 N.Y. 246, 247 (1884) (applying a statute, which provided that "a sentence of imprisonment in a State prison for any term less than for life ... suspends, during the term of the sentence, all the civil rights ... of, or held by, the person sentenced.").

The upshot of this history for present purposes is that the consequences of a felony conviction were not as categorically severe as the governments suggest. Capital punishment was less pervasive than one might think. Outside the capital context, civil death applied exclusively to life sentences and only if authorized by statute—and even then, it was more modest than the ancient version because the convict retained some rights. Felons serving a term of years did not suffer civil death; their rights were suspended but not destroyed. In sum, a felony conviction and the loss of all rights did not necessarily go hand-in-hand.

Because they did not go hand-in-hand, the argument that the severity of punishment at the founding implicitly sanctions the blanket stripping of rights from all felons, including those serving a term of years, is misguided. Those who ratified the Second Amendment would not have assumed that a free man, previously convicted, lived in a society without any rights and without the protection of law. This is not to say that felons could not lose rights under another theory. Indeed, state legislatures did explicitly exclude felons from the enjoyment of particular rights. *See infra* Section II.C. But history confirms that the basis for the permanent and pervasive loss of all rights cannot be tied generally to one's status as a convicted felon or to the uniform severity of punishment that befell the class.

Even if it could be, though, one might reasonably ask: "So what?" We wouldn't draw this inference from the severity of founding-era punishment in other contexts—for example, we wouldn't say that **\*462** the state can deprive felons of the right to free speech because felons lost that right via execution at the time of the founding. The obvious point that the dead enjoy no rights does not tell us what the founding-era generation would have understood about the rights of felons who lived, discharged their sentences, and returned to society.

C.

While scholars have not identified eighteenth or nineteenth century laws depriving felons of the right to bear arms, history does show that felons could be disqualified from exercising certain rights—like the rights to vote and serve on juries—because these rights belonged only to virtuous citizens. *See* Thomas M. Cooley, A Treatise on the Constitutional Limitations 29 (1st ed. 1868) (explaining that certain classes of people were "almost universally excluded" from the franchise for "want of capacity or of moral fitness"); Saul Cornell, *"Don't Know Much About History" The Current Crisis in Second Amendment Scholarship*, 29 N. Ky. L. Rev. 657, 679 (2002) (identifying the "right to sit on juries" as "limited to those members of the polity who were deemed capable of exercising it in a virtuous manner"). Some maintain that the right to bear arms is similarly limited by a virtue requirement. *See, e.g.,* Don. B. Kates Jr., *The Second Amendment: A Dialogue*, 49 Law & Contemp. Probs., Winter 1986,

at 143, 146 ("[T]he right to arms does not preclude laws disarming the unvirtuous citizens (i.e., criminals) or those who, like children or the mentally unbalanced, are deemed incapable of virtue."). On this view, the legislature can disarm felons because of their poor character, without regard to whether they are dangerous. *See Medina*, 913 F.3d at 159 (endorsing the view that the Second Amendment excludes not only the dangerous, but also the "unvirtuous") The majority is sympathetic to this view. *See* Maj. Op. at 446.

The problem with this argument is that virtue exclusions are associated with civic rights—individual rights that "require[ ] citizens to act in a collective manner for distinctly public purposes." *See* Saul Cornell, *A New Paradigm for the Second Amendment*, 22 Law & Hist. Rev. 161, 165 (2004). For example, the right to vote is held by individuals, but they do not exercise it solely for their own sake; rather, they cast votes as part of the collective enterprise of self-governance. Similarly, individuals do not serve on juries for their own sake, but as part of the collective enterprise of administering justice. Some scholars have characterized the right to keep and bear arms as a civic right, because it was "one exercised by citizens, not individuals ..., who act together in a collective manner, for a distinctly public purpose: participation in a well regulated militia." *See* Cornell & DeDino, 73 Fordham L. Rev. at 491 ("[T]he text [of the Second Amendment] fits a civic rights model better than either the individual or collective rights paradigms."). Saul Cornell explains:

> Perhaps the most accurate way to describe the dominant understanding of the right to bear arms in the Founding era is as a civic right. Such a right was not something that all persons could claim, but was limited to those members of the polity who were deemed capable of exercising it in a virtuous manner. Freedom of religion, freedom of the press, trial by jury were genuinely rights belonging to individuals and were treated differently than were civic rights such as militia service, or the right to sit on juries.

Cornell, 29 N. Ky. L. Rev. at 679 (footnotes omitted). And as a right that was exercised **\*463** for the benefit of the community (like voting and jury service), rather than for the benefit of the individual (like free speech or free exercise), it belonged only to virtuous citizens.

*Heller*, however, expressly rejects the argument that the Second Amendment protects a purely civic right. *Moore v. Madigan*, 702 F.3d 933, 935 (7th Cir. 2012). It squarely holds that "the Second Amendment confer[s] *an individual right* to keep and bear arms," *Heller*, 554 U.S. at 595, 128 S.Ct. 2783 (emphasis added), and it emphasizes that the Second Amendment is rooted in the individual's right to defend himself—*not* in his right to serve in a well-regulated militia, *id.* at 582–86, 128 S.Ct. 2783. The "civic rights" approach runs headlong into both propositions. *See Binderup*, 836 F.3d at 371 (Hardiman, J., concurring in part and concurring in the judgments) ("[T]his virtuous-citizens-only conception of the right to keep and bear arms is closely associated with pre-*Heller* interpretations of the Second Amendment by proponents of the 'sophisticated collective rights model' who *rejected* the view that the Amendment confers an individual right and instead characterized the right as a 'civic right....' " (citation omitted)). The parties have introduced no evidence that virtue exclusions ever applied to individual, as opposed to civic, rights.[10] And if virtue exclusions don't apply to individual rights, they don't apply to the Second Amendment.

It bears emphasis that virtue exclusions from the exercise of civic rights were explicit. If the right to bear arms was similarly subject to a virtue exclusion, we would expect to see provisions expressly depriving felons of that right too—but we don't. By 1820, ten states' constitutions included provisions excluding or authorizing the exclusion of those who "had committed crimes, particularly felonies or so-called infamous crimes" from the franchise. *See* Alexander Keyssar, The Right to Vote 62–63 & tbl. A.7 (Kentucky, Vermont, Ohio, Louisiana, Indiana, Mississippi, Connecticut, Illinois, Alabama, Missouri). By 1857, twenty-four state constitutions included such provisions. *Id.* The same crimes often "made a person ineligible to serve as a witness in a legal proceeding," *id.* at 62, and to serve on a jury.[11]

State constitutions protecting the right to bear arms do not follow a similar pattern. Between 1790 and 1820, nine states enacted their own right-to-arms provisions in their constitutions. *See* Volokh, 11 Tex. Rev. L. & Pol. at 208–09 (four more had **\*464** enacted such provisions prior to 1790). None of those provisions made an exception for criminals. *Id.* And notably, seven of those nine states explicitly excluded or authorized the exclusion of certain criminals from the right to vote. *Compare id.* (identifying Kentucky, Ohio, Indiana, Mississippi, Connecticut, Alabama, and Missouri as seven of the nine states with right-to-

arms provisions in their constitutions by 1820), *with* Keyssar, *supra*, at tbl. A.7 (the same seven state constitutions specifically excluded certain criminals from the right to vote). The same pattern held true in 1857. *Compare* Volokh, 11 Tex. Rev. L. & Pol. at 209–10, *with* Keyssar, *supra*, at tbl. A.7. There is no basis, then, for assuming that a virtue requirement on the right to vote applies equally to the right to keep and bear arms. *See Binderup*, 836 F.3d at 372 (Hardiman, J., concurring in part and concurring in the judgments) ("We have found no historical evidence on the public meaning of the right to keep and bear arms indicating that 'virtuousness' was a limitation on one's qualification for the right—contemporary insistence to the contrary falls somewhere between guesswork and *ipse dixit*.").[12]

In sum, the available evidence suggests that the right to arms differs from rights that depend on civic virtue for enjoyment. The Second Amendment confers an individual right, intimately connected with the natural right of self-defense, and not limited to civic participation (i.e., militia service). By the very terms of the civic-rights argument, then, the right to arms would have been "treated differently" than rights like the right to vote or to sit on juries. *See* Cornell, 29 N. Ky. L. Rev. at 679 ("[R]ights belonging to individuals ... were treated differently than were civic rights such as militia service, or the right to sit on juries."). And that difference is borne out by historical treatment: we see no explicit criminal, or even more general virtue-based, exclusions from the right to bear arms like we do in other contexts. Thus, although the right protected by the Second Amendment is not unlimited, *see Heller*, 554 U.S. at 595, 128 S.Ct. 2783, its limits are not defined by a general felon ban tied to a lack of virtue or good character.

## III.

The history canvassed in Part II yields two conclusions that are important for present purposes. History does not support the proposition that felons lose their Second Amendment rights solely because of their status as felons. But it does support the proposition that the state can take the right to bear arms away from a category of people that it deems dangerous. Our precedent is consistent with this principle: we have held that "Congress is not limited to case-by-case exclusions of persons who have been shown to be untrustworthy with weapons, nor need these limits be established by evidence presented in court." *Skoien*, 614 F.3d at 641. Instead, the legislature can make that judgment on a class-wide basis. *See id.* at 640 ("That *some* categorical limits are proper is part of the original meaning, leaving to the people's elected representatives the filling in of details."). And it may do so based on present-day judgments about categories of people whose possession of guns would endanger the public safety; as we said in *Skoien*, **\*465** "exclusions need not mirror limits that were on the books in 1791." *Id.* at 641. Such restrictions are "lineal descendants" of historical laws banning dangerous people from possessing guns. *See* Transcript of Oral Argument at 77, Heller, 554 U.S. 570 (No. 07290) (Chief Justice Roberts: "[W]e are talking about lineal descendants of the arms but presumably there are lineal descendants of the restrictions as well.").

That said, "the government does not get a free pass simply because Congress has established a 'categorical ban.' " *United States v. Williams*, 616 F.3d 685, 692 (7th Cir. 2010). The government could quickly swallow the right if it had broad power to designate any group as dangerous and thereby disqualify its members from having a gun. *See Skoien*, 614 F.3d at 641 ("We do not mean that a categorical limit on the possession of firearms can be justified under the rational-basis test, which deems a law valid if any justification for it may be imagined."). The legislature must be able to justify its designation, and the rigor with which we review this justification "depends on 'how close the law comes to the core of the Second Amendment right and the severity of the law's burden on the right.' " *Ezell II*, 846 F.3d at 892 (citation omitted). "Severe burdens on the core right of armed defense require a very strong public-interest justification and a close means-ends fit...." *Id.*

The majority contends that the means-end review should be "arguably less rigorous in this case because ... felon dispossession laws do not restrict the 'core right of armed defense,' but rather burden 'activity lying closer to the margins of the right.' " Maj. Op. at 448 n.10 (quoting *Ezell II*, 846 F.3d at 892). I disagree. First, felon dispossession statutes target the whole right, including its core: they restrict even mere possession of a firearm in the home for the purpose of self-defense. *Cf. Heller*, 554 U.S. at 630–35, 128 S.Ct. 2783 (finding unconstitutional a law that made it impossible for citizens to use firearms for "the core lawful purpose of self-defense"); *id.* at 628, 128 S.Ct. 2783 ("[T]he inherent right of self-defense has been central

to the Second Amendment right.").[13] And second, the burden is severe: it is a *permanent* disqualification from the exercise of a fundamental right. *See* Maj. Op. at 439–40; *see also United States v. McCane*, 573 F.3d 1037, 1048–49 (10th Cir. 2009) (Tymkovich, J., concurring) ("[T]he broad scope of § 922(g)(1)—which *permanently* disqualifies *all* felons from possessing firearms—would conflict with the 'core' self-defense right embodied in the Second Amendment."). Thus, "a very strong public-interest justification and a close means-ends fit" is required before Kanter may be constitutionally subject to the United States and Wisconsin dispossession statutes. *Ezell II*, 846 F.3d at 892.

There is no question that the interest identified by the governments and supported by history—keeping guns out of the hands of those who are likely to misuse them—is very strong. And we have held **\*466** that several of the other categorical bans within § 922(g) demonstrate the necessary fit between this public-safety end and the government's chosen means. In *Skoien*, we upheld § 922(g)(9), which prohibits those convicted of domestic violence misdemeanors from possessing firearms, because "no one doubts that the goal of § 922(g)(9), preventing armed mayhem, is an important governmental objective" and "[b]oth logic and data establish a substantial relation between § 922(g)(9) and this objective." 614 F.3d at 642; *see also id.* at 644 ("[N]o matter how you slice these numbers, people convicted of domestic violence remain dangerous to their spouses and partners."). In *United States v. Yancey*, we sustained § 922(g)(3), which prohibits any person "who is an unlawful user of or addicted to any controlled substance" from possessing a gun, because "studies amply demonstrate the connection between chronic drug abuse and violent crime, and illuminate the nexus between Congress's attempt to keep firearms away from habitual drug abusers and its goal of reducing violent crime." 621 F.3d 681, 686 (7th Cir. 2010). And in *United States v. Meza-Rodriguez*, we rejected a challenge to § 922(g)(5), which prohibits aliens unlawfully present in the United States from possessing firearms, reasoning that keeping guns out of the hands of "persons who are difficult to track and who have an interest in eluding law enforcement" serves the public-safety objectives of § 922(g). 798 F.3d 664, 673 (7th Cir. 2015).

In contrast to these narrowly defined categorical bans, § 922(g)(1), which applies to *all* felons, is "wildly overinclusive." Adam Winkler, *Scrutinizing the Second Amendment,* 105 Mich. L. Rev. 683, 721 (2007). Its application is not limited to those who have committed violent crimes like murder, assault, and rape.[14] It also encompasses those who have committed *any* nonviolent felony or qualifying state-law misdemeanor—and that is an immense and diverse category. It includes everything from Kanter's offense, mail fraud, to selling pigs without a license in Massachusetts, redeeming large quantities of out-of-state bottle deposits in Michigan, and countless other state and federal offenses. *See* Mass. Gen. Laws ch. 129, §§ 39, 43; Mich. Comp. Laws § 445.574a(1)(a), (2)(d); *see also, e.g.*, 21 U.S.C. § 676 (violating the Federal Meat Inspection Act in certain ways); 18 U.S.C. § 1621 (committing perjury); Mass. Gen. Laws ch. 266, § 30A (shoplifting goods valued at $100).[15] These **\*467** crimes, like many others captured by § 922(g), "rais[e] no particular suspicion that the convict is a threat to public safety." Winkler, 105 Mich. L. Rev. at 721. Put more colorfully, "It is hard to imagine how banning Martha Stewart or Enron's Andrew Fastow from possessing a gun furthers public safety." *Id.*

We have addressed the constitutionality of § 922(g)(1) before. In *United States v. Williams,* a defendant with a prior robbery conviction challenged the statute as applied to him. 616 F.3d at 691. We held that the provision is constitutional as applied to violent felons, including the defendant in that case. 616 F.3d at 694 ("Because Williams was convicted of a violent felony, his claim that § 922(g)(1) unconstitutionally infringes on his right to possess a firearm is without merit."). But our decision came with an important qualification: we expressly noted that "§ 922(g)(1) may be subject to an overbreadth challenge at some point because of its disqualification of all felons, including those who are non-violent." *Id.* at 693. We asserted that "[e]ven if the government may face a difficult burden of proving § 922(g)(1)'s 'strong showing' in future cases, it certainly satisfies its burden in this case, where [the defendant] challenges § 922(g)(1) as it was applied to him." *Id.* As a violent felon, the defendant in *Williams* was in no position to challenge § 922(g)(1) on the ground that its application to nonviolent felons is unconstitutional. *See Skoien*, 614 F.3d at 645 ("A person to whom a statute properly applies can't obtain relief based on arguments that a differently situated person might present."). As a nonviolent felon, however, Kanter is in a position to make that argument.

The first step in analyzing Kanter's as-applied challenge is to consider whether banning all nonviolent felons is substantially related to the governments' interest in preventing future gun violence. *See Williams*, 616 F.3d at 692–93. *Williams* held that because the characteristic common to all violent felons is a demonstrated propensity for violence, the ban on possessing firearms

is constitutional as applied to all members of that class. *Id.* at 693–94. In contrast, and to state the obvious, the characteristic common to all nonviolent felons is that their criminal conduct was nonviolent.[16] Thus, the reasoning that supports the categorical disarmament of violent felons—that past violence is predictive of future violence—simply does not apply.

The governments argue, though, that being convicted of a nonviolent crime is also predictive of future violence. They try to support that position with statistics showing that nonviolent felons are likely to commit violent crimes in the future. These statistics are unhelpful, however, because they lump all nonviolent felons together—and while some nonviolent felons may be likely to misuse firearms, the characteristics that make them risky cannot **\*468** be generalized to the whole class. For example, the characteristics of an individual convicted of a drug-related offense tell us little if anything about the tendency of an individual convicted of perjury—or, for that matter, mail fraud—to commit gun violence. The sheer diversity of crimes encompassed by these statutes makes it virtually impossible for the governments to show that banning *all* nonviolent felons from possessing guns is closely tailored to the goal of protecting the public safety. Thus, we must decide whether the statutes are unconstitutional as applied to Kanter in particular. *See Williams*, 616 F.3d at 692–93.

If Kanter's conviction—mail fraud—is substantially related to violent behavior, the governments can disarm him without regard to any personal circumstances or characteristics suggesting that he poses a low risk to public safety. But their case for tying mail fraud to a risk of future violence rests on a single study related to mail-fraud recidivism. *See* David Weisburd et al., White-Collar Crime and Criminal Careers (2004). This study suggests that almost 40% of individuals convicted of mail fraud were later rearrested. *Id.* at 29. It does not say, however, whether those arrests were for violent or nonviolent offenses. Nor does it say what percentage of those individuals were convicted. A different portion of the same study suggests that 25% of all white-collar repeat offenders (on the numbers provided, I'll assume that means roughly 10% of those with a mail-fraud conviction, though we have been given no way to know)[17] have an arrest for a violent crime. *Id* at 45. But it does not specify whether the violent arrest preceded or post-dated the white-collar arrests, and the numbers drop dramatically for those with only two total offenses, *id.*, suggesting that a pattern of criminality, rather than a particular mail-fraud arrest, might be an indication of future dangerousness, *see id.* at 46 ("[T]hose with fewer arrests seldom had violent crimes in their criminal histories."). This study falls well short of establishing the "close means-ends fit" required before the governments may totally and permanently strip offenders like Kanter of the ability to exercise a fundamental right.[18]

This does not mean that Wisconsin and the United States cannot disarm Kanter. Even though the mail-fraud conviction, standing alone, is not enough, they might still be able to show that Kanter's history or characteristics make him likely to misuse firearms. And if banning Kanter, in particular, from possessing a gun is substantially related to the governments' goal of "preventing armed mayhem," then the statutes could be constitutionally applied to him. *Skoien*, 614 F.3d at 642.

At this point, however, neither Wisconsin nor the United States has presented any evidence that Kanter would be dangerous if armed. Instead, as the majority notes, "Kanter is a first-time, non-violent offender with no history of violence, firearm misuses, or subsequent convictions," and he is "employed, married, and does not use illicit drugs, all of which correspond **\*469** with lower rates of recidivism." Maj. Op. at 449. Absent evidence that Kanter would pose a risk to the public safety if he possessed a gun, the governments cannot permanently deprive him of his right to keep and bear arms.

\* \* \*

If the Second Amendment were subject to a virtue limitation, there would be no need for the government to produce—or for the court to assess—evidence that nonviolent felons have a propensity for dangerous behavior. But *Heller* forecloses the "civic right" argument on which a virtue limitation depends. And while both Wisconsin and the United States have an unquestionably strong interest in protecting the public from gun violence, they have failed to show, by either logic or data, *cf. Skoien*, 614 F.3d at 642, that disarming Kanter substantially advances that interest. On this record, holding that the ban is constitutional as applied to Kanter does not "put[ ] the government through its paces," *see Williams*, 616 F.3d at 692, but instead treats the Second Amendment as a "second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees," *McDonald v. City of Chicago*, 561 U.S. 742, 780, 130 S.Ct. 3020, 177 L.Ed.2d 894 (2010) (plurality opinion). I therefore dissent.

ER367

**All Citations**

919 F.3d 437

Footnotes

1     Accordingly, calling the statute a "felon" dispossession statute is somewhat of a "misnomer." Carly Lagrotteria, Note, *Heller's Collateral Damage: As-Applied Challenges to the Felon-in-Possession Prohibition*, 86 Fordham L. Rev. 1963, 1970 (2018).

2     The Attorney General delegated its authority under § 925(c) to the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"). 28 C.F.R. § 0.130(a)(1).

3     Because "the federal and state prohibitions are equivalent in effect" as to Kanter, our Second Amendment analysis of the two statutes is the same. *Baer v. Lynch*, 636 F. App'x 695, 698–99 (7th Cir. 2016).

4     Both parties appealed to the Supreme Court, but the Supreme Court denied the petitions for writ of certiorari. *See Sessions v. Binderup*, —— U.S. ——, 137 S.Ct. 2323, 198 L.Ed.2d 746 (2017) (noting Justices Ginsburg and Sotomayor would grant the petition); *Binderup v. Sessions*, —— U.S. ——, 137 S.Ct. 2323, 198 L.Ed.2d 746 (2017) (same).

5     *But see Berron v. Ill. Concealed Carry Licensing Review Bd.,* 825 F.3d 843, 847 (7th Cir. 2016) ("When holding in [*Heller*] that the Second Amendment establishes personal rights, the Court observed that only law-abiding persons enjoy these rights, even at home.").

6     Indeed, numerous legal historians have endorsed this view. *See, e.g.,* Saul Cornell, "*Don't Know Much About History" The Current Crisis in Second Amendment Scholarship*, 29 N. Ky. L. Rev. 657, 679 (2002) ("Perhaps the most accurate way to describe the dominant understanding of the right to bear arms in the Founding era is as a civic right [that] ... was limited to those members of the polity who were deemed capable of exercising it in a virtuous manner."); Robert Dowlut, *The Right to Arms: Does the Constitution or the Predilection of Judges Reign?*, 36 Okla. L. Rev. 65, 96 (1983) ("Colonial and English societies of the eighteenth century ... excluded ... felons [from possessing firearms]."); Don B. Kates, Jr., *Handgun Prohibition and the Original Meaning of the Second Amendment*, 82 Mich. L. Rev. 204, 266 (1983) ("Felons simply did not fall within the benefits of the common law right to possess arms."); Glenn Harlan Reynolds, *A Critical Guide to the Second Amendment*, 62 Tenn. L. Rev. 461, 480 (1995) ("One implication of this emphasis on the virtuous citizen is that the right to arms does not preclude laws disarming the unvirtuous (i.e. criminals) ...." (citation omitted)). Moreover, according to Thomas M. Cooley's 1868 Treatise on Constitutional Limitations, which the *Heller* court described as a "massively popular" treatise written by "[t]he most famous" late-nineteenth-century legal scholar, 554 U.S. at 616, 128 S.Ct. 2783, certain classes of people were "almost universally excluded" from exercising certain civic rights, including "the idiot, the lunatic, and the felon, on obvious grounds." Thomas M. Cooley, *A Treatise on the Constitutional Limitations Which Rest Upon the Legislative Power of the States of the American Union* 29 (1st ed. 1868).

7     Although *Everist* was issued before the *Heller* decision, the Fifth Circuit already recognized an individual right to bear arms pre-*Heller* and reaffirmed the validity of the *Everist* decision after *Heller. See Scroggins*, 599 F.3d at 451.

8     For support for Judge Sykes's observation regarding the conflicting scholarship on the historical conception of the Second Amendment, *see, e.g.,* Carlton F.W. Larson, *Four Exceptions in Search of A Theory:* District of Columbia v. Heller *and Judicial Ipse Dixit*, 60 Hastings L.J. 1371, 1374 (2009) ("[S]o far as I can determine, no colonial or state law in eighteenth-century America formally restricted the ability of felons to own firearms."); C. Kevin Marshall, *Why Can't Martha Stewart Have a Gun?*, 32 Harv. J.L. & Pub. Pol'y 695, 698 (2009) ("[A]ctual 'longstanding' precedent in America and pre-Founding England suggests that a firearms disability can be consistent with the Second Amendment to the extent that ... its basis credibly indicates a present danger that one will misuse arms against others and the disability redresses that danger."); Adam Winkler, *Heller's Catch-22*, 56 UCLA L. Rev. 1551, 1563 (2009) ("The Founding generation had no laws ... denying the right to people convicted of crimes.").

9     In fact, we usually defer the threshold historical scope inquiry and proceed directly to means-end scrutiny. *See, e.g., Horsley v. Trame*, 808 F.3d 1126, 1131 (7th Cir. 2015) (declining to decide whether eighteen- to twenty-year-olds are within the scope of the Second Amendment); *Yancey*, 621 F.3d at 684–85. One notable exception to our generally restrained approach in this area is *United States v. Meza-Rodriguez*, 798 F.3d 664 (7th Cir. 2015). There, the majority held that undocumented immigrants were historically within the

scope of the Second Amendment but ultimately concluded that the statute at issue nevertheless survived intermediate scrutiny. *Id.* at 669–73. The concurrence advocated for a "prudential approach" since we did not need to decide the threshold question to resolve the case, and proposed "reserv[ing] resolution of this challenging constitutional question for a case that compels addressing it." *Id.* at 673–74 (Flaum, J., concurring in the judgment). We think that prudential approach is appropriate here.

10    Our means-end review is arguably less rigorous in this case because the weight of the historical evidence summarized above suggests that felon dispossession laws do not restrict the "core right of armed defense," but rather burden "activity lying closer to the margins of the right." *Ezell II*, 846 F.3d at 892. Indeed, we have said that "the state can prevail with less evidence when, as in *Skoien*, guns are forbidden to a class of persons who present a higher than average risk of misusing a gun." *Moore*, 702 F.3d at 940. We have even gone so far as to say that "empirical evidence of a public safety concern can be dispensed with altogether when the ban is limited to obviously dangerous persons such as felons and the mentally ill." *Id.*

11    Even the study that Kanter relies upon found that approximately 40 percent of individuals convicted of mail fraud had at least one additional arrest afterward. David Weisburd & Elin Waring, *White-Collar Crime and Criminal Careers* 12, 29 (2004). The same study found that 24.5 percent of all repeat white-collar offenders had at least one violent arrest on their record. *Id.* at 45. In other words, "white-collar offenders often have multiple contacts with the criminal justice system" and "are unlikely to evidence a high degree of specialization." *Id.* at 49.

12    We decline to revisit our comment in *Williams* "that § 922(g)(1) may be subject to an overbreadth challenge at some point because of its disqualification of all felons, including those who are non-violent." 616 F.3d at 693. That statement was dictum, and we need not determine whether § 922(g)(1) may ever be subject to an as-applied challenge to reach our decision in this case. There may be a case in the future that requires addressing whether any individual may successfully bring an as-applied challenge to the statute, but Kanter's is not that case. *See Broadrick v. Oklahoma*, 413 U.S. 601, 610, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973) ("[A] person to whom a statute may constitutionally be applied will not be heard to challenge that statute on the ground that it may conceivably be applied unconstitutionally to others, in other situations not before the Court.").

1    Because the federal and state statutes operate to the same effect as applied to Kanter, my analysis applies equally to both. For simplicity's sake, I often refer only to the federal statute. In addition, I sometimes refer to the statutes as imposing a "felon ban" or "felon dispossession" with the understanding that § 922(g)(1) also encompasses state misdemeanors punishable by more than two years in prison. *See* 18 U.S.C. § 921(a)(20)(B).

2    Or at least that would be true absent the unlikely event that the Second Amendment, as originally understood, imposed a very specific restriction on the length of time that such a misdemeanant was excluded from the right.

3    Felon disenfranchisement laws have a long history, and the Fourteenth Amendment's protection of the right to vote expressly acknowledges the authority of state legislatures to enact such laws. U.S. Const. amend. XIV, § 2 (providing that a state's representation in the House will be reduced if the right to vote "is denied ... or in any way abridged, except for participation in rebellion, or other crime"). The Second Amendment contains no similar acknowledgement. Legislative power to strip the right from certain people or groups was nonetheless a historically accepted feature of the pre-existing right that the Second Amendment protects. *See Heller*, 554 U.S. at 592, 128 S.Ct. 2783 ("[T]he Second Amendment ... codified a *pre-existing* right."); *id.* at 595, 128 S.Ct. 2783 ("Of course the right was not unlimited ...."); *Skoien*, 614 F.3d at 640 ("That *some* categorical limits are proper is part of the original meaning, leaving to the people's elected representatives the filling in of details."). Thus, such a regulation does not "infringe" the right to bear arms because the right was always qualified by the government's power to prevent the dangerous from exercising it.

4    This common-law offense was adapted from the 1328 Statute of Northampton, which decreed that a person may not "go nor ride armed by night nor by day in fairs, markets, ... nor in no part elsewhere, upon pain to forfeit their armour to the King, and their bodies to prison at the King's pleasure." Statute of Northampton, 2 Edw. 3, c. 3 (1328). By the middle of the seventeenth century, the statute was "almost gone in desuetudinem," because the law recognized "a general connivance to gentlemen to ride armed for their security." *Rex v. Knight*, 90 Eng. Rep. 330, 330 (K.B. 1686). But it was still enforced against those who violated the terms of the statute "malo animo," *id.*—that is, those who carried arms with intent "to terrorize their neighbors," *see* Joyce Lee Malcolm, To Keep and Bear Arms at 104 (1994).

5    To be sure, the American experience does not map on exactly to the English one. For one thing, the right protected by the Second Amendment was decidedly broader than the one protected in the English Bill of Rights. *See* Malcolm, *supra*, at 162. Still, the American

version was derived from its English predecessor, *see id.* at 150, 164, which makes English practice instructive. That is especially true when the patterns from English practice repeat themselves in American law.

6   First, the allegiance required was to the Crown, and later, it was to the sovereign and independent states. *See id.* at 159 & n.49 (quoting 4 Journals of the Continental Congress, 1774–1789, at 201–05 (1906) (calling for the disarmament of those "who are notoriously disaffected to the cause of America, or who have not associated, and shall refuse to associate, to defend, by arms, these United Colonies")).

7   It should go without saying that such race-based exclusions would be unconstitutional today.

8   The same court had two years earlier suggested that where a statute changed punishment from death to a life sentence, the statute may be read as an affirmance of the common law punishment of civil death. *See Platner*, 6 Johns. Ch. at 127–28 (citing *Troup*, 4 Johns. Ch. 228). But in *Platner*, the court explicitly rejected its earlier assumption and replaced it with a well-reasoned, widely-adopted, and enduring view that civil death existed only if authorized by statute. *Id.* at 128 ("The same point arose, incidentally, in respect to this same conviction, in the case of *Troup v. Wood*, and I was there induced to think, upon the authority of Lord *Coke*, that every person attainted of felony was accounted, in law, *civiliter mortuus*. It was not a necessary or very material point in that case, and I did not pursue the subject to the extent I should have done, if it had been then, as it is now, the direct and material point in issue. I have, likewise, since, had the benefit of a full and able discussion, and of a diligent and accurate research, particularly on the part of the plaintiff, respecting this very unusual question of law." (citation omitted)).

9   Courts were consistent and explicit about the difficulty of trying to apply the doctrine of civil death outside the context of the death penalty. *See, e.g., Shapiro v. Equitable Life Assur. Soc. of U.S.*, 182 Misc. 678, 45 N.Y.S.2d 717 (N.Y. Sup. Ct. 1943) ("Palpable anomaly inevitably results from attempting to attribute civil death, not only to persons about to be executed, but, also, to persons who may remain physically alive for many years and also may be paroled of pardoned."); *Byers v. Sun Sav. Bank*, 41 Okla. 728, 139 P. 948, 949 (1914) ("[Civil death] had its origin in the fogs and fictions of feudal jurisprudence and doubtlessly has been brought forward into modern statutes without fully realizing either the effect of its literal significance or the extent of its infringement upon the spirit of our system of government. At any rate, the full significance of such statutes have never been enforced by our courts for the principal reason that they are out of harmony with the spirit of our fundamental laws and with other provisions of statutes."); *Avery*, 18 N.E. at 155 ("Any one who takes the pains to explore the ancient and in many respects obsolete learning connected with the doctrine of civil death in consequence of crime, will find that he has to grope his way along paths marked by uncertain, flickering, and sometimes misleading lights; and he cannot feel sure that at some point in his course he has not missed the true road."). But here, defining the precise impact of "civil death" on a felon sentenced to life is not as important as underscoring that the impact was no longer complete destruction of rights and death to the law.

10  The governments gesture towards *Heller* as support for a virtue exclusion, citing *Heller*'s assertion that the Second Amendment "surely elevates above all other interests the right of law-abiding, responsible citizens to use arms in defense of hearth and home." 554 U.S. at 635, 128 S.Ct. 2783. That statement implies that the legislature might have the power to more heavily regulate those who are not law-abiding or responsible. But it does not purport to analyze the scope of that power, nor does it endorse the very specific concept of a virtue exclusion.

11  *See, e.g.*, Act of Feb. 28, 1803, ch. 92, § 1, *in* Acts and Laws of the Commonwealth of Massachusetts 173 (Wright & Potter 1898) (jurors must be "of good Moral Character" and qualified to vote; "and if any person, whose name shall be put into either [jury] Box, shall be convicted of any Scandalous crime, or be guilty of any gross immorality, his name shall be withdrawn from the [jury] Box, by Selectmen of his town"); Act of Feb. 2, 1811, ch. 158, § 2, *in* 4 Laws of the State of Delaware, at 445, 449 (Bradford & Porter 1816) (grand jurors must be "sober, substantial and judicious freeholders, lawful men, of fair characters"); *id.* § 7 (petit jurors must be "sober, discreet and judicious freeholders,... lawful men of fair characters"); Act of Dec. 17, 1796, § 52, *in* Acts for the Commonwealth of Kentucky 134 (Stewart 1796) (jurors must "be of good demeanor").

12  The fact that the first general prohibition on felon gun possession was not enacted until 1961 further undercuts the argument that either history or tradition supports a virtue-based restriction on the right. *See* An Act to Strengthen the Federal Firearms Act, Pub. L. No. 87-342, 75 Stat. 757 (1961) (amending the Federal Firearms Act by "deleting the words 'crime of violence' ... and inserting in lieu thereof the words 'crime publishable by imprisonment for a term exceeding one year' ").

13  The majority suggests that *who* exercises the right changes *what* the core of the right is, *see* Maj. Op. at 448 n.10, but that is circular. *Heller* distinguishes the two inquiries: First, it held that the District of Columbia's ban on handgun possession violated the Second

Amendment (the *what*). 554 U.S. at 635, 128 S.Ct. 2783. Then, it indicated the need to consider whether Heller could be disqualified from exercising that right (the *who*). *Id.* ("Assuming that Heller is not disqualified from the exercise of Second Amendment rights, the District must permit him to register his handgun and must issue him a license to carry it in the home."). Heller's qualification or lack thereof did not change the content of the right itself; it affected whether the legislature could take it away. The same is true of Kanter here.

14    Section 922(g)(1)'s predecessor, the Federal Firearms Act of 1938, did not permanently ban all felons from possessing firearms, but rather those convicted of "crime[s] of violence," defined then as "murder, manslaughter, rape, mayhem, kidnapping, burglary, housebreaking," and certain forms of aggravated assault. *See* Marshall, 32 Harv. J.L. & Pub. Pol'y at 698–99 (citing Federal Firearms Act, ch. 850, § 1(6), 52 Stat. 1250, 1250 (1938)). Even today, many scholars cited as supporting a general felon ban actually seem to assume or advocate something much closer to a *violent*-felon ban. *See, e.g.*, Don B. Kates & Clayton E. Cramer, *Second Amendment Limitations and Criminological Considerations*, 60 Hastings L. J. 1339, 1362–63 (2009) ("At early common law, the term 'felony' applied only to a few very serious, very dangerous offenses such as murder, rape, arson, and robbery.... Insofar as federal or state statutes would seek to bar arms possession by [felons who 'pos[e] no physical danger to others'], those laws would seem to be invalid on their face."); Stephen P. Halbrook, *What the Framers Intended: A Linguistic Analysis of the Right to "Bear Arms"*, 49 Law & Contemp. Probs., Winter 1986, at 151, 161 ("[*V*]*iolent criminals*, children, and those of unsound mind may be deprived of firearms...." (emphasis added)).

15    It's worth noting that, in addition to the eclectic and wide-ranging offenses already included in this category, there are very few limits on the ability of Congress and state legislatures to expand the number of qualifying nonviolent offenses. *Cf. United States v. Phillips*, 827 F.3d 1171, 1176 n.5 (9th Cir. 2016) ("Can Congress or the States define petty larceny as a felony? Of course. Can a conviction for stealing a lollipop then serve as a basis under § 922(g)(1) to a ban a person for the rest of his life from ever possessing a firearm, consistent with the Second Amendment?").

16    The majority suggests that nonviolent felonies are united by another characteristic relevant to the constitutionality of disarmament: that the commission of "*mala in se* felonies reflect[s] grave misjudgment and maladjustment." Maj. Op. at 450 (citation omitted). But that is just another way of saying that nonviolent felons have demonstrated a lack of virtue. Absent evidence that this lack of virtue is tied to a propensity for risky behavior that threatens public safety, it does not justify stripping them of their Second Amendment rights.

17    This assumes that the rate of violent arrest for mail fraudsters who reoffend tracks that of all white-collar criminals who reoffend. The governments' study doesn't speak to this question, underscoring the inability of the data provided to support the governments' arguments.

18    My analysis is limited to the total bans that Congress and the Wisconsin legislature enacted. It might be that this study or other evidence would support other, more limited intrusions on Kanter's Second Amendment right. But the constitutionality of a more limited measure (for example, a temporary ban or one that limits the places in which Kanter can have a gun) is not presented by this case.

