No. 22-50281 & 22-50283

# IN THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
*Plaintiff-Appellee,*

*v.*

TRAVIS SCHLOTTERBECK AND JAMES VLHA,
*Defendant-Appellants.*

*APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA
DISTRICT COURT NO. CR 19-343-GW*

## GOVERNMENT'S ANSWERING BRIEF

E. MARTIN ESTRADA
United States Attorney

BRAM M. ALDEN
Assistant United States Attorney
Chief, Criminal Appeals Section

SURIA M. BAHADUE
Assistant United States Attorney
Criminal Appeals Section

1000 United States Courthouse
312 North Spring Street
Los Angeles, CA 90012
Telephone: (213) 894-5487
Email: suria.bahadue@usdoj.gov

Attorneys for Plaintiff-Appellee
UNITED STATES OF AMERICA

# TABLE OF CONTENTS

**DESCRIPTION**                                  **PAGE**

I INTRODUCTION ...................................................................... 1

II ISSUES PRESENTED ............................................................ 4

III STATEMENT OF THE CASE ............................................... 4

    A.     Jurisdiction, Timeliness, and Bail Status ............................ 4

    B.     Statement of Facts and Procedural History ......................... 5

        1.     Defendants' unlicensed gun-manufacturing business ...................................................................... 5

        2.     Defendants' charges .................................................. 13

        3.     Defendants' motion to dismiss under *Bruen* .............. 14

        4.     The district court's decision denying defendants' motion to dismiss .................................................... 18

        5.     Defendants' guilty pleas and sentencings ................. 19

IV SUMMARY OF ARGUMENT ............................................... 20

V ARGUMENT ........................................................................ 22

    A.     Standard of Review ............................................................ 22

    B.     The Second Amendment Allows Commercial Restrictions That Do Not Infringe on a Law-Abiding Citizen's Right to Keep and Bear Arms ........................... 22

        1.     The Second Amendment protects the right of a law-abiding citizen to possess and carry weapons ...... 22

        2.     The Second Amendment does not create a freestanding right to sell firearms ............................... 27

## TABLE OF CONTENTS (continued)

**DESCRIPTION**                                        **PAGE**

3.   *Bruen* reaffirmed *Heller*, *McDonald*, and this
Court's precedents ........................................................ 31

4.   History confirms the Second Amendment's
meaning, as interpreted by the Supreme Court
and this Court ............................................................ 36

C.   Sections 922(d)(1) and 922(a)(1)(A) are Commercial
Restrictions that Do Not Infringe on a Law-Abiding
Citizen's Right to Keep and Bear Arms ................................ 45

1.   Section 922(d)(1)'s prohibition on selling guns to
felons is constitutional ................................................ 46

2.   Section 922(a)(1)(A)'s prohibition on unlicensed
gun dealing is constitutional ........................................ 57

VI CONCLUSION ........................................................................ 66

# TABLE OF AUTHORITIES

**DESCRIPTION**                                                  **PAGE(S)**

## Cases

*Andrews v. State,*
    50 Tenn. 165 (1871)................................................................27

*Baze v. Rees,*
    553 U.S. 35 (2008) .............................................................. 41

*District of Columbia v. Heller,*
    554 U.S. 570 (2008) ................................................... passim

*Ezell v. City of Chicago,*
    846 F.3d 888 (7th Cir. 2017)..........................................39, 63

*Folajtar v. Attorney General,*
    980 F.3d 897 (3d Cir. 2020) .............................................. 42

*Hamilton v. Pallozzi,*
    848 F.3d 614 (4th Cir. 2017)..........................................27, 54

*Hatfield v. Barr,*
    925 F.3d 950 (7th Cir. 2019)..............................................56

*Illinois Ass'n of Firearms Retailers v. City of Chicago,*
    961 F. Supp. 2d 928 (N.D. Ill. 2014).....................................64

*Kanter v. Barr,*
    919 F.3d 437 (7th Cir. 2019)..........................................44, 56

*Logan v. United States,*
    552 U.S. 23 (2007).............................................................55

*Mai v. United States,*
    974 F.3d 1082 (9th Cir. 2020)........................................26, 48

# TABLE OF AUTHORITIES (continued)

**DESCRIPTION**                                      **PAGE(S)**

*McDonald v. City of Chicago,*
  561 U.S. 742 (2010) ........................................................... passim

*Medina v. Whitaker,*
  913 F.3d 152 (D.C. Cir. 2019) ....................................... 27, 42

*New York State Rifle & Pistol Ass'n v. Bruen,*
  142 S. Ct. 2111 (2022) .................................................... passim

*New York State Rifle & Pistol Ass'n v. City of New York,*
  140 S. Ct. 1525 (2020) ............................................................. 36

*Peruta v. Cnty. of San Diego,*
  824 F.3d 919 (9th Cir. 2016) .................................................. 37

*Range v. Attorney General,*
  69 F.4th 96 (3d Cir. 2023) ............................. 27, 38, 49, 56

*Rehaif v. United States,*
  139 S. Ct. 2191 (2019) ............................................................ 55

*Teixeira v. County of Alameda,*
  873 F.3d 670 (9th Cir. 2017) ......................................... passim

*Teter v. Lopez,*
  76 F.4th 938 (9th Cir. 2023) .................................................. 54

*United States v. Alaniz,*
  69 F.4th 1124 (9th Cir. 2023) ................................................ 23

*United States v. Bacon,*
  884 F.3d 605 (6th Cir. 2018) ........................................... 30, 46

*United States v. Bogle,*
  717 F.3d 281 (2d Cir. 2013) .................................................. 27

# TABLE OF AUTHORITIES (continued)

**DESCRIPTION**                                           **PAGE(S)**

*United States v. Carey,*
  602 F.3d 738 (6th Cir. 2010) ................................................................ 27

*United States v. Castro,*
  2011 WL 6157466 (9th Cir. Nov. 28, 2011) ........................................ 30

*United States v. Chafin,*
  423 F. App'x 342 (4th Cir. 2011) ........................................................ 30

*United States v. Charles,*
  633 F. Supp. 3d 874 (W.D. Tex. 2022) ................................................ 53

*United States v. Chovan,*
  735 F.3d 1127 (9th Cir. 2013) ............................................................. 26

*United States v. Collette,*
  630 F. Supp. 3d 841 (W.D. Tex. 2022) ................................................ 53

*United States v. Davis*, No. 2:22-CR-189,
  Report and Recommendation,
  Dkt. No. 31 (E.D. Wis. Feb. 27, 2023) ................................................ 47

*United States v. Deare,*
  2023 WL 4732568 (W.D. La. July 24, 2023) ...................................... 61

*United States v. Dunn,*
  76 F.4th 1062 (8th Cir. 2023) .............................................................. 50

*United States v. Flores,*
  2023 WL 361868 (S.D. Tex. Jan. 23, 2023) ........................................ 61

*United States v. Focia,*
  869 F.3d 1269 (11th Cir. 2017) ........................................................... 29

## TABLE OF AUTHORITIES (continued)

**DESCRIPTION**                                            **PAGE(S)**

*United States v. Garza,*
   2023 WL 4044442 (5th Cir. June 15, 2023) ......................................... 51

*United States v. Hickcox,*
   2023 WL 3075054 (5th Cir. Apr. 25, 2023) ......................................... 51

*United States v. Hosford,*
   843 F.3d 161 (4th Cir. 2016) ............................................................ 30, 63

*United States v. Jackson,*
   69 F.4th 495 (8th Cir. 2023) ......................................................... passim

*United States v. Johnson,*
   2023 WL 3431238 (5th Cir. May 12, 2023) ......................................... 51

*United States v. Kazmende,*
   2023 WL 3867792 (N.D. Ga. June 7, 2023) ......................................... 62

*United States v. King,*
   2022 WL 17668454 (E.D. Pa. Dec. 14, 2022) ..................................... 61

*United States v. McCane,*
   573 F.3d 1037 (10th Cir. 2009) ............................................................ 27

*United States v. McNulty,*
   2023 WL 4826950 (D. Mass. July 27, 2023) ..................................... 61

*United States v. Moore,*
   2023 WL 154588 (D. Or. Jan. 11, 2023) ............................................. 52

*United States v. Phillips,*
   827 F.3d 1171 (9th Cir. 2016) ............................................................. 26

*United States v. Porter,*
   2023 WL 113739 (S.D.W. Va. Jan. 5, 2023) ...................................... 46

# TABLE OF AUTHORITIES (continued)

**DESCRIPTION** **PAGE(S)**

*United States v. Quiroz,*
629 F. Supp. 3d 511 (W.D. Tex. 2023)................................................53

*United States v. Ridgeway,*
2022 WL 10198823 (S.D. Cal. Oct. 17, 2022)......................................52

*United States v. Roy,*
2023 WL 3073266 (5th Cir. Apr. 25, 2023) .........................................51

*United States v. Rozier,*
598 F.3d 768 (11th Cir. 2010)..............................................................27

*United States v. Scroggins,*
599 F.3d 433 (5th Cir. 2010)................................................................27

*United States v. Tilotta,*
2022 WL 3924282 (S.D. Cal. Aug. 30, 2022)......................................61

*United States v. Torres-Rosario,*
658 F.3d 110 (1st Cir. 2011) ...............................................................27

*United States v. Vongxay,*
594 F.3d 1111 (9th Cir. 2010)......................................................passim

*United States v. Williams,*
616 F.3d 685 (7th Cir. 2010)................................................................27

*United States v. Wondra,*
2022 WL 17975985 (D. Idaho Dec. 27, 2022)......................................52

*United States v. Woolsey,*
759 F.3d 905 (8th Cir. 2014)................................................................27

# TABLE OF AUTHORITIES (continued)

**DESCRIPTION**                                               **PAGE(S)**

*Van Der Hule v. Holder,*
  759 F.3d 1043 (9th Cir. 2014)................................................................26

*Vincent v. Garland,*
  — F.4th —, 2023 WL 5988299 (10th Cir. Sept. 15, 2023)............. 49, 50

*Walker v. United States,*
  2022 WL 16541183 (S.D. Cal. Oct. 28, 2022).......................................52

*Young v. Hawaii,*
  992 F.3d 765 (9th Cir. 2021)................................................................36

**Constitution**

U.S. Const. Amend. I................................................................................44

U.S. Const. Amend. II ...................................................................... passim

**Statutes**

18 U.S.C. § 371........................................................................................13

18 U.S.C. § 921........................................................................................58

18 U.S.C. § 922.............................................................................. passim

18 U.S.C. § 923........................................................................................59

18 U.S.C. § 925(c)....................................................................................55

18 U.S.C. § 3231........................................................................................4

28 U.S.C. § 1291........................................................................................4

**Rules**

Fed. R. App. P. 4(b)(1)(A)(i) .......................................................................5

# TABLE OF AUTHORITIES (continued)

**DESCRIPTION**                                    **PAGE(S)**

## Other Authorities

1 J. Hammond Trumbull, *The Public Records of the
Colony of Connecticut, Prior to the Union with New
Haven Colony, May, 1665* (1850) ........................................... 39

1 William Blackstone, *Commentaries on the Laws
of England* 139-40 (1765) ........................................................ 38

1 William Blackstone & St. George Tucker, *Blackstone's Commentaries:
With Notes of Reference, to the Constitution and Laws, of the Federal
Government of the United States, and of the Commonwealth of
Virginia* 145 (St. George Tucker ed., 1803) ......................... 38

*4 Journals of the Continental Congress, 1774-1789*
(Worthington Chauncey Ford ed., 1906) ............................... 40

*A Critical Guide to the Second Amendment*,
62 Tenn. L. Rev. 461 (1995) .................................................. 26

*A Digest of the Laws of Maryland* 255-56 (1799) ................... 41

Act of Apr. 20, 1745, ch. III, 23 *The State Records of North Carolina*
(1904) ....................................................................................... 41

Act of Aug. 4, 1675, *5 Records of the Colony of New
Plymouth* (1856) ..................................................................... 38

Act of Feb. 21, 1788, ch. 37, 1788 N.Y. Laws 664-65 ............ 41

Act of June 1776, *7 Records of the Colony of Rhode Island and
Providence Plantations in New England 567* (1862) ............ 42

Act of June 13, 1777, ch. 756 §§ 2-4, 1777 Pa. Laws 110 ....... 42

# TABLE OF AUTHORITIES (continued)

**DESCRIPTION**                                          **PAGE(S)**

Act of July 1, 1656, *Laws and Ordinances of New
  Netherland* (1868) ............................................................ 38, 41

Act of Mar. 14, 1776, ch. 21, 1775-76 Mass. Acts 479 ............................. 42

