Nos. 22-50281, 22-50283

IN THE UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff-Appellee, | ) |
| | ) |
| v. | ) |
| | ) |
| TRAVIS SCHLOTTERBECK and | ) |
| JAMES VLHA, | ) |
| | ) |
| Defendants-Appellants. | ) |
| | ) |

---

**APPELLANTS' JOINT REPLY BRIEF**

---

Appeal from the United States District Court
for the Central District of California

No. 19-CR-00343-GW
Hon. George H. Wu, United States District Judge

Katherine Kimball Windsor
Law Office of Katherine Kimball
Windsor
65 N. Raymond Avenue, Suite 320
Pasadena, CA 91103
Telephone: (213) 663-9219
Email: katy@windsorlaw.us

Attorney for Defendant-Appellant
**JAMES VLHA**

Edward M. Robinson (126244)
Rachael A. Robinson (313991)
Law Office of Edward M. Robinson
21515 Hawthorne Boulevard, Suite 730
Torrance, CA 90502
Telephone: (310) 316-9333
Facsimile: (310) 316-6442

Attorneys for Defendant-Appellant
**TRAVIS SCHLOTTERBECK**

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ................................................................................ 1

ARGUMENT ...................................................................................... 1

    I. Mr. Schlotterbeck's Conviction on Count Three Must Be Vacated
       Because 18 U.S.C. § 922(d)(1) is Unconstitutional ............................. 2

      A.   Mr. Schlotterbeck's Conduct Falls within the Scope of the
           Second Amendment Protections.................................................... 2

      B.  The Government Did not, and Cannot, Carry Its Burden to Rebut
           the Presumption ................................................................ 7

    II. Mr. Vlha's and Mr. Schlotterbeck's Conviction on Count One Must be
       Vacated Because 18 U.S.C. § 922(a)(1)(A) is Unconstitutional.......... 10

      A.   Mr. Vlha's and Mr. Schlotterbeck's Conduct in Manufacturing
           Firearms is Presumptively Protected ......................................... 10

      B.  The Government Did Not, and Cannot, Carry its Burden to Rebut
           this Presumption ............................................................ 16

CONCLUSION ................................................................................ 20

# <u>TABLE OF AUTHORITIES</u>

## Cases

*Andrews v. State*,
  50 Tenn. 165 (1871) ...................................................................... 3, 11

*Carey v. Population Servs., Int'l*,
  431 U.S. 678 (1977) ............................................................................ 12

*District of Columbia v. Heller*,
  554 U.S. 570 (2008) ..................................................................... passim

Ezell v. City of Chicago,
  846 F.3d 888 (7th Cir. 2017) ............................................................... 4

*Ill. Ass'n of Firearms Retailers v. City of Chicago*,
  961 F.Supp.2d 928 (N.D. Ill. 2014) ................................................. 3, 11

*Jackson v. City and County of San Francisco*,
  746 F.3d 953 (9th Cir. 2014) ....................................................... 3, 11, 12

*Kanter v. Barr*,
  919 F.3d 437 (7th Cir. 2019) .............................................................. 8, 9

*Maryland Shall Issue, Inc. v. Moore*,
  2023 WL 8043827 (4th Cir. November 21, 2023) ....................... 11, 15

*Minneapolis Star & Tribune Co. v. Minn. Comm'r of Revenue*,
  460 U.S. 575 (1983) ............................................................................ 12

*Morrison v. Olson*,
  487 U.S. 654 (1988) .............................................................................. 9

*New York State Rifle and Pistol Assn. v. Bruen*,
  579 U.S. –, 142 S. Ct. 2111 (2022) ............................................. passim

*Range v. Attorney General*,
  69 F.4th 96 (3d Cir. 2023) ............................................................ 6, 7, 8

*Teixeira v. County of Alameda*,
  873 F.3d 670 (2017) ..................................................................... passim

*United States v. Hosford*,
   843 F.3d 161 (4th Cir. 2016) ................................................................. 11