---

**End of Document**        © 2022 Thomson Reuters. No claim to original U.S. Government Works.

ER371

# EXHIBIT B

other device at any time, for the purpose of killing any water fowl within the limits of Washington Territory, shall be guilty of a misdemeanor.

<u>West Virginia</u>: *1889 W. Va. Acts 173, An Act to Repeal chapter 28 Of The Acts Of The Legislature Of 1889, Entitled "AN Act To Establish A Court Of Limited Jurisdiction In The county Of Wayne, pt. 11*: And it shall be unlawful for any person by the use of any swivel or pivot gun, or any other than the common shoulder gun, or by the aid of any push boat or sneak boat, used for carrying such gun, to catch, kill, wound or destroy, or to pursue with such intent upon any of the waters, bogs . . . within this state, any wild goose, wild duck or brant.

## Manufacturing, Inspection and Sale of Gunpowder.

### Colonial (1607-1791)

<u>Maryland</u>: *1757-68 Md. Acts 53, An Act Prohibiting All Trade With The Indians, For The Time Therein Mentioned, § 3*: That it shall not be lawful for any person or persons within this Province, to sell or give to any Indian Woman or Child, any gunpowder, shot, or lead, whatsoever, nor to any Indian Man within this province, more than the quantity of one pound of gunpowder and six pounds of shot or lead, at any one time, and not those, or lesser quantities of powder or lead oftener than once in Six months, under the Penalty of Five Pounds Current Money for every pound of gunpowder. . .

<u>New Jersey</u>:  *1776-77 N.J. Laws 6, An Act For The inspection Of Gunpowder, chap. 6, § 1*: That any person who, from and after the publication of this act, shall offer any gun powder for sale, without being previously inspected and marked as is herein after directed, shall forfeit, fore every such offence, the sum of five shillings a pound for every pound weight so offered for sale, and so in proportion for greater or lesser quantity. . .

### Pre-14[th] Amendment (1791-1868)

<u>Connecticut</u>: *1836 Conn. Acts 105 (Reg. Sess.) An Act Incorporating The Cities of Hartford, New Haven, New London, Norwich and Middletown, chap. 1, § 20*: relative to prohibiting and regulating the bringing in, and conveying out, or storing of gunpowder in said cities . .

<u>Indiana</u>: *1847 Ind. Acts 93, An Act To Reduce the Law Incorporating the City of Madison, and the Several Acts Amendatory thereto Into One Act, And To Amend the Same, chap 61, § 8,  pt. 4*: to regulate and license, or provide by ordinance for regulating and licensing . . . the keepers of gunpowder and other explosive compounds.

<u>Iowa</u>: *1845 Iowa Laws 119, An Act to Incorporate and Establish the City of Dubuque, chap 123, § 12*: they shall have power from time to time to make and publish all such

60

Electronic copy available at: https://ssrn.com/abstract=2200991

laws and ordinances as to them shall seem necessary to provide for the safety, preserve health, promote the prosperity and improve the morals, order, comfort and convenience of said city, and the inhabitants thereof, to impose fines, forfeitures and penalties on all persons offending against the laws and ordinances of said city, and provide for the prosecution, recovery and collection thereof, and shall have power to regulate by ordinance the keeping and sale of gunpowder within the city.

Massachusetts: *1814 Mass. Acts 464, An Act In Addition To An Act, Entitled "An Act To Provide For The Proof Of Fire Arms, Manufactured Within This Commonwealth." § 1:* From and after the passing of this act, all musket barrels and pistol barrels, manufactured within this commonwealth shall, before the same shall be sold, and before the same shall be stocked, be proved by the person appointed according to the provisions of this act . . . with a charge of powder equal in weight to the ball which fits the bore of the barrel to be proved . . . § 2. If any person of persons, from and after the passing of this act, shall manufacture within this Commonwealth, any musket or pistol, or shall sell and deliver, or shall knowingly purchase any musket or pistol, without having the barrels first proved according to the provisions of the first section of this act, marked and stamped according the provisions of the first section of the act to which this is an addition . . .

New Hampshire: *1820 N.H. Laws 274, An Act To Provide For The Appointment Of Inspectors And Regulating The Manufacture Of Gunpowder, chap XXV, §§ 1-9:* The Governor . . . is herby authorized to appoint an inspector of gunpowder for every public powder magazine, and at every manufactory of gunpowder in this state . . . § 2. And be it further enacted that from and after the first day of July next, all gunpowder which shall be manufactured within this estate shall be composed of the following proportions and quality of materials. . . § 3. It shall be the duty of each of said inspectors to inspect examine and prove all gunpowder which after the first day of July shall not be deposited at any public powder magazine, or manufactory of this state. . . § 4: No gunpowder within this state shall be considered to be of proof unless one ounce thereof, placed in a chamber of a four inch howitzer and elevated so as to form an angle of forty five degrees with the horizon, will, upon being fired throw a twelve pound shot seventy five yards at the lease. § 5: Whenever any of said inspectors shall discover any gunpowder, deposited at any public powder magazine, or any other place within this state, which is not well manufactured or which is composed of impure materials . . . the inspector in such case, shall mark each cask containing such impure ill manufactured or deficient gunpowder. § 6. If any person shall knowingly sell any condemned gunpowder . . . every such person, so offending , shall forfeit and pay not less than two hundred dollars nor more than five hundred dollars. . . § 7. Each inspector . . . be shown to the faithful and impartial discharge of the duties of his office, and each inspector one cent for each pound gunpowder, by him examined inspected and proved § 8. That if any manufacturer of gunpowder meant to be sold inspected . . . shall forfeit . . . not less than two dollars . . . § That if any person with within this state . . shall knowingly . . . shall forfeit not less than 5 dollars nor more than 500 dollars.

New Hampshire: *1825 N.H. Laws 74, An Act To Regulate The Keeping And Selling, And Transporting Of Gunpowder, chap. 61, § 5:* That if any person or persons shall sell or

Electronic copy available at: https://ssrn.com/abstract=2200991

offer for sale by retail any gunpowder in any highway, or in any street, lane, or alley, or on any wharf, or on parade or common, such person so offending shall forfeit and pay for each and every offense a sum not more than five dollars nor less than one dollar, to be recovered and applied as aforesaid.

New Jersey: 1811 N.J. Laws 300, An Act To Regulate Gun Powder Manufactories And Magazines Within This State, § 1: No person or persons whatsoever shall be permitted within this state to erect or establish or cause to be erected or established any manufactory which shall be actually employed in manufacturing gun powder either by himself or any other person, either on his own land or another, within the distance of a quarter of a mile from any dwelling house, barn or out house, without the consent under hand and seal of all and every the owner or owners of such dwelling house. . .

Ohio: *1849 Ohio Laws 408, An Act To Incorporate The Town Of Ripley In The County Of Brown, § 4*: That the said town council of Ripley shall have power to ordain and establish laws and ordinances . . . to regulate the sale of gunpowder therein.

Pennsylvania: *1794 Pa. Laws 764, An Act Providing For The Inspection Of Gunpowder chap. 337*: Whereas gun-powder imported from abroad, and manufactured within this stat, have frequently been found to vary much in its strength, and sometimes of inferior qualities, and its defects not discovered until brought into actual use : and whereas the modes herefore rules to prove the force thereof have been found uncertain and variable; and whereas Joseph Leacock, of the city of Philadelphia, hath invented an engine, called a pendulum powder proof, with a graduated arch and catch pall, by which it is conceived that the force of gunpowder may be proved by experiment, and the article reduced to certain and uniform standards of strength, whereby the manufacture may be advanced towards ultimate perfection, and the purchaser and consumer protected against fraud and imposition.

Tennessee: *1867-68 Tenn. Pub. Acts 26, An Act To Amend The Charter Of The City Of Memphis, And For Other Purposes, pt. 20*: To provide for the prevention and extinguishment of fires . . . to regulate and prevent carrying on manufactures dangerous in causing or producing fire . . .

Vermont: *1865 Vt. Acts & Resolves 213, An Act To Amend An Act Entitled "An Act To Incorporate The Village Of Rutland,:" Approved November 15, 1847, § 10*: . . . and said fire wardens may inspect the manner of manufacturing and keeping gun-powder, lime, ashes, matches, lights, fire-works of all kinds, and other combustibles, . . . and said fire-wardens may , if they deem the same to be dangerous, order the persons manufacturing and keeping such gun powder . . . in what manner to manufacture and keep the same. . .

## Post 14th Amendment

California: 1883 Cal. Stat. 156, § 153: The Municipal Council shall provide by ordinance for the payment into a "Fireman's Charitable Fund" of such city, or city and county, of all moneys received for licenses for the storage, manufacture, or sale of gunpowder, blasting

62

Electronic copy available at: https://ssrn.com/abstract=2200991

powder, gun cotton, fireworks, nitroglycerine, dualine, or any explosive oils or compounds, or as a municipal tax upon the same; also all fines collected in the police court for violations of fire ordinances. . . .

Kentucky: *1874 Ky. Acts 327, An Act to Revise and Amend the Charter of the City of Newport, § 6*: To prohibit the manufacture of gunpowder or other explosive, dangerous or noxious compounds or substances in said city, and to regulate their sale and storage by license.

Nebraska: *1869 Neb. Laws 53, An Act To Incorporate Cities Of The First Class In The State Of Nebraska, § 47*: The City Council shall have power to license all . . . vendors of gunpowder. . .

Nebraska: *1895 Neb. Laws 233, Statutes Relating To The government Of The City Of Lincoln, § 17*: No person shall keep, sell, or give away any gunpowder or guncotton in any quantity without permission in writing signed by the Chief of Fire Department and City Clerk, and sealed with the corporate seal, under a penalty of twenty-five dollars for every offense: Provided, any person may keep for his own defense a quantity of gunpowder or guncotton not exceeding one pound.

New Hampshire: *1891 N.H. Laws 332, Safe-keeping Of Gunpowder And Other Explosives, § 7*: If any person shall carry from town to town, or from place to place, any gunpowder  for the purpose of peddling or selling it by retail in quantities less than twenty-five pounds, or shall sell, or offer to sell by retail, any gunpowder in any highway or street, or on any wharf, parade, or common, or if any person shall sell or deal out any gunpowder in the night time, between sunset and sunrise, he shall forfeit for each offense a sum not more than five dollars.

New Jersey: 1886 N.J. Laws 358, An Act To Regulate The Manufacture And Storage Of Gun Powder, Dynamite And Other Explosive, § 1: No person or persons or corporations shall after the passage of this act, be permitted within this state to erect, have or maintain, or cause to be erected, had or maintained any establishment, storehouse or building in which in which shall be manufactured, stored or kept any gun powder, blasting powder, dualin, dynamite, forcite, giant powder, nitroglycerine, or any powder or materials of which nitroglycerine is an essential ingredient or forms a component part, or any other explosive within the distance of one thousand feet from any public road . . .

Ohio: 1889 Ohio Laws 164, An Act To Amend Section 2669 Of The Revised Statutes, As Amended April 22, 1885, § 2669: The council of the city or village may provide by ordinance for licensing all exhibiters of shows or performances of any kind, not prohibited by law, hawkers, peddlers, auctioneers of horses and other animals on the highways or public grounds of the corporation, vendors of gun powder and other explosives, taverns and houses of public entertainment, and hucksters in the public streets or markets, and in granting such license, may extract and receive such sum of money as it may think reasonable . . .

Electronic copy available at: https://ssrn.com/abstract=2200991

<u>Oklahoma</u>: *1890 Okla. Sess. Laws 447, Crime and Punishment, § 24*: Every person guilty of making or keeping gunpowder or saltpeter within any city or village, in any quantity of manner such as is prohibited by law or by and ordinance of said city or village, in consequence whereof any explosion occurs whereby any human being is killed, is guilty of manslaughter.

<u>Oklahoma</u>: *1890 Okla. Sess. Laws 474, Crime and Punishment, § 4*: Every person who makes or keeps gunpowder or saltpeter within any city or village, and every person who carries gunpowder through the streets thereof, in any quantity or manner such as is prohibited by law, or by any ordinance of such city or village , is guilty of a misdemeanor.

<u>Rhode Island</u>: *1885 R.I. Pub. Laws 6, An Act In Amendment Of And in Addition To Chapter 242 Of The Public Statutes, Entitles "Of Offenses Against Private Property." § 1*: Every person who shall knowingly deliver or cause to be delivered to any person or carrier any box, can or other package of nitroglycerine, gunpowder, naptha or other equally explosive material, not marked with a plain and legible label describing its contents, or who shall remove or cause to be removed any such label or mark shall be fined not more than ten thousand dollars or imprisoned not more than five years.

<u>Tennessee</u>: *1899 Tenn. Pub. Acts 327, An Act To Repeal The Charter Of The Town Of Waverly, In Humphreys county, And to Incorporate Said Town And Define Its Rights, Powers, etc., § 10*: To regulate, restrain, or prevent the carrying on of manufactories dangerous in causing or producing fires, and to prevent and suppress the sale of firearms, fireworks, Roman candles, crackers, sky rockets, etc., and toy pistols. . .

## Militia Regulation

### Classical Period (Prior to 800 AD)

*Constitution of Athens, Aristotle § 4:* Now his constitution had the following form. The franchise was given to all who could furnish themselves with a military equipment.

### English (800-1776)

*Militia Act of 1662, 13 & 14 Car. 2, c. 3, § 1 (1662)* (Allowed Militia lieutenants to disarm individuals deemed to be a threat to the state).

### Colonial (1607-1791)

<u>Connecticut</u>: *1775 Conn. Acts 413 (Reg. Sess.) An Act For Supplying The Troops Ordered to be raised For the Special Defense and Safety of this Colony with Necessary Fire Arms*: . . .

Electronic copy available at: https://ssrn.com/abstract=2200991

# EXHIBIT C

# Second Amendment Timeline

 Facebook  Twitter  LinkedIn

## 1934 _Automatic Firearms Are Regulated_

Following an attempt on the life of President-elect Franklin D. Roosevelt with a handgun in 1933, Congress passes the National Firearms Act of 1934. The nation's first feder law taxes the manufacture, sale, and transfer of fully automatic firearms and "gangster-type weapons," including machine guns and sawed-off shotguns. It also requires FBI b checks and local law enforcement notification for people who wish to purchase these weapons.

 Facebook  Twitter  LinkedIn

## 1938 _Federal Regulation Of Gun Sales Begins_

The Federal Firearms Act of 1938 requires gun sellers to obtain a license from the Internal Revenue Service to sell guns and to maintain a record of purchases. The act also convicted felons from purchasing firearms or ammunition. However, the law makes no provision for criminals who provide false information when they purchase weapons.

 Facebook  Twitter  LinkedIn

## 1968 _Congress Enacts Expanded Gun Regulations_

In 1927, Congress had passed legislation that banned mailing such concealable weapons as cane guns and pen guns, but until 1968 there is no law that regulates the mailing shotguns, or handguns. Following the assassination of President John F. Kennedy in 1963 and the handgun-related assassinations of Reverend Martin Luther King Jr. and Se Kennedy in 1968, Congress enacts the Gun Control Act. The act regulates imported guns, expands licensing and record keeping requirements, bans mail-order sales of guns ammunition, raises the age at which one can legally buy a gun, and prevents convicted felons, mentally ill people, and illegal drug users from buying guns.

 Facebook  Twitter  LinkedIn

## 1972 _Bureau Of Alcohol, Tobacco And Firearms Is Created_

Displeased with the lack of vigorous enforcement of federal gun control laws, Congress separates the Bureau of Alcohol, Tobacco, and Firearms (ATF) (since renamed the F Alcohol, Tobacco, Firearms, and Explosives) from the Internal Revenue Service and forms it as a separate law enforcement organization within the U.S. Department of Justi

 Facebook  Twitter  LinkedIn

## 1990 _Government Seeks To Make School Zones Gun-Free_

The Gun-Free School Zones Act makes it a federal crime to knowingly bring a gun within a thousand feet of a school, or to fire a gun within that zone. However, in _United S_ (1995), the U.S. Supreme Court rules that Congress overstepped its constitutional authority under the commerce clause when it passed this act. The Court finds that the pu gun possession and gun use near schools is a matter for each state to regulate on its own.

 Facebook  Twitter  LinkedIn

## 1994 _Brady Law Requires Background Checks_

The Brady Law is named for former Presidential press secretary James Brady, who was seriously wounded during the 1981 assassination attempt on President Ronald Reaga requires federally licensed firearm dealers to perform background checks with law enforcement officials before selling a firearm. During the background check, officials con the buyer falls within a category of individuals prohibited from owning or possessing a firearm by state law or the 1968 Gun Control Act. In _Printz v. United States_ (1997) th Supreme Court holds that the Brady Law's waiting-period requirement is constitutional, but finds that the mandatory background checks required of local authorities are unconstitutional.

 Facebook   Twitter   LinkedIn

## 1994

### Semiautomatic Weapons Are Banned

The Violent Crime Control and Law Enforcement Act of 1994 bans nineteen types of semiautomatic weapons and ammunition clips holding more than ten rounds (except police use). It also bans handgun possession by anyone under age eighteen and increases the requirements for federal gun dealer licenses.

 Facebook   Twitter   LinkedIn

## 2000

### Smith & Wesson Reaches A Settlement

In the first settlement of its kind, the gun manufacturer Smith & Wesson reaches a settlement in many of the lawsuits brought against it by municipalities around the country: Atlanta; Berkeley, California; Bridgeport, Connecticut; Camden, New Jersey; Detroit; Gary, Indiana; Englewood, New Jersey; Los Angeles, Miami-Dade; San Francisco; St Washington, D.C. The settlement binds Smith & Wesson to change the way it designs and distributes its guns. The company is required to install safety mechanisms including locks and "smart gun" technology and sell only to authorized dealers who can prove that the guns they sell are not disproportionately used in crimes.

 Facebook   Twitter   LinkedIn

### Related Resources

Timeline: Second Amendment
Book: Second Amendment (1791)
Book: Chapter 23: The Right to Bear Arms

## Annenberg Classroom

**Contact Information**
Annenberg Classroom
The Annenberg Public Policy Center
202 S. 36th St.
Philadelphia, PA 19104-3806
info@annenbergclassroom.org

**Civics Renewal Network Newsletter**
The best free civics materials from around the web in one monthly mailing.

Email Address | SUBSCRIBE

**Best Civics Sites**
Constitutional Sources Project
NewseumED
National Constitution Center
iCivics
Library of Congress
More…

**Resources**
Book
Game
Handout
Timeline
Video
Website

**Topics**
Immigration
Guns
Education
Discrimination

More…

**Annenberg Guide to the Constitution: What It Says, What It Means**
This interactive guide to the U.S. Constitution provides the original text and an explanation of the meaning of each article and amendment. The guide is an excellent research tool for students to use to gain a deeper understanding of one of our nation's founding documents and the establishment of the federal government.

**Recommended Documentaries**
Freedom of Assembly: Nationalist Socialist Party v. Skokie
The 19th Amendment: A Woman's Right to Vote
Korematsu and Civil Liberties
Your Right to Remain Silent: Miranda v. Arizona
Making Our Fourth Amendment Right Real: Mapp v. Ohio

**Popular Lesson Plans**
Freedom of Assembly: The Right to Protest
Influential Movements in the Struggle for Women's Suffrage
Civil Liberties vs. National Security: A Wartime Balancing Act
Monty Python and the Quest for the Perfect Fallacy
Actions That Changed the Law: Ledbetter v. Goodyear
More…

**Annenberg Public Policy Center**

AnnenbergPublicPolicyCenter.org   FactCheck.org   AnnenbergClassroom.org   CivicsRenewalNetwork.org

Transparency Statement                Copyright Policy                © Copyright 2022 The Annenberg Public Policy Center of the University of Pennsylvania

**EDWARD M. ROBINSON (CA Bar 126244)**
**BRIAN A. ROBINSON (CA Bar 333650)**
21515 Hawthorne Blvd, Suite 730
Torrance, CA 90503
Office:  (310) 316-9333
Facsimile: (310) 316-6442
eroblaw@gmail.com

Attorneys for Defendant
*Travis Schlotterbeck*

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA
## WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 19-cr-00343-GW-1 |
| Plaintiff, | **DEFENDANTS' JOINT MOTION TO DISMISS THE INDICTMENT PER FED. R. CRIM. P. 12(b)(3)(A); EXHIBIT IN SUPPORT** |
| v. | |
| TRAVIS SCHLOTTERBECK | DATE: July 11, 2022 |
| Defendant. | TIME: 8:30 AM |
| | Courtroom of the |
| | Honorable George H. Wu |

1

ER382

# **TABLE OF CONTENTS**

**INTRODUCTION** ...................................................................................................1

**ARGUMENT** ........................................................................................................2

   **I. THE INDICTMENT MUST BE DISMISSED AS THE CHARGES IN THE**
      **INDICTMENT RUN AFOUL OF THE SECOND AMENDMENT** .................2

     A.   Legal Standard ..................................................................................3

     B.   Count Three ......................................................................................3

     C.   Counts One and Two ........................................................................4

**CONCLUSION** .....................................................................................................5

ER383

# <u>TABLE OF AUTHORITIES</u>

**Cases**

*District of Columbia v. Heller*
 554 U.S. 570 (2008)...................................................................3

*Kanter v. Barr*
 919 F.3d 437 (7th Cir. 2019) ......................................................4

*New York State Rifle and Pistol Assn v. Bruen*
 597 U.S. __ (2022) ...............................................................1, 3, 5

**Statutes**

18 U.S.C. § 371.............................................................................1

18 U.S.C. § 922......................................................................1, 2, 4

ER384

### INTRODUCTION

Mr. Schlotterbeck and Mr. Vhla are charged in a three-count indictment alleging that they conspired with each other and others to manufacture firearms without the appropriate federal firearms license. They are also charged with the substantive count of manufacturing five firearms for profit without the appropriate federal firearms license in violation of 18 U.S.C. §§ 371 and 922(a)(1)(A). The indictment alleges that the defendants aided and abetted each other and alleged co-conspirators in the substantive count of manufacturing firearms without a license. (*See* Doc. 1, Count 2.) Finally, Mr. Schlotterbeck is charged in count 3 with selling a firearm to a prohibited person in violation of 18 U.S.C. §922(d).

On June 23, 2022, the United States Supreme Court issued the landmark opinion in *New York State Rifle and Pistol Assn v. Bruen*, 597 U.S. __ (2022). This opinions new application of the textual and historical text in determining what government regulations run afoul with the Second Amendment established a sea change on the law concerning Second Amendment claims.

The means-end strict scrutiny approach to determining whether a government regulation was constitutional under the Second Amendment has been abandoned. It has been replaced with a text and history analysis. *Bruen*, 597 U.S. at 10. Under the *Bruen* case, in all analysis of a Second Amendment claim, like this one to dismiss the charges in the indictment, it is presumed that "[the] individual's conduct" is constitutionally protected. *Id*. at 8. In order to justify government regulation, like the ones in the indictment concerning manufacturing firearms without a license for profit and selling a firearm to a felon, it is no longer constitutional even if that "regulation promotes an important interest." Now, "the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation. Only if a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's" unqualified right to possess a firearm. *Id*. With respect to counts one and two, the government cannot meet

1

1  its heavy burden to establish that Mr. Schlotterbeck and Mr. Vlha's conduct would be
2  subject to regulation at the time of the ratification of the Second Amendment.
3       Additionally, concerning count three in this case, Mr. Schlotterbeck is charged
4  with violating 18 U.S.C. § 922(b)(1)—sale of a firearm to a felon. The statute
5  criminalizing this behavior only defines the felony, rendering the purchaser a prohibited
6  person thereby criminalizing the sale, as a term of imprisonment exceeding one-year.
7  As will be set forth below, the government cannot carry its heavy burden establishing
8  that the sale to all felons, regardless of the nature of the offense, is consistent with
9  regulations on the right to possess a firearm at the time of the ratification of the Second
10 Amendment.  Thus, for these reasons, and those set forth below, the indictment must be
11 dismissed.

**ARGUMENT**

**I.**    **THE INDICTMENT MUST BE DISMISSED AS THE CHARGES IN THE INDICTMENT RUN AFOUL OF THE SECOND AMENDMENT**

15      It hardly needs to be said that agreeing with, causing, or transacting with another
16 in legal and constitutionally protected conduct is not a crime. The allegation in count
17 three of the indictment against Mr. Schlotterbeck is premised on the requirement that
18 the purchaser of the weapon in count three was a "prohibited person" under 18 U.S.C. §
19 922(g) and therefore was unable to exercise his Second Amendment right to possess a
20 firearm. This now outdated interpretation of the Second Amendment and the statutes
21 blanket prohibition on felons has now been rendered unconstitutional.
22      Concerning counts one and two, manufacturing a firearm to sell for profit was
23 not regulated conduct at the time of the ratification of the Second Amendment. To
24 criminalize that conduct as a necessary means to protect the public runs afoul of the
25 text of the Second Amendment, is not supported by historical analysis concerning the
26 time of the ratification and is now the waste product of the abandoned means-end
27 testing concerning the right to bear arms.
28

2

A. <u>Legal Standard</u>

As stated above, the *Bruen* court rejected the two-step means-end scrutiny test and adopted a new two-step, burden-shifting approach that is concerned only with "text and history." *Bruen*, 597 U.S. at 10. At step one, courts ask whether "the Second Amendment's plain text covers an individual's conduct." If it does, then "the Constitution presumptively protects that conduct." *Id*. at 14-15. At step two, the burden shifts to the government to "justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id*. at 15.

In meeting its burden, the government must show that in 1791, when the Second Amendment was enacted, there was a robust tradition of regulations that are "relevantly similar" to the challenged statute. Courts may look to "historical precedent from before, during, and even after the founding" to determine whether a particular category of firearm regulation was understood to be permissible when the Second Amendment was ratified. But the farther back or forward you go from 1791, the less relevant that precedent becomes, especially if it "contradicts" evidence from the period immediately surrounding 1791. As set forth in *Bruen*, "not all history is created equal[,] '[c]onstitutional rights are enshrined with the scope they were understood to have *when the people adopted them*.'" *Id*. at 25; citing *District of Columbia v. Heller*, 554 U.S. 570, 634-635 (2008) (emphasis in original). If "multiple plausible interpretations" of a particular historical source are presented to the court, the court must "favor the one that is more consistent with the Second Amendment's commandment." *Bruen*, 597 U.S. at 35, fn. 11.

B. <u>Count Three</u>

With respect to Mr. Schlotterbeck and count three, the indictment alleges an unconstitutional criminal regulation of Mr. Schlotterbeck's conduct. In full recognition of *Bruen's* command that the government must bear the burden of proving that this regulation does not run afoul of the Second Amendment, under the new analysis, attached as an exhibit, is then Judge now Justice Amy Comey Barrett's dissenting

opinion in the case of *Kanter v. Barr*, 919 F.3d 437 (7th Cir. 2019). In that case, then Judge Barrett meticulously analyzes the history of regulating a felon's right to possess a firearm. Justice Barrett concludes in her dissent that the felon in possession charge set forth in 922(g)(1) violates the Second Amendment. The majority opinion upholding the constitutionality of the transcendent definition of felons in 922(g) has been abrogated by the *Bruen* decision.

Benefiting from Justice Barrett's detailed analysis, the government will not be able to meet its burden of proof and production. The statute in count three on its face fails the textual and historical analysis, and as applied to Mr. Schlotterbeck, criminalizes an otherwise constitutional transaction. There was no indication that the felon reference in the indictment was dangerous or "a threat to the public safety." *Kanter*, 919 F.3d at 458 (Barrett, J., dissenting.) On its face and as applied, the allegation in count three violates the Second Amendment and must be dismissed.

### C. Counts One and Two

With respect to counts one and two, the indictment alleges an unconstitutional criminal regulation of both Mr. Schlotterbeck's and Mr. Vlha's conduct. Like count three, the government will not be able to meets its burden of proving that this regulation—unlicensed manufacturing of firearms for profit—does not run afoul of the Second Amendment.

At the time of the ratification of the Second Amendment, regulations on the manufacturing of firearms among the states were almost non-existent. *See* Exhibit B. There were no federal laws or regulations restricting the manufacturing of firearms until 1934, nearly 150-years after the ratification of the Second Amendment. This regulation, the National Firearms Act of 1934, however, only applied to automatic firearms and did not impose a licensing requirement on the manufacture, sale and

4

transfer, rather it merely imposed a federal tax. *See* Exhibit C. The Federal Firearms Act of 1938 was the first federal regulation imposing a license requirement on firearm manufacturers.[1] *Id.*

As such, the statutes in counts one and two on their faces fail the textual and historical analysis and as applied to Mr. Schlotterbeck and Mr. Vlha, criminalize otherwise constitutionally protected conduct. On their faces and as applied, the allegations in counts one and two violate the Second Amendment and must be dismissed.[2]

## CONCLUSION

For the foregoing reasons, Mr. Schlotterbeck and Mr. Vlha request that this Court dismiss the indictment against both defendants. In the alternative, defendants request that this court stay the proceedings pending further development in the law.

Respectfully submitted,


DATED:  July 1, 2022          By  */s/ Edward M. Robinson*
                             Edward M. Robinson
                             Brian A. Robinson
                             Attorney for Defendant
                             *Travis Schlotterbeck*


                             By /s/ Jerome J Haig
                             Jerome J Haig
                             Attorney for Defendant
                             *James Bradley Vlha*

---

[1] As stated in the *Bruen* opinion, "not all history is created equal." *Bruen*, 597 U.S. at 25. The historical analysis must focus on the time period of the ratification of the Second Amendment.

[2] While Justice Kavanaugh's concurrence argues that this new interpretation does not affect licensing regulations, for obvious reasons this position was not adopted in the majority opinion and is thus not the law of the land.

5

**EDWARD M. ROBINSON (CA Bar 126244)**
21515 Hawthorne Blvd, Suite 730
Torrance, CA 90503
Office: (310) 316-9333
Facsimile: (310) 316-6442
eroblaw@gmail.com

Attorneys for Defendant
*Travis Schlotterbeck*

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA
## WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>        Plaintiff,<br><br>    v.<br><br>TRAVIS SCHLOTTERBECK<br><br>        Defendant. | Case No. 19-cr-00343-GW-1<br><br>**DEFENDANTS' REPLY TO GOVERNMENT'S OPPOSITION TO DEFENDANTS' JOINT MOTION TO DISMISS**<br><br>DATE: June 23, 2022<br>TIME: 8:00 AM<br>Courtroom of the<br>Honorable George H. Wu |

1

# **TABLE OF CONTENTS**

INTRODUCTION ........................................................................................................ 1

ARGUMENT ............................................................................................................... 1

I.     The Constitutional Challenge is not Waived ..................................................... 1

II.    The Argument Regarding Receivers is Directly Relevant to the Vague Nature of the Statute, As Applied to Defendants' Conduct .................................................... 2

III.   The Term "Manufacturing" is Unconstitutionally Vague .................................. 2

CONCLUSION ........................................................................................................... 4

ER391

# TABLE OF AUTHORITIES

**Cases**

*Broughman v. Carver*,
  624 F.3d 670 (2010)................................................................2, 3

*Chappell v. United States*,
  270 F.2d 274 (9th Cir. 1959) ...........................................................1

*Hoffman Estates v. Flipside, Hoffman Estates, Inc.*,
  455 U.S. 489 (1982).........................................................................3

*Thibodeau v. Portuondo*,
  486 F.3d 61 (2d Cir. 2007) ..............................................................3

*United States v. Carona*,
  660 F.3d 360 (9th Cir. 2011) ...........................................................4

*United States v. Clark*,
  412 F.2d 885 (5th Cir. 1969) ...........................................................1

*United States v. Haig*,
  365 F. Supp. 3d 1101 (2019)........................................................2, 3

*United States v. Pheaster*,
  544 F.2d 353 (9th Cir. 1976) ...........................................................1

*United States v. Thompson/Center Arms Company*,
  504 U.S. 505 (1992).........................................................................4

ER392

ER393

**INTRODUCTION**

Congress has not defined the term "manufacturing." The parties cannot substitute their own preferred definitions in light of this congressional inaction. Certainly, the jury cannot draw its own. Moreover, the 2010 ATF Notification attached to the government's opposition merely underscores the complexity and confusion surrounding the application of 18 U.S.C. § 922(a)(1)(A). ATF's drawn-out efforts to explain this law to its regulated public detracts from any clarity and highlights the vagueness created by Congress's inaction.

Nothing in the government's opposition remedies this confusion or the lack of notice regarding the potential illegality of the defendants' conduct.

For these reasons and those set forth in the motion to dismiss, the indictment against Mr. Schlotterbeck and Mr. Vlha is unconstitutionally vague and must be dismissed.

**ARGUMENT**

**I.    The Constitutional Challenge is not Waived**

Preliminarily, this motion is not waived. Counsel for Mr. Schlotterbeck became counsel on May 17, 2022 and has complied with the briefing schedule to which the parties agreed. More importantly, this is a constitutional challenge to the statutes in the indictment as applied to the defendants. This motion can be raised at any time. *See, e.g. United States v. Pheaster*, 544 F.2d 353, 361 (9th Cir. 1976), ("Failure of an indictment to state an offense is, of course, a fundamental defect which can be raised at any time[]"); *citing United States v. Clark*, 412 F.2d 885, 888 (5th Cir. 1969); *Chappell v. United States*, 270 F.2d 274, 276 (9th Cir. 1959). The cases upon which the government relies deal with untimely suppression motions, not with challenges to the fundamental defects of an indictment. (Opp. at 7.) They are, thus, irrelevant. That prior counsel failed to bring these constitutional challenges to the charges in the indictment cannot possibly be a binding waiver on present counsel or on the defendants who must rely on their counsel's effective assistance.

1

The government's argument that the defendants have waived a facial challenge fails as well. Despite a conclusory claim that the challenge was not developed, the defendants spent a significant amount of time explaining why the term "manufacturing" is vague, both on its face and as applied.

## II.    The Argument Regarding Receivers is Directly Relevant to the Vague Nature of the Statute, As Applied to Defendants' Conduct

The government mistakes the division of the vagueness challenge brought by the defendants, between the completed receiver and manufacturing, as an attempt by the defense to recharacterize the indictment. It is not. The allegations in the indictment regarding "milling out a lower receiver" must be considered with the understanding that a lower receiver is not a "firearm" within the definition but is merely a part that, when assembled with other unregulated parts, creates the firearm in question. It is the assembling of these parts, which the indictment characterizes as "manufacturing" of the firearm, that is the crux of the vagueness challenge.

## III.    The Term "Manufacturing" is Unconstitutionally Vague

To quote from the Fourth Circuit case *Broughman v. Carver*, 624 F.3d 670, 674 (2010), "[w]hether Broughman is a firearms 'manufacturer' within the meaning of GCA is 'a question of statutory interpretation, a quintessential question of law …'" The Fourth Circuit continues, by stating what now appears to be the obvious, "in all cases of statutory interpretation [the objective] is 'to ascertain and implement the intent of Congress.'" It is from this case via the district court case in Nevada, *United States v. Haig*, 365 F. Supp. 3d 1101 (2019) that the government proposes the definition of manufacturing to be "assembling a firearms' individual components so as to render the firearm suitable for use." (Opp. at 17.) Yet the government itself, in a separate portion of its opposition, claims that the defendant can attack both the "milling phase and assembly phase" of the manufacturing process, thus apparently acknowledging that these are two separate processes. (Opp. at 19.) This acknowledgment is consistent with the competing dictionary definitions.

2

Moreover, the *Haig* case had nothing to do with the definition of manufacturing. The *Broughman* case is a regulatory case, not a criminal case. There, a licensed dealer sought review in the circuit over an unfavorable ruling in the district court where he sought declaratory relief under the Administrative Procedure Act so as to avoid having to pay an additional $50 per year to obtain a manufacturing license in addition to his dealing license. As *Broughman* is merely a regulatory case and not a criminal case, vagueness challenges like the one brought there are subject to a significantly more lenient test. *See Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 498-99 (1982) (Courts have "expressed greater tolerance of enactments with civil rather than criminal penalties because the consequences of imprecision are qualitatively less severe.").

While the Court in *Broughman* states that applying "a more general definition of 'manufacture'" in a civil context is appropriate, it certainly is not so here. 624 F.3d 675, fn.3. The *Broughman* Court itself notes the various dictionary definitions of the term "manufacture," used differently in different legal contexts. *Id*. While the Court there relies on a more generalized definition, a criminal defendant would not be placed on adequate notice that the general definition, as opposed to a more specific one, is the guide by which he must follow to act within the confines of this law. Given the penalties associated with a criminal conviction, and the various dictionary definitions of the term "manufacturing," some which may support an assembling of component parts and others which require "something made by raw materials by hand or by machinery" the highest scrutiny is required. *Thibodeau v. Portuondo*, 486 F.3d 61, 66 (2d Cir. 2007). When the penalty is a $50 application fee, perhaps the "common sense" approach applied by the Court in *Broughman* is justified. Given the conflicting definitions, such an approach violates the constitution when a defendant's statutory maximum penalty is over a decade in prison.

The government suggests that Investigator Chimileski's views on what is and is not a firearm, and his disagreements with the position of then Attorney-General Lynch

ER395

on the merit of prosecuting receiver cases given the vagueness, "may be subject to defendant's cross-examination at trial,[] and are not to support a motion to dismiss." (Opp. at 14.) This claim that these discrepancies in definitions can be fleshed out through cross-examination of the government's expert gravely misses the point. It is this quintessential question of law that must be decided by this Court, and, for obvious reasons, cannot be debated in front of the jury.

## CONCLUSION

Despite the government's contention to the contrary, there is "grievous ambiguity or uncertainty" surrounding the appropriate definition of the term "manufacturing." *United States v. Carona*, 660 F.3d 360, 369 (9th Cir. 2011). There is absolutely no notice or guidance from Congress regarding which common use dictionary definition of "manufacturing" applies to a criminal prosecution. Given these conflicting definitions, particularly in this area of law where "loopholes" abound, this Court must apply the rule of lenity and "resolve the ambiguity in [the defendants' favor.'" *United States v. Thompson/Center Arms Company*, 504 U.S. 505 (1992).