Act of May 1777, ch. III, 9 *The Statutes at Large;
  Being a Collection of all the Laws of Virginia* 281-82 (1821) .............. 43

Act of Nov. 15, 1777, ch. 6, 1777 N.C. Sess. Laws 231 ........................... 42

Act of Oct. 9, 1652, *Laws and Ordinances of New
  Netherland* 138 (1868) ........................................................... 43

Act of Sept. 20, 1777, ch. XL, 1777 N.J. Laws 90 ................................... 42

Acts of Assembly, Mar. 1675–76, 2 William Waller Hening,
  *The Statutes at Large: Being a Collection of All the Laws of
  Virginia, from the First Session of the Legislature, in the
  Year 1619* (1823) .................................................................... 39

An Act for the Punishment of Certain Crimes Against the United
  States, Pub. L. No. 1-9, § 14, 1 Stat. 112, 115 (1790) ........................ 43

*Assembly Proceedings, February-March 1638/9, in Proceedings and
  Acts of the General Assembly of Maryland, January 1637/8—
  September 1664* (William Hand Browne, ed., 1883) ......................... 41

Bill of Rights, 1 W. & M. Sess. II, c. 2 (1688) (Eng.) ............................... 39

Dru Stevenson, *In Defense of Felon-in-Possession Laws*,
  43 Cardozo L. Rev. 1573 (2022) ............................................... 42

Joseph G.S. Greenlee, *The Historical Justification for
  Prohibiting Dangerous Persons from Possessing Arms*,
  20 Wyo. L. Rev. 249 (2020) ..................................................... 40

# TABLE OF AUTHORITIES (continued)

**DESCRIPTION** **PAGE(S)**

Michael A. Bellesiles, *Gun Laws in Early America:*
*The Regulation of Firearms Ownership, 1607-1794,*
16 Law & Hist. Rev. 567 (1998)............................................................39

Militia Act of 1662, 14 Car. 2, c. 3, § 13 (Eng.)......................................39

*Records of the Governor and Company of the Massachusetts*
*Bay in New England* 196 (Nathaniel B. Shurtleff, ed., 1853) ...........41

Robert Spitzer, *Gun Law History in the United States*
*and the Second Amendment Rights*,
80 Law & Contemp. Probs. 55 (2017)...................................................40

*The Constitution and Laws, of the Federal Government of*
*the United States, and of the Commonwealth of Virginia* 145
(St. George Tucker ed., 1803) ..............................................................38

*The Documentary History of the Ratification of the Constitution*, Vol. 2
(Merrill Jensen ed., 1976).....................................................................44

*The Documentary History of the Ratification of the Constitution*,
Vol. 6 (John P. Kaminski & Gaspare J. Saladino eds., 2000)............45

*The Documentary History of the Ratification of the Constitution*,
Vol. 7, *Letter from Jeremy Belknap to Ebenezer Harvard (Feb. 10,*
*1788)* (John P. Kaminski & Gaspare J. Saladino eds., 2001*)* ...........*45*

*The Second Amendment: A Dialogue*,
49 Law & Contemp. Probs. 143 (1983)................................................26

*The State Records of North Carolina,*
218 (1904) ..............................................................................................41

## TABLE OF AUTHORITIES (continued)

**DESCRIPTION** **PAGE(S)**

Thomas M. Cooley, *A Treatise on the Constitutional Limitations Which Rest Upon the Legislative Power of the States of the American Union* (1st ed. 1868)...................................44

Solomon K. Smith, *Firearms Manufacturing, Gun Use, and the Emergence of Gun Culture in Early North America*, 49th Parallel, Vol. 34 (2014) .....................................64

Stephen P. Halbrook, *The Founders' Second Amendment: Origins of the Right to Bear Arms* 273 (2008).....................................46

Stuart Banner, *The Death Penalty: An American History* 23 (2002) ............................................43

Nos. 22-50281 & 22-50283

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
*Plaintiff-Appellee,*

*v.*

TRAVIS SCHLOTTERBECK AND JAMES VLHA,
*Defendant-Appellants.*

*APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA
DISTRICT COURT NO. CR 19-CR-343-GW*

## GOVERNMENT'S ANSWERING BRIEF

## I

## INTRODUCTION

For at least two years, defendants Travis Schlotterbeck and James Vlha operated an unlicensed gun-manufacturing business that built and sold untraceable assault weapons known as "ghost guns." Six separate times, defendants sold approximately $10,000 worth of firearms to a confidential informant, who was a felon, and to undercover agents.

Over the course of those deals, defendants bragged about their firearms acumen and requested new customer referrals.

Both defendants were charged with conspiring to engage in and engaging in the business of dealing and manufacturing firearms without a license, in violation of 18 U.S.C. § 922(a)(1)(A); Schlotterbeck was additionally charged with selling a firearm to a felon, in violation of 18 U.S.C. § 922(d)(1). Below, defendants claimed that both statutes violated their Second Amendment rights based on *New York State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111 (2022). The district court rejected their arguments.

Defendants' convictions should be affirmed. The Supreme Court and this Court have repeatedly recognized that the Second Amendment safeguards an individual right of law-abiding citizens—not felons—to possess and carry weapons for self-defense. And the Second Amendment does not confer a "freestanding" right to engage in firearms commerce divorced from the citizenry's right to possess firearms. *See Teixeira v. County of Alameda*, 873 F.3d 670, 682-86 (9th Cir. 2017) (*en banc*).

*Bruen* reinforced these basic principles. In *Bruen*, the Court reiterated more than a dozen times that the right to keep and bear arms belongs to law-abiding citizens; this Court's decision in *United States v. Vongxay*, 594 F.3d 1111 (9th Cir. 2010), said the same thing. *Bruen* casts no doubt on longstanding prohibitions on the possession of firearms by felons. Thus, as its text and historical record establish, the Second Amendment does not protect selling firearms to felons, because felons have no right to possess firearms in the first place.

Similarly, in *Bruen*, the Supreme Court explicitly approved of licensing regimes that do not encroach on law-abiding citizens' ability to exercise their Second Amendment right. This Court's *en banc* decision in *Teixeira* stands for the same principle. *See* 873 F.3d at 682-86. The unlicensed-dealing prohibition, 18 U.S.C. § 922(a)(1)(A), encroaches on no one's right: it requires only that those individuals who wish to sell or manufacture firearms commercially obtain a license. Individuals otherwise remain free to possess or acquire firearms, and even to sell or manufacture firearms for a non-commercial purpose. The statute does not implicate, much less infringe upon, law-abiding citizens' right to possess and carry firearms for self-defense. This Court should affirm.

3

## II

## ISSUES PRESENTED

A.      Whether 18 U.S.C. § 922(d)(1)—the law prohibiting the sale or transfer of firearms to felons—is unconstitutional on its face or as applied to Schlotterbeck.

B.      Whether 18 U.S.C. § 922(a)(1)(A)—the law requiring individuals to apply for and obtain a license to engage in the business of manufacturing firearms—is unconstitutional on its face or as applied to defendants.

## III

## STATEMENT OF THE CASE

### A.   Jurisdiction, Timeliness, and Bail Status

The district court's jurisdiction rested on 18 U.S.C. § 3231.  This Court's jurisdiction rests on 28 U.S.C. § 1291.  The district court entered judgment on November 17, 2022.  (1-ER-2-11.)[1]  Schlotterbeck

---

[1]  "ER" refers to defendants' Excerpts of Record.  "AOB" refers to Appellant's Joint Opening Brief and is followed by applicable page numbers.  "PSR" refers to the Presentence Investigation Report and is followed by applicable paragraph references.  Each PSR is designated by the applicable defendant along with paragraph references.  "CR"

(continued  . . . .)

filed a timely notice of appeal on November 23, 2022 (3-ER-495), and

Vlha filed a timely notice of appeal on November 22, 2022 (3-ER-496).

*See* Fed. R. App. P. 4(b)(1)(A)(i).  Neither defendant is in custody.

**B.    Statement of Facts and Procedural History**

   ***1.    Defendants' unlicensed gun-manufacturing business***

   For two years, defendants and their co-conspirators manufactured

and sold semi-automatic AR-15 firearms without a license in Bellflower,

California.  (Schlotterbeck PSR ¶¶ 15-21; Vlha PSR ¶¶ 15-21; *see also* 2-

ER-198-202, 218-22; *see generally* CR 168 (sentencing position with

additional details, pictures, and accompany exhibits).)

   The business worked as follows: defendants took custom orders;

obtained firearm parts, including unfinished lower receivers; arranged

to have cavities, or holes, drilled into the lower receivers; and then

attached the lower receivers to upper receivers and barrels to construct

completed AR-15-type firearms.  (Schlotterbeck PSR ¶¶ 17-19; Vlha

PSR ¶¶ 17-18; *see also* 3-ER-199-200, 220; CR 168 at 3-4.)  Defendants

then applied a customizable protective coating before selling the assault

---

refers to the Clerk's Record in the district court and is followed by the
docket number and page number.

weapons to customers. (Schlotterbeck PSR ¶¶ 17-19; Vlha PSR ¶¶ 17-18; *see also* 3-ER-200, 220.) Not one of the firearms that defendants built and sold had a serial number. (Schlotterbeck PSR ¶ 18; Vlha PSR ¶ 17.) That meant defendants manufactured and sold untraceable assault weapons—"ghost guns." (Schlotterbeck PSR ¶ 18; Vlha PSR ¶ 17; CR 168 at 1, 5.)

During this time, unbeknownst to defendants, they manufactured and sold six AR-15-type firearms—three rifles and three pistols—to a confidential informant and undercover federal agents. (Schlotterbeck PSR ¶ 20; Vlha PSR ¶ 19.) In July 2015, the confidential informant first learned about defendants' illegal gun-manufacturing business, alerted law enforcement, and then, at law enforcement's direction, met with Schlotterbeck to learn more about the business. (CR 168 at 4; 3-ER-458.) During the initial meeting, Schlotterbeck boasted that he and his team, including Vlha, built AR-15s "from the ground up" and "all the time." (CR 168 at 6; *see also* 168-2 at 1; 168-3 at 1; 3-ER-458.) Around this time, the informant disclosed to Schlotterbeck that he had a felony conviction. (2-ER-202; 3-ER-458-89.) Unfazed, Schlotterbeck took the informant's firearm order and a down payment. (3-ER-458-59.)

6

Several weeks later, in September 2015, defendants constructed the below AR-15-type firearm—*i.e.*, they had a lower receiver drilled out and attached it to an upper receiver and a barrel—and sold it to the informant for $2,000:



(CR 168 at 5; *see also* Schlotterbeck PSR ¶ 20(a); Vlha PSR ¶ 19(a); 3-ER-200, 220; 3-ER-459.)

Following this first deal, Schlotterbeck continued to boast about his work and welcomed new customers. (CR 168 at 7; 168-7.) For example, he called the informant and bragged about the above-pictured firearm, claiming it was "one of the . . . best builds . . . we've ever done." (CR 168 at 7; 168-7 at 1.) The informant offered to refer customers, and Schlotterbeck responded, "please do." (CR 168 at 8; 168-7 at 1.) A few days after that, an undercover agent, who attended the first deal with the informant, called Schlotterbeck to discuss a potential firearm order. (CR 168 at 8.) The undercover agent also told Schlotterbeck, "I could

probably get you some more business too, brother;" Schlotterbeck

responded, "Great." (CR 168 at 8; CR-168-16 at 2.)

Next, in mid-October 2015, the informant and undercover agent

met with defendants who spoke at length about building and selling

custom AR-15-type firearms. Vlha, for example, discussed keeping a

low profile, stating that "when it comes to guns it's [sic] like . . . who do

you know that's not gonna open his mouth." (CR 168-21 at 2.) Vlha

also discussed the time and labor spent obtaining parts: it "takes about

a week to get everything, uh, because we'll have to get things from

different places." (3-ER-460.) Schlotterbeck, for his part, pitched prices

and quality, noting that they charge at least $1,200 for a "basic, but

like, decent gun" and emphasizing that customers cannot buy guns like

theirs in a store. (*Id.*) The undercover agent then ordered an AR-15-

type rifle and paid a down payment. (3-ER-460.) Later that month,

defendants built the below AR-15-type rifle, and sold it to the

undercover for $1,500:



(CR 168 at 5; *see also* Schlotterbeck PSR ¶ 20(b); Vlha PSR ¶ 19(b); 2-ER-200-201, 221; 3-ER-460.)