*United States v. Marzzarella*,
   614 F.3d 85 (3d Cir. 2010) ................................................................. 11

*United States v. Vongxay*,
   594 F.3d 1111 (9th Cir. 2010) ............................................................. 7

### Statutes

18 U.S.C. § 922 ........................................................................ passim

18 U.S.C. § 923 ............................................................................. 15

### Other Authorities

*Some Considerations on the Game Laws*,
   54 (1796) ............................................................................. 2

## **INTRODUCTION**

The Government's Answering Brief ("GAB") overlooks one fundamental issue in this case – the right to bear arms requires a right to receive and transfer those arms. If a felon is not prohibited from possessing a firearm, there is no crime in transferring one to him. And because the range of who qualifies as a felon has changed so radically from the time of founding, there can be no meaningful historical analog to the present case. For this reason, 18 U.S.C. § 922 (d)(1) is unconstitutional and Mr. Schlotterbeck respectfully requests that this Court vacate his conviction on Count 3.

With respect to 18 U.S.C. § 922(a)(1)(A), if the fundamental right to bear arms is to have any meaning, it must include the right to freely purchase and sell the firearms. As such, the limiting nature of 18 U.S.C. § 922(a)(1)(A) is unconstitutional and both Mr. Vlha and Mr. Schlotterbeck respectfully request that this Court vacate their convictions on Count 1.

## **ARGUMENT**

In *New York State Rifle and Pistol Assn. v. Bruen*, 579 U.S. –, 142 S. Ct. 2111, 2122 (2022), the Supreme Court expressly held:

> We reiterate that the standard for applying the Second Amendment is as follows: When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation. Only then may a court conclude that the

1

individual's conduct falls outside the Second Amendment's "unqualified command."

As argued in the opening brief, *Bruen* is dispositive in favor of Mr. Schlotterbeck and Mr. Vlha: this Court should recognize 18 U.S.C. §§ 922(a)(1)(A) and (d)(1) as unconstitutional on their face and dismiss the case against both defendants. If the Court is not inclined to dismiss, it should remand the case to the district court and hold the government to its heavy burden to demonstrate that both laws are "consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2126.

## I. Mr. Schlotterbeck's Conviction on Count Three Must Be Vacated Because 18 U.S.C. § 922(d)(1) is Unconstitutional

### A. Mr. Schlotterbeck's Conduct Falls within the Scope of the Second Amendment Protections

#### 1. The Government's Argument Misunderstands the Focus of 18 U.S.C. § 922(d)(1)

The transfer of firearms is presumptively protected under the Second Amendment, and the government's arguments to the contrary misunderstand both law and history. The Supreme Court in *District of Columbia v. Heller*, 554 U.S. 570, 583, n. 7 (2008) referred back to the founding, where the right to transfer and purchase firearms was inherent to the right to possess them. Literature at the time made clear that anyone who could afford purchase a firearm, had the right to possess one. *Id*., quoting *Some Considerations on the Game Laws*, 54 (1796) ("What law forbids the veriest pauper, if he can raise a sum sufficient for the

purchase of it, from mounting his Gun on his Chimney Piece...?") This understanding of the plain meaning of the Second Amendment has been applied throughout the nation's history. *See Andrews v. State*, 50 Tenn. 165, 178 (1871) ("The right to keep arms, necessarily involves the right to purchase them"); *Jackson v. City and County of San Francisco*, 746 F.3d 953, 968 (9th Cir. 2014) (prohibition on the sale of certain types of particularly lethal ammunition burdened Second Amendment right); *Ill. Ass'n of Firearms Retailers v. City of Chicago*, 961 F.Supp.2d 928 (N.D. Ill. 2014) (city ordinances allowing firearm sales and transfers only outside city limits burdened Second Amendment right).