For the foregoing reasons and those set forth in the defendants' motion to dismiss, Mr. Schlotterbeck and Mr. Vlha respectfully request that this Court dismiss the indictment against them.

Respectfully submitted,

DATED: June 14, 2022        By  */s/ Edward M. Robinson*
                                _____
                                Edward M. Robinson

                                Attorney for Defendant
                                *Travis Schlotterbeck*

                            By  */s/ Jerome J Haig*
                                _____
                                Jerome J. Haig

                                Attorney for Defendant
                                *James Bradley Vlha*

4

1    TRACY L. WILKISON
     United States Attorney
2    SCOTT M. GARRINGER
     Assistant United States Attorney
3    Chief, Criminal Division
     BRIAN R. FAERSTEIN (Cal. Bar No. 274850)
4    Assistant United States Attorney
     Environmental and Community Safety Crimes Section
5    DAN G. BOYLE (Cal. Bar No. 332518)
     Assistant United States Attorney
6    Asset Forfeiture Section
          1300/1400 United States Courthouse
7         312 North Spring Street
          Los Angeles, California 90012
8         Telephone: (213) 894-3819/2426
          Facsimile: (213) 894-0141/0142
9         E-mail:    Brian.Faerstein@usdoj.gov
                     Daniel.Boyle2@usdoj.gov
10
     Attorneys for Plaintiff
11   UNITED STATES OF AMERICA

12                  UNITED STATES DISTRICT COURT

13            FOR THE CENTRAL DISTRICT OF CALIFORNIA

14   UNITED STATES OF AMERICA,          No. CR 19-343-GW

15            Plaintiff,                GOVERNMENT'S OPPOSITION TO
                                        DEFENDANTS' JOINT MOTION TO
16            v.                        DISMISS INDICTMENT; DECLARATION OF
                                        BRIAN FAERSTEIN; EXHIBIT
17   TRAVIS SCHLOTTERBECK and
     JAMES BRADLEY VLHA,                Hearing Date: June 23, 2022
18                                      Hearing Time: 8:00 a.m.
              Defendant.                Location:     Courtroom of the
19                                                    Hon. George H. Wu

20

21        Plaintiff United States of America, by and through its counsel

22   of record, the United States Attorney for the Central District of

23   California and Assistant United States Attorneys Brian Faerstein and

24   Dan Boyle, hereby files its opposition to defendants' joint motion to

25   dismiss indictment.  (Dkt. No. 113.)

26        This opposition is based upon the attached memorandum of points

27   and authorities, the accompanying declaration and exhibit, the files

28   //

1 | and records in this case, and such further evidence and argument as
2 | the Court may permit.
3 | Dated: June 9, 2022                    Respectfully submitted,
4 |                                        TRACY L. WILKISON
                                           United States Attorney
5 |
                                           SCOTT M. GARRINGER
6 |                                        Assistant United States Attorney
                                           Chief, Criminal Division
7 |
8 |                                            /s/
                                           _____
                                           BRIAN R. FAERSTEIN
9 |                                        DAN G. BOYLE
                                           Assistant United States Attorney
10|
                                           Attorneys for Plaintiff
11|                                        UNITED STATES OF AMERICA
12|
13|
14|
15|
16|
17|
18|
19|
20|
21|
22|
23|
24|
25|
26|
27|
28|

# TABLE OF CONTENTS

DESCRIPTION                                                                PAGE

TABLE OF CONTENTS.................................................i

TABLE OF AUTHORITIES............................................iii

OPPOSITION MEMORANDUM OF POINTS AND AUTHORITIES....................1

I.   INTRODUCTION................................................1

II.  RELEVANT BACKGROUND.........................................2

     A.   The Indictment.........................................2

          1.   Count 1 - Conspiracy.............................2

          2.   Count 2 – Engaging in the Business Without a
               License.........................................5

          3.   Count 3 – Sale to a Prohibited Person...........5

     B.   Presentation of Charges at Trial......................5

III. ARGUMENT....................................................6

     A.   Relevant Legal Standards..............................6

     B.   Defendants' Motion Should be Denied as Untimely.......6

     C.   Defendants Do Not and Cannot Mount Facial Vagueness
          Challenges............................................7

     D.   Defendants' Vagueness Claims Premised on "Receiver"
          are Irrelevant to This Case...........................9

          1.   The Indictment Alleges the Manufacture and Sale
               of Completed AR-15-type Firearms, Not Lower
               Receivers.......................................9

          2.   The Case Law Upon Which Defendants Relies
               Undermines Their Claims.........................11

          3.   Defendants' Reliance Upon the Government's Letter
               is Misplaced and Misguided......................13

     E.   Defendants' Vagueness Claims Premised on
          "Manufacturing" are Without Merit.....................15

          1.   The Statute is Not Vague As Applied.............16

               a.   The Statute Provides Fair Notice...........16

ER399

**TABLE OF CONTENTS (CONTINUED)**

DESCRIPTION                                                                                                              PAGE

          b.    The Statute is Not Subject to Arbitrary or
               Discriminatory Enforcement......................21

    F.   The Rule of Lenity Does Not Apply........................24

IV.  CONCLUSION..................................................25

DECLARATION OF BRIAN FAERSTEIN...................................26

ER400

**TABLE OF AUTHORITIES**

DESCRIPTION                                                                                    PAGE

**Federal Cases**

Broughman v. Carver,
   624 F.3d 670 (4th Cir. 2010) .................................. 17, 18

Bryan v. United States,
   524 U.S. 184 (1998) ............................................. 25

Dimaya v. Sessions,
   138 S. Ct. 1204 (2018) ........................................... 8

Grayned v. City of Rockford,
   408 U.S. 104 (1972) ............................................. 23

Hill v. Colorado,
   530 U.S. 703 (2000) ............................................. 23

Holder v. Humanitarian Law Project,
   561 U.S. 1 (2010) ............................................... 25

Johnson v. United States,
   576 U.S. 591 (2015) ............................................. 8

Kashem v. Barr,
   941 F.3d 358 (9th Cir. 2019) .................................... 8

United States v. Agront,
   773 F.3d 192 (9th Cir. 2014) .................................... 9

United States v. Alexander,
   480 F. Supp. 3d 988 (N.D. Cal. 2020) ......................... 8, 22

United States v. Backlund,
   689 F.3d 986 (9th Cir. 2012) .................................... 8

United States v. Boren,
   278 F.3d 911 (9th Cir. 2002) ............................. 6, 14, 22

United States v. Carona,
   660 F.3d 360 (9th Cir. 2011) .................................... 24

United States v. Davis,
   139 S. Ct. 2319 (2019) .......................................... 8

ER401

**TABLE OF AUTHORITIES (CONTINUED)**

DESCRIPTION                                                                    PAGE

United States v. Guo,
  634 F.3d 1119 (9th Cir. 2011) ................................ 24, 25

United States v. Haig,
  No. 2:18-CR-256, 2019 WL 2028514 (D. Nev. May 8, 2019) ........ 17-18

United States v. Harris,
  705 F.3d 929 (9th Cir. 2013) .................................. 8, 9

United States v. Jimenez,
  191 F. Supp. 3d 1038 (N.D. Cal. 2016) ........................ 11, 12

United States v. Kahre,
  737 F.3d 554 (9th Cir. 2013) ................................. 25

United States v. Kilbride,
  584 F.3d 1240 (9th Cir. 2009) ............................. 8, 17, 21

United States v. Kuzma,
  967 F.3d 959 (9th Cir. 2020) ................................. 8, 9

United States v. Lanier,
  520 U.S. 259 (1997) ......................................... 6, 15

United States v. Matta-Ballesteros,
  71 F.3d 754 (9th Cir. 1995) .................................... 7

United States v. Mazurie,
  419 U.S. 544 (1975) ............................................ 8

United States v. Nukida,
  8 F.3d 665 (9th Cir. 1993) ..................................... 6

United States v. Roh,
  No. SACR 14-167-JVS (C.D. Cal.) .............................. 11, 12

United States v. Torres,
  908 F.2d 1417 (9th Cir. 1990) .................................. 7

United States v. Vest,
  448 F. Supp. 2d 1002 (S.D. Ill. 2006) ......................... 23

United States v. Wanland,
  830 F.3d 947 (9th Cir. 2016) ................................. 17, 25

United States v. Williams,
  553 U.S. 285 (2008) ........................................ passim

iv

ER402

**TABLE OF AUTHORITIES (CONTINUED)**

DESCRIPTION                                                              PAGE

United States v. Wu,
    711 F.3d. 1 (1st Cir. 2013) ..................................... 25

United States v. Yousef,
    327 F.3d 56 (2d Cir. 2003) ...................................... 7

Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.,
    455 U.S. 489 (1982) ......................................... 16, 21

**Federal Statutes**

18 U.S.C. § 921(a)(3)(A) .................................... 2, 11, 17

18 U.S.C. § 921(a)(3)(B) ..................................... 2, 3, 11

18 U.S.C. § 921(a)(10) ........................................... 16

18 U.S.C. § 921(a)(21)(A) ........................................ 16

18 U.S.C. § 922(a)(1) ............................................ 18

18 U.S.C. § 922(a)(1)(A) ..................................... passim

18 U.S.C. § 922(a)(1)(B) ......................................... 17

18 U.S.C. § 922(o) ............................................... 11

26 U.S.C. § 5861(d) .............................................. 11

**Federal Rules**

Fed. R. Crim. P. 12(b)(1) ......................................... 6

Fed. R. Crim. P. 12(b)(3) ......................................... 7

Fed. R. Crim. P. 12(c)(1) ......................................... 6

Fed. R. Crim. P. 12(c)(3) ......................................... 7

**Federal Regulations**

27 C.F.R. § 478.11 ........................................... 10, 11

27 C.F.R. § 479.11 ............................................... 12

ER403

1    **OPPOSITION MEMORANDUM OF POINTS AND AUTHORITIES**

2    **I.    INTRODUCTION**

3        Defendants Travis Schlotterbeck and James Bradley Vlha have

4    moved to dismiss the indictment, claiming constitutional vagueness as

5    applied to the firearms manufacturing charges against them.  (Dkt.

6    No. 113 ("Mot").)  Defendants' motion, which was untimely filed,

7    raises challenges to the meanings of "receiver" and "manufacturing"

8    as they purportedly relate to the charges in the indictment.

9    Defendants' claims are misplaced and without merit.

10       First, defendants' challenge to the definition of "receiver" is

11   wholly irrelevant to the charges in this case.  Defendants are

12   alleged to have manufactured for sale completed AR-15-type weapons.

13   Yet defendants devote one-half of their motion to the fiction that

14   they are charged with having manufactured lower receivers, which are

15   a component of AR-15-type weapons.  Defendants' vagueness claim vis-

16   à-vis the definition of "receiver" thus has no bearing on this case,

17   and neither requires nor warrants any manner of vagueness analysis.

18       Second, defendants separately challenge as vague the term

19   "manufacturing" as it relates to the conspiracy and substantive

20   charges of engaging in the business of manufacturing firearms without

21   a license.  Contrary to defendants' claims, this term as used in the

22   statutory scheme provides both fair notice and does not invite

23   arbitrary or discriminatory enforcement, such that defendants' as-

24   applied vagueness challenge should be rejected.

25       Defendants' last-ditch effort to seize on the rule of lenity

26   ignores that the charges in this case require the government to prove

27   willfulness, thus mitigating any potential vagueness and rendering

28   the rule of lenity inapposite.  Defendants' motion should be denied.

ER404

## II.   RELEVANT BACKGROUND

### A.   The Indictment

Defendants are charged in a three-count indictment that is premised, at its core, on defendants' and co-conspirator Ping-Yi Kwan's manufacture for sale of completed AR-15-type firearms.[1] Schlotterbeck and Vlha both are charged in Count 1 (conspiracy) and Count 2 (engaging in the business of manufacturing and dealing in firearms without a license).  Schlotterbeck is charged alone in Count 3 (sale of firearm to felon).  The government summarizes below the allegations in the indictment most relevant to defendants' motion.

#### 1.   Count 1 - Conspiracy

The introductory allegations of the conspiracy count provide, in part, the statutory definition of "firearm" as it principally applies in this case, specifically, "any weapon . . . which will or is designed to or may readily be converted to expel a projectile by the action of an explosive."  (Dkt. No. 1 ("Ind.") at 2, ¶ 3 (quoting 18 U.S.C. § 921(a)(3)(A)).)  The indictment also recites a separate subpart of the "firearm" definition, that is, "the frame or receiver of any such weapon."  (Id. (quoting 18 U.S.C. § 921(a)(3)(B)).)  The next two paragraphs make clear that the operative definition of "firearm" for purposes of the manufacture and sale of firearms in this case is the "weapon" described in § 921(a)(3)(A) and not the "frame or receiver of any such weapon" described in § 921(a)(3)(B).

Specifically, the introductory allegations explain that an "AR" was "a type of firearm" and an "AR-type rifle consisted of many

_____

[1] A third defendant, Jacob Dekoning, was dismissed from the case upon motion of the government.  (Dkt. Nos. 70, 71.)  Kwan pleaded guilty in a separate proceeding and has yet to be sentenced.

ER405

parts, including . . . the lower receiver." (Id. at 2, ¶ 4.) Thus, the AR-type firearm necessarily constitutes a "weapon" (assuming it could "expel a projectile by the action of an explosive"), not a component "receiver," under the definition of "firearm."

Paragraph 5 of the introductory allegations summarizes certain aspects of the manufacturing process for creating an AR-type rifle or pistol (i.e., the "weapon"), including "convert[ing] an unfinished lower receiver into a finished lower receiver that could be assembled into a rifle or pistol." (Id. at 2, ¶ 5.) This conversion aspect of the process could be done through use of "specialized machinery" to "create, or 'mill out,' cavities" in the lower receiver, and then an "upper receiver and barrel [could] attach to the lower receiver" to "create[]" the firearm that did not contain a serial number. (Id.)

The indictment identifies the objects of the conspiracy as "engaging in the business of manufacturing and dealing firearms without a license, in violation of Title 18, United States Code, Section 922(a)(1)(A)." (Id. at 2-3.) In describing the "manner and means of the conspiracy," the indictment explains, "in substance," how these objects were to be accomplished. The alleged manner and means include, among other things, "[d]efendant SCHLOTTERBECK and co-conspirator Kwan . . . obtain[ing] firearms parts, including unfinished lower receivers;" "[d]efendant SCHLOTTERBECK . . . arrang[ing] to drill the cavities in in unfinished lower receivers necessary to make the lower receivers attach to an upper receiver and barrel;" and "[d]efendants SCHLOTTERBECK and VLHA, and co-conspirator Kwan . . . assembl[ing], finish[ing], and sell[ing] the completed firearms to customers." (Id. at 3, ¶¶ 2, 3, 5.)

3

1    These specific allegations track, in large part, the summary of
2    aspects of the manufacturing process described in paragraph 5,
3    specifically, arranging to create cavities in the unfinished lower
4    receivers for the other components to be attached and assembling the
5    components to create completed firearms for sale.

6    Notably, the manner and means also contain one allegation
7    regarding conduct engaged in by dismissed defendant Dekoning
8    regarding his "set up [of] a machine to mill, and direct[ing] firearm
9    customers to press the button on a machine to mill, cavities on the
10   lower receivers to finish the lower receivers." (Id. at 3, ¶ 4.)
11   The overt acts clarify Dekoning's alleged involvement was related to
12   the first two AR-15-type firearm transactions described in the
13   indictment but not the last three. (See id. at 4, OA Nos. 4-5; id.
14   at 5, OA No. 12.) Thus, the indictment alleges Dekoning's conduct
15   standing on its own and does not allege that it was tied to or relied
16   upon the prior allegation that Schlotterbeck "arrange[d] to drill the
17   cavities in unfinished lower receivers." (Id. at 3, ¶¶ 3, 4.)

18   The overt acts provide a non-exclusive list of acts undertaken
19   by defendants Schlotterbeck and Vlha, as well as dismissed defendant
20   Dekoning, co-conspirator Kwan, and "others known and unknown to the
21   Grand Jury," in furtherance of the conspiracy. Among other things,
22   the overt acts summarize certain, but not all, aspects of the
23   manufacture and sale of five completed AR-15-type firearms from
24   September 23, 2015, through June 15, 2016. The overt acts also
25   describe a search warrant executed at the businesses defendants
26   operated in Bellflower, California, where numerous firearms parts
27   including unfinished and finished AR-type lower receivers and other
28   firearms not bearing serial numbers were found.

1            2.    <u>Count 2 – Engaging in the Business Without a License</u>

2     Count Two alleges that between approximately September 23, 2015,

3 and June 21, 2017, defendants Schlotterbeck and Vlha, as well as

4 dismissed defendant Dekoning and "others known and unknown to the

5 Grand Jury," willfully engaged in the business of manufacturing and

6 dealing in firearms without a license. The count expressly includes

7 an aiding and abetting theory. The count also specifies "the

8 assembly and sales" of five completed AR-15-type firearms bearing no

9 serial numbers, tracking those summarized in the overt acts.

10            3.    <u>Count 3 – Sale to a Prohibited Person</u>

11     Count Three alleges that on or about September 23, 2015,

12 defendant Schlotterbeck knowingly sold a completed AR-15-type firearm

13 bearing no serial number knowing or having reasonable cause to

14 believe that the customer had been convicted of a felony. The

15 approximate date of this sale tracked the first transaction

16 summarized in the overt acts of the conspiracy count.

17     **B.   Presentation of Charges at Trial**

18     As described in its trial memorandum, the government informed

19 defense counsel on April 20, 2022, that, with respect to Counts One

20 and Two of the indictment, the government would be proceeding on a

21 theory of engaging in the business of manufacturing firearms without

22 a license only, without submitting the alternate charged theory of

23 dealing to the jury. (Dkt. No. 89 at 9.[2]) The proposed jury

24 instructions the parties jointly filed reflect this narrowed theory

25 for purposes of trial, (<u>see</u> Dkt. Nos. 85, 86), and so too will the

26 joint statement of the case to be filed by the parties.

27  

28     [2] All references to pages in filings on the Court's docket refer
to the page numbers in the ECF-filing banner at the top of the page.

# III. ARGUMENT

## A. Relevant Legal Standards

Federal Rule of Criminal Procedure 12(b) permits a pretrial motion to dismiss "that the court can determine without a trial on the merits." Fed. R. Crim. P. 12(b)(1). However, in ruling on such a motion, "the district court is bound by the four corners of the indictment." <u>United States v. Boren</u>, 278 F.3d 911, 914 (9th Cir. 2002). The motion "cannot be used as a device for a summary trial of the evidence." <u>Id.</u> The "unavailability of Rule 12 in determination of general issues of guilt or innocence . . . helps ensure that the respective provinces of the judge and jury are respected[.]" <u>United States v. Nukida</u>, 8 F.3d 665, 670 (9th Cir. 1993).

A statute is unconstitutionally vague if it "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement." <u>United States v. Williams</u>, 553 U.S. 285, 304 (2008). Vagueness is not implicated because of "the mere fact that close cases can be envisioned," or because reasonable jurists might disagree on where to draw the line in particular circumstances. <u>See id.</u> at 305-06. Rather, "the touchstone is whether the statute, either standing alone or as construed, made it reasonably clear at the relevant time that the defendant's conduct was criminal." <u>United States v. Lanier</u>, 520 U.S. 259, 267 (1997).

## B. Defendants' Motion Should be Denied as Untimely

Rule 12(c)(1) provides that, "[t]he court may, at the arraignment or as soon afterward as practicable, set a deadline for the parties to make pretrial motions and may also schedule a motion hearing." Fed. R. Crim. P. 12(c)(1). "If a party does not meet the

6

1  deadline for making a Rule 12(b)(3) motion, the motion is untimely.

2  But a court may consider the defense, objection, or request if the

3  party shows good cause." Fed. R. Crim. P. 12(c)(3).

4      Here, the Court entered two orders with deadlines (initially

5  January 4, 2021, and then July 15, 2021) for defendants to file Rule

6  12 motions, which they did not do. (Dkt. Nos. 73, 75.) Defendants

7  later represented in a stipulation to continue "that they do not

8  anticipate filing any motions pursuant to [Rule] 12(b), consistent

9  with their not having previously filed any Rule 12 pretrial motions

10 within the periods dictated for the filing of Rule 12 pretrial

11 motions as previously ordered by the Court." (Dkt. No. 78 at ¶ 8.c.)

12 Having not complied with the Court's prior Rule 12 motion deadlines,

13 defendants have waived their right to file one now, almost one year

14 after the last deadline. See, e.g., United States v. Matta-

15 Ballesteros, 71 F.3d 754, 766 (9th Cir. 1995), opinion amended, 98

16 F.3d 1100 (9th Cir. 1996) (Rule 12 motion denied as untimely where

17 filed over two months after cut-off set by court); United States v.

18 Torres, 908 F.2d 1417, 1424 (9th Cir. 1990) (Rule 12 motion denied as

19 untimely where filed three months after motions cut-off date).[3]

20     **C.   Defendants Do Not and Cannot Mount Facial Vagueness
             Challenges**

22     Defendants assert in passing that the statutes they are charged

_____

[3] While Schlotterbeck's new counsel may argue he was recently
retained, the decisions of Schlotterbecks's prior counsel do not
insulate him from waiver. See, e.g, United States v. Yousef, 327
F.3d 56, 124-25 (2d Cir. 2003) ("A strategic decision by counsel not
to pursue a claim, inadvertence of one's attorney, and an attorney's
failure to timely consult with his client are all insufficient to
establish cause" for untimely pretrial motion practice). In any
event, counsel to defendant Vlha, who has been retained since August
2019, does not have any possible argument for "good cause" here.

with violating are vague "both on their face and as applied to the defendants' conduct" (Mot. at 2), but their entire argument is devoted to "as applied" challenges (Mot. at 6 & n.2, 8, 9, 11, 13). They have waived any facial challenge by failing to develop it, and rightfully so given that "'[v]agueness challenges to statutes which do not involve First Amendment freedoms must be examined in the light of the facts of the case at hand,'" <u>United States v. Harris</u>, 705 F.3d 929, 932 (9th Cir. 2013) (quoting <u>United States v. Mazurie</u>, 419 U.S. 544, 550 (1975)); <u>accord</u> <u>United States v. Backlund</u>, 689 F.3d 986, 997 (9th Cir. 2012). The guiding principle outside the First Amendment context is that one "who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others." <u>United States v. Kilbride</u>, 584 F.3d 1240, 1257 (9th Cir. 2009); <u>see</u> <u>also</u> <u>Kashem v. Barr</u>, 941 F.3d 358, 375 (9th Cir. 2019) ("[A] defendant who cannot sustain an as-applied vagueness challenge to a statute cannot be the one to make a facial vagueness challenge to the statute.").[4]

---

[4] The only other precedents recognizing an exception to the rule that defendants may not mount facial vagueness challenges to criminal provisions are cases involving challenges to the "residual clause" of penalty-enhancing statutes. <u>See</u> <u>Kashem</u>, 941 F.3d at 377; <u>see also</u> <u>Johnson v. United States</u>, 576 U.S. 591, 597 (2015); <u>Dimaya v. Sessions</u>, 138 S. Ct. 1204, 1210-11 (2018); <u>United States v. Davis</u>, 139 S. Ct. 2319, 2336 (2019). Those cases undertake facial vagueness analysis because they entail application of the categorical approach, which itself requires a facial analysis, evaluating "the idealized ordinary case of the crime" rather than "the facts of the case at hand." <u>Kashem</u>, 941 F.3d at 377; <u>United States v. Alexander</u>, 480 F. Supp. 3d 988, 1000 (N.D. Cal. 2020) (declining to reach facial vagueness claim to definitions of "firearm silencer" and "firearm muffler" where the statutory definition did "not require the Court to 'imagine how the idealized ordinary case of the crime subsequently plays out'"). To the extent <u>United States v. Kuzma</u>, 967 F.3d 959 (9th Cir. 2020), suggests that facial vagueness challenges are cognizable in other contexts, the suggestion is dicta because the Court rejected the facial challenge in that case. <u>Id.</u> at 971 & n.10.
*(footnote cont'd on next page)*

8

ER411

An as-applied vagueness challenge focuses on the conduct alleged and turns on whether a challenged statute "fails to put a defendant on notice that his conduct was criminal." United States v. Harris, 705 F.3d 929, 932 (9th Cir. 2013). Because defendants do not and cannot mount facial vagueness challenges, this Court "need only examine the vagueness challenge under the facts of the particular case and decide whether, under a reasonable construction of the statute, the conduct in question is prohibited." United States v. Agront, 773 F.3d 192, 195 (9th Cir. 2014).

**D.  Defendants' Vagueness Claims Premised on "Receiver" are Irrelevant to This Case**

The first half of defendants' motion is premised on a fallacy that neither requires nor warrants any manner of vagueness analysis to decide.  This is not a case about the manufacture and sale of "lower receivers," as much as defendants claim it to be.  Rather, defendants are charged with manufacturing for sale completed AR-15-type weapons, and any potential vagueness in the definition of "lower receiver" has no bearing on the Court's resolution of the motion.

**1.  The Indictment Alleges the Manufacture and Sale of Completed AR-15-type Firearms, Not Lower Receivers**

As described above, all three counts of the indictment are premised on the manufacture and sale of completed AR-15-type firearms.  The conspiracy count (Count 1) describes the manufacture of AR-15-type firearms that fit the definition of "any weapon . . . which will or is designed to or may readily be converted to expel a

---

And, in fact, Kuzma confirmed that in an 18 U.S.C. § 922 prosecution like this one, a categorical inquiry is improper; rather, "an objective standard about the actual features of a device is to be applied to the real-world facts of the defendant's specific device." Id. at 971.

ER412

1   projectile by the action of an explosive."  The manner and means

2   described how the co-conspirators manufactured those completed

3   weapons.  And the overt acts provided non-exclusive examples of acts

4   in furtherance of manufacturing five separate completed AR-15-type

5   weapons.  The substantive trafficking count (Count 2) alleges the

6   manufacture and sale of the same five separate completed AR-15-type

7   weapons.  And the sale to a prohibited person count (Count 3)

8   similarly alleges the sale of a completed AR-15-type rifle.

9        Notwithstanding this record, defendants make numerous claims

10  that are counterfactual to the charges in this case.  For instance,

11  in the introduction to their motion, defendants contend that the

12  "statutory term for firearm, <u>in this case the receiver</u>, does not

13  provide any definition about the necessary characteristics of that

14  receiver/firearm."  (Mot. at 5 (emphasis added).)  Defendants

15  similarly state that "[n]owhere . . . in the indictment, is there an

16  acknowledgment that this 'milled out' lower receiver does not fit the

17  definition of 'firearm,'" which, of course, is irrelevant given that

18  the completed AR-15-type weapons are the firearms. (<u>Id.</u> at 4.)

19       Defendants then devote the entire first half of their vagueness

20  challenge – section II, titled "Vagueness: Receiver" – to alleging

21  vagueness as to the then definition of "firearm frame or receiver"

22  under 27 C.F.R. § 478.11.  (Mot. at 6-9.)  Defendants conclude that,

23  "since Counts 1, 2 and 3 are premised on the lower receiver being the

24  'firearm,' thus requiring a federal firearms license to manufacture,

25  the charges against Mr. Schlotterbeck must be dismissed as

26  unconstitutionally vague."  (Mot. at 9.)

27       Defendants are wrong.  The completed AR-15-type rifles and

28  pistols are alleged to be the "firearms," that is, "any weapon . . .

10

which will or is designed to or may readily be converted to expel a projectile by the action of an explosive." 18 U.S.C. § 921(a)(3)(A). (See also Ind. at 2, ¶ 3.) While the indictment also recites one of the alternate definitions of "firearm" – i.e., "the frame or receiver of any such weapon," 18 U.S.C. § 921(a)(3)(B) – the context, implication, and plain meaning of the indictment, as described in section II.A above, makes clear the charges are premised on the AR-15-type firearms being a "weapon," not a "frame or receiver."

The entirety of defendants' analysis of the lower receiver issue assumes, without justification, just the opposite. The regulatory definition of "firearm frame or receiver" upon which they focus (27 C.F.R. § 478.11) pertains solely to the statutory definition of "frame or receiver" under § 921(a)(3)(B). Defendants' extensive arguments on this point are irrelevant and do not give rise to a vagueness challenge here.

2. The Case Law Upon Which Defendants Relies Undermines Their Claims

The cases upon which defendants rely in their vagueness analysis of "receiver" only underscore their fundamentally flawed approach in their motion. The two opinions they cite – United States v. Jimenez and United States v. Roh – were predicated on charges relating solely to "lower receivers." And in fact, the courts in both cases found no vagueness concerns when considering completed firearms.

First, in United States v. Jimenez, 191 F. Supp. 3d 1038 (N.D. Cal. 2016) (which defendants attached as Exhibit B to their motion), the government charged the defendant with illegally possessing "an AR-15-style machinegun lower receiver" under both 18 U.S.C. § 922(o) and 26 U.S.C. § 5861(d). Id. at 1039 (emphasis added). The

11

ER414

indictment did not allege that the defendant possessed other
components of a machinegun, much less a completed machinegun.  In
considering the defendant's challenge to the applicable regulatory
definition of the term "receiver," the court found the definition was
vague as applied and dismissed the indictment "to the extent the
Government's prosecution . . . is based on the theory that [the
defendant] possessed a 'receiver' as that term is defined in 27
C.F.R. § 479.11."  Id. at 1045.

Notably, however, the court denied the defendant's motion to the
extent the government's theory was that "the AR-15 lower receiver
[the defendant] possessed could be deemed a 'part designed and
intended solely and exclusively . . . for use in converting a weapon
into a machinegun.'"  Id.  The court explained that whether the
defendant could "be convicted on this basis is a question of fact and
not one of law or vagueness."  Id.  The court did not foreclose
prosecution of the defendant "under any part of the machinegun laws
not dependent on possession of a 'receiver.'"  Id. at 1046.

Defendants cite to a letter from then Attorney General Loretta
Lynch describing the facts and legal analysis of Jimenez in finding
that the case was "not a suitable vehicle for appellate review."
(Mot., Exh. B (Dkt. No. 113-2) at 3.)  Much like the court in
Jimenez, however, the letter makes clear that "[i]n this case, the
defendant purchased only a lower receiver."  (Id. at 2.)

Second, in United States v. Roh, No. SACR 14-167-JVS (C.D.
Cal.), Judge Selna issued a tentative order regarding a post-trial
vagueness challenge and Rule 29 motion, where the defendant was
alleged to have "willfully engaged in the business of manufacturing
and dealing firearms, to wit, hundreds of AR-15-type lower receivers,

12

1  completed pistols, and completed rifles." (See Mot., Exh. B at 15.)

2  Ruling on a tentative basis, the court found that "with respect to

3  manufacturing receivers, the statute and regulation are

4  unconstitutionally vague as applied here." (Id. at 20.) However,

5  with respect to the charges predicated on the manufacture of

6  completed firearms, the court found that "[t]here is no question that

7  [the defendant] manufactured completed AR-15s," rejecting a similar

8  "lack of notice" argument on that ground. (Id. at 22.) Thus, the

9  court tentatively denied the defendant's Rule 29 motion to the extent

10 the government's theory of his manufacture and sale of firearms was

11 predicated on the completed AR-15-type firearms. (Id.)

12     Despite the clear and material distinction between the

13 allegations in Jimenez and Roh (lower receivers) and here (completed

14 weapons), defendants inexplicably "request that this court

15 incorporate the reasoning in the [Jimenez and Roh] orders and

16 determine that the lower receiver of the AR-15, for constitutional

17 vagueness purposes, cannot constitute a 'firearm' for the purpose of

18 criminal prosecution under the statutes supporting the indictment

19 against them." (Mot. at 8.) The Court should reject defendants'

20 request. These cases - and the entirety of defendants' argument

21 regarding vagueness as to the definition of "receiver" - are wholly

22 irrelevant to a vagueness challenge to the charges in this case.

23         3.   Defendants' Reliance Upon the Government's Letter is
                Misplaced and Misguided

24

25     In further support of their erroneous focus on lower receivers,

26 defendants also seek to rely on a letter the government provided to

27 defendants in this case regarding the anticipated trial testimony of

28 ATF Senior Industry Operations Investigator / Industry Operations

13

1    Intelligence Specialist Thomas M. Chimileski, Jr.  (See Mot., Exh. A

2    (Dkt. No. 113-1).)  Defendants claim that the information in the

3    letter is a "perfect illustration of the constitutionally defective

4    arbitrary enforcement problem."  (Mot. at 9.)  Defendants are wrong.

5        As a preliminary matter, information pertaining to a government

6    witness's potential testimony is outside the scope of a Rule 12

7    motion.  Boren, 278 F.3d at 914.  Defendants cannot use their motion

8    "as a device for a summary trial of the evidence," and the Court

9    "should not consider evidence not appearing on the face of the

10   indictment."  Id.  While the potential views of the government's

11   anticipated expert witness (albeit distilled through a letter from

12   government counsel) may be subject to defendants' cross-examination

13   at trial, they are not a basis to support a motion to dismiss.

14       Moreover, defendants misunderstand the import of the information

15   the government summarized in the letter.  Specifically, the letter

16   explains that, despite becoming aware of ATF's "change in criminal

17   enforcement litigating position in this District" in light of recent

18   lower receiver vagueness challenges, Investigator Chimileski "still

19   considers finished lower receivers as meeting the [soon-to-be-amended

20   regulatory] definition of 'firearm frame or receiver'" for purposes

21   of his "day-to-day regulatory duties."  (Mot., Exh. A at 3 (emphasis

22   added).)  Defendants distort this statement to mistakenly claim that

23   Investigator Chimileski "still believes his interpretation should

24   have force of criminal law."  (Mot. at 9.)  Defendants confuse the

25   "regulatory duties" of an ATF industry operations investigator in the

26   field with "criminal enforcement" decisions having nothing to do with

27   someone in Investigator Chimileski's position.

28

                                      14

To be fair, defendants have yet to have the opportunity to examine Investigator Chimileski about these and other evidentiary issues.  But the appropriate time for such will be at trial, not through a motion to dismiss alleging constitutional vagueness.  And in any event, defendants' claims of purported "arbitrary enforcement" with respect to lower receivers and the regulatory definition of "receiver" have nothing to do with the actual charges in this case.

\*    \*    \*

For the foregoing reasons, the Court should decline to consider defendants' vagueness challenge premised on the regulatory definition of "receiver" as it relates to uncharged lower receivers in this case.  The Court thus should deny defendants' motion as it relates to the definition of "receiver."[5]

**E.    Defendants' Vagueness Claims Premised on "Manufacturing" are Without Merit**

Defendants challenge the term "manufacturing" as used in 18 U.S.C. § 922(a)(1)(A) both as failing to provide fair notice of the criminally punishable conduct as well as inviting arbitrary enforcement.  Defendants' claims should be rejected, as the statute as charged here "made it reasonably clear at the relevant time that the [defendants'] conduct was criminal."  <u>Lanier</u>, 520 U.S. at 267.

Defendants raise their claims on an as-applied basis, focusing on the conduct alleged in this case.  Indeed, as explained above, defendants' vagueness challenge here should be considered <u>only</u> as

---

[5] Defendant Schlotterbeck based his vagueness challenge to Count Three (sale to a prohibited person) solely upon the section of his motion claiming vagueness vis-à-vis the definition of "receiver." (<u>See</u> Mot. at 6 n.2.)  Thus, the Court need not consider further any vagueness challenge as it relates to Count Three.

15

ER418

applied, because a person "who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others."  Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc., 455 U.S. 489, 495 (1982).

### 1.   The Statute is Not Vague As Applied

#### a.   The Statute Provides Fair Notice

The central thrust of defendants' notice claim is that "[n]owhere in the indictment, or the statutes supporting the indictment, is the term manufacturing defined," and their alleged conduct amounted to "assembling – not manufacturing a firearm.  (Mot. at 10, 11.)  Contrary to defendants' claims, section 922(a)(1)(A) provides more than sufficient notice to make it "reasonably clear" that defendants' alleged conduct here was criminally prohibited.

Section 922(a)(1)(A) makes it unlawful, in relevant part, "for any person except a licensed importer, licensed manufacturer, or licensed dealer, to engage in the business of importing, manufacturing, or dealing in firearms."  18 U.S.C. § 922(a)(1)(A).  Section 921(a)(1) defines "manufacturer" as "any person engaged in the business of manufacturing firearms or ammunition for purposes of sale or distribution."  18 U.S.C. § 921(a)(10).  In turn, section 921(a)(21)(A) provides that the term "engaged in the business" means "as applied to a manufacturer of firearms, a person who devotes time, attention, and labor to manufacturing firearms as a regular course of trade or business with the principal objective of livelihood and profit through the sale or distribution of the firearms manufactured."  18 U.S.C. § 921(a)(21)(A).  And, as previously explained, "firearm" as used in this case means "any weapon . . .

16

1 which will or is designed to or may readily be converted to expel a
2 projectile by the action of an explosive." 18 U.S.C. § 921(a)(3)(A).

3  While the term "manufacturing" is not further defined, "[w]hen
4 Congress does not define a term in a statute, we construe that term
5 according to its ordinary, contemporary, common meaning." United
6 States v. Kilbride, 584 F.3d 1240, 1257 (9th Cir. 2009) (quotation
7 marks and citation omitted); cf United States v. Wanland, 830 F.3d
8 947, 954 (9th Cir. 2016) ("[A] lack of prior appellate rulings on the
9 topic does not render the law vague."). A recent District of Nevada
10 case involving a vagueness challenge to the term "manufacturing
11 ammunition" as used in 18 U.S.C. § 922(a)(1)(B) is instructive as to
12 the "ordinary meaning" of "manufacturing." See United States v.
13 Haig, No. 2:18-CR-256, 2019 WL 2028514, at *4 (D. Nev. May 8, 2019).