Next, in December 2015 and January 2016, the undercover agent ordered an AR-15 type firearm from Vlha and another co-conspirator. (3-ER-460.)[2]  During an in-person meeting in January 2016, defendants advised that they would use a finished lower receiver—*i.e.*, one that was already drilled out and ready to be attached to an upper receiver—to build the undercover's next firearm.  (3-ER-461.)  Schlotterbeck explained that they already "got a bunch [of lower receivers] done for people," and Vlha explained that they use drilled-out lower receivers for "returning customers."  (*Id.*)  After ordering a firearm, the undercover agent told Schlotterbeck about friends who were interested in buying firearms, to which Schlotterbeck responded, "Yeah, bring them in."  (CR 168 at 8; CR 168-17 at 1.)  The group then discussed when the undercover's firearm would be ready, and Schlotterbeck explained that

---

[2] This co-conspirator, Ping-Yi Kwan, was charged in an information in a separate proceeding for possessing an unregistered firearm and engaging in the business of manufacturing and dealing. *See United States v. Ping Yi-Kwan*, 19-CR-00292-GW, Dkt. 1 (May 13, 2019).  The district court sentenced him to 24 months of probation.  *See id.*, Dkt. 79 (Jan. 24, 2023).

he could not give an exact date, because defendants had multiple guns to build for other customers. (CR-168 at 7; CR-168-9 at 3 (Schlotterbeck stating he would keep the undercover "posted" because defendants received "two builds that [they] just got the parts in [for] today.").) A month later, in February 2016, defendants completed their build of the below AR-15-type pistol for the undercover, which they sold, along with multiple high-capacity ammunition magazines, for $1,600:



(CR 168 at 5; *see also* Schlotterbeck PSR ¶ 20(c); Vlha PSR ¶ 19(c); 2-ER-201, 221; 3-ER-461.)

Defendants built and sold three more AR-15-type firearms to the government customers over the ensuing months. In mid-March 2016, defendants built and sold an "Ironman"-themed AR-15-type firearm, as depicted below, and magazines to the undercover's associate—another undercover law-enforcement officer posing as a firearm customer—for $1,530. (Schlotterbeck PSR ¶ 20(d); Vlha PSR ¶ 19(d); *see also* 2-ER-

201, 221; 3-ER-461-62; CR 168 at 5.) And in May 2016, defendants built and sold an AR-15-type pistol with a "Stormtrooper" finish, as depicted below, along with a high-capacity magazine, for $1,770. (Schlotterbeck PSR ¶ 20(e); Vlha PSR ¶ 19(e); 2-ER-201, 221.)





(CR 168 at 5.) When the undercover agents went to pick up the Stormtrooper-firearm, Schlotterbeck and Vlha again talked about their thriving business, with Vlha boasting that they "always" have a firearm to build. (3-ER-463; *see also* CR 168-10 at 1.) A month later, in June 2016, an undercover ordered an AR-15-type firearm (3-ER-463), and two days later, defendants built and sold the below weapon, along with a high-capacity ammunition magazine, to the undercover for $1,600:



(Schlotterbeck PSR ¶ 20(f); Vlha PSR ¶ 19(f); *see also* 2-ER-201, 221; 3-ER-463; CR 168 at 5.)  In total, defendants earned $10,000 for the firearms they built and sold to the informant and undercover agents. (2-ER-200-202, 220-222.)  Not one of these assault weapons had a serial number.  (Schlotterbeck PSR ¶ 18; Vlha PSR ¶ 17.)

Defendants did not confine their unlicensed gun-manufacturing business to the informant or undercover officers.  (Schlotterbeck PSR ¶ 21; Vlha PSR ¶ 21.)  To the contrary, they repeatedly boasted that they built AR-15s "all the time" (CR 168-3 at 1; 168-8 at 1); constructed multiple guns at once (CR-168-9 at 2); and "always" had a firearm to build (CR 168-10 at 1).  Consistent with those statements, Schlotterbeck's phone contained numerous photographs of AR-15-type firearms and parts in various stages of construction (CR 168-14), and conversations with non-government customers requesting builds for AR-15-type assault weapons (CR 168 at 7-8).  Those conversations reflected Schlotterbeck's indifference to where his guns were going.

(*See, e.g.*, 168-12 at 1 (sending a price quote to a customer who suggested he was buying "ar's" to resell to others).)

But even if defendants didn't care where their guns ended up, they cared quite a bit about who knew of their business. (*See, e.g.*, CR 168-20 at 1 (Vlha stating that the undercover agent could refer friends if "it's someone that you can say, like, you'll give them, like your word"); CR 168-21 at 2 (Vlha stating "when it comes to guns it's [sic] like . . . who do you know that's not gonna open his mouth"); CR 168-19 at 2 (Schlotterbeck encouraging the undercover agent to bring customers if the undercover could "trust them"). Defendants thus wanted not only to sell firearms but to sell firearms without any oversight.

### 2. *Defendants' charges*

Defendants were indicted in a three-count indictment in June 2019. (3-ER-484-94.) Both defendants were charged with conspiracy to engage in the business of manufacturing and dealing in firearms without a license, in violation of 18 U.S.C. §§ 371, 922(a)(1)(A) (Count One); and with engaging in the business of manufacturing and dealing in firearms without a license, in violation of 18 U.S.C. § 922(a)(1)(A), for building and selling the AR-15-type firearms (Count Two). (3-ER-484-

13

91.)  In addition, Schlotterbeck was charged with selling a firearm to a felon, in violation of 18 U.S.C. § 922(d)(1) (Count Three).  (3-ER-492.)

### 3.  *Defendants' motion to dismiss under* Bruen

In June 2022, the Supreme Court decided *Bruen*.  There, the Court held that the Second Amendment protects a right to carry guns as well as possess them, and instructed lower courts to look at "text and history" when assessing the constitutionality of a particular regulation—as opposed to engaging in an "interest-balancing inquiry." 142 S. Ct. at 2129 (quotation marks omitted).  In clarifying the legal standard, the Court explained that "nothing" in its "analysis should be interpreted to suggest the unconstitutionality" of "licensing regimes," *id.* at 2138 n.9, and three concurring justices reiterated that the Court's holding casted no "doubt on the longstanding prohibitions on the possession of firearms by felons, . . . or laws imposing conditions and qualifications on the commercial sale of arms."  *Id.* at 2162 (Kavanaugh, J., joined by Roberts, C.J., concurring) (quotation marks omitted); *id.* at 2157 (Alito, J., concurring).

Shortly thereafter, defendants moved to dismiss the three-count indictment based on *Bruen*.  (3-ER-382-89.)  They claimed that

14

§ 922(d)(1) (the law prohibiting selling firearms to felons) and

§ 922(a)(1)(A) (the law requiring a license to engage in the business of

gun-manufacturing) were unconstitutional on their face and as applied

to them. (3-ER-386-89.)

In opposition, the government argued that *Bruen* did not extend

the Second Amendment to felons or expand the right to "keep and bear

arms" to include selling guns without a license. (2-ER-329-353.) *Bruen*

simply held that the Amendment's plain text—"keep and bear"— covers

"'an individual's right to possess and carry weapons in case of

confrontation.'" (2-ER-340 (quoting *Bruen*, 142 S. Ct. at 2128).) It did

not expand that right to include selling firearms to felons or running a

gun-manufacturing business without a license. (2-ER-337-52.) To the

contrary, the Supreme Court—as it had in *District of Columbia v.*

*Heller*, 554 U.S. 570, 626-27, 636 (2008), and *McDonald v. City of*

*Chicago*, 561 U.S. 742, 786 (2010)—confirmed that "nothing" in *Bruen*

"'should be taken to cast doubt on longstanding prohibitions on the

possession of firearms by felons and the mentally ill . . . or laws

imposing conditions and qualifications on the commercial sale of arms.'"

*Bruen*, 142 S. Ct. at 2162 (Kavanaugh, J., joined by Roberts, C.J.,

concurring) (quoting *Heller*, 554 U.S. at 626-27 & n.26 and *McDonald*, 561 U.S. at 786); *see also id.* at 2159 (Alito, J., concurring) ("All that we decide in this case is that the Second Amendment protects the right of law-abiding people to carry a gun outside the home for self-defense."). As a result, as the government explained before the district court, *Bruen* did not disturb this Court's (and others') pre-*Bruen* precedents upholding laws disarming felons, criminalizing sales to felons, or requiring a license to engage in a firearms business. (3-ER-345-50 (citing cases).)

As to laws disarming felons and criminalizing sales to felons, the government primarily relied on *Vongxay*, 594 F.3d at 1115, 1118, which held that "'felons are categorically different from the individuals who have a fundamental right to bear arms.'" (2-ER-349.) That principle—that felons are not "law-abiding citizens," *Bruen*, 142 S. Ct. at 2122—refuted the premise of defendants' argument that § 922(d)(1) is unconstitutional because § 922(g)(1), the federal law disarming felons, is unconstitutional. (2-ER-348-52.) If there is no right to possess a gun as a felon, there is no right to sell a gun to a felon. (2-ER-347-52.)

As to § 922(a)(1)(A), the government primarily relied on *Teixeira*, in which an *en banc* panel of this Court conducted an extensive textual and historical analysis of the Second Amendment and held that (i) "[n]othing in the specific language of the Amendment suggests that sellers fall within the scope of its protection" and (ii) "[n]o historical authority suggests that the Second Amendment protects an individual right to *sell* a firearm unconnected to the rights of citizens to 'keep and bear' arms." 873 F.3d at 683-87 (reviewing the historical record dating back to early English law through the Founding). Thus, the government concluded, the Second Amendment's plain text also does not protect defendants' charged conduct—unlicensed manufacturing of firearms for sale. (2-ER-346.)

Throughout its opposition, the government made clear that the district court need not engage in a historical analysis of analogous firearm regulations because the Second Amendment's plain text did not cover any of defendants' charged crimes. But the government nevertheless referred to the "numerous" historical examples (3-ER-347) of colonial governments controlling the firearms trade detailed in *Teixeira*, 873 F.3d at 685-86.

17

### 4. The district court's decision denying defendants' motion to dismiss

The district court denied defendants' motion from the bench. (1-ER-14-28.) While engaging in a back-and-forth with both parties, the court recognized that *Bruen* rejected the two-step analysis deployed by the courts of appeals in the wake of *Heller*, but it explained that the Second Amendment's language is "clear" and does not cover the charged conduct in this case. (1-ER-17; *see also* 1-ER-21.) The court—pushing back on the claim that it should immediately start searching for historical analogues—noted that defense counsel was skipping a step, because *Bruen* stands for the proposition that "when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct." (1-ER-21.) That, the court reasoned, is "not what we have here," because the plain text does not cover selling firearms generally or to a convicted felon in particular. (1-ER-21; *see also* 1-ER-28 (noting that the "same analysis" applies to the unlicensed-manufacturing count.)

The court also relied on *Heller*. It explained that *Bruen* followed *Heller*, where the Supreme Court pronounced that "nothing" in its decision "should be taken to cast doubt on the longstanding prohibitions

18

on the possession of firearms by felons . . . or laws imposing conditions and qualifications on the commercial sale of firearms." (1-ER-16, 23.) The district court further reasoned that *Bruen* "did not consider" any of the longstanding prohibitions recognized by *Heller* and thus did not change the "landscape as to this particular case." (1-ER-16.)

### 5. *Defendants' guilty pleas and sentencings*

Defendants pleaded guilty (2-ER-184-85) pursuant to written plea agreements (2-ER-192-231). In their plea agreements, they reserved the right to appeal the district court's decision denying their motion to dismiss the indictment based on *Bruen*. (2-ER-192-93, 214-15.)

The district court held sentencing proceedings in November 2022. (2-ER-70-135.) Based on a criminal history category of I and an offense level of 20, Schlotterbeck faced a Sentencing Guidelines range of 33 to 41 months' imprisonment. (Schlotterbeck PSR ¶ 96.) The district court sentenced Schlotterbeck to three months in prison—30 months below the low-end of the applicable Guidelines range. (2-ER-131; 1-ER-2.) As for Vlha, based on a criminal history category of I and an offense level of 10, he faced a Sentencing Guidelines range of 8 to 14 months'

imprisonment.  (Vlha PSR ¶ 90.)  The district court sentenced Vlha to time served (2-ER-102), meaning one day in prison (Vlha PSR at 1).