In conflict with this long-recognized right, the government argues that the transfer of a firearm is not protected by the Second Amendment because there is no independent right to sell or trade weapons. GAB 46. In this context, the government's argument is fundamentally flawed and its reliance on *Teixeira v. County of Alameda*, 873 F.3d 670 (2017) is misplaced. In *Teixeira*, an *en banc* panel of this Court addressed the constitutionality of a county ordinance prohibiting a gun store from being located within 500 feet of any residential district, school, other gun store, or establishment that sold liquor. *Id.* at 678. The Court found the permitting laws to be constitutional under the Second Amendment in part because nothing in the law placed any "meaningful constraint" on the ability of gun purchasers in the area to obtain gun related services. *Id.* at 679-680.

This Court recognized that in other instances, where firearm regulations "severely limited" a class of individuals' accessibility to firearm related activity, courts have invalidated such restrictions as unconstitutional. *Id*.; *citing Ezell v. City of Chicago* ("*Ezell II*"), 846 F.3d 888 (7th Cir. 2017).

Here, 18 U.S.C. § 922(d)(1) infringes upon the ability of an entire class of would-be gun purchasers, "felons," to obtain gun related services. In other words, the conduct being criminalized or regulated here addresses not *how* an individual may sell or transfer a firearm but *to whom* an individual may sell or transfer a firearm. Therefore, the criminality of the conduct turns entirely on whether or not the individual at issue is legally entitled to possess a firearm. If, as argued below, a felon has a Second Amendment right to possess a firearm, then there is no crime here. It cannot be criminal conduct to transfer a firearm to an individual who is constitutionally entitled to possess it. Any other reading of the Second Amendment would allow the government to deprive entire classes of "the people" from possessing firearms by merely criminalizing the transfer of firearms to those people, rendering their Second Amendment right utterly toothless.

### 2. *The Plain Text of the Second Amendment Includes "Felons"*

Thus, the inquiry here must turn on whether or not an individual generally characterized by today's standards as a "felon" has a constitutional right to possess a firearm. The Supreme Court has answered this question.

First, the words "the people" in the Second Amendment have been interpreted throughout the Constitution to "unambiguously refer[ ] to all members of the political community, not an unspecified subset." *Heller*, 554 U.S. at 580. To the extent that the Court in *Heller* seemed to, at other times in the opinion, imply otherwise, that portion of the opinion is merely dicta and has been subsequently rejected. *Id*. at 626. As Justice Stevens noted in his dissent in *Heller*, "the class of persons protected by the First and Fourth Amendments is not so limited; for even felons (and presumably irresponsible citizens as well) may invoke the protections of those constitutional provisions. The Court offers no way to harmonize its conflicting pronouncements." *Id*. at 644 (Stevens, J., dissenting). The Supreme Court's streamlined analysis in *Bruen* does just that – it removes the conflicting pronouncements by considering only who would have been qualified to possess a firearm under the plain terms of the Constitution.[1]

Second, this streamlined approach is consistent with the understanding of "the people" throughout other provisions of the Constitution. As the Third Circuit

_____

[1] To the extent that concurring opinions in *Bruen* imply otherwise, those opinions are not binding on this Court and quite clearly fail to grapple with the "plain meaning" test required under *Bruen*. There is no way to reconcile the plain meaning of the term "the people" with a finding that any and all individuals categorized by today's standards as "felons" are precluded from protections under the Second Amendment. As the Third Circuit aptly noted, "the criminal histories of the plaintiffs in *Heller*, *McDonald*, and *Bruen* were not at issue in those cases. So their references to "law-abiding, responsible citizens" were dicta." *Range*, 69 F.4th at 101.

recently held, "[u]nless the meaning of the phrase "the people" varies from provision to provision – and the Supreme Court in *Heller* suggested it does not – to conclude that [a nonviolent felon] is not among 'the people' for Second Amendment purposes would exclude [that felon] from those rights as well." *Range v. Attorney General*, 69 F.4th 96, 102 (3d Cir. 2023). There is no reason to believe that this is what the Supreme Court intended in *Bruen*.