14  In Haig, the district court observed that the "Ninth Circuit has
15 not provided the plain and ordinary meaning of 'manufacturing.'
16 However, the Fourth Circuit held in Broughman that 'manufacturing
17 firearms' means assembling a firearm's individual components so as to
18 render the firearm suitable for use." Id. at *4 (construing
19 Broughman v. Carver, 624 F.3d 670 (4th Cir. 2010)). The Fourth
20 Circuit in Broughman and the district court in Haig both looked to
21 the Merriam-Webster Dictionary definition of "manufacturing," i.e.,
22 "to make a product suitable for use." Broughman, 624 F.3d at 675;
23 Haig, 2019 WL 20285114, at *4. The Haig court also noted the
24 Dictionary.com definition as "to make or produce by hand or
25 machinery, especially on a large scale." Haig, 2019 WL 20285114, at
26 *4. Both courts held that "manufacturing" (as to firearms in
27 Broughman and ammunition in Haig) means "assembling [a firearm's or
28 ammunitions'] individual components so as to render the [firearm or

ammunition] suitable for use." <u>Broughman</u>, 624 F.3d at 675; <u>Haig</u>, 2019 WL 20285114, at *4.

Defendants contend that all they did was "assemble" firearms, and the "claim that the assembling of the component parts amounts to manufacturing for which a federal manufacturing license is required" is constitutionally vague. (Mot. at 10-11.) However, the courts that have directly considered the meaning of "manufacturing" within the context of 18 U.S.C. § 922(a)(1), looking at the "plain and ordinary" meaning of the term, have indicated that assembly of firearms to make them suitable for use does constitute manufacturing. Even the tentative opinion in the <u>Roh</u> case, upon which defendants rely heavily, found that "there [wa]s no question that [the defendant] manufactured completed AR-15s," which it referred to as the "Assembly of Firearms." (Mot., Exh. B at 21-22.) There, customers "initiat[ed] the process of machining a receiver" and "[b]ut for that one step, [the defendant] performed all of the steps in manufacturing completed AR-15s." (<u>Id.</u> at 17.)

But assembly is not all defendants are charged with doing in this case. The indictment expressly describes the manufacturing process for the completed AR-15-type firearms, which includes not only the ultimate assembly of the weapons but also the "use [of] specialized machinery on an unfinished lower receiver to create, or 'mill out,' cavities to create a lower receiver" which can then be ready for "an upper receiver and barrel to attach." (Ind. at 2, ¶ 5.) As part of the manner and means, Schlotterbeck is alleged to have obtained the component parts, including unfinished lower receivers, and "arranged to drill the cavities in unfinished lower receivers necessary to make the lower receivers attach to an upper

18

1   receiver and barrel."[6]  (Id. at 3, ¶ 3.)  Defendants are charged with

2   conspiring in the object of manufacturing these completed AR-15-type

3   firearms, and aiding and abetting each other in the same.  In sum,

4   the alleged manufacturing conduct here includes both the arranging

5   for lower receivers to be milled out and the subsequent assembly of

6   those lower receivers with the other components obtained by the co-

7   conspirators to create completed weapons.

8       Defendants critically mischaracterize the manner and means in

9   their summary of the indictment, twisting and conflating the

10  allegations to imply that, in all cases, defendant Schlotterbeck and

11  co-conspirator Kwan "'arrange[d]' to have the 'firearm customers'

12  mill the unfinished lower receivers."  (Mot. at 5.)  That is false,

13  as the overt acts make clear that customers were involved, with the

14  co-conspirators' assistance, in initiating the process to mill out

15  the lower receivers for the first two weapons but not the last

16  three.[7]  Defendants' distortion of the allegations underscores the

17  fundamental disconnect between their motion and the charges in the

18  indictment.  The indictment sufficiently alleges they were involved

19  with both the milling phase and assembly phase of the manufacturing

20  process.  Defendants will have the opportunity at trial to challenge

21  the evidence proving their involvement in the manufacturing process.

22

23      [6] Defendants ignore this central allegation regarding machining
    in their motion, incorrectly claiming that the "only reference to
24  anything other than [] assembling" is in Paragraph 5 of the
    Introductory Allegations.  (Mot. at 4.)
25
        [7] Even where the customers were involved in the initial step in
26  the process, the co-conspirators provided assistance.  For instance,
    during the first transaction, Schlotterbeck provided the unfinished
27  lower receiver to the CI as well as the $60 to pay for the milling
    process.  (Ind. at 4, OA No. 4.)  During the second transaction, Kwan
28  provided the unfinished lower receiver and drove the undercover agent
    to the machine shop.  (Id. at 5, OA No. 11.)

1    Indeed, "[c]lose cases can be imagined under virtually any statute.

2    The problem that poses is addressed, not by the doctrine of

3    vagueness, but by the requirement of proof beyond a reasonable

4    doubt."  <u>United States v. Williams</u>, 553 U.S. 285, 306 (2008).

5         Finally, the statutory scheme and the plain and ordinary

6    meaning of "manufacturing" were more than sufficient to provide "a

7    person of ordinary intelligence fair notice of what is prohibited" –

8    including the conduct at issue in the case at hand.  <u>Williams</u>, 553

9    U.S. at 304.  But if defendants had any doubts, ATF had issued a

10   Director's Ruling ("ATF 2015-1") titled "Manufacturing and

11   Gunsmithing" on January 2, 2015 – just several months before

12   defendants' conspiracy was alleged to have commenced in May 2015.

13   (<u>See</u> Declaration of Brian Faerstein, Exhibit A; <u>see also</u>

14   https://www.atf.gov/firearms/docs/ruling/2015-1-manufacturing-and-

15   gunsmithing/download (last visited June 9, 2022).)

16        Among other things, ATF 2015-1 made clear that "one can be a

17   manufacturer of a 'frame or receiver,' <u>and also</u> a 'weapon . . . which

18   will or is designed to or may readily be converted to expel a

19   projectile by the action of an explosive' that incorporates that

20   frame or receiver."  (Exh. A at 3 (emphasis added).)  ATF 2015-1 also

21   stated that "when a person performs machining or other manufacturing

22   process on a blank [<u>i.e.</u>, an unfinished lower receiver] to make a

23   firearm 'frame or receiver,' <u>or</u> on an existing frame or receiver to

24   make it suitable for use as part of a 'weapon . . . which will or is

25   designed to or may readily be converted to expel a projectile by the

26   action of an explosive,' that person has performed a manufacturing

27   operation other than what is contemplated by the [Gun Control Act] of

28   dealer-gunsmiths."  (<u>Id.</u> (emphasis added).)  And ATF-2015 further

20

clarified that "machining or other manufacturing process" included "making a frame or receiver, or taking <u>any</u> of the steps to make an existing frame or receiver functional – that is, suitable for use as part of a weapon that will expel a projectile by the action of an explosive." (<u>Id.</u> (emphasis in original).) In other words, ATF 2015-1 made clear, consistent with the plain meaning of manufacturing, that a completed weapon can be manufactured (not just a lower receiver), and the machining process applied to a lower receiver can be part of the overall manufacturing process for a completed firearm.[8] Thus, defendants' claim that they could only have manufactured the lower receiver because it was "the only part of the weapon in question that was converted from raw materials" is wrong. (Mot. at 10.)

Under these circumstances, defendants had fair notice that their conduct was prohibited. Even where applying a heightened requirement for clarity in the criminal context, "due process does not require impossible standards of clarity." <u>United States v. Kilbride</u>, 584 F.3d 1240, 1257 (9th Cir. 2009). And as described in section III.F below, the requirement that the government prove willfulness with respect to 18 U.S.C. § 922(a)(1)(A) "may mitigate a law's vagueness, especially with respect to the adequacy of notice . . . that [the] conduct is proscribed." <u>Hoffman Estates</u>, 455 U.S. at 499.

> *b.  The Statute is Not Subject to Arbitrary or*
> *Discriminatory Enforcement*

Defendants' as-applied vagueness challenge predicated on arbitrary enforcement is similarly without merit, as the meaning of

---

[8] ATF 2015-1 also cited directly to the Fourth Circuit's definition of "manufacture" in <u>Broughman</u>, <u>i.e.</u>, "to make into a product suitable for use." (Exh. A at 3 n.1.)

21

"manufacturing" within the statutory scheme is not "so standardless that it authorizes or encourages seriously discriminatory enforcement." <u>Williams</u>, 553 U.S. at 304.

First, defendants' alleged conduct in this case, both with respect to arranging to mill out the unfinished lower receivers and assembling them with all the other components they obtained to create completed firearms, "plainly fits within" the statutory scheme of engaging in the business of "manufacturing" firearms, as described in the fair notice section above. This fact alone rebuts any claim that the challenged statute "lacks any standards and allows ad-hoc decision making." <u>See</u>, <u>e.g.</u>, <u>United States v. Alexander</u>, 480 F. Supp. 3d 988, 999 (N.D. Cal. 2020) (declining to address an arbitrary enforcement claim where the silencer at issue "plainly fit within" the statutory definition found to constitute fair notice).

Second, defendants' reliance on the government's letter regarding Investigator Chimileski once again is misplaced. (Mot. at 10-11.) As previously explained, the information in the letter pertaining to potential witness testimony at trial is not before the Court on this motion to dismiss. <u>See</u> <u>Boren</u>, 278 F.3d at 914. But even if it was, the information in the disclosure does not reflect a statutory scheme "so standardless that it authorizes or encourages seriously discriminatory enforcement." <u>Williams</u>, 553 U.S. at 304.

Defendants focus on certain language in the letter – written by government counsel, not Investigator Chimileski – regarding the first two firearm manufacturing transactions described in the indictment, as potentially differentiated from the latter three included in the indictment (among others that will be part of the government's evidence at trial). Specifically, defendants argue that the

22

1   inclusion of qualifying terms in the letter, such as "may have

2   required" and "would likely require" a specific type of firearm

3   license, evinces "the degree and type of unconstitutional vagueness

4   that allows 'the government . . . to pick and choose who is covered

5   by [the term manufacturing] and who isn't.'"  (Mot. at 11-12 (quoting

6   United States v. Vest, 448 F. Supp. 2d 1002, 1012 (S.D. Ill. 2006).)

7   The government's letter also makes clear, however, that the analysis

8   of the licensing scheme is informed by "fact-specific circumstances,"

9   (Mot., Exh. A at 3), and "perfect clarity and precise guidance have

10  never been required even of regulations that restrict expressive

11  activity."  Williams, 553 U.S. at 304; see also cf. Hill v. Colorado,

12  530 U.S. 703, 733 (2000) ("[B]ecause we are '[c]ondemned to the use

13  of words, we can never expect mathematical certainty from our

14  language,'" and recognizing that "'[a]s always, enforcement requires

15  the exercise of some degree of police judgment,'") (quoting Grayned

16  v. City of Rockford, 408 U.S. 104, 110 (1972)).

17      Moreover, to the extent such information outside the four

18  corners of the indictment were to be considered on this motion to

19  dismiss, so too should evidence the government expects to present at

20  trial demonstrating, among other things, that the co-conspirators'

21  escorting of the first two customers to a machine shop (and providing

22  them the unfinished lower receiver and paying for it to be milled)

23  was an aberrational charade as part of defendants' manufacturing

24  conspiracy; and defendants expressly informed the customers

25  thereafter that defendants would arrange for the milling of the lower

26  receivers so long as the customers lied that they had done it

27  themselves.  However, courts do not evaluate such potential "close

28

23

1    cases" through "the doctrine of vagueness, but by the requirement of

2    proof beyond a reasonable doubt." <u>Williams</u>, 553 U.S. at 306.

3        Finally, as explained below, the willfulness requirement of 18

4    U.S.C. § 922(a)(1)(A), and the government's burden of proving that

5    state of mind at trial, further guard against any potential arbitrary

6    or discriminatory enforcement as applied to defendants' conduct here.

7    <u>See</u>, <u>e.g.</u>, <u>United States v. Guo</u>, 634 F.3d 1119, 1123 (9th Cir. 2011)

8    ("[T]he scienter requirement in § 1705(c) further alleviates any

9    concern over the complexity of the regulatory scheme.").

10        Accordingly, the charges against defendants predicated on their

11    engaging in the business of "manufacturing" firearms without a

12    license are not vague as applied in this case.

13        **F.   The Rule of Lenity Does Not Apply**

14        Defendants' contention that the rule of lenity provides an

15    alternative ground for the Court to dismiss the "manufacturing"

16    charges also is without merit. (Mot. at 12.) The Ninth Circuit has

17    cautioned that, "[t]he rule of lenity only applies . . . where there

18    is a grievous ambiguity or uncertainty in the language and structure

19    of the [statute], such that even after a court has seize[d]

20    everything from which aid can be derived, it is still left with an

21    ambiguous statute." <u>United States v. Carona</u>, 660 F.3d 360, 369 (9th

22    Cir. 2011) (quotation marks and citation omitted). Thus, "[b]ecause

23    the meaning of language is inherently contextual," the Ninth Circuit

24    has "declined to deem a statute ambiguous for purposes of lenity

25    merely because it was <u>possible</u> to articulate a construction more

26    narrow than that urged by the government." <u>Id.</u> (emphasis in

27    original). Any ambiguity in the meaning of "manufacturing" (and the

28

24

government contends there is none) is far from the "grievous ambiguity or uncertainty" contemplated by the Ninth Circuit.

Moreover, defendants ignore that the statute at issue (18 U.S.C. § 922(a)(1)(A)) contains a willfulness requirement. The "[i]nclusion of a scienter requirement 'mitigates a law's vagueness, especially with respect to the adequacy of notice to the complainant that his conduct is proscribed." United States v. Kahre, 737 F.3d 554, 572 (9th Cir. 2013) (quoting Guo, 634 F.3d at 1123). "Lenity is especially inappropriate" where statutes require scienter. United States v. Wanland, 830 F.3d 947, 954 (9th Cir. 2016); see also Guo, 634 F.3d at 1123 (willfulness requirement in statute "further alleviates any concern over the complexity of the regulatory scheme"); United States v. Wu, 711 F.3d. 1, 15 (1st Cir. 2013) ("Where a statute explicitly provides that a criminal violation of its terms must be 'willful,' the void-for-vagueness doctrine is especially inapposite, since the statute itself ensures that good-faith errors are not penalized.") (cleaned up).

Here, the government must prove that defendants knew their conduct of manufacturing firearms without a license was unlawful, and that they acted intentionally and purposely and with the intent to do something the law forbids. Bryan v. United States, 524 U.S. 184, 190-192 (1998). As "the knowledge requirement of the statute further reduces any potential for vagueness," Holder v. Humanitarian Law Project, 561 U.S. 1, 21 (2010), application of the rule of lenity is neither necessary nor appropriate in this case.

IV. **CONCLUSION**

Accordingly, the government respectfully requests that this Court deny defendants' joint motion to dismiss the indictment.

ER428

**DECLARATION OF BRIAN FAERSTEIN**

I, Brian Faerstein, declare as follows:

1.    I am an Assistant United States Attorney in the United States Attorney's Office for the Central District of California.  I represent the government in United States v. Travis Schlotterbeck and James Bradley Vlha, 2:19-CR-343-GW.

2.    Attached hereto as **Exhibit A** is a Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") Director's Ruling, titled "Manufacturing and Gunsmithing" and dated January 2, 2015 ("ATF 2015-1").  I obtained a digital copy of ATF 2015-1 over the internet at the following address on June 9, 2022: https://www.atf.gov/firearms/docs/ruling/2015-1-manufacturing-and-gunsmithing/download.

I declare and affirm under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed on June 9, 2022, at Los Angeles, California.

_____
BRIAN FAERSTEIN

ER429

**EDWARD M. ROBINSON (CA Bar 126244)**
21515 Hawthorne Blvd, Suite 730
Torrance, CA 90503
Office: (310) 316-9333
Facsimile: (310) 316-6442
eroblaw@gmail.com

Attorneys for Defendant
*Travis Schlotterbeck*

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA
## WESTERN DIVISION

|  |  |
|---|---|
| UNITED STATES OF AMERICA,<br><br>        Plaintiff,<br><br>    v.<br><br>TRAVIS SCHLOTTERBECK, and<br>JAMES BRADLEY VLHA<br><br>        Defendant. | Case No. 19-cr-00343-GW<br><br>**DEFENDANTS' JOINT MOTION TO DISMISS INDICTMENT PER FED. R. CRIM. P. 12(b)(3)(a); EXHIBITS IN SUPPORT**<br><br>DATE: June 23, 2022<br>TIME: 8:00 AM<br>Courtroom of the<br>Honorable George H. Wu |

# **TABLE OF CONTENTS**

INTRODUCTION ............................................................................................... 1

ARGUMENT ....................................................................................................... 3

   I.    LEGAL STANDARD ............................................................................. 3

   II.   VAGUENESS: RECEIVER ................................................................... 3

       A.   Attorney General Lynch's Letter Explains the Vagueness Problem ............... 4

       B.   Previous Courts' Dismissals Under Similar Facts Further Underscore the Vagueness of the Law Surrounding an AR-15 "Lower Receiver" ................... 5

       C.   The Government's Letter Here Highlights the Arbitrary Enforcement Problem Associated with Vague Statutes ........................................................ 6

   III.  VAGUENESS: MANUFACTURING ................................................... 6

   IV.  The Rule of Lenity Applies ................................................................... 9

CONCLUSION ................................................................................................. 10

ER431

# <u>TABLE OF AUTHORITIES</u>

**Cases**

*Abramski v. United States,*
    573 U.S. 169 (2014)..................................................................................6

*Dunn v. United States,*
    442 U.S. 100 (1979)..................................................................................9

*Grayned v. City of Rockford,*
    408 U.S. 104 (1972)..................................................................................3

*Hoffman Estates v. Flipside, Hoffman Estates, Inc.,*
    455 U.S. 489 (1982)...................................................................................7

*Kolender v. Lawson,*
    461 U.S. 352 (1983)...............................................................................3, 7

*Lurie v. Wittner,*
    228 F.3d 113 (2nd Cir. 2000) ....................................................................9

*Perrin v. United States,*
    444 U.S. 37 (1979)....................................................................................8

*Thibodeau v. Portuondo,*
    486 F.3d 61 (2nd Cir. 2007) .....................................................................7

*United States v. Apel,*
    571 U.S. 359 (2014)..................................................................................6

*United States v. Santos,*
    553 U.S. 507 (2008)..................................................................................9

*United States v. Short Accountancy Corp.,*
    785 F.2d 1448 (9th Cir. 1986) ..................................................................3

*United States v. Thompson/Center Arms Company,*
    504 U.S. 505 (1992)..................................................................................9

*United States v. Vest,*
    448 F. Supp. 2d 1002 (S.D. Ill. 2006)......................................................9

**Statutes**

18 U.S.C. § 371 ............................................................................................1

18 U.S.C. § 921 ............................................................................................8

18 U.S.C. § 922 .....................................................................................1, 2, 9

**Other Authorities**

27 C.F.R. § 478.11 ...............................................................................2, 4, 6

ii

# INTRODUCTION

Mr. Schlotterbeck and Mr. Vhla are charged in a three-count indictment alleging that they conspired with each other and others to manufacture firearms without the appropriate federal firearms license. They are also charged with the substantive count of manufacturing five firearms without the appropriate federal firearms license as well as selling a firearm to a felon in violation of 18 U.S.C. §§ 371 and 922(a)(1)(A). The indictment alleges that the defendants aided and abetted each other and alleged co-conspirators in the substantive count of manufacturing firearms without a license. (*See* Doc. 1, Count 2.)[1] Finally, Mr. Schlotterbeck is charged in count 3 with selling a firearm to a prohibited person in violation of 18 U.S.C. § 922(d).

The introductory allegations of the indictment cite the statutory definition of a "firearm" as "any weapon…which will or is designed to or may readily be converted to expel a projectile by the action of an explosive," and "the frame or receiver of any such weapon." (*See* Doc 1, pg. 2.) The indictment then describes the weapons in question, the AR-15 type rifle, as "consist[ing] of many parts, including the: (1) lower receiver; (2) upper receiver; (3) stock; (4) barrel; and (5) magazine. (Doc. 1 at 2.)

Paragraph 5 describes the "assembl[ing]" of the component parts into a rifle or pistol, stating that "a finished lower receiver had the shape and space necessary for an upper receiver and barrel to attach to the lower receiver." (Doc. 1, at 2.) The only reference to anything other than this assembling is where the indictment, with respect to the lower receiver, states, "a person could use specialized machinery on an unfinished lower receiver to create, or 'mill out' cavities to create a finished lower receiver." Nowhere in paragraph 5, or in the indictment, is there an acknowledgment that this 'milled out' lower receiver does not fit the definition of a "firearm." Paragraph 5 further describes, with no detail, that a milled out lower receiver has the shape and space necessary for an upper receiver and barrel to attach to the lower receiver. (Doc. 1,

---

[1] The government has abandoned its theory of prosecution that the defendants were dealing without a license. (Doc. 89 at 1.)

at 2.) It is against this alleged backdrop of 'assembly' that the allegations of manufacturing and, with respect to count three, the selling of a "firearm is made." The term manufacturing is not defined in the indictment.

The "Manner and Means" section of the conspiracy count follow the same pattern as the introductory paragraphs. It is alleged in the manner and means section that Mr. Schlotterbeck and co-conspirator Kwan would "obtain firearm parts, including *unfinished lower receivers*," and, "arrange" to have the "firearm customers" mill the unfinished lower receivers to attach to an "upper receiver and barrel." The co-defendants would then "assemble" and sell the "completed firearms" to the customers. (Doc 1., page 3.)

The statutory term for firearm, in this case the receiver, does not provide any definition about the necessary characteristics of that receiver/firearm. 27 C.F.R. §478.11 defines a firearm/receiver as "[t]hat part of a firearm which provides housing for the hammer, bolt or breechblock, and firing mechanism, and which is usually threaded at its forward portion to receive the barrel." It is uncontroverted that a "finished [or milled out in this case] AR-15 receiver does not contain a bolt or breechblock and is not threaded to receive the barrel." Furthermore, the government concedes that the upper receiver, stock, barrel and magazine (the component parts of the AR-15) are not regulated and are not, like the receiver, defined as firearms for which a particular federal manufacturing license is required.

Given the ambiguity and complexity that exists surrounding this area of law, no reasonable person of ordinary intelligence could understand whether or not their conduct was unlawful. As such, 18 U.S.C. §§ 922(a)(1)(A) and 922(d) are unconstitutionally vague, both on their face and as applied to the defendants' conduct at issue here.

2

ER434

**ARGUMENT**

## I.  <u>LEGAL STANDARD</u>

Vague laws are legally impermissible for three critical reasons. First, they "may trap the innocent" by failing to provide "a reasonable opportunity to know what is prohibited." *Grayned v. City of Rockford*, 408 U.S. 104, 108-109 (1972). Second, they encourage "arbitrary and discriminatory enforcement" by delegating "basic policy matters to policemen, judges, and juries for resolution on an ad hoc and subjective basis." *Id*. And third, because they force individuals to "steer far wider of the unlawful zone" than necessary and "inhibit the exercise of … freedom." *Id*.

The indictment, as applied to both defendants, is unconstitutionally vague in that it fails to provide constitutionally required notice such that "ordinary people can understand what conduct is prohibited…and in a manner that does not encourage arbitrary and discriminatory enforcement." *Kolender v. Lawson*, 461 U.S. 352, 357 (1983).

In this case, a pretrial motion to dismiss the indictment is appropriate because, as argued below and set forth in the exhibits, the defendants are asking the court to rule on a question of law and not fact. This court, "may make preliminary findings of fact necessary to decide the questions of law presented by pretrial motions so long as the court's findings on the motion do not invade the province of the ultimate finder of fact." *United States v. Short Accountancy Corp.*, 785 F.2d 1448, 1452 (9th Cir. 1986) (citations omitted).

## II.  <u>VAGUENESS: RECEIVER</u>[2]

On April 22, 2022, the government wrote Mr. Vlah's counsel and Mr. Schlotterbeck's prior counsel to "provide additional information relating to the anticipated trial testimony of Bureau of Alcohol, Tobacco, Firearms and Explosives

---

[2] For reasons discussed throughout this section, Count 3 against Mr. Schlotterbeck must also be dismissed. Whether or not the alleged receiver is a firearm is unclear and thus this charge, as applied to Mr. Schlotterbeck, is unconstitutionally vague as well.

3

1  (ATF) Senior Industry Operations Investigator/ Industry Operations Intelligence
2  Specialist Thomas M. Chimileski, Jr[.]" That letter is attached hereto as Exhibit A. In
3  that letter the government discusses a telephone call between the prosecutors,
4  investigator Chimileski and ATF legal counsel. The contents of that call are
5  summarized and include the statement that "[the] ATF had conceded as a criminal
6  enforcement litigating position in certain federal districts, including the Central District
7  of California, that an AR-15-type lower receiver did not strictly meet the soon-to-be
8  amended definition of 'firearm frame or receiver' under 27 C.F.R. § 478.11 (i.e., that
9  the lower receiver does not contain the bolt or breechblock, and is not usually threaded
10 at its forward position to receive the barrel)." This "concession" is based upon, among
11 other things, the decisions in *United States v. Alejandro Jimenez*, Case No. 15-cr-
12 00372-JD-1, and *United States v. Roh*, Case No. SACR-14-167-JVS, as well as a letter
13 from Attorney General Loretta Lynch. (*See* Exhibit B, order in the *Jimenez* case, the
14 tentative minute order in the *Roh* case, and Attorney General Lynch's letter.)

A. <u>Attorney General Lynch's Letter Explains the Vagueness Problem</u>

15
16      As set forth by the Attorney General in 2016 about the law in this area at the time
17 of the acts alleged in the indictment, the law in this area is "unconstitutionally vague."
18 Attorney General Lynch urged Congress to amend the law, specifically in relation to an
19 AR-15, noting that "AR-15s have split receivers. The upper receiver ordinarily houses
20 the bolt or breechblock and is threaded to receive the barrel. The lower receiver houses
21 the hammer and firing mechanism. In this case, the defendant purchased only a lower
22 receiver. The indictment did not allege that he also possessed or received the upper
23 portion of a split AR-15 receiver-the portion that houses the 'bolt or breechblock' and
24 that attaches to the barrel. The government therefore conceded in response to the
25 defendant's motion to dismiss that the lower receiver purchased did 'not perfectly fit the
26 CFR section definition.'" (*See* Lynch Letter, Exhibit B, at 1-2).

27      Attorney General Lynch concluded that the Justice Department could not prevail
28 in such cases under the current statutory framework, declaring that the decision in

1    *United States v. Jimenez*, case no. 15-cr-00372-JD-1 (N.D. Cal. 2016) and other federal

2    prosecutions were either doomed because of vagueness and that the "relevant

3    regulatory scheme did not cover the charged conduct."

4              B. Previous Courts' Dismissals Under Similar Facts Further Underscore

5              the Vagueness of the Law Surrounding an AR-15 "Lower Receiver"

6              The orders granting dismissal for vagueness speak for themselves. The

7    defendants request that this court incorporate the reasoning in the orders and determine

8    that the lower receiver of the AR-15, for constitutional vagueness purposes, cannot

9    constitute a "firearm" for the purpose of criminal prosecution under the statutes

10   supporting the indictment against them. More specifically, the defendants ask that this

11   court, based upon the above referenced reasoning, conclude that they could not have

12   received fair notice, as required under the Constitution, in that, "even if [the

13   defendants] had read the rules and regulations, [they] could not have known that the

14   lower receiver of the AR-15 would be covered by them." *Jimenez* Order, pg. 5, lines 2-

15   3. And that, the defendants, "could not turn to any statute or regulations, however

16   complicated, to determine that acquiring the lower receiver alone would legally be

17   treated as the criminal act of [possessing a] 'receiver' within the definition of what is a

18   firearm." *Id*., pg. 7, lines 23-25.

19             Furthermore, the likelihood of arbitrary enforcement supports the finding that, as

20   applied to the defendants, these statutes are unconstitutionally vague, the District Court

21   in *Jimenez* stated "[s]ince the gun laws and regulations do not squarely state how split

22   receivers for rifles like the AR-15 will be treated, ATF is perfectly free to take a totally

23   different enforcement approach at any time. It might have enforced the current AR-15

24   lower receiver interpretation to a fare-thee-well for many years but that in no way

25   means it can flip to a new interpretation should a future in-house counsel decide to

26   break with her predecessor's advice…." *Id*., pg. 10, lines 9-14.

27

28

5

## C. The Government's Letter Here Highlights the Arbitrary Enforcement Problem Associated with Vague Statutes

A perfect illustration of the constitutionally defective arbitrary enforcement problem is set forth in the government's letter. The letter states that, after having been informed of the "change in criminal enforcement litigating position in this district, investigator Chimileski explained that in his day-to-day regulatory duties as an Industry Operations Investigator, including meeting with federal firearm licensees in the field, he (and ATF more broadly) still considers finished lower receivers as meeting the definition of "firearm frame or receiver" under 27 C.F.R. § 478.11 that will soon be amended." This statement speaks for itself. While the government is to be lauded for disclosing this information, it does not change the fact that this investigator, despite the position of ATF legal counsel, federal district court judges, and the attorney general of the United States, still believes that his interpretation should have force of criminal law. *See Abramski v. United States*, 573 U.S. 169, 191 (2014) ("the critical point is that criminal laws are for courts, not for the government, to construe[]"); *quoting United States v. Apel*, 571 U.S. 359, 368 (2014) ("[w]e have never held that the government's reading of a criminal statute is entitled to any deference.") As Judge Selna stated in his tentative order dismissing the receiver charge against Roh, "knowledge of the ATF's position does not give ATF's unsupported position the force of law." *See* cases cited in tentative.

In conclusion, since Counts 1, 2 and 3 are premised on the lower receiver being the "firearm," thus requiring a federal firearms license to manufacture, the charges against Mr. Schlotterbeck must be dismissed as unconstitutionally vague.

## III. VAGUENESS: MANUFACTURING

The defendant's conduct with respect to the allegations of manufacturing firearms—the lower receiver—is not within the scope of the statute or the ATF-regulatory definition. As District Court Judge Selna ruled in the *Roh* case, "the statute and regulation are unconstitutionally vague as applied him. No reasonable person

6

would understand that a part constitutes a receiver where it lacks the components specified in the regulation." *Roh* order, pg. 6.

The claim that the assembling of the component parts amounts to manufacturing for which a federal manufacturing license is required suffers from the same vagueness problems as set forth above. Nowhere in the indictment, or the statutes supporting the indictment, is the term manufacturing defined. The common meaning of manufacturing, as set forth in the Merriam-Webster dictionary, is "something made from raw materials by hand or by machinery." Again, the only part of the weapon in question that was converted from raw materials, through the common understanding of manufacturing, was the lower receiver which, even with the milling, did not meet the statutory definition of a "firearm" for which a manufacturing license is required. As stated more thoroughly from the Supreme Court in *Kolender*, "[Due Process requires that a penal statute] define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." *Kolender* at 357. In *Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 498 (1982), the Supreme Court, in differentiating vagueness challenges concerning criminal laws versus non-criminal laws held, "[t]he degree of vagueness that the Constitution tolerates-as well as the relative importance of fair notice and fair importance-depends in part on the nature of the enactment." The Second Circuit in *Thibodeau v. Portuondo*, 486 F.3d 61, 66 (2nd Cir. 2007) reiterated the highest form of vagueness scrutiny for criminal laws as, "a more stringent analysis [is required] when examining laws that impose criminal penalties because the consequences of imprecision are qualitatively more severe."

The vagueness of the manufacturing theory is highlighted in the governments letter where Investigator Chimileski states that "based on certain variables, the first two AR-15 type firearms transactions described in the indictment (i.e., the sales on September 23 and October 27, 2015 [Count 3 deals with September 23 transaction]) could *potentially* be considered *differently* under the federal firearm licensing scheme

7

than the four transactions that followed….." Investigator Chimileski further provides the 'legal opinion' that with respect to the first 2 transactions, they *may* require either a federal type 07 manufacturer's license or a type 01 dealer's license depending on the passing of title. With respect to the following 4 transactions, Investigator Chimileski explains that those transactions '*likely*' require a manufacturing license. Most importantly, Investigator Chimileski analysis concerning the question of which type of license would be required for the conduct in the indictment was "predicated on the assumption that a finished lower receiver qualified as a firearm 'frame or receiver' under 18 U.S.C. § 921(a)(3)(B) *not withstanding* ATF's then proposed rule making regarding receivers and other related issues of which Investigator Chimileski was aware." (*Emphasis* supplied.)

The indictment speaks of assembling parts into a firearm. Assembling is different than "something made from raw materials by hand or by machinery." The Miriam Webster definition is "to fit together the parts of." The criminal law in this case does not define "manufacturing." The fundamental canon of statutory construction "…that, unless otherwise defined, words will be interpreted as taking their ordinary, contemporary, common meaning[,]" does not lend clarity the charged conduct. *Perrin v. United States*, 444 U.S. 37, 42 (1979). The defendants are, in the ordinary, contemporary and common description of their conduct, assembling-not manufacturing a firearm.

To add additional confusion and vagueness to the mix, what the defendants are doing could also be defined as gunsmithing—which does not require a federal firearm manufacturing license. Webster's Ninth New Collegiate Dictionary defines "gunsmith" as "one who designs, *makes*, or repairs small firearms." (*Emphasis* supplied.) This ordinary and common description fits the defendant's conduct.

The term manufacture, in this context and as applied to the defendants is ambiguous. Investigator Chemiliski's opinion that the conduct in the indictment "may" ore Likely" requites a manufacturing license is the degree and type of unconstitutional

8

vagueness that allows "the government …to pick and choose who is covered by [the term manufacturing] and who isn't."  *United States v. Vest*, 448 F. Supp. 2d 1002, 1012 (S.D. Ill. 2006).

## IV.    <u>The Rule of Lenity Applies</u>

The ambiguity that creates the constitutional vagueness implicates the rule of lenity. The rule of lenity is one of the original tools of statutory construction and "requires ambiguous criminal laws to be interpreted in favor of the defendants subjected to them." *United States v. Santos*, 553 U.S. 507, 514 (2008). The rule of lenity "places the weight of inertia upon the party that can best induce [law-makers] to speak more clearly[.]" *Id*. Importantly, the rule of lenity is not merely a convenient maxim of statutory construction, instead it is rooted in "fundamental principles of due process which mandate that no individual be forced to speculate . . . whether his conduct is prohibited." *Dunn v. United States*, 442 U.S. 100 (1979); *see also Lurie v. Wittner*, 228 F.3d 113 (2nd Cir. 2000)

This Court must apply the rule of lenity here to the term "manufacturing" and "resolve the ambiguity in [the defendants' favor]." *United States v. Thompson/Center Arms Company*, 504 U.S. 505 (1992). In doing so, it becomes clear that the defendants' conduct at issue likely does not constitute "manufacturing" in violation of 18 U.S.C. § 922(a)(1)(A). As such, under the Rule of Lenity, as well as the constitutional guarantee against vagueness, all charges against the defendants should be dismissed.

9

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# CONCLUSION

As applied to these defendants the law and the resulting indictment is unconstitutionally vague.  To proceed to trial on this indictment violates their right to Due Process.  The defendants ask that this case be dismissed.


Respectfully submitted,


DATED:  June 2, 2022          By  */s/ Edward M. Robinson*
                                   Edward M. Robinson

                                   Attorney for Defendant
                                   *Travis Schlotterbeck*

                              By  */s/ Jerome J Haig*
                                   Jerome J Haig

                                   Attorney for Defendant
                                   *James Bradley Vlha*

1  TRACY L. WILKISON
   United States Attorney
2  SCOTT M. GARRINGER
   Assistant United States Attorney
3  Chief, Criminal Division
   BRIAN R. FAERSTEIN (Cal. Bar No. 274850)
4  Assistant United States Attorney
   Environmental and Community Safety Crimes Section
5       1300 United States Courthouse
        312 North Spring Street
6       Los Angeles, California 90012
        Telephone: (213) 894-3819
7       Facsimile: (213) 894-0141
        E-mail:   Brian.Faerstein@usdoj.gov
8
   Attorneys for Plaintiff
9  UNITED STATES OF AMERICA

10              UNITED STATES DISTRICT COURT

11         FOR THE CENTRAL DISTRICT OF CALIFORNIA

12  UNITED STATES OF AMERICA,        No. CR 19-00343-GW

13          Plaintiff,               GOVERNMENT'S TRIAL MEMORANDUM

14             v.
                                     Trial Date: May 24, 2022
15  TRAVIS SCHLOTTERBECK and         Trial Time: 9:00 AM
    JAMES BRADLEY VLHA,              Location:   Courtroom of the
16                                               Hon. George H. Wu
            Defendants.
17

18

19       Plaintiff United States of America, by and through its counsel

20  of record, the United States Attorney for the Central District of

21  California and Assistant United States Attorney Brian Faerstein,

22  hereby files its Trial Memorandum.

23  //

24  //

25  //

26  //

27  //

28

                              1

ER443

Leave is respectfully requested to file additional memoranda as
may become appropriate during the course of trial.