## IV

## SUMMARY OF ARGUMENT

In *Heller*, *McDonald*, and *Bruen*, the Supreme Court has consistently interpreted the Second Amendment, on the basis of text and history, to guarantee law-abiding citizens the right to possess and carry arms for self-defense.  Before *Bruen*, following *Heller*, this Court reached the same conclusion: that felons are "categorically" excluded from the Second Amendment because they are not law-abiding citizens. *Vongxay*, 594 F.3d at 1115.  And in *Teixeira*, the *en banc* Court held that the Second Amendment permits commercial regulations that do not infringe on law-abiding citizens' ability to acquire and possess firearms, 873 F.3d at 686-87.  This Court's decisions in *Vongxay* and *Teixeira*—which defendants ignore entirely—foreclose their arguments in this case.

*Bruen* reinforced these precedents.  *Vongxay* and *Teixeira* both used the "text-and-history" approach approved by *Bruen* rather than the "means-end" balancing it rejected.  142 S. Ct. at 2130 n.6.  And in

*Bruen*, the Court reiterated over a dozen times that the Second Amendment right as historically understood belongs to "'law-abiding, responsible citizens.'" *E.g.*, 142 S. Ct. at 2131. Accordingly, the Court endorsed "shall-issue" licensing schemes for carrying firearms that ensure only law-abiding citizens will do so. *Id.* at 2138 n.9. Indeed, six justices explicitly clarified that *Bruen* casts no doubt on longstanding laws that disarm felons and impose conditions or qualifications on the commercial sale of firearms. *Id.* at 2162 (Kavanaugh, J., joined by Roberts, C.J., concurring); *id.* at 2157 (Alito, J., concurring); *id.* at 2189 (Breyer, J., joined by Sotomayor and Kagan, JJ., dissenting).

Against this legal backdrop, neither the felon-selling prohibition in § 922(d)(1) nor the licensing requirement in § 922(a)(1)(A) violate the Second Amendment. Felons have no right to obtain and possess firearms. *Vongxay*, 594 F.3d at 1118. And the Second Amendment, as a matter of both text and historical understanding, permits legislatures to regulate the firearms *trade* as long as those regulations do not infringe on any law-abiding citizen's right to "keep and bear" arms. *Teixeira*, 873 F.3d at 686-87. Indeed, § 922(a)(1)(A) leaves individuals free to possess and acquire firearms, and even to sell or manufacture

21

firearms for a non-commercial purpose.  All that the statute requires is that individuals obtain a license to engage in a firearms business. Defendants have not shown, and cannot show, that any law-abiding citizen's ability to acquire, and thus possess, a firearm has been implicated, much less infringed.

Accordingly, this Court should affirm defendants' convictions.

# V

# ARGUMENT

## A.    Standard of Review

This Court reviews the constitutionality of a statute *de novo*. *Vongxay*, 594 F.3d at 1114.

## B.    The Second Amendment Allows Commercial Restrictions That Do Not Infringe on a Law-Abiding Citizen's Right to Keep and Bear Arms

### 1.    *The Second Amendment protects the right of a law-abiding citizen to possess and carry weapons*

The Second Amendment provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed."  U.S. Const. amend. II.  In *District of Columbia v. Heller*, the Supreme Court held, "on the basis of both text and history, that the Second Amendment conferred an

individual right to keep and bear arms." 554 U.S. 570, 595 (2008). In doing so, the Court interpreted the operative language of the Amendment—"keep and bear Arms"—and explained that "the most natural reading of 'keep Arms' . . . is to 'have weapons'" and that "'bear arms'" is naturally read to mean "'wear, bear, or carry . . . upon the person or in clothing or in a pocket for the purpose . . . of being armed and ready for offensive or defensive action in case of conflict with another person.'" *Id.* at 582, 84. From there, the Court determined that the Amendment "protects the 'law-abiding, responsible' citizen's possession of arms for the 'lawful purpose of self-defense.'" *United States v. Alaniz*, 69 F.4th 1124, 1127 (9th Cir. 2023) (quoting *Heller*, 554 U.S. at 576-603).

*Heller* specifically identified the right to keep and bear arms as belonging to "law-abiding, responsible citizens." *Id.* at 635. As the Court explained, "the right secured by the Second Amendment is not unlimited." 554 U.S. at 626; *cf. id.* at 635 (noting by way of analogy that certain types of speech, including "obscenity, libel, and disclosure of state secrets," fall outside the scope of the First Amendment's free-speech clause). The Court specifically stated that "nothing in [its]

23

opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill . . . or laws imposing conditions and qualifications on the commercial sale of arms"—all of which the Court deemed "presumptively lawful." *Id.* at 626-27 & n.26.  Indeed, when discussing the plaintiff (Heller) himself, the Court held that he would be entitled to keep a handgun in his home "[a]ssuming" that he is "not disqualified from the exercise of Second Amendment rights." *Id.* at 635; *see also id.* at 631 (noting the assumption that Heller was "not a felon").

The Court has adhered to this understanding in the decades since *Heller* was decided.  Two years after *Heller*, in *McDonald v. City of Chicago*, a plurality of the Court similarly observed that the Second Amendment protects "the safety of . . . law-abiding members of the community."  561 U.S. at 790.  There, the Court also "repeat[ed]" the "assurances" that *Heller* "did not cast doubt on such longstanding regulatory measures as 'prohibitions on the possession of firearms by felons . . . , or laws imposing conditions and qualifications on the commercial sale of firearms.'"  *Id.* at 786 (quoting *Heller*, 554 U.S. at 626-27).

24

And this Court, too, has followed *Heller* and *McDonald* to hold that the Second Amendment protects the right of law-abiding, responsible citizens to possess arms in self-defense. In *Vongxay*, this Court rejected a nonviolent felon's claim that § 922(g)(1) violated his Second Amendment rights and reasoned that felons are "categorically different from the individuals who have a fundamental right to bear arms." 594 F.3d at 1115, 1118. To reach that conclusion, the Court relied on passages from *Heller* noted above and concluded that "[n]othing in *Heller* can be read legitimately to cast doubt on the constitutionality of § 922(g)(1)." *Id.* at 1114-15. This Court also examined "cases from other circuits and [] historical gun restrictions." *Id.* at 1116-17. And while recognizing that the "historical question" had not been "definitively resolved," this Court concluded that "most scholars of the Second Amendment agree that the right to bear arms was 'inextricably . . . tied to' the concept of a 'virtuous citizen[ry],'" which excludes criminals. *Id.* at 1118 (quoting Don B. Kates, Jr., *The Second Amendment: A Dialogue*, 49 Law & Contemp. Probs. 143, 146 (1983), and citing Glenn Harlan Reynolds, *A Critical Guide to the Second Amendment*, 62 Tenn. L. Rev. 461, 480 (1995)).

*Vongxay* did not—even as an alternative holding—discuss, much less engage in, intermediate scrutiny, strict scrutiny, or any "means-end" scrutiny balancing the costs and benefits of barring felons from Second Amendment protections. *Cf.* 594 F.3d at 1117 (mentioning "heightened scrutiny" only to describe the Fifth Circuit's pre-*Heller* precedent). Instead, *Vongxay* based its holding on *Heller'*s "analy[sis] [of] the history of the Second Amendment." 594 F.3d at 1115. And this Court has since relied on *Vongxay* to repeatedly hold that the Second Amendment does not confer a right of possession on felons.[3] Nor is *Vongxay* an outlier: post-*Heller*, every other court of appeals to address

---

[3] *See, e.g.*, *United States v. Phillips*, 827 F.3d 1171, 1173-74 (9th Cir. 2016); *Van Der Hule v. Holder*, 759 F.3d 1043, 1050-51 (9th Cir. 2014); *cf. United States v. Chovan*, 735 F.3d 1127, 1144-45 (9th Cir. 2013) (Bea, J., concurring) (observing that "*Heller* seemed to equate the status of a felon . . . with a presumptive disqualification from the Second Amendment right," because "[t]hroughout history, felons have been subject to forfeiture and disqualification"); *Mai v. United States*, 974 F.3d 1082, 1091, 1093-94 (9th Cir. 2020) (Bumatay, J., joined by Ikuta, Bade, Hunsaker, JJ., dissenting from denial of rehearing en banc) (citing *Vongxay* and Blackstone for the proposition that felons can be permanently dispossessed of the right to bear arms).

the issue has reached the same conclusion with respect to persons

convicted of felony offenses.[4]

### 2. *The Second Amendment does not create a freestanding right to sell firearms*

In defining the scope of the Second Amendment—*i.e.*, the right of

law-abiding citizens to possess and carry firearms for self-defense—this

Court has also recognized that the Amendment protects "ancillary

rights necessary to the realization of the core right to possess a firearm

for self-defense." *Teixeira*, 873 F.3d at 677; *see also Andrews v. State*,

50 Tenn. 165, 178 (1871) ("The right to keep arms, necessarily involves

---

[4] *See United States v. Torres-Rosario*, 658 F.3d 110, 113 (1st Cir. 2011); *United States v. Bogle*, 717 F.3d 281, 281 (2d Cir. 2013) (per curiam); *Hamilton v. Pallozzi*, 848 F.3d 614, 625-27 (4th Cir. 2017); *United States v. Scroggins*, 599 F.3d 433, 451 (5th Cir. 2010); *United States v. Carey*, 602 F.3d 738, 741 (6th Cir. 2010); *United States v. Williams*, 616 F.3d 685, 692 (7th Cir. 2010); *United States v. Woolsey*, 759 F.3d 905, 909 (8th Cir. 2014); *United States v. McCane*, 573 F.3d 1037, 1047 (10th Cir. 2009); *United States v. Rozier*, 598 F.3d 768, 770-71 (11th Cir. 2010); *Medina v. Whitaker*, 913 F.3d 152, 157-60 (D.C. Cir. 2019). Only the Third Circuit, in *Range v. Attorney General*, 69 F.4th 96, 98-99, 106 (3d Cir. 2023) (en banc), has held that § 922(g)(1) is unconstitutional as applied to a petitioner with a state *misdemeanor* conviction for making a false statement to obtain food stamps. This "narrow" decision, *id.* at 106, did not address whether § 922(g)(1) is unconstitutional as applied to felons, nor conflicts with the conclusion (adopted by every other circuit to consider the issue) that § 922(g)(1) is constitutional as applied to felons.

27

the right to purchase them, to keep them in a state of efficiency for use, and to purchase and provide ammunition suitable for such arms."). Such "ancillary rights" include possessing ammunition, practicing firing the weapon, and acquiring the weapon in the first place. 873 F.3d at 677-78. But the Second Amendment does not confer "a freestanding right, wholly detached from any customers ability to acquire firearms, upon a proprietor of a commercial establishment to sell firearms." *Id.* at 682. "Keep and bear" does not include "sell or trade." *Id.* at 683; *see also id.* at 689 ("the act of selling firearms is not part or parcel of the right to 'keep and bear arms'"). "Nothing in the text of the Amendment . . . confers an independent right to sell or trade weapons." *Id.* at 683 (noting that no Founding-era state constitution "extend[ed] to those who would engage in firearms commerce" and that the "right to sell firearms was not within the historical understanding" of the right in 17th and 18th century England).

As *Teixeira* explained, the question is whether any regulation of the ancillary right "meaningfully constrain[s]" someone's actual right. *Id.* at 680. In *Teixeira*, a gun-store owner challenged a county ordinance that prohibited gun stores from being located within 500 feet

of schools, day care centers, liquor stores, other gun stores, and residential neighborhoods. *Id.* at 674. The gun-store owner claimed, among other things, that the Second Amendment guaranteed a "right to sell firearms," "independent of the rights of his potential customers." *Id.* at 681. But this Court disagreed, explaining that the holder of the right was the gun *buyer* (and ultimate possessor), and that there was no evidence that a single "honest-to-God resident" of the county could not "lawfully buy a gun nearby." *Id.* at 680-81. Driving a little further or "walking a few extra blocks" to buy a gun is not an infringement on anyone's right to keep and bear arms. *Id.* (quotation marks omitted). This Court contrasted that to the very different situation presented by a regulation that effectively banned the sale of firearms anywhere in the county. *Id.* at 679 (discussing *Ezell v. City of Chicago*, 846 F.3d 888 (7th Cir. 2017), where zoning regulations prevented any firing range from operating within city limits). The threshold question is necessarily whether a given regulation "infringe[s]" on someone's right to "keep and bear" arms—if not, the Second Amendment is not implicated. *Id.*[5]

---

[5] Following *Heller*, other courts of appeals agree. *See, e.g.*, *United States v. Focia*, 869 F.3d 1269, 1286 (11th Cir. 2017) (upholding
(continued . . . .)