Finally, as noted by the Third Circuit, the Supreme Court's use of the term "'law-abiding, responsible citizens' is as expansive as it is vague." *Range*, 69 F.4th at 102. This Court need not grapple with this vague pronouncement, which is clearly dicta, but instead must consider whether the plain text of the Second Amendment protects felons' rights to possess firearms. Under the proper analysis, the answer is clearly yes.

The Second Amendment right presumptively "belongs to all Americans." *Heller*, 554 U.S. at 581. In other words, therefore, the Second Amendment's plain text covers the right of all people, including felons, to possess a firearm. *Bruen*, 142 S. Ct. at 2126; *see also Range*, 69 F.4th at 101 (finding that felons are included among "the people" in the Second Amendment). Therefore, 18 U.S.C. § 922(d)(1) is presumptively unconstitutional.

B. <u>The Government Did not, and Cannot, Carry Its Burden to Rebut the Presumption</u>

The government's recitation of cases post-*Bruen* that have upheld the constitutionality of prohibiting felons from possessing firearms fails to adequately address the new burden the Supreme Court has placed on it. 142 S. Ct. at 2126. Moreover, the government's reliance on this Court's decision in *United States v. Vongxay*, 594 F.3d 1111, 1118 (9th Cir. 2010) overlooks a critical line in that decision, where this Court recognized that, "the historical question" regarding whether or not felons were categorically excluded from the Second Amendment "has not been definitively resolved." Courts have since engaged in an exhaustive historical analysis resolving the issue.

Since the time of filing the opening brief, the Third Circuit has found that the blanket prohibition on felons' possession of firearms was unconstitutional, as applied to the defendant in that case. *Range*, 69 F.4th at 104-105. Its analysis is instructive here. Critically, the Third Circuit noted that the defendant there was nonviolent – he had been convicted of making a false statement to obtain food stamp assistance. *Id*. at 105. Given the nature of his crime, the *Range* Court highlighted the absurdity of comparing founding-era felony punishments to disarmament of felons today. *Id*. ("That Founding-era governments punished some nonviolent crimes with death does not suggest that the *particular* (and distinct) punishment at issue – lifetime disarmament – is rooted in our Nation's history and

7

tradition …founding-era governments' execution of some individuals convicted of certain offenses does not mean the State, then or now, could constitutionally strip a felon of his right to possess arms if he was not executed"). The Court also highlighted founding era laws that allowed many felons – who were not executed – to repurchase firearms after successfully completing a sentence and reintegrating into society. *Id*. Finally, the Court looked to "[f]ounding-era laws [which] often prescribed the forfeiture of the weapon used to commit a firearms-related offense without affecting the perpetrator's right to keep and bear arms generally." *Id*. Given this historical analysis, the court found that it was unconstitutional to strip the nonviolent felon defendant of his right to obtain and possess a firearm. *Id*. This historical analysis applies with equal force to Mr. Schlotterbeck's conduct here. There was never an indication that the "felon" at issue here was violent. The burden rests on the government to prove otherwise, and the government failed to meet its burden here.

Moreover, while perhaps not yet officially adopted, then-Judge Barrett's extensive historical analysis in her dissent in *Kanter v. Barr*, 919 F.3d 437, 451 (7th Cir. 2019), is both correct and complete. And the government makes no meaningful argument here against it. It was upon this precise analysis that the Supreme Court formulated its new constitutional test and nothing in *Bruen* suggested that her historical analysis was incorrect. That a Court has not yet

adopted it is not the relevant inquiry for this Court here – the only thing for this Court to decide is whether or not the government can provide a meaningful historical analog to the law as applied here. It has not and it cannot.