Dated: May 6, 2022                Respectfully submitted,

                                  TRACY L. WILKISON
                                  United States Attorney

                                  SCOTT M. GARRINGER
                                  Assistant United States Attorney
                                  Chief, Criminal Division

                                         /s/
                                  _____
                                  BRIAN R. FAERSTEIN
                                  Assistant United States Attorney

                                  Attorneys for Plaintiff
                                  UNITED STATES OF AMERICA

ER444

**TABLE OF CONTENTS**

DESCRIPTION                                                          PAGE

GOVERNMENT'S TRIAL MEMORANDUM.................................... 1

I.   STATUS OF THE CASE......................................... 1

     A.   Charges.............................................. 1

     B.   Trial Status......................................... 1

     C.   Pretrial Status of Defendants........................ 1

     D.   Government's Case-in-Chief........................... 1

     E.   Motions in Limine.................................... 3

     F.   Stipulations......................................... 4

     G.   Trial Indictment

     H.   Forfeiture Allegation................................ 4

II.  THE CRIMES AND THEIR ELEMENTS............................. 5

     A.   Conspiracy to Engage in the Business of Manufacturing
          Firearms Without a License........................... 5

     B.   Engaging in the Business of Manufacturing Firearms
          Without a License; Aiding and Abetting............... 5

     C.   Sale of a Firearm to a Prohibited Person............. 6

III. STATEMENT OF FACTS AND EVIDENCE........................... 7

     A.   Manufacture and Sale of Rifle to CI
          on September 23, 2015................................ 8

     B.   Manufacture and Sale of Rifle to UC-1
          on October 27, 2015.................................. 9

     C.   Manufacture and Sale of Pistol to UC-1
          on February 11, 2016................................ 10

     D.   Manufacture and Sale of Pistol to UC-2
          on March 16, 2016................................... 11

     E.   Manufacture and Sale of Pistol to UC-1
          on May 6, 2016...................................... 12

     F.   Manufacture and Sale of Rifle to UC-2
          on June 15, 2016.................................... 13

i

ER445

**TABLE OF CONTENTS (CONTINUED)**

DESCRIPTION                                                                 PAGE

    G.    Additional Evidence Relating to Charges............... 13

II.  EVIDENTIARY ISSUES......................................... 15

    A.    Authentication and Foundation......................... 15

         1.    Video and Audio Recordings..................... 15

         2.    Transcripts of Recordings...................... 16

         3.    Photographs.................................... 16

         4.    Firearms, Magazines and Other Physical Evidence.. 17

    B.    Summary Exhibits and Summary Witness.................. 18

         1.    Summary Exhibits............................... 18

         2.    Summary Witness................................ 20

    C.    Hearsay and Exceptions to Hearsay.................... 21

         1.    Defendants' Statements as Admissions of a Party Opponent....................................... 21

         2.    Defendants' and Co-Conspirator Kwan's Statements as Co-Conspirator Statements..................... 22

         3.    Public Records................................. 25

    D.    Expert and Lay Opinion Testimony..................... 25

         1.    Federal Firearms Requirements.................. 26

         2.    Digital Devices................................ 27

         3.    Lay Opinion of Law Enforcement Agents.......... 27

    E.    Truthful Testimony Provisions of Plea Agreement....... 29

    F.    Cross-Examination of Defendants and Defense Witnesses. 30

    G.    Affirmative Defenses................................. 32

    H.    Reciprocal Discovery................................. 32

III. CONCLUSION............................................... 33

ER446

**TABLE OF AUTHORITIES**

DESCRIPTION                                                              PAGE

**Federal Cases**

Bourjaily v. United States,
    483 U.S. 171 (1987) ........................................ 23

Crawford v. Washington,
    541 U.S. 36 (2004) ......................................... 23

Lucero v. Stewart,
    892 F.2d 52 (9th Cir. 1989) ................................ 17

Reyes v. United States,
    383 F.2d 734 (9th Cir. 1967) ............................... 18

Sendejas v. United States,
    428 F.2d 1040 (9th Cir. 1970) ........................... 23-24

United States v. Allen,
    425 F.3d 1231 (9th Cir. 2005) .............................. 24

United States v. Bailleux,
    685 F.2d 1105 (9th Cir. 1982) .............................. 31

United States v. Barragan,
    871 F.3d 689 (9th Cir. 2017) ............................... 22

United States v. Black,
    767 F.2d 1334 (9th Cir. 1985) .............................. 30

United States v. Chu Kong Yin,
    935 F.2d 990 (9th Cir. 1991) ............................... 15

United States v. Cuozzo,
    962 F.2d 945 (9th Cir. 1992) ............................... 30

United States v. Dhinsa,
    243 F.3d 635 (2d Cir. 2001) ................................ 15

United States v. Dorsey,
    677 F.3d 944 (9th Cir. 2012) ............................... 29

United States v. Freeman,
    498 F.3d 893 (9th Cir. 2007) ............................... 28

iii

ER447

Case 2:03-cv-02343-GW Document 89-2 Filed 05/06/22 Entry Page 6 of 41 Page ID #:532

**TABLE OF AUTHORITIES (CONTINUED)**

DESCRIPTION                                                          PAGE

United States v. Gadson,
    763 F.3d 1189 (9th Cir. 2014) ............................... 28

United States v. Gay,
    967 F.2d 322 (9th Cir. 1992) ............................... 31

United States v. Harrington,
    923 F.2d 1371 (9th Cir. 1991) ............................... 17

United States v. Hegwood,
    977 F.2d 492 (9th Cir. 1992) ............................... 32

United States v. Henderson,
    241 F.3d 638 (9th Cir. 2000) ............................... 17

United States v. Johnson,
    594 F.2d 1253 (9th Cir. 1979) ............................... 18

United States v. Kaiser,
    660 F.2d 724 (9th Cir. 1981) ............................ 17-18

United States v. King,
    587 F.2d 956 (9th Cir. 1978) ............................... 15

United States v. Lloyd,
    807 F.3d 1128 (9th Cir. 2015) ............................... 24

United States v. Mendoza-Prado,
    314 F.3d 1099 (9th Cir. 2002) ............................... 32

United States v. Monroe,
    943 F.2d 1007 (9th Cir. 1991) ............................... 29

United States v. Ortega,
    203 F.3d 675 (9th Cir. 2000) ............................... 21

United States v. Pree,
    408 F.3d 855 (7th Cir. 2005) ............................... 20

United States v. Reid,
    634 F.2d 469 (9th Cir. 1980) ............................... 31

ER448

**TABLE OF AUTHORITIES (CONTINUED)**

DESCRIPTION                                                    PAGE

United States v. Rizk,
   660 F.3d 1125 (9th Cir. 2011) ............................... 19

United States v. Scholl,
   166 F.3d 964 (9th Cir. 1999) ............................... 32

United States v. Schoneberg,
   396 F.3d 1036 (9th Cir. 2005) .............................. 29

United States v. Shaw,
   829 F.2d 714 (9th Cir. 1987) ............................... 29

United States v. Shirley,
   884 F.2d 1130 (9th Cir. 1989) .............................. 20

United States v. Smith,
   591 F.3d 974 (8th Cir. 2010) ............................... 16

United States v. Soulard,
   730 F.2d 1292 (9th Cir. 1984) .............................. 21

United States v. Torres,
   908 F.2d 1417 (9th Cir. 1990) .............................. 16

United States v. Turner,
   528 F.2d 143 (9th Cir. 1975) ............................... 16

United States v. Valerio,
   441 F.3d 837 (9th Cir. 2006) ............................... 22

United States v. Vera,
   770 F.3d 1232 (9th Cir. 2014) .............................. 28

United States v. Zavala-Serra,
   853 F.2d 1512 (9th Cir. 1988) .............................. 24

**Federal Statutes**

18 U.S.C. § 371 ........................................... 1, 5

18 U.S.C. § 922 ........................................ 1, 5, 6

v

**TABLE OF AUTHORITIES (CONTINUED)**

DESCRIPTION                                                                PAGE

**Other**

Fed. R. Crim. P. 16 .............................................. 25, 33

Fed. R. Crim. P. 26.2 ............................................... 33

Fed. R. Evid. 106 .................................................. 22

Fed. R. Evid. 404 ........................................... 3, 30, 32

Fed. R. Evid. 405 .................................................. 32

Fed. R. Evid. 608 .................................................. 31

Fed. R. Evid. 701 .............................................. 27, 28

Fed. R. Evid. 702 .................................................. 26

Fed. R. Evid. 801 ............................................... *passim*

Fed. R. Evid. 803 .................................................. 25

Fed. R. Evid. 901 .............................................. 15, 16

Fed. R. Evid. 902 .................................................. 25

Fed. R. Evid. 1006 ................................................. 18

ER450

1      __GOVERNMENT'S TRIAL MEMORANDUM__

2 **I. STATUS OF THE CASE**

3   **A. Charges**

4    On June 11, 2019, a federal grand jury returned a three-count

5 indictment against Travis Schlotterbeck ("Schlotterbeck"), James

6 Bradley Vlha ("Vlha"), and Jacob Dekoning ("Dekoning").  The

7 indictment charged defendants with conspiracy to engage in the

8 business of dealing in and manufacturing firearms without a license

9 in violation of 18 U.S.C. § 371 (Count One) and engaging in the

10 business of dealing in and manufacturing firearms without a license

11 in violation of 18 U.S.C. § 922(a)(1)(A) (Count Two).  Schlotterbeck

12 also was charged with selling a firearm to a prohibited person, in

13 violation of 18 U.S.C. § 922(d)(1) (Count Three).

14    On February 20, 2020, on the government's own motion, the Court

15 dismissed the indictment as to Dekoning only.  (Dkt. Nos. 70, 71.)

16    On April 20, 2022, the government informed defense counsel

17 that, with respect to Counts One and Two of the indictment, it would

18 be proceeding on a theory of engaging in the business of

19 manufacturing firearms without a license only, without submitting

20 the alternate theory of dealing in firearms to the jury.

21   **B. Trial Status**

22    Trial against Schlotterbeck and Vlha is set to commence on May

23 24, 2022.  Trial by jury has not been waived.

24   **C. Pretrial Status of Defendants**

25    Schlotterbeck and Vlha are on bond pending trial.

26   **D. Government's Case-in-Chief**

27    The estimated time for the presentation of the government's

28

ER451

1    case-in-chief is approximately four days.  This includes the

2    estimated time for cross-examination of the government's witnesses.

3         Subject to certain stipulations currently being negotiated

4    between the parties, the government expects to call approximately

5    eight witnesses: (1) Bureau of Alcohol, Tobacco, Firearms and

6    Explosives (ATF) Senior Industry Operations Investigator Thomas

7    Chimileski, Jr.; (2) ATF Special Agent Stephanie Crebbs; (3) ATF

8    Special Agent Hercules Fandino; (4) Ping-Yi "Jesse" Kwan ("Kwan,"

9    who is a defendant in a related case);[1] (5) ATF Special Agent Jason

10   Moore; (6) ATF Special Agent Daniel Thompson; (7) ATF Special Agent

11   Monika Uchiyama; and (8) ATF confidential informant.  Absent certain

12   stipulations regarding factual matters and the authenticity and

13   admissibility of certain exhibits, the government also would

14   anticipate calling some or all of the following witnesses, which

15   would likely extend the estimated timing of the government's case-

16   in-chief: (9) Federal Firearms Licensing Center Supervisor Stephanie

17   Custer; (10) Computer Examiner Gregory Estes; (11) Computer Examiner

18   Terry Hom; (12) Jennifer Igercic, City of Bellflower City Clerk's

19   Office; and (13) ATF NIBIN Technician Jill Jacobson.[2]

20        As described further herein, a substantial portion of the

21   government's evidence will be presented in the form of clips of

22   video and audio recordings of covertly recorded meetings and phone

---

[1] Kwan pleaded guilty in a separate proceeding to an information
alleging that, among other things, Kwan engaged in the business of
manufacturing and dealing in firearms without a license.  See Case
No. CR 19-292-GW, Dkt. Nos. 1, 19.  Kwan has not yet been sentenced
in that case.

[2] The government reserves the right to call additional witnesses as
necessary, including in rebuttal should defendants present a case.

2

1   calls involving or pertaining to defendants, as well as other

2   physical and photographic evidence, compilations and summary

3   exhibits from voluminous digital evidence, text messages, other

4   records and documents, and Schlotterbeck's statements to ATF.

5   **E.   Motions in Limine**

6       The government has filed three motions in limine.

7       The government's MIL #1 seeks to admit certain evidence and

8   permit argument regarding defendants' willfulness.  (Dkt. No. 80.)

9   Specifically, the government seeks to admit, under Federal Rule of

10  Evidence 404(b)(2), evidence of defendants' firearms purchases

11  before or during the course of the alleged conspiracy for the

12  limited purpose of proving their knowledge and absence of mistake

13  regarding the unlawful nature of their alleged conduct here.  The

14  government also seeks to admit, as part of the charged conduct

15  and/or as inextricably intertwined, evidence relating to defendants'

16  companion sales of large-capacity magazines of ammunition and

17  discussions with undercover agents regarding obtaining silencers.

18      The government's MIL #2 seeks to admit certain statements

19  Schlotterbeck made to ATF during a voluntary interview on June 21,

20  2017, while a search warrant was being executed at businesses

21  Schlotterbeck controlled in Bellflower, California.  (Dkt. No. 81.)

22  Defendant's statements are admissions of a party opponent under Rule

23  801(d)(2)(A), and do not pose any Bruton issues in this case.

24      The government's MIL #3 seeks to exclude the proffered

25  testimony of Steven D. Lieberman, Esq., a criminal defense attorney

26  and use-of-force trainer the defense jointly noticed as a purported

27  expert witness in this case.  (Dkt. No. 82.)

28

1    As of the time of this filing, defendants have not filed

2    responses to these motions (the date for oppositions was May 6,

3    2022), and the motions remain pending.  Defendants also did not file

4    any motions in limine by April 29, 2022, the date for motions in

5    limine pursuant to the Court's order.  (Dkt. No. 79.)

6    **F.   Stipulations**

7    The parties are negotiating certain stipulations regarding

8    factual issues and the authenticity, foundation, and admissibility

9    of a significant number of exhibits that may obviate the need for

10   the government to call certain witnesses in its case-in-chief.

11   **G.   Trial Indictment**

12   The government sent defense counsel a proposed trial indictment

13   that (1) removed defendant Dekoning consistent with his dismissal

14   from the case;[3] and (2) removed the alternate theory of "dealing in"

15   firearms without a license from Counts One and Two.  Counsel for

16   defendant Vlha proposed other deletions relating to certain

17   allegations, to which the government objects.  The parties will

18   continue to meet and confer although the government may be amenable

19   to the indictment not being sent back to the jury room.

20   **H.   Forfeiture Allegation**

21   Notwithstanding the forfeiture allegation in the indictment,

22   the government does not anticipate seeking to forfeit any property

23   in a forfeiture phase of trial (in the event of a conviction(s)).

24

25   _____

26   [3] Assuming Dekoning is removed from a trial indictment or the
     indictment is not sent back with the jury, it will not be necessary
27   to instruct the jury on the absence of Dekoning from the case.  It
     would be improper for defendants to comment on the dismissal of
28   Dekoning as a defendant in any event.  See generally Ninth Circuit
     Model Criminal Jury Instruction No. 2.15.

4

1  **II.  THE CRIMES AND THEIR ELEMENTS**

2      **A.  Conspiracy to Engage in the Business of Manufacturing Firearms Without a License**

3

4      Schlotterbeck and Vlha are charged in Count One with conspiring

5  to engage in the business of manufacturing firearms without a

6  license, in violation of 18 U.S.C. § 371.  In order for a defendant

7  to be found guilty of that charge, the government must prove each of

8  the following elements beyond a reasonable doubt:

9      First, beginning on or about May 21, 2015, and ending on or

10 about June 21, 2017, there was an agreement between two or more

11 persons to engage in the business of manufacturing firearms without

12 a license, as charged in the indictment;

13     Second, the defendant became a member of the conspiracy knowing

14 of its object and intending to help accomplish it; and

15     Third, one of the members of the conspiracy performed at least

16 one overt act for the purpose of carrying out the conspiracy.

17     **B.  Engaging in the Business of Manufacturing Firearms Without a License; Aiding and Abetting**

18

19     Schlotterbeck and Vlha also are each charged in Count Two with

20 engaging in the business of manufacturing firearms without a

21 license, in violation of 18 U.S.C. § 922(a)(1).  In order for a

22 defendant to be found guilty of that charge, the government must

23 prove each of the following elements beyond a reasonable doubt:

24     First, the defendant was willfully engaged in the business of

25 manufacturing firearms within the dates specified in the indictment;

26 and

27     Second, the defendant did not then have a license as a firearms

28

5

1    manufacturer.

2         Willfully, as used in this statute, requires proof that the

3    defendant knew that his conduct was unlawful, but does not require

4    proof that the defendant knew of the federal licensing requirement.

5         This count expressly alleges an aiding and abetting theory as

6    well.  In order for either defendant to be found guilty of a charge

7    based on aiding and abetting, the government must prove each of the

8    following elements beyond a reasonable doubt:

9         First, the charged crime was committed by someone;

10        Second, defendant aided, counseled, commanded, induced or

11   procured that person with respect to at least one element of the

12   crime charged;

13        Third, defendant acted with the intent to facilitate the crime

14   charged; and

15        Fourth, defendant acted before the crime was completed.

16        **C.   Sale of a Firearm to a Prohibited Person**

17        Schlotterbeck is charged in Count Three with selling a firearm

18   to a prohibited person in violation of 18 U.S.C. § 922(d)(1).  In

19   order for Schlotterbeck to be found guilty of that charge, the

20   government must prove each of the following elements beyond a

21   reasonable doubt:

22        First, the defendant knowingly sold a firearm to an informant

23   working on behalf of the ATF; and

24        Second, the defendant knew or had reasonable cause to believe

25   that the informant had been convicted in any court of a crime

26   punishable by imprisonment for a term exceeding one year.

27

28

                                    6

**III. STATEMENT OF FACTS AND EVIDENCE**

The government expects that the evidence at trial will establish, among others, the following facts.

Between approximately May 21, 2015, and June 21, 2017, defendants Schlotterbeck and Vlha, along with co-conspirator Kwan and others, worked together to manufacture for sale multiple custom-ordered AR-15-type firearms lacking serial numbers (commonly referred to as "ghost guns"). These activities predominantly took place at the businesses Schlotterbeck controlled in Bellflower, called Sign Imaging and Live Fire Coatings (together, the "Bellflower shops").[4] Defendants and co-conspirator Kwan took custom orders for AR-15-type firearms (both rifles and pistols), obtained the firearm parts, arranged for certain parts (specifically, unfinished lower receivers) to be drilled for use, and assembled and finished (including through the use of a protective ceramic coating known as Cerakote) the AR-15-type firearms for sale. None of the co-conspirators nor the storefronts Schlotterbeck controlled had a federal firearms license.

Defendants and co-conspirator Kwan manufactured and sold six of these firearms to a confidential informant (the "CI") and two undercover agents ("UC-1" and "UC-2," and, together, the "UCs") working with the ATF between on or about July 7, 2015, and June 15, 2016. The evidence will demonstrate that the co-conspirators had other customers as well and engaged in additional so-called "builds" and sales of AR-15-type firearms on a custom-order basis. The

---

[4] Sign Imaging was licensed with the City of Bellflower; Live Fire Coatings was not.

ER457

evidence will further show that defendants and co-conspirator Kwan
engaged in this conduct for the principal objective of livelihood
and profit, without a license to do so.

     A substantial portion of the government's evidence will be
presented through clips of recorded meetings between one or more of
the co-conspirators and the ATF CI and/or UCs, along with recorded
telephone calls and text messages exchanged between these
individuals.  The meetings, calls, and text messages, all of which
were produced in discovery as well as summarized in detail in ATF
reports of investigation, relate to the discussions, negotiations,
and transactions underlying defendants' and co-conspirator Kwan's
manufacture and sales of the six AR-15-type firearms purchased by
the CI and UCs.[5]  The government summarizes and provides examples
below of some but not all of the evidence that it will seek to
introduce at trial regarding these six firearm sales.

     A.    Manufacture and Sale of Rifle to CI on September 23, 2015

     The government will present evidence that the CI met with
Schlotterbeck during a recorded meeting at the Bellflower shops on
July 7, 2015, during which Schlotterbeck informed the CI that he
could "build" an AR-15-type firearm for sale and "we do it all the
time."  Schlotterbeck and the CI preliminarily discussed the terms
of a sale, with Schlotterbeck informing the CI that "your budget's
gonna determine what you get."  The CI also told Schlotterbeck about

---

[5] The government has prepared clips (with synchronized captions from
transcripts of the recordings for the Court's and jury's
convenience) of relevant portions of the meeting and call
recordings.  The government has provided copies of these clips to
the defense for its review.

his prohibited status, informing, in part, Schlotterbeck's knowledge in connection with his alleged sale of a firearm to a prohibited person (Count Three).

The CI eventually placed an order with Schlotterbeck for an AR-15-type rifle, for which the CI paid Schlotterbeck $1,000 as a down payment. The CI later met with Schlotterbeck in a recorded meeting on September 22, 2015, to take one of the firearm parts the co-conspirators had ordered as part of the build – an unfinished lower receiver – to be drilled with certain cavities (also referred to as being "milled out," "machined" or "cut") at a third-party machine shop. The evidence will show that Schlotterbeck paid for this machining process, and the additional step of the CI visiting the third-party shop at Schlotterbeck's direction and pressing a button to start the machining process was largely a charade in the context of this case. The CI returned the following day, September 23, 2015, and met with Kwan and Vlha to take possession of and pay the remaining $1,000 balance for the completed AR-15-type rifle.

UC-1 accompanied the CI during this meeting and was introduced as another customer for firearms. Both Vlha and Kwan informed UC-1 that he could contact any of the three of them (Schlotterbeck, Vlha or Kwan) to order a firearm, with Vlha explaining, "Yup, we're all good. We all talk to each other."

**B. Manufacture and Sale of Rifle to UC-1 on October 27, 2015**

Following his introduction to Vlha and Kwan on September 23, 2015, UC-1 met with Schlotterbeck and Vlha at the Bellflower shops on October 8, 2015. During this recorded meeting, both defendants spoke at length about all aspects of their business of manufacturing

ER459

customized AR-15-type firearms for sale, including, among other
things, the types of parts, pricing, timing, Cerakote finishing
options, manner of placing firearm orders, and prior sales.

For instance, during the course of the approximately one-hour-
long meeting, defendants discussed keeping a low-profile for their
illegal business (Vlha: "Especially when it comes to guns its like .
. . Like, who do you, who do you know that's not gonna open his
mouth"); timing of obtaining parts (Vlha: "it probably takes about a
week to get everything, uh, because we'll have to get things from
different places"); pricing of firearms (Schlotterbeck: "the twelve
hundred dollar range, you're not going to get pretty much any of
that. It's just going to be, like, the most basic, but like, decent
gun"); and the uniqueness of the firearms (Schlotterbeck: "Yeah, and
you will get something that you can't buy in a store").  UC-1 placed
an order for an AR-15-type rifle and paid $740 as a down payment.

UC-1 returned to the Bellflower shops on October 22, 2015,
after Vlha and Kwan communicated with UC-1 in separate text message
exchanges.  During the recorded meeting on October 22, Kwan took UC-
1 to the third-party machine shop and Kwan paid to get the lower
receiver milled out (as part of the same charade described above).
UC-1 met Kwan and Vlha to pick up and pay the remaining $760 balance
for the AR-15-type rifle at the Bellflower shops on October 27.

**C.    Manufacture and Sale of Pistol to UC-1 on February 11, 2016**

In December 2015 and January 2016, UC-1 exchanged text messages
with both Kwan and Vlha regarding an additional AR-15-type firearm
order.  On January 26, 2016, UC-1 asked whether Vlha had "anything
[he] could check out for ideas," indicating he (UC-1) was looking

10

for something "more compact."  In response, Vlha sent a text message image of an AR-15-type rifle that appeared to have a short barrel.

UC-1 ultimately met with Schlotterbeck and Vlha in a recorded meeting at the Bellflower shops on January 26, 2016, to purchase another AR-15-type firearm.  Similar to the October 8, 2015 meeting, defendants discussed in detail the specifications and pricing of the AR-15-type firearm that UC-1 would be ordering.  Importantly, both defendants informed UC-1 that they could use a finished lower receiver that was already "cut" for building UC-1's next customized AR-15-type firearm, without taking UC-1 back through the charade of visiting the third-party machine shop.  Schlotterbeck explained that they already "got a bunch [of lower receivers] done for people that, like-like this," and stated they could use a pre-cut lower receiver so long as UC-1 said he got the lower receiver milled out himself, noting that "obviously there's a bit of a sketchy situation if we don't know the guy."  Vlha similarly said the completed lower receivers were for "returning customers on the builds."  UC-1 gave Schlotterbeck $750 as a down payment on the AR-15-type pistol order (and ordered magazines of ammunition as well), and Schlotterbeck confirmed he would be interested in UC-1 bringing in more customers.

UC-1 returned to the Bellflower shops on the evening of February 11, 2016, where he met with Kwan, to pick up and pay the remaining $850 balance for the AR-15-type pistol and four magazines, and to introduce UC-2 as an additional new customer.

**D.  Manufacture and Sale of Pistol to UC-2 on March 16, 2016**

During the recorded February 11, 2016 meeting, UC-2 placed an order with Kwan for an AR-15-type pistol.  Similar to defendants'

ER461

comments to UC-1 on January 26, 2016, Kwan informed UC-1 and UC-2 that they could use a pre-cut lower receiver for the build, but "we only do it to people we know." Kwan confirmed that UC-2 wanted the same type of build as UC-1 ordered for the pistol he picked up that evening, stating, "You want to do the same thing, we'll just do the exact same thing." UC-2 requested they Cerakote the pistol in yellow and red colors in the theme of the movie "Ironman," and paid $750 of the $1,500 purchase price upfront.

The UCs returned to the Bellflower shops on the evening of March 16, 2016, to pick up UC-2's "Ironman" pistol (along with two magazines) and for UC-1 to order another AR-15-type firearm.

**E.   Manufacture and Sale of Pistol to UC-1 on May 6, 2016**

During the recorded March 16, 2016 meeting, Kwan and Vlha met with the UCs and discussed the specifications and finish for UC-1's next firearm build. UC-1 paid Kwan $820 upfront for the next AR-15-type pistol UC-1 was ordering in a "Stormtrooper" finish.

The UCs met with Schlotterbeck and Vlha at the Bellflower shops during a recorded meeting on May 6, 2016 to pick up UC-1's latest AR-15-type firearm order. UC-1 paid the remaining $950 balance for the pistol (and magazines) to Schlotterbeck (after paying the initial portion to Kwan). UC-2 asked Schlotterbeck if he could contact him to purchase another firearm, and Schlotterbeck gave UC-2 his phone number and said "text me."

During this meeting, both defendants talked about the general habits of their customers for other firearm orders. Schlotterbeck said, "Not everybody comes back uh- . . . Usually, a lot of people, most people that buy one, they're happy and they just- . . . And

12

then other people are the opposite." Vlha similarly explained, "We get some, like, some of our friends just get one, and then that's it . . . We're always building one . . . Always got one [U/I] build."

**F. Manufacture and Sale of Rifle to UC-2 on June 15, 2016**

On June 13, 2016, UC-2 sent a text message to Schlotterbeck, asking, "Can I come thru on Wednesday to order up another one of them things?" Schlotterbeck wrote back, "Yeah see you Wednesday" and "Rifle or pistol?" Kwan called UC-2 thereafter to take UC-2's order over the phone, and UC-2 placed an order for his second AR-15-type firearm build without having to pay any money upfront.

During a recorded meeting on June 15, 2016, UC-2 met Schlotterbeck at the Bellflower shops to pick up the AR-15-type rifle. Schlotterbeck commented that Kwan had gone "overkill on the parts" and discussed certain aspects of the functionality of the firearm. UC-2 paid Schlotterbeck the full $1,600 payment for the firearm and an illegal 30-round large-capacity magazine. UC-2 informed Schlotterbeck that he had friends that also would like to purchase custom-ordered AR-15-type firearms, and Schlotterbeck told UC-2 to put them in contact with him "as long as you trust them."

**G. Additional Evidence Relating to Charges**

In addition to the government's extensive video, audio, and text message evidence, the government also will be offering additional evidence, including, among other things:

- Physical and photographic evidence of the AR-15-type firearms the CI and UCs purchased as well as the magazines that were negotiated as part of those sales.

13

ER463

1      •     Photographic and/or physical evidence obtained during the

2 course of surveillance and the execution of search warrants at the

3 Bellflower shops on June 21, 2017.

4      •     Evidence obtained from the search of Schlotterbeck's cell

5 phone, including text messages to be introduced through summary

6 exhibits and a summary witness, described further below.

7      •     Evidence obtained from the search of three hard drives

8 seized from Sign Imaging, including documentary and photographic

9 evidence further demonstrating the nature, scope, and promotion of

10 the co-conspirators' illegal firearms trafficking business.

11      •     Evidence of statements made by defendant Schlotterbeck

12 during a voluntary interview with ATF on June 21, 2017, which is the

13 subject of the government's motion <u>in limine</u> #2.

14      •     Evidence of the federal firearms licensee status during

15 the course of the conspiracy of the defendants, the Bellflower

16 shops, and other relevant individuals and entities.

17      •     Evidence through expert witness testimony of an ATF Senior

18 Industry Operations Investigator and Industry Operations

19 Intelligence Specialist (described further in section II.D.1 below).

20      •     Evidence relating to the confidential informant's criminal

21 history as it relates to Count Three of the indictment against

22 defendant Schlotterbeck.

23      •     Evidence, for a limited purpose as set forth in the

24 government's motion <u>in limine</u> #1, relating to defendants' purchases

25 of firearms through apparently lawful channels as compared to the

26 illegal firearms business they operated.

27

28

ER464

**II. EVIDENTIARY ISSUES**

**A. Authentication and Foundation**

Federal Rule of Evidence requires that a proponent of evidence make a prima facie showing of authenticity so that a reasonable juror could find "that the item is what the proponent claims it is." Fed. R. Evid. 901(a); United States v. Chu Kong Yin, 935 F.2d 990, 996 (9th Cir. 1991). This requirement "does not erect a particularly high hurdle, and the proponent of the evidence is not required to rule out all possibilities inconsistent with authenticity, or to prove beyond any doubt that the evidence is what it purports to be." United States v. Dhinsa, 243 F.3d 635, 658-59 (2d Cir. 2001) (citations omitted). The government need make only a prima facie showing of authenticity. Chu Kong Yin, 935 F.2d at 996.

The parties are meeting and conferring on potential stipulations to a number of the government's exhibits. However, absent stipulations to some or all of the government's proffered evidence, the government may need to authenticate certain types of exhibits, including the following categories of evidence.

**1. Video and Audio Recordings**

The government will introduce a significant number of prepared clips of video and audio recordings arising out of the covert CI and UC operations during the course of the investigation. The government also intends to introduce several audio clips from Schlotterbeck's voluntary interview with ATF.

A recording is admissible upon a showing that it is "accurate, authentic, and generally trustworthy." United States v. King, 587 F.2d 956, 961 (9th Cir. 1978). For example, testimony that a

15

recording depicts evidence that the witness observed is sufficient
to authenticate the recording.  Fed. R. Evid. 901(b)(1); United
States v. Smith, 591 F.3d 974, 979-80 (8th Cir. 2010).  Agents and
witnesses involved in the subject meetings and calls have knowledge
of how the recordings were made.  In addition, other agents observed
the events in real-time while the recordings were made and have
familiarity with the individuals interviewed and their voices.  They
are therefore qualified to testify about who can be seen and heard
in the recordings.  Fed. R. Evid. 901(b)(5); United States v.
Torres, 908 F.2d 1417, 1425 (9th Cir. 1990) ("Testimony of voice
recognition constitutes sufficient authentication.").

The government has provided notice to defendants of what
portions of the recordings it may seek to admit at trial and
provided the defense with copies of those recording clips.

        2.   Transcripts of Recordings

The government has prepared written transcripts of video and
audio recordings as an aid to the jury in listening to recordings.
See United States v. Turner, 528 F.2d 143, 167 (9th Cir. 1975)
(permitting the transcripts of sound recordings to be used
contemporaneously with the introduction of the recordings into
evidence).  Copies of the government's transcripts have been
provided to the defense, and the transcripts will be displayed on a
screen simultaneous to the playing of the video and audio files.
The transcripts themselves will not be offered into evidence.

        3.   Photographs

The government intends to offer a number of photographs,
including, among other things, photos taken of the AR-15-type

16

firearms and ammunition purchased by the CI and UCs and photos taken
during the execution of search warrants at the Bellflower shops.

Photographs may be authenticated by a witness who "identif[ies]
the scene itself [in the photograph] and its coordinates in time and
place." Lucero v. Stewart, 892 F.2d 52, 55 (9th Cir. 1989). It is
not necessary to have the photographer establish the foundation for
the photograph. Any person sufficiently familiar with the area in
the photograph can be the proponent of the photograph. Id.; see
also United States v. Henderson, 241 F.3d 638, 650 (9th Cir. 2000)
("A lay witness may give an opinion regarding the identity of an
individual depicted in a photograph provided the witness has had
sufficient contact with the defendant to achieve a level of
familiarity that renders the lay opinion helpful.").

### 4. Firearms, Magazines and Other Physical Evidence

The government also intends to offer physical evidence of the
actual purchased firearms and ammunition, other firearms-related
items seized during the search warrant executions, and the seized
digital devices (if necessary for admission of digital evidence).

To be admitted into evidence, a physical exhibit must be in
substantially the same condition as when the crime was committed.
The Court may admit the evidence if there is "a reasonable
probability the article has not been changed in important respects."
United States v. Harrington, 923 F.2d 1371, 1374 (9th Cir. 1991).
Factors the Court may consider in making this determination include
the nature of the item, the circumstances surrounding its
preservation, and the likelihood of intermeddlers having tampered
with it. See United States v. Kaiser, 660 F.2d 724, 733 (9th Cir.

17

ER467

1  1981).  In establishing chain of custody as to an item of physical

2  evidence, the government is not required to call all persons who may

3  have come into contact with the piece of evidence.  <u>Reyes v. United</u>

4  <u>States</u>, 383 F.2d 734 (9th Cir. 1967).  Moreover, a presumption of

5  regularity exists in the handling of exhibits by public officials.

6  <u>Kaiser</u>, 660 F.2d at 733.

7        **B.**    **Summary Exhibits and Summary Witness**

8             **1.**   <u>**Summary Exhibits**</u>

9      The government intends to offer evidence from digital devices

10  seized during the execution of search warrants at the Bellflower

11  shops, including text messages and other digital evidence obtained

12  from Schlotterbeck's cellular phone and three hard drives seized

13  from Sign Imaging.  The digital evidence is voluminous, and the

14  government intends to offer this evidence through summary exhibits

15  or compilations from the case agent's review of the digital devices.

16      Federal Rule of Evidence 1006 provides:

17        The proponent may use a summary, chart, or calculation to
          prove the content of voluminous writings, recordings, or
18        photographs that cannot be conveniently examined in court.
          The proponent must make the originals or duplicates
19        available for examination or copying, or both, by other
          parties at a reasonable time and place.  And the court may
20        order the proponent to produce them in court.

21  Fed. R. Evid. 1006; <u>see also</u> <u>id.</u>, 1972 Adv. Comm. Notes ("The

22  admission of summaries of voluminous books, records, or documents

23  offers the only practicable means of making their contents available

24  to judge and jury.  The rule recognizes this practice, with

25  appropriate safeguards."); <u>United States v. Johnson</u>, 594 F.2d 1253,

26  1255 (9th Cir. 1979) ("The purpose of Rule 1006 is to allow the use

27  of summaries when the volume of documents being summarized is so

28

1   large as to make their use impractical or impossible; summaries may

2   also prove more meaningful to the judge and jury.").

3       A summary exhibit may be admitted as substantive evidence when

4   the proponent establishes that the underlying documents upon which

5   the summary is based are voluminous, admissible, and available for

6   inspection.  <u>Johnson</u>, 594 F.2d at 125-26; <u>see also</u> <u>United States v.</u>

7   <u>Rizk</u>, 660 F.3d 1125, 1130 (9th Cir. 2011).  Although the materials

8   underlying the summary must be admissible, they need not themselves

9   be admitted into evidence.  <u>Rizk</u>, 660 F.3d at 1130—31.

10      Here, the summary exhibits predominantly will consist of

11  verbatim excerpts of text message exchanges between defendant

12  Schlotterbeck and other customers, suppliers, defendant Vlha, and

13  co-conspirator Kwan, reproduced on individual slides.  The excerpts

14  are from a voluminous 880-page Cellebrite report and accompanying

15  compilation of hundreds of images and other data files derived from

16  the responsive materials on Schlotterbeck's phone.  The underlying

17  Cellebrite report and accompanying materials were produced to the

18  defense on October 10, 2019.  As discussed further below, the text

19  messages are admissible as admissions of a party opponent, co-

20  conspirator statements, or non-hearsay, and are relevant to the

21  nature, scope, and promotion of the co-conspirators' illegal

22  firearms trafficking business.  The government anticipates

23  finalizing and producing the text message summary exhibits to the

24  defense during the week of May 9, 2022, so the defense will have an

25  opportunity to inspect the summary exhibits prior to trial.

26      The government also will be offering compilation exhibits of

27  photographs and documents seized from the Sign Imaging hard drives.

28

19

1    These exhibits are not summary exhibits, as they are the actual

2    photographic and documentary records seized from the hard drives.

3    These records were first produced to the defense on October 10 and

4    December 17, 2019, and they were later attached as appendices to ATF

5    Report of Investigation (ROI) 80, produced on February 3, 2021.

6              2.   Summary Witness

7         The government anticipates that ATF Special Agent Monika

8    Uchiyama will testify about the summary exhibits from defendant

9    Schlotterbeck's phone and the compilation exhibits from the three

10   Sign Imaging hard drives.  Agent Uchiyama initially reviewed the

11   materials on these digital devices as part of the responsiveness

12   review of the devices under the search warrants, and she later

13   completed detailed reports (ATF ROIs 61 and 80) regarding the

14   responsive contents of the devices.

15        With respect to the summary exhibits of the text messages from

16   Schlotterbeck's phone, a summary witness may properly testify about,

17   and use a chart to summarize, evidence that is voluminous and

18   complex.  The court and jury are entitled to have a witness

19   "organize and evaluate evidence which is factually complex and

20   fragmentally revealed."  United States v. Shirley, 884 F.2d 1130,

21   1133-34 (9th Cir. 1989) (agent's testimony regarding her review of

22   various telephone records, rental receipts, and other previously

23   offered testimony held to be proper summary evidence, as it helped

24   jury organize and evaluate evidence; summary charts properly

25   admitted); see also United States v. Pree, 408 F.3d 855, 869 (7th

26   Cir. 2005) ("When a summary witness simply testifies as to what the

27   government's evidence shows, he does not testify as an expert

28

ER470

witness."). Further, a summary witness may be assisted by others in the preparation of summary evidence; the assistance provided by other people in the preparation of summary evidence goes to its weight, not its admissibility. See United States v. Soulard, 730 F.2d 1292, 1299 (9th Cir. 1984).