*Teixeira*, like *Vongxay*, did not apply intermediate scrutiny, strict scrutiny, or any "means-end" scrutiny balancing the costs and benefits of the ordinance at issue. To the contrary, the Court "conduct[ed] a full textual and historical review," *id.* at 683, examining the Second Amendment's text and history at length, *see id.* at 683-90, before concluding that the ordinance limiting a gun store's ability to sell in a certain location did "not burden conduct falling within the Amendment's scope." *Id.* at 690. And without a direct violation of the

---

§ 922(a)(5), which prohibits an unlicensed person from transferring a firearm to an out-of-state unlicensed person, because the prohibition "does not operate to completely prohibit [defendant] or anyone else, for that matter, from selling or buying firearms"); *United States v. Hosford*, 843 F.3d 161, 168 (4th Cir. 2016) (upholding § 922(a)(1)(A) because it "does not touch on the Second Amendment's core protections," as individuals "remain free to possess firearms for self-defense" and "purchase or sell firearms owned for personal, self-defensive use"); *United States v. Bacon*, 884 F.3d 605, 611-12 (6th Cir. 2018) (upholding § 922(d)(1) and finding no "historical indication that the Second Amendment encompasses such sales" to felons); *see also United States v. Castro*, 2011 WL 6157466, at *1 (9th Cir. Nov. 28, 2011) (rejecting argument that "prosecution for dealing weapons violates the Second Amendment" on the grounds that the "Supreme Court has made it clear that the government can continue to regulate commercial gun dealing") (citing *Heller*, 554 U.S. at 626-27, and *McDonald*, 561 U.S. at 790); *United States v. Chafin*, 423 F. App'x 342, 344 (4th Cir. 2011) (rejecting challenge to § 922(a)(1)(A) and holding that "although the Second Amendment protects an individual's right to bear arms, it does not necessarily give rise to a corresponding right to sell a firearm.").

plaintiff's right to sell guns, or any indirect violation of a customer's right to "keep and bear" them, there could be no Second Amendment violation.

### 3. Bruen *reaffirmed* Heller, McDonald, *and this Court's precedents*

Defendants make no argument that *Bruen* overruled this Court's historical holding in *Vongxay* that felons have no right to possess guns or its textual holding in *Teixeira* that there is no freestanding right to sell guns. Indeed, defendants fail to cite *Vongxay* or *Teixeira* in their brief. But in any event, *Vongxay* and *Teixeira* are still good law, and undisturbed by *Bruen*.

*Bruen* did not "upend" every Second Amendment decision that has ever been decided. (*Contra* AOB 1, 9.) Rather, *Bruen* instructed courts to look to the "text and history" of the Second Amendment to determine its scope, as the Court did in *Heller*, 554 U.S. at 595, and as this Court did *Vongxay*, 594 F.3d at 1115, 1118 (relying on the historical analysis in *Heller* and by "scholars of the Second Amendment"), and *Teixeira*, 873 F.3d at 682-90 (conducting a "full textual and historical review"). All the Supreme Court did in *Bruen* was to reaffirm this focus on "the

Second Amendment's text, as informed by history." 142 S. Ct. at 2127; *see also id.* at 2128-29 ("constitutional text and history").

In *Bruen*, the Court examined a state licensing regime for the public carrying of handguns that required applicants to demonstrate a "special need" to carry a gun in public. *Id.* at 2122. Both the applicants and the state agreed that the Second Amendment (as incorporated by the Fourteenth Amendment) "protect[s] the right[s]" of "ordinary, law-abiding citizens . . . to carry handguns publicly for their self-defense." *Id.*; *see also id.* at 2134 (looking to the Second Amendment's text and explaining that "'bear' naturally encompasses public carry"). The court of appeals, however, had upheld the "special need" licensing regime on the ground that it satisfied intermediate scrutiny—*i.e.*, that restricting the right to bear arms in public to those with a special need was "substantially related to the achievement of an important governmental interest." *Id.* at 2125 (quotation marks omitted).

*Bruen* rejected such an "interest-balancing inquiry" or "means-end test" as inconsistent with *Heller*. *Id.* at 2129 (quotation marks omitted). Rather than apply a freestanding standard that "asks whether the statute burdens a protected interest in a way or to an extent that is out

of proportion to the statute's salutary effects upon other important governmental interests," a court should look to "text and history" to "defin[e] the character of the right" or "the outer limits of the right," or to "assess[] the constitutionality of a particular regulation." *Id.* (quotation marks omitted). *Bruen* then undertook a lengthy historical analysis, *id.* at 2138-56, concluding that a state cannot "prevent[] law-abiding citizens with ordinary self-defense needs from exercising their right to keep and bear arms" in public. *Id.* at 2156.

Nothing in *Bruen* undermines this Court's precedents; to the contrary, it reaffirms them. Neither *Vongxay* nor *Teixeira* engaged in the "means-end test" that *Bruen* rejected. And *Bruen*, like *Heller* and *Vongxay*, excluded felons from "the people" protected by the Second Amendment. *See* 142 S. Ct. at 2134 ("It is undisputed that petitioners Koch and Nash—two ordinary, law-abiding, adult citizens—are part of 'the people' whom the Second Amendment protects." (citing *Heller*, 554 U.S. at 580)); *see also, e.g.*, *Heller*, 554 U.S. at 635 ("law-abiding, responsible citizens"). In fact, *Bruen* repeatedly interpreted the right as belonging to "law-abiding" citizens, using that phrase no fewer than 14

times throughout the opinion,[6] and more in the concurrences.[7]  Indeed, consistent with the understanding that felons have no right to own guns, *Bruen* approved of "shall-issue" state licensing regimes that "often require applicants to undergo a background check or pass a firearms safety course," reasoning that such requirements "are designed to ensure only that those bearing arms in the jurisdiction are, in fact, 'law-abiding, responsible citizens.'"  *Id.* at 2138 & n.9 (quoting *Heller*, 554 U.S. at 635).

---

[6] *See, e.g.*, *Bruen*, 142 S. Ct. at 2125 ("law-abiding, adult citizens"); *id.* at 2131 ("law-abiding, responsible citizens") (citation omitted); *id.* at 2133 ("a law-abiding citizen's right to armed self-defense" and "law-abiding citizens"); *id.* at 2134 ("ordinary, law-abiding, adult citizens"); *id.* at 2135 n.8 ("law-abiding citizens"); *id.* at 2138 ("law-abiding citizens"); *id.* at 2138 n.9 (" 'law-abiding, responsible citizens'" and "ordinary citizens") (citation omitted); *id.* at 2149 ("the responsible") (citation omitted); *id.* at 2150 ("law-abiding citizens" and "responsible arms carrying"); *id.* at 2156 ("law-abiding, responsible citizens" and "law-abiding citizens").

[7] *See Bruen*, 142 S. Ct. at 2157 (Alito, J., concurring) ("law-abiding residents"); *id.* at 2158 ("law-abiding citizens" and "[o]rdinary citizens"); *id.* at 2159 ("law-abiding person," "right of law-abiding people," "law-abiding New Yorker," and "ordinary person"); *id.* at 2161 ("right of ordinary law-abiding Americans"); *id.* at 2161 (Kavanaugh, J., joined by Roberts, C.J., concurring) ("ordinary, law-abiding citizens") (citation omitted).

Further, three justices who joined the Court's decision clarified the limits of *Bruen*, expressly noting that laws prohibiting possession of firearms by felons and imposing conditions and qualifications on the commercial sale of arms remain constitutional. *See id.* at 2162 (Kavanaugh, J., joined by Roberts, C.J., concurring) (reiterating that "longstanding prohibitions on the possession of firearms by felons" and "laws imposing conditions and qualifications on the commercial sale of arms" are constitutional under *Heller* and *McDonald* (quotation marks omitted)); *id.* at 2157 (Alito, J., concurring) (explaining that *Bruen* did not "disturb[] anything that [the Court] said in *Heller* or *McDonald* about restrictions that may be imposed on the possession or carrying of guns" (citation omitted)). Justice Alito made the point clearly: "All that we decide in this case is that the Second Amendment protects the right of law-abiding people to carry a gun outside the home for self-defense." *Id.* at 2159; *see id.* at 2157 ("Our holding decides nothing about who may lawfully possess a firearm or the requirements that must be met to buy a gun.") (Alito, J., concurring).[8]

---

[8] In total, eight members of the *Bruen* Court—every member but Justice Barrett—has joined an opinion endorsing *Heller*'s and

(continued  . . . .)

### 4. History confirms the Second Amendment's meaning, as interpreted by the Supreme Court and this Court

As *Bruen* makes clear, the constitutionality of all firearms laws (including the two statutes at issue here) are not—contrary to defendants' claim—"effectively[] issues of first impression." (AOB 9.) But even if they were, defendants would be wrong.

The history of the Second Amendment establishes that the right belongs to law-abiding citizens and that Congress may impose commercial regulations consistent with that right. This Court has laid out that history many times. *See Teixeira*, 873 F.3d at 683-90 (reviewing historical record as to county ordinance regulating gun store locations); *Young v. Hawaii*, 992 F.3d 765, 786-813 (9th Cir. 2021),

---

*McDonald*'s approval of felon-dispossession statutes. In addition to the three concurring justices noted above, the three dissenters in *Bruen* agreed with the concurrences that "the Court's opinion" should be understood as "cast[ing] no doubt on [the] aspect of *Heller*'s holding" permitting felons to be prohibited from possessing firearms. *Bruen*, 142 S. Ct. at 2189 (Breyer, J., joined by Sotomayor and Kagan, JJ., dissenting). And two years earlier, Justices Thomas and Gorsuch wrote that *Heller* "recognized that history supported the constitutionality of some laws limiting the right to possess a firearm," including laws "prohibiting possession by felons and other dangerous individuals." *New York State Rifle & Pistol Ass'n v. City of New York*, 140 S. Ct. 1525, 1540-41 (2020) (Alito, J., joined by Thomas and Gorsuch, JJ., dissenting from denial of *certiorari*).

*abrogated by Bruen*, 142 S. Ct. at 2156 (same, as to open-carry restrictions); *Peruta v. Cnty. of San Diego*, 824 F.3d 919, 929-39 (9th Cir. 2016) (same, as to concealed-carry restrictions).

Restrictions on the possession of firearms date back to England in the late 1600s. Parliament first recognized a legal right to possess arms in the Bill of Rights, 1 W. & M. Sess. II, c. 2 (1688) (Eng.). The Bill recited that King James II, who had been deposed in the Glorious Revolution, had disarmed "severall good subjects being Protestants." *Id.* To prevent that abuse, the Bill guaranteed that "the Subjects which are Protestants may have Arms for their Defence suitable to their Conditions and *as allowed by Law*." *Id.* (emphasis added). While the Bill of Rights condemned the disarming of "good subjects," it allowed the disarming of irresponsible ones: it did not, for example, displace the Militia Act of 1662, which authorized local officials to disarm individuals they judged "dangerous to the Peace of the Kingdome." 14 Car. 2, c. 3, § 13 (Eng.). And relevant here, the English Bill of Rights— as interpreted by preeminent scholars on English law reflected in "authoritative historic accounts"—neither stated nor implied that the English right "encompassed an independent right to engage in firearms

commerce." *Teixeira*, 873 F.3d at 684 (citing 1 William Blackstone, *Commentaries on the Laws of England* 139-40 (1765) and 1 William Blackstone & St. George Tucker, *Blackstone's Commentaries: With Notes of Reference, to the Constitution and Laws, of the Federal Government of the United States, and of the Commonwealth of Virginia* 145 (St. George Tucker ed., 1803)).

The understanding the government could lawfully disarm non-law-abiding persons and enact regulations to effectuate disarmament laws remained intact in colonial America. *See Range*, 69 F.4th at 122-24 (Krause, J., dissenting) (reviewing colonial laws disarming "members of the political community . . . whom the authorities believed could not be trusted to obey the law," such as Catholics and nonconformist Protestants). For example, early legislatures prohibited Native Americans from owning firearms. Michael A. Bellesiles, *Gun Laws in Early America: The Regulation of Firearms Ownership, 1607-1794*, 16 Law & Hist. Rev. 567, 578-79 (1998).[9] And those early legislatures, in

---

[9] *See also* Act of Aug. 4, 1675, *5 Records of the Colony of New Plymouth* 173 (1856); Act of July 1, 1656, *Laws and Ordinances of New Netherland* 234-35 (1868).

turn, "passed laws in the first half of the seventeenth century making it a crime to sell, give, or otherwise deliver firearms or ammunition" to Native Americans. *Teixeira*, 873 F.3d at 685 (citing statutes);[10] *see also* Robert Spitzer, *Gun Law History in the United States and the Second Amendment Rights*, 80 Law & Contemp. Probs. 55, 57 (2017) (describing how the first General Assembly of Virginia met in Jamestown where it deliberated for five days and enacted a gun control law prohibiting individuals from selling firearms to Native Americans, "upon pain of being held a traitor to the colony and of being hanged"). At least two "colonies controlled more generally where colonial settlers could transport or sell guns." *Teixeira*, 873 F.3d at 685 (citing statutes).[11]

---

[10] *See Acts of Assembly, Mar. 1657-8, in* 1 William Waller Hening, *The Statutes at Large: Being a Collection of All the Laws of Virginia, from the First Session of the Legislature, in the Year 1619*, at 441 (1823); 1 J. Hammond Trumbull, *The Public Records of the Colony of Connecticut, Prior to the Union with New Haven Colony, May, 1665*, at 49, 182 (1850); A*ssembly Proceedings, February-March 1638/9, in Proceedings and Acts of the General Assembly of Maryland, January 1637/8—September 1664*, at 103 (William Hand Browne, ed., 1883); *Records of the Governor and Company of the Massachusetts Bay in New England* 196 (Nathaniel B. Shurtleff, ed., 1853).