The facts of this case highlights the critical problems with the government's position. As then-Judge Barrett concluded, "[f]ounding-era legislatures *did not strip felons* of the right to bear arms simply because of their status as felons." *Kanter*, 919 F.3d at 451 (Barrett, J., dissenting) (*emphasis* supplied). This was a sting operation, and there was no actual felon at issue. The informant gave Mr. Schlotterbeck no information about what his alleged felony was. Thus, the entire scope of felony crimes is in question here. And there are significantly more crimes that qualify as felonies today than there were at the time of founding or thereafter. *See, e.g., Morrison v. Olson*, 487 U.S. 654, 728 (1988) (Scalia, J., dissenting) ("[w]ith the law books filled with a great assortment of crimes, a prosecutor stands a fair chance of finding at least a technical violation of some act on the part of almost anyone"). Conduct which was legal then now constitutes felonious conduct, and conduct which at the founding was considered criminal is now legal. While the government may be able to point to some historical analog for firearm prohibitions as to some felons, there is no possibility that the government can do so with respect to every type of felony that now exists.

Despite the burden clearly lying with the government, the government now makes the incomprehensible claim that the law is not unconstitutional as applied to Mr. Schlotterbeck because, "[b]elow, Schlotterbeck did not show that he sold or transferred a firearm to a non-dangerous felon (whatever that might mean), much less put forth a standard for courts to deploy to make that assessment." GAB at 57. This claim completely ignores the factual history of this case. As discussed above, Mr. Schlotterbeck was set up in a sting operation – there was no actual felon here. In order to maintain his constitutional rights, Mr. Schlotterbeck should not, and does not, have the burden of proving that a non-existent felon was not violent. The government's argument turns the Second Amendment's protections on their head is it would require every individual to prove their entitlement to the right. This is not the correct standard.

Thus, for these reasons and those addressed in Mr. Schlotterbeck's opening brief, Mr. Schlotterbeck's conviction on Count 3 should be vacated as the statute violates the plain terms of the Second Amendment.

## II. <u>Mr. Vlha's and Mr. Schlotterbeck's Conviction on Count One Must be Vacated Because 18 U.S.C. § 922(a)(1)(A) is Unconstitutional</u>

### A. <u>Mr. Vlha's and Mr. Schlotterbeck's Conduct in Manufacturing Firearms is Presumptively Protected</u>

The government's argument that 18 U.S.C. § 922(a)(1)(A) falls outside of the protections of the Second Amendment is misplaced. A law criminalizing the

manufacture and sale of firearms without a license clearly qualifies by its very nature as an "infringe[ment]" on the right to keep and bear arms. As courts across this country have held, "[c]ommercial regulations on the sale of firearms do not fall outside the scope of the Second Amendment." *United States v. Marzzarella*, 614 F.3d 85, 92 n.8 (3d Cir. 2010); *see also United States v. Hosford*, 843 F.3d 161, 167 (4th Cir. 2016) ("assum[ing], without holding, that the federal prohibition against unlicensed firearm dealing burdens conduct protected by the Second Amendment"); *Jackson*, 746 F.3d at 968 (handgun ordinance burdened Second Amendment right); *Maryland Shall Issue, Inc. v. Moore*, --F.4th --, 2023 WL 8043827 (4th Cir. November 21, 2023) (state statute requiring handgun qualification license as condition for purchasing handgun regulated conduct protected by the Second Amendment's plain text); *Ill. Ass'n of Firearms Retailers v. City of Chicago*, 961 F.Supp.2d 928 (N.D. Ill. 2014) (city ordinances allowing firearm sales and transfers only outside city limits burdened Second Amendment right). The historical record confirms this result. As early as 1871, courts recognized that the "right to keep arms, necessarily involve[d] the right to purchase them[.]" *Andrews v. State*, 50 Tenn. 165, 178 (1871). If the right to bear arms is to

have any meaning, it must include the right to freely purchase and sell the firearms citizens are constitutionally entitled to possess under *Heller* and *Bruen*.[2]