**C.** **Hearsay and Exceptions to Hearsay**

In its MIL #2, the government seeks to admit at trial certain statements Schlotterbeck made to ATF during a voluntary interview as admissions of a party opponent. The government also intends to offer (1) Schlotterbeck's and Vlha's statements in text messages and clips of audio-recorded phone calls and video-recorded meetings with the CI and/or one or both of the UCs; (2) Kwan's similar communications with the CI and/or one or both of the UCs, in some cases including one or both of defendants; and (3) text messages obtained from Schlotterbeck's cell phone. The statements in these recordings and text messages are admissible as admissions of a party opponent, co-conspirator statements, and/or non-hearsay.

1. Defendants' Statements as Admissions of a Party Opponent

Hearsay is an out of court declarant's statement that a party offers in evidence to prove the truth of the matter asserted. Fed. R. Evid. 801(c). Statements by a party opponent when offered against that party are excluded from the hearsay definition. Fed. R. Evid. 801(d)(2)(A); United States v. Ortega, 203 F.3d 675, 682 (9th Cir. 2000). Defendants Schlotterbeck's and Vlha's statements during the course of their communications with the CI and/or the UCs, as well as Schlotterbeck's text communications, are not hearsay

ER471

1  when offered against each defendant individually because they are
2  statements by a party-opponent.  Fed. R. Evid. 801(d)(2)(A).

3       However, as the government explained in its MIL #2,
4  incorporated by reference herein, defendants cannot admit their own
5  out of court statements unless a hearsay exception applies.  (See
6  Dkt. No. 81 at 7-8.)  Nor does the "rule of completeness" under Rule
7  106 allow defendants to circumvent the hearsay exception requirement
8  even where the government has admitted segments of a conversation
9  without including the entire conversation.  (See id.)

10      In addition, statements that provide context to defendants'
11 statements, including the CI's and UCs statements in meetings,
12 calls, and text messages, are also admissible as such statements are
13 not being offered for the truth of the matter asserted but rather to
14 provide context for the defendants' statements.  Fed. R. Evid.
15 801(c); see also United States v. Valerio, 441 F.3d 837, 844 (9th
16 Cir. 2006) (informant's statements on a recording are admissible to
17 give context to defendant's statements); United States v. Barragan,
18 871 F.3d 689, 705 (9th Cir. 2017) ("[T]he informant's statements on
19 the tapes were not hearsay because, as the court instructed the
20 jury, they were offered only for context, not for 'the truth of the
21 matter asserted.'").

22           2.   Defendants' and Co-Conspirator Kwan's Statements as
                  Co-Conspirator Statements
23

24      Defendants' statements, along with co-conspirator Kwan's
25 statements, also are admissible against both defendants as co-
26 conspirator statements.  Declarations by one co-conspirator during
27 the course of, and in furtherance of, a conspiracy may be used

28

against another conspirator because such declarations are not hearsay.  Fed. R. Evid. 801(d)(2)(E).  Statements made in furtherance of a conspiracy also are not "testimonial" and, consequently, do not violate the Confrontation Clause.  <u>Crawford v. Washington</u>, 541 U.S. 36, 56 (2004).  Accordingly, under Rule 801(d)(2)(E), the introduction of co-conspirator statements requires only a foundation that: (1) the declaration was made during the course of the conspiracy; (2) it was made in furtherance of the conspiracy; and (3) there is, including the co-conspirator's statement itself, sufficient proof of the existence of the conspiracy and of the defendant's connection to it.  <u>Bourjaily v. United States</u>, 483 U.S. 171, 173, 181 (1987).

The evidence at trial -- including the clips of numerous recorded meetings, calls and text messages summarized in part in the Statement of Facts and Evidence section above, physical evidence of the AR-15-type firearms, digital and photographic evidence from search warrant executions at the Bellflower shops, and witness testimony, among other things -- will prove that a conspiracy existed at least between May 21, 2015, and June 21, 2017; that defendants Schlotterbeck and Vlha (along with co-conspirator Kwan) each had knowledge of and participated in the conspiracy; and the proffered statements were made during the course of and in furtherance of the conspiracy.  Even though defendants and co-conspirator Kwan did not participate in each meeting, call or text message, a defendant need not be present at the time the co-conspirator made the statement.  <u>See</u> <u>Sendejas v. United States</u>, 428 F.2d 1040, 1045 (9th Cir. 1970) ("It is well settled that a

conversation between two co-conspirators which takes place out of the presence of a third co-conspirator is admissible into evidence against the third co-conspirator.").

Moreover, "[i]t is well established that statements made by a co-conspirator need not be made to a member of the conspiracy to be admissible under Rule 801(d)(2)(E)." United States v. Zavala-Serra, 853 F.2d 1512, 1516 (9th Cir. 1988). Co-conspirator statements are admissible when made to third parties, such as government informants and undercover agents. Id.; United States v. Lloyd, 807 F.3d 1128, 1160-61 (9th Cir. 2015) ("It is not necessary that the statement be made to another member of the conspiracy for it to come under [R]ule 801(d)(2)(E)."). The focus is not a statement's "actual effect in advancing the goals of the conspiracy, but on the declarant's intent in making the statement." Zavala-Serra, 853 F.2d at 1516.

Here, defendant Schlotterbeck's and Vlha's and co-conspirator Kwan's statements to each other and the CI and/or UCs, as well as Schlotterbeck's text messages on his phone, were made to further the conspiracy to illegally manufacture firearms for sale. Among other things, the co-conspirators coordinated with each other and their customers (including the CI and the UCs in the recordings) to apprise the buyers about their options for ordering customized AR-15-type firearms, take orders and obtain parts for the builds, establish trust with their buyers given the illicit nature of the transactions, and promote additional business and referrals through the completed transactions.[6]

---

[6] Admission of Schlotterbeck's and Vlha's statements in the meeting and call recordings and text messages against the other does not present any Bruton issues at trial. While "Bruton precludes the

24

3.   Public Records

The government intends to offer public records, absent certain stipulations, including certified copies of the CI's conviction records, a certified business license for Sign Imaging, and certified copies of information bearing on defendants' apparently lawful purchases of firearms (as described in the government's MIL #1, Dkt. No. 80, incorporated herein by reference).  Public records, reports, statements, or data compilations of public offices or agencies setting forth the activities of the office or agency, or matters observed pursuant to a duty imposed by law as to which matters there was a duty to report, are admissible as an exception to the hearsay rule.  Fed. R. Evid. 803(8).  Domestic public documents bearing a seal of the United States, any state, or a political subdivision, department, officer, or agency thereof, and a signature purporting to be an attestation or execution, are self-authenticating and do not require extrinsic evidence of authentication as a condition precedent to admissibility.  Fed. R. Evid. 902(1).  The same is true of certified copies of public records.  Fed. R. Evid. 902(4).

**D.   Expert and Lay Opinion Testimony**

The government has provided disclosure to defendants concerning two areas of potential expert testimony under Federal Rule of Criminal Procedure 16(a)(1)(G): (1) federal firearms requirements and related issues; and (2) forensic analysis of the digital devices

admission of a defendant's confession implicating a co-defendant during a joint trial . . . a statement made by a co-conspirator during and in furtherance of the conspiracy [is] not barred by Bruton."  United States v. Allen, 425 F.3d 1231, 1235 n.5 (9th Cir. 2005) (internal citation omitted).

25

1  involved in this case (absent a stipulation on that issue).[7]  If

2  specialized knowledge will assist the trier of fact in understanding

3  the evidence or determining a fact in issue, a qualified expert

4  witness may provide opinion testimony on the issue in question.

5  Fed. R. Evid. 702.

6          1.   <u>Federal Firearms Requirements</u>

7       The government intends to call ATF Senior Industry Operations

8  Investigator / Industry Operations Intelligence Specialist Thomas M.

9  Chimileski, Jr. to testify regarding the federal firearms licensing

10  system, the types of licenses required based on various types of

11  activities, administrative requirements attendant to certain types

12  of licenses, and restrictions on engaging in certain activities

13  without a federal firearms license (FFL).  The government

14  anticipates Investigator Chimileski also will testify regarding

15  regulatory matters relating to certain license types and the

16  manufacture of firearms for sale; the system of tracking firearms

17  manufactured for sale, including serialization and marking

18  requirements, and issues attendant to firearms lacking serial

19  numbers, or so-called "ghost guns;" records and other information

20  maintained by federal and state authorities concerning the

21  manufacture, sale and registration of firearms, including, among

22  other things, the California Automated Firearms System, which

23  maintains dealers records of sale (DROS); the nature,

24  characteristics, and components of the type of AR-15-type firearms

25

26  _____

27  [7] The government provided the defense with a disclosure regarding
the government's anticipated expert witness testimony on April 22,

28  2022, pursuant to the Court's order (Dkt. No. 79) and the parties'
agreement to extend their cross-disclosure deadline by one week.

ER476

1  and ammunition involved in this case as well as the assembly of such

2  firearms; and other aspects relating to the customization of

3  firearms, including Cerakote and related processes.

4        2.   Digital Devices

5        Absent a stipulation, the government intends to call Computer

6  Examiner Gregory Estes and/or Computer Examiner Terry Hom – both

7  currently or formerly with the FBI's Computer Analysis Response Team

8  at the Orange County Regional Computer Forensic Laboratory – to

9  testify regarding the procedures followed in the imaging,

10  processing, extraction, analysis, and/or review of data obtained

11  from Schlotterbeck's cellular telephone and the three hard drives

12  seized from Sign Imaging during the course of this investigation.

13        3.   Lay Opinion of Law Enforcement Agents

14        The government may elicit lay opinion testimony by law

15  enforcement agents, primarily through the ATF UCs and ATF Special

16  Agent Monika Uchiyama who reviewed the digital devices in this case.

17  For example, SA Uchiyama will testify about text messages in

18  Schlotterbeck's cell phone, many of which contain shorthand related

19  to firearms, such as "lower," "cutting" and "milling out," "80s" (in

20  reference to so-called "80% finished lower receivers), "builds,"

21  "rails," "bolts," and other vague or unfamiliar terms to a lay

22  person.  The UCs also may testify about their understanding as to

23  the meaning of vague, unclear, or coded statements made by

24  defendants and co-conspirator Kwan during the course of their

25  recorded meetings, calls and text messages.

26        Federal Rule of Evidence 701 provides that, "[i]f a witness is

27  not testifying as an expert, testimony in the form of an opinion is

28

27

ER477

1   limited to one that is: (a) rationally based on the witness's
2   perception; (b) helpful to clearly understanding the witness's
3   testimony or to determining a fact in issue; and (c) not based on
4   scientific, technical, or other specialized knowledge within the
5   scope of Rule 702." Fed. R. Evid. 701. Thus, under Ninth Circuit
6   law, an officer's interpretation of intercepted calls or code words,
7   for example, is admissible lay opinion because it is based on the
8   officer's "direct knowledge of the investigation." See United
9   States v. Freeman, 498 F.3d 893, 902, 904-05 (9th Cir. 2007) ("A lay
10  witness may provide opinion testimony regarding the meaning of vague
11  or ambiguous statements [in recorded conversations]"). "A lay
12  witness's opinion testimony necessarily draws on the witness's own
13  understanding, including a wealth of personal information,
14  experience, and education, that cannot be placed before the jury."
15  United States v. Gadson, 763 F.3d 1189, 1208 (9th Cir. 2014). But a
16  lay opinion witness "may not testify based on speculation, rely on
17  hearsay or interpret unambiguous, clear statements." United States
18  v. Vera, 770 F.3d 1232, 1242 (9th Cir. 2014). Lay witness testimony
19  is "even if the testifying officer was not a participant in the
20  recorded conversation." Gadson, 763 F.3d at 1207.

21      Here, the UCs' understanding as to their communications with
22  the co-conspirators will be based on their direct knowledge of the
23  investigation and their understanding of the context of the co-
24  conspirators' statements. Similarly, SA Uchiyama, who served as the
25  lead case agent for the duration of the years-long investigation, is
26  well versed in the defendants' business, their manner of
27  communications, and the context of their communications. Therefore,

28

1    law enforcement lay opinion testimony should be admissible at trial.

2        **E.    Truthful Testimony Provisions of Plea Agreement**

3        The government intends to call a cooperating witness who has

4    pleaded guilty to various charges.  The witness has a plea agreement

5    that includes a provision that requires the cooperating witness to

6    fully cooperate with the government, including by testifying as a

7    witness if called upon to do so.  The plea agreement also includes

8    provisions requiring the cooperating witness to be honest and

9    forthcoming, and to render truthful testimony.

10       "Eliciting testimony on direct examination that a witness

11   entered into a plea agreement that requires truthful testimony may

12   constitute vouching."[8]  United States v. Dorsey, 677 F.3d 944, 953

13   (9th Cir. 2012).  However, "referring to a plea agreement's mandate

14   to be truthful does not constitute vouching for a witness if such

15   references are 'made in response to an attack on the witness's

16   credibility because of his plea bargain,' including an attack in

17   defense counsel's opening statement."  Id. (quoting United States v.

18   Monroe, 943 F.2d 1007, 1013-14 (9th Cir. 1991)); see also id. at 954

19   ("Defense counsel implied in his opening statement that Fomby was a

20   liar and that he was biased because he got 'a deal from the

21   government.'  The prosecutor permissibly responded to this attack by

22

23   _____

24   [8] If such testimony is inadvertently elicited on direct examination
     before any attack on the cooperating witnesses' credibility in
25   opening or otherwise, a curative instruction would be in order, see
     United States v. Shaw, 829 F.2d 714, 717-18 (9th Cir. 1987), and of
26   course defense counsel must be permitted fulsome cross examination,
     see United States v. Schoneberg, 396 F.3d 1036, 1043 (9th Cir.
27   2005) (finding error where truthfulness provision was elicited on
     direct examination, and defense counsel's cross examination "was cut
28   off" in a manner that – when viewed alongside the language of the
     curative instructions – "vitiated" defense counsel's point).

                                    29

1    eliciting testimony that Fomby's plea agreement required him to tell

2    the truth.  When the defense opens a door, it should not be

3    surprised to see the prosecutor enter.").

4         Here, the government anticipates that defense counsel will

5    attack the cooperating witness's credibility, perhaps as early as in

6    the opening statement.  If so, the government should be permitted to

7    elicit testimony regarding the truthful testimony provision during

8    direct examination.

9         **F.   Cross-Examination of Defendants and Defense Witnesses**

10             1.   Scope of Cross-Examination

11        A defendant who testifies at trial waives his right against

12   self-incrimination and subjects himself to cross-examination

13   concerning all matters reasonably related to the subject matter of

14   his testimony.  The scope of defendant's waiver is coextensive with

15   the scope of relevant cross-examination.  United States v. Cuozzo,

16   962 F.2d 945, 948 (9th Cir. 1992); see also United States v. Black,

17   767 F.2d 1334, 1341 (9th Cir. 1985) ("What the defendant actually

18   discusses on direct does not determine the extent of permissible

19   cross-examination or his waiver.  Rather, the inquiry is whether

20   'the government's questions are reasonably related' to the subjects

21   covered by the defendant's testimony.") (internal quotations and

22   citation omitted).

23             2.   Other Act Evidence

24        Defendants' credibility will be crucial if either defendant

25   chooses to testify.  Rule 404(b) does not proscribe the use of other

26   act evidence as an impeachment tool during cross-examination.

27   United States v. Gay, 967 F.2d 322, 328 (9th Cir. 1992).  Thus,

28

                                    30

cross-examination about other possible untruthful conduct in which either defendant may have engaged is necessary for the jury to weigh whether his testimony is credible. In addition, Rule 608(b) "specifically contemplates inquiries into prior behavior in order to challenge a witness's credibility. Evidence of prior frauds is considered probative of the witness's character for truthfulness or untruthfulness." Id.; see also United States v. Reid, 634 F.2d 469, 474 (9th Cir. 1980) ("The fact that appellant made the false statements [in a letter] eight years prior to trial did not destroy the relevance of the statements for impeachment purposes.").

Moreover, the prejudicial effect of such evidence, if any, can be addressed by a limiting instruction. Gay, 967 F.3d at 328. "All evidence which tends to establish the guilt of a defendant is, in one sense, prejudicial to that defendant, but that does not mean that such evidence should be excluded." United States v. Bailleux, 685 F.2d 1105, 1111 (9th Cir. 1982). Admission of evidence regarding the defendant's other acts might only constitute unfair prejudice if the jury in this case considered the evidence to establish a defendant's propensity to commit the charged crime. However, this potential unfair prejudice can be cured by a limiting instruction that the jury should consider the evidence only for the purpose for which it is introduced. Gay, 967 F.3d at 328.

3. Cross-Examination of Defense Witnesses

Similarly, if either defendant calls a character witness, the government should be allowed to cross examine that witness with information pertaining to how the witness's opinion of defendant's character would change if the witness were confronted with a

31

ER481

specific instance of defendant's conduct that rebuts that opinion.
A character witness who offers an opinion about or discusses
defendant's reputation for good character on direct examination can
be cross examined with relevant specific instances of conduct.
Under Fed. R. Evid. 404(a)(2)(A), character evidence is admissible
when offered by the prosecution to rebut "evidence of a pertinent
trait" of character offered by a defendant.  See also Fed. R. Evid.
405(a).  "[W]hen the defendant 'opens the door' to testimony about
an issue by raising it for the first time himself, he cannot
complain about subsequent government inquiry into that issue."
United States v. Mendoza-Prado, 314 F.3d 1099, 1105 (9th Cir. 2002)
(quoting United States v. Hegwood, 977 F.2d 492, 496 (9th Cir.
1992)).  Such cross examination can be properly phrased in the form
of "have you heard" or "did you know" questions regarding
defendant's criminal conduct.  See United States v. Scholl, 166 F.3d
964, 974 (9th Cir. 1999).

### G.   Affirmative Defenses

Neither defendant has given notice of any affirmative defenses
or an intent to rely on any affirmative defense, including mental
incapacity, entrapment, or duress, or an alibi defense, in response
to the government's requests for such notice.  Therefore, to the
extent either defendant may attempt to rely on such a defense, the
government reserves the right to object and to move to preclude the
defendant from asserting such a defense.

### H.   Reciprocal Discovery

The government has requested reciprocal discovery, Jencks
material, and expert disclosures from defendants in multiple

32

discovery letters. Defendants have yet to produce any reciprocal discovery to which the government is entitled under Rules 16 and 26.2 of the Federal Rules of Criminal Procedure or the Jencks Act. Thus, to the extent defendants may attempt to introduce or use any documents at trial that they have not previously produced, the government reserves the right to object and to seek to have such documents precluded.

**III. CONCLUSION**

The government respectfully requests leave to file such supplemental memoranda as may become necessary during trial.

33

FILED
CLERK, U.S. DISTRICT COURT

JUN 1 1 2019

CENTRAL DISTRICT OF CALIFORNIA
BY _____ DEPUTY

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

January 2019 Grand Jury

UNITED STATES OF AMERICA,

      Plaintiff,

      v.

TRAVIS SCHLOTTERBECK,
JAMES BRADLEY VLHA, and
JACOB DEKONING,

      Defendants.

CR No. **ER 19 00343-GW**

I N D I C T M E N T

[18 U.S.C. § 371: Conspiracy;
18 U.S.C. § 922(a)(1)(A): Engaging
in the Business of Manufacturing
and Dealing in Firearms Without a
License; 18 U.S.C. § 922(d): Sale
of a Firearm to a Felon; 18 U.S.C.
§ 2(a): Aiding and Abetting;
18 U.S.C. § 924(d) and 28 U.S.C.
§ 2461(c): Criminal Forfeiture]

The Grand Jury charges:

COUNT ONE

[18 U.S.C. § 371]

[ALL DEFENDANTS]

A.   INTRODUCTORY ALLEGATIONS

   At times relevant to this Indictment:

   1.   Defendants TRAVIS SCHLOTTERBECK, JAMES BRADLEY VLHA, and

JACOB DEKONING, and co-conspirator Ping-Yi Kwan, did not have a

federal firearms license issued by the United States Bureau of

1

Alcohol, Tobacco, Firearms and Explosives ("ATF"), and thus were not licensed to import, manufacture, or deal in firearms.

    2.    Defendant SCHLOTTERBECK operated Live Fire Coatings and Sign Imaging, two adjacent businesses located in Bellflower, California in the Central District of California.

    3.    A "firearm" was defined in 18 U.S.C. § 921(a)(3), in part, as "any weapon . . . which will or is designed to or may readily be converted to expel a projectile by the action of an explosive," and "the frame or receiver of any such weapon."

    4.    An "AR" was a type of firearm. An AR-type rifle consisted of many parts, including the: (1) lower receiver; (2) upper receiver; (3) stock; (4) barrel; and (5) magazine.

    5.    In order to convert an unfinished lower receiver into a finished lower receiver that could be assembled into a rifle or pistol, a person could use specialized machinery on an unfinished lower receiver to create, or "mill out," cavities to create a finished lower receiver. A finished lower receiver had the shape and space necessary for an upper receiver and barrel to attach to the lower receiver. A firearm created in this way could be untraceable because it generally did not have a serial number or manufacturer-created identification markings.

B.   OBJECT OF THE CONSPIRACY

    Beginning on a date unknown to the Grand Jury, but no later than on or about May 21, 2015, and continuing to an unknown date, but no earlier than on or about June 21, 2017, in Los Angeles County, within the Central District of California, and elsewhere, defendants SCHLOTTERBECK, VLHA, and DEKONING, and co-conspirator Kwan, and others known and unknown to the Grand Jury, conspired with each other

2

to commit an offense against the United States, namely, engaging in the business of manufacturing and dealing firearms without a license, in violation of Title 18, United States Code, Section 922(a)(1)(A).

C.   <u>MANNER AND MEANS OF THE CONSPIRACY</u>

The object of the conspiracy was to be accomplished, in substance, as follows:

1.   Defendants SCHLOTTERBECK and VLHA, and co-conspirator Kwan would agree to sell firearms to firearms customers.

2.   Defendant SCHLOTTERBECK and co-conspirator Kwan would obtain firearm parts, including unfinished lower receivers.

3.   Defendant SCHLOTTERBECK would arrange to drill the cavities in unfinished lower receivers necessary to make the lower receivers attach to an upper receiver and barrel.

4.   Defendant DEKONING would set up a machine to mill, and direct firearm customers to press the button on a machine to mill, cavities on the lower receivers to finish the lower receivers.

5.   Defendants SCHLOTTERBECK and VLHA, and co-conspirator Kwan, would assemble, finish, and sell the completed firearms to customers at Live Fire Coatings and Sign Imaging.

D.   <u>OVERT ACTS</u>

In furtherance of the conspiracy and to accomplish its object, on or about the following dates, defendants SCHLOTTERBECK, VLHA, and DEKONING, co-conspirator Kwan, and others known and unknown to the Grand Jury, committed various overt acts within the Central District of California, and elsewhere, including, but not limited to, the following:

3

**September 23, 2015 Sale of AR-15-Type Rifle**

<u>Overt Act No. 1</u>:     On or about July 7, 2015, at Sign Imaging, defendant SCHLOTTERBECK agreed to sell an AR-15-type rifle to an individual who defendant SCHLOTTERBECK believed to be a firearms customer but who was, in fact, a confidential informant working at the direction of the ATF (the "CI").

<u>Overt Act No. 2</u>:     On or about August 27, 2015, defendant SCHLOTTERBECK met with the CI at Live Fire Coatings and accepted $1,000 as a down payment from the CI for the AR-type rifle that the CI ordered.

<u>Overt Act No. 3</u>:     On or about September 11, 2015, defendant SCHLOTTERBECK directed the CI to meet defendant SCHLOTTERBECK at a business in Paramount, California called "Cherokee Tactical," to mill out cavities in an unfinished lower receiver.

<u>Overt Act No. 4</u>:     Or our about September 22, 2015, outside of Cherokee Tactical, defendant SCHLOTTERBECK gave the CI the unfinished lower receiver and $60 cash to pay defendant DEKONING, a Cherokee Tactical employee.

<u>Overt Act No. 5</u>:     On or about September 22, 2015, at Cherokee Tactical, defendant DEKONING set up a machine to mill cavities into the CI's unfinished lower receiver, and directed the CI to push the green start button on the machine to activate each milling phase.

<u>Overt Act No. 6</u>:     On or about September 23, 2015, at defendant SCHLOTTERBECK's direction, the CI met defendant VLHA and co-conspirator Kwan at Live Fire Coatings, where co-conspirator Kwan assisted the CI in fully assembling the rifle with the lower receiver finished at Cherokee Tactical, and sold the completed rifle to the CI for an additional $1,000.

ER487

Overt Act No. 7:   On or about September 23, 2015, defendant VLHA told the CI that the CI could contact him, defendant SCHLOTTERBECK, or co-conspirator Kwan about ordering more firearms because they all communicate with each other.

**October 27, 2015 Sale of AR-15-Type Rifle**

Overt Act No. 8:   Between on or about October 5, 2015, and on or about October 7, 2015, using coded language in telephone calls and text messages, defendant SCHLOTTERBECK arranged to meet with and sell a firearm to a person he believed to be a firearms customer, but who was, in fact, an undercover ATF agent ("UC-1").

Overt Act No. 9:   On or about October 8, 2015, at Sign Imaging, defendants SCHLOTTERBECK and VLHA agreed to sell a custom-designed AR-15-type rifle for $1,500 to UC-1.  At that meeting, defendant SCHLOTTERBECK accepted a down payment of $740 from UC-1.

Overt Act No. 10:   Between or about October 16, 2015, and on or about October 19, 2015, using coded language in text messages and telephone calls, defendant VLHA told UC-1 that the firearm parts had arrived and that co-conspirator Kwan could begin assembling the firearm.

Overt Act No. 11:   On or about October 22, 2015, co-conspirator Kwan provided UC-1 with an unfinished lower receiver and drove UC-1 to meet defendant DEKONING at Cherokee Tactical.

Overt Act No. 12:   On or about October 22, 2015, at Cherokee Tactical, defendant DEKONING set up a machine to mill cavities into UC-1's unfinished lower receiver, and directed UC-1 to push the green start button on the machine to activate each milling phase.

Overt Act No. 13:   On or about October 27, 2015, at Live Fire Coatings, defendant VLHA and co-conspirator Kwan met UC-1, where

5

co-conspirator Kwan sold UC-1 the completed AR-15-type rifle with the lower receiver finished at Cherokee Tactical for an additional $760.

**February 11, 2016 Sale of AR-15-Type Rifle**

Overt Act No. 14:   On or about January 25, 2016, using coded language in text messages, defendant VLHA discussed selling a firearm to UC-1 and sent a text message to UC-1 containing a photograph of what appeared to be a short-barreled AR-15 rifle.

Overt Act No. 15:   On or about January 26, 2016, at Live Fire Coatings, defendants SCHLOTTERBECK and VLHA agreed to sell UC-1 an AR-15 pistol using already-milled firearm parts.  Defendant SCHLOTTERBECK accepted a down payment of $750 for the firearm from UC-1 and agreed to sell magazines to UC-1.

Overt Act No. 16:   On or about February 11, 2016, at Live Fire Coatings, co-conspirator Kwan sold to UC-1 an AR-15-type pistol, bearing no serial number, two 30-round magazines, and three 10-round magazines, for an additional $850.

**May 6, 2016 Sale of AR-15-Type Pistol**

Overt Act No. 17:   On or about March 16, 2016, at Live Fire Coatings, co-conspirator Kwan agreed to sell to UC-1 a 9mm AR-15-type pistol, as well a 50-round drum magazine and a 10-round magazine, and accepted a down payment of $820.

Overt Act No. 18:   Between on or about April 30, 2016, and on or about May 3, 2016, co-conspirator Kwan texted UC-1 a photograph of the 9mm AR-15-type pistol and directed UC-1 to pick up the firearm from either defendant SCHLOTTERBECK or defendant VLHA at Live Fire Coatings on May 6, 2016.

Overt Act No. 19:   On or about May 6, 2016, defendants SCHLOTTERBECK and VLHA met UC-1 at Live Fire Coatings, where

6

ER489

1  defendant SCHLOTTERBECK sold to UC-1 a 9mm AR-15 type pistol and a

2  31-round large-capacity magazine, for an additional $950.

3  **June 15, 2016 Sale of AR-15-Type Rifle**

4      Overt Act No. 20:   On or about June 13, 2016, using coded

5  language in text messages, defendant SCHLOTTERBECK agreed to sell a

6  rifle to a person he believed to be a firearms customer, but who was,

7  in fact, another undercover ATF agent ("UC-2").

8      Overt Act No. 21:   On or about June 15, 2016, at Live Fire

9  Coatings, defendant SCHLOTTERBECK sold to UC-2 a completed AR-15-type

10  rifle and a 30-round large-capacity magazine, for $1,600.

11  **Possession of Firearms and Parts**

12      Overt Act No. 22:   On or about June 21, 2017, at Sign Imaging

13  and Live Fire Coatings, defendant SCHLOTTERBECK possessed four

14  unfinished AR-type lower receivers; nine finished AR-type lower

15  receivers; one lower receiver, bearing serial number 3C4119; and the

16  following completed firearms: a Glock model 21C .45 Auto caliber

17  pistol, bearing serial number GXS756; a Springfield 1911 pistol,

18  bearing serial number NM497013; a Ruger model P91DC pistol, bearing

19  serial number 340-08352; a Rock Island Armory 1911-type pistol,

20  bearing serial number RIA889947; a Polymer 80 pistol, bearing no

21  serial number; and four 1911-type pistols, each bearing no serial

22  number.

7

ER490

COUNT TWO

[18 U.S.C. §§ 922(a)(1)(A), 2(a)]

[ALL DEFENDANTS]

Beginning on a date unknown to the Grand Jury, but no later than on or about September 23, 2015, and continuing until on or about June 21, 2017, in Los Angeles County, within the Central District of California, and elsewhere, defendants TRAVIS SCHLOTTERBECK, JAMES BRADLEY VLHA, and JACOB DEKONING, and others known and unknown to the Grand Jury, each aiding and abetting the other, not being licensed importers, manufacturers, or dealers of firearms, willfully engaged in the business of manufacturing and dealing in firearms, specifically, the assembly and sales of the following firearms, on or about the following dates:

| DATE | FIREARM |
| --- | --- |
| September 23, 2015 | An AR-15-type rifle, bearing no serial number |
| October 27, 2015 | An AR-15-type rifle, bearing no serial number |
| February 11, 2016 | An AR-15-type pistol, bearing no serial number |
| May 6, 2016 | An AR-15-type 9mm pistol, bearing no serial number |
| June 15, 2016 | An AR-15-type rifle, bearing no serial number |

ER491

COUNT THREE

[18 U.S.C. § 922(d)(1)]

[DEFENDANT SCHLOTTERBECK]

On or about September 23, 2015, in Los Angeles County, within the Central District of California, defendant TRAVIS SCHLOTTERBECK knowingly sold a firearm, namely, an AR-15 type rifle, bearing no serial number, to a person defendant SCHLOTTERBECK believed to be a firearm customer but who was, in fact, a confidential informant working for the Bureau of Alcohol, Tobacco, Firearms and Explosives, knowing and having reasonable cause to believe that the confidential informant had been convicted of a felony crime punishable by a term of imprisonment exceeding one year.

ER492

FORFEITURE ALLEGATION

[18 U.S.C. § 924(d)(1) and 28 U.S.C. § 2461(c)]

[ALL DEFENDANTS]

1. Pursuant to Rule 32.2 of the Federal Rules of Criminal Procedure, notice is hereby given that the United States of America will seek forfeiture as part of any sentence, pursuant to Title 18, United States Code, Section 924(d)(1) and Title 28, United States Code, Section 2461(c), in the event of any defendant's conviction of the offenses set forth in any of Counts One and Two of this Indictment.

2. Any defendant so convicted shall forfeit to the United States of America the following:

(a) All right, title, and interest in any firearm or ammunition involved in or used in or used in any such offense; and

(b) To the extent such property is not available for forfeiture, a sum of money equal to the total value of the property described in subparagraph (a).

3. Pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c), any defendant so convicted, shall forfeit substitute property, up to the value of the property described in the preceding paragraph if, as the result of any act or omission of said defendant, the property described in the preceding paragraph or any portion thereof: (a) cannot be located upon the exercise of due diligence; (b) has been transferred, sold to, or deposited with a third party; (c) has been placed beyond the jurisdiction of the court; (d) has been

//

//

10

ER493

substantially diminished in value; or (e) has been commingled with other property that cannot be divided without difficulty.

A TRUE BILL

/s/

Foreperson

NICOLA T. HANNA
United States Attorney

BRANDON D. FOX
Assistant United States Attorney
Chief, Criminal Division

SCOTT M. GARRINGER
Assistant United States Attorney
Deputy Chief, Criminal Division

CHRISTINA T. SHAY
Assistant United States Attorney
Deputy Chief, General Crimes
Section

SARA B. MILSTEIN
Assistant United States Attorney
Violent & Organized Crime Section

ER494

Name __Edward M Robinson__

Address __21515 Hawthorne Blvd Ste 730__

City, State, Zip __Torrance, CA 90503__

Phone __(310) 316-9333__

Fax _____

E-Mail __eroblaw@gmail.com__

☐ FPD   ☐ Appointed   ☐ CJA   ☐ Pro Per   ☒ Retained

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| United States | CASE NUMBER: |
|---|---|
| PLAINTIFF(S), | 19-cr-00343-GW |
| v. | |
| Travis Schlotterbeck | **NOTICE OF APPEAL** |
| DEFENDANT(S). | |

NOTICE IS HEREBY GIVEN that _____Travis Schotterbeck_____ hereby appeals to

*Name of Appellant*

the United States Court of Appeals for the Ninth Circuit from:

**Criminal Matter**

☒ Conviction only [F.R.Cr.P. 32(j)(1)(A)]
☐ Conviction and Sentence
☐ Sentence Only (18 U.S.C. 3742)
☐ Pursuant to F.R.Cr.P. 32(j)(2)
☐ Interlocutory Appeals
☐ Sentence imposed:

☐ Bail status:

**Civil Matter**

☐ Order (specify):

☐ Judgment (specify):

☐ Other (specify):

Imposed or Filed on __November 17, 2022__. Entered on the docket in this action on __November 17, 2022__.

A copy of said judgment or order is attached hereto.

__November 23, 2022__                    /s/ Edward M. Robinson

Date                                              Signature

☐ Appellant/ProSe   ☒ Counsel for Appellant   ☐ Deputy Clerk

**Note:** The Notice of Appeal shall contain the names of all parties to the judgment or order and the names and addresses of the attorneys for each party. Also, if not electronically filed in a criminal case, the Clerk shall be furnished a sufficient number of copies of the Notice of Appeal to permit prompt compliance with the service requirements of FRAP 3(d).

Name  Jerome J. Haig, Attorney at Law (SBN 131903)

Address  21143 Hawthorne Blvd, Suite 454

City, State, Zip  Torrance, CA 90503

Phone  (424) 488-0686

Fax  (424) 271-5990

E-Mail  jerome@jeromehaiglaw.com

☐ FPD  ☐ Appointed  ☐ CJA  ☒ Pro Per  ☐ Retained

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

UNITED STATES

PLAINTIFF(S),

v.

JAMES BRADLEY VLHA

DEFENDANT(S).

CASE NUMBER:

19 CR-343-GW-2

## NOTICE OF APPEAL

NOTICE IS HEREBY GIVEN that _____ James Bradley Vlha _____ hereby appeals to

*Name of Appellant*

the United States Court of Appeals for the Ninth Circuit from:

**Criminal Matter**

☐ Conviction only [F.R.Cr.P. 32(j)(1)(A)]
☒ Conviction and Sentence
☐ Sentence Only (18 U.S.C. 3742)
☐ Pursuant to F.R.Cr.P. 32(j)(2)
☐ Interlocutory Appeals
☐ Sentence imposed:

☒ Bail status:
　　out of custody

**Civil Matter**

☐ Order (specify):

☐ Judgment (specify):

☐ Other (specify):

Imposed or Filed on ___ November 17, 2022 ___. Entered on the docket in this action on ___ November 18, 2022 ___.

A copy of said judgment or order is attached hereto.

___ November 22, 2022 ___
Date

*James B Vlha (Nov 22, 2022 15:03 PST)*
Signature
☒ Appellant/ProSe  ☐ Counsel for Appellant  ☐ Deputy Clerk

**Note:**  The Notice of Appeal shall contain the names of all parties to the judgment or order and the names and addresses of the attorneys for each party.  Also, if not electronically filed in a criminal case,  the Clerk shall be furnished a sufficient number of copies of the Notice of  Appeal to permit prompt compliance with the service requirements of FRAP 3(d).