[11] 1 J. Hammond Trumbull, *The Public Records of the Colony of Connecticut* at 138-39, 145-46; Acts of Assembly, Mar. 1675–76, 2 William Waller Hening, *The Statutes at Large: Being a Collection of All*

(continued  . . . .)

39

Further, religious minorities, such as Catholics in Maryland, Virginia, and Pennsylvania, were subject to disarmament. Bellesiles, *supra*, at 574; Joseph G.S. Greenlee, *The Historical Justification for Prohibiting Dangerous Persons from Possessing Arms*, 20 Wyo. L. Rev. 249, 263 (2020). And in the Revolutionary War era, the Continental Congress, Massachusetts, Virginia, Pennsylvania, Rhode Island, North Carolina, and New Jersey prohibited possession of firearms by people who refused to declare an oath of loyalty. *See United States v. Jackson*, 69 F.4th 495, 503 (8th Cir. 2023) (upholding § 922(g)(1) as applied to felons— nonviolent or otherwise—following *Bruen*); *id.* (citing statutes).[12] These laws, some which are repugnant and unconstitutional now, reveal that

---

*the Laws of Virginia, from the First Session of the Legislature, in the Year 1619*, at 336-37 (1823).

[12] *See 4 Journals of the Continental Congress*, 1774-1789, at 205 (Worthington Chauncey Ford ed., 1906); Act of Mar. 14, 1776, ch. 21, 1775-76 Mass. Acts 479; Act of May 1777, ch. III, 9 *The Statutes at Large; Being a Collection of all the Laws of Virginia* 281-82 (1821); Act of June 13, 1777, ch. 756 §§ 2-4, 1777 Pa. Laws 110, 111-13; Act of June 1776, *7 Records of the Colony of Rhode Island and Providence Plantations in New England 567* (1862); Act of Nov. 15, 1777, ch. 6, 1777 N.C. Sess. Laws 231; Act of Sept. 20, 1777, ch. XL, 1777 N.J. Laws 90.

early American legislatures denied arms to classes of individuals deemed unfit to possess them.

Colonies and early state legislatures also ordered punishment that "subsumed disarmament—death or forfeiture of a perpetrator's entire estate"—even for non-violent offenses. *See Jackson*, 69 F.4th at 503 (citing statues).[13] Capital punishment for felonies was "ubiquit[ous]" in the late eighteenth century and "'the standard penalty for all serious crimes.'" *Baze v. Rees*, 553 U.S. 35, 94 (2008) (Thomas, J., concurring in the judgment) (quoting Stuart Banner, *The Death Penalty: An American History* 23 (2002)). Indeed, the First Congress, which drafted and proposed the Second Amendment, made a variety of felonies punishable by death, including treason, murder on federal land, forging or

---

[13] *See* Act of Oct. 9, 1652, *Laws and Ordinances of New Netherland* 138 (1868) (forfeiture of firearms by persons who committed non-violent hunting offenses); Act of Apr. 20, 1745, ch. III, 23 *The State Records of North Carolina* 218-19 (1904) (same); *see also* See An Act for the Punishment of Certain Crimes Against the United States, Pub. L. No. 1-9, § 14, 1 Stat. 112, 115 (1790) (death or forfeiture of a perpetrator's entire estate—for non-violent offenses involving deceit and wrongful taking of property); Act of Feb. 21, 1788, ch. 37, 1788 N.Y. Laws 664-65 (same); Act of May 1777, ch. XI, 9 *The Statutes at Large*; *Being a Collection of all the Laws of Virginia* 302-03 (1821) (same); *A Digest of the Laws of Maryland* 255-56 (1799) (same).

counterfeiting a public security, and piracy on the high seas. *See* An Act for the Punishment of Certain Crimes Against the United States, 1 Stat. 112-15 (1790). This "widespread, continued condemnation of felons, including those who committed non-violent offenses, to death demonstrates that in 1791 Americans understood felons, as a group, to commit serious crimes." *Folajtar v. Attorney General*, 980 F.3d 897, 905 (3d Cir. 2020), *abrogated by Bruen*, 142 S. Ct. at 2127. The "framers could not have intended Second Amendment guarantees to apply to felons if, as a rule, all the felons were dead." Dru Stevenson, *In Defense of Felon-in-Possession Laws*, 43 Cardozo L. Rev. 1573, 1587 (2022); *see also Medina*, 913 F.3d at 158-59.

At the Founding, many precursors to the Second Amendment described the class of persons entitled to keep and bear arms using synonyms for "law-abiding, responsible citizens." For example, Anti-Federalists proposed a bill of rights that, among other things, forbade "disarming the people, or any of them, *unless for crimes committed, or real danger of public injury from individuals.*" 2 *The Documentary History of the Ratification of the Constitution (Documentary History)* 598 (Merrill Jensen ed., 1976) (emphasis added). The Federalists

42

defeated the proposal, but the Anti-Federalists published it in the Dissent of the Minority of the Convention, *id.* at 624, which was widely read and proved "highly influential," *Heller*, 554 U.S. at 604. At the Massachusetts ratifying convention, Samuel Adams similarly proposed a bill of rights that would have denied Congress the power "to prevent the people of the United States, *who are peaceable citizens*, from keeping their own arms." 6 *Documentary History* 1453 (John P. Kaminski & Gaspare J. Saladino eds., 2000) (emphasis added). A contemporary described the proposal as an effort to protect "the right of *peaceable citizens* to bear arms." Letter from Jeremy Belknap to Ebenezer Hazard (Feb. 10, 1788), in *7 Documentary History* 1583 (John P. Kaminski & Gaspare J. Saladino eds., 2001) (emphasis added). The convention rejected the proposal, but only because Adams had waited until the morning of the day of ratification to present it. *Id.* Although the precursors used different language from the Second Amendment, they shed light on the Amendment's meaning. *See Heller*, 554 U.S. at 604 (relying on the Pennsylvania, Massachusetts, and New Hampshire proposals to conclude that they "plainly" and "unequivocally referred to individual rights").

Not all limitations are explicit—the First Amendment, for example, does not protect "obscenity, libel, [or] disclosure of state secrets." *Id.* at 635. As Thomas Cooley explained in his "massively popular 1868 Treatise on Constitutional Limitations," *id.* at 616, "the people in whom is vested the sovereignty of the State . . . cannot include the whole population," and "[c]ertain classes have been almost universally excluded"—including "the idiot, the lunatic, and the felon, on obvious grounds." Thomas M. Cooley, *A Treatise on the Constitutional Limitations Which Rest Upon the Legislative Power of the States of the American Union* 28-29 (1st ed. 1868). That is, it would have been "'obvious'" to the founders that certain groups, including (but not necessarily limited to) "the felon," *Kanter v. Barr*, 919 F.3d 437, 446 n.6 (7th Cir. 2019), *abrogated by Bruen*, 142 S. Ct. at 2127 (quoting *Cooley*, *supra*, at 28-29), could properly be subject to disarmament laws, consistent with the "*pre-existing* right" that was "codified" in the Second Amendment, *Bruen*, 142 S. Ct. at 2127. *See also Heller*, 554 U.S. at 592; Stephen P. Halbrook, *The Founders' Second Amendment: Origins of the Right to Bear Arms* 273 (2008) (founding-era proponents of a constitutional right to bear arms "did not object to the lack of an explicit

exclusion of criminals from the individual right to keep and bear arms" during the debates over "what became the Second Amendment," because this limitation "was understood").

**C.   Sections 922(d)(1) and 922(a)(1)(A) are Commercial Restrictions that Do Not Infringe on a Law-Abiding Citizen's Right to Keep and Bear Arms**

As set forth above, the Second Amendment protects "the right of the people to keep and bear Arms."  U.S. Const. amend. II.  Where the validity of a restriction is challenged, a court looks to "the Second Amendment's plain text," as informed by "this Nation's historical tradition of firearm regulation."  *Bruen*, 142 S. Ct. at 2126.

As this Court has already held (and as *Bruen* repeatedly reaffirmed), felons are not part of the "the people" covered by the Second Amendment.  *See Vongxay*, 594 F.3d at 1115.  And as this Court held in *Teixeira*, 873 F.3d at 683, there is no "independent right to sell or trade weapons" absent an infringement on someone else's right to possess them.  These two principles foreclose defendants' arguments.  Section 922(d)(1) constitutionally prohibits people from selling guns to felons, and 922(a)(1)(A) constitutionally requires gun dealers to be licensed (and in any event, defendants make no argument that the

licensing requirement they evaded somehow infringed on someone else's right to possess a firearm).

### 1. Section 922(d)(1)'s prohibition on selling guns to felons is constitutional

The Second Amendment's plain text does not protect the conduct that 18 U.S.C. § 922(d)(1) prohibits. Section 922(d)(1) makes it "unlawful for any person to sell or otherwise dispose of any firearm . . . to any person knowing or having reasonable cause to believe that such person . . . has been convicted in any court of, a crime punishable by imprisonment for a term exceeding one year." 18 U.S.C. § 922(d)(1). That is the same definition of "felon" as contained in 18 U.S.C. § 922(g)(1). As explained above, there is no "independent right to sell or trade weapons." *Teixeira*, 873 F.3d at 683. "Sell or trade" is not "keep and bear."

Nor does preventing people from selling firearms to felons infringe upon anyone else's Second Amendment rights, because felons have no right to own firearms. *See, e.g.*, *Bacon*, 884 F.3d at 611-12 (finding, pre-*Bruen*, no "historical indication that the Second Amendment encompasses such sales" to felons); *United States v. Porter*, 2023 WL 113739, at *2-3 (S.D.W. Va. Jan. 5, 2023) (rejecting *Bruen* challenge

46

because § 922(d)(1) does not "implicate the plain text of the Second Amendment" and there are "sufficient historical analogues to indicate" that the regulation falls within the Nation's historical tradition); *United States v. Davis*, No. 2:22-cr-189, Report and Recommendation on Defendant's Motion to Dismiss, Dkt. No. 31 at 6-7 (E.D. Wis. filed Feb. 27, 2023) (rejecting argument that the Second Amendment extends to sellers or transferors).

Schlotterbeck, for his part, does not contend that the Second Amendment's plain text protects his conduct—selling or transferring a firearm to a felon. He instead claims that felons are part of the "people" (AOB 10-11) and thus have the same "ancillary rights" as anyone else to acquire firearms, *Teixeira*, 873 F.3d at 677. According to his logic, if § 922(g)(1), the law disarming felons, is unconstitutional, then the statute criminalizing the sale or transfer of a firearm to the same category of prohibited persons must also be unconstitutional. This argument fails.

*First*, the premise is wrong: § 922(g)(1) is not unconstitutional. As explained above, the Supreme Court and this Court have repeatedly defined the Second Amendment right as one belonging to law-abiding

47

citizens, which plainly does not include criminals. *See supra* Section

V.B.1.; *see also, e.g.*, *Heller*, 554 U.S. at 635 (describing the right to keep

and bear arms as a "right of law-abiding, responsible citizens"); *id.* at

626 & n.26 ("longstanding prohibitions on the possession of firearms by

felons" is an example of "presumptively lawful regulatory measures");

*McDonald*, 561 U.S. at 790 (observing that the Second Amendment

protects "the safety of . . . law-abiding members of the community" and

repeating "assurances" that Congress may disarm felons); *Vongxay*, 594

F.3d at 1115, 1118 (applying *Heller* to conclude that felons are

"categorically different from the individuals who have a fundamental

right to bear arms"); *Mai*, 974 F.3d at 1093-94 (Bumatay, J., joined by

Ikuta, Bade, Hunsaker, JJ., dissenting from denial of rehearing en

banc). Moreover, the Supreme Court in *Heller and McDonald*—and

now, *Bruen*—have repeatedly assured lower courts that nothing in its

decisions "should be taken to cast doubt on longstanding prohibitions on

the possession of firearms by felons . . . or laws imposing conditions and

qualifications on the commercial sale of arms" that are "presumptively

lawful." *Heller*, 554 U.S. at 626-27 & n.26; *McDonald*, 561 U.S. at 786;

*Bruen*, 142 S. Ct. at 2162 (Kavanaugh, J., joined by Roberts, C.J., concurring).