The government concedes, as it must, that licensing schemes can at least in some cases encroach on the Second Amendment right. *See* GAB 3. In *Bruen*, the Supreme Court did not address the constitutionality of burdens on the right to manufacture or sell firearms, but it clearly acknowledged that regulations could violate the Second Amendment, noting that it did not rule out constitutional challenges even to narrowly-drawn and objective licensing regimes if they denied "ordinary citizens their right to public carry." 142 S.Ct. at 2138 n. 9. And this Court acknowledged the same in *Teixeira*. 873 F.3d at 677 ("the Second Amendment protects ancillary rights necessary to the realization of the core right to possess a firearm for self-defense"), citing *Jackson*, 746 F.3d at 968 (prohibition on the sale of certain types of ammunition burdened the core Second Amendment right); *see id.* ("As with purchasing ammunition and maintaining proficiency in

---

[2] Indeed, in other contexts, the Supreme Court has recognized the common-sense notion that the right to engage in certain activity includes within it the right to engage in commercial transactions that make that activity possible. For example, in *Minneapolis Star & Tribune Co. v. Minn. Comm'r of Revenue*, 460 U.S. 575 (1983), the Court held that a tax on paper and ink products consumed in the production of publication violated the First Amendment because it impermissibly burdened freedom of the press. *Id.* at 585. Likewise, in *Carey v. Population Servs., Int'l*, 431 U.S. 678 (1977), the Court recognized that "[l]imiting the distribution of nonprescription contraceptives to licensed pharmacists clearly imposes a significant burden on the right of the individuals to use contraceptives if they choose to do so." *Id.* at 689.

firearms use, the core Second Amendment right to keep and bear arms for self-defense wouldn't mean much without the ability to acquire arms") (cleaned up).

The government wrongly argues that this Court's decision in *Teixeira* has already decided the first prong of the test set out in *Bruen*, a decision which issued over four years *after Teixeira*. *See* GAB 57-63. In *Teixeira*, this Court addressed a different regulation than the statute challenged here, and as discussed below, much of the historical research cited by the government concerns an entirely different issue – whether the Second Amendment confers a right to sell firearms entirely divorced from the right to keep and bear arms. *See Teixeira*, 873 F.3d at 681-82; *see also* discussion infra at II. The government is also incorrect to insist that the analysis in *Teixeira* remains unaffected by *Bruen*. *See* GAB 31 (arguing that *Teixeira* is still good law). Contrary to the government's claim that *Texiera* did not use the two-step means-end balancing test rejected by *Bruen*, *see* GAB 20, 30, *Teixeira* specifically cites and applies the means-end test. 873 F.3d at 682 ("We apply a two-step inquiry to examine Teixeira's claim. We first ask whether the challenged law burdens conduct protected by the Second Amendment, and if so, we then determine the appropriate level of scrutiny") (cleaned up); *id*. at 679 n.10 (discussing level of scrutiny). *Teixeira* also placed the burden on the petitioner, *see* 873 F.3d at 680-81, while the *Bruen* test places the burden on the government to justify the regulation. *See* 142 S.Ct. at 2129-30, 2135 (government has burden to

13

show that regulation is consistent with historical tradition of firearm regulation).[3] And *Teixeira*'s dismissal of First Amendment analysis, *see* 873 F.3d at 688 ("the language of the Second Amendment is specific as to whose rights are protected and what those rights are, while the First Amendment is not"), conflicts with *Bruen*'s affirmative adoption of First Amendment analysis which grew out of *Heller*. 213 S.Ct. at 2130 ("This Second Amendment standard accords with how we protect other constitutional rights. Take, for instance, the freedom of speech in the First Amendment, to which *Heller* repeatedly compared the right to keep and bear arms"). Regardless of whether any part of *Teixeira* survives, it is irrelevant to the issue here where this Court must apply *Bruen*'s new two-part test.

Nor is the dicta in and around footnote 26 of *Heller* and in footnote 9 of *Bruen* controlling. *See* GAB 24-25, citing *Heller*, 554 U.S. at 626-27 and n. 26 ("nothing in our opinion should be taken to cast doubt on longstanding prohibitions on … laws imposing conditions and qualifications on the commercial sale of arms"); GAB 60, citing *Bruen*, 142 S.Ct. at 2138 n. 9 ("nothing in our analysis should be interpreted to suggest the unconstitutionality of the 43 States' "shall-issue" licensing regimes…"). The Fourth Circuit recently rejected this argument:

---

[3] The means-end analysis permeates the entire decision from its first line highlighting the State's interest in passing the law at issue. *See Teixeira*, 873 F.3d at 673 ("The County of Alameda seeks to preserve the health and safety of its residents …").