ER496

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA (Western Division - Los Angeles)
## CRIMINAL DOCKET FOR CASE #: 2:19-cr-00343-GW All Defendants

Case title: USA v. Schlotterbeck et al

Date Filed: 06/11/2019

Date Terminated: 11/17/2022

Assigned to: Judge George H. Wu

Appeals court case numbers: 22-50283 9th
CCA, 22-50312 9th CCA

**Defendant (1)**

**Travis Schlotterbeck**
*TERMINATED: 11/17/2022*

represented by **Rachael A Robinson**
Edward M Robinson A Professional Law
Corporation
21515 Hawthorne Boulevard Suite 730
Torrance, CA 90503
310-316-9333
Fax: 310-316-6442
Email: raeroblaw@gmail.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Pro Bono*

**Robison D. Harley , Jr.**
Law Offices of Robison D. Harley Jr.
825 North Ross Street
Santa Ana, CA 92701
714-972-8141
Fax: 714-972-8107
Email: rob.harley@sbcglobal.net
*TERMINATED: 05/17/2022*
*LEAD ATTORNEY*
*Designation: CJA Appointment*

**Brian Arthur Robinson**
Law Offices of Edward M. Robinson, A
Professional Corp.
21515 Hawthorne Boulevard Suite 730
Torrance, CA 90503
310-316-9333
Fax: 310-316-6442
Email: broblaw11@gmail.com
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

**Edward M. Robinson**

Edward M. Robinson, A Professional Corp
21515 Hawthorne Boulevard Suite 730
Torrance, CA 90503-6533
310-316-9333
Fax: 800-285-1692
Email: eroblaw@gmail.com
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

| **Pending Counts** | **Disposition** |
|---|---|
| 18:371: Conspiracy (1) | Defendant, Travis Schlotterbeck, is hereby committed on Counts 1 and 3 of the Indictment to the custody of the Bureau of Prisons for a term of three (3) months. Supervised release for Three (3) years, pay special assessment of $200, Fine of $50,000. |
| 18:922(d)(1): Sale of a Firearm to a Felon (3) | Defendant, Travis Schlotterbeck, is hereby committed on Counts 1 and 3 of the Indictment to the custody of the Bureau of Prisons for a term of three (3) months. Supervised release for Three (3) years, pay special assessment of $200, Fine of $50,000. |

**Highest Offense Level (Opening)**

Felony

| **Terminated Counts** | **Disposition** |
|---|---|
| 18:922(a)(1)(A): Engaging in the Business of Manufacturing and Dealing in Firearms Without a License (2) | The Government's request to dismiss the remaining counts of the underlying Indictment is GRANTED. |

**Highest Offense Level (Terminated)**

Felony

| **Complaints** | **Disposition** |
|---|---|
| None | |

Assigned to: Judge George H. Wu

Appeals court case numbers: 22-50281 Ninth CCA, 22-50312 9th CCA

**Defendant (2)**

| **James Bradley Vlha** | represented by | **Jerome J Haig** |
|---|---|---|
| REG 78500-112 | | Law Office of Jerome J Haig |
| *TERMINATED: 11/17/2022* | | 21143 Hawthorne Boulevard Suite 454 |

Torrance, CA 90503
424-488-0686
Fax: 424-271-5990
Email: jerome@jeromehaiglaw.com
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

**Robert E Scott**
**Robert E Scott and Associates**
11801 Pierce Street Suite 200
Riverside, CA 92505
951-710-3226
Fax: 951-735-2078
Email: rescott20@prodigy.net
*TERMINATED: 08/23/2019*
*Designation: CJA Appointment*

| **Pending Counts** | **Disposition** |
|---|---|
| 18:371: Conspiracy (1) | Defendant, James Bradley Vlha, is hereby committed on Count 1 of the Indictment to the custody of the Bureau of Prisons for a term of TIME SERVED. Supervised release for Three (3) years. Pay a special assessment of $100, Fine in the total amount of $25,000. |

**Highest Offense Level (Opening)**

Felony

| **Terminated Counts** | **Disposition** |
|---|---|
| 18:922(a)(1)(A): Engaging in the Business of Manufacturing and Dealing in Firearms Without a License (2) | On Government's motion, all remaining counts are ordered DISMISSED. |

**Highest Offense Level (Terminated)**

Felony

| **Complaints** | **Disposition** |
|---|---|
| None | |

Assigned to: Judge George H. Wu

**Defendant (3)**

**Jacob Dekoning**                    represented by    **Peter C. Swarth**
*TERMINATED: 02/20/2020*                               Law Offices of Peter C. Swarth
                                                       6520 Platt Avenue Suite 557
                                                       West Hills, CA 91307
                                                       818-887-8800

Fax: 818-877-8802
Email: pswarth@gmail.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: CJA Appointment*

**Pending Counts**                                                **Disposition**

None

**Highest Offense Level (Opening)**

None

**Terminated Counts**                                             **Disposition**

18:371: Conspiracy                                                On Government's motion, the Indictment is
(1)                                                               dismissed without prejudice

18:922(a)(1)(A): Engaging in the Business
of Manufacturing and Dealing in Firearms                          On Government's motion, the Indictment is
Without a License                                                 dismissed without prejudice
(2)

**Highest Offense Level (Terminated)**

Felony

**Complaints**                                                    **Disposition**

None

---

**Plaintiff**

**USA**                              represented by    **Brian R. Faerstein**
                                                       AUSA - Office of US Attorney
                                                       Public Corruption and Civil Rights Section
                                                       312 North Spring Street, Suite 1500
                                                       Los Angeles, CA 90012
                                                       213-894-3819
                                                       Email: brian.faerstein@usdoj.gov
                                                       *LEAD ATTORNEY*
                                                       *ATTORNEY TO BE NOTICED*
                                                       *Designation: Assistant US Attorney*

                                                       **Daniel G. Boyle**
                                                       AUSA - Office of US Attorney
                                                       General Crimes Section
                                                       312 North Spring Street 14th Floor
                                                       Los Angeles, CA 90012
                                                       213-894-2426
                                                       Fax: 213-894-0142
                                                       Email: daniel.boyle2@usdoj.gov
                                                       *ATTORNEY TO BE NOTICED*
                                                       *Designation: Assistant US Attorney*

ER500

**Sara B. Vargas**
AUSA - Office of US Attorney
Violent and Organized Crime Section
312 North Spring Street 15th Floor
Los Angeles, CA 90012
213-894-8611
Fax: 213-894-3713
Email: sara.milstein@usdoj.gov
*TERMINATED: 07/02/2019*
*Designation: Assistant US Attorney*

| Date Filed | # | Docket Text |
|---|---|---|
| 06/11/2019 | 1 | INDICTMENT filed as to Travis Schlotterbeck (1) count(s) 1, 2, 3, James Bradley Vlha (2) count(s) 1, 2, Jacob Dekoning (3) count(s) 1, 2. Offense occurred in LA. (mhe) (Entered: 06/12/2019) |
| 06/11/2019 | 2 | CASE SUMMARY filed by AUSA Sara B Milstein as to Defendant Travis Schlotterbeck; defendants Year of Birth: 1984 (mhe) (Entered: 06/12/2019) |
| 06/11/2019 | 3 | CASE SUMMARY filed by AUSA Sara B Milstein as to Defendant James Bradley Vlha; defendants Year of Birth: 1993 (mhe) (Entered: 06/12/2019) |
| 06/11/2019 | 4 | CASE SUMMARY filed by AUSA Sara B Milstein as to Defendant Jacob Dekoning; defendants Year of Birth: 1988 (mhe) (Entered: 06/12/2019) |
| 06/11/2019 | 8 | SEALED EX PARTE APPLICATION to Seal Case Filed by Plaintiff USA as to Defendant Travis Schlotterbeck, James Bradley Vlha, Jacob Dekoning. (mhe) (Entered: 06/12/2019) |
| 06/11/2019 | 9 | ORDER by Magistrate Judge Jean P. Rosenbluth: granting 8 EX PARTE APPLICATION to Seal Case as to Travis Schlotterbeck (1), James Bradley Vlha (2), Jacob Dekoning (3) (mhe) (Entered: 06/12/2019) |
| 06/11/2019 | 10 | NOTICE OF REQUEST FOR DETENTION filed by Plaintiff USA as to Defendant Travis Schlotterbeck (mhe) (Entered: 06/12/2019) |
| 06/11/2019 | 11 | NOTICE OF REQUEST FOR DETENTION filed by Plaintiff USA as to Defendant James Bradley Vlha (mhe) (Entered: 06/12/2019) |
| 06/11/2019 | 12 | NOTICE OF REQUEST FOR DETENTION filed by Plaintiff USA as to Defendant Jacob Dekoning (mhe) (Entered: 06/12/2019) |
| 06/11/2019 | 13 | NOTICE of Related Case(s) filed by Plaintiff USA as to Defendant Travis Schlotterbeck, James Bradley Vlha, Jacob Dekoning Related Case(s): 19CR262 (mhe) (Entered: 06/12/2019) |
| 06/11/2019 | 14 | MEMORANDUM filed by Plaintiff USA (See attachment) (mhe) (Entered: 06/12/2019) |
| 06/11/2019 | 15 | MEMORANDUM filed by Plaintiff USA (See attachment) (mhe) (Entered: 06/12/2019) |
| 06/20/2019 | 16 | ORDER RE TRANSFER PURSUANT TO GENERAL ORDER 19-03 (Related Case) filed. Transfer of case declined by Judge Stephen V. Wilson, for the reasons set forth on this order. Related Case No. 2:19-cr-00262 SVW (rn) (Entered: 06/21/2019) |
| 07/02/2019 | 17 | SEALED NOTICE OF APPEARANCE OR REASSIGNMENT of AUSA Brian R Faerstein for USA on behalf of Plaintiff USA. Filed by Plaintiff USA. (mrgo) (Entered: |

| | | 07/12/2019) |
|---|---|---|
| 08/13/2019 | 18 | REPORT COMMENCING CRIMINAL ACTION as to Defendant James Bradley Vlha; defendants Year of Birth: 1993; date of arrest: 8/13/2019 (mhe) (Entered: 08/14/2019) |
| 08/13/2019 | 19 | MINUTES OF POST-INDICTMENT ARRAIGNMENT: held before Magistrate Judge Shashi H. Kewalramani as to Defendant James Bradley Vlha (2) Count 1,2. Defendant arraigned, states true name: As charged. Defendant entered not guilty plea to all counts as charged. Attorney: Robert E Scott for James Bradley Vlha, Appointed, present. Case assigned to Judge George H Wu. Court orders bail set for James Bradley Vlha (2) $75,000 Appearance Bond, see attached for terms and conditions. Jury Trial set for 9/24/2019 09:00 AM before Judge George H. Wu. Status Conference set for 8/29/2019 08:00 AM before Judge George H. Wu. RELEASE ORDER NO 37938 Court Smart: CS 8/13/19. (mhe) Modified on 8/23/2019 (lmu). (Entered: 08/14/2019) |
| 08/13/2019 | 20 | DECLARATION RE: PASSPORT filed by Defendant James Bradley Vlha, declaring that I have been issued a passport or other travel document(s), but they are not currently in my possession. I will surrender any passport or other travel document(s) issued to me, to the U.S. Pretrial Services Agency by the deadline imposed. I will not apply for a passport or other travel document during the pendency of this case. (mhe) (Entered: 08/14/2019) |
| 08/13/2019 | 21 | FINANCIAL AFFIDAVIT filed as to Defendant James Bradley Vlha. (Not for Public View pursuant to the E-Government Act of 2002) (mhe) (Entered: 08/14/2019) |
| 08/13/2019 | 22 | ADVISEMENT OF STATUTORY & CONSTITUTIONAL RIGHTS filed by Defendant James Bradley Vlha. (mhe) (Entered: 08/14/2019) |
| 08/13/2019 | 23 | ARREST WARRANT RETURNED Executed on 8/13/19 as to Defendant James Bradley Vlha. (mhe) (Entered: 08/14/2019) |
| 08/13/2019 | 24 | REDACTED AFFIDAVIT OF SURETIES (No Justification - Pursuant to Local Criminal Rule 46-5.2.8) in the amount of $25,000 by surety: Katie Vlha for Filed by Defendant James Bradley Vlha (mhe) (Entered: 08/14/2019) |
| 08/13/2019 | 25 | SEALED UNREDACTED Affidavit of Surety (No Justification) filed by Defendant James Bradley Vlha re: Affidavit of Surety (No Justification)(CR-4) 24 (mhe) (Entered: 08/14/2019) |
| 08/13/2019 | 27 | REPORT COMMENCING CRIMINAL ACTION as to Defendant Travis Schlotterbeck; defendants Year of Birth: 1984; date of arrest: 8/13/2019 (mhe) (Entered: 08/14/2019) |
| 08/13/2019 | 28 | MINUTES OF POST-INDICTMENT ARRAIGNMENT: held before Magistrate Judge Autumn D. Spaeth as to Defendant Travis Schlotterbeck (1) Count 1,2,3. Defendant arraigned, states true name: As charged. Defendant entered not guilty plea to all counts as charged. Attorney: Robison D Harley, Jr for Travis Schlotterbeck, Appointed, present. Case assigned to Judge George H Wu. Court orders bail set for Travis Schlotterbeck (1) $25,000 Appearance Bond, see attached for terms and conditions. Jury Trial set for 9/24/2019 09:00 AM before Judge George H. Wu. Status Conference set for 8/29/2019 08:00 AM before Judge George H. Wu. Court Smart: CS 8/13/19. (mhe) (Entered: 08/15/2019) |
| 08/13/2019 | 29 | DECLARATION RE: PASSPORT filed by Defendant Travis Schlotterbeck, declaring that I have been issued a passport or other travel document(s), but they are not currently in my possession. I will surrender any passport or other travel document(s) issued to me, to the U.S. Pretrial Services Agency by the deadline imposed. I will not apply for a passport or other travel document during the pendency of this case. (mhe) (Entered: 08/15/2019) |

| 08/13/2019 | 30 | FINANCIAL AFFIDAVIT filed as to Defendant Travis Schlotterbeck. (Not for Public View pursuant to the E-Government Act of 2002) (mhe) (Entered: 08/15/2019) |
| 08/13/2019 | 31 | STATEMENT OF CONSTITUTIONAL RIGHTS filed by Defendant Travis Schlotterbeck (mhe) (Entered: 08/15/2019) |
| 08/13/2019 | 32 | ARREST WARRANT RETURNED Executed on 8/13/19 as to Defendant Travis Schlotterbeck. (mhe) (Entered: 08/15/2019) |
| 08/13/2019 | 33 | REDACTED AFFIDAVIT OF SURETIES (No Justification - Pursuant to Local Criminal Rule 46-5.2.8) in the amount of $25,000 by surety: Traci Schlotterbeck for Filed by Defendant Travis Schlotterbeck (mhe) (Entered: 08/15/2019) |
| 08/13/2019 | 34 | SEALED UNREDACTED Affidavit of Surety (No Justification) filed by Defendant Travis Schlotterbeck re: Affidavit of Surety (No Justification)(CR-4) 33 (mhe) (Entered: 08/15/2019) |
| 08/14/2019 | 26 | PASSPORT RECEIPT from U. S. Pretrial Services as to Defendant James Bradley Vlha. USA passport was received on 8/14/19. (mhe) (Entered: 08/14/2019) |
| 08/19/2019 | 35 | TEXT-ONLY ENTRY - IN CHAMBERS: by Judge George H. Wu: The STATUS CONFERENCE as to Defendant Travis Schlotterbeck previously scheduled for 08/29/2019 is CONTINUED to 9/12/2019 at 08:00 AM before Judge George H. Wu. The 09/24/2019 trial date is unchanged. THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY. (jag) TEXT ONLY ENTRY (Entered: 08/19/2019) |
| 08/19/2019 | 36 | TEXT-ONLY ENTRY - IN CHAMBERS: by Judge George H. Wu: The STATUS CONFERENCE as to Defendant James Bradley Vlha previously scheduled for 08/29/2019 is CONTINUED to 9/12/2019 at 08:00 AM before Judge George H. Wu. The 09/24/2019 trial date is unchanged. THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY. (jag) TEXT ONLY ENTRY (Entered: 08/19/2019) |
| 08/19/2019 | 38 | PASSPORT RECEIPT from U. S. Pretrial Services as to Defendant Travis Schlotterbeck. USA passport was received on 8/16/19. (mhe) (Entered: 08/21/2019) |
| 08/20/2019 | 37 | REQUEST TO SUBSTITUTE ATTORNEY Jerome J. Haig in place of attorney Robert E. Scott Filed by Defendant James Bradley Vlha. (Attachments: # 1 Proposed Order) (Attorney Jerome J Haig added to party James Bradley Vlha(pty:dft)) (Haig, Jerome) (Entered: 08/20/2019) |
| 08/20/2019 | 39 | BOND AND CONDITIONS OF RELEASE filed as to Defendant Travis Schlotterbeck conditions of release: $25,000 Appearance Bond, see attached for terms and conditions approved by Magistrate Judge John D. Early. (mhe) (Entered: 08/22/2019) |
| 08/20/2019 | 40 | Memorandum re PSA Clear Warrant re Travis Schlotterbeck (mhe) (Entered: 08/22/2019) |
| 08/20/2019 | 41 | MINUTES OF INDICTMENT HEARING held before Magistrate Judge Karen L. Stevenson as to Defendant Jacob Dekoning. Defendant states true name as charged. Attorney: Peter C Swarth for Jacob Dekoning, Appointed, present.Court orders bail set as: Jacob Dekoning (3) $10,000 Appearance Bond, see attached for terms and conditions. Defendant remanded to the custody of the USM. Court Smart: 8/20/19. (mhe) (Entered: 08/23/2019) |
| 08/20/2019 | 42 | FINANCIAL AFFIDAVIT filed as to Defendant Jacob Dekoning. (Not for Public View pursuant to the E-Government Act of 2002) (mhe) (Entered: 08/23/2019) |
| 08/20/2019 | 43 | ADVISEMENT OF STATUTORY & CONSTITUTIONAL RIGHTS filed by Defendant Jacob Dekoning. (mhe) (Entered: 08/23/2019) |

| 08/20/2019 | 44 | BOND AND CONDITIONS OF RELEASE filed as to Defendant Jacob Dekoning conditions of release: $10,000 Appearance Bond, see attached for terms and conditions approved by Magistrate Judge Karen L. Stevenson. (mhe) (Entered: 08/23/2019) |
| --- | --- | --- |
| 08/20/2019 | 45 | REDACTED AFFIDAVIT OF SURETIES (No Justification - Pursuant to Local Criminal Rule 46-5.2.8) in the amount of $10,000 by surety: Cheryl Dekoving for Bond and Conditions (CR-1) 44 . Filed by Defendant Jacob Dekoning (mhe) (Entered: 08/23/2019) |
| 08/20/2019 | 46 | SEALED UNREDACTED Affidavit of Surety (No Justification) filed by Defendant Jacob Dekoning re: Affidavit of Surety (No Justification)(CR-4) 45 (mhe) (Entered: 08/23/2019) |
| 08/20/2019 | 47 | MINUTES OF POST-INDICTMENT ARRAIGNMENT: held before Magistrate Judge Karen L. Stevenson as to Defendant Jacob Dekoning (3) Count 1,2. Defendant arraigned, states true name: As charged. Defendant entered not guilty plea to all counts as charged. Attorney: Peter Carl Swarth, Appointed present. Case assigned to Judge George H. Wu. Jury Trial set for 10/1/2019 09:00 AM before Judge George H. Wu. Court Smart: CS 08/20/2019. (tba) (Entered: 08/23/2019) |
| 08/22/2019 | 49 | REDACTED Rule 5(c)(3) Documents Received as to Jacob Dekoning. (mrgo) (Entered: 08/26/2019) |
| 08/22/2019 | 50 | SEALED UNREDACTED Rule 5 Documents filed as to Defendant Jacob Dekoning re: Rule 5(c)(3) Documents Received (fka Rule 40) 49 . (mrgo) (Entered: 08/26/2019) |
| 08/23/2019 | 48 | ORDER by Judge George H. Wu: granting 37 REQUEST for Approval of Substitution of Attorney. Jerome J. Haig is substituted in place of attorney Robert E. Scott as to Defendant James Bradley Vlha. Attorney Robert E Scott terminated as to James Bradley Vlha (2). (mrgo) (Entered: 08/26/2019) |
| 08/26/2019 | 51 | TEXT-ONLY ENTRY - IN CHAMBERS: by Judge George H. Wu: The Court sets a STATUS CONFERENCE as to Defendant Jacob Dekoning for 9/12/2019 at 08:00 AM before Judge George H. Wu. The October 1, 2019 trial date is unchanged. THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY. (jag) TEXT ONLY ENTRY (Entered: 08/26/2019) |
| 08/27/2019 | 52 | STIPULATION for Order [Proposed] Protective Order filed by Plaintiff USA as to Defendant Travis Schlotterbeck, James Bradley Vlha, Jacob Dekoning (Attachments: # 1 Proposed Order)(Faerstein, Brian) (Entered: 08/27/2019) |
| 08/28/2019 | 53 | COMPACT DISC Order for date of proceedings 8/13/19 to 8/13/19 as to Defendant Travis Schlotterbeck, James Bradley Vlha, Jacob Dekoning Court will contact Brian Faerstein at brian.faerstein@usdoj.gov with any questions regarding this order. Transcript portion requested: Other: 8/13/19 Dkt#; 19 & 28 Mins of PIA. Federal Government Agency - No fee required: United States Attorneys Office.(Faerstein, Brian) (Entered: 08/28/2019) |
| 08/29/2019 | 54 | PROTECTIVE ORDER REGARDING DISCOVERY CONTAINING PERSONAL IDENTIFYING INFORMATION AND CONFIDENTIAL INFORMANT INFORMATION by Judge George H. Wu. FOR GOOD CAUSE SHOWN the Court hereby FINDS AND ORDERS as follows: (SEE PROTECTIVE ORDER FOR FURTHER DETAILS) (yl) (Entered: 09/03/2019) |
| 09/05/2019 | 55 | STIPULATION to Continue Trial from September 24, 2019 to March 3, 2020 filed by Plaintiff USA as to Defendant Travis Schlotterbeck, James Bradley Vlha, Jacob Dekoning (Attachments: # 1 Proposed Order)(Faerstein, Brian) (Entered: 09/05/2019) |

| | | |
|---|---|---|
| 09/05/2019 | 57 | ORDER DATE AND FINDINGS REGARDING EXCLUDABLE TIME PERIODS PURSUANT TO SPEEDY TRIAL ACTby Judge George H. Wu as to Defendant Travis Schlotterbeck, James Bradley Vlha, Jacob Dekoning. The trial in this matter is continued from September 24,2019, with respect to defendants Schlotterbeck and Vlha, and October 1, 2019, with respect to defendant Dekoning, to March 3, 2020, as to all defendants. The status conference hearing is continued to February 20, 2020 at 8:00 a.m. (SEE ORDER FOR FURTHER DETAILS) (yl) (yl). (Entered: 09/10/2019) |
| 09/05/2019 | 60 | **AMENDED** ORDER CONTINUING TRIAL DATE AND FINDINGS REGARDING EXCLUDABLE TIME PERIODS PURSUANT TO SPEEDY TRIAL ACT by Judge George H. Wu. The trial in this matter is continued from September 24, 2019, with respect to defendants Schlotterbeck and Vlha, and October 1, 2019, with respect to defendant Dekoning, to March 3, 2020, as to all defendants. The status conference hearing is continued to February 20, 2020 at 8:00 a.m. (SEE ORDER FOR FURTHER DETAILS) (yl) (Entered: 09/11/2019) |
| 09/09/2019 | 59 | BOND AND CONDITIONS OF RELEASE filed as to Defendant James Bradley Vlha conditions of release: $75,000 Appearance Bond, see attached for terms and coditions approved by Magistrate Judge Paul L. Abrams. (mhe) (Entered: 09/11/2019) |
| 09/09/2019 | 61 | AFFIDAVIT OF SURETIES (Property) in the amount of $50,000 by surety: James B Vlha for Bond and Conditions (CR-1) 59 for property located at: 4014 Center Avenue, Norco CA 92860; filed by Defendant James Bradley Vlha. Approved by Magistrate Judge Paul L. Abrams. (mhe) (Entered: 09/12/2019) |
| 09/09/2019 | 62 | BOND REMARK: Original Short Form Deed of Trust filed by James B Vlha located at Norco, CA 92860 as reflected on instrument number 2019-0341333 naming the Clerk of Court as Beneficiary therein on the property re defendant James Bradley Vlha. (Attachments: # 1 bank statement, # 2 lot book, # 3 Appraisal, # 4 deed) (mhe) (Entered: 09/12/2019) |
| 09/10/2019 | 56 | WAIVER of Defendants Presence filed by Defendant Travis Schlotterbeck (Harley, Robison) (Entered: 09/10/2019) |
| 09/10/2019 | 58 | NOTICE OF CLERICAL ERROR, as to Defendant Travis Schlotterbeck, James Bradley Vlha, Jacob Dekoning: Due to clerical error, AN NEF DID NOT GO OUT WITH THE ENTRY AND IS ATTACHED TO THIS NOTICE OF CLERICAL ERROR. (yl) (Additional attachment(s) added on 9/10/2019: # 1 ORDER) (yl). (Entered: 09/10/2019) |
| 10/01/2019 | 63 | STIPULATION for Modification of Conditions of Release filed by Plaintiff USA as to Defendant Travis Schlotterbeck (Attachments: # 1 Proposed Order)(Faerstein, Brian) (Entered: 10/01/2019) |
| 10/04/2019 | 64 | ORDER MODIFYING CONDITIONS OF BOND by Magistrate Judge Autumn D. Spaeth, re: 63 STIPULATION for Modification of Conditions of Release as to Defendant Travis Schlotterbeck (1). The following conditions are hereby added to defendant's existing conditions of pretrial release: 1. Defendant Schlotterbeck shall avoid all contact, directly or indirectly (including by any electronic means), with any person who is a known victim or witness in the subject investigation or prosecution. 2. Defendant Schlotterbeck shall avoid all contact, directly or indirectly (including by any electronic means), with any known codefendants except in the presence of counsel. (hr) (Entered: 10/04/2019) |
| 10/09/2019 | 65 | BOND AND CONDITIONS OF RELEASE filed as to Defendant Travis Schlotterbeck conditions of release: $25,000 approved by Magistrate Judge Autumn D. Spaeth. (dg) (Entered: 10/10/2019) |

| 11/19/2019 | [66](#) | STIPULATION for Modification of Conditions of Release filed by Defendant James Bradley Vlha (Attachments: # [1](#) Proposed Order)(Haig, Jerome) (Entered: 11/19/2019) |
|---|---|---|
| 11/19/2019 | [67](#) | ORDER MODIFYING CONDITIONS OF RELEASE by Judge George H. Wu as to Defendant James Bradley Vlha (2) $75,000 Appearance Bond IS IS HEREBY ORDERD that defendant James Brandley Vlha's conditions of release are modified. (SEE DOCUMENT FOR FURTHER DETAILS) (ddav) (Entered: 11/21/2019) |
| 01/30/2020 | [68](#) | STIPULATION to Continue Trial from March 3, 2020 to August 25, 2020 filed by Plaintiff USA as to Defendant Travis Schlotterbeck, James Bradley Vlha, Jacob Dekoning (Attachments: # [1](#) Proposed Order)(Faerstein, Brian) (Entered: 01/30/2020) |
| 02/01/2020 | [69](#) | ORDER CONTINUING TRIAL DATE AND FINDINGS REGARDING EXCLUDABLE TIME PERIODS PURSUANT TO SPEEDY TRIAL ACT by Judge George H. Wu as to Defendant Travis Schlotterbeck, James Bradley Vlha, Jacob Dekoning. Jury Trial continued to 8/25/2020 at 08:30 AM before Judge George H. Wu. Status Conference continued to 8/13/2020 at 08:00 AM before Judge George H. Wu. (mrgo) (Entered: 02/04/2020) |
| 02/14/2020 | [70](#) | NOTICE OF MOTION AND MOTION to Dismiss Counts 1 and 2 as to Defendant Jacob Dekoning ONLY *GOVERNMENT'S MOTION TO DISMISS INDICTMENT AGAINST DEFENDANT JACOB DEKONING PURSUANT TO FEDERAL RULE OF CRIMINAL PROCEDURE 48(a)* Filed by Plaintiff USA as to Defendant Jacob Dekoning. (Attachments: # [1](#) Proposed Order) (Faerstein, Brian) (Entered: 02/14/2020) |
| 02/20/2020 | [71](#) | ORDER DISMISSING INDICTMENT AGAINST DEFENDANT JACOB DEKONING PURSUANT TO FEDERAL RULE OF CRIMINAL PROCEDURE 48(a) by Judge George H. Wu as to Jacob Dekoning (3), the Court HEREBY ORDERS that the indictment filed in this matter be dismissed without prejudice as to defendant Jacob Dekoning only. (es) (Entered: 02/21/2020) |
| 07/24/2020 | [72](#) | STIPULATION to Continue Trial from August 25, 2020 to April 13, 2021 filed by Plaintiff USA as to Defendant Travis Schlotterbeck, James Bradley Vlha, Jacob Dekoning (Attachments: # [1](#) Proposed Order)(Faerstein, Brian) (Entered: 07/24/2020) |
| 07/28/2020 | [73](#) | ORDER CONTINUING TRIAL DATE AND FINDINGS REGARDING EXCLUDABLE TIME PERIODS PURSUANT TO SPEEDY TRIAL ACT by Judge George H. Wu as to Defendant Travis Schlotterbeck, James Bradley Vlha. Jury Trial continued to 4/13/2021 at 08:30 AM before Judge George H. Wu. Status Conference continued to 4/1/2021 at 08:00 AM before Judge George H. Wu. (mrgo) (Entered: 07/29/2020) |
| 03/23/2021 | [74](#) | STIPULATION to Continue Trial from April 13, 2021 to November 9, 2021 filed by Plaintiff USA as to Defendant Travis Schlotterbeck, James Bradley Vlha (Attachments: # [1](#) Proposed Order)(Faerstein, Brian) (Entered: 03/23/2021) |
| 03/25/2021 | [75](#) | ORDER CONTINUING TRIAL DATE AND FINDINGS REGARDING EXCLUDABLE TIME PERIODS PURSUANT TO SPEEDY TRIAL ACT by Judge George H. Wu as to Defendant Travis Schlotterbeck, James Bradley Vlha. (Pretrial Motions to be filed by 7/15/2021. Replies due by 8/5/2021. Responses due by 7/29/2021). Jury Trial continued to 11/9/2021 at 08:30 AM before Judge George H. Wu. Status Conference continued from 4/1/2021 to 10/28/2021 at 08:00 AM before Judge George H. Wu. (mrgo) Modified on 3/29/2021 (mrgo). (Entered: 03/26/2021) |
| 08/24/2021 | [76](#) | STIPULATION for Order *Parties' Stipulation Regarding Pretrial Filings Schedule* filed by Plaintiff USA as to Defendant Travis Schlotterbeck, James Bradley Vlha (Attachments: # [1](#) Proposed Order)(Faerstein, Brian) (Entered: 08/24/2021) |

| 08/26/2021 | 77 | ORDER REGARDING PRETRIAL FILINGS SCHEDULE by Judge George H. Wu as to Defendant Travis Schlotterbeck, James Bradley Vlha: October 1, 2021 Parties' cross-disclosure of expert disclosures, if any. Motions in Limine to be filed by 10/15/2021. Responses due by 10/22/2021, if any; joint proposed jury instructions, including annotated competing instructions, if any; joint proposed verdict form (if necessary); trial memoranda; and proposed voir dire, if any. (aco) (Entered: 08/26/2021) |
|---|---|---|
| 10/11/2021 | 78 | STIPULATION to Continue Trial from November 9, 2021 to May 24, 2022 filed by Plaintiff USA as to Defendant Travis Schlotterbeck, James Bradley Vlha (Attachments: # 1 Proposed Order)(Faerstein, Brian) (Entered: 10/11/2021) |
| 10/13/2021 | 79 | ORDER CONTINUING TRIAL DATE AND FINDINGS REGARDING EXCLUDABLE TIME PERIODS PURSUANT TO SPEEDY TRIAL ACT by Judge George H. Wu as to Defendants Travis Schlotterbeck, James Bradley Vlha.The trial in this matter is continued from November 9, 2021, to May 24, 2022 at 8:30 a.m. The status conference currently scheduled for October 28, 2021, is continued to May 12, 2022 at 8:00 a.m. The pretrial filings scheduled previously entered by the Court (Dkt. No. 77) is hereby vacated. Based on the continued status conference and trial dates, the schedule for the following pretrial disclosures and filings is as follows: a. April 15, 2022 Parties' cross-disclosure of expert disclosures, if any. b. April 29, 2022 Parties' filing of motions in limine, if any. c. May 6, 2022 Parties' filing of: responses to motions in limine, if any; joint proposed jury instructions, including annotated competing instructions, if any; joint proposed verdict form (if necessary); trial memoranda; and proposed voir dire, if any. See order for details. (lom) (Entered: 10/14/2021) |
| 04/29/2022 | 80 | NOTICE OF MOTION AND MOTION in Limine to Admit *GOVERNMENT'S MOTION IN LIMINE #1 TO ADMIT EVIDENCE AND PERMIT ARGUMENT* Filed by Plaintiff USA as to Defendant Travis Schlotterbeck, James Bradley Vlha Motion set for hearing on 5/12/2022 at 08:00 AM before Judge George H. Wu. (Attachments: # 1 Exhibit A) (Faerstein, Brian) (Entered: 04/29/2022) |
| 04/29/2022 | 81 | NOTICE OF MOTION AND MOTION in Limine to Admit *GOVERNMENT'S MOTION IN LIMINE #2 TO ADMIT DEFENDANT SCHLOTTERBECK INTERVIEW STATEMENTS* Filed by Plaintiff USA as to Defendant Travis Schlotterbeck, James Bradley Vlha Motion set for hearing on 5/12/2022 at 08:00 AM before Judge George H. Wu. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F)(Faerstein, Brian) (Entered: 04/29/2022) |
| 04/29/2022 | 82 | NOTICE OF MOTION AND MOTION in Limine to Exclude *GOVERNMENT'S MOTION IN LIMINE #3 TO EXCLUDE TESTIMONY OF PROPOSED DEFENSE EXPERT STEVEN D. LIEBERMAN, ESQ.* Filed by Plaintiff USA as to Defendant Travis Schlotterbeck, James Bradley Vlha Motion set for hearing on 5/12/2022 at 08:00 AM before Judge George H. Wu. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C) (Faerstein, Brian) (Entered: 04/29/2022) |
| 05/05/2022 | 83 | TEXT-ONLY ENTRY - IN CHAMBERS: by Judge George H. Wu: The time to appear at the VTC STATUS CONFERENCE as to Defendants Travis Schlotterbeck and James Bradley Vlha, presently set for May 12, 2022 is confirmed for 10:00 a.m. THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY. (jag) TEXT ONLY ENTRY (Entered: 05/05/2022) |
| 05/06/2022 | 84 | CONSENT to Video Conference/Telephonic Conference filed by Defendant James Bradley Vlha. (Haig, Jerome) (Entered: 05/06/2022) |
| 05/06/2022 | 85 | PROPOSED JURY INSTRUCTIONS (Annotated set) filed by Plaintiff USA as to Defendant Travis Schlotterbeck, James Bradley Vlha (Faerstein, Brian) (Entered: |

| | | |
|---|---|---|
| | | 05/06/2022) |
| 05/06/2022 | 86 | PROPOSED JURY INSTRUCTIONS (Disputed - Annotated set) filed by Plaintiff USA as to Defendant Travis Schlotterbeck, James Bradley Vlha (Faerstein, Brian) (Entered: 05/06/2022) |
| 05/06/2022 | 87 | PROPOSED JURY VERDICT filed by Plaintiff USA as to Defendant Travis Schlotterbeck, James Bradley Vlha (Faerstein, Brian) (Entered: 05/06/2022) |
| 05/06/2022 | 88 | EX PARTE APPLICATION for Leave to File Excess Pages as to Trial Memorandum Filed by Plaintiff USA as to Defendant Travis Schlotterbeck, James Bradley Vlha. (Attachments: # 1 Declaration, # 2 Proposed Order) (Faerstein, Brian) (Entered: 05/06/2022) |
| 05/06/2022 | 89 | TRIAL MEMORANDUM filed by Plaintiff USA as to Defendant Travis Schlotterbeck, James Bradley Vlha (Faerstein, Brian) (Entered: 05/06/2022) |
| 05/06/2022 | 90 | PROPOSED VOIR DIRE QUESTIONS filed by Plaintiff USA as to Defendant Travis Schlotterbeck, James Bradley Vlha (Faerstein, Brian) (Entered: 05/06/2022) |
| 05/10/2022 | 91 | ORDER 88 by Judge George H. Wu as to Travis Schlotterbeck, James Bradley Vlha. IT IS HEREBY ORDERED THAT: The government's unopposed ex parte application to file a trial memorandum exceeding 25 pages is GRANTED up to 33 pages. IT IS SO ORDERED. (lom) (Entered: 05/10/2022) |
| 05/10/2022 | 92 | CONSENT TO VIDEO CONFERENCE/TELEPHONIC CONFERENCE AND ORDER by Judge George H. Wu as to Defendant James Bradley Vlha. (aco) (Entered: 05/10/2022) |
| 05/10/2022 | 93 | Notice of Appearance or Withdrawal of Counsel: for attorney Daniel G. Boyle counsel for Plaintiff USA. Adding Dan G. Boyle as counsel of record for United States of America for the reason indicated in the G-123 Notice. Filed by Plaintiff United States of America. (Attorney Daniel G. Boyle added to party USA(pty:pla))(Boyle, Daniel) (Entered: 05/10/2022) |
| 05/10/2022 | 94 | CONSENT to Video Conference/Telephonic Conference filed by Defendant Travis Schlotterbeck. (Harley, Robison) (Entered: 05/10/2022) |
| 05/12/2022 | 95 | ORDER by Judge George H. Wu as to Defendant Travis Schlotterbeck, re: Consent to Video/Telephonic Conference and/or Waiver of Presence (CR-29) 94 (bm) (Entered: 05/12/2022) |
| 05/12/2022 | 96 | MINUTES OF STATUS CONFERENCE held before Judge George H. Wu as to Defendants Travis Schlotterbeck, James Bradley Vlha: Hearing is held by video teleconference. Defendant's CARES Act Order as to Defendant James Bradley Vlha was filed on May 10, 2022 92 . Defendant Travis Schlotterbeck's CARES Act waiver was filed on May 10, 2022. Separate Order to issue. Court and counsel confer. The trial set for May 24, 2022 is tentatively set for June 7, 2022 at 8:30 a.m. A VTC pretrial conference is set for May 26, 2022 at 10:00 a.m. Defendants will have until May 19, 2022 to respond to the Governments Motions in Limine. The Government's responses are due by noon on May 24, 2022. A joint statement of the case, voir dire questions, joint witness and exhibit lists are to be filed by noon on May 24, 2022. The Court authorizes CJA funds in the amount of $50 per hour for the evidentiary portion of in-court services to paralegal Maya Jauregui on behalf of Defendant Travis Schlotterbeck. Court Reporter: Terri A. Hourigan. (bm) (Entered: 05/12/2022) |
| 05/16/2022 | 97 | REQUEST TO SUBSTITUTE ATTORNEY Edward M Robinson in place of attorney ROBINSON D HARLEY Filed by Defendant Travis Schlotterbeck. (Attachments: # 1 |