*Second*, the historical record supports the Supreme Court's and this Court's interpretation of the Second Amendment conferring the right to law-abiding citizens, not felons. *See supra* Section V.B.4. The Supreme Court's assurances and the historical record that backs them up, moreover, refutes the Third Circuit's view in *Range* that "the people" is not confined to "law-abiding citizens." 69 F.4th at 103.

*Third*, *Bruen* reinforces that the Second Amendment is "subject to certain reasonable, well-defined restrictions." *Bruen*, 142 S. Ct. at 2156; *see id.* at 2122 (reiterating *Heller's* and *McDonald's* holding that the Amendment protects "the right of an ordinary, law-abiding citizen to possess a handgun in the home"). There, the Court reiterated more than a dozen times that the right to keep and bear arms belongs to *law-abiding* citizens, *see supra* nn. 6-7, and explicitly approved of "shall-issue" licensing regimes that ensure those who carry guns "are, in fact, 'law-abiding, responsible citizens,'" *id.* at 2138 n.9 (citation omitted). *See Vincent v. Garland*, — F.4th —, 2023 WL 5988299, at *3 (10th Cir. Sept. 15, 2023) (*Bruen's* approval of regulations requiring criminal

background checks implies the constitutionality of denying firearm licenses to individuals with felony convictions).

Following *Bruen*, the courts of appeal uniformly agree that § 922(g)(1) does not violate the Second Amendment facially and as applied to persons convicted of a felony offense. The Eighth Circuit and Tenth Circuit have rejected § 922(g)(1) challenges as applied to felons—nonviolent or otherwise. *Jackson*, 69 F.4th at 502; *Vincent*, 2023 WL 5988299, at *1-4; *see also United States v. Dunn*, 76 F.4th 1062, 1068 (8th Cir. 2023) (rejecting post-*Bruen* challenge on plain error review). To reach that conclusion, the Eighth Circuit relied on the Supreme Court's repeated "assurances" of the validity of prohibitions on felons' possession of firearms. *Jackson*, 69 F.4th at 501-504. The Eighth Circuit also conducted a historical review of laws dating back to the 1600s through the Founding and determined that "legislatures traditionally employed status-based restrictions to disqualify categories of persons from possessing firearms," regardless of whether those actions are "best characterized as restrictions on persons who deviated from legal norms or persons who presented an unacceptable risk of dangerousness." *Id.* at 502-505; *Vincent*, 2023 WL 5988299, at *1-4

50

(finding that *Bruen* did not abrogate its precedent that found "no basis to draw constitutional distinctions based on the type of felony involved").  The Fifth Circuit similarly has rejected post-*Bruen* challenges to the constitutionality of § 922(g)(1) on plain-error review. *See, e.g.*, *United States v. Garza*, 2023 WL 4044442, at *1 (5th Cir. June 15, 2023); *United States v. Johnson*, 2023 WL 3431238, at *1 (5th Cir. May 12, 2023); *United States v. Roy*, No. 22-10677, 2023 WL 3073266, *1 (5th Cir. Apr. 25, 2023); *United States v. Hickcox*, No. 22-50365, 2023 WL 3075054, *1 (5th Cir. Apr. 25, 2023).[14]  In addition, over 100 district courts to have considered post-*Bruen* challenges to the constitutionality of § 922(g)(1) have upheld the statute.[15]  As these authorities show,

---

[14] This Court will first consider the constitutionality of § 922(g)(1) in *United States v. Registe*, C.A. No. 20-30042, which is scheduled for oral argument on November 16, 2023, and *United States v. Duarte*, C.A. No. 22-50048, which is scheduled for oral argument on December 4, 2023.

[15] For ease of reference, the government cites only examples of those decisions from within this Circuit. *See, e.g.*, *United States v. Guthery*, No. 2:22-cr-173, Dkt. No. 49 (E.D. Cal. Mar. 29, 2023); *United States v. Pena*, No. 2:22-cr-366, Dkt. No. 95 (C.D. Cal. Mar. 21, 2023); *United States v. Davis*, No. 1:21-cr-206, Dkt. No. 86 (E.D. Cal. Mar. 14, 2023); *United States v. Kilgore*, No. 1:21-cr-277, Dkt. No. 40 (E.D. Cal. Mar. 14, 2023); *United States v. Bacchus*, No. 2:22-cr-450, Dkt. No. 120 (C.D. Cal. Feb. 2, 2023); *United States v. Smith*, No. 2:19-cr-505, Dkt.

(continued  . . . .)

51

*Bruen* merely confirmed—again—that the Second Amendment belongs to law-abiding citizens, not felons.

---

No. 183 (C.D. Cal. Jan. 19, 2023); *United States v. Serrano*, No. 3:21-cr-1590, Dkt. No. 65 (S.D. Cal. Jan. 17, 2023*); *United States v. Moore*, No. 3:20-cr-474, Dkt. No. 100, 2023 WL 154588 (D. Or. Jan. 11, 2023); *United States v. Wondra*, No. 1:22-cr-99, 2022 WL 17975985 (D. Idaho Dec. 27, 2022); *United States v. Mugavero*, No. 3:22-cr-1716, Dkt. No. 29 (S.D. Cal. Dec. 19, 2022); *United States v. Dotson*, No. 3:22-cr-1502, Dkt. No. 26 (S.D. Cal. Dec. 12, 2022); *United States v. Tran*, No. 3:22-cr-331, Dkt. No. 63 (S.D. Cal. Dec. 12, 2022); *United States v. Fencl*, No. 3:21-cr-3101, Dkt. No. 81 (S.D. Cal. Dec. 7, 2022); *United States v. Perez-Garcia*, No. 3:22-cr-1581, Dkt. No. 70 (S.D. Cal. Dec. 6, 2022); *United States v. Walker*, No. 2:19-cr-234, Dkt. No. 83 (E.D. Cal. Dec. 6, 2022); *United States v. Jacobs*, No. 2:22-cr-160, Dkt. No. 28 (C.D. Cal. Nov. 28, 2022); *United States v. Brunson*, No. 3:22-cr-149, Dkt. No. 66 (S.D. Cal. Nov. 18, 2022); *United States v. Butts*, No. 9:22-cr-33, Dkt. No. 33 (D. Mont. Oct. 31, 2022); *United States v. Carleson*, No. 3:22-cr-32, Dkt. No. 39 (D. Ak. Oct. 28, 2022); *Walker v. United States*, No. 3:20-cv-31, Dkt. No. 16, 2022 WL 16541183 (S.D. Cal. Oct. 28, 2022); *United States v. Borne*, No. 1:22-cr-83, Dkt. No. 35 (D. Wyo. Oct. 24, 2022); *United States v. Ridgeway*, No. 3:22-cr-175, Dkt. No. 32, 2022 WL 10198823 (S.D. Cal. Oct. 17, 2022); *United States v. Ortiz*, No. 3:21-cr-2503, Dkt. No. 91 (S.D. Cal. Oct. 14, 2022); *United States v. Williams*, No. 3:21-cr-478, Dkt. No. 76 (S.D. Cal. Sept. 30, 2022); *United States v. Perez*, No. 3:21-cr-508, Dkt. No. 78 (S.D. Cal. Sept. 26, 2022); *United States v. Delpriore*, No. 3:18-cr-136, Dkt. No. 287 (D. Ak. Sept. 23, 2022); *United States v. Hill*, No. 3:21-cr-107, Dkt. No. 70, 2022 WL 4361917 (S.D. Cal. Sept. 20, 2022); *United States v. Rojo*, No. 3:21-cr-682, Dkt. No. 50 (S.D. Cal. Sept. 14, 2022); *United States v. Havins*, No. 3:21-cr-1515, Dkt. No. 62 (S.D. Cal. Sept. 12, 2022); *United States v. Nevens*, No. 2:19-cr-774, Dkt. No. 121 (C.D. Cal. Aug. 15, 2022); *United States v. Ramos*, No. 2:21-cr-395, Dkt. No. 31 (C.D. Cal. Aug. 5, 2022).

The district court's decision in *United States v. Quiroz*, 629 F. Supp. 3d 511 (W.D. Tex. 2023), does not undermine the authority described above. (AOB 11.) There, the district court reasoned that a right to possess a firearm necessarily encompasses a right to receive one. *Id.* at 516-17. But the district court said nothing about the right to sell or transfer a firearm, much less to sell or transfer a firearm to a felon. Indeed, the very judge who decided *Quiroz* issued a pair of decisions just days later that offered a thorough analysis of the historical and conceptual underpinnings of the Supreme Court's Second Amendment jurisprudence and concluded that § 922(g)(1) is constitutional under *Bruen*. *See United States v. Collette*, 630 F. Supp. 3d 841, 851 (W.D. Tex. 2022) (finding § 922(g)(1) consistent with *Bruen's* analysis of the Second Amendment because "this Nation has a 'longstanding' tradition of exercising its right—as a free society—to exclude from 'the people' those who squander their rights for crimes and violence"); *United States v. Charles*, 633 F. Supp. 3d 874, 888 (W.D. Tex. 2022) (same).

*Fourth*, even if this Court considered the law disarming felons anew and concluded that felons fall within the Second Amendment's

53

plain text, sufficient historical analogues indicate that § 922(g)(1) falls within this Nation's historical tradition.[16] *Bruen*'s historical-analogue inquiry "requires only that the government identify a well-established and representative historical *analogue*, not a historical *twin*." 142 S. Ct. at 2133. The representative analogues must be "relevantly similarly" as to "how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Id.* at 2127, 2131-33.

Here, and as already described, the United States has a long tradition, dating back to colonial times, of disarming persons who deviated from legal norms. *See supra* Section V.B.4; *see also Jackson*, 69 F.4th at 504-06. Thus, as to "how" the regulation "burden[s] a law-abiding citizen's right to armed self-defense," the answer is not at all: § 922(g)(1) imposes no burden on a law-abiding citizen. *See Hamilton*, 848 F.3d at 626 (A "conviction of a felony necessarily removes one from the class of 'law-abiding, responsible citizens' for the purposes of the

---

[16] Contrary to defendants' claims (AOB 12, 16), this Court need not remand for the district court to conduct a historical analysis in the first instance. *Teter v. Lopez*, 76 F.4th 938, 946-47 (9th Cir. 2023) (declining to remand for historical analysis when such an analysis involves "legislative facts" that the Court "can confidently decide" itself).

Second Amendment."). Moreover, the burden imposed on a felon's right (to the extent there is one), is comparable to historical laws disarming the untrustworthy and *less* severe than many historical felony-punishment laws, which often included the death penalty and forfeiture of one's property.[17] As to "why" the regulation burdens a law-abiding citizens' right, the modern and historical laws are "comparably justified." *Bruen*, 142 S. Ct. at 2133. The historical laws sought to punish those who deviated from legal norms, as well as to protect society from the untrustworthy. Section 922(g)(1) serves a more limited but equally justified purpose. It seeks to protect society from gun violence committed by felons, who have previously shown disregard for society's laws and are more likely to reoffend potentially in dangerous ways. *Rehaif v. United States*, 588 U.S. — , 139 S. Ct. 2191, 2201 (2019) (Alito, J., dissenting) (Section 922(g)(1) is "no minor provision," for it

---

[17] Nor is § 922(g)(1) a permanent firearm ban. Congress specifically identified ways to avoid the ban, such as by securing an expungement, pardon, or having one's civil rights restored. 18 U.S.C. § 921(a)(20). Additionally, although it is currently unfunded, Congress enacted 18 U.S.C. § 925(c), which allows the Bureau of Alcohol, Tobacco, and Firearms to restore an individual's right to possess a firearm upon consideration of the individual's personal circumstances. *See Logan v. United States*, 552 U.S. 23, 28 n.1 (2007).

"probably does more to combat gun violence than any other federal law.").

Schlotterbeck's only response, that there is no "historical analogy" for banning transfers to dangerous felons (AOB 12), runs headlong into this Court's precedent—which *Bruen* did not disturb and Schlotterbeck fails to address entirely—and the historical record. *See Vongxay*, 594 F.3d at 1118; *see also supra* Section V.B.4. And while then-Judge Barrett, in a dissenting opinion, interpreted the historical record as permitting legislatures to disarm only the dangerous, *Kanter*, 919 F.3d at 454, no court of appeals has adopted that categorical view following *Bruen, see Range*, 69 F.4th at 104 n.9 (declining to decide the issue). In any event, even if "dangerousness is considered the traditional *sine qua non* for dispossession," there is no historical tradition of an "an individualized determination of dangerousness as to each person in a class of prohibited persons," *Jackson*, 69 F.4th at 504.

*Fifth* and finally, defendant, as the proponent of an as-applied constitutional challenge, has the burden of showing that § 922(d)(1) is unconstitutional *as applied to him*. *See Hatfield v. Barr*, 925 F.3d 950, 953 (7th Cir. 2019) ("[S]omeone who wants us to carve out particular

felonies (or felons) from a category that the Supreme Court has said is presumptively valid must supply an adequate basis for that distinction."). Below, Schlotterbeck did not show that he sold or transferred a firearm to a *non-dangerous* felon (whatever that might mean), much less put forth a standard for courts to deploy to make that assessment. (3-ER-385-89.) Thus, even if this Court accepted his constitutional theory—that § 922(g)(1) is unconstitutional as applied to non-dangerous felons—Schlotterbeck is not entitled to relief.

In sum, the Second Amendment does not cover the conduct that § 922(d)(1) prohibits. Text and history establish that Schlotterbeck has no freestanding Second Amendment right to sell or transfer firearms, independent of a customer's ability to acquire and possess a firearm; and a felon (the purported customer) has no Second Amendment right to keep and bear arms.

### 2. Section 922(a)(1)(A)'s prohibition on unlicensed gun dealing is constitutional

Section 922(a)(1)(A) does not implicate the Second Amendment at all. And even if it did, this Court has already held that the historical record demonstrates that such a regulation fits well within this Nation's tradition of firearms regulation.

To begin, the question before the Court is a limited one. Section 922(a)(1)(A) forbids anyone "except a licensed importer, licensed manufacturer, or licensed dealer, to engage in the business of manufacturing, or dealing in firearms." 18 U.S.C. § 922(a)(1)(A). And "[e]ngaged in the business" is a defined term: "a person who devotes time, attention, and labor to manufacturing firearms as a regular course of trade or business with the principal objective of livelihood and profit through the repetitive purchase and resale of firearms." 18 U.S.C. § 921(21)(A) (2019) (version of the statute in force when defendants committed their criminal conduct). The term "principal objective of livelihood and profit" is also defined, meaning that the intent of the sale "is predominantly one of obtaining livelihood and pecuniary gain," as opposed to other intents like decreasing or increasing one's personal firearm collection. 18 U.S.C. § 921(22) (2019).

Thus, the Court need only assess whether the Second Amendment encompasses a person's right to manufacture firearms without a license as a regular course of trade or business to make a profit. The statute does not impact defendants' ability to keep or bear arms, to manufacture firearms for non-commercial purposes, or even to

58

commercially manufacture and sell firearms *with a license*.  And in the words of *Bruen*, this is a "shall-issue" license: a prospective dealer who wishes to obtain a license need only submit an application, be at least twenty-one years old, pay a fee, and establish lawful premises for selling firearms.  18 U.S.C. § 923(a), (d).  If the applicant fulfills these steps and is otherwise legally able to possess, transport, and ship firearms, the application must be approved.  18 U.S.C. § 923(d).

None of this violates anyone's right "to keep and bear Arms."  U.S. Const. amend. II.  As explained in *Heller*, "keep" means to "have weapons" and "bear" means to "carry" weapons.  554 U.S. at 582, 584 (quotations omitted).  Defendants' charged conduct—*unlicensed* manufacturing of assault weapons to sell wholesale or retail—does not fall within that operative language, as defined in *Heller*.  *See Teixeira*, 873 F.3d at 683 ("Nothing in the text of the Amendment, as interpreted authoritatively in *Heller*, suggests the Second Amendment confers an independent right to sell or trade weapons.").

*Bruen* reinforced the meaning that *Heller* and *McDonald* affixed to the Second Amendment.  The Court examined whether the Second Amendment protected petitioners Koch's and Nash's proposed course of

59

conduct—carrying handguns publicly for self-defense. 142 S. Ct. 2134-

35. Answering affirmatively, the Court relied on *Heller* and stated that

the "'textual elements'" of the Amendment's "operative clause"

"guarantee the individual right to possess and carry weapons in case of

confrontation." 142 S. Ct. 2134. Nothing in *Bruen* suggests, much less

implies, that the operative language extends to the unlicensed

commercial sale of firearms. To the contrary, and as noted, the Court

explicitly approved of state "shall-issue" licensing regimes so long as

those laws do not deny law-abiding citizens their right to keep and bear

arms, *id.* at 2138 n.9, and the concurring justices clarified that

"[n]othing" in its decision "should be taken to cast doubt on

longstanding . . . laws imposing conditions and qualifications on the

commercial sale of arms," which are "presumptively lawful," *id.* at 2162

(Kavanaugh, J., joined by Roberts, C.J., concurring) (quoting *Heller*, 554

U.S. at 626-27 n.26 and *McDonald*, 561 U.S. at 786).

Indeed, following *Bruen*, the district courts that have reached the

issue have rejected challenges to the constitutionality of § 922(a)(1)(A).[18]

---

[18] As far as the government is aware, no court of appeals has addressed the constitutionality of this statute following *Bruen*.

*See, e.g.*, *United States v. Deare*, No. 6:21-cr-00212-01, 2023 WL 4732568, at *2 (W.D. La. July 24, 2023) (agreeing that licensing/record-keeping requirements of 18 U.S.C. § 922(a)(1) "do not affect an individual's rights to possess firearms"); *United States v. Kazmende*, No. 1:22-cr-236-SDG-CCB, 2023 WL 3872209, at *5 (N.D. Ga. May 17, 2023), *report and recommendation adopted*, No. 1:22-cr-00236-SDG, 2023 WL 3867792 (N.D. Ga. June 7, 2023) (The Second Amendment "simply does not extend to the commercial sale of firearms."); *United States v. McNulty*, No. 22-cr-10037-WGY, 2023 WL 4826950, at *4 (D. Mass. July 27, 2023) (same); *United States v. Flores*, — F. Supp. 3d —, 2023 WL 361868, at *4-5 (S.D. Tex. Jan. 23, 2023) (same); *United States v. King*, No. 5:22-cr-00215-001, 2022 WL 17668454, at *3 (E.D. Pa. Dec. 14, 2022) (same); *United States v. Tilotta*, 2022 WL 3924282, at *6 (S.D. Cal. Aug. 30, 2022) ("[T]he natural reading of 'keep and bear arms' does not include the ability to sell or transfer firearms unrestricted."). As these authorities reflect, *Bruen* did not assign a new meaning to the Second Amendment that would confer a right to engage in firearms commerce without a license.

Defendants' argument, that the "right to keep and bear arms necessarily includes the right to manufacture firearms," is mistaken. (AOB 15.) As an initial matter, defendants did not simply manufacture firearms. *See supra* Section III.B.1. The indictment alleged that they engaged in the business of dealing and manufacturing firearms without a license (3-ER-491), and they pleaded guilty to that crime (2-ER-198-202, 218-222). Thus, whether one has a Second Amendment right to manufacture a firearm for one's own use (or to give to someone else) is not a question presented here.

As to the question actually presented, this Court has already held that the Second Amendment does not confer a "freestanding right to engage in firearms commerce," much less to do so without a license, "divorced from the citizenry's ability to obtain and use guns." *Teixeira*, 873 F.3d at 684. To be sure, the "core Second Amendment right to keep and bear arms for self-defense 'wouldn't mean much' without the ability to acquire arms," *id.* at 677. But this licensing regulation does not encroach on any law-abiding citizen's ability to acquire firearms—and defendants certainly have made no showing that a single law-abiding citizen could not acquire a firearm as a result of this regulation

prohibiting their conduct. Nor could they. Nothing in § 922(a)(1) prohibits individuals from possessing firearms for self-defense, or purchasing or selling firearms owned for personal, self-defensive use. *See Hosford*, 843 F.3d at 168. Section 922(a)(1)(A) "merely imposes a licensing requirement on those who wish to profit by regularly selling firearms outside of their personal collection; it serves, not as a prohibition, but as a condition or qualification." *Id.* That is not an effective ban, or even close—it prevents no one with a right to possess a firearm from doing so. *Cf. Teixeira*, 873 F.3d at 680. Defendants' logic would conflate requiring a license to operate a shooting range with effectively banning all shooting ranges. *Id.* at 679 (discussing *Ezell*, 846 F.3d at 894). That is not the law.

In sum, because § 922(a)(1)(A) does not "prevent 'law-abiding, responsible citizens' from exercising their Second Amendment right," it is no different than the licensing regimes that *Bruen* approved. 142 S. Ct. at 2138 n.9. Accordingly, the regulated conduct falls outside the Second Amendment.

Finally, although unnecessary to reach, 922(a)(1)(A)'s licensing requirement is consistent with the Nation's historical tradition of

firearms regulation. As noted above, this Court has already concluded that the historical record dating back to the 1600s and continuing through the Founding establishes that the Second Amendment did not encompass "an independent right to engage in firearms commerce." *Teixeira*, 873 F.3d at 684-85 ("colonial governments substantially controlled the firearms trade"); *id.* at 685 ("The government provided and stored guns, controlled the conditions of trade, and financially supported private firearms manufacturers (citing Solomon K. Smith, *Firearms Manufacturing, Gun Use, and the Emergence of Gun Culture in Early North America*, 49th Parallel, Vol. 34, at 6-8, 18-19 (2014)); *id.* (explaining that "colonial government regulation included some restrictions on the commercial sale of firearms" and citing statutes); *see supra* Section V.B.4.

Defendant ignores the historical analysis set forth in *Teixeira*. He instead relies on *Illinois Ass'n of Firearms Retailers v. City of Chicago*, 961 F. Supp. 2d 928 (N.D. Ill. 2014). In that case, however, the city proffered three state statutes from the late 1800s as its historical evidence justifying a virtual ban on "all sales and transfers inside the City's limits." *Id.* at 930-31. Here, the government has proffered

historical evidence dating back to the 1600s that this Court has cited in its own precedents to conclude that the Second Amendment does not "independently create[] a commercial entitlement to sell guns if the right of the people to obtain and bear arms was not compromised." *Teixeira*, 873 F.3d at 686. Defendants offer no reason to disregard this *en banc* Court's prior conclusion. Accordingly, § 922(a)(1)(A)'s licensing requirement complies with the Second Amendment.

//

//

# VI

# CONCLUSION

Defendants' convictions should be affirmed.

DATED: September 25, 2023

Respectfully submitted,

E. MARTIN ESTRADA
United States Attorney

MACK E. JENKINS
Assistant United States Attorney
Chief, Criminal Division

BRAM M. ALDEN
Assistant United States Attorney
Chief, Criminal Appeals Section

*/s/ Suria M. Bahadue*

SURIA M. BAHADUE
Assistant United States Attorney
Criminal Appeals Section

Attorneys for Plaintiff-Appellee
UNITED STATES OF AMERICA

## STATEMENT OF RELATED CASES

The government states, pursuant to Ninth Circuit Rule 28-2.6, that it is unaware of any cases that raise the precise issues presented here—that is, whether 18 U.S.C. § 922(d)(1) and 18 U.S.C. § 922(a)(1)(A) are constitutional after *New York State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111 (2022).

The government is aware, however, of a number of cases presenting a related issue, namely, whether 18 U.S.C. § 922(g)(1) is constitutional after *Bruen*:

*United States v. Registe*, C.A. 20-30042;

*United States v. Ramos*, C.A. 22-50177;

*United States v. Rojo*, C.A. 23-598;

*United States v. Butts*, C.A. 23-313;

*United States v. Howard*, C.A. 22-10211;

*United States v. Martinez*, C.A. 23-1125; and

*United States v. Bacchus*, C.A. No. 23-1857.

# CERTIFICATE OF COMPLIANCE

I certify that:

1.     This brief complies with the length limits permitted by Ninth Circuit Rule 32-1 because the brief contains 13,001 words, including words manually counted in any visual images and excluding the portions exempted by Fed. R. App. P. 32(f).

2.     This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface (14-point Century Schoolbook) using Microsoft Word 2016.

DATED: September 25, 2023          */s/ Suria M. Bahadue*

SURIA M. BAHADUE
Attorney for Plaintiff-Appellee
UNITED STATES OF AMERICA