> …[I]t would be poor judicial practice to "read a footnote" in a
> Supreme Court case to "establish the general rule" for that case.
> *United States ex re. Schutte v. SuperValu Inc.*, 598 U.S. 739 (2023),
> 143 S.Ct. 1391, 1403 n. 6, 216 L.Ed.2d 1 (2023). *Bruen* was not shy
> about telling lower courts how to handle Second Amendment
> challenges: We turn to the Amendment's "text," "informed by
> history," and by "the historical tradition that delimits the outer bounds
> of the right." *Bruen*, 142 S.Ct. at 2127. So if we have to choose
> between the outcome dictated by text, history, and tradition and the
> outcome hinted at in dicta, it is no contest: Text, history, and tradition
> wins every time.

*Maryland Shall Issue, Inc.*, 2023WL 8043827 at *5 and n.9. The Fourth Circuit

also noted that *Bruen*'s footnote 9 pertains to the second step of the test, as

opposed to the first: "So the Court here was comparing the burdens may-and-shall-

issue regimes impose for purposes of identifying historical analogues to justify

them, not to explain when the Second Amendment is triggered in the first place."

*Id.* In any event, this Court should not consider the government's arguments about

the licensing required being of the "shall-issue" type. *See* GAB 59, citing 18

U.S.C. § 923(a),(d). The factual basis of the appellants' conditional pleas states:

"At all relevant times, neither defendant nor his co-conspirators had applied for or

been issued a firearms license from any federal, state, or local governmental entity

to engage in business as firearms or ammunition importers, manufacturers, or

dealers within the State of California." 2-ER-199, 219. No evidence of what was

required for licensing by the various authorities – federal, state, and local – was

presented to the district court and thus it is outside the record.

B. <u>The Government Did Not, and Cannot, Carry its Burden to Rebut this Presumption</u>

Relying on the outdated analysis in *Teixeira*, the government makes little attempt to meet its burden on the second step of the *Bruen* rubric which requires a showing that § 922(a)(1)(A) is consistent with this nation's historic tradition of firearm regulation. In *Teixeira*, this Court addressed the "right to sell firearms" as a right separate and apart under the Second Amendment from the right to bear arms, finding that the historical evidence "demonstrates that the right codified in the Second Amendment did not encompass a freestanding right to engage in firearms commerce divorced from the citizenry's ability to obtain and use guns." 873 F.3d at 684. Drawing from the Supreme Court's analysis in *Heller,* this Court pointed to the English Bill of Rights and William Blackstone's Commentaries on the Laws of England, both of which "recognized the right to bear arms in England to have been held by individual British subjects as a means to provide for the preservation of personal liberties." *Id*. at 684. The Court then found meaning in the silence -- these sources' *lack* of discussion of a right to engage in firearms commerce meant that there was no such right. *Id*. at 686 ("Yet no contemporary commentary suggests that the right codified in the Second Amendment independently created a commercial entitlement to sell guns if the right of the people to obtain and bear arms was not compromised.") The *Teixeira* Court then looked to colonial sources demonstrating the government's involvement in helping to ensure that the

16

populace was well-armed by "provid[ing] and stor[ing] guns, control[ling] the conditions of trade, and financially support[ing] private firearms manufacturers." *Id*. at 685 (citation omitted). It also noted that the colonies "regulated the sale of weapons to some degree," pointing to restrictions "making it a crime to sell, give, or otherwise deliver firearms or ammunition to Indians." *Id*. It found that there is no individual right to sell a firearm unconnected to the right to keep and bear arms. *Id*. at 686-87.

But that question is not the one before the Court today. The appellants have not asked this Court to divorce the right to bear arms from the right to manufacture and sell arms. *See*, *e.g*., *id*. at 687 ("We emphasize that in many circumstances, there will be no need to disentangle an asserted right of retailers to sell firearms from the rights of potential firearm buyers and owners to acquire them, as the Second Amendment rights of potential customers and the interests of retailers seeking to sell to them will be aligned"). The appellants entered conditional pleas to conspiring to engage in the business of manufacturing and dealing in firearms without a license in violation of § 922(a)(1)(A). Under *Bruen*, the government is required to identify an American tradition justifying § 922(a)(1)(A)'s infringement on the Second Amendment right to keep and bear arms by requiring licensing for manufacture and dealing of firearms by law-abiding people. The Court's reliance in *Teixeira* on the *absence* of affirmative statements of an independent right to sell

17

arms does not address the inquiry required by *Bruen*; none of the *Teixeira* sources prove a government tradition of restricting firearms manufacture or sale, except the limited one restricting sales to Indians, an offensive relic which has nothing to do with § 922(a)(1)(A). The government's out-of-context citation of *Teixeira* for the proposition that "colonial governments substantially controlled the firearms trade" is misleading, *see* GAB 64; what this Court pointed to were practices designed to encourage, not restrict, the *arming* of the citizenry.

The historical analysis required by *Bruen* focuses on tradition at the time of the founding and the ratification of the Second Amendment in 1791. Evidence that long pre-dates or post-dates ratification does not illuminate the scope of the right if "linguistic or legal conventions changed in the intervening years." *Id*. at 2136. In particular, as the Court noted in *Bruen,* "post-Civil War discussions of the right to keep and bear arms took place 75 years after the ratification of the Second Amendment" and so provide limited insight into its meaning. *Id*. at 2137.

Where the regulation confronts a longstanding "general societal problem" that the founders could have addressed but did not or addressed through "materially different means," the regulation is unconstitutional. *Id*. at 2131. The government, instead, must point to a tradition of "distinctly similar historical regulation" in order to meet its burden. *Id*. Where the societal problem addressed

by the regulation is "unprecedented," however, the government has more leeway. *Id*. at 2132.

Here, the "societal problem" that 18 U.S.C. § 922(a)(1)(A) is designed to address—presumably, the manufacture and sale of firearms by people who are not monitored —has persisted since the founding. Thus, the government must point to a robust tradition of similar historical regulation in order to sustain its burden. The government, however, has not pointed to any similar licensing regulation in the historical tradition, instead focusing on sales to felons or other person who might qualify as dangerous. But § 922(a)(1)(A) does not contain any such element of danger – it criminalizes manufacturing and sale without a license, regardless of the background and law-abidingness of the person conducting the manufacturing or sales. The government utterly fails to meet its burden that criminalizing law-abiding citizens from manufacturing and sales of firearms without a license is rooted in this Nation's history and tradition as codified by the Second Amendment.

## **<u>CONCLUSION</u>**

For the foregoing reasons, Mr. Schlotterbeck and Mr. Vlha respectfully requests that this Court vacate the convictions and dismiss the case against them. Alternatively, Mr. Schlotterbeck and Mr. Vlha respectfully request that this Court vacate the convictions and remand to the district court with instructions to conduct a hearing consistent with the Supreme Court's holding in *Bruen*.

Dated:  December 6, 2023

By:  */s/ Edward M. Robinson*

Edward M. Robinson
Attorneys for Defendant-Appellant
TRAVIS SCHLOTTERBECK

By: */s/ Katherine Kimball Windsor*

Katherine Kimball Windsor
Attorney for Defendant-Appellant
JAMES VLHA

## CERTIFICATE OF COMPLIANCE

Pursuant to Ninth Circuit Rule 32(e)(4), I certify that the Appellant's Reply Brief is:

 X  Proportionately spaced, has a typeface of 14 points or more, and contains 4,778 words.

Dated: December 6, 2023          *s/ Katherine Kimball Windsor*

KATHERINE KIMBALL WINDSOR