| | | |
|---|---|---|
| | | Proposed Order) (Attorney Edward M. Robinson added to party Travis Schlotterbeck(pty:dft)) (Robinson, Edward) (Entered: 05/16/2022) |
| 05/17/2022 | 98 | ORDER by Judge George H. Wu granting 97 REQUEST for Approval of Substitution of Attorney as to Travis Schlotterbeck (1): The Court hereby orders that the request of: Travis Schlotterbeck, Defendant, to substitute Edward D. Robinson who is Retained Counsel, as attorney of record instead of Robinson D. Harley. The clerk is hereby ordered to terminate Notices of Electronic Filing for the withdrawing attorney(s) in this case. (bm) (Entered: 05/17/2022) |
| 05/19/2022 | 99 | EX PARTE APPLICATION to Continue TRIAL DATE from June 7, 2022 to September 27, 2022. Filed by Defendant Travis Schlotterbeck. (Attachments: # 1 Proposed Order) (Robinson, Edward) (Entered: 05/19/2022) |
| 05/19/2022 | 100 | JOINDER filed by Defendant Travis Schlotterbeck joining in Miscellaneous Order, 54 . (Robinson, Edward) (Entered: 05/19/2022) |
| 05/19/2022 | 101 | TEXT-ONLY ENTRY - IN CHAMBERS: by Judge George H. Wu: The Court sets a VTC HEARING ON DEFENDANT TRAVIS SCHOLTTERBECKS EX-PARTE APPLICATION TO (1) CONTINUE TRIAL DATE AND (2) FINDINGS OF EXCLUDABLE TIME PERIOD PURSUANT TO SPEEDY TRIAL ACT 99 for 5/23/2022 at 10:30 AM before Judge George H. Wu. THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY. (jag) TEXT ONLY ENTRY (Entered: 05/19/2022) |
| 05/20/2022 | 102 | OPPOSITION to EX PARTE APPLICATION to Continue TRIAL DATE from June 7, 2022 to September 27, 2022. 99 filed by Plaintiff USA as to Defendant Travis Schlotterbeck and James Bradley Vlha. (Attachments: # 1 Exhibit 1 (Declaration of Brian Faerstein))(Faerstein, Brian) (Entered: 05/20/2022) |
| 05/23/2022 | 103 | MINUTES OF DEFENDANT TRAVIS SCHLOTTERBECK'S EX-PARTE APPLICATION TO (1) CONTINUE TRIAL DATE AND (2) FINDINGS OF EXCLUDABLE TIME PERIOD PURSUANT TO SPEEDY TRIAL ACT 99 Hearing held before Judge George H. Wu as to Defendant Travis Schlotterbeck, James Bradley Vlha, granting in part and denying in part 99 EX PARTE APPLICATION to Continue as to Travis Schlotterbeck (1). Court and counsel confer. For reasons stated on the record, Defendant Schlotterbeck's Ex Parte Application is granted in part. The trial set for June 7, 2022 is continued to July 12, 2022 at 8:30 a.m. The pretrial conference set for May 26, 2022 is continued to June 23, 2022 at 8:00 a.m. All motions in limine documents and final pretrial documents are to be filed by June 14, 2022.The Defendants and their counsel orally waive their speedy trial rights on the record. Counsel are to file a stipulation and order re Speedy Trial Act forthwith. Court Reporter: Terri A. Hourigan. (aco) (Entered: 05/24/2022) |
| 05/25/2022 | 104 | NOTICE OF LODGING filed by Plaintiff USA as to Defendant Travis Schlotterbeck, James Bradley Vlha *NOTICE OF LODGING OF PROPOSED ORDER CONTINUING TRIAL DATE AND FINDINGS REGARDING EXCLUDABLE TIME PERIODS PURSUANT TO SPEEDY TRIAL ACT* (Attachments: # 1 Proposed Order)(Faerstein, Brian) (Entered: 05/25/2022) |
| 05/26/2022 | 105 | ORDER CONTINUING TRIAL DATE AND FINDINGS REGARDING EXCLUDABLE TIME PERIODS PURSUANT TO SPEEDY TRIAL ACT by Judge George H. Wu as to Defendants Travis Schlotterbeck, James Bradley Vlha. Defendants shall appear in Courtroom 9D of the Federal Courthouse, 350 W. 1st Street, Los Angeles, California on June 23, 2022, at 8:00 a.m., for a pretrial conference in this proceeding, and on July 12, 2022, at 8:30 a.m. for trial in this proceeding. (SEE DOCUMENT FOR FURTHER DETAILS) (aco) (Entered: 05/27/2022) |

| | | |
|---|---|---|
| 05/31/2022 | 106 | OPPOSITION to MOTION in Limine to Admit *GOVERNMENT'S MOTION IN LIMINE #1 TO ADMIT EVIDENCE AND PERMIT ARGUMENT* 80 (Attachments: # 1 Exhibit Exhibit A ATF Notice)(Robinson, Edward) (Entered: 05/31/2022) |
| 05/31/2022 | 107 | OPPOSITION to MOTION in Limine to Admit *GOVERNMENT'S MOTION IN LIMINE #2 TO ADMIT DEFENDANT SCHLOTTERBECK INTERVIEW STATEMENTS* 81 (Attachments: # 1 Exhibit A)(Robinson, Edward) (Entered: 05/31/2022) |
| 05/31/2022 | 108 | Joint OPPOSITION to MOTION in Limine to Exclude *GOVERNMENT'S MOTION IN LIMINE #3 TO EXCLUDE TESTIMONY OF PROPOSED DEFENSE EXPERT STEVEN D. LIEBERMAN, ESQ.* 82 filed by Defendant Travis Schlotterbeck and James Vlha. (Haig, Jerome) (Entered: 05/31/2022) |
| 06/01/2022 | 109 | NOTICE OF APPEARANCE of attorney Brian Arthur Robinson, (Retained), appearing on behalf of Defendant Travis Schlotterbeck, filed by Defendant Travis Schlotterbeck. (Robinson, Brian) (Entered: 06/01/2022) |
| 06/01/2022 | 110 | Notice of Appearance or Withdrawal of Counsel: for attorney Rachael A Robinson counsel for Defendant Travis Schlotterbeck. Adding Rachael A Robinson as counsel of record for Travis Schlotterbeck for the reason indicated in the G-123 Notice. Filed by Defendant Travis Schlotterbeck. (Robinson, Rachael) (Entered: 06/01/2022) |
| 06/01/2022 | 111 | NOTICE TO FILER OF DEFICIENCIES in Electronically Filed Documents RE: Notice of Appearance or Withdrawal of Counsel (G-123), 110 . The following error(s) was/were found: Failed to note if attorney is CJA, Pro Bono or Retained. Listed attorney as Pro Bono to add her to docket. In response to this notice, the Court may: (1) order an amended or correct document to be filed; (2) order the document stricken; or (3) take other action as the Court deems appropriate. You need not take any action in response to this notice unless and until the Court directs you to do so. (lt) (Entered: 06/01/2022) |
| 06/01/2022 | 112 | NOTICE OF MOTION AND Joint MOTION in Limine to Exclude Pejorative term of "ghost gun" and any reference to "unserialized" or "with no serial number" Filed by Defendant James Bradley Vlha Motion set for hearing on 6/23/2022 at 08:00 AM before Judge George H. Wu.(Haig, Jerome) (Entered: 06/01/2022) |
| 06/02/2022 | 113 | Joint NOTICE OF MOTION AND MOTION to Dismiss Case Filed by Plaintiff Travis Schlotterbeck as to Defendant Travis Schlotterbeck, James Bradley Vlha, Jacob Dekoning. Motion set for hearing on 6/23/2022 at 08:00 AM before Judge George H. Wu. (Attachments: # 1 Exhibit Exhibit A Letter to Counsel, # 2 Exhibit Exhibit B Letters and Orders) (Robinson, Rachael) (Entered: 06/02/2022) |
| 06/06/2022 | 114 | JOINT STIPULATIONS OF FACT filed by Plaintiff USA as to Defendant Travis Schlotterbeck, James Bradley Vlha (Faerstein, Brian) (Entered: 06/06/2022) |
| 06/06/2022 | 115 | JOINT STIPULATIONS REGARDING EXHIBITS filed by Plaintiff USA as to Defendant Travis Schlotterbeck, James Bradley Vlha (Faerstein, Brian) (Entered: 06/06/2022) |
| 06/07/2022 | 116 | REPLY in Support of MOTION in Limine to Admit *GOVERNMENT'S MOTION IN LIMINE #2 TO ADMIT DEFENDANT SCHLOTTERBECK INTERVIEW STATEMENTS* 81 (Boyle, Daniel) (Entered: 06/07/2022) |
| 06/07/2022 | 117 | REPLY In Support MOTION in Limine to Exclude *GOVERNMENT'S MOTION IN LIMINE #3 TO EXCLUDE TESTIMONY OF PROPOSED DEFENSE EXPERT STEVEN D. LIEBERMAN, ESQ.* 82 filed by Plaintiff USA as to Defendant Travis Schlotterbeck and James Bradley Vlha. (Faerstein, Brian) (Entered: 06/07/2022) |

| | | |
|---|---|---|
| 06/07/2022 | 118 | REPLY In Support MOTION in Limine to Admit *GOVERNMENT'S MOTION IN LIMINE #1 TO ADMIT EVIDENCE AND PERMIT ARGUMENT* 80 filed by Plaintiff USA as to Defendant Travis Schlotterbeck and James Bradley Vlha. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Exhibit G, # 8 Exhibit H, # 9 Exhibit I)(Faerstein, Brian) (Entered: 06/07/2022) |
| 06/09/2022 | 119 | MEMORANDUM in Opposition to Joint MOTION in Limine to Exclude Pejorative term of "ghost gun" and any reference to "unserialized" or "with no serial number" 112 filed by Plaintiff USA as to Defendant SCHLOTTERBECK and VLHA. (Boyle, Daniel) (Entered: 06/09/2022) |
| 06/09/2022 | 120 | OPPOSITION to Joint NOTICE OF MOTION AND MOTION to Dismiss Case 113 filed by Plaintiff USA as to Defendant Travis Schlotterbeck and James Bradley Vlha. (Attachments: # 1 Exhibit A)(Faerstein, Brian) (Entered: 06/09/2022) |
| 06/14/2022 | 121 | REPLY In Support Joint NOTICE OF MOTION AND MOTION to Dismiss Case 113 filed by Defendant Travis Schlotterbeck and James Bradley Vlha. (Robinson, Rachael) (Entered: 06/14/2022) |
| 06/14/2022 | 122 | EXHIBIT LIST filed by Plaintiff USA as to Defendant Travis Schlotterbeck, James Bradley Vlha (Faerstein, Brian) (Entered: 06/14/2022) |
| 06/14/2022 | 123 | WITNESS LIST filed by Plaintiff USA as to Defendant Travis Schlotterbeck, James Bradley Vlha (Faerstein, Brian) (Entered: 06/14/2022) |
| 06/14/2022 | 124 | PROPOSED STATEMENT OF THE CASE filed by Plaintiff USA as to Defendant Travis Schlotterbeck, James Bradley Vlha (Faerstein, Brian) (Entered: 06/14/2022) |
| 06/14/2022 | 125 | PROPOSED JURY INSTRUCTIONS (Disputed Supplemental set) filed by Plaintiff USA as to Defendant Travis Schlotterbeck, James Bradley Vlha (Faerstein, Brian) (Entered: 06/14/2022) |
| 06/14/2022 | 126 | PROPOSED JURY INSTRUCTIONS (Annotated set) filed by Plaintiff Travis Schlotterbeck as to Defendant Travis Schlotterbeck, James Bradley Vlha, Jacob Dekoning (Robinson, Rachael) (Entered: 06/14/2022) |
| 06/16/2022 | 127 | TEXT-ONLY ENTRY - IN CHAMBERS: by Judge George H. Wu: The time to appear for the VTC PRETRIAL CONFERENCE as to Defendants Travis Schlotterbeck and James Bradley Vlha, set for hearing on June 23, 2022, is changed from 8:00 a.m. to 12:00 p.m. THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY. (jag) TEXT ONLY ENTRY (Entered: 06/16/2022) |
| 06/22/2022 | 128 | MINUTES OF IN CHAMBERS - TENTATIVE RULING ON DEFENDANTS' JOINT MOTION TODISMISS INDICTMENT PER FED. R.CRIM. P. 12(b)(3)(a) by Judge George H. Wu as to Defendants Travis Schlotterbeck, James Bradley Vlha. Attached hereto is the Court's Tentative Ruling on Defendants' Joint Motion to Dismiss 113 set for hearing on 6/23/2022 at 12:00 PM before Judge George H. Wu. (gk) (Entered: 06/22/2022) |
| 06/23/2022 | 130 | MINUTES OF PRETRIAL CONFERENCE held before Judge George H. Wu as to Defendants Travis Schlotterbeck, James Bradley Vlha granting in part and denying in part 80 Motion in Limine to Admit as to Travis Schlotterbeck (1), James Bradley Vlha (2); denying 113 MOTION to Dismiss Case as to Travis Schlotterbeck (1), James Bradley Vlha (2). The pretrial conference is continued to June 28, 2022 at 10:00 a.m. Supplemental briefs are to be filed by June 27, 2022. (SEE DOCUMENT FOR FURTHER DETAILS). Court Reporter: Terri A. Hourigan/Suzanne McKennon. (aco) (Entered: 06/27/2022) |

| 06/24/2022 | 129 | Supplemental OPPOSITION to MOTION in Limine to Admit *GOVERNMENT'S MOTION IN LIMINE #2 TO ADMIT DEFENDANT SCHLOTTERBECK INTERVIEW STATEMENTS 81* filed by Defendant Travis Schlotterbeck and James Bradley Vlha. (Robinson, Brian) (Entered: 06/24/2022) |
|---|---|---|
| 06/27/2022 | 131 | PARTIES' STIPULATION REGARDING JOINT PROPOSED REDACTED TRIAL INDICTMENT filed by Plaintiff USA as to Defendant Travis Schlotterbeck, James Bradley Vlha (Attachments: # 1 Exhibit 1, # 2 Exhibit 2)(Faerstein, Brian) (Entered: 06/27/2022) |
| 06/27/2022 | 132 | PARTIES' JOINT SUBMISSION REGARDING EXPERT DISCLOSURES filed by Plaintiff USA as to Defendant Travis Schlotterbeck, James Bradley Vlha (Attachments: # 1 Exhibit Government Exhibit 1, # 2 Exhibit Defendants' Exhibit A)(Faerstein, Brian) (Entered: 06/27/2022) |
| 06/27/2022 | 133 | Joint NOTICE OF MOTION AND MOTION to Continue jury trial of defendants from July 22, 2022 to a date determined by the Court. *Ex Parte Motion* Filed by Plaintiff James Bradley Vlha as to Defendant Travis Schlotterbeck, James Bradley Vlha. Motion set for hearing on 6/28/2022 at 10:00 AM before Judge George H. Wu. (Attachments: # 1 Proposed Order) (Haig, Jerome) (Entered: 06/27/2022) |
| 06/28/2022 | 134 | OPPOSITION to Joint NOTICE OF MOTION AND MOTION to Continue jury trial of defendants from July 22, 2022 to a date determined by the Court. *Ex Parte Motion* 133 filed by Plaintiff USA as to Defendant Travis Schlotterbeck and James Bradley Vlha. (Faerstein, Brian) (Entered: 06/28/2022) |
| 06/28/2022 | 135 | MINUTES OF PRETRIAL CONFERENCE held before Judge George H. Wu as to Defendants Travis Schlotterbeck, James Bradley Vlha, denying 133 MOTION to Continue as to Travis Schlotterbeck (1), James Bradley Vlha (2). Defendants' Ex Parte Motion to Continue Trial of Defendants Based upon New Supreme Court Decision Impacting the Defendant's 2nd Amendment Rights Against Further Prosecution 133 is denied. Court hears further argument as to Motions in Limine. Counsel are to discuss remaining issues and file supplemental briefs by noon on July 7, 2022. The pretrial conference is continued to July 11, 2022 at 8:30 a.m. The trial set for July 12, 2022, is tentatively continued to July 22, 2022 at 8:30 a.m. Court Reporter: Terri A. Hourigan. (aco) (Entered: 06/28/2022) |
| 07/01/2022 | 136 | Joint NOTICE OF MOTION AND MOTION to Dismiss Case Filed by Plaintiff Travis Schlotterbeck as to Defendant Travis Schlotterbeck, James Bradley Vlha, Jacob Dekoning. Motion set for hearing on 7/11/2022 at 08:30 AM before Judge George H. Wu. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C) (Robinson, Brian) (Entered: 07/01/2022) |
| 07/01/2022 | 137 | TEXT-ONLY ENTRY - IN CHAMBERS: by Judge George H. Wu: The time to appear at the VTC PRETRIAL CONFERENCE as to Defendants Travis Schlotterbeck and James Bradley Vlha, set for hearing on July 11, 2022 is changed from 8:30 a.m. to 1:30 p.m. THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY. (jag) TEXT ONLY ENTRY (Entered: 07/01/2022) |
| 07/01/2022 | 138 | PROPOSED JURY INSTRUCTIONS (Annotated set) filed by Defendant Travis Schlotterbeck (Robinson, Edward) (Entered: 07/01/2022) |
| 07/01/2022 | 139 | PROPOSED JURY INSTRUCTIONS (Annotated Amended Supplemental set) filed by Plaintiff USA as to Defendant Travis Schlotterbeck, James Bradley Vlha (Faerstein, Brian) (Entered: 07/01/2022) |
| 07/05/2022 | 140 | TRANSCRIPT ORDER as to Defendant Travis Schlotterbeck, James Bradley Vlha, Jacob Dekoning DCN number: R22A01085 for Court Reporter. Order for: Criminal Non |

| | | Appeal.(Faerstein, Brian) (Entered: 07/05/2022) |
|---|---|---|
| 07/07/2022 | 141 | PARTIES JOINT SUPPLEMENTAL POSITIONS RE DEFENSE PROPOSED EXPERT filed by Plaintiff USA as to Defendant Travis Schlotterbeck, James Bradley Vlha, Jacob Dekoning (Boyle, Daniel) (Entered: 07/07/2022) |
| 07/07/2022 | 142 | OPPOSITION to Joint NOTICE OF MOTION AND MOTION to Dismiss Case 136 filed by Plaintiff USA as to Defendant Travis Schlotterbeck and James Bradley Vlha. (Faerstein, Brian) (Entered: 07/07/2022) |
| 07/08/2022 | 143 | TRANSCRIPT filed as to Defendant Travis Schlotterbeck, James Bradley Vlha, Jacob Dekoning for proceedings held on 5/23/2022 8:30 a.m.. Court Reporter/Electronic Court Recorder: Terri Hourigan, phone number hourigan.terri@gmail.com. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Electronic Court Recorder before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Notice of Intent to Redact due within 7 days of this date. Redaction Request due 7/29/2022. Redacted Transcript Deadline set for 8/8/2022. Release of Transcript Restriction set for 10/6/2022.(Hourigan, Terri) (Entered: 07/08/2022) |
| 07/08/2022 | 144 | TRANSCRIPT filed as to Defendant Travis Schlotterbeck, James Bradley Vlha, Jacob Dekoning for proceedings held on 6/23/2022 8:30 a.m.. Court Reporter/Electronic Court Recorder: Terri Hourigan, phone number hourigan.terri@gmail.com. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Electronic Court Recorder before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Notice of Intent to Redact due within 7 days of this date. Redaction Request due 7/29/2022. Redacted Transcript Deadline set for 8/8/2022. Release of Transcript Restriction set for 10/6/2022.(Hourigan, Terri) (Entered: 07/08/2022) |
| 07/08/2022 | 145 | TRANSCRIPT filed as to Defendant Travis Schlotterbeck, James Bradley Vlha, Jacob Dekoning for proceedings held on 6/28/2022 8:30 a.m.. Court Reporter/Electronic Court Recorder: Terri Hourigan, phone number hourigan.terri@gmail.com. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Electronic Court Recorder before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Notice of Intent to Redact due within 7 days of this date. Redaction Request due 7/29/2022. Redacted Transcript Deadline set for 8/8/2022. Release of Transcript Restriction set for 10/6/2022.(Hourigan, Terri) (Entered: 07/08/2022) |
| 07/08/2022 | 146 | NOTICE OF FILING TRANSCRIPT filed as to Defendant Travis Schlotterbeck, James Bradley Vlha, Jacob Dekoning for proceedings 5/23/2022; 6/23/2022; 6/28/2022 re Transcript 145 , 144 , 143 THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY. (Hourigan, Terri) TEXT ONLY ENTRY (Entered: 07/08/2022) |
| 07/11/2022 | 147 | MINUTES OF PRETRIAL CONFERENCE held before Judge George H. Wu as to Defendants Travis Schlotterbeck, James Bradley Vlha granting in part and denying in part 82 Motion in Limine to Exclude as to Travis Schlotterbeck (1), James Bradley Vlha (2); denying 136 MOTION to Dismiss Case as to Travis Schlotterbeck (1), James Bradley Vlha (2). Defendants' Joint Motion to Dismiss the Indictment per Fed. R. Crim. P. 12(b) (3)(A) 136 is denied. Court hears further argument as to Motion in Limine No. 3 to Exclude Testimony of Proposed Defense Expert Steven D. Lieberman, Esq. 82 . Motion is granted in part and denied in part. The pretrial conference is continued to July 14, 2022 at 9:30 a.m. Court Reporter: Terri A. Hourigan. (aco) (Entered: 07/11/2022) |
| 07/13/2022 | 148 | TRANSCRIPT ORDER as to Defendant Travis Schlotterbeck, James Bradley Vlha, Jacob Dekoning DCN number: R22A01130 for Court Reporter. Order for: Criminal Non |

ER513

| | | |
|---|---|---|
| | | Appeal.(Faerstein, Brian) (Entered: 07/13/2022) |
| 07/14/2022 | 149 | CONSENT to Video Conference/Telephonic Conference filed by Defendant James Bradley Vlha. (Haig, Jerome) (Entered: 07/14/2022) |
| 07/14/2022 | 150 | CONSENT to Video Conference/Telephonic Conference filed by Defendant Travis Schlotterbeck. (Robinson, Edward) (Entered: 07/14/2022) |
| 07/14/2022 | 151 | PLEA AGREEMENT filed by Plaintiff USA as to Defendant Travis Schlotterbeck (Faerstein, Brian) (Entered: 07/14/2022) |
| 07/14/2022 | 152 | PLEA AGREEMENT filed by Plaintiff USA as to Defendant James Bradley Vlha (Faerstein, Brian) (Entered: 07/14/2022) |
| 07/14/2022 | 153 | MINUTES OF Change of Plea Hearing held before Judge George H. Wu as to Defendant Travis Schlotterbeck. The Defendant Travis Schlotterbeck (1) pleads GUILTY to Counts 1,3. Court questions defendant regarding the plea. The plea is accepted. The Court ORDERS the preparation of a Presentence Report. Sentencing set for 11/17/2022 08:00 AM before Judge George H. Wu. Parties are to submit their sentencing positions by no later than November 10, 2022. The Court vacates the Court and/or Jury Trial date. Court Reporter: Terri A. Hourigan. (aco) (Entered: 07/21/2022) |
| 07/14/2022 | 154 | MINUTES OF Change of Plea Hearing held before Judge George H. Wu as to Defendant James Bradley Vlha. The Defendant James Bradley Vlha (2) pleads GUILTY to Count 1. Court questions defendant regarding the plea. The plea is accepted. The Court ORDERS the preparation of a Presentence Report. Sentencing set for 11/17/2022 08:00 AM before Judge George H. Wu. Parties are to submit their sentencing positions by no later than November 10, 2022. The Court vacates the Court and/or Jury Trial date. Court Reporter: Terri A. Hourigan. (aco) (Entered: 07/21/2022) |
| 07/14/2022 | 155 | CONSENT TO VIDEO/TELEPHONIC CONFERENCE AND PROPOSED FINDINGS/ORDER by Judge George H. Wu as to Defendant James Bradley Vlha. (aco) (Entered: 07/21/2022) |
| 07/14/2022 | 156 | CONSENT TO VIDEO/TELEPHONIC CONFERENCE AND PROPOSED FINDINGS/ORDER by Judge George H. Wu as to Defendant Travis Schlotterbeck. (aco) (Entered: 07/21/2022) |
| 08/23/2022 | 157 | TRANSCRIPT filed as to Defendant Travis Schlotterbeck, James Bradley Vlha, Jacob Dekoning for proceedings held on 19-343. Court Reporter/Electronic Court Recorder: Terri Hourigan, phone number hourigan.terri@gmail.com. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Electronic Court Recorder before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Notice of Intent to Redact due within 7 days of this date. Redaction Request due 9/13/2022. Redacted Transcript Deadline set for 9/23/2022. Release of Transcript Restriction set for 11/21/2022.(Hourigan, Terri) (Entered: 08/23/2022) |
| 08/23/2022 | 158 | TRANSCRIPT filed as to Defendant Travis Schlotterbeck, James Bradley Vlha, Jacob Dekoning for proceedings held on 7/11/2022 10:00 a.m.. Court Reporter/Electronic Court Recorder: Terri Hourigan, phone number hourigan.terri@gmail.com. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Electronic Court Recorder before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Notice of Intent to Redact due within 7 days of this date. Redaction Request due 9/13/2022. Redacted Transcript Deadline set for 9/23/2022. Release of Transcript Restriction set for 11/21/2022.(Hourigan, Terri) (Entered: 08/23/2022) |

| 08/23/2022 | 159 | NOTICE OF FILING TRANSCRIPT filed as to Defendant Travis Schlotterbeck, James Bradley Vlha, Jacob Dekoning for proceedings 7/11/2022 10:00 a.m. re Transcript 158 THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY. (Hourigan, Terri) TEXT ONLY ENTRY (Entered: 08/23/2022) |
| --- | --- | --- |
| 10/06/2022 | 160 | DISCLOSED RECOMMENDATION LETTER as to Defendant Travis Schlotterbeck (cy) (Entered: 10/06/2022) |
| 10/06/2022 | 161 | PRESENTENCE REPORT as to Defendant Travis Schlotterbeck (cy) (Entered: 10/06/2022) |
| 10/26/2022 | 164 | OBJECTION TO PRESENTENCE INVESTIGATION REPORT filed by Plaintiff USA as to Defendant James Bradley Vlha (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8, # 9 Exhibit 9, # 10 Exhibit 10, # 11 Exhibit 11, # 12 Exhibit 12, # 13 Exhibit 13, # 14 Exhibit 14, # 15 Exhibit 15, # 16 Exhibit 16, # 17 Exhibit 17, # 18 Exhibit 18)(Faerstein, Brian) (Entered: 10/26/2022) |
| 11/10/2022 | 166 | POSITION WITH RESPECT TO SENTENCING FACTORS filed by Defendant Travis Schlotterbeck (Attachments: # 1 Exhibit Schlotterbeck Letter, # 2 Exhibit Character Letters)(Robinson, Rachael) (Entered: 11/10/2022) |
| 11/10/2022 | 167 | SENTENCING MEMORANDUM filed by Defendant James Bradley Vlha (Attachments: # 1 Exhibit A. Letter from De Ann Kurimay, # 2 Exhibit B. Letter from Staff Sergeant Correa, # 3 C. Letter from Zackary Kasanjian-King)(Haig, Jerome) (Entered: 11/10/2022) |
| 11/10/2022 | 168 | SENTENCING MEMORANDUM filed by Plaintiff USA as to Defendant Travis Schlotterbeck (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8, # 9 Exhibit 9, # 10 Exhibit 10, # 11 Exhibit 11, # 12 Exhibit 12, # 13 Exhibit 13, # 14 Exhibit 14, # 15 Exhibit 15, # 16 Exhibit 16, # 17 Exhibit 17, # 18 Exhibit 18, # 19 Exhibit 19, # 20 Exhibit 20, # 21 Exhibit 21, # 22 Exhibit 22, # 23 Exhibit 23)(Faerstein, Brian) (Entered: 11/10/2022) |
| 11/10/2022 | 169 | SENTENCING MEMORANDUM filed by Plaintiff USA as to Defendant James Bradley Vlha (Faerstein, Brian) (Entered: 11/10/2022) |
| 11/11/2022 | 170 | REPLY to Sentencing Memorandum,, 168 , filedby Defendant Travis Schlotterbeck (Robinson, Rachael) (Entered: 11/11/2022) |
| 11/14/2022 | 171 | FIRST ADDENDUM to Presentence Report 161 as to Defendant Travis Schlotterbeck (eza) (Entered: 11/14/2022) |
| 11/15/2022 | 172 | RESPONSE to Sentencing Memorandum 167 ,filed by Plaintiff USA as to Defendant James Bradley Vlha *GOVERNMENT'S RESPONSE TO DEFENDANT JAMES BRADLEY VLHA'S SENTENCING MEMORANDUM* (Faerstein, Brian) (Entered: 11/15/2022) |
| 11/17/2022 | 173 | MINUTES OF SENTENCING Hearing held before Judge George H. Wu as to Defendant Travis Schlotterbeck. Defendant is hereby committed on Counts 1 and 3 of the Indictment to the custody of the Bureau of Prisons for a term of three (3) months. Supervised release for Three (3) years, pay special assessment of $200, Fine of $50,000. The Government's request to dismiss the remaining counts of the underlying Indictment is GRANTED. Bond Exonerated. Defendant advised of right of appeal. Court Reporter: Katie E. Thibodeaux. (es) (Entered: 11/18/2022) |
| 11/17/2022 | 174 | JUDGMENT AND COMMITMENT by Judge George H. Wu as to Defendant Travis Schlotterbeck (1), Defendant, Travis Schlotterbeck, is hereby committed on Counts 1 and 3 of the Indictment to the custody of the Bureau of Prisons for a term of three (3) months. |

| | | |
|---|---|---|
| | | Supervised release for Three (3) years, pay special assessment of $200, Fine of $50,000. [See Judgment and Commitment for additional information.] (es) (Entered: 11/18/2022) |
| 11/17/2022 | 175 | MINUTES OF SENTENCING Hearing held before Judge George H. Wu as to Defendant James Bradley Vlha. Defendant is hereby committed on Count 1 of the Indictment to the custody of the Bureau of Prisons for a term of TIME SERVED. Supervised release for Three (3) years. Pay a special assessment of $100, Fine in the total amount of $25,000. On Government's motion, all remaining counts are ordered DISMISSED. Bond Exonerated. Defendant advised of right of appeal. Court Reporter: Katie E. Thibodeaux. (es) (Entered: 11/18/2022) |
| 11/17/2022 | 176 | JUDGMENT AND COMMITMENT by Judge George H. Wu as to Defendant James Bradley Vlha (2), Defendant, James Bradley Vlha, is hereby committed on Count 1 of the Indictment to the custody of the Bureau of Prisons for a term of TIME SERVED. Supervised release for Three (3) years. Pay a special assessment of $100, Fine in the total amount of $25,000. On Government's motion, all remaining counts are ordered DISMISSED. [See Judgment and Commitment for additional information.] (es) (Entered: 11/18/2022) |
| 11/22/2022 | 179 | NOTICE OF MOTION AND MOTION for Leave to Appeal re: Judgment and Commitment, 176 Filed by Defendant James Bradley Vlha. (Attachments: # 1 Proposed Order) (Haig, Jerome) (Entered: 11/22/2022) |
| 11/22/2022 | 180 | NOTICE OF APPEAL to Appellate Court filed by Defendant James Bradley Vlha re Judgment and Commitment, 176 . IFP REQUESTED. (Attachments: # 1 Exhibit Judgment and Commitment Order)(Haig, Jerome) (Entered: 11/22/2022) |
| 11/22/2022 | 182 | NOTIFICATION by Circuit Court of Appellate Docket Number 22-50281 as to Defendant James Bradley Vlha, Ninth CCA regarding Notice of Appeal to USCA - Final Judgment 180 . (aco) (Entered: 11/23/2022) |
| 11/23/2022 | 181 | NOTICE OF APPEAL to Appellate Court filed by Defendant Travis Schlotterbeck re Judgment and Commitment, 174 . Filing fee $505, receipt number ACACDC-34374504. (Attachments: # 1 Judgment and Commitment Order)(Robinson, Rachael) (Entered: 11/23/2022) |
| 11/23/2022 | 183 | FILING FEE LETTER issued as to Defendant James Bradley Vlha, re Notice of Appeal to USCA - Final Judgment 180 . (mat) (Entered: 11/23/2022) |
| 11/23/2022 | 184 | NOTIFICATION by Circuit Court of Appellate Docket Number 22-50283 as to Defendant Travis Schlotterbeck, 9th CCA regarding Notice of Appeal to USCA - Final Judgment 181 . (aco) (Entered: 11/28/2022) |
| 11/28/2022 | 185 | ORDER by Judge George H. Wu: Granting 179 MOTION for Leave to Appeal as to James Bradley Vlha (2) (car) (Entered: 11/28/2022) |
| 12/01/2022 | 186 | TRANSCRIPT ORDER as to Defendant Travis Schlotterbeck, James Bradley Vlha, Jacob Dekoning DCN number: R23A0236 for Court Reporter. Order for: Criminal Non Appeal.(Faerstein, Brian) (Entered: 12/01/2022) |
| 12/02/2022 | 187 | ORDER of USCA filed as to Defendant James Bradley Vlha, CCA #22-50281. Appellant's motion to proceed in forma pauperis is denied as unnecessary. On November 28, 2022, the district court granted appellant leave to proceed in forma pauperis on appeal. The (9th CCA) Clerk will amend the docket to reflect this status. [See document for details.] (mat) (Entered: 12/05/2022) |
| 12/05/2022 | 188 | TRANSCRIPT ORDER re: Court of Appeals case number 22-50283, as to Defendant Travis Schlotterbeck for Court Reporter. Order for: Criminal Appeal. Court will contact Rachael A Robinson at raeroblaw@gmail.com with further instructions regarding this |

| | | order. Transcript preparation will not begin until payment has been satisfied with the court reporter.(Robinson, Rachael) (Entered: 12/05/2022) |
|---|---|---|
| 12/05/2022 | [189](#) | DESIGNATION OF RECORD ON APPEAL filed by Defendant Travis Schlotterbeck re Notice of Appeal to USCA - Final Judgment [181](#) (Robinson, Rachael) (Entered: 12/05/2022) |
| 12/20/2022 | [190](#) | NOTICE OF APPEAL to Appellate Court filed by Plaintiff USA as to Defendant Travis Schlotterbeck, James Bradley Vlha. Filing fee WAIVED. (Faerstein, Brian) (Entered: 12/20/2022) |
| 12/20/2022 | [191](#) | NOTIFICATION by Circuit Court of Appellate Docket Number 22-50312 as to Defendant Travis Schlotterbeck, James Bradley Vlha, 9th CCA regarding Cross Notice of Appeal to USCA - Final Judgment [190](#) . (mat) (Entered: 12/20/2022) |
| 12/21/2022 | [192](#) | DESIGNATION OF RECORD ON APPEAL filed by Plaintiff USA as to Defendant Travis Schlotterbeck, James Bradley Vlha re Notice of Appeal to USCA - Final Judgment [190](#) (Faerstein, Brian) (Entered: 12/21/2022) |
| 12/21/2022 | [193](#) | TRANSCRIPT filed as to Defendant Travis Schlotterbeck, James Bradley Vlha for proceedings held on 11/17/22 8:06 am. Court Reporter/Electronic Court Recorder: Katie Thibodeaux, CSR, RPR, CRR, phone number ktbdx@aol.com. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Electronic Court Recorder before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Notice of Intent to Redact due within 7 days of this date. Redaction Request due 1/11/2023. Redacted Transcript Deadline set for 1/23/2023. Release of Transcript Restriction set for 3/21/2023.(Thibodeaux, Elizabeth) (Entered: 12/21/2022) |
| 12/21/2022 | 194 | NOTICE OF FILING TRANSCRIPT filed as to Defendant Travis Schlotterbeck, James Bradley Vlha for proceedings 11/17/22 8:06 am re Transcript [193](#) THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY. (Thibodeaux, Elizabeth) TEXT ONLY ENTRY (Entered: 12/21/2022) |
| 01/24/2023 | [195](#) | TRANSCRIPT filed as to Defendant Travis Schlotterbeck, James Bradley Vlha for proceedings held on 7/14/2022 2:00 p.m.. Court Reporter/Electronic Court Recorder: Terri Hourigan, phone number hourigan.terri@gmail.com. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Electronic Court Recorder before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Notice of Intent to Redact due within 7 days of this date. Redaction Request due 2/14/2023. Redacted Transcript Deadline set for 2/24/2023. Release of Transcript Restriction set for 4/24/2023.(Hourigan, Terri) (Entered: 01/24/2023) |
| 01/24/2023 | 196 | NOTICE OF FILING TRANSCRIPT filed as to Defendant Travis Schlotterbeck, James Bradley Vlha for proceedings 7/14/2022 2:00 p.m. re Transcript [195](#) THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY. (Hourigan, Terri) TEXT ONLY ENTRY (Entered: 01/24/2023) |

ER517

| Description: | Docket Report | Search Criteria: | 2:19-cr-00343-GW End date: 5/25/2023 |
|---|---|---|---|
| Billable Pages: | 21 | Cost: | 2.10